# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JAMAL KIYEMBA, as Next Friend of
ABDUSABUR DOE, *et al.*,

      Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

      Respondents/Defendants.

Case No. 1:05-cv-01509-RMU

**APPLICATION FOR
PRELIMINARY INJUNCTION
AND MEMORANDUM IN
SUPPORT THEREOF**

**(Oral Argument Requested)**

## INTRODUCTION

Petitioners Abdusabur Doe, Abdusamad Doe, Abdunasir Doe, Hammad Doe, Hudhaifa Doe, Jalaal Doe, Khalid Doe, Saabir Doe and Saadiq Doe (hereinafter "Petitioners") are prisoners at the United States Naval Station, Guantánamo Bay, Cuba ("Guantánamo"). Based on recent Government announcements and press reports, Petitioners believe that they may be transferred to the custody of a foreign government without a hearing and without proper consideration of the likelihood they will be of tortured by the transferee government. Accordingly, pursuant to Fed. R. Civ. P. 65 and the All Writs Act, 28 U.S.C. § 1651, Petitioners request that the Court issue a Preliminary Injunction preventing the Government from transferring them from Guantánamo to any other location absent thirty-days advance written notice to Petitioners and their Counsel.

## BACKGROUND

### I.    Uighur Detainees at Guantánamo

As detailed in the Petitioners' July 29, 2005, *habeas corpus* petition ("Petition") and

August 17, 2005, Motion for Order to Show Cause, Petitioners are believed to be ethnic Uighurs

("WEE-ghurs") from the Xinjiang Uyghur Autonomous Region, a province of the People's

Republic of China (also referred to as "East Turkistan").  Uighurs are a Turkic Muslim minority

group that has been, and continues to be, brutally oppressed by the communist Chinese

government. *See* U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES –

2004 (Feb. 28, 2005), *at* http://www.state.gov/g/drl/rls/hrrpt/2004/41640.htm ("The [Chinese]

Government used the international war on terror as a pretext for cracking down harshly on

suspected Uighur separatists expressing peaceful political dissent.") (hereinafter "China

Report").

Strikingly, the Government has repeatedly acknowledged that many—*if not most*—of the

Uighurs imprisoned at Guantánamo have been exonerated by the Government in its Combatant

Status Review Tribunals ("CSRT") or otherwise. *See, e.g.*, Interview with Pierre-Richard

Prosper, United States Ambassador at Large for War Crimes, in Washington, D.C., at 1-2 (Aug.

25, 2005) (discussing efforts to release and resettle the Uighur population at Guantánamo)

(hereinafter "Prosper Interview") (attached at Ex. 1); Robin Wright, *Chinese Detainees Are Men*

*Without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at Guantánamo With*

*Nowhere to Go*, WASH. POST, Aug. 24, 2005 ("In late 2003, the Pentagon quietly decided that 15

Chinese Muslims detained at the military prison at Guantánamo Bay, Cuba, could be released.")

(hereinafter "Wright Article") (attached at Ex. 2); Interview with Gordon England, Secretary of

the Navy, in Washington, D.C., at 3 (Mar. 29, 2005) ("I think it has been reported we have

Uighurs from China that we have not returned to China, even though, you know, some of those have been deemed, even before these hearings, to be non-enemy combatants because of concerns and issues about returning them to their country."); Interview with Colin Powell, Secretary of State, in Washington, D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantánamo. The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at."). Yet despite these acknowledgements, the Uighurs still languish in prison at Guantánamo. Meanwhile, the Government continues to assert its authority detain the Uighurs for "as long as it takes." Tr. of Status Conference before the Hon. James Robertson at 18 (Aug. 25, 2005), *Qassim v. Bush*, Civ. No. 05-497 (JR) (attached at Ex. 3).

Reportedly, the Government has been having a difficult time locating a third country willing to admit Uighurs. *See, e.g.*, Prosper Interview at 1 ("We've approached probably about 25 countries."); Josh White, *5 Chinese Detainees Given More Freedom at Guantánamo*, WASH. POST, Aug. 26, 2005 (attached at Ex. 4); Neil A. Lewis, *Guantánamo detainees pose dilemma: Eligible for release, the Muslim Uighurs could be in danger if returned to China*, N.Y. TIMES, Nov. 15, 2004 (attached at Ex. 5). These difficulties counsel in favor of judicial circumspection to ensure that any Uighur detainees scheduled for release are transferred to a safe country that will not collapse under anticipated pressure from the Chinese government to repatriate the Uighurs to China. *See* AMNESTY INT'L, PEOPLE'S REPUBLIC OF CHINA, UIGHURS FLEEING PERSECUTION AS CHINA WAGES ITS "WAR ON TERROR" (2004) ("Amnesty International has received credible allegations that during this visit [to Guantánamo], which reportedly lasted

between one and two weeks, Chinese officials took photographs of the Uighurs and interrogated them about their backgrounds."), http://web.amnesty.org/library/index/engasa170212004.

## II.     Rendition and Transfer of Detainees to a Foreign Country

Petitioners have reason to fear that they will be rendered or transferred to countries where they could be tortured, abused or detained indefinitely without due process of law. Upon information and belief, the United States has moved Guantánamo detainees to other countries for interrogation without complying with legal procedures. This practice, known as "rendition" or "extraordinary rendition," is thought to be used to facilitate interrogation through torture, and detainees are "rendered" to countries where torture is routine.

American and international news organizations have documented the Government's use of this practice. Citing CIA, FBI, and other Government sources, The Washington Post, The L.A. Times, and The New Yorker, amongst others, have reported that the Government has transferred detainees such as the Petitioners into the custody of foreign governments that engage in torture. According to *The Washington Post*:

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries, including Egypt . . ., whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, WASH. POST, Mar. 11, 2002 (attached as Ex. 6).

These "renditions" are based on agreements between the United States and foreign governments "to have local security services hold certain terror suspects in their facilities for interrogation by CIA and foreign liaison officers." Dana Priest, *Long-Term Plan Sought for*

*Terror Suspects,* WASH. POST, Jan. 2, 2005 (attached at Ex. 7); *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* WASH. POST, Dec. 26, 2002 (in cases involving "lower-level captives, the CIA hands them to foreign intelligence services—notably those of Jordan, Egypt and Morocco—with a list of questions the agency wants answered. These 'extraordinary renditions' are done without resort to legal process and usually involve countries with security services known for using brutal means.") (attached at Ex. 8).

The Government has acknowledged that Guantánamo detainees may be transferred to the control of another government, including their country of citizenship, for continued detention and prosecution. *See* Decl. of Pierre-Richard Prosper at 2 (filed in *Qassim v. Bush*) (emphasis added) (hereinafter, "Prosper Decl.") (attached at Ex. 9). Accordingly, there can be no doubt that the prospect of rendition is a real danger that each of the Petitioners faces.

Distressingly, the latest reports indicate that the Department of Defense is poised to *greatly accelerate the pace of renditions and transfers* of Guantánamo detainees to foreign countries. *See* Andrea Koppel & Elise Labott, *U.S. Officials: Gitmo Transfer talks Active,* CNN, Aug. 10, 2005 ("The United States and at least 10 other nations are involved in negotiations that could drop the detainee population at Guantánamo Bay by 80 percent—or approximately 410 people—within the coming months, State Department officials said.") (attached at Ex. 10); Josh White & Robin Wright, *Afghanistan Agrees to Accept Detainees: U.S. Negotiating Guantánamo Transfers,* WASH. POST, Aug. 5, 2005 ("The Bush administration is negotiating the transfer of nearly 70 percent of the detainees at the U.S. detention facility in Guantánamo Bay, Cuba, to three countries as part of a plan.") (attached at Ex. 11); Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba,* N.Y. TIMES, Mar. 11, 2005 (hereinafter "Jehl Article") (attached at Ex. 12).

- 5 -

The government's decision to transfer detainees is apparently directly related to judicial action in the Guantánamo *habeas* cases. As noted in the Jehl Article, Defense Department officials have stated that "adverse court rulings ha[ve] contributed to their determination to reduce the population at Guantánamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects." This brings up the possibility of jurisdictional battles following any transfer of Petitioners to a foreign country. The Government may try and argue that transfer, by itself, would divest this Court of jurisdiction to grant Petitioners' requested relief. Regardless of the merits of such an argument, it's important for the Court to consider the practical harm to Petitioners that such a stance would cause.

Furthermore, any rendition of Petitioners to China would be disastrous. According to the State Department, in China during 2004 "[f]ormer detainees reported credibly that officials used electric shocks, prolonged periods of solitary confinement, incommunicado detention, beatings, shackles, and other forms of abuse. . . . Deaths in custody due to police use of torture to coerce confessions from criminal suspects continued to occur." China Report § 1.c. The State Department reports particularly harsh abuse of the ethnic Uighur Muslims of Eastern Turkistan in China's Xinjiang Province:

> Uighurs were sentenced to long prison terms and sometimes executed during the year on charges of separatism. During the strike-hard campaign, which officially concluded in 2003, authorities stated they prosecuted more than 3,000 cases in Xinjiang and held mass sentencing rallies attended by more than 300,000 persons. By its own account, the Government broke up 22 groups engaged in what it claimed were separatist and terrorist activities and meted out 50 death sentences to those charged with separatist acts from January to August. In July, two Muslim Uighurs reportedly were executed after being convicted in Aksu City, Xinjiang, of illegally organizing the East Turkestan People's Party and using armed tactics to split the country. Approximately 15 others were convicted of separatism and sentenced to long prison terms in the same case. In October 2003, Uighur Shaheer Ali was executed after being convicted of terrorism. *He had been repatriated forcibly from Nepal in*

- 6 -

> *2002, where he had been interviewed by the UNHCR and granted refugee status.*

*Id.* § 5 (emphasis added). These reports emphasize the potential for harm that Petitioners face.

The Government's official policy on the rendition of detainees is "not to transfer a person to a country if it determines that it is *more likely than not* that the person will be tortured." Prosper Decl. at 2 (acknowledging the Secretary of Defenses responsibility for the "transfer of detainees from Guantánamo Bay to other governments either for release or for further detention, investigation, prosecution or control, as appropriate"). Ignoring the fact that our Government finds it permissible to unilaterally transfer people—including non-enemy combatants—who've been imprisoned for years absent judicial process, and without the protection of international law, it's particularly troubling to consider that the Government is willing to transfer such a detainee to a country where it perceives there to be a *49% chance that the detainee will be tortured.* The danger of this policy highlights the potential harm to Petitioners upon transfer from Guantánamo, and the urgent need for the Court to enter a Preliminary Injunction against their removal absent proper notice.

To be sure, at the heart of the Petition is a request by Petitioners to be released from unlawful detention, and, depending on the circumstances, transfer to another country may be an acceptable resolution. There is strong evidence, however, that "release" or transfer may simply be a change of warden from Guantánamo to a foreign state where abuse is routine and due process unavailable. Under such circumstances, and in light of the Petitioner's isolation from counsel and the outside world, notice, a hearing, and an impartial fact finding are vital to ensure that any transfer from Guantánamo (i) safeguards the Court's jurisdiction, (ii) protects the Petitioners' rights to meaningfully challenge their detention and (iii) will not subject the Petitioners to torture or abuse. Furthermore, the requested relief merely seeks to preserve the

status quo. Accordingly, Petitioners are entitled to a preliminary injunction preventing their transfer absent proper notice and a hearing.

## STATEMENT OF FACTS

Due to Government restrictions on communicating with detainees at Guantánamo, undersigned counsel has had no direct contact with Petitioners. Accordingly, information concerning the backgrounds and statuses of each Petitioner is limited.

Upon information and belief, all the petitioners are Uighurs who have been held at Guantánamo for more than three years. Eight of the nine Petitioners are believed to be citizens of the People's Republic of China. The ninth Petitioner, Saddiq Doe, however, is thought to be an ethnic Uighur who is a citizen of Saudi Arabia. Furthermore, upon information and belief, **Petitioner Saddiq Doe has been exonerated by the Government in a Combatant Status Review Tribunal**. *See* Declassified Notes of Clive A. Stafford Smith (July 2, 2005) (attached at Ex. 13). In light of these facts, it appears that each Petitioner faces a real likelihood of immediate and surreptitious transfer to a potentially dangerous foreign country.

## ARGUMENT

### I.   Petitioners are Entitled to a Preliminary Injunction

Petitioners' request meets the most fundamental purpose of preliminary injunctive relief: "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 MOORE'S FEDERAL PRACTICE § 65.20 (3d ed. 2004). Moreover, each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) the Petitioners will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioners are likely to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the Government

- 8 -

from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

Where the balance of hardships tips decidedly in favor of the moving party, it will "ordinarily be enough that the [Movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

A.    Petitioners Are Likely to Succeed on the Merits of their Claims

Petitioners have properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004) ("We...hold that [28 U.S.C.] § 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantánamo Bay Naval Base."). Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). On information and belief, in response to recent "adverse court rulings," the Government is "determine[ed] to reduce the population at Guantánamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects." *See* Jehl Article. "Releasing" Petitioners from Guantánamo, where their detention is subject to habeas review, to the custody of a foreign sovereign where it is not, may enable the Government to perpetuate the detention while doing an end-run around this Court's ability to grant effective relief.[1] The requested injunction is essential to protect the Court's jurisdiction. *See* 28 U.S.C. § 1651(a); *Vision Communications*, 74 F.3d at 291.

---

[1] The Court need not reach here the question of whether rendition would deprive it of jurisdiction. At a minimum, it would practically limit the Court's ability to fashion practical and effective relief.

- 9 -

Moreover, the underlying Petition raises weighty issues that already have been resolved largely in Petitioners' favor by Judge Green in *In re Guantánamo Detainee Cases. See generally* 355 F. Supp. 2d 443 (D.D.C. 2005). As Judge Collyer ruled in *Abdah v. Bush*, "the Petitioners . . . raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the executive." Memo. Op. (Mar. 12, 2005) (Civ. No. 04-1254) (hereinafter "Abdah Order") (attached at Ex. 14). Petitioners here ask no more than the opportunity for this Court's deliberative consideration of their claims, claims which raise issues that are so serious, substantial, and difficult as to warrant maintaining the status quo. *See id.* at 6 (*citing Washington Metro. Area Transit Comm'n*, 559 F.2d at 844).

    B.    <u>The Balance of Harm Manifestly Favors the Petitioners</u>

Whether rendered to China, or somewhere else altogether, Petitioners stand to suffer immeasurable and irreparable harm. Transfer to another country, even if "only" for continued imprisonment, may effectively circumvent Petitioners' rights to adjudicate the legality of their detention in this Court.

> While the Supreme Court has granted them a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in habeas corpus, because the U.S. courts would no longer have control over their warden. . . . With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners.[2]

*Abdah* Order at 7-8.

---

[2] In *Abdah*, Judge Collyer suggested that transfer of petitioners back to their native Yemen for release would cause them no harm because it is the goal of their habeas petition. *Abdah* Order at 8. Here, by contrast, such a presumption is unwarranted as "release" to China may be the functional equivalent of continued detention and torture.

By contrast, Respondents, who on information and belief have already held Petitioners for more than three years, are asked only to give thirty-days advance notice prior to transferring the Petitioners from Guantánamo. This would merely facilitate judicial review (to the extent necessary). Such a requirement would have no impact "on the Government's efforts to arrange transfers of Guantánamo Bay detainees but would ensure that a judicial officer reviews the Petitioners' rights to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer." *Id.* at 9-10.

C.    There Is a Clear Public Interest in Preventing the United States from Rendering the Petitioners to Foreign Countries for Detention and Torture

The final criterion does not warrant extensive discussion. Public policy favors requiring the Government to give adequate notice of any planned transfer of Petitioners away from Guantánamo and out of the Court's jurisdiction where there is a risk that the Petitioners will be delivered into the hands of torturers. No matter how satisfied the executive branch may be that its actions are lawful, the public good requires that a federal litigant—one properly before the Court and represented by counsel—be provided with a meaningful opportunity to contest his transfer to places that may have a demonstrated record of torturing detainees. The notion that the public interest might favor permitting the Government make such a transfer without meaningful review is unthinkable. The Government has detained these individuals for more than three years without trial, without counsel, and without charges. There can be no possible harm to national security, or any other legitimate interest, if the Respondents are merely required to give adequate notice of a planned transfer.

## CONCLUSION

For the foregoing reasons, the Petitioners ask that Respondents be required to give Petitioners and their counsel no less than thirty-days advance written notice of any proposed transfer of the

- 11 -

Petitioners away from Guantánamo Bay Naval Station, the proposed destination, and of the proposed

date of transfer.

Dated: September 7, 2005

By: _____

Sabin Willett
Neil G. McGaraghan
Jason S. Pinney
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
Telephone:    (617) 951-8000
Facsimile:    (617) 951-8925

Susan Baker Manning
Kara L. Haberbush
Hope M. Jarkowski
BINGHAM McCUTCHEN LLP
1120 20th Street, NW, Suite 800
Washington, DC  20036
Telephone:    (202) 778-6150
Facsimile:    (202) 778-6155

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Telephone:    (212) 614-6439

- 12 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMAL KIYEMBA, as Next Friend of
ABDUSABUR DOE, *et al.*,

      Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

      Respondents/Defendants.

Case No. 1:05-cv-01509-RMU

**DECLARATION OF JASON
STILES PINNEY RE
APPLICATION FOR
PRELIMINARY INJUNCTION
AND MEMORANDUM IN
SUPPORT THEREOF**

**(Oral Argument Requested)**

I, Jason Stiles Pinney, declare as follows:

1.    I am over 18 years of age. I have personal knowledge of the facts stated herein, except those stated on information and belief, and, if called upon, could and would testify competently to them. I make this declaration in support of Abdusabur Doe, Abdusamad Doe, Abdunasir Doe, Hammad Doe, Hudhaifa Doe, Jalaal Doe, Khalid Doe, Saabir Doe and Saadiq Doe's (hereinafter "Petitioners"), acting on their own behalf and through their Next Friend, Jamal Kiyemba, Application for Preliminary Injunction and Memorandum in Support Thereof. I am associated with Bingham McCutchen LLP, counsel for Petitioner.

2.    A true and correct copy of an interview with Pierre-Richard Prosper, U.S. Ambassador at Large for War Crimes in Washington, D.C. dated Aug. 25, 2005, is attached as Exhibit 1.

3.    A true and correct copy of an article by Robin Wright, *Chinese Detainees Are Men Without a County: 15 Muslims, Cleared of Terrorism Charges, Remain At Guantánamo With Nowhere to Go*, WASH. POST, Aug. 24, 2005, is attached as Exhibit 2.

4.    A true and correct copy of the Transcript of Status Conference Before the Hon. James Robertson, Aug. 25, 2005, *Qassim v. Bush*, Civ. No. 05-497 (JR), is attached as Exhibit 3.

5.    A true and correct copy of an article by Josh White, *5 Chinese Detainees Given More Freedom at Guantánamo*, WASH. POST, Aug. 25, 2005, is attached as Exhibit 4.

6.    A true and correct copy of an article by Neil A. Lewis, *Guantánamo Detainees Pose Dilemma: Eligible for Release, the Muslims Uighurs Could be in Danger if Returned to China*, N.Y. TIMES, Nov. 15, 2004, is attached as Exhibit 5.

7.    A true and correct copy of an article by article by Rajiv Chanrasekaran and Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects,* WASH. POST, Mar. 11, 2002, is attached as Exhibit 6.

8.    A true and correct copy of an article by Dana Priest, *Long-Term Plan Sought for Terror Suspect*, WASH. POST, Jan. 2, 2005, is attached as Exhibit 7.

9.    A true and correct copy of an article by Dana Priest and Barton Gellman, *U.S. Decries Abuse But Defends Interrogations*, WASH. POST, Dec. 26, 2002, is attached as Exhibit 8.

10.    A true and correct copy of a Declaration by Pierre-Richard Prosper (filed in *Qassim v. Bush*, Civ. No. 05-497 (JR)) is attached as Exhibit 9.

11.    A true and correct copy of an article by Andrea Koppel & Elise Labott, *U.S. Officials: Gitmo Transfer Talks Active*, CNN, Aug. 9, 2005, is attached as Exhibit 10.

12.    A true an correct copy of an article by Josh White & Robin Wright, *Afghanistan Agrees to Accept Detainees U. S. Negotiating Guantánamo Transfers*, WASH. POST, Aug. 5, 2005, is attached as Exhibit 11.

13.    A true and correct copy of an article by Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, N.Y. TIMES, Mar. 11, 2005, is attached as Exhibit 12.

14.    A true and correct copy of the Declassified Notes of Clive A. Stafford Smith (July 2, 2005), is attached as Exhibit 13.

15.    A true and correct copy of Memo. Op. (Mar. 12, 2005) (Civ. No. 04-1254), is attached as Exhibit 14.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed on September 7, 2005, in Boston, Massachusetts.

_____
Jason Stiles Pinney

# **EXHIBIT 1**

# National Public Radio

National Public Radio
Morning Edition

August 25, 2005

Analysis: Chinese detainees at Guantanamo get hearing

Edition: 11:00 AM-12:00 Noon

Article Text:

STEVE INSKEEP, host:

A federal judge will hear arguments today concerning the fate of two men being held at the US military detention center at Guantanamo Bay, Cuba. The men are Uighurs. That's a minority Muslim group in northwestern China. They've been held at the remote military base for more than three years, even though the administration has determined that the men are no longer a risk to the United States. To find out why, we've called on NPR national security correspondent Jackie Northam.

JACKIE NORTHAM reporting:

Very little is known about the two Chinese Muslim men who are at the core of today's federal court hearing, but their situation has exposed the deep flaw in the Bush administration's policy on holding suspected terrorists at Guantanamo Bay. What is known is that Abu Bakker Qassim and Adel Abdu al-Hakim grew up in China. The Pentagon says the two received weapons training by the Taliban in Afghanistan. Both! men were captured and sent to Guantanamo in June of 2002.

More than a year ago, the Pentagon determined that the two Uighurs are not enemy combatants and so by rights should be allowed to leave Guantanamo. But Pierre-Richard Prosper, the US ambassador at large for war crimes, says the two men face persecution and perhaps torture if they're sent home to China.

Ambassador PIERRE-RICHARD PROSPER (US Ambassador At Large For War Crimes): When we made a decision that we wanted to release these Uighurs, we also decided that we were not prepared to send them back to China. So as a result, we had to find a third country for resettlement.

NORTHAM: Prosper says the US government has been actively trying to find a country that will take Qassim and Hakim, as well as more than a dozen other Uighurs being held at Guantanamo, with no luck.

Amb. PROSPER: We've approached probably about 25 countries.

NORTHAM: And...

Amb. PROSPER: Well, different degrees of response. Some is, you know, the flat-out no, some, you know, lukewarm, and others we continue to go back and forth with.

NORTHAM: Alex Biscaro is spokesman for the Swiss Embassy in Washington, DC. He says the US approached his government informally to see if it would be interested in taking the Uighurs.

Mr. ALEX BISCARO (Spokesman, Swiss Embassy): The question was whether there is a possibility to get them into Switzerland and with a status of refugees. And that was the main hurdle we have, was what kind of status can be given to them because, actually, technically or legally speaking, it's difficult to put them into a refugee status. So we have severe legal hurdles, so that we had to decline.

NORTHAM: Some countries have looked to the United Nations' High Commissioner for Refugees, or UNHCR, to determine refugee status before they agreed to resettle anyone. Jennifer Pagonis, a spokesman for the UNHCR in Geneva, says her organization needs more details about the Uighurs before it makes that determination.

Ms. JENNIFER PAGONIS (Spokesman, UNHCR): We don't have any information. We don't know who these people are, what their stories are, what were the circumstances surrounding their arrests. So, you know, if we don't have any of this information, we can't really know whether they're of concern to us or not.

NORTHAM: Pagonis says the UNHCR would need to talk to each of the Uighurs before making that determination, but the UNHCR has not been invited to Guantanamo to talk to the Uighurs and it won't be invited until it can give the administration a sense of whether or not it can help sort out the problem, says the State Department's Prosper.

Amb. PROSPER: In other words, there's no sense in having them go to Guantanamo if they know right now that they will not be able to, A, classify them as refugees, and then, B, help us with the resettlement process.

NORTHAM: But lawyers for the Uighurs say it's wrong for their clients to have to sit in prison while the administration tries to find them somewhere to live. US military officials say the men will be moved into a newly refurbished minimum security prison at Guantanamo and they'll have access to DVDs, communal dinners and more time for recreation. Sabin Willett, defense lawyer for Qassim and Hakim, argues that his clients should either be allowed to live on the civilian side of the Guantanamo Base or, Willett says, that the judge hearing the case should bring the two men to the United States and grant them some kind of parole.

Mr. SABIN WILLETT (Lawyer for Qassim and Hakim): That is, release them to the care and custody of some of the ex-pat Uighurs who are resident in the area and subject to, you know, reporting conditions or something like that until the State Department ultimately works out a country for them to go to.

NORTHAM: But Brad Berenson, a Washington lawyer who was involved in formulating the administration's legal strategy regarding detainees, says that the Uighurs cannot be allowed to resettle in the US. Mr. BRAD BERENSON (Washington Lawyer): What if our determination that they no longer present a danger to us is incorrect? I think it would be very, very hard for the president or the secretary of Defense or the secretary of State to justify to the American public releasing someone into our population, on our soil, if it later turns out they really were hostile to us and are, in fact, armed jihadists.

NORTHAM: That's the same argument that several governments made when asked why they turned down overtures by Washington to resettle the Uighurs held at Guantanamo.

Jackie Northam, NPR News, Washington.

INSKEEP: This is NPR News.

Copyright ©2005 National Public Radio®. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio. This transcript may not be reproduced in whole or in part without prior written permission. For further information, please contact NPR's Permissions Coordinator at (202) 513-2030.
Record Number: 200508251104

**<u>EXHIBIT 2</u>**

**NewsRoom**

Citation                    Search Result        Rank(R) 1 of 1        Database
8/24/05 WP-BUS (No Page)                                                WP-BUS

8/24/05 Wash. Post (Bus. Sec.) (Pg. Unavail. Online)
2005 WLNR 13274237

Washington Post
Copyright 2005 The Washington Post

**August 24, 2005**

**Chinese Detainees** Trapped in Limbo at Guantanamo

By Robin Wright

WASHINGTON _ In late 2003, the Pentagon quietly decided that 15 Chinese Muslims detained at the military prison in Guantanamo Bay, Cuba, could be released. Five were people who were in the wrong place at the wrong time, some of them picked up by Pakistani bounty hunters for U.S. payoffs. The other 10 were deemed low-risk detainees whose enemy was China's communist government _ not the United States, according to senior U.S. officials.

More than 20 months later, the 15 still languish at Guantanamo Bay, imprisoned and sometimes shackled, with most of their families unaware whether they are even alive.

They are men without a country. The Bush administration has chosen not to send them home for fear China will imprison, persecute or torture them, as the United States charges has happened to other members of China's Muslim minority. But the State Department has also been unable to find another country to take them in, according to U.S. officials and recently filed court documents.

Other detainees cleared of terrorism charges have also languished for years at Guantanamo Bay, but all have been sent home or are in the process of being transferred. For the Chinese Uighurs (pronounced WEE-gurs), there is no end in sight. About 20 countries _ including Sweden, Finland, Switzerland, Turkey and a Latin American country _ have turned down U.S. overtures to give them asylum, according to U.S. officials.

The State Department says it is still working behind the scenes to find the Uighurs a home. A senior official called their situation ``unfortunate.''

This month, lawyers and human rights groups appealed to the United States to take in the stranded Uighurs. ``It's not like these people were once considered to be a threat and now are not,'' said Tom Malinowski of Human Rights Watch. ``These people need to be released, either in another country or the U.S. They're America's responsibility.''

But the Bush administration has balked at allowing them to enter the United States, even under restricted supervision, or to appear in a court that is

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





8/24/05 WP-BUS (No Page)

hearing two of the men's cases, according to U.S. officials and court documents.

In the meantime, the men are still treated as prisoners. Sabin Willett, a Boston lawyer who volunteered to take the cases of two Uighurs in March, finally met with them last month, after he and his team went through their own FBI clearances. One of the Uighurs was ``chained to the floor'' in a ``box with no windows,'' Willett said in an Aug. 1 court hearing.

``You're not talking about your client?'' asked Judge James Robertson of the U.S. District Court in Washington.

``I'm talking about my client,'' Willett said.

``He was chained to a floor?'' Robertson asked again.

``He had a leg shackle that was chained to a bolt in the floor,'' Willett replied.

For more than three years, Willett's clients _ Abu Bakker Qassim, 36, and Adel Abdu Hakim, 31 _ had been denied legal counsel. Then, in March, another detainee with an attorney asked his lawyer to help them find representation through a legal process called ``next friend authorization.''

Most facts in the Uighur cases are still classified secrets. Lawyers are not allowed to provide information unless facts are revealed in court papers or hearings. But the basics are beginning to come to light _ and Robertson is now pressing for action. This past Friday, the judge ordered the government to disclose the status of efforts to relocate the two men at a hearing on Thursday.

All 15 Uighurs have actually been cleared for release from Guantanamo Bay twice, once after a Pentagon review in late 2003 and again last March, U.S. officials said. Seven other Uighurs were ruled to be enemy combatants and will continue to be detained.

Even after the second decision, however, the government did not notify the 15 men for several months that they had been cleared. ``They clearly were keeping secret that these men were acquitted. They were found not to be al-Qaida and not to be Taliban,'' Willett said. ``But the government still refused to provide a transcript of the tribunal that acquitted them to the detainees, their new lawyers or a U.S. court.''

Through the next friend authorization process, Willett and his team have now taken on the cases of 10 other Uighur detainees _ although they know only the first names of nine of their new clients.

Uighurs are a Muslim minority whose heartland is in northwestern China. They are a Turkic people who speak a language similar to others in neighboring Central Asian nations and have long sought autonomy in China's Xinjiang province _ a region Uighurs refer to as East Turkistan.

Uighur dissidents have engaged in sporadic attacks against the Chinese

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





8/24/05 WP-BUS (No Page)

government in Xinjiang province. Chinese authorities accuse Uighur separatists of a committing a series of bombings and assassinations since 1990, according to the Council on Foreign Relations.

Ironically, many view the United States as a ``beacon of hope'' that ``will assist in the Uighurs' quest for fundamental freedom and human dignity,'' said Nury Turkel, a U.S.-trained lawyer and president of the Uighur American Association in Washington.

``They are not soldiers. They are not criminals. They are just Uighur people,'' Willett argued in court. ``... There might not be a more pro-U.S. Muslim group in the world. The Uighurs have traditionally suffered under religious and political oppression at the hands of the Communist Chinese, and I can remember a time when that made a person someone we liked in this country.''

Information on how the Uighurs ended up at Guantanamo is scarce and limited to U.S. summations from interrogations. Qassim and Hakim fled the city of Ghulja in China to Central Asia in 2001. They met in Kyrgyzstan and traveled to Pakistan, then to Afghanistan, where they received training in use of small arms, according to a recent court statement by Brig. Gen. Jay W. Hood, commander of Joint Task Force Guantanamo.

After the United States attacked Afghanistan in 2001, they fled to Pakistan, where they were captured by bounty hunters, according to their lawyers and court papers.

Transcripts from the tribunals, obtained through the Freedom of Information Act, indicate why the Uighurs ended up in Guantanamo Bay and what their intentions were.

``That is true, I went to Afghanistan,'' said one detainee who is clearly a Uighur based on information in the transcript. ``The reason is number one: I am scared of the torture from my home country. Second: if I go there I will get some training to fight back against the (deleted) government.''

``We have nothing to do with the Taliban or the Arabs. We have nothing to do with the U.S. government or coalition forces. We never thought about fighting with the Americans,'' another testified. ``I want you to understand what our goal is: just to fight against the (deleted) government. If there is nothing happening in the future, we would like to stay wherever, abroad, to do our business.''

In court papers, the administration acknowledged the dangers facing Uighurs if they are returned to China. Yet Chinese officials were allowed to visit and question the Uighurs two years ago, according to their lawyers. In recently declassified material, Hakim said that a Chinese interrogator was allowed to take a photo of him with the help of Guantanamo personnel and despite his efforts to resist.

The Justice Department has argued in court that it has no obligation to release the Uighurs because of ``wind-up power,'' which gives a government the time

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




8/24/05 WP-BUS (No Page)

necessary at the end of a conflict to figure out what to do with detainees. As a precedent, it cited the treatment of Italians held in the United States after World War II.

Lawyers and human rights groups are concerned that incarceration has tainted the Uighurs forever.

``These people are branded by being in Guantanamo. Even if cleared for doing nothing wrong, it doesn't erase the stain,'' said Barbara Olshansky, deputy legal director of the Center for Constitutional Rights, the New York-based nonprofit organization that found volunteer attorneys for Qassim and Hakim. ``It's a terrible toll to place on people for our mistakes.''

   -0-<

Staff writer Josh White and researcher Julie Tate contributed to

this report.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36))

INDUSTRY:  (Aerospace & Defense (1AE96); Defense (1DE43))

REGION:  (Afghanistan (1AF45); China (1CH15); Americas (1AM92); Southern Asia (1SO52); North America (1NO39); Asia (1AS61); Western Europe (1WE41); Eastern Asia (1EA61); Latin America (1LA15); Cuba (1CU43); Scandinavia (1SC27); Europe (1EU83); Northern Europe (1NO01); USA (1US73); Pakistan (1PA05); Indian Subcontinent (1IN32); Caribbean (1CA06); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (CHINESE; CHINESE DETAINEES TRAPPED; CHINESE UIGHURS; COMMUNIST CHINESE; FBI; JOINT TASK FORCE; JUSTICE DEPARTMENT; PENTAGON; STATE DEPARTMENT; US DISTRICT COURT; UIGHUR; UIGHUR AMERICAN ASSOCIATION; UIGHURS; WEE)  (Abu Bakker Qassim; Adel Abdu Hakim; Barbara Olshansky; Bush; Hakim; Ironically; James Robertson; Jay W. Hood; Josh White; Julie Tate; Nury Turkel; Qaida; Qassim; Robertson; Sabin Willett; Staff; Tom Malinowski; Willett)

Word Count: 1641
8/24/05 WP-BUS (No Page)

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





**<u>EXHIBIT 3</u>**

Abu Bakker Qassim, et al. vs.                    CV 05-497                         August 25, 2005
George W. Bush, et al.

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et          :        Civil Action No. 05-497
al.,                           :
          Plaintiffs,          :        August 25, 2005
v.                             :
GEORGE BUSH, et al.,           :
          Defendants           :        2:00 p.m.
. . . . . . . . . . . . . :     . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiffs:      P. SABIN WILLETT, ESQUIRE
                         BINGHAM McCUTCHEN, LLP
                         150 Federal Street
                         Boston, Massachusetts  02110-1726
                         (617) 951-8684

                         SUSAN BAKER MANNING, ESQUIRE
                         BINGHAM McCUTCHEN, LLP
                         1120 20th Street, NW
                         Suite 800
                         Washington, D.C.  20036-3406
                         (202) 778-6172
                         BARBARA J. OLSHANSKY, ESQUIRE
                         CENTER FOR CONSTITUTIONAL RIGHTS
                         666 Broadway
                         New York, New York  10012
                         (212) 614-6439
For the Defendants:      TERRY M. HENRY, ESQUIRE
                         U.S. DEPARTMENT OF JUSTICE
                         CIVIL DIVISION
                         20 Massachusetts Avenue, NW
                         Room 7144
                         Washington, D.C.  20530
                         (202)514-4107
Court Reporter:          REBECCA KING, RPR, CRR
                         Official Court Reporter
                         Room 4802-B, U.S. Courthouse
                         Washington, D.C. 20001
                         (202) 898-9398
Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

United States District Court                 202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                          Official Court Reporter

Abu Bakker Qassim, et al. vs.                CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 2

```
 1                    P R O C E E D I N G S

 2          COURTROOM DEPUTY:  Civil action number 05-CV-497,

 3    Abu Bakker Qassim, et al. versus George W. Bush, et al.

 4    P. Willett and Susan Baker Manning for the plaintiff; Terry

 5    Marcus Henry for the defendant.

 6          THE COURT:  Counsel, I set this hearing by an order

 7    that I issued last week, perhaps somewhat hopefully, thinking

 8    that between then and now the parties might have an opportunity

 9    to talk with each other and perhaps work out what I have called

10    a just and honorable solution to the problem before us.

11          And I don't have any particular agenda for this

12    hearing, except I do have a number of questions.  But I think we

13    should begin, perhaps, simply by asking -- well, the petitioner

14    can go first.  Tell me if you will, sir, what changes, if any,

15    have occurred since you were last here on August 1st, and what

16    the present situation is with your clients, as you understand

17    it.

18          MR. WILLETT:  Good afternoon, Your Honor.  Sabin

19    Willett of Bingham McCutchen for the petitioners.  With me is

20    Susan Baker Manning and the Center For Constitutional Rights.

21          Mr. Henry and I did have a chance to speak after your

22    order.  We were not able to narrow our differences.  What has

23    happened with respect to my clients is that on the 19th of

24    August, Ms. Manning and I were able to communicate by telephone

25    with them.  Also on that day, my client Adel Abdul Hakim spoke
```

United States District Court                202-898-9398                Rebecca King, RPR, CRR
For the District of Columbia                                           Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 3

1    by telephone with his sister.  It was a little bit awkward to

2    organize that; his sister had to travel to Stockholm to the

3    U.S. Embassy and speak on a secure phone.  But my grandmother

4    always said, if you don't like someone's coat, you should

5    compliment her hat, so we do compliment the Government's hat for

6    arranging that telephone call.

7            It is my understanding that our clients are in a place

8    called Camp Iguana.  It's still a prison; there are, as I

9    understand it, somewhat better conditions than the prison they

10   used to be in.

11           The other development I would say, Your Honor, is one

12   that I have not learned myself, I have been reading about it in

13   the press.  And that is, it now appears from the public

14   statements both that Ambassador Prosper made on the radio this

15   morning and that were reported by the Washington Post yesterday,

16   that the Government has been involved in this effort for

17   two years, that they have struck out with two-dozen countries,

18   and that this thing isn't going anywhere any time soon.

19           And I don't know if now is the time to argue, or you

20   have other questions, but I did want to at some point today

21   return to what we now see is the only legitimate solution to

22   this problem.

23           THE COURT:  You have met with your clients once.  Is

24   that correct --

25           MR. WILLETT:  That's correct, Your Honor.

Abu Bakker Qassim, et al. vs.                    CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 4

1          THE COURT:  -- or on one series of occasions?

2          MR. WILLETT:  We have a meeting scheduled for Monday as

3     well this week in Cuba.  But we met them only once before now.

4          THE COURT:  And you're going to Cuba again?

5          MR. WILLETT:  Sunday, yes.

6          THE COURT:  What are the logistics of you going to

7     Guantanamo Bay?

8          MR. WILLETT:  You fly to Ft. Lauderdale and you there

9     present a theatre clearance to a little airline called

10    Aero Sunshine, the sort of airplane where they ask you what you

11    weigh and then they say, you sit in this seat and you sit in

12    that seat.  And then you fly three hours to Gitmo.

13         You are billeted at the combined bachelor's quarters,

14    which costs $12 a night and is worth every penny, and then in

15    the morning they take you across on a ferry to the windward

16    side, where you're met by a Navy chief petty officer, who

17    escorts you to the prison.

18         You meet your client at what they call Camp Echo at the

19    prison for certain hours of the day where this is permitted, and

20    then you're escorted back to the ferry at the end of the day.

21         THE COURT:  Do you have any information about the

22    conditions under which you'll be able to meet your clients this

23    time at Camp Iguana?

24         MR. WILLETT:  I don't, Your Honor.  I don't know that I

25    would be able to meet them at Camp Iguana, though I would like

United States District Court                    202-898-9398                    Rebecca King, RPR, CRR
For the District of Columbia                                                    Official Court Reporter

Page 5

1    to.  I think the Government's practice is to bring all habeas

2    counsel to Camp Echo and meet them in the conditions that I

3    described last time we were together.  Meeting them at Camp

4    Iguana would be helpful because we would get a sense of what

5    their current situation is like, but to be candid, Mr. Henry and

6    I haven't spoken about whether I would be permitted to do that.

7         THE COURT:  You say that you and Mr. Henry have met but

8    have not been able to narrow the differences between you.  Is

9    that right?

10        MR. WILLETT:  We spoke, Your Honor.  We did not meet.

11   But it is correct that I think it's safe to say, we did not

12   narrow the differences.

13        THE COURT:  All right.  Thank you.  Thank you, sir.

14   Maybe I should hear from Government counsel.

15        MR. HENRY:  Thank you, Your Honor.  Terry Henry with

16   the Department of Justice.  I'm here for the respondents.

17        Your Honor, just to clarify, petitioner's counsel and

18   myself did speak once on Monday about Your Honor's order, and

19   counsel had some questions.  I don't think the discussion was

20   any kind of negotiation over things.  So just to make it clear

21   for the record what's going on here.

22        But there have been a number of developments since we

23   submitted the last declaration of General Hood in this matter on

24   August 8th, along with our supplemental brief, and I'm happy to

25   report to the Court on what those developments are.

Abu Bakker Qassim, et al. vs.                    CV 05-497                          August 25, 2005
George W. Bush, et al.

1          THE COURT:  I would be happy to hear them.

2          MR. HENRY:  As counsel indicated, on Friday the 19th

3     there was a telephone conference between counsel and both

4     petitioners in this case.  They were able to use the translator

5     that they had mentioned to the Court at the last hearing, who

6     does not have a security clearance, but as indicated in General

7     Hood's declaration, DOD is okay with that translator being used

8     subject to appropriate security conditions.  And that happened.

9          There was also --

10         THE COURT:  Just let me stop you with that.  That was a

11    telephone call, a telephone conference between counsel with

12    their clients and their interpreter?

13         MR. HENRY:  That's correct.

14         THE COURT:  Was it a monitored call?

15         MR. HENRY:  It was monitored by a member of the

16    privilege team, which under the protective order regime in this

17    case is a DOD person that's basically responsible for reviewing

18    materials that counsel learns from detainees that counsel wants

19    to use in an unclassified context for classification purposes.

20         The protective order operates on the assumption that

21    information learned from the detainee is either classified or

22    subject to protection; then, when counsel want to use that

23    information in an unclassified context, filing or go to the

24    press or whatever, they run it through the privilege team who

25    does a classification review on it.  And that privilege team is

United States District Court                  202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                            Official Court Reporter

Abu Bakker Qassim, et al. vs.    CV 05-497    August 25, 2005
George W. Bush, et al.

Page 7

1   segregated from the litigation other than their involvement in

2   the...

3        THE COURT:  Mr. Henry, help me understand this

4   classification business.  These petitioners have been designated

5   as no longer enemy combatants.  Right?

6        MR. HENRY:  That's correct.

7        THE COURT:  What do they know, could they say that

8   would be classified?

9        MR. HENRY:  Well, as General Hood pointed out in his

10  declaration, there are two main areas of information that is of

11  concern.  And the first deals with security measures at the camp

12  itself.  That may be classified or it may just be information

13  that would be deemed protected under the protective order, which

14  is entitled to being treated like under seal and that kind of

15  thing, as opposed to being classified.

16       THE COURT:  But if they have that kind of information,

17  how can they ever be let out?

18       MR. HENRY:  Well, Your Honor, the purpose of the

19  classification review is to review the information and just see.

20  I mean, Gitmo is aware of the situation if people are let out

21  and if there needs to be any change to the way things are done,

22  things like that, but while folks are there in the camp, there

23  is the concern about sharing, you know, concurrent information,

24  if you will, about that.

25       So that information is just reviewed by a privilege

Page 8

```
 1   team member, it's either classified or not, and then things go

 2   forward.

 3           The other class of information that's involved is

 4   information about the status of other detainees.  And again,

 5   it's just, you know, a precaution with respect to information

 6   they would be sharing while they continue to be detained there.

 7           This regime has been in place for almost a year now.

 8   It works, with complaints by petitioner's counsel as well as

 9   complaints on the other end, but it has worked well for the past

10   your or so.  I might add, the monitoring by the privilege team

11   member was with the agreement of counsel.

12           The other thing that happened on this past Friday was,

13   as petitioner's counsel mentioned, the call between one of the

14   petitioners and the sister, his sister that was identified at

15   the last hearing.  And just to make one correction to what

16   Mr. Willett said, it was not over a secure phone, it was over an

17   unsecured line, just a normal telephone call to the embassy

18   there in Sweden.  The embassy was involved just to make sure

19   that the person receiving the call on the other end was actually

20   the person that was identified as the petitioner's sister.  So

21   that call went on for an hour and a half or so.

22           The other major area of development deals with the

23   living arrangements that the petitioners are in in Camp Iguana.

24   As noted in General Hood's declaration, there had been plans in

25   the works for a number of weeks to renovate Camp Iguana for
```

Page 9

```
 1    folks NLEC's like petitioner, where they could stay pending
 2    their relocation or whatever.
 3            As indicated in General Hood's declaration, that
 4    renovation was accomplished and the petitioners were moved there
 5    the week of August 15th.  The camp is made up of several
 6    buildings; there is a sleeping quarters building that's air
 7    conditioned and they have individual beds.  All the living
 8    quarters there at Camp Iguana are air conditioned, there's a
 9    recreation building where there are sofas, television, video
10    games, other recreational materials, ping-pong tables, table
11    soccer, that kind of thing.
12            There's a kitchen building, where, although the
13    petitioners are provided three meals a day that are prepared in
14    Halal fashion, they do have a kitchen-type affair, a building
15    that has a microwave, refrigerator, coffee pot, stove, utensils,
16    and they get tea, coffee, fresh fruit, ice cream, things like
17    that, snack items.
18            There is a bathhouse that has separate shower stalls,
19    separate toilet stalls similar to the type of building that's
20    used for troops in some of the more permanent camps in the
21    Middle East.  There's an outside recreation yard with picnic
22    tables and that sort of thing, a soccer goal, that kind of
23    stuff.
24            The petitioners have 24-hour access to all of these
25    materials -- or all of these facilities, and this is in addition
```

Abu Bakker Qassim, et al. vs.                    CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 10

1    to the medical care and access to Qur'ans and prayer books and

2    things like that that all the other detainees have.

3            THE COURT:  There's no lockdown in any part of this

4    facility, this Camp Iguana?

5            MR. HENRY:  They are free to roam that facility.

6            THE COURT:  24/7?

7            MR. HENRY:  24/7, yes, Your Honor.

8            THE COURT:  But there's a gate around it?

9            MR. HENRY:  There is a fence.

10           THE COURT:  A fence around it?

11           MR. HENRY:  Yes, Your Honor, there is.

12           THE COURT:  How many people are there?

13           MR. HENRY:  Currently there are about 10 NLEC's total,

14   and all of the NLEC's, all the Uighur NLECs are there.  I think

15   we had mentioned before that -- in General Hood's declaration

16   that there were a couple of NLEC's that were in another camp due

17   to disciplinary infractions.  I think two of those were Uighurs,

18   and those two Uighur folks have been moved to Camp Iguana.

19           I believe that there is one or two other nationality

20   NLEC's that are in a disciplinary confinement situation, and one

21   that is in another area due to medical needs.  You know, he's

22   not there for disciplinary reasons.

23           THE COURT:  There are 10 Uighur NLEC's, or 10 NLEC's

24   all total?

25           MR. HENRY:  All total.

United States District Court                  202-898-9398              Rebecca King, RPR, CRR
For the District of Columbia                                           Official Court Reporter

Page 11

1              THE COURT:  Of whom how many are Uighurs, are you able

2    to tell?

3              MR. HENRY:  I'm not able to say on the public record,

4    but it's just a handful.

5              THE COURT:  And when counsel come down to Gitmo next

6    week to meet with these people, will they be able to meet with

7    them in a free and open manner at Camp Iguana, or are they going

8    to have to be taken back over to Camp Echo and be shackled to

9    the floor again?

10             MR. HENRY:  All of the meetings at Camp Echo; as a

11   matter of practice, there are safety considerations that we've

12   talked about before.  The shackling is one leg to a bolt in the

13   floor, standard operating procedure, the purpose of which is to

14   prevent any sort of incident where someone could, you know, hurt

15   someone else.  Which attempts like that are not unheard of.

16   It's difficult for DOD to have basically a nonuniform policy in

17   this regard with respect to specific individuals, that kind of

18   thing.  They have, like I said, a standard operating procedure

19   there.

20             But all of the counsel meetings are there in Camp Echo.

21   There would be concerns about having some kind of meeting

22   arrangement in Camp Iguana; number one because there's not

23   facilities for it there, and number two, there's the aspect of

24   subjecting other NLEC's over there in Camp Iguana to inspection,

25   if you will, by outsiders.

Abu Bakker Qassim, et al. vs.                         CV 05-497                              August 25, 2005
George W. Bush, et al.

Page 12

1            There is one change, though, with respect to the

2    meetings at Echo, and that's that counsel would be able to use

3    the translator that doesn't have a security clearance.

4            THE COURT:  That does not have a security clearance?

5            MR. HENRY:  That's right.

6            THE COURT:  They can bring their interpreter down with

7    them?

8            MR. HENRY:  Yes.  And I understand that's their

9    intention.

10           THE COURT:  Well, you anticipated my next question.

11   What about mail?  What about mail facilities?

12           MR. HENRY:  Mail facilities?

13           THE COURT:  Can they receive mail and send mail?

14           MR. HENRY:  Absolutely.  In fact, we have addressed

15   this in the context of other motions that have been filed in

16   other cases.  The mail operation at Gitmo is quite extensive.

17   It involves thousands of pieces of mail a month, and the mail

18   is -- you know, they can send mail, they can receive mail,

19   they're given postcards and stationery on which to write stuff

20   and mail letters that's processed through the security apparatus

21   there at Gitmo, and it is forwarded on.  And the same happens in

22   reverse for incoming mail from family members or whoever.

23           And then, of course, there's the attorney-client mail,

24   which is a different operation that does not go through the

25   security monitoring apparatus, and pursuant to the regime that

Page 13

```
 1    was worked out in the protective order.  So that mail remains

 2    privileged.

 3           THE COURT:  Are these petitioners literate in their own

 4    language, or do you know?

 5           MR. HENRY:  I believe they are, Your Honor.  But I

 6    don't know for sure.

 7           MR. WILLETT:  They are.

 8           THE COURT:  And again, is every telephone call as

 9    complicated as the call from this one petitioner to his sister?

10    Do they have to arrange something?

11           MR. HENRY:  The family call -- the calls with family

12    members is actually a very rare occurrence.  It had been done,

13    my understanding is once before, with respect to a military

14    commissioned candidate.  So this is a relatively new practice

15    for Guantanamo.  There was this concern, especially since the

16    first time anybody on the Government side had heard about the

17    petitioner's sister -- and my understanding from the last

18    hearing was that the sister basically cold called Mr. Willett.

19    There was some concern just to make sure that the person on the

20    other end of the call was who, you know, they purported to be.

21           And for now, the easiest way to do that was to ask the

22    sister to go to the embassy, which I understand is about 45 or

23    so miles from where she currently lives.  She did that, the

24    embassy confirmed her identity and then accepted the call, gave

25    her the phone, let her talk.
```

Abu Bakker Qassim, et al. vs.            CV 05-497            August 25, 2005
George W. Bush, et al.

Page 14

1        With respect to family members in other situations, if

2  there would be some easier way to do it, it's hard to say right

3  now, just because this is one of the very few calls that have

4  actually happened.  As General Hood indicated, he was amenable

5  to making a provision for family calls for NLEC's, so I'm sure

6  going forward they'll get a process down.  But right now that's

7  what we have.

8        THE COURT:  But as I hear you state it, the calls would

9  be, A, monitored, and B, these people, although officially

10  designated no longer enemy combatants, you're not willing to say

11  they're no longer under suspicion, so there still has to be some

12  double checking of who they're talking to?

13        MR. HENRY:  Well, there are a couple of issues in

14  there.  I mean, number one is the double checking who they're

15  talking to, that's for a number of reasons, including just to

16  avoid having some crackpot on the other end, if you will, who

17  happens to learn the name of a relative of one of the NLEC's.

18        THE COURT:  Whose problem is it if there's a crackpot

19  on the other end of the line?

20        MR. HENRY:  Well, Your Honor, having these phone calls

21  is a resource intensive operation at Guantanamo, and aside

22  from --

23        THE COURT:  Are you talking about money?

24        MR. HENRY:  Talking about resources as far as moving

25  the detainee to where a phone is and getting that all set up.

Abu Bakker Qassim, et al. vs.                    CV 05-497                          August 25, 2005
George W. Bush, et al.

1          But also I think Guantanamo has an interest in not

2     subjecting a detainee to receiving prank phone calls, if you

3     will.  So there are interests involved there.

4          With respect to the monitoring, again, that's an item

5     that was worked out in the protective order regime and is

6     allowed, monitoring of family calls, and --

7          THE COURT:  But the protective order regime had to do

8     with detainees, enemy combatant detainees, didn't it?

9          MR. HENRY:  Your Honor, when we negotiated that

10    protective order, the Combatant Status Review Tribunal process

11    was ongoing.  So I think it's fair to say that, you know, we

12    didn't know the precise outcome of all of those, and the order

13    was negotiated just in a broad brush sense applicable to

14    everyone.

15         THE COURT:  Well, you urged me the last time I was

16    here -- you were here not to mess around with the protective

17    order that had been negotiated with such difficulty and at such

18    length and in so many cases, and I have foreborne, if that's the

19    right form of that verb, from doing so for 25 days.  But I think

20    one of the questions that's in my mind is whether that

21    protective order works for NLEC's.

22         So that's kind of on the table.  I mean, it's

23    unthinkable, I imagine, for the Government just to put a phone

24    booth in Camp Iguana.

25         MR. HENRY:  That's correct, Your Honor.  If I could

United States District Court                    202-898-9398                Rebecca King, RPR, CRR
For the District of Columbia                                               Official Court Reporter

Abu Bakker Qassim, et al. vs.                    CV 05-497                          August 25, 2005
George W. Bush, et al.

Page 16

1    make one suggestion --

2            THE COURT:  It's difficult for me to understand why

3    that's unthinkable, actually.

4            MR. HENRY:  Well, there could be any number of reasons,

5    including, again, just keeping an eye on who is being called;

6    you know, do we give the detainees international calling cards?

7    You know, there are logistical as well as other issues.

8            But if I could make one suggestion.  If the

9    petitioner's counsel has got problems with particular aspects of

10   the order, they can bring them up and we can talk about it, and

11   I can see if the client is willing to loosen things up.  I mean,

12   General --

13           THE COURT:  That's kind of what I was hoping might

14   happen before today.  But maybe it will happen after today.

15           MR. HENRY:  Well, Your Honor, the protective order is

16   very long, it's very complex.  There are a lot of provisions in

17   it, all of which were negotiated at length and was approved by

18   Judge Green.  So they deal with mail, they deal with phone

19   calls, they deal with all kinds of stuff.

20           So I think, you know, expecting a wholesale

21   renegotiation of that may not be practical.  It would very well

22   be very time-consuming.  I think probably the best way to

23   proceed would be to take things on a little more incremental

24   level, and if there are specific problems that exist, we'll try

25   to work it out.

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

1          THE COURT:  I will borrow from Mr. Willett's analogy

2     and say, I can't exactly compliment your coat, but I'm going to

3     take that "maybe we can loosen things up," quote, unquote, as a

4     nice compliment on your hat.

5          MR. HENRY:  Thank you, Your Honor.

6          THE COURT:  Now, I asked you in the order to be

7     prepared to make an in camera presentation of the details of

8     efforts to place these petitioners, and I don't know how you

9     propose to -- whether you have something for me in writing,

10    whether you want to adjourn literally for an in camera

11    proceeding, but I would like to hear what's going on.

12         Last time I said I wasn't sure I did want to know what

13    was going on, but I think I'm ready.

14         MR. HENRY:  Well, Your Honor, I'm prepared to brief the

15    Court orally, and at the level of detail that I've been

16    authorized to talk about, we can do this with cleared counsel in

17    chambers if you want to do it that way.

18         THE COURT:  Who's cleared?

19         MR. HENRY:  I believe Mr. Willett is.

20         MR. WILLETT:  And Ms. Manning, Your Honor.

21         THE COURT:  Then when we adjourn here we'll go to

22    chambers and do just that.  Thank you.

23         I would like to talk a little bit more about the big

24    picture.  It's been almost six months now since these men were

25    declared to be NLEC's.  Does the Government have a position on

1   the length of time that it would be reasonable to continue

2   holding them in this status if you still can't find any place

3   for them?

4          MR. HENRY:  Well, Your Honor, I believe our position is

5   that the condition -- the living arrangements as they currently

6   exist meet and exceed any kind of level that would be

7   appropriate as a matter of constitutional law or any kind of

8   situation like that, and that we would continue to hold them --

9          THE COURT:  You're not saying constitutional law.  You

10  don't think the Constitution applies down there, do you?

11         MR. HENRY:  That's correct.  But one issue with

12  addressing the living arrangements, if you will, is what kind of

13  standard are you going to apply.  And the only analogy of which

14  I'm aware -- and the Court's involvement in living arrangements

15  with respect to individuals detained in the course of a war has

16  not been done of which I am aware.  But the only area of

17  analogy, of course, would be the administration of prisons with

18  respect to other convicted folks or pretrial detainees.  So

19  that's what I'm referring to.

20         So I think our position would be that we can continue

21  to hold them in Camp Iguana or something like it as long as it

22  takes.

23         Now, having said that, the living conditions for the

24  NLEC's have evolved since the NLEC determinations were made.

25  They've evolved significantly.  I have no reason to believe they

Page 19

1    will not continue to do that.

2           And with respect to length of time and that sort of

3    thing, I can -- I would prefer to talk about that in camera.

4           THE COURT:  The Government's memorandum submitted after

5    the last hearing contained a number of rather nonspecific

6    concerns about what might happen if the petitioners were to set

7    foot in the United States.  And we don't have to rehearse all

8    those.  Your papers say what they say.  They betrayed in my

9    mind -- those of you in the audience who are not lawyers or

10   products of the American law schools don't take this phrase off

11   and put it in the newspapers, because it's a lawyer's phrase.

12   Imaginary horribles.

13          Has the Government refined its position on this -- on

14   whether there's any circumstances in which these people might be

15   even considered refugees admittable to the United States or

16   admittable on some sort of limited parole that would not commit

17   them to the United States?

18          MR. HENRY:  Well, Your Honor, I think our position was

19   set out in our brief, and I don't think it would be imaginary

20   that bringing them here would change their immigration status

21   significantly.  And I think that's still the case.

22          As far as further details on that and what may be the

23   Government's thinking, just like the courts, we try to wait for

24   specific situations before we commit anything publicly as to

25   what our position would be.

Abu Bakker Qassim, et al. vs.   CV 05-497   August 25, 2005
George W. Bush, et al.

Page 20

1  THE COURT:  I've noticed that.  I've noticed that.

2  All right.  Thank you, Mr. Henry.

3  Mr. Willett, your turn.  Do you have any comment or

4 questions about what we've just discussed here with Mr. Henry?

5  MR. WILLETT:  No, Your Honor.  What I do want to

6 address is interim release under the SARD case, and I don't know

7 whether it's better to do that after the chambers conference or

8 now.  Because what we're reading in the newspapers and what I

9 think you're going to hear in chambers is they're not going to

10 fix this internationally, not any time soon.  They've been at it

11 for two years, according to the Washington Post, according to

12 NPR.  I mean, they had Ambassador Prosper on the radio this

13 morning saying they've gone at 24 or 25 countries without

14 success.

15  Evidently some countries are intimidated by the heft of

16 China in the international marketplace; others may ask why a

17 particular administration with a go-it-alone philosophy about

18 foreign affairs now comes to them for help.  I'm not a diplomat.

19 I don't know.

20  But what I do know is, it's not working.  It's not

21 going to work next month, it's not going to work in six months,

22 it's particularly not going to work if we just fluff up the

23 pillows a little bit at Gitmo and leave them there, with no

24 particular pressure on the government to make something happen.

25  So whenever it's appropriate, I want to talk to you

Page 21

1    about prophesy, because I would like to propose a different

2    prophesy than the one Your Honor suggested in your August 19th

3    order.  It looks like now is the time.

4            THE COURT:  I think now is the time.

5            MR. WILLETT:  Okay.  Let's go back to what nobody can

6    argue with, because the Supreme Court said it in Rassoul.  And

7    that's that you have jurisdiction in this case, which means that

8    you have jurisdiction of the case and the petitioners.  An act

9    of Congress says you can bring them to this courtroom.  No one

10   could question that, either.

11           We then move to the Court of Appeals for this circuit,

12   which has said that a habeas judge having jurisdiction of a case

13   has the power before the final determination of the writ to

14   order appropriate, in effect, parole, conditions of interim

15   release.  And at such a hearing you have to consider, is there a

16   danger to the community, does the petitioner represent a danger

17   to himself, is there a risk that he would flee, all of those

18   things that nobody better than the Federal District Court knows

19   how to do, because you do it all the time in slightly different

20   circumstances.  You have that power.  I don't think anyone can

21   argue with that power.  So we have to ask ourselves, would this

22   be the case that the Court of Appeals would determine to rip

23   from the jurisdiction of the federal trial court?

24           And here's why I suggested a different prophesy:  The

25   first is that there's actual a technical inaccuracy in your

Page 22

1    opinion.  The Court of Appeals did not stay Judge Hens Green's

2    order, she stayed it herself.  As far as I know, they've never

3    yet tipped their hand in a habeas case that didn't involve the

4    process for a military tribunal.

5          Why they wouldn't tip it has partly to do, of course,

6    with the unarguable, unassailable propositions I just laid out

7    for you in terms of your jurisdiction.  It has partly to do, I

8    think, because they know their own supervisory court expressed

9    in Hamdan, expressed in Rassoul, expressed in Zadvadus a real

10   horror of indefinite incarceration.  That was the thing to be

11   feared.  I think I just heard Mr. Henry say they're going to be

12   there as long as it takes.

13         THE COURT:  That's what I heard, too.

14         MR. WILLETT:  So is this the case, where people have

15   been determined not to be enemy combatants, where they would

16   leap in to take that jurisdiction from the trial court?

17         My prophesy -- I'm going to go with Justice

18   Frankfurter, Your Honor, who on several occasions referred to

19   the fairness, the common sense, and the courage of the District

20   Court in this country.  And I'm going to believe the Court of

21   Appeals, just like this Court, believes in the rule of law, and

22   relies, just as everyone else does, on the exercise of that

23   common sense, fairness, and courage.

24         So my prophesy is a little different.  And I hope it

25   doesn't go too far to say -- because we are talking about

Page 23

 1    prophesy, and it's all about what's practical, not necessarily

 2    what's legal or even appropriate.  But I guess it is a fact that

 3    we're about to begin a big circus next week or the week after in

 4    the United States Senate.  I don't doubt that the Hamdan

 5    decision is going to be on the table during those confirmation

 6    hearings, and the Court of Appeals may find itself under a

 7    scrutiny from the media that it's not accustomed to.  In that

 8    crucible, is it going to leap into this courtroom to take this

 9    case away?

10         Suppose for a moment that my prophesy is wrong, and

11    suppose that the Government invites a radical degree of judicial

12    activism from the Court of Appeals.  I suppose it's probably

13    100 percent likelihood that they'll ask for a stay.

14         Well, if that happens, Your Honor, I'll just get on the

15    elevator and go to the fifth floor, and with the deepest

16    respect, I think if that happens, it becomes my problem.

17         Now, we've thought long and hard about fluffing up the

18    pillows as opposed to asking you for this relief.  The problem

19    is, if it was 30 days of fluffing up the pillows, we probably

20    wouldn't be asking for it.  We would stick at the base.  It's

21    not going to be 30 or 60 or 90.  It's going on two years.

22         So if there is an order for interim release from this

23    Court after you've had the hearing, let the Government explore

24    any concerns they have about risk to the community, after you've

25    settled a set of terms for appropriate conditional release,

Abu Bakker Qassim, et al. vs.    CV 05-497      August 25, 2005
George W. Bush, et al.

Page 24

1 after Mr. Parhat Yassin (ph), who is in the courtroom today and

2 is a resident asylee Uighur escaped from China himself, and who

3 has called me up to offer his home as refuge for these people,

4 after you've heard the evidence, if you issue that kind of

5 order, the only thing I can tell you is that I'll be proud to

6 ride the elevator to any floor of this building and defend it.

7   THE COURT:  Well, it certainly has not escaped your

8 notice, nor Mr. Henry's, that the concern I had with issuing

9 this little memorandum the other day was the question of whether

10 something could be done in the interim that would make the lives

11 of these petitioners tolerable pending the reasonable amount of

12 time that it takes to get them placed.

13   If you're right that they're not going to be placed and

14 it's indefinite, well, that puts a different picture on it, and

15 maybe it won't matter so much if it takes a year for the Court

16 of Appeals to sort it out on appeal.  I don't think Mr. Henry is

17 going to even want to respond to what you've just said because

18 it's sort of hypothetical.  Am I right, Mr. Henry?

19   MR. HENRY:  That's correct, Your Honor.

20   THE COURT:  One more question, Mr. Willett.  Is there

21 any dispute about the conditions under which these people are

22 being held, or about the appropriateness or necessity of the

23 conditions under which they're now being held?

24   MR. WILLETT:  Oh, yes.  I mean, Your Honor, I don't

25 think they should be held behind any fence.  If you mean do we

Page 25

1   dispute the nature of the kitchen and so forth, I don't know the

2   facts myself.  We didn't get in to them on the 19th.  So I don't

3   have a basis today to dispute what Mr. Henry told you about the

4   living conditions.

5          THE COURT:  I'm just wondering what purpose might be

6   served, if any, if the petitioners can't be brought here, if

7   their bodies can't be brought here, if perhaps a magistrate

8   judge of this court might go there.  And I'm wondering what

9   purpose such a visit might have.

10         MR. WILLETT:  We welcome anyone going there, the Court,

11  the press, us, anybody.  We think that's a good thing.  What I

12  would suggest, though, is that the only remedy that's really

13  going to make sense is to open up the gate, and since they don't

14  want to do that on Gitmo, we're down to the District of

15  Columbia.  So we think ultimately they should be here and they

16  should not be in any kind of jail.

17         While we understand that since the ultimate resolution

18  is probably going to be, in effect, a deportation subject to

19  Your Honor 's being satisfied with the place they're being

20  deported to --

21         THE COURT:  You really think I'm going to have anything

22  to say about that?

23         MR. WILLETT:  Well, you will, actually, Your Honor, if

24  you retain jurisdiction of the case by not concluding the habeas

25  case.  That's why interim release seemed like the perfect fit

Abu Bakker Qassim, et al. vs.                    CV 05-497                    August 25, 2005
George W. Bush, et al.

Page 26

1   here.  You still have the case, it's not a final order, you have

2   jurisdiction of it, and when Mr. Henry comes in and says we've

3   talked the Netherlands into it or talked Sweden into it or

4   whatever we can do, at that point they will be sent to that

5   country and the case will be dismissed as moot.

6            But the interim release has that nice feature of Your

7   Honor's retained jurisdiction, which I think addresses their

8   parade of horribles.

9            THE COURT:  Okay, Mr. Willett.  Thank you.  Well,

10  people sitting out in the courtroom may be wondering what has

11  happened.  I'm not sure much of anything has happened, but we've

12  had a conversation, we're now going to have a conversation in

13  camera.  That will be in chambers, it will be among the

14  government counsel and other cleared counsel.

15           Since I don't think we have a cleared court reporter,

16  it's going to be off the record.  Any problem with that,

17  counsel?

18           MR. WILLETT:  No, Your Honor.

19           MR. HENRY:  No, Your Honor.

20           THE COURT:  In that case we will adjourn this

21  proceeding and I will see counsel in chambers directly.  Thank

22  you.

23           (Proceedings adjourned at 2:55 p.m.)

24

25

Abu Bakker Qassim, et al. vs.                CV 05-497                           August 25, 2005
George W. Bush, et al.

Page 27

1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Rebecca King, certify that the foregoing is a

4      correct transcript from the record of proceedings in the

5      above-entitled matter.

6

7

8

9      _____        _____

10     SIGNATURE OF COURT REPORTER               DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court                202-898-9398                Rebecca King, RPR, CRR
For the District of Columbia                                             Official Court Reporter

**<u>EXHIBIT 4</u>**

2 of 546 DOCUMENTS

Copyright 2005 The Washington Post
The Washington Post

**August 26, 2005 Friday**
Final Edition

**SECTION:** A Section; A22

**LENGTH:** 527 words

**HEADLINE:** 5 Chinese **Detainees** Given More Freedom at Guantanamo

**BYLINE:** Josh White, Washington Post Staff Writer

**BODY:**

Officials at the U.S. detention facility at Guantanamo Bay, Cuba, have moved five ethnic Uighurs into a less restrictive area of the prison while the United States tries to find a way to free the Chinese separatists in a third country.

The Uighurs are part of a group of 15 who have been held at Guantanamo Bay for three years but have been found to pose no threat to the United States or its allies. Last week they were transferred from cells to an area known as Camp Iguana, where they have use of an entertainment room, a kitchen and an outdoor recreational area, U.S. lawyers told a federal court judge at a hearing yesterday.

But they are still surrounded by a fence, have minimal contact with the outside world and are uncertain when their legal limbo will end.

Although five have been found not to be enemy combatants and all 15 have been cleared for release from Guantanamo Bay, the United States has found no country to accept the Uighurs (pronounced wee-gurs), Muslims who are seeking their own homeland on territory that is now part of northwestern China. The United States will not return them to China for fear that the government would persecute or torture them. The Uighurs have fought the Chinese government and are accused of terrorist attacks there.

U.S. authorities have asked nearly two dozen nations to provide refuge for the Uighurs without success, in part because other nations do not want to anger the Chinese. In the meantime, the U.S. government and lawyers for two of the Uighurs are trying to work out ways to grant the **detainees** greater freedom at Guantanamo Bay.

U.S. District Judge James Robertson said yesterday that he would like more time to consider the issue. He seemed pleased that the Uighurs, as well as about five other unidentified **detainees,** had been moved to better living quarters while they await their release.

Lawyers for the two Uighurs — Abu Bakker Qassim and Adel Abdu Hakim — who also represent seven other members of the group, argued yesterday that the U.S. government should allow the Uighurs to come to the United States as political asylum-seekers and grant them a loosely defined "parole" status. Two Washington area Uighurs have volunteered to house the men, said Omar Kanat of Vienna, vice president of the Uyghur American Association.

Sabin P. Willett argued in U.S. District Court in Washington yesterday that the Uighurs could be trapped in Guantanamo Bay indefinitely. Willett said the move to better quarters in the military prison amounted to "fluffing the pillows" instead of granting the men their freedom.

"I don't think they should be held behind any fence," Willett said.

Terry Henry, a Justice Department lawyer, said that one of the Uighur **detainees** was able to speak to his sister in Sweden on Friday for 90 minutes. Only one other **detainee** at Guantanamo Bay has been allowed to use the telephone. But Henry said the Uighurs should be held until arrangements can be made for them, and that they should not be released to the United States, even under parole status.

  

The Washington Post August 26, 2005 Friday

"We can continue to hold them in Camp Iguana, or something like it, for as long as it takes," Henry said.

**LOAD-DATE:** August 26, 2005





**EXHIBIT 5**

| | User Name | User Name | ☑ Rem∈ |
|---|---|---|---|
| Uyghur American Association forum > Uyghur American Association | Name | | |
| **Guantanamo detainees pose dilemma** | Password | | Log In |

| Register | FAQ | Members List | Calendar | Today's Posts | Sear |
|---|---|---|---|---|---|

**Post Reply**

Thread Tools    Search this Thread    Rate Thread    Display

15-11-04, 06:40

uyghur Advice
Guest

**Guantanamo detainees pose dilemma**

Guantanamo detainees pose dilemma

Eligible for release, the Muslim Uighurs could be in danger if returned to China.

By Neil A. Lewis

New York Times News Service

GUANTANAMO BAY, Cuba - One of the most vexing and peculiar problems that the imprisonment of suspected of being terrorists at Guantanamo has caused for the Bush administration has been what with ethnic Uighur detainees.

Guantanamo has 22 Uighur (pronounced WEE-ger) detainees, most captured in Afghanistan. They tr there from their homeland in the Xinjiang region of China, where the mostly Muslim Uighurs have for low-level insurgency against Beijing's rule for years.

U.S. military officials have concluded that at least half of the Uighurs here are eligible for release, bu prisoners have said they do not want to be returned to China, because they fear they will be tortured killed as terrorists.

That has sent U.S. officials scrambling to find a third country willing to accept the Uighurs. So far, se European countries, including Norway and Switzerland, have declined. Newspapers in other European countries have reported that their governments have refused as well.

Beijing has asserted that the Uighurs are terrorists and that the United States should return them to to demonstrate its commitment to fighting terrorism around the world.

A spokesman for China's Foreign Ministry warned this month that relations between Washington and could be harmed if the United States sent any Uighurs to a third country.

One of the Uighurs held at Guantanamo went before a special tribunal recently to argue that he was unlawful enemy combatant and should not have been arrested in Afghanistan and kept in the detent camp here.

The man, a 33-year-old with an artificial left leg, told the military panel that he was not an enemy of United States and that he hoped America would one day help the Uighur independence movement.

After taking an oath before Allah that he would tell the truth, the man said, "It's true that I went to Afghanistan," explaining that he did so to find a place for his family to live free from Chinese oppress

He disputed a statement that he had told an interrogator that he had been a member of the East Tur Islamic Movement, which was defined by the government as an extremist Muslim group in China.

"We fought against the Chinese government for years," he said. "That does not mean we are al-Qaed said he had sought military training and the proper use of a gun to fight the Chinese in the future.

At various times, he said that there was no proof he had been involved with al-Qaeda. "Do you have proof that I am with al-Qaeda? Any real proof?"

When he was told that there was evidence of his association but that it was classified and he could n it, he said, "I can't bring any evidence against the classified information I cannot see."



« Previous Thread | Next Thread »

**Posting Rules**

You **may** post new threads
You **may** post replies
You **may not** post attachments
You **may not** edit your posts

vB code is **On**
Smilies are **On**
[IMG] code is **On**
HTML code is **On**

Forum Jump

Uyghur American Associati

All times are GMT -4. The time now is 11:32.

RSS feed - XML feed - Contact Us - UAA Forum -

Powered by: vBulletin Version 3.0.7
Copyright ©2000 - 2005, Jelsoft Enterprises Ltd.

**<u>EXHIBIT 6</u>**

FOCUS – 1 of 2 DOCUMENTS

Copyright 2002 The Washington Post
The Washington Post

**March** 11, 2002 Monday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 2048 words

**HEADLINE:** U.S. Behind Secret Transfer of **Terror** Suspects

**BYLINE:** **Rajiv** Chandrasekaran and **Peter Finn,** Washington Post Foreign Service

**DATELINE:** JAKARTA, Indonesia March 10

**BODY:**

Arriving here from Pakistan in mid–November, Muhammad Saad Iqbal Madni told acquaintances that he had come to Indonesia to disburse an inheritance to his late father's second wife. But instead of writing a check and leaving, he settled into a small boarding house in a crowded, lower–middle–class neighborhood, where he visited the local mosque and spent hours on end watching television at a friend's house.

Stocky and bearded, Iqbal, 24, betrayed little about his life in Pakistan, except to hand out business cards identifying him as a Koran reader for an Islamic radio station. In early January, however, the CIA informed Indonesia's State Intelligence Agency that Iqbal had another occupation, according to Indonesian officials and foreign diplomats. Iqbal, they said, was an al Qaeda operative who had worked with Richard C. Reid, the Briton charged with trying to detonate explosives in his shoes on an American Airlines flight from Paris to Miami on Dec. 22.

The officials and diplomats said the CIA provided information about Iqbal's whereabouts and urged Indonesia to apprehend him. A few days later, the Egyptian government formally asked Indonesia to extradite Iqbal, who carried an Egyptian as well as a Pakistani passport, a senior Indonesian official said. The Egyptian request alleged Iqbal was wanted in connection with terrorism, he said. It did not specify the crime, he said, but Indonesian officials were told the charges were unrelated to the Reid case.

By Jan. 9, Iqbal was in the hands of Indonesian intelligence agents. Two days later — without a court hearing or a lawyer — he was hustled aboard an unmarked, U.S.–registered Gulfstream V jet parked at a military airport in Jakarta and flown to Egypt, the Indonesian officials said.

Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries, including Egypt and Jordan, whose intelligence services have close ties to the CIA and where they can be subjected to **interrogation** tactics — including torture and threats to families — that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the **interrogation,** the sources said.

"After September 11, these sorts of movements have been occurring all the time," a U.S. diplomat said. "It allows us to get information from terrorists in a way we can't do on U.S. soil."

U.S. officials would not comment on evidence linking Iqbal to Reid, but Western diplomats in Jakarta said Iqbal's name appeared on al Qaeda documents discovered by U.S. intelligence agents in Afghanistan. Indonesian officials said U.S. officials did not detail Iqbal's alleged involvement with terrorism other than to say he was connected to Reid, and as a consequence, he was highly sought by the U.S. government.

Iqbal remains in custody in Egypt, intelligence sources said. The sources said he has been questioned by U.S. agents but there was no word on his legal status, a situation that resembles that of other Islamic activists taken into

  

The Washington Post March 11, 2002 Monday

custody in cooperation with the CIA.

In October, for instance, a Yemeni microbiology student wanted in connection with the bombing of the USS Cole was flown from Pakistan to Jordan on a U.S.–registered Gulfstream jet after Pakistan's intelligence agency surrendered him to U.S. authorities at the Karachi airport, Pakistani government sources said. The hand-over of the shackled and blindfolded student, Jamil Qasim Saeed Mohammed, who was alleged to be an al Qaeda operative, occurred in the middle of the night at a remote corner of the airport without extradition or deportation procedures, the sources said.

U.S. forces seized five Algerians and a Yemeni in Bosnia on Jan. 19 and flew them to a detention camp at the U.S. naval base at Guantanamo Bay, Cuba, after they were ordered released by the Bosnian Supreme Court for lack of evidence — and despite an injunction from the Bosnian Human Rights Chamber that four of them be allowed to remain in the country pending further proceedings. The Human Rights Chamber, created under the U.S.–brokered Dayton peace accords that ended the 1992–95 war, was designed to protect human rights and due process.

U.S. involvement in seizing terrorism suspects in third countries and shipping them with few or no legal proceedings to the United States or other countries — known as "rendition" — is not new. In recent years, U.S. agents, working with Egyptian intelligence and local authorities in Africa, Central Asia and the Balkans, have sent dozens of suspected Islamic extremists to Cairo or taken them to the United States, according to U.S. officials, Egyptian lawyers and human rights groups. U.S. authorities are urging Pakistan to take the same step with the chief suspect in the kidnapping and killing of Wall Street Journal reporter Daniel Pearl.

In 1998, U.S. agents spirited Talaat Fouad Qassem, 38, a reputed leader of the Islamic Group, an Egyptian extremist organization, to Egypt after he was picked up in Croatia while traveling to Bosnia from Denmark, where he had been granted political asylum. Qassem was allegedly an associate of Ayman Zawahiri, the number-two man in Osama bin Laden's al Qaeda network. Egyptian lawyers said he was questioned aboard a U.S. ship off the Croatian coast before being taken to Cairo, where a military tribunal had already sentenced him to death in absentia. Egyptian officials have refused to discuss his case.

U.S. intelligence officers are also believed to have participated in the 1998 seizure in Azerbaijan of three members of Egypt's other main underground group, Egyptian Islamic Jihad, according to testimony provided to their attorneys in Cairo.

Also in 1998, CIA officers working with Albanian police seized five members of Egyptian Islamic Jihad who were allegedly planning to bomb the U.S. Embassy in Tirana, Albania's capital.

After three days of **interrogation,** the five men were flown to Egypt aboard a plane that was chartered by the CIA; two were put to death. The five were among 13 suspects known to have been picked up in the Balkans with U.S. involvement and taken to Egypt for trial.

Between 1993 and 1999, terrorism suspects also were rendered to the United States from Nigeria, the Philippines, Kenya and South Africa in operations acknowledged by U.S. officials. Dozens of other covert renditions, often with Egyptian cooperation, were also conducted, U.S. officials said. The details of most of these operations, which often ignored local and international extradition laws, remain closely guarded.

Even when local intelligence agents are involved, diplomats said it is preferable to render a suspect secretly because it prevents lengthy court battles and minimizes publicity that could tip off the **detainee's** associates. Rendering suspects to a third country, particularly Muslim nations such as Egypt or Jordan, also helps to defuse domestic political concerns in predominantly Muslim nations such as Indonesia, the diplomats said.

Sending a suspect directly to the United States, the diplomats said, could prompt objections from government officials who fear that any publicity of such an action would lead to a backlash from fundamentalist Islamic groups.

In Iqbal's case, Indonesian government officials told local media that he had been sent to Egypt because of visa violations. A spokesman for the immigration department said Iqbal failed to identify a sponsor for his visit to Indonesia on his visa application form, which was submitted in Islamabad, Pakistan.

A senior Indonesian government official said disclosing the U.S. role would have exposed President Megawati Sukarnoputri to criticism from Muslim-oriented political parties in her governing coalition. "We can't be seen to be cooperating too closely with the United States," the official said.

  

The Washington Post March 11, 2002 Monday

The official said an extradition request from Egypt and the discovery of Iqbal's visa infraction provided political cover to comply with the CIA's request. "This was a U.S. deal all along," the senior official said. "Egypt just provided the formalities."

Indonesian officials believe Iqbal, who arrived in Jakarta on Nov. 17, came to the vast Southeast Asian archipelago not to plan an attack but to seek refuge as the Taliban neared collapse and al Qaeda leaders sought to flee Afghanistan. Western officials said they do not have a full picture of what Iqbal was doing in Indonesia and they cannot rule out the possibility that he was engaged in terrorist activities here.

Iqbal had lived in Jakarta as a teenager while his father, who also was an expert Koran reader, taught at the Arab Language Institute. Shortly after Iqbal arrived in November, he returned to his old neighborhood, a district in east Jakarta with narrow, winding streets and open sewers. There he met up with one of his father's former students, Mohammed Rizard, who helped him get a room at a nearby boarding house.

Rizard, a printer, said Iqbal often would spend afternoons at his house, watching television and singing Indian karaoke tunes. Although Iqbal said he came to Indonesia to distribute an inheritance to his father's second wife, he appeared to be in no hurry to perform the task, Rizard said.

"He was taking it easy," Rizard said. "He was more interested in talking about girls and singing karaoke."

Just before his arrest, Iqbal visited Solo, a city in central Java, Indonesia's main island, saying he was going to see his stepmother. The city is regarded by Western and Asian intelligence officials as a base for Jemaah Islamiah, a militant Muslim group with bases in Indonesia, Singapore and Malaysia that is alleged to be affiliated with al Qaeda. The group is accused of plotting to blow up Western embassies and U.S. naval vessels in Singapore and of aiding two of the Sept. 11 hijackers during a trip they made to Malaysia in 2000.

Rizard said he never discussed politics with Iqbal or inquired about his life in Pakistan. "He never talked about jihad or America," Rizard said. Rizard also said he rifled through Iqbal's suitcase and "found nothing suspicious."

In December, Iqbal sent several letters to friends in Pakistan, Rizard said. Three replies arrived at Rizard's house, which Iqbal used as a return address, after he had been seized and sent to Egypt. Rizard gave the unopened letters to correspondents for The Washington Post and the Weekend Australian newspaper.

The handwritten letters, in the Urdu language, contain no incriminating details but do suggest that Iqbal's missives had expressed deep frustration and despair.

"Why have you lost all hope?" one of his friends, Hafiz Mohammad Riazuddin, wrote. "Please keep your head and spirits up."

"Surprisingly you have asked about the Taliban," Riazuddin continued. "How did you become interested in politics? Anyway, by the time you sent this letter, Taliban rule has ended in Afghanistan. U.S. and British troops have landed in Afghanistan. The U.S. has taken bases in Pakistan and Pakistan's nuclear program is in danger."

A lengthy letter from a woman who appears to be his girlfriend suggested Iqbal had left Pakistan suddenly and had not told those close to him where he was going. "It gives great pleasure to know that you are alive," she wrote.

Another letter, from a man named Shahid, refers to plans to visit an "uncle in America" and talk to an "Uncle Babar" in Malaysia.

Despite criticism from some U.S. officials as well as from neighboring Singapore and Malaysia that Indonesia is not moving aggressively enough against suspected terrorists, particularly members of Jemaah Islamiah, officials here quickly point to Iqbal's rendition as proof they are cooperating, albeit quietly, in the global fight against terrorism.

"The CIA asked us to find this guy and hand him over," the senior Indonesian official said. "We did what they wanted."

Finn reported from Berlin. Correspondent Howard Schneider in Cairo, special correspondent Kamran Khan in Karachi, Pakistan, and staff writers Dan Eggen and Walter Pincus in Washington contributed to this report.

**LOAD-DATE:** March 11, 2002





**EXHIBIT 7**

FOCUS – 42 of 361 DOCUMENTS

Copyright 2005 The Washington Post
The Washington Post

**January 2, 2005 Sunday**
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1165 words

**HEADLINE:** Long-Term Plan Sought For **Terror** Suspects

**BYLINE: Dana Priest,** Washington Post Staff Writer

**BODY:**

Administration officials are preparing long-range plans for indefinitely imprisoning suspected terrorists whom they do not want to set free or turn over to courts in the United States or other countries, according to intelligence, defense and diplomatic officials.

The Pentagon and the CIA have asked the White House to decide on a more permanent approach for potentially lifetime detentions, including for hundreds of people now in military and CIA custody whom the government does not have enough evidence to charge in courts. The outcome of the review, which also involves the State Department, would also affect those expected to be captured in the course of future counterterrorism operations.

"We've been operating in the moment because that's what has been required," said a senior administration official involved in the discussions, who said the current detention system has strained relations between the United States and other countries. "Now we can take a breath. We have the ability and need to look at long-term solutions."

One proposal under review is the transfer of large numbers of Afghan, Saudi and Yemeni **detainees** from the military's Guantanamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries. The prisons would be operated by those countries, but the State Department, where this idea originated, would ask them to abide by recognized human rights standards and would monitor compliance, the senior administration official said.

As part of a solution, the Defense Department, which holds 500 prisoners at Guantanamo Bay, plans to ask Congress for $25 million to build a 200-bed prison to hold **detainees** who are unlikely to ever go through a military tribunal for lack of evidence, according to defense officials.

The new prison, dubbed Camp 6, would allow inmates more comfort and freedom than they have now, and would be designed for prisoners the government believes have no more intelligence to share, the officials said. It would be modeled on a U.S. prison and would allow socializing among inmates.

"Since global war on **terror** is a long-term effort, it makes sense for us to be looking at solutions for long-term problems," said Bryan Whitman, a Pentagon spokesman. "This has been evolutionary, but we are at a point in time where we have to say, 'How do you deal with them in the long term?' "

The administration considers its toughest detention problem to involve the prisoners held by the CIA. The CIA has been scurrying since Sept. 11, 2001, to find secure locations abroad where it could detain and interrogate captives without risk of discovery, and without having to give them access to legal proceedings.

Little is known about the CIA's captives, the conditions under which they are kept — or the procedures used to decide how long they are held or when they may be freed. That has prompted criticism from human rights groups, and from some in Congress and the administration, who say the lack of scrutiny or oversight creates an unacceptable risk of abuse.

Rep. Jane Harman (D-Calif.), vice chairman of the House intelligence committee who has received classified briefings on the CIA's **detainees and interrogation** methods, said that given the long-term nature of the detention

  

The Washington Post January 2, 2005 Sunday

situation, "I think there should be a public debate about whether the entire system should be secret.

"The details about the system may need to remain secret," Harman said. At the least, she said, **detainees** should be registered so that their treatment can be tracked and monitored within the government. "This is complicated. We don't want to set up a bureaucracy that ends up making it impossible to protect sources and informants who operate within the groups we want to penetrate."

The CIA is believed to be holding fewer than three dozen al Qaeda leaders in prison. The agency holds most, if not all, of the top captured al Qaeda leaders, including Khalid Sheik Mohammed, Ramzi Binalshibh, Abu Zubaida and the lead Southeast Asia terrorist, Nurjaman Riduan Isamuddin, known as Hambali.

CIA detention facilities have been located on an off-limits corner of the Bagram air base in Afghanistan, on ships at sea and on Britain's Diego Garcia island in the Indian Ocean. The Washington Post reported last month that the CIA has also maintained a facility within the Pentagon's Guantanamo Bay complex, though it is unclear whether it is still in use.

In contrast to the CIA, the military produced and declassified hundreds of pages of documents about its detention and **interrogation** procedures after the Abu Ghraib prison scandal. And the military **detainees** are guaranteed access to the International Committee of the Red Cross and, as a result of a U.S. Supreme Court ruling, have the right to challenge their imprisonment in federal court.

But no public hearings in Congress have been held on CIA detention practices, and congressional officials say CIA briefings on the subject have been too superficial and were limited to the chairman and vice chairman of the House and Senate intelligence committees.

The CIA had floated a proposal to build an isolated prison with the intent of keeping it secret, one intelligence official said. That was dismissed immediately as impractical.

One approach used by the CIA has been to transfer captives it picks up abroad to third countries willing to hold them indefinitely and without public proceedings. The transfers, called "renditions," depend on arrangements between the United States and other countries, such as Egypt, Jordan and Afghanistan, that agree to have local security services hold certain **terror** suspects in their facilities for **interrogation** by CIA and foreign liaison officers.

The practice has been criticized by civil liberties groups and others, who point out that some of the countries have human rights records that are criticized by the State Department in annual reports.

Renditions originated in the 1990s as a way of picking up criminals abroad, such as drug kingpins, and delivering them to courts in the United States or other countries. Since 2001, the practice has been used to make certain **detainees** do not go to court or go back on the streets, officials said.

"The whole idea has become a corruption of renditions," said one CIA officer who has been involved in the practice. "It's not rendering to justice, it's kidnapping."

But top intelligence officials and other experts, including former CIA director George J. Tenet in his testimony before Congress, say renditions are an effective method of disrupting terrorist cells and persuading **detainees** to reveal information.

"Renditions are the most effective way to hold people," said Rohan Gunaratna, author of "Inside al Qaeda: Global Network of **Terror.**" "The threat of sending someone to one of these countries is very important. In Europe, the custodial **interrogations** have yielded almost nothing" because they do not use the threat of sending **detainees** to a country where they are likely to be tortured.

**LOAD-DATE:** January 2, 2005





# EXHIBIT 8

2 of 3 DOCUMENTS

Copyright 2002 The Washington Post
The Washington Post

December 26, 2002 Thursday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 2838 words

**HEADLINE:** U.S. Decries **Abuse** but **Defends Interrogations**;
'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities

**BYLINE:** Dana Priest and Barton Gellman, Washington Post Staff Writers

**BODY:**

Deep inside the forbidden zone at the U.S.-occupied Bagram air base in Afghanistan, around the corner from the detention center and beyond the segregated clandestine military units, sits a cluster of metal shipping containers protected by a triple layer of concertina wire. The containers hold the most valuable prizes in the war on terrorism — captured al Qaeda operatives and Taliban commanders.

Those who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles, according to intelligence specialists familiar with CIA interrogation methods. At times they are held in awkward, painful positions and deprived of sleep with a 24-hour bombardment of lights — subject to what are known as "stress and duress" techniques.

Those who cooperate are rewarded with creature comforts, interrogators whose methods include feigned friendship, respect, cultural sensitivity and, in some cases, money. Some who do not cooperate are turned over — "rendered," in official parlance — to foreign intelligence services whose practice of torture has been documented by the U.S. government and human rights organizations.

In the multifaceted global war on terrorism waged by the Bush administration, one of the most opaque — yet vital — fronts is the detention and interrogation of terrorism suspects. U.S. officials have said little publicly about the captives' names, numbers or whereabouts, and virtually nothing about interrogation methods. But interviews with several former intelligence officials and 10 current U.S. national security officials — including several people who witnessed the handling of prisoners — provide insight into how the U.S. government is prosecuting this part of the war.

The picture that emerges is of a brass-knuckled quest for information, often in concert with allies of dubious human rights reputation, in which the traditional lines between right and wrong, legal and inhumane, are evolving and blurred.

While the U.S. government publicly denounces the use of torture, each of the current national security officials interviewed for this article defended the use of violence against captives as just and necessary. They expressed confidence that the American public would back their view. The CIA, which has primary responsibility for interrogations, declined to comment.

"If you don't violate someone's human rights some of the time, you probably aren't doing your job," said one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA.."

The off-limits patch of ground at Bagram is one of a number of secret detention centers overseas where U.S. due process does not apply, according to several U.S. and European national security officials, where the CIA undertakes or manages the interrogation of suspected terrorists. Another is Diego Garcia, a somewhat horseshoe-shaped island in the Indian Ocean that the United States leases from Britain.

  

The Washington Post December 26, 2002 Thursday

U.S. officials oversee most of the interrogations, especially those of the most senior captives. In some cases, highly trained CIA officers question captives through interpreters. In others, the intelligence agency undertakes a "false flag" operation using fake decor and disguises meant to deceive a captive into thinking he is imprisoned in a country with a reputation for brutality, when, in reality, he is still in CIA hands. Sometimes, female officers conduct interrogations, a psychologically jarring experience for men reared in a conservative Muslim culture where women are never in control.

In other cases, usually involving lower-level captives, the CIA hands them to foreign intelligence services — notably those of Jordan, Egypt and Morocco — with a list of questions the agency wants answered. These "extraordinary renditions" are done without resort to legal process and usually involve countries with security services known for using brutal means.

According to U.S. officials, nearly 3,000 suspected al Qaeda members and their supporters have been detained worldwide since Sept. 11, 2001. About 625 are at the U.S. military's confinement facility at Guantanamo Bay, Cuba. Some officials estimated that fewer than 100 captives have been rendered to third countries. Thousands have been arrested and held with U.S. assistance in countries known for brutal treatment of prisoners, the officials said.

At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

According to one official who has been directly involved in rendering captives into foreign hands, the understanding is, "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them." Some countries are known to use mind-altering drugs such as sodium pentathol, said other officials involved in the process.

Abu Zubaida, who is believed to be the most important al Qaeda member in detention, was shot in the groin during his apprehension in Pakistan in March. National security officials suggested that Zubaida's painkillers were used selectively in the beginning of his captivity. He is now said to be cooperating, and his information has led to the apprehension of other al Qaeda members.

U.S. National Security Council spokesman Sean McCormack declined to comment earlier this week on CIA or intelligence-related matters. But, he said: "The United States is treating enemy combatants in U.S. government control, wherever held, humanely and in a manner consistent with the principles of the Third Geneva Convention of 1949."

The convention outlined the standards for treatment of prisoners of war. Suspected terrorists in CIA hands have not been accorded POW status.

Other U.S. government officials, speaking on condition of anonymity, acknowledged that interrogators deprive some captives of sleep, a practice with ambiguous status in international law.

The U.N. High Commissioner for Human Rights, the authoritative interpreter of the international Convention Against Torture, has ruled that lengthy interrogation may incidentally and legitimately cost a prisoner sleep. But when employed for the purpose of breaking a prisoner's will, sleep deprivation "may in some cases constitute torture."

The State Department's annual human rights report routinely denounces sleep deprivation as an interrogation method. In its 2001 report on Turkey, Israel and Jordan, all U.S. allies, the department listed sleep deprivation among often-used alleged torture techniques.

U.S. officials who defend the renditions say the prisoners are sent to these third countries not because of their coercive questioning techniques, but because of their cultural affinity with the captives. Besides being illegal, they said, torture produces unreliable information from people who are desperate to stop the pain. They look to foreign allies more because their intelligence services can develop a culture of intimacy that Americans cannot. They may use interrogators who speak the captive's Arabic dialect and often use the prospects of shame and the reputation of the captive's family to goad the captive into talking.

In a speech on Dec. 11, CIA director George J. Tenet said that interrogations overseas have yielded significant returns recently. He calculated that worldwide efforts to capture or kill terrorists had eliminated about one-third of the al Qaeda leadership. "Almost half of our successes against senior al Qaeda members has come in recent months," he said.

  

The Washington Post December 26, 2002 Thursday

Many of these successes have come as a result of information gained during interrogations. The capture of al Qaeda leaders Ramzi Binalshibh in Pakistan, Omar al-Faruq in Indonesia, Abd al-Rahim al-Nashiri in Kuwait and Muhammad al Darbi in Yemen were all partly the result of information gained during interrogations, according to U.S. intelligence and national security officials. All four remain under CIA control.

Time, rather than technique, has produced the most helpful information, several national security and intelligence officials said. Using its global computer database, the CIA is able to quickly check leads from captives in one country with information divulged by captives in another.

"We know so much more about them now than we did a year ago — the personalities, how the networks are established, what they think are important targets, how they think we will react," said retired Army general Wayne Downing, the Bush administration's deputy national security adviser for combating terrorism until he resigned in June.

"The interrogations of Abu Zubaida drove me nuts at times," Downing said. "He and some of the others are very clever guys. At times I felt we were in a classic counter-interrogation class: They were telling us what they think we already knew. Then, what they thought we wanted to know. As they did that, they fabricated and weaved in threads that went nowhere. But, even with these ploys, we still get valuable information and they are off the street, unable to plot and coordinate future attacks."

In contrast to the detention center at Guantanamo Bay, where military lawyers, news reporters and the Red Cross received occasional access to monitor prisoner conditions and treatment, the CIA's overseas interrogation facilities are off-limits to outsiders, and often even to other government agencies. In addition to Bagram and Diego Garcia, the CIA has other secret detention centers overseas, and often uses the facilities of foreign intelligence services.

Free from the scrutiny of military lawyers steeped in the international laws of war, the CIA and its intelligence service allies have the leeway to exert physically and psychologically aggressive techniques, said national security officials and U.S. and European intelligence officers.

Although no direct evidence of mistreatment of prisoners in U.S. custody has come to light, the prisoners are denied access to lawyers or organizations, such as the Red Cross, that could independently assess their treatment. Even their names are secret.

This month, the U.S. military announced that it had begun a criminal investigation into the handling of two prisoners who died in U.S. custody at the Bagram base. A base spokesman said autopsies found one of the detainees died of a pulmonary embolism, the other of a heart attack.

Al Qaeda suspects are seldom taken without force, and some suspects have been wounded during their capture. After apprehending suspects, U.S. take-down teams — a mix of military special forces, FBI agents, CIA case officers and local allies — aim to disorient and intimidate them on the way to detention facilities.

According to Americans with direct knowledge and others who have witnessed the treatment, captives are often "softened up" by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms. The alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subjected to loud noises and deprived of sleep. The tone of intimidation and fear is the beginning, they said, of a process of piercing a prisoner's resistance.

The take-down teams often "package" prisoners for transport, fitting them with hoods and gags, and binding them to stretchers with duct tape.

Bush administration appointees and career national security officials acknowledged that, as one of them put it, "our guys may kick them around a little bit in the adrenaline of the immediate aftermath." Another said U.S. personnel are scrupulous in providing medical care to captives, adding in a deadpan voice, that "pain control [in wounded patients] is a very subjective thing."

The CIA's participation in the interrogation of rendered terrorist suspects varies from country to country.

"In some cases [involving interrogations in Saudi Arabia], we're able to observe through one-way mirrors the live investigations," said a senior U.S. official involved in Middle East security issues. "In others, we usually get summaries. We will feed questions to their investigators. They're still very much in control."

The official added: "We're not aware of any torture or even physical abuse."

  

The Washington Post December 26, 2002 Thursday

Tenet acknowledged the Saudis' role in his Dec. 11 speech. "The Saudis are proving increasingly important support to our counterterrorism efforts — from making arrests to sharing debriefing results," he said.

But Saudi Arabia is also said to withhold information that might lead the U.S. government to conclusions or policies that the Saudi royal family fears. U.S. teams, for that reason, have sometimes sent Saudi nationals to Egypt instead.

Jordan is a favored country for renditions, several U.S. officials said. The Jordanians are considered "highly professional" interrogators, which some officials said meant that they do not use torture. But the State Department's 2001 human rights report criticized Jordan and its General Intelligence Directorate for arbitrary and unlawful detentions and abuse.

"The most frequently alleged methods of torture include sleep deprivation, beatings on the soles of the feet, prolonged suspension with ropes in contorted positions and extended solitary confinement," the 2001 report noted. Jordan also is known to use prisoners' family members to induce suspects to talk.

Another significant destination for rendered suspects is Morocco, whose general intelligence service has sharply stepped up cooperation with the United States. Morocco has a documented history of torture, as well as longstanding ties to the CIA..

The State Department's human rights report says Moroccan law "prohibits torture, and the government claims that the use of torture has been discontinued; however, some members of the security forces still tortured or otherwise abused detainees."

In at least one case, U.S. operatives led the capture and transfer of an al Qaeda suspect to Syria, which for years has been near the top of U.S. lists of human rights violators and sponsors of terrorism. The German government strongly protested the move. The suspect, Mohammed Haydar Zammar, holds joint German and Syrian citizenship. It could not be learned how much of Zammar's interrogation record Syria has provided the CIA.

The Bush administration maintains a legal distance from any mistreatment that occurs overseas, officials said, by denying that torture is the intended result of its rendition policy. American teams, officials said, do no more than assist in the transfer of suspects who are wanted on criminal charges by friendly countries. But five officials acknowledged, as one of them put it, "that sometimes a friendly country can be invited to 'want' someone we grab." Then, other officials said, the foreign government will charge him with a crime of some sort.

One official who has had direct involvement in renditions said he knew they were likely to be tortured. "I . . . do it with my eyes open," he said.

According to present and former officials with firsthand knowledge, the CIA's authoritative Directorate of Operations instructions, drafted in cooperation with the general counsel, tells case officers in the field that they may not engage in, provide advice about or encourage the use of torture by cooperating intelligence services from other countries.

"Based largely on the Central American human rights experience," said Fred Hitz, former CIA inspector general, "we don't do torture, and we can't countenance torture in terms of we can't know of it." But if a country offers information gleaned from interrogations, "we can use the fruits of it."

Bush administration officials said the CIA, in practice, is using a narrow definition of what counts as "knowing" that a suspect has been tortured. "If we're not there in the room, who is to say?" said one official conversant with recent reports of renditions.

The Clinton administration pioneered the use of extraordinary rendition after the bombings of U.S. embassies in Kenya and Tanzania in 1998. But it also pressed allied intelligence services to respect lawful boundaries in interrogations.

After years of fruitless talks in Egypt, President Bill Clinton cut off funding and cooperation with the directorate of Egypt's general intelligence service, whose torture of suspects has been a perennial theme in State Department human rights reports.

"You can be sure," one Bush administration official said, "that we are not spending a lot of time on that now."

  

The Washington Post December 26, 2002 Thursday

Staff writers Bob Woodward, Susan Schmidt and Douglas Farah, and correspondent Peter Finn in Berlin, contributed to this report.

**LOAD–DATE:** December 26, 2002





# **EXHIBIT 9**

*Redacted Version*
*for Public Filing*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et al.,

      Petitioners,

    v.

GEORGE W. BUSH, et al.,

      Respondents.

Civil Action No. 05-497 (JR)

## DECLARATION OF PIERRE-RICHARD PROSPER IN SUPPORT OF
## RESPONDENTS' SUPPLEMENTAL MEMORANDUM PURSUANT
## TO THE COURT'S INVITATION AT THE AUGUST 1, 2005 HEARING
### (Redacted Version for Public Filing)

CONFIDENTIAL

## DECLARATION OF PIERRE-RICHARD PROSPER

I, Pierre-Richard Prosper, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.  (U) I am the Ambassador-at-Large for War Crimes Issues and have supervised the operation of the Department of State Office of War Crimes Issues (S/WCI) since July 13, 2001. In that capacity I advise the Secretary of State directly and comment on U.S. policy on serious violations of the law of armed conflict committed in areas of conflict throughout the world. As the President's envoy, I travel worldwide and engage foreign government leaders and international organizations to build bilateral and international support for U.S. policies related to armed conflicts and international humanitarian law. Since September 11, 2001, my office has played a key role in maintaining a diplomatic dialogue with foreign governments whose nationals have been captured in connection with the armed conflict with the Taliban and al Qaida and who are detained at the U.S. Naval Base at Guantanamo Bay, Cuba. The following statements provide a general overview of the Department of State role in carrying out United States policy with respect to the transfer to foreign governments of detainees held at Guantanamo Bay and the process that is followed to ensure that any treaty-based obligations and United States policies are properly implemented. They are not intended to be an exhaustive description of all of the steps that might be undertaken in any particular case. I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

CONFIDENTIAL

Classified by
United States Department of State
S/WCI - Pierre-Richard Prosper
E.O. 12958, For Reasons 1.4 (b) and (d)

2

~~CONFIDENTIAL~~

2. (U) The United States has no interest in detaining enemy combatants longer than necessary. The paramount goal is to ensure, to the maximum extent reasonably possible that transferring a detainee out of U.S. government control prior to the cessation of hostilities will not increase the risk of further attacks on the United States or its allies. The Secretary of Defense, or

Case 1:05-cv-00497-JR    Document 27-3    Filed 08/08/2005    Page 3 of 6

his designee, is generally responsible for approving the transfer of detainees from Guantanamo Bay to other governments either for release or for further detention, investigation, prosecution or control, as appropriate. On an ongoing basis, the Department of Defense is constantly reviewing the continued detention of each individual held at Guantanamo Bay Naval Base, Cuba.

3. (U) The Department of Defense consults with appropriate United States Government agencies, including the Department of State, before determining whether to transfer particular individuals. Of particular concern to the Department of State in considering the transfer of a detainee to a foreign government, either for release or continued detention, investigation, and prosecution, is the question of whether that government will treat the detainee humanely, in a manner consistent with its international obligations, and will not persecute the individual on basis of his race, religion, nationality, membership in a social group, or political opinion. The Department is particularly mindful of the longstanding policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured or, in appropriate cases, that the person has a well-founded fear of persecution and would not be disqualified from persecution protection on criminal- or security-related grounds. This policy is consistent with the Convention Against Torture and other Cruel, Inhuman, or

~~CONFIDENTIAL~~

3

~~CONFIDENTIAL~~

Degrading Treatment or Punishment ("Torture Convention") and the Convention Relating to the

Status of Refugees ("Refugee Convention"). The Department of State advises the Department of

Defense and relevant agencies on the likelihood of persecution or torture in a given country and

the adequacy and credibility of assurances obtained from a particular foreign government prior to

transfer.



~~CONFIDENTIAL~~

4
~~CONFIDENTIAL~~



~~CONFIDENTIAL~~

5

~~CONFIDENTIAL~~



05    Page 6 of 6

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on **8** August 2005.

Pierre-Richard Prosper

~~CONFIDENTIAL~~

# **EXHIBIT 10**

2 of 2 DOCUMENTS

Copyright 2005 Cable News Network
All Rights Reserved
CNN.com

**August** 9, 2005 Tuesday  5:00 PM EST

**SECTION:** U.S.

**LENGTH:** 503 words

**HEADLINE:** U.S. officials: Gitmo **transfer** talks active

**BYLINE:** From Andrea **Koppel** and Elise **Labott** CNN Washington Bureau

**DATELINE:** WASHINGTON

**BODY:**

The United States and at least 10 other nations are involved in negotiations that could drop the detainee population at Guantanamo Bay by 80 percent — or 410 people — within the coming months, State Department officials said.

Saudi Arabia and Yemen are among the countries in "various stages of discussion" with the Bush administration about the return of their citizens in the next two months, said the two U.S. officials who hold senior posts.

Last week the United States and Afghanistan announced an agreement on a similar **transfer.**

The United States has 510 detainees from 34 countries in custody at Guantanamo.

Citizens from Saudi Arabia, Afghanistan and Yemen account for the majority of those detainees with 129, 110 and 107 respectively, the two U.S. officials said.

Detainees whom the United States considers "really bad guys" will remain in Guantanamo, the officials said,  but in coming months the facility population could drop to about 100.

The U.S. military began bringing detainees from Afghanistan to the facility in Cuba in early 2002. The detainees in custody are suspected terrorists.

The releases could begin as early as next month. CNN reviewed the agreement that countries must sign before the United States **transfers** detainees.

The terms include a commitment to:

treat detainees "humanely and in a manner consistent with applicable international obligations"

refrain from torture

allow the United States or a third party such as the International Committee of the Red Cross (ICRC) access to the detainees to "verify the assurances"

"investigate, detain and prosecute" the detainee to the fullest extent possible; and

provide the United States with "advance notice" and place the detainee on "watch lists" should a country decide to release a detainee.

"We're not changing how the detainees are classified," one senior U.S. official said. " We're changing where they're held."

The United States likely will not release all of a country's citizens at one time after reaching an agreement, one senior U.S. official said.

  

CNN.com August 9, 2005 Tuesday

This **transfers** would be more gradual, happening over months or years, the official said. That would allow the countries to avoid having to handle a crush of detainees all at once and provide the United States with the opportunity to ensure that the various governments abide by the terms of the agreement.

One particularly sticky situation in negotiations with an unnamed European country concerns the placement of more than a dozen Chinese Uigurs — Turkic people who live mainly in west China and Uzbekistan, the senior officials said. The United States is concerned the Uigurs might suffer abuse in China.

The officials said that after negative media reports about the Guantanamo facility and alleged desecrations of the Quran, citizens in Muslim countries "woke up" their governments to expediting the necessary preparations for their nationals' return.

During the last two, years the United States has released at least 80 people, including dozens of detainees to European countries.

**LOAD–DATE:** August 10, 2005

  

# **EXHIBIT 11**

NewsRoom

**Page      1**

Citation                    Search Result        Rank(R) 2 of 2        Database
8/5/05 WP-BUS  (No Page)                                                WP-BUS

8/5/05 Wash. Post (Bus. Sec.) (Pg. Unavail. Online)
2005 WLNR 12297832

Washington Post
Copyright 2005 The Washington Post

**August 5, 2005**

U.S. Negotiating Guantanamo Transfers

By Josh **White** and Robin **Wright**

WASHINGTON _ The Bush administration is negotiating the transfer of nearly 70 percent of the detainees at the U.S. detention facility in Guantanamo Bay, Cuba, to three countries as part of a plan, officials said, to share the burden of keeping suspected terrorists behind bars.

U.S. officials announced Thursday that they have reached an agreement with the government of Afghanistan to transfer most of its nationals to Kabul's ''exclusive'' control and custody. There are 110 Afghan detainees at Guantanamo and 350 more at the Bagram airfield near Kabul. Their transfers could begin in the next six months.

Pierre-Richard Prosper, ambassador at large for war crimes, who led a U.S. delegation to the Middle East this week, said similar agreements are being pursued with Saudi Arabia and Yemen, whose nationals make up a significant percentage of the Guantanamo population. Prosper held talks in Saudi Arabia on Sunday and Monday, but negotiations were cut off after the announcement of King Fahd's death.

The decision to move more than 20 percent of the detainees at Guantanamo to Afghanistan and to largely clear out the detention center at Bagram is part of a broader plan to significantly reduce the population of ''enemy combatants'' in U.S. custody. Senior U.S. officials said Thursday's agreement is the first major step toward whittling down the Guantanamo population to a core group of people the United States expects to hold indefinitely.

''This is not an effort to shut down Guantanamo. Rather, the arrangement we have reached with the government of Afghanistan is the latest step in what has long been our policy _ that we need to keep dangerous enemy combatants off the battlefield,'' Matthew Waxman, deputy assistant secretary of defense for detainee affairs, said shortly after leaving Kabul with Prosper. ''We, the U.S., don't want to be the world's jailer. We think a more prudent course is to shift that burden onto our coalition partners.''

The negotiations come amid intense international and domestic pressure on U.S. detention operations, with allegations of mistreatment and abuse as well as

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



8/5/05 WP-BUS (No Page)

concern that detainees have been held for years without being prosecuted for their alleged crimes. Legal problems have also plagued the prosecutorial process at Guantanamo, which has been blocked for months as detainees' attorneys present challenges in U.S. federal courts.

''The Guantanamo issue is clearly a liability for the Bush administration, and emptying it has become a priority,'' said John Sifton, a specialist on Afghanistan and detainee issues at Human Rights Watch, an international monitoring group. ''It's not a victory for human rights if a whole set of people deprived of their liberty are then moved to another place and continued to be deprived of their liberty unlawfully.''

The agreement with Afghanistan is the largest of its kind so far. Prosper said Thursday that the U.S. government is working to send 129 Saudis and 107 Yemenis from Guantanamo to the custody of their home countries. If the U.S. government is able to arrange the transfer of detainees who came from all three countries, the population at the U.S. facility will drop by 68 percent, from 510 to 164.

Because the United States could hold on to those detainees who are considered by officials to pose the greatest terrorist threat, the numbers could change slightly. Negotiations depend on the cooperation of the other nations.

''We're now engaging the countries with the largest populations, so we expect to see the largest potential movement from Guantanamo,'' Prosper said in an interview from Dubai. ''So if we can reach an understanding with these countries that will allow us to return them with the greatest assurances, then this will be the biggest movement yet out of Guantanamo.''

Prosper and Waxman said that before such transfers can occur, the detainees' home countries must commit to taking steps that will prevent enemy combatants from re-engaging in hostile activity, and commit to treating the detainees humanely.

A major obstacle to the transfer of detainees to Afghanistan is infrastructure. U.S. officials have agreed to help Afghanistan build an appropriate prison and to train its guards.

One possible interim solution under consideration is that Afghan detainees at Guantanamo could be transferred to Bagram until permanent facilities are built. Prosper said such facilities could allow a gradual transfer over the next six months.

The United States considers all the remaining detainees to be medium- or high-risk and therefore not eligible for release once handed over, as has happened with about 70 detainees released earlier to about a dozen countries.

Over the past year, U.S. military authorities have released several dozen Afghans that have been determined as not posing a threat. But President Hamid Karzai has repeatedly called on the United States to hand over all Afghan citizens. He raised the issue during a meeting with President Bush in May.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



8/5/05 WP-BUS (No Page)

''I don't expect it will be too long before the actual transfer of detainees will start. It should be a matter of months to build the facilities,'' said Karim Rahimi, a spokesman for Karzai.

Senior military officials and members of Congress have said in recent days that the goal is to reduce the population at Guantanamo to a point at which the detainees who are the highest security risks can be held at the modern prison buildings there, while the rest of the facility could be ''mothballed'' for possible future use. Guantanamo's Camp V and the future Camp VI are modeled after U.S. domestic prisons.

In a military fact sheet about ''the future'' of Guantanamo, developed in early July, defense officials indicated that the operational priority of the facility is to shift from intelligence gathering to long-term detention.

The document noted that ''the significant majority of detainees are no longer regularly interrogated'' and that officials expect the population to decrease.

''The way that we've looked at it is that in waging the war against al-Qaida and the Taliban, we will continue to capture enemy fighters and need to prevent them from returning to the battlefield,'' Waxman said. ''But it need not be the U.S. who detains them for the long term.''

  -0-<

Correspondent N.C. Aizenman in Kabul and researcher Julie Tate in

Washington contributed to this report.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (International Terrorism (1IN37))

INDUSTRY:  (Construction (1CO11); Correctional Facilities (1CO72); Commercial Construction (1CO15); Defense Policy (1DE81); Aerospace & Defense (1AE96); Defense (1DE43))

REGION:  (Afghanistan (1AF45); Americas (1AM92); Saudi Arabia (1SA38); North America (1NO39); Asia (1AS61); Latin America (1LA15); Cuba (1CU43); Middle East (1MI23); USA (1US73); Arab States (1AR46); Caribbean (1CA06); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (AFGHANISTAN; BAGRAM; CONGRESS; GUANTANAMO; LEGAL; TALIBAN; US NEGOTIATING GUANTANAMO)  (Bush; Correspondent N.C. Aizenman; Fahd; Hamid Karzai; John Sifton; Julie Tate; Karim Rahimi; Karzai; Matthew Waxman; Prosper; Qaida; Richard Prosper; Waxman)

Word Count: 1268
8/5/05 WP-BUS (No Page)

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



8/5/05 WP-BUS  (No Page)

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# **EXHIBIT 12**

**The New York Times**                                        **The New York Times**

**Page      1**

Citation                    Search Result          Rank(R) 6 of 11          Database
3/11/05 NYT A1                                                               NYT

3/11/05 N.Y. Times A1
2005 WLNR 3773506

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

**March 11, 2005**

Section: A

## THE REACH OF WAR: GUANTANAMO; PENTAGON SEEKS TO SHIFT INMATES FROM CUBA BASE

DOUGLAS **JEHL**; Neil A. Lewis and Tim Golden contributed reporting for this article.

Pentagon reportedly seeks help from State Department and other agencies to cut detainee population at Guantanamo prison by more than half, in part by transferring suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen; CIA, which has carried out such transfers, and State and Justice Departments have resisted some previous handovers out of concern for US security or potential mistreatment; Sec Donald Rumsfeld seeks support for plan, starting with Afghanistan; some outright releases are also possible to cut detainee population of about 540; Pentagon has also halted flow of new prisoners into Guantanamo; most there no longer have intelligence value and are not interrogated regularly; adverse court rulings and determination to get other countries to share burden also cited; Rumsfeld photo; chart on transfers (M)

WASHINGTON, March 10 The Pentagon is seeking to enlist help from the State Department and other agencies in a plan to cut by more than half the population at its detention facility in Guantanamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials.

The transfers would be similar to the renditions, or transfers of captives to other countries, carried out by the Central Intelligence Agency, but are subject to stricter approval within the government, and face potential opposition from the C.I.A. as well as the State and Justice Departments, the officials said.

Administration officials say those agencies have resisted some previous handovers, out of concern that transferring the prisoners to foreign governments could harm American security or subject the prisoners to mistreatment.

A Feb. 5 memorandum from Defense Secretary Donald H. Rumsfeld calls for broader interagency support for the plan, starting with efforts to work out a significant transfer of prisoners to Afghanistan, the officials said. The proposal is part of a Pentagon effort to cut a Guantanamo population that stands at about 540 detainees by releasing some outright and by transferring others for

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



3/11/05 NYT A1

continued detention elsewhere.

The proposal comes as the Bush administration reviews the future of the naval base at Guantanamo as a detention center, after court decisions and shifts in public opinion have raised legal and political questions about the use of the facility.

The White House first embraced using Guantanamo as a holding place for terrorism suspects taken in Afghanistan, in part because the base was seen as beyond the jurisdiction of United States law. But recent court rulings have held that prisoners there may challenge their detentions in federal court.

Indeed, the Pentagon has halted, for the last six months, the flow of new terrorism suspects into the prison, Defense Department officials said. In January, a senior American official said in an interview that most prisoners at Guantanamo no longer had any intelligence value and were not being regularly interrogated.

The proposed transfers would represent a major acceleration of Pentagon efforts that have transferred 65 prisoners from Guantanamo to foreign countries. The population at Guantanamo includes more than 100 prisoners each from Afghanistan, Saudi Arabia and Yemen, a senior administration official said, and the United States might need to provide money or other logistical support to make possible a large-scale transfer to any of those nations.

Defense Department officials said that the adverse court rulings had contributed to their determination to reduce the population at Guantanamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects.

Under the administration's approach, the State Department is responsible for negotiating agreements in which receiving countries agree "to detain, investigate, and/or prosecute" the prisoners and to treat them humanely.

"Our top choice would be to win the war on terrorism and declare an end to it and repatriate everybody," a senior Defense Department official said in an interview. "The next best solution would be to work with the home governments of the detainees in order to get them to take the necessary steps to mitigate the threat these individuals pose."

The official, who spoke on condition of anonymity, said that future transfers into Guantanamo remained a "possibility," but made clear that the court decisions and the burdens of detaining prisoners at the American facility had made it seem less attractive to administration policymakers than before.

"It's fair to say that the calculus now is different than it was before, because the legal landscape has changed and those are factors that might be considered," a senior Defense Department official said.

In addition to working to transfer prisoners to their home countries, either to face charges there or simply to be kept in detention, officials also hope to

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



3/11/05 NYT A1

shed dozens of prisoners whose cases are being studied by special review boards.

Those three-member military boards began working in earnest in January to determine which prisoners are no longer a threat, have no information of value and may be released outright.

At its peak, the population at Guantanamo exceeded 750 prisoners. But the last time prisoners were transferred there was on Sept. 22, 2004, when a group of 10 was transferred from Afghanistan. The United States has already dispatched 211 Guantanamo prisoners, releasing the majority of them. Sixty-five have been transferred to the custody of other counties, including 29 to Pakistan, 5 to Morocco, 7 to France, 7 to Russia, and 4 to Saudi Arabia.

The administration's policy of detaining suspected terrorists at Guantanamo has relied on declarations that the detainees are unlawful "enemy combatants," based on assertions that they did not serve in a conventional army, and thus did not qualify for the protections listed in the Geneva Conventions.

Administration lawyers argued successfully in lower federal courts that United States laws, including access to the courts, did not apply because Guantanamo is part of Cuba.

But last June, the Supreme Court ruled that United States law applied to Guantanamo and that prisoners there could challenge their detentions in federal courts.

In August, a federal district judge ruled that the Geneva Conventions apply to Guantanamo prisoners and that the special military commissions to try war crimes were unconstitutional. The government's appeal of that ruling is scheduled to be heard next month.

Even as it moves to reduce the population at Guantanamo, the Pentagon has asked Congress for another $41 million in supplemental financing for construction there, including $36 million for a new, more modern prison and $5 million for a new perimeter fence.

The purpose, Defense Department officials said, was to provide a secure, humane detention facility for a remnant of the current population who are expected to remain there for the foreseeable future.

As many as 200 of those now at Guantanamo will most likely remain there indefinitely, the officials said, on grounds that they are too dangerous to be turned over to other nations or would probably face mistreatment if returned to those nations.

Each of the roughly 540 prisoners at Guantanamo have gone before a three-member military board, to have their status as enemy combatants reviewed. A final review has been completed in 487 cases; of those, all but 22 were found to have been properly classified, a status leaving them subject to possible war crimes charges.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



3/11/05 NYT A1

Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments. Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept. 11.

By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring interagency approval. Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the governments that accept the prisoners are not expected to carry out the will of the United States.

Indeed, officials have been concerned that transfer of some detainees could threaten American security because they might escape from foreign prisons or the foreign governments might free them.

The White House has said its policy prohibits the transfer of prisoners to other nations if it is likely they will be tortured, and administration officials said the interagency review is intended in part to enforce that standard. Transfers have been approved by the State Department to countries including Saudi Arabia and Pakistan, identified in the department's own human rights reports as nations where the use of torture in prisons is common.

Administration officials said that American diplomats in those countries were responsible for monitoring agreements to make sure prisoners were not mistreated. The senior Defense Department official said that the difficulty of "gaining effective and credible assurances" that prisoners would not be mistreated had been "a cause of some delay in releasing or transferring some detainees we have at Guantanamo."

It is possible that Guantanamo inmates could petition a federal court to stop a transfer to a country where they did not want to be sent. But there is little if any precedent to suggest how the courts would rule.

In November, a lawyer for Mamdouh Habib, a prisoner who claimed he had been tortured in Egypt before being transferred to Guantanamo, asked a federal district court to stop the Bush administration from returning him to Egypt. Before the court ruled, he was sent to Australia in January and freed.

Photo: Defense Secretary Donald H. Rumsfeld is said to have sought broader support from other governmental agencies for transfers of detainees. (Photo by Doug Mills/The New York Times)(pg. A10)

Chart: "Transferred From Guantnamo"
While roughly 540 detainees are still being held by the American military at Guantnamo Bay, Cuba, 211 detainees have left. Of those 211, 146 have been released, and 65 have been transferred to other countries for further detention or for prosecution.

Detainees transferred from Guantnamo to other countries

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



3/11/05 NYT A1

To Pakistan: 29
Britain: 9
France: 7
Russia: 7
Morocco:5
Saudi Arabia: 4
Australia, Kuwait, Spain and Sweden: 1 each

(Source by Department of Defense)(pg. A10)

March 15, 2005, Tuesday - A front-page article on Friday about the Pentagon's efforts to send prisoners to other countries from Guantanamo Bay, Cuba, referred incompletely to legal proceedings in a recent case involving Mamdouh Habib, who had asked the Federal District Court in Washington to prohibit the government from sending him to Egypt. In November, a judge denied Mr. Habib's request but gave him permission to renew it if the government ordered his transfer there, and required the government to give advance notice of any such transfer. Mr. Habib was later sent instead to Australia, where he was released.

                    ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36); Prisons (1PR87))

INDUSTRY:  (Commercial Construction (1CO15); Aerospace & Defense (1AE96); Defense (1DE43); Construction (1CO11); Correctional Facilities (1CO72); Security (1SE29); Defense Intelligence (1DE90); Defense Policy (1DE81))

REGION:  (North Africa (1NO44); Yemen (1YE36); Southern Asia (1SO52); Saudi Arabia (1SA38); North America (1NO39); Western Europe (1WE41); Latin America (1LA15); Cuba (1CU43); Europe (1EU83); Central Europe (1CE50); Africa (1AF90); Eastern Europe (1EA48); Russia (1RU33); Indian Subcontinent (1IN32); Pakistan (1PA05); Egypt (1EG34); Arab States (1AR46); Western Asia (1WE54); Afghanistan (1AF45); Americas (1AM92); Asia (1AS61); Mediterranean (1ME20); Middle East (1MI23); Australasia (1AU56); Morocco (1MO33); USA (1US73); Oceania (1OC40); Australia (1AU55); Switzerland (1SW77); France (1FR23); Caribbean (1CA06))

Language:  EN

OTHER INDEXING:  (Rumsfeld, Donald H (Sec); Jehl, Douglas)  (BUSH; CENTRAL INTELLIGENCE AGENCY; DEFENSE; DEFENSE DEPARTMENT; DEPARTMENT OF DEFENSE; FEDERAL DISTRICT COURT; HABIB; MAMDOUH HABIB; PENTAGON; PRESIDENT BUSH; RUMSFELD; SEEKS; STATE; STATE DEPARTMENT; SUPREME COURT; WHITE HOUSE)  (Afghanistan; Donald H. Rumsfeld; Doug Mills; Habib; Justice Departments; Sec Donald Rumsfeld; Sixty) (Prisoners of War; Guantanamo Bay Naval Base (Cuba); United States Armament and Defense; United States International Relations; Terrorism; Intelligence Services; Security and Warning Systems)  (Afghanistan; Yemen; Saudi Arabia; Afghanistan)

COMPANY TERMS: STATE DEPARTMENT; JUSTICE DEPARTMENT; CENTRAL INTELLIGENCE AGENCY

EDITION: Late Edition - Final

                (C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



3/11/05 NYT A1

Word Count: 2047
3/11/05 NYT A1

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT 13**

JK                          7/2/05

NOT E.C.'s AT CSRT: (17 REMAIN MOSTLY IN ONE CAMP) (50 OTHRS +/-)

1. HAMAD     (SUDAN)

2. KHALID ALAJMAR  (ABDULLAH JAFFA, JORDAN)

3. SALIH AL OSHAN  (KSA)      (Amputee)

4. SIDDIQ AL BUKHARY  (KSA)

5. DR. ABU MOHAMMED  (ALGERIA)   (was working as MD in Pakistan)

6. KHARAMA        (YEMEN)

7. ABU BAKR QASSIM   (TURKESTAN)

8. MOHAMMED ABU ABID  (   "   )

9. MUKTAR          (   "   )

10. AHMAD          (   "   )

11. ZHAKIR        (UZBEKISTAN)      (2 IN THALKER ?)
                   /RUSSIAN

12. AL AYUB       (TURKESTAN)      (BACK TO CAMP I)

13. SHEIKH ALAA ALAA  (EGYPT)     (   "   "   "   )

14. MISHAL        (KSA) (     )   (HOSPITAL) (WAS in Comm)

15.

16.

17.

OTHERS RUMORED: WERE SAID TO BE EC's but reversed the ruling

**FOUO**                          5

# **EXHIBIT 14**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAHMOAD ABDAH, *et al.*, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | )     Civil Action No. 04-1254 (HHK) (RMC) |
| | ) |
| GEORGE W. BUSH, *et al.*, | ) |
| | ) |
| Respondents. | ) |

## MEMORANDUM OPINION

Thirteen Yemeni nationals, designated as "enemy combatants" at the Guantanamo Bay Naval Base ("GTMO") in Cuba, petition for a temporary restraining order ("TRO") to prevent their removal from GTMO and rendition to the custody of another government. They argue that such removal and rendition could have the effect of denying them access to U.S. courts for review of their detainment status and also potentially expose them to interrogation techniques and treatment that would be contrary to the laws of the United States.

Prior to their application for a TRO, the Petitioners had sought a preliminary injunction that would require the Government to give Petitioners' counsel 30-days notice of any such transfer. That matter is set for hearing before Judge Henry Kennedy on March 24, 2005.[1] In the

---

[1] The petition for a TRO is before the undersigned as the emergency motions judge for the weekend. It was filed in a manner consistent with secret documents in these cases at approximately 10:30 p.m. on Friday evening, March 11, 2005. Because the motion was filed on a Friday night *ex parte*, and because some of the materials appended to the motion are classified "Secret," the Court has not had the benefit of an opposition to the petition for a TRO or even argument from Petitioners' counsel, there being no available court reporter with clearance. Its decision here is clearly limited by those circumstances. The Court concludes that it can enter this memorandum opinion and order because it bases its analysis largely on the Government's arguments and factual proffer before Judge Kennedy.

meantime, the *New York Times* ran a story on March 11, 2005, describing a proposal by the Pentagon

and Secretary of Defense Donald Rumsfeld to transfer more than half of the GTMO detainees to

prisons in Saudi Arabia, Afghanistan, and Yemen.[2]   Petitioners' counsel also learned from co-

counsel at the Center for Constitutional Rights, "citing information from a person, who, for

professional reasons, refuses to make her sources public – that the government intends to transfer

many detainees very quickly."  Petitioners' *Ex Parte* Motion for Temporary Restraining Order to

Prevent Respondents From Removing Petitioners From Guantanamo Until Petitioners' Motion for

Preliminary Injunction Is Decided ("Pets.' Motion"), Declaration of Marc D. Falkoff ("Falkoff

Decl.") ¶ 3. Petitioners seek an *ex parte* TRO "because they are apprehensive that a public filing will

provoke respondents to initiate the exact dark-of-night transfers that petitioners seek to prevent."

Pets.' Motion at 2.

**BACKGROUND**

The Petitioners' underlying case is one of many *habeas corpus* petitions filed in the

District Court for the District of Columbia on behalf of GTMO detainees after the Supreme Court

in *Rasul v. Bush* held that "the federal courts have jurisdiction to determine the legality of the

Executive's potentially indefinite detention of individuals who claim to be wholly innocent of

wrongdoing." 124 S. Ct. 2686, 2699 (2004).  The Government filed motions to dismiss or for

judgment as a matter of law in opposition to many of these *habeas* petitions.  Judge Joyce Hens

Green, who had been designated to decide common issues of law and fact in eleven of these cases,

---

[2] *See* Pets.' Motion, Exh. C (Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba, The New York Times* (March 11, 2003)).

granted the motion in part and denied it in part.[3]  In a separate case, Judge Richard Leon granted the

motion in its entirety.[4]  The cases before Judges Green and Leon have been fully briefed in the D.C.

Circuit Court of Appeals and are under submission.

Fearful that the Government would transfer the detainees to other countries to avoid

further adverse court rulings, the Petitioners have sought a preliminary injunction from Judge

Kennedy to require 30-days prior notice of any such transfer.  The Government filed its opposition

to that petition on March 8, 2005 and described in detail the nature of its process for considering

transfer of GTMO detainees.  While that process involves high-level contacts between the U.S.

Department of State and a foreign government, as well as consideration of a detainee's status by the

U.S. Department of Defense, it does not contemplate any coordination or notice to the courts, where

constitutional issues are being litigated, or notice to the detainees' counsel.

## LEGAL STANDARDS

A TRO may be granted "without written or oral notice to the adverse party or that

party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified

complaint that immediate and irreparable injury, loss, or damage will result to the applicant before

the adverse party or that party's attorney can be heard in opposition . . . ." FED. R. CIV. P. 65(b).  The

purpose of a TRO is to preserve the status quo and prevent irreparable harm until a hearing can be

held.  *See Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974).

In considering a request for a TRO, the court must examine whether: "(1) there is a

---

[3]  *In re Guantanamo Detainee Cases*, 2005 WL 195356 (D.D.C. Jan. 31, 2005), *appeal docketed*, No. 05-8003 (D.C. Cir. ___ ).

[4]  *Khalid v. Bush*, 2005 WL 100924 (D.D.C. Jan. 19, 2005), *appeal docketed*, No. 05-5063 (D.C. Cir. ___ ).

substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360 (D.C. Cir. 1999). These factors interrelate on a sliding scale and must be balanced against each other. *Id.* at 361. A strong showing on one factor can outbalance a weaker showing on another.

Where the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.* at 844.

## ANALYSIS

The analysis here needs to define the rights at issue. Petitioners have a pending motion for a preliminary injunction ("PI") to obtain prior notice before they may be transferred to a foreign country for continued detention and, perhaps, interrogation by techniques that may be contrary to the laws of this country. Their motion for a PI, in turn, is designed to protect the Petitioners' rights to have the lawfulness of their current detention at GTMO ruled on by the Court of Appeals.

As defined by the Supreme Court, "'the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest.'" *Rasul*, 124 S. Ct. at 2692 (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)). "Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land." *Id.* (quoting *Shaughnessy v. United States ex. rel. Mezei*, 345 U.S. 206, 218-219 (1953) (Jackson, J., dissenting)). The "law of the land" is interpreted and applied in this country by its court systems.

Detainees at GTMO may be transferred to the control of another government, generally to their country of citizenship, for release. Respondents' Memorandum in Opposition to Petitioners' Motion for Order Requiring Advance Notice of Any Repatriations or Transfers From Guantanamo ("U.S. Opp.") at 3; Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman ("Waxman Decl.") ¶ 3; Declaration of Ambassador Pierre-Richard Prosper ("Prosper Decl.") ¶ 3. "The United States also transfers Guantanamo detainees, under appropriate conditions, to the control of other governments for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies." U.S. Opp. at 3; *see also* Pets.' Motion, Exh. F.

The Petitioners have adequately shown that they could face continued detention at the request of the United States, or as a condition of their release from GTMO set by the United States, in any country to which they might be transferred even if, after the transfer, that foreign nation assumed full responsibility and control over their terms of incarceration and the United States

-5-

fully relinquished such responsibility and control.

 A. <u>Likelihood of Success on the Merits</u>

  *Habeas corpus* challenges the detention of the petitioner. The Government wants at least some of the GTMO detainees to remain in detention, even if transferred to the control of foreign nation. Once transferred, however, their *habeas* petitions would become moot because the courts in the United States would no longer have control over their warden.

  The Government argues to Judge Kennedy, in its opposition to the Petitioners' request for a preliminary injunction, that "[t]here is no legal basis for judicial intervention in the processes by which enemy combatant detainees are repatriated or transferred, and any such interference would illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." U.S. Opp. at 1. Obviously, the Petitioners' request for 30-days advance notice of any transfer is not at issue here and will not be decided. For purposes of the TRO, however, the Court finds that it would not be necessary in any way to intrude into foreign relations or negotiations over repatriation or transfer. The Court need only assess whether removing the detainees from the jurisdiction of the Court – while insisting on their continued detention – is subject to a temporary injunction so that the legality of that detention *ab initio* can be determined and the trial judge can decide whether prior notice is appropriate. These issues are "'so serious, substantial, difficult and doubtful'" as to warrant maintaining the status quo "whether or not movant has shown a mathematical probability of success." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844 (citation omitted).

  There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions. *Rasul*, 124 S. Ct. at 2698. There is also no doubt that "the All Writs

-6-

Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its jurisdiction . . . ." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). The Government resists this conclusion by arguing that Judge Green stayed these cases "for all purposes" and that there is no jurisdiction remaining in the district court. The Court disagrees.

The appeal from Judge Green's ruling is interlocutory; the rest of the case remains with Judge Kennedy and with the undersigned as the emergency motions judge. Because Judge Green's ruling was so fundamental to the very rights of these litigants in the federal courts – and because Judge Leon's ruling disagreed – Judge Green ordered an administrative stay to save time, money and judicial resources. Such a stay could not be read to also deprive the Petitioners of their rights to seek emergency assistance when faced with continued detention at the request of the United States but no venue in which to challenge its legality.

The Court expresses no opinion on the likelihood that Petitioners will succeed in their request for a 30-day notice prior to any transfer to a foreign country. Instead, it rules that the Petitioners have at least a fifty-fifty chance of prevailing on their constitutional claims before the Court of Appeals and that they raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the executive.

B.     Irreparable Harm

Were the Petitioners to be transferred to the control of a foreign country, they would effectively lose their rights to pursue their *habeas* claims in this country. The Court finds that their injury would be continued detention outside the jurisdiction of U.S. courts – courts that are actively reviewing the constitutionality of that very detention. While the Supreme Court has

granted them a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in *habeas corpus*, because U.S. courts would no longer have control over their warden. Presumably, the Petitioners would suffer no harm if the Government were to transfer them to Yemen for release; that is the goal of their *habeas* petitions. A transfer with continued indeterminate detention with no right of review or further court access poses a very different set of parameters. With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners.

Nonetheless, the Court pauses over whether the Petitioners have shown the immediacy of potential harm that justifies a TRO before the Government or its attorney could be heard. FED. R. CIV. P. 65(b) (TRO may be granted without notice only if "it clearly appears from specific facts . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition."). The only evidence of immediacy here is third- or fourth-hand hearsay: co-counsel at the Center for Constitutional Rights told Petitioners' counsel that s/he was informed by an unnamed person that another unnamed source confided that the Government intends to transfer many detainees – who may or may not include any of the instant Petitioners – "very quickly." The reliability of such information cannot be ascertained. Yet the Government has already denied a request from counsel for the Petitioners that it informally agree to give advance notice of any transfer and it clearly regards such notice as an intrusion into the executive sphere of foreign relations. Consequently, the Petitioners state that they filed *ex parte* to avoid precipitating any hasty action by the Government to avoid addressing such transfers-and-continued-detention in a U.S. court.

-8-

What is evident from the record is that the Pentagon and the State Department are working together to arrange for some numbers of unspecified GTMO detainees to be transferred to foreign nations and detained for uncertain periods. The Government refuses to give any advance notice of such transfers. Approximately 200 detainees have already been transferred, sixty-five of whom were sent abroad on the condition that they continue to be detained. Prosper Decl. ¶ 2. "Of those 65 detainees who have been transferred to the control of host governments, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco, 6 to France, 4 to Saudi Arabia, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia." *Id.* That this process continues is acknowledged by the United States. "Among the assurances sought in every transfer case in which continued detention by the government concerned is foreseen is the assurance of humane treatment . . . ." *Id.* ¶ 6. Under these circumstances, the only way that anyone could know that a transfer is about to happen, *i.e.,* be "immediate," is if one is within the chain of command within the federal departments that consult on such matters or if there were information revealed *sotto voce* to a reporter. Based on the totality of the circumstances, the Court finds that the Petitioners face a risk of irreparable harm that is sufficiently immediate to warrant temporary relief.

      C.   <u>Injury to the Government</u>

The Court can see no injury to the Government from granting a temporary injunction here. At most, this injunction will be alive for ten days unless both parties agree to its continuation or Judge Kennedy extends it another ten days. Nothing about this injunction will serve to prevent the Government's diplomatic and other efforts to arrange transfers of Guantanamo Bay detainees but it will ensure that a judicial officer reviews the Petitioners' rights

-9-

to prior notice and/or retention in this jurisdiction before the Government actually carries out any

such transfer.

        D.    <u>Injury to the Public Interest</u>

The Court can see no injury to the public interest from granting a temporary

injunction here.

## CONCLUSION

For the reasons stated, the *Ex Parte* Motion for a Temporary Restraining Order

will be GRANTED. The Temporary Restraining Order accompanies this memorandum opinion.


DATE: March 12, 2005.               /s/ _____

                                     ROSEMARY M. COLLYER

TIME: 3:40 p.m.                    United States District Judge