# IN THE UNITED STATES DISTRICT
# COURT FOR THE DISTRICT OF COLUMBIA

JAMAL KIYEMBA, *et al.*,

      Petitioners,

      v.

GEORGE W. BUSH,
*et al.*,

      Respondents.

Case No. 1:05-cv-01509-RMU

**OPPOSITION TO MOTION FOR
ORDER TO SHOW CAUSE WHY
CASE SHOULD NOT BE
DISMISSED FOR LACK OF
PROPER "NEXT FRIEND"
STANDING**

      Petitioners Abdusabur Doe, Abdusamad Doe, Abdunasir Doe, Hammad Doe, Hudhaifa Doe, Jalaal Doe, Khalid Doe, Saabir Doe, and Saddiq Doe (hereinafter "Petitioners"), are prisoners at the United States Naval Station, Guantánamo Bay, Cuba, ("Guantánamo"). Petitioners, having no meaningful way of securing legal representation for themselves, filed *habeas corpus* petitions through their next friend, Jalaal Kiyemba ("Kiyemba"). Due to Government imposed restrictions on access to and communication with Guantánamo detainees, undersigned counsel has not yet been permitted to speak directly with Petitioners.

      In their Motion for an Order to Show Cause Why Case Should Not be Dismissed for Lack of Proper Next Friend Standing ("Motion"), Respondents argue that Petitioners are not entitled to challenge the legality of their detention through their next friend, Kiyemba. This Motion ignores the fact that the Government has—to date—denied Petitioners access to counsel. Before issuing any order to show cause, the Court should require that Respondents allow Petitioners' counsel to come to Guantánamo and meet with Petitioners. Such meetings will (i) identify any prisoners who do not wish to have counsel, (ii) permit those petitioners who do

which for us to proceed to so indicate in their own right, and thus (iii) moot much of the relief

sought.  Until counsel are afforded access to Petitioners, the Motion is premature.

The Motion appears to be yet another effort by Respondents to frustrate the Supreme

Court's mandate that Petitioners are entitled to have the District Court "*hear* [their] habeas

corpus challenges to the legality of their detention." *Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004)

(emphasis added).  Since imprisoning at Guantánamo suspected "enemy combatants" nearly

four years ago, the Government has actively sought to discourage detainees from seeking legal

counsel.  Among other things, the Government has:

- isolated and mistreated detainees who have sought access to counsel (Decl. of Clive A. Stafford Smith, ¶¶ 99-101 (Sept. 12, 2005) ("Smith Decl.") (attached at Ex. 1);
- told detainees that they have a better chance of being released if they do not hire a lawyer (*Id.* at ¶ 104); and
- falsely impersonated lawyers in an effort to get detainees to talk (*Id.* at ¶ 103).

This mistreatment cannot be allowed to continue.

In its Motion, the Government wrings its hands about "the practical difficulty of

identifying the detainees for whom *habeas* relief is sought." Motion at 11-12. This claim is

meritless. Petitioners are part of a very small and discrete Turkic Muslim minority group known

as Uighurs ("WEE-ghurs").  Only a handful of Uighurs are imprisoned at Guantánamo.

Moreover, the Government has—*for well over a year*—acknowledged that many if not all of the

Uighurs at Guantánamo are non "enemy combatants." *See, e.g.*, Interview with Gordon England,

Secretary of the Navy, in Washington, D.C., at 3 (Mar. 29, 2005) ("I think it has been reported

*we have Uighurs from China that we have not returned to China, even though, you know, some*

*of those have been deemed, even before these hearings, to be non-enemy combatants* because of

concerns and issues about returning them to their country.") (emphasis added) (Decl. of Jason

2

Stiles Pinney Re Pet'rs' Mot. for Order to Show Cause and For Entry of Protective Order ¶ 4 (Aug. 17, 2005)) ("Pinney Aug. 17, 2005, Decl."); Interview with Colin Powell, Secretary of State, in Washington, D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantanamo. The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at.") (*Id.* ¶ 6); Interview with Richard Boucher, Spokesman for the Department of State, in Washington, D.C., at 6-7 (May 13, 2004) ("In the case of the Uighurs who are there, *we have identified some who might be eligible for release*. We are currently considering how that process can work. If it's decided that they can, obviously, the situations of individual, individuals need to be taken into account, including their wishes and their ability to go to different places.") (emphasis added) (attached at Ex. 2). The Government clearly knows their identities.

The hypocrisy of the Government's position is further demonstrated by its claim that "of the petitioners whom respondents have been able to arguably identify as of this date, all are held as enemy combatants." Motion at 19 n.18. As we show in the Declaration of Sabin Willett (filed under seal), this assertion is simply false. The information known to the Government for at least a month makes it clear beyond any doubt that the Government knows precisely who and where Petitioner Saadiq Doe is, and likely has similar knowledge with respect to all of the Petitioners.

Although Petitioners believe that proper next friend standing exists, any doubt can easily be eliminated if counsel is permitted to visit Guantánamo to meet with Petitioners. Petitioners are all in the Government's custody. The Government could make them available for interviews.

3

An effort to have their cases dismissed is a transparent effort to avoid disclosing to the judiciary that there is no lawful basis to hold them.

## BACKGROUND

As detailed in the Petitioners' July 29, 2005, *habeas corpus* petition ("Petition"), Petitioners are believed to be ethnic Uighurs from the Xinjiang Uyghur Autonomous Region, a province of the People's Republic of China (also referred to as "East Turkistan"). Uighurs are a minority group that has been, and continues to be, brutally oppressed by the communist Chinese government. *See* U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2004 (Feb. 28, 2005) (Pinney Aug. 17, 2005, Decl. ¶ 2).

As noted above, the Government has repeatedly acknowledged that many—*if not most*— of the Uighurs imprisoned at Guantánamo have been exonerated by the Government. *See, e.g.,* Robin Wright, *Chinese Detainees Are Men Without a Country: 15 Muslims, Cleared of Terrorism Charges, Remain at Guantánamo With Nowhere to Go*, WASH. POST, Aug. 24, 2005 ("In late 2003, the Pentagon quietly decided that 15 Chinese Muslims detained at the military prison at Guantánamo Bay, Cuba, could be released.") (Decl. of Jason Stiles Pinney Re Application for Prelim. Inj. and Memo. in Supp. Thereof ¶ 3) (Sept. 7, 2005) ("Pinney Sept. 7, 2005, Decl."). Yet the Uighurs still languish in prison at Guantánamo, and the Government continues to assert its authority detain them for "as long as it takes." Tr. of Status Conf. before Hon. James Robertson at 18 (Aug. 25, 2005), *Qassim v. Bush*, Civ. No. 05-497 (JR) (*Id.* ¶ 4).

Upon information and belief, all Petitioners have been held virtually *incommunicado* at Guantánamo for over three years. Eight of the nine Petitioners are believed to be citizens of the People's Republic of China. Petitioner Saddiq Doe, however, is thought to be an ethnic Uighur who is a citizen of Saudi Arabia. Furthermore, upon information and belief, **Petitioner Saddiq Doe has been exonerated by the Government in a Combatant Status Review Tribunal**. *See id.* ¶ 14. As is shown in the September 8, 2005, Declaration of Sabin Willett ("Willett Sept. 8, 2005, Decl."), filed under seal, there can be no doubt that the Respondents know precisely who

4

Petitioner Saddiq Doe is, precisely where he is, and that he is not an enemy combatant. That Declaration also shows beyond a shadow of a doubt that the Government has kept the fact of his exoneration a secret and, by this Motion, would continue to do so.

Further, it may be that other Petitioners are also non enemy combatants—a fact which would remain concealed by a grant of this Motion.

Because the Petitioners lack any meaningful way of accessing United States courts or obtaining counsel, Kiyemba, who is also presently incarcerated at Guantánamo, brought the Petition as Petitioners' next friend.

## ARGUMENT

**I.      Petitioners' Right to Seek Habeas Relief Should Be Jealously Guarded by the Court.**

As the Supreme Court has repeatedly recognized, "[t]he writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969).  It is for that reason that "[t]he scope and flexibility of the writ – its capacity to reach all manner of illegal detention – its ability to cut through barriers of form and procedural mazes – have always been emphasized and jealously guarded by courts . . . ." *Id.* at 291.

Petitioners allege that they have been held "virtually incommunicado" (Petition ¶ 27), "denied access to legal counsel and to the Courts of the United States" (*id.* ¶ 5), and subjected to "unlawful . . . interrogation techniques . . . includ[ing] . . . physical and psychological abuse" (*id.* ¶ 36).  The Supreme Court recognized in *Rasul* that such allegations "unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.' 28 U.S.C. § 2241(c)(3)." 124 S. Ct. at 2698 n.15.  In light of *Rasul*, the Supreme Court's admonition that "[t]he very nature of the Writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected," *Harris*, 394 U.S. at 291, rings especially true.

The Government's concerted effort to obstruct the Petitioners' access to counsel and the courts—of which their Motion is but one small part—plainly undermines "[t]he very nature" of

the Great Writ.

## II.    The Government Actively Obstructs Detainees' Access to Counsel.

The Government's suggestion that it has gone to great lengths to ensure that detainees have access to counsel and the courts is unmitigated hypocrisy.  The Petitioners are prisoners on an island thousands of miles from their homes and families.  They have been detained there, cut off from the outside world, for more than three years.  Many detainees are housed in solitary confinement and cannot speak to other prisoners or even guards.  Smith Decl. ¶¶ 99-101. Contrary to the Government's assertion, many detainees are not given access to pen and paper. *Id.* ¶ 95-96.  Many, of course, do not speak English, and few if any have legal training.  They are reluctant to contact friends and family on the outside—if at all possible—for fear of putting them at risk. *Id.* ¶ 88.  For all intents and purposes, they simply have no meaningful contact with the outside world.

The Government asserts that the Petitioners' physical isolation is remedied by three factors:  (1) detainees have been told that they "have a right to file a petition for habeas corpus" and have been given "the address of the United States District Court;" (2) the government will give the American Bar Association's ("ABA") address to *pro se* detainees who ask for counsel; and (3) all detainees can "send and receive mail, allowing them to contact family and friends . . . to have them file habeas petitions on their behalf."  Motion at 5-6.   The notion that this constitutes access to the courts and counsel is nonsense.

A.    The "right" to file *pro se* is illusory.

First, it is almost incomprehensible that a detainee, operating from a cell in Guantánamo, with no knowledge of the United States legal system, who does not speak English, and who may not even have access to pen and paper, is supposed to be able to file a *pro se* petition for *habeas corpus*.  Even if a detainee were capable of writing and filing the petition, that would hardly be an effective means of exercising the right, given the intensity and complexity of the legal impediments the Government is throwing up to block this Court from hearing *habeas* petitions at all.  The challenge is great enough for teams of skilled detainee lawyers on the pending cases.  A

6

*pro se* petitioner does not stand a chance. As this Court recognized in *Al Odah*, "[p]etitioners cannot be expected to exercise this right without the assistance of counsel." *Al-Odah v. United States*, 346 F. Supp. 2d 1, 8 (D.D.C. 2004). As such, the detainees' "right" to file a *pro se* petition is illusory.[1]

    B.    <u>Offering to help find ABA volunteer lawyers is disingenuous and ineffective.</u>

The proposal to help detainees secure volunteer lawyers through the ABA is laughable. First, it is exceedingly difficult to imagine that Petitioners, or any detainees, are likely to trust attorney referrals from their jailers. A list of counsel "approved" by the Government is the worst imaginable incarnation of "trust us. We are the Government and we are here to help."

Moreover, the supposed ABA program *does not even exist yet*. According to the Government "DoD *will soon begin* delivering a notification to [detainees who request counsel] to advise them of the ABA's offer to secure them legal representation, and to provide them with the address of the ABA if they desire such assistance." Motion at 6 (emphasis supplied). The Petitioners want help <u>now</u>, not when the DoD decides it is time.

Lastly, the Petitioners already have help. They are represented by willing *pro bono* counsel. It defies logic to suggest that the Petitioners—who have already expressed through their next friend their desire to be represented in this *habeas* petition—should have their case dismissed now in favor of different *pro bono* counsel offered to them at some later time via a Government initiated program created *years* into their incarceration.

    C.    <u>The Petitioners already have contacted a friend to bring a Petition for them.</u>

The Government concludes that because "all detainees have been notified of their right to submit petitions for writ of habeas corpus [and] they have the ongoing opportunity to send mail to family, friends, and the court . . . it cannot simply be assumed that [these Petitioners] cannot

---

[1] Even if it is true, as the Government says, that 55 detainees—less than 10% of the detainee population—have done so, it is bizarre to conclude, as the Government does, that the 500 or more detainees who have not filed *pro se* petitions would prefer indefinite imprisonment to representation by counsel.

file petitions on their own behalf." Motion at 6-7. First, for the reasons describe above (and probably others), the Petitioners most likely cannot file petitions on their own behalf, a circumstance created by the Government itself.

Moreover, *the Government explicitly told the Petitioners that they could contact a "friend" to file on their behalf.* Motion at 6 and supporting Declaration of Frank Sweigart ("Sweigart Decl.") ¶¶ 3-5 & Exs. A-C thereto (stating that all detainees were informed in writing that they could "ask a *friend* or family member or a lawyer to file [a *habeas* petition] with the court.") (emphasis added). The Government now would have the court dismiss Petitioners' cases for having done what it asked.

"No," the Government in effect insists, "not this friend who has been incarcerated with you for the past three years. You must find someone else. Perhaps someone in China." That is extremely problematic. It is already the case among many detainees generally that they do not wish to involve their friends or family for fear of dragging them in and causing them to be harmed. Smith Decl. ¶ 88. This fear is even more acute in the case of the Uighur detainees, because of the brutal repression Uighurs face at the hands of the communist Chinese government. It is more than reasonable to suppose that these Petitioners, who want their freedom, do not want it at the expense of their loved ones' lives or liberty, and therefore would not seek their help as next friends.

### III.    The Government's Challenge to the Uighur Petitioners is Indefensible.

The Government frets that "the phenomenon of detainees filing petitions purportedly on behalf of other detainees about whom they have little knowledge presents the practical difficulty of identifying the detainees for whom habeas relief is sought." Motion at 11. This challenge to these Uighur Petitioners is especially indefensible.

First, the Uighur population at Guantánamo reportedly totals twenty-two people. At least two of them are presently represented and known to the Government in the *Qassim* case. That leaves twenty Uighurs, nine of whom are the Petitioners here. The Uighurs have presented unique issues for the Government because most of them have been found to be non enemy

8

combatants ("NECs"), but they cannot be sent back to China for fear that they will be tortured there. As noted above, the Government has explicitly recognized the Uighurs' plight publicly. For the Government to suggest that it cannot identify these nine Petitioners is beyond belief. It knows their names, their ISN's, and their locations.

The Government asked Petitioners' counsel to collect additional information about them, which request was accommodated. Motion at 10. That additional information was gathered, put into a memorandum, and submitted to the Government. A copy is attached to the Willett Sept. 8, 2005, Declaration, and has resided in the secure facility since mid-August, where it awaits "classification review." What can be said now is that the memorandum contains considerable detail about each detainee, including the camp in which the detainee is housed and physical characteristics of the detainee. Still, the Government purports to be unable to identify some of these nine Uighur Petitioners.

Moreover, the Motion asserts that "of the petitioners whom the respondents have been able to arguably identify as of this date, all are held as enemy combatants." Motion at 19 n.18. Petitioners have already submitted evidence to this Court that Petitioner Saddiq Doe has previously been determined to be a NEC. *See* Pinney Sept. 7, 2005, Decl. ¶ 14. The Declaration of Sabin Willett[2] (which is designated "classified" and stored at the Secure Facility) also contains information that demonstrates (i) that one of the Petitioners is known to the Government to be a NEC, (ii) that the Government has had, since August 13, further descriptive information about all of the Petitioners, and (iii) that the Government knew that counsel in this matter, who visited other clients on August 29, 2005, was within ten meters of Petitioner Saddiq Doe and could easily have addressed any issue as to representation had the Government not waited until after that visit to file the Motion.

---

[2] The Willett Declaration contains presumptively classified information and thus has been filed under seal from the Secure Facility. Petitioners' counsel has sought Department of Defense review for purposes of having it unclassified. If the Government determines that all or part of the declaration should be unclassified, Petitioners will promptly file an unclassified version.

The Government has a history of deceiving the Court as to the non-enemy combatant status of Uighur detainees. In *Qassim*, the Government knew for months—but did not disclose to the Court or to Petitioners' counsel—that both petitioners there had been cleared and were deemed to be NECs. *See* Willett Sept. 8, 2005, Decl.; *Qassim* Aug. 19, 2005, Memo. Order at 1-2 ("*Qassim* Memo. Order") (attached at Ex. 3). Despite this knowledge (or perhaps because of it), the Government actively fought giving factual returns and obtained a stay of the case. *Qassim* Memo. Order at 2. It was not until the petitioners counsel visited them at Guantánamo that they learned the petitioners had been exonerated. *Id.*

The pattern has begun to repeat itself here, with the false claim that the Government knows of no NECs among the petitioners. Moreover, because of the concededly high number of Uighurs who have been found to be NECs, and their similar factual situation, there is a reasonable probability more of these Petitioners have been cleared. Given that the Government refuses to produce CSRT reports or offer any evidence of the petitioners' enemy combatant status, *see* Letter and E-Mail Correspondence Between Susan Baker Manning and Terry Henry (Aug. & Sept. 2005) (attached at Ex. 4), this Motion can only be another effort to conceal the fact of our clients' right to release.

If identification is truly a problem, there is a simple solution. Petitioners' counsel should be permitted to visit Guantánamo for purposes of meeting with the clients, or, at minimum, with their next friend Kiyemba. Three of the undersigned counsel have obtained security clearances, and seek to visit Guantánamo within the month. All Petitioners ask is that they be given an opportunity to confer with their counsel. Surely this is a reasonable response under the circumstances, especially where the Government itself purports to be bending over backwards to ensure that detainees who want counsel have access.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully ask that the Government's Motion for an Order to Show Cause Why Case Should Not be Dismissed for Lack of Proper Next Friend Standing be denied, or, in the alternative, held in abeyance until a reasonable time after

Petitioners' Counsel have been permitted to meet with the Petitioners.

Dated:  September 12, 2005

Of Counsel:

    Barbara Olshansky
    Deputy Director
    CENTER FOR CONSTITUTIONAL
    RIGHTS
    666 Broadway, 7th Floor
    New York, NY 10012
    Telephone:    (212) 614-6439

Sabin Willett
Neil McGaraghan
Jason S. Pinney
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
Telephone:    (617) 951-8000
Facsimile:    (617) 951-8925

Susan Baker Manning
Hope M. Jarkowski
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC  20036-3406
Telephone:    (202) 778-6150
Facsimile:    (202) 778-6155

David A. Peters
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
Telephone:    (860) 240-2700
Facsimile:    (860) 240-2800

11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JAMAL KIYEMBA, *et al.*,

   Petitioners,

   v.

GEORGE W. BUSH
*et al.*,

   Respondents.

Case No. 1:05-cv-01509-RMU

**DECLARATION OF JASON STILES PINNEY RE OPPOSITION TO MOTION FOR ORDER TO SHOW CAUSE WHY CASE SHOULD NOT BE DISMISSED FOR LACK OF PROPER "NEXT FRIEND" STANDING**

I, Jason Stiles Pinney, declare as follows:

   1. I am over 18 years of age. I have personal knowledge of the facts stated herein, except those stated on information and belief, and, if called upon, could and would testify competently to them. I make this declaration in support of Abdusabur Doe, Abdusamad Doe, Abdunasir Doe, Hammad Doe, Hudhaifa Doe, Jalaal Doe, Khalid Doe, Saabir Doe and Saddiq Doe's (hereinafter "Petitioners"), acting on their own behalf and through their Next Friend, Jamal Kiyemba, Opposition to Motion for Order to Show Cause why Case Should Not be Dismissed for Lack of Proper "Next Friend" Standing. I am associated with Bingham McCutchen LLP, counsel for Petitioners.

   2. A true and correct copy of the Declaration of Clive A. Stafford Smith, dated Sept. 12, 2005, is attached as Exhibit 1.

   3. A true and correct copy of an Interview with Richard Boucher, Spokesman for the Department of State, in Washington, D.C., dated May 13, 2004, is attached as Exhibit 2.

   4. A true and correct copy of the August 19, 2005, Memorandum Order in *Qassim, et al., v. Bush, et al.* (Civ. No. 05-497 (JR)), is attached as Exhibit 3.

   5. True and correct copies of letter and e-mail correspondence between Susan Baker Manning and Terry Henry (Aug. & Sept. 2005), are attached as Exhibit 4.

   6. A true and correct copy of a Declaration by Attorney Barbara Olshansky, with attachments, dated September 9, 2005, is attached as Exhibit 5.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on September 12, 2005, in Boston, Massachusetts.

Jason Stiles Pinney

LITDOCS/614795.1

# **EXHIBIT 1**

LONDON, ENGLAND

## DECLARATION OF CLIVE A. STAFFORD SMITH

COMES NOW, CLIVE A. STAFFORD SMITH, being sworn, and hereby states as follows:

1.    I am a member of the bars of Georgia, Louisiana and Mississippi, as well as of the United States Supreme Court and various lower federal courts.

2.    I make this declaration concerning the plight of the prisoners in Guantanamo Bay, and the problems that they face in obtaining meaningful access to courts.

3.    Everything I write in this affidavit is unclassified or not subject to the classification procedure.

4.    Respondents in these cases have recently filed to dismiss the habeas cases brought by various prisoners by next friends. *Respondents' Motion for Order to show Cause why Case should not be Dismissed for Lack of Proper 'Next Friend' Standing or, in the Alternative, to stay proceedings pending related Appeals and for Continued Coordination* (hereafter *'Respondent's Motion'*).

5.    The next friends who are challenged are identified as Omar Deghayes, Jamal Kiyemba, Shaker Aamer, Bisher al Rawi, Usama abu Kabir, former detainee Moazzam Begg, all of whom are my clients. The only one who is not is the "one unnamed detainee." *Respondents' Motion, at 4.*

6.    The list of cases are as follows:

| Number | Petitioner | Next Friend Petitioner |
|---|---|---|
| 05-CV-1458(ESH) | Ahmed Doe | Omar Deghayes |
| 05-CV-1497(RCL) | Adil bin Muhammed al Wirghi | Moazzam Begg |
| 05-CV-1504(RMC) | Nabil | Jamal Kiyemba |
| 05-CV-1505(RMC) | Abbar Sufian al Hawary | Shaker Aamer |
| 05-CV-1506(RMC) | Shafiq | Jamal Kiyemba |
| 05-CV-1601(GK) | Hamid al Razak | Bisher al Rawi |
| 05-CV-1635(PLF) | Mohammed Akhtiar | 'Unnamed Detainee' |
| 05-CV-1704(JR) | Sadar Doe | Usama Abu Kabir |

7.    Respondents' position is difficult to accept for a number of reasons.

### Guantanamo Bay: The Background

1

8.    I first became involved in the representation (or attempted representation) of the prisoners in Guantanamo Bay in early 2002, because I believed strongly that this nation fails in its most profound promise when it holds prisoners beyond the rule of law.

9.    The prisoners are cut off from the world to an extraordinary degree. The isolation of the prisoners has been a cause of huge concern for families of missing persons across the world, as not everyone there is able to send or receive mail. Some family members do not know today – more than three years later – that their loved ones are in Guantanamo Bay. Indeed, one of my clients, who was apparently just fourteen at the time that he was seized in Pakistan, has never received any letter from his family in Saudi Arabia and still does not know whether his family know that he is alive.

10.    The fact that family members do not know who is truly in Guantanamo Bay is entirely the fault of Respondents. Like most of the problems faced by all parties to this process, this could be solved by the simple expedient of publishing the names and 'Internment Serial Numbers' (ISN's) of all prisoners. This, Respondents have steadfastly refused to do.

### The Extremely Difficult Challenge of Providing Prisoners with a Channel for their Legal Rights

11.    After initially bringing litigation on behalf of two British nationals and one Australian, the small group of lawyers involved in this litigation were joined by the twelve Kuwaitis, whose families got together to hire Shearman & Sterling. From the beginning, the U.S. military frustrated every effort to let the prisoners know their rights. For example, we asked the U.S. military to consent to merely informing the clients that they were represented in court, but Respondents refused even this meager measure. I learned from one of my British clients upon his release that they did not learn that they were represented for many months.

12.    Our small group of lawyers was just that – very small. Our resources were very limited. For example, I was working full time as director of a capital trial office, with a full docket of capital cases.

### Because the Military Would Not Even Reveal the Names of Those Being Held in Guantanamo, Trying to Identify the Prisoners Who Wanted Legal Assistance Was a Monumental Task

13.    The U.S. Military has thrown roadblocks in the way all along. To begin with, the government would not allow any lawyers to represent anyone. Thus, we had to begin by filing suit in the *Rasul* case, on February 19, 2002. It took almost two and a half years before the Supreme Court recognized the legal rights of the prisoners on June 28, 2004.

14.    The first problem in bringing any kind of systematic challenge to the lack of access to courts in Guantanamo Bay was that the U.S. military kept the identities of the

2

prisoners secret, so we had to work out who was there. To this day, the military has never made known the names of the prisoners on Guantanamo Bay.

15.     In coordination with various other people, I have conducted a project over more than three years merely to identify the names of the prisoners in Guantanamo. This was like completing a very complicated jigsaw. There have been over 750 prisoners from roughly 50 countries, who speak many languages. The only way that their names would come to light was if the home country published a list of their prisoners (provided presumably to the home government by the U.S.), or if the names would leak into the press from the families of the prisoners.

16.     Only a small minority of the prisoners (fewer than one percent, all now released) were nationals of European countries. More than 99% were from other countries scattered around the world.

17.     Most of these names came out in Arabic media, which made the work of identifying them that much harder. Often the name was misspelled in the Arabic newspaper to begin with, and then transliterated into English in a number of different ways. Thus, the task of sorting out the names of the prisoners was very difficult. Also, many foreign media outlets are not available on the internet.

18.     Even today, more than three years after we began, it has been impossible to get an accurate number even of the nationalities of the prisoners, let alone their names. As of August 31, 2005, the following table provides our best estimate of the numbers of prisoners who were from each country:

| Country | Approx. Number of Prisoners |
|---|---|
| Afghanistan | 88 |
| Algeria | 29 |
| Australia | 2 |
| Azerbaijan | 1 |
| Bahrain | 6 |
| Bangladesh | 2 |
| Belgium | 3 |
| Bosnia | 8 |
| Britain | 9 |
| Canada | 2 |
| Chad | 2 |
| Chechnya | 2 |
| Denmark | 1 |

| Egypt | 16 |
|---|---|
| Ethiopia | 1 |
| France | 12 |
| Georgia | 2 |
| Germany | 1 |
| Iran | 2 |
| Iraq | 2 |
| Jordan | 10 |
| Kazakhstan | - |
| Kenya | 1 |
| Kuwait | 12 |
| Libya | 19 |
| Maldives | 1 |
| Mauritania | 3 |
| Morocco | 34 |
| Pakistan | 65 |
| Palestine | 5 |
| Qatar | 2 |
| Russia | 9 |
| Saudi Arabia | 170 |
| Somalia | 1 |
| Spain | 1 |
| Sudan | 15 |
| Sweden | 1 |
| Syria | 10 |
| Tajikistan | 4 |
| Tunisia | 17 |
| Turkestan | 26 |
| Turkey | 17 |
| Uganda | 1 |
| Uzbekistan | 7 |
| Yemen | 147 |

19.    I would not pretend that these estimates are accurate. For example, I believe the total number of Yemenis is lower than 147, and the Saudi figure is lower than 170. The higher number is a result of various factors. First, when the media in the prisoners' home country published a list of Guantanamo prisoners, this would often include the names of other missing persons who had not actually been confirmed as being held in Guantanamo. Second, because the prisoners may use different names or nicknames, they might be duplicated. Third, there has been confusion over the prisoners' true nationality, particularly in Saudi Arabia where there are many foreign nationals who have lived there all their lives but do not technically hold Saudi nationality.

20.    At the same time, the list probably underestimates the numbers of other prisoners who have been held there. For example, I believe there should be at least 22 more Afghanis, given that the U.S. has recently announced that it plans to repatriate 110 Afghanis.

21.    There is a simple solution to our dilemma, if only Respondents would provide us with a complete list of detainees. This would allow us to build an accurate list of those who need legal services. However, Respondents have refused to take this basic step. It is very difficult to see how, three years into the Guantanamo Bay experiment, there can be any valid security concern in ensuring that we are all operating off an accurate list. Indeed, I could even help sort out the confusion if I was allowed to review a classified list.

22.    Under each nationality on our aggregate list we have the names of the prisoners. Again, I cannot guarantee the list to be accurate in any way. However, even though it is only our best estimate, the list does reflect the enormity of the task we have faced.

23.    As of June 2004, when the Supreme Court ruled, we had identified fewer than one third of the prisoners being held in Guantanamo Bay, and the names that we had for some of these prisoners were very questionable. Having the names was only the first step. Very rarely did the media identify any way to contact the family or friends of a prisoner, and tracking them down in a country such as Yemen was never going to be easy if we were operating from the United States.

### Rules Imposed by Respondents
### That Made Identification Much Harder

24.    Respondents suggest that demanding a more rigorous relationship between the prisoner and the next friend "would diminish the identification issues that have plagued the parties in the Guantanamo detainee litigation thus far." *Respondents' Motion, at 14.* This is simply not the cause of our problems. If Respondents would just identify the names which they believe to be the correct names of the prisoners, life would be much simpler. If they gave us a list, we could easily review it with our clients in Guantanamo Bay and identify the names of petitioners according to information known to Respondents.

25.    Indeed, I strongly suspect that we could help Respondents make their own list more accurate. While we have never been allowed to see the list of those Respondents believe to be in Guantanamo Bay, we do know that, after three years, Respondents have not even been able to identify the ages of many of the prisoners, let alone their proper names. For example, I have been told repeatedly in Guantanamo that my client M.C. is much older than he really is. This is because he secured identification that stated his age as older, because he could not otherwise travel without his parents. Respondents have made public statements about the ages of prisoners that seem highly inaccurate.

5

26.     We could also help clear up a great deal of confusion over nicknames. Arabic and Muslim culture encourages the use of nicknames — for example, the father of Imran may be called Abu Imran. One of my clients is known by at least six names, each of which is an innocuous nickname, rather than some kind of alias. Many prisoners prefer to be known by their nicknames in Guantanamo Bay. They feel that they have been humiliated, and they do not want some of the details of their humiliation to be known to their families, as this would cause the family member great distress. This applies particularly to the sexual humiliation that they have suffered. However we, as the lawyers, are in a position to clear up which are the real names and which are nicknames, if only Respondents would let us review a list.

27.     Respondents say that they have yet to identify two dozen petitioners, *Respondents' Motion, at 14*, and that there have been two counsel who went all the way to Guantanamo only to learn that Respondents had incorrectly identified their petitioners. *Respondents' Motion, at 14* They seek to imply that this is somehow the fault of the lawyers involved.

28.     The fault, here, does not lie with Petitioners' counsel but with Respondents' rules. The only consistent method of identification was the ISN. However, the process of identifying people has been made radically more difficult by the fact, despite constant requests for a change in policy, Respondents deemed the ISN to be classified FOUO ('For Official Use Only') until July 7, 2005.[1] This meant that we could not ask our clients for the ISN and then put it in a central list of all the prisoners to crosscheck it. Each time I would get an authorization from a prisoner, I had to edit the ISN out before I could remove the authorization from the secure facility and provide it to counsel for filing a petition. When that petition was then filed, without the ISN, it was correspondingly more difficult to make the proper identification.

29.     Again, here, Respondents' insistence on secrecy makes no sense at all. The ISN is either a number (e.g., 000123) or a series of letters (e.g., JJJABC). The letters reflect the numbers (A=1, B=2, etc.). The series of letters appears on every piece of correspondence that the prisoner sends to his family, to the family will know the prisoner's ISN the moment they receive mail. Indeed, they are required to put the ISN on their replies.

30.     Thus, making the ISN classified made no sense, but made our task of identifying each prisoner to Respondents' satisfaction much more difficult. If Respondents are complaining, they must accept that they created this problem themselves.

---

[1] See *E-mail of Andrew Warden* (July 7, 2005) ("After further consultation on the subject, the Department of Defense has determined for the purposes of this habeas litigation only that the pairing of a detainee's name and the 3, 4, or 5-digit ISN for the detainee is no longer classified or subject to treatment as protected information under the applicable protective orders.").

6

**The U.S. Military Has Not Given Accurate Information
About Prisoners Even to the Governments of Our Closest Allies**

31.    The inaccuracy of Respondents' own data would seem to also be the cause of the misinformation that Respondents have given to other governments about the prisoners in Guantanamo bay. For example, based on what the U.S. has told them, the British government maintains to this day that there are only five British residents in Guantanamo Bay – Shaker Aamer, Jamil al Banna, Bisher al Rawi, Omar Deghayes and Jamal Kiyemba. I represent them all, and relied for a long time on the British government's assertion that these were the sum total.

32.    That reliance was misplaced. There are many other British residents among the prisoners, including Binyam Mohammed, Ahmed Errachidi, Abdulnour Sameur, Ahmed Ben Bacha, and apparently others whom I have not yet confirmed.

33.    The tragic case of Binyam Mohammed illustrates how hard it has been to secure authorizations from family members, based on the misinformation spread abroad by Respondents. Mr. Mohammed was a resident of the U.K., who had applied for political asylum from Ethiopia. His siblings all received asylum from the U.S., and are now U.S. nationals.

34.    When Binyam went missing from the world, his older brother and sister worked tirelessly to try to find him. They wanted to locate him and, had they known he was in prison, they would definitely have wanted to get him legal counsel. However, an FBI Agent actively lied to them, telling them that Binyam was not in U.S. custody and that the U.S. did not know where he was. The Agent, who left his card, was James R. Sobchack, Special Agent, Washington Metropolitan Field office, Washington, DC 20535 (phone 202-278-4352).

35.    This was false, as Binyam had been rendered from Pakistan to Morocco in a U.S. plane, where he underwent 18 months of horrendous abuse. Meanwhile, his brother traveled to England to try to find him. His sister distributed his picture as far afield as Pakistan, to no avail. He was 'missing' for more than two years, and they did not even learn he was in Guantanamo Bay until 2005, several months after he arrived there.

36.    Binyam himself, when he finally reached Guantanamo Bay about a year ago, tried all kinds of ways to get counsel. He asked other prisoners who had friends to ask them to contact lawyers. He got my address from another prisoner, and wrote to me – but it took months for the letter to get through. In the meantime, he also asked one of my clients to act as his next friend, and this is how I came to take up his case.

37.    Binyam is an educated person, who speaks English fluently, and who has even lived in the United States. Despite this, he found it impossible to achieve any

meaningful access to the courts before a petition was filed for him by the next friend process.

38.    His family were much better placed than 99 percent of the families of prisoners, as they lived in the U.S., so they could have found him counsel. Indeed, they would have secured him legal assistance but could not because they did not know where he was. The fact that it proved so difficult to identify, locate and help an educated prisoner from England with family in the U.S. merely illustrates the immensity of the task when it comes to other countries.

### Identifying the Family Members Was Even More Difficult

39.    If it was difficult to identify prisoners' names, it was even more difficult to identify and contact the families. While the media might identify the names of some prisoners, very rarely did the media identify family members. Part of the reason for this was the reticence among family members to be identified publicly.

40.    The problems for families contacting us were profound. First, they had to know that help was available, and there was no way that we were able to broadcast to families all over the world that they could contact us. Second, they had to have a means to contact us, and the internet is not readily available to many people in a country such as Yemen. Third, they would have to be able to contact us in English to have any chance of making contact.

41.    Indeed, I did not begin to receive an appreciable number of contacts from family members until recently, after I had done some media with Al Jazeera to try to raise the profile of the issues. Even so, I have received fewer than ten direct contacts from family members in the past year, without traveling abroad to try to find them.

42.    Even in the limited number of cases where family members have been able to establish contact inn this way, it has been difficult to maintain consistent e-mail contact, due to problems with the e-mail in places like Yemen. For example, I received the following on July 31, 2005, at 11:12:27 PM GMT+01:00:

Hi

Thank you Mr clivess for your send.

I am not spling english good sorry. ok i have may brother in coba goantnamo his name is tariek ali abdullah ahmad his from yamen. and i have may cazen his name mohamed abdullah mohamed al hemere. pls hilp hime and send me pls thank you very mash.

Mr. Yaseer Ali Abdullah Ahmad

It has not been possible to get a signed statement from Mr. Ahmad – indeed, I have not received a response to my full up e-mail.  While this makes less difference here (it is clear that Mr. Ahmad has given authorization) the inability to get back in touch with other family correspondents had made it very difficult to get meaningful authorizations via e-mail or fax.

### Given That We Had to Go to Great Lengths to Facilitate Securing Counsel for the Prisoners or Their Families, Respondents' Allegation That We Have Been 'Soliciting' Clients Is Hard to Accept

43.    Respondents accuse volunteer counsel for the prisoners of "improperly abusing the next friend device in order merely to solicit the Guantanamo detainee population for clients. . . ." *Respondents' Motion, at 14 n.11.*

44.    To be accused of 'soliciting' clients – presumably with overtones of ethical impropriety – is rather difficult to accept.  Those of us who have been primarily responsible for securing authorizations from prisoners mainly work with two charities – my own, and the *Center for Constitutional Rights.*  Virtually all of the other lawyers involved are working *pro bono* at great expense to themselves.

45.    Speaking for myself, and I believe for the other lawyers involved in this effort, the effort made on behalf of the prisoners in Guantanamo Bay has been solely directed at ensuring that they have legal assistance available, and has been extremely expensive.  No representative of any prisoner has paid me for the assistance rendered.

46.    It must be borne in mind that the only reason we have to seek out any next friend for the prisoners is that Respondents have held them effectively incommunicado in Guantanamo Bay.

### Initially, the Only Way to Make Legal Assistance Available Was to Travel to Foreign Countries to Secure Authorizations to Represent Prisoners

47.    Respondents suggest that using 'friends' of the prisoners at Guantanamo is unnecessary because there are other ways to achieve the same ends.  *Respondents' Motion, at 13* (citing 5 such examples).

48.    The implication is apparently that getting authorizations from family members is a simple alternative.  This is not the case.  Over the years, I have been responsible for filing various next friend petitions in capital cases in the United States, and on each occasion the next friend has been available within the United States, generally within the state where the petition has been filed.  In contrast, with the prisoners in Guantanamo Bay, the family members were spread over 50 countries.

49.    I found early on in the process that the only realistic way to secure authorization from family members was to travel to each country to secure it.

9

50.    Given the lack of resources in our group, and a reasonable reticence on the part of some to travel to countries that were potentially hostile to a United States citizen, for many months I was the *only* volunteer counsel to travel around the Middle East seeking out the prisoners' family members and friends, and asking whether they wanted legal assistance. All of this had to be self-funded since Respondents opposed the appointment and funding of counsel.

51.    My first foreign trip (other than to Britain) was to Paris shortly before Christmas 2003. I was then living in New Orleans, and made this trip during my vacation. Through this, and other efforts, we were able to make contact with some of the French prisoners' families. They had French lawyers, making the task easier. I had to pay for this trip with no realistic hope of reimbursement from any U.S. government source.

52.    The European nationals constituted a small number of the prisoners, roughly twenty-two out of several hundred prisoners. Once we moved beyond Europe, the problem got much more difficult. There was the sheer size of the problem – there were reportedly about 350 prisoners from Afghanistan, Saudi Arabia, and Yemen combined, and many from various other countries outside Europe.

53.    There was also a significant issue of cost. Some countries only had one or two prisoners, and it would be prohibitively costly to go there to try to locate their families.

54.    I therefore first chose to visit Yemen, because it had a large number of prisoners. My first trip was to Sana'a, the capital of Yemen, in April 2004. Yemen is geographically quite large, and it is very poor. I visited the capital, but the prisoners' families were spread over the entire country. I had been warned prior to leaving that it could be dangerous to leave the capital and travel around the country. I would have been willing to risk it, but I had no way of knowing where the families and friends of the prisoners might be located.

55.    Thus, I had to figure out a way to get the 'next friends' to come to Sana'a. To do this, I had to hold a press conference upon my arrival so that the local media would make it known that families could come to my hotel. Given the obstacles, I thought the trip a great success when 'next friends' for 31 prisoners came to the hotel where I was staying, or provided authorizations to a local human rights group. However, this expensive trip only netted authorizations for fewer than one third of the prisoners.

56.    As of June 28, 2004, when the Supreme Court ruled in *Rasul*, my records reflect that we had authorizations for 45 'new' prisoners beyond those involved in the *Rasul* litigation: two of the remaining British nationals and two British refugees, three French, one Turkish resident of Germany, one Canadian, one Australian, one Syrian, three Algerians (who I had contacted through the Canadian wife of one of the Algerian prisoners), and 31 Yemenis.

10

57.    In July 2004, I then went to Bahrain. Again, I had to find funding for this trip since there was no chance that the U.S. government would assist in this effort. With the help of local Human Rights advocates, and the father of one of the Kuwaiti prisoners, in the week I was there we secured 33 authorizations. These come from Bahrain (6), Jordan (3), Libya (2), Qatar (1), Saudi Arabia (19), Syria (1) and Yemen (1).

58.    Again, this was an enormous amount of work. Again, we had to get information into the local media that I had come to Bahrain who could provide help to the prisoners, so that the friends and families would come to meet with me. I had to meet with various Bahraini government officials to ensure that the work would not be curtailed by the government.

59.    So desperate were people to help the prisoners in Guantanamo that nineteen Saudis crossed the border into Bahrain, and two other people who wanted to help prisoners flew in from Qatar and the United Arab Emirates when they heard on al Jazeera of the efforts we were making.

60.    In late August, my wife and I moved from Louisiana to London, which did not allow for much travel for a while.

61.    I next went to Jordan in October 2004. I had some concerns about going there because of its reputation as a repressive society. This was to prove prescient. When I arrived in Jordan, as usual I spoke with the media in order to get the word out to families and friends of the prisoners that I was there to offer help, since this was the only realistic way of making contact with the prisoners' families and friends. I mentioned that there was a dispute concerning the number of Jordanians in Guantanamo Bay, because my information indicated that there might be as many as 30. Some of these might be Palestinians, many of whom live in Jordan rather than the West Bank.

62.    When this appeared in the Jordanian media, I had an Arabic translator who was kindly helping me without charging me anything, and we had given out her contact details in the media. She received more than one hostile call from someone purporting to be with Jordanian Secret Service. The person who called her gave an apparently false name (Abu Mataz) and a telephone number. "Abu Mataz" started demanding what she was doing with me, and made various scandalous and false accusations against her and me. He demanded that we appear at the Secret Police headquarters at 6pm that evening. Before going, I asked an associate to seek consular assistance if I have not returned in two hours.

63.    The translator came with me. When we told the taxi driver that we wanted to go to the secret police HQ, he was very nervous and refused to take us to the gate. We had to walk the last part of the way, towards a well-defended building that housed the Secret Police. We were led into the white building, along a lengthy white corridor, with sporadic closed doors. It was nighttime, and totally silent. I will admit to being rather intimidated at this point.

64.     We were taken into a room with two men. I introduced myself, and asked their names. One of them, apparently the most senior, said rather melodramatically.. "We do not use names in this building."

65.     I wrote a description of him during the meeting. He was about 45-50, short, balding, reddish hair, and wore a very large and expensive looking watch. He did not speak much English, apparently, though he appeared to understand a fair amount. I later described him to a local lawyer, who immediately identified him as Colonel Ali Borjak, who is Director of the Terrorism Department of the Jordanian Intelligence Service. I was told that he is notorious – rightly or wrongly – for having tortured Al Zarkawi when the latter was held in Jordanian custody.

66.     Col. Borjak demanded to know why I had said in the newspaper that there were 30 Jordanians in Guantanamo. We had a discussion about this, and he seemed not to believe that I would have come that distance to offer free legal assistance to these prisoners.

67.     Hoping that bravado would help us out of an unpleasant situation, I told him that the Jordanian government was morally obligated to help me find the families and friends of the prisoners so that I could help them. Col. Borjak said that they did not know where most of the families are, and demanded that I share what I knew with him. This seemed improbable, given that he worked for the intelligence service. I was doubly nervous about his interest because the worst thing that could happen would be having the Jordanian Secret Police show up on the families' doorstep and intimidate them not to work with me.

68.     We were kept at the Secret Police HQ for the best part of an hour. This intervention emphasized the problems we face trying to help prisoners who come from a repressive state like this. On that trip, for all this trouble and expense, I was eventually able to secure authorizations for only two additional prisoners, although I was also able to meet the three families in person who had made contact with me in Bahrain.

### Foreign Government Interference with Access to Prisoners' Families

69.     When it comes to interference by foreign governments with our efforts to offer help to the families and friends of prisoners, Jordan is by no means the worst offender.

70.     There are obvious examples of countries where one simply cannot imagine traveling there to meet with family members, either because I would not get a visa to go, or because the families would be placed in jeopardy if I went. These would include Algeria, Chechnya, Egypt, Iran, Iraq, Kazakhstan, Libya, Saudi Arabia, Syria, Tajikistan, Turkestan, and Uzbekistan.

71.     Saudi Arabia has been a good example of a country that has not only forbidden me from traveling there, but has also actively impeded our access to prisoners'

families. It was on a trip to Yemen in 2004 that I met with six lawyers from Saudi Arabia, headed by Ahmad Maszar. They were designated by the Saudi authorities as the 'legal committee' assigned to 'help' the Saudi prisoners in Guantanamo Bay. In fact they have consistently obstructed us from assisting the prisoners.

72.     I impressed upon Mr. Mazhar that it was very important to let the friends and families of the prisoners know that we could provide free legal assistance to them. I asked Mr. Mazhar if he could arrange a visa for me to come to Saudi Arabia to meet with family members. I said that I would come there at no cost to them, and find lawyers in the U.S. who would represent the prisoners at no cost. I said that alternatively the Saudi government could follow the lead of the Kuwaitis, and retain a firm they trusted in the U.S. The Saudi government had hired a firm (McKenna) to file an amicus brief in the U.S. Supreme Court, and I hoped that they might be willing to retain McKenna or another firm this time as well.

73.     Mr. Mazhar promised to consult back in Saudi and get back in touch with me. I continually tried to contact him when I returned to the U.S., with no success. He consistently failed to reply to my messages.

74.     On my Bahrain trip four months later, I prevailed upon Mr. Mazhar to come across the border so that I could continue in my efforts to persuade him, as the representative of the Saudi government, to cooperate in our efforts, at least by letting me come to Saudi and meet with people in the government and those who might be concerned about the prisoners. Again, Mr. Mazhar said that I would not be able to come to Saudi Arabia.

75.     I learned that the families and friends of Saudi prisoners were being reassured that they did not need to do anything on behalf of the prisoners because Mr. Mazhar's committee was taking care of it. This actively prevented the Saudi prisoners from getting meaningful representation, although the Saudi 'committee' was doing nothing to assist the prisoners secure legal assistance.

76.     In between my other responsibilities, these were the only trips that I was able to make up to October. I did go again to Jordan in November 2004, and Yemen in June 2005, but all of this travel cost a great deal of money, as well as time. The cost of these trips was over $5,000. By November, I had been able to secure authorizations for only 66 prisoners from family members, roughly one tenth of those in Guantanamo Bay at the time. At this rate, ensuring that all the prisoners had meaningful access to counsel was going to be prohibitively expensive, and unacceptably slow. There had to be another, more efficient way to get the prisoners the legal assistance that they so badly wanted.

77.     However difficult it is to locate the family members, it should be emphasized that virtually every family wants to secure free legal assistance for their loved ones, thereby sharing a community of interest with the prisoner next friends we subsequently used. To this day I have never located a friend or family member of a

13

prisoner in Guantanamo Bay who did not want legal assistance for the prisoner, although some people have been intimidated, thinking that they would incur the wrath of their home governments if they were seen to be working with a foreign lawyer. Many were incredulous that American lawyers would agree to provide this assistance without payment, and had to be convinced that we were for real.

### Ultimately, It Became Possible to Cut Out the Need for International Travel and Secure Authorizations from Guantanamo Bay

78.     In November 2004, I was first able to visit two clients in Guantanamo Bay. This was a great relief, because it opened up a new avenue for helping the prisoners get counsel.

79.     My clients told me that other prisoners desperately wanted counsel and asked me how they could help. My initial idea was to write out a form that my clients could take back to their cells and use as the format for other prisoners. If other prisoners wanted me to help them, they could write out the form and send it to me. However, this proved ineffective. One client I had at the time was not well educated, and found it hard to understand how to go about it.

80.     We also had to contend with the unacceptable legal mail system from Guantanamo Bay. I have my clients keep logs of the letters that they send me, and the ones they receive from me. The letters that my clients send to me either do not get through at all, or take an unacceptably long time arriving. Via this method, I only received four signed requests for counsel, and those did not come through the mail to me until *May 29, 2005*, five months after they had been sent.

### The Next Friend Petitioners Relied on the Representations or Promises Made by the U.S.

81.     Thus, by early 2005, there were still very few prisoners for whom there was authorization to file a petition, although I talked to my clients and learned that many were desperate to secure help. We had to search for a more reasonable way to deliver this assistance.

82.     One of my clients showed me the English-language version of the Enemy Combatant Notice (ECN) that he had been given by the U.S. military. This gave us the idea of the way in which those of my clients could act as next friends for the other prisoners, thereby helping the other prisoners get the legal assistance they so desperately wanted.

83.     To set this in context, the Center for Constitutional Rights (CCR) had been working to persuade the Military to agree to circulate a meaningful notice to the prisoners that would inform them that they could have lawyers, and that the lawyers would cost nothing.

14

84.    The Military would not agree to this, and instead circulated their own ECN. This reads in pertinent part:

> You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You **may ask a friend** or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member **or a friend** who could file this petition for you, you may file your own petition.

*Exhibit A* to *Declaration of Frank Sweigard* (filed with *Respondent's Motion*) (italics in original; bold emphasis supplied).[2]

85.    It should be noted that Respondents did not begin to provide this notice to the prisoners until December 2004, roughly six months after the Supreme Court identified the prisoners' right to file for habeas corpus. *Declaration of Frank Sweigard, at ¶3*. Why this was delayed so long is not explained.

86.    However, virtually every prisoner should, at this stage, have been provided with the information in *Exhibit A* in one form or another – either orally or in writing, either in English or Arabic, or some other language. I have discussed this document with some of my clients, and they have understood this to mean that they could file a request for legal assistance for their 'friends' in Guantanamo Bay.

87.    It is difficult to see how the Respondents can expect to craft and circulate this notice, and then argue that 'friends' in Guantanamo Bay cannot file a next friend petition. Indeed, under the ECN, the prisoner is not told that his first alternative is to file a petition himself: The default alternative is to have a friend file a petition, and only if there is no available friend is the prisoner told that he 'may' file a petition on his own. Therefore, from the prisoners' perspective, this is not an issue of whether another prisoner may act as 'next friend' – but simply whether the U.S. Military is going to be held to its promise.

88.    The prisoners certainly have no way of having a lawyer act as next friend and most prisoners would rather have a fellow prisoner as 'next friend' than a family member. For example, one of my British resident clients, Jamal Kiyemba, has stated in an unclassified document that "[t]he prisoners want to know why they have to have a family member contacted on this. It's personal. They think this is just a way of dragging their families into this process, putting them at risk. This is particularly true when the

---

[2] The identical language appears in the other 'Notifications'. *See Exhibits B & C* to *Declaration of Frank Sweigard*. For identical language in another similar form provided to the prisoners, *see also* Exhibit E, attached to *Declaration of First Lieutenant Wade M. Brown* (filed with *Respondent's Motion*).

family is in a repressive society back home. What is the point of having a family member involved?"

89. Based on this, various of my clients have wanted to act as next friends for other prisoners with whom they have become friendly while in the prison. I have asked them to be sure that the prisoners for whom they act desire legal assistance. (I refer to these prisoners as 'prisoner next friends.')

### The Special Problems of Camp Echo

90. It is unrealistic – and, given that Respondents are holding our clients incommunicado, unreasonable -- for Respondents to pretend that the prisoners can easily secure the legal assistance they desired.

91. It is not easy for any prisoner to secure help, but it is next to impossible for some who are held in certain areas. Camp Echo has been one example, and prisoners there continue to have problems, although it is used now mainly for client legal visits.

92. On one of my visits to Guantanamo, at 3:35pm on May 3, 2005, I was at Camp Echo talking to Lt. Col. Lowery when a man who was in the exercise cage shouted to me to ask whether I was a lawyer. Col. Lowery allowed me to speak to him, and he said that he "desperately want[ed] a lawyer". He said he had been in Camp Echo for months and had not been able to get counsel. I had this information unclassified so that I could execute my own statement as the basis for filing a petition for a writ of habeas corpus on his behalf.

93. Not only is it difficult for prisoners to get help in Camp Echo, but Respondents make it very difficult for them even to have a friend in the prison to file on their behalf. As Jamal Kiyemba notes, "many prisoners are held under circumstances under which they cannot talk to any 'friend.' For example, in Camp Echo, there is no talking to any other prisoner, or you are punished. . . ."

### The Special Problems of Camp V and Level 2, 3 & 4 Prisoners

94. Camp V has now taken over from Camp Echo as the solitary confinement camp, and the prisoners are not meant to have any contact there. The prisoners in Camp V, and those who have been held in restrictive custody of other kinds, face other problems.

95. Camp V prisoners are held in solitary confinement and have nobody who can help them to write documents to counsel. More important, those in Camp V, and those in restrictive levels, are not allowed pen and paper. Respondents suggest that "Detainees are supplied pens, paper and envelopes regularly. . . ." *Respondents' Motion, at ~ n.4.* For these prisoners, this is just not true, according to the reports of my clients.

16

96.    According to the unclassified information that I have secured from my clients, "particularly with levels 3 & 4 [prisoners], the lack of pen and paper make it very difficult for prisoners to work with counsel." This has been confirmed by my own experience. When I met with my prisoners on one visit, the Sergeant at Camp Echo said that the prisoners could not have a pen except when I was present with them. Clearly, it is impossible for prisoners to represent themselves without a pen.

## Other Military Interference with the Right to Counsel

97.    One issue raised by Respondents is whether my clients have a community of interest with the other prisoners such as to justify their acting as 'next friends.' It is very hard to see how any rational person would not want assistance in vindicating his rights. To the limited extent that some prisoners are mistrustful of American lawyers who volunteer to help them, this is almost exclusively attributable to the manipulative strategies adopted by Respondents and their personnel.

98.    It should always be remembered that the Military could easily have solved all of these problems. All the Military had to do was allow an independent person to speak to each prisoner and ask him whether he would like counsel, and we would have secured counsel for everyone who wanted it. Instead, the process of getting the prisoners the help they want has been incredibly convoluted.

99.    Far from making counsel available, Respondents have tried to prevent the prisoners from trusting counsel. Some of the prisoners have been manipulated by the Military into thinking that the lawyers are yet another part of the Guantanamo deception. There has been extremely troubling interference with the right to counsel, with the Military discouraging prisoners from attending legal meetings. For example, when I have been to Guantanamo Bay, I meet with prisoners at Camp Echo, which used to be a punitive camp, and continues to be an isolation camp. When there, the prisoners are held in solitary confinement, are not allowed a shower every day, cannot have collective prayer, and are only allowed out briefly once or twice a week. I am required to provide the Military with a schedule for my visits, so the Military are on notice when people need to be there. Yet the military has sometimes made a practice of taking the prisoners over there long before they are needed.

100.    As one of my clients, Jamal Kiyemba, has explained in unclassified materials:

> "Camp Echo is the most lonely place on earth. Last time I
> had a legal visit, I was all alone for ten days. They brought
> me over there, they would not let me take my Koran, and
> they put me in an isolation cell with nothing. There is no
> way to talk to any other prisoner, you're not meant to talk to
> the guards. There is a camera and microphones in the cell to
> make sure this is obeyed. The camera seems to shrink the
> cell, and make you paranoid. * * * There is no communal

> prayer. Showers and recreation were greatly limited – I got
> to go into the outside cell once for half an hour in six days,
> and got one shower. In [Camp] Delta I get outside [e]very
> day, and have a shower every day. If I complain [about
> Camp Echo], I am told that it is the lawyer's fault. If I did
> not have to come for a legal visit, I would not be treated like
> this."

101.    I have kept a log of when my clients were brought over to Camp Echo for visits, and when they left after my visit. When I was in Guantanamo in May, two of my clients were brought over to Camp Echo five days before my scheduled meeting, one eight days early and one *eleven* days early. I learned on my subsequent trip that one of my clients was held in solitary confinement in Camp Echo for *eleven* days after I met with him. There is no imaginable security reason for this; however, it was a huge imposition on my clients' right to meet with their attorneys.

102.    There have also been other consistent and troubling steps taken by the Military to frustrate the right to counsel. On a basic level, the prisoners have a hard time believing that the lawyers are for real because (due to Respondents' opposition to counsel visiting) it took almost three years for them to begin to come to the prison. How, the prisoners ask, can this be a legitimate legal system if the lawyers did not come all that time? It strikes the prisoners as more likely that the lawyers are simply the next devious step in the interrogation system.

103.    This impression is radically enhanced by the Military's deceitful practices. My unclassified notes reflect that several prisoners have told me that investigators have impersonated lawyers in an effort to get prisoners to talk. More recently, a juvenile prisoner explained to me how the interrogator had boasted about her experience in the U.S. Supreme Court and what she was going to do for the young man. Naturally, when they learn that these 'lawyers' are actually interrogators, this makes the prisoners loathe to believe that we are really lawyers on their side.

104.    The interrogators consistently tell prisoners that the lawyer's advice is wrong, that having a lawyer is harmful, and that if the prisoner has a lawyer that makes it less likely that the prisoner will get out.

105.    Not one of my clients believes that attorney-client discussions are confidential, and there have been suggestions that the Military does monitor supposedly privileged hearings. Certainly, the Military has tried to interrogate the prisoners about what they discussed with their lawyers. With more than one of my clients, after I left, the interrogators sought to question them about their privileged discussions with me.

106.    As one prisoner said:

> "We all know that everything we say in these rooms is
> being monitored by them, and every time we say that we

> particularly hated being treated in a particular way, we
> know that this will later be used against us. There are
> constant examples of this. Last time my lawyer was here, I
> told him that I did not like being spoken to by my ISN
> number all the time, because it was so dehumanizing. * * *
> When I got back to my cell, they suddenly started doing
> this a whole lot more. And other things I just don't want to
> mention."

Regardless of whether the Military does violate the order of the court, the prisoners all
believe they do – a belief based on the consistent deceit and manipulation that the
Military has practiced.

107.    The requirement that everything said to counsel has to be subjected to
review before counsel can speak publicly about it is also a basis for creating mistrust with
the prisoners. As Jamal Kiyemba said to me, "[w]hat am I meant to think of my
Attorney-Client Privilege when everything that is in the privilege is being 'reviewed'?"

**Inadequate Descriptions of Legal Rights**

108.    Respondents suggest, via the declaration of Frank Sweigart, that they have
"notified each detainee at Guantanamo Bay of his right to file a petition for habeas
corpus, and has provided each detainee with the address of the United States District
Court in the event that he desires to submit his own petition to the Court." *Respondents'
Motion, at 7.*

109.    It would be inappropriate to rely on the Enemy Combatant Notification as
sufficient to ensure that the prisoners will get the legal assistance that they need. To my
knowledge, not one prisoner has thus far secured counsel through a 'petition' filed as a
result of the ECN notice.

110.    The prisoners are not even consistently allowed a copy of the ECN to
study. For example, according to reports of my clients that have been unclassified, Omar
Deghayes was not allowed to have a copy of the form, while Jamal Kiyemba was allowed
it briefly, and Shaker Aamer was able to keep his copy.

111.    The ECN states that the Assisting Military Officer (AMO) will help the
prisoner to understand his right to file for habeas corpus. ("Please talk to your Assisting
Military Officer if you have any questions about this notification. Your Assisting
Military Officer will meet with you later."). However, in my experience this is simply
not done – certainly not on any systematic level.

112.    None of my clients have ever heard of an AMO. They have heard of a
Personal Representative (PR). Yet, setting aside the ethical propriety of the Military
encouraging non-lawyers to provide legal advice to prisoners, the PR's have provided
inadequate 'advice' in the cases with which I am familiar.

113.    Omar Deghayes received only one visit from a PR (with respect to the CSRT), and he received no meaningful assistance. Mr. Deghayes thought the PR was an interrogator (he was even told he had a "Reservation," the euphemism for interrogation), the PR would not give Omar his name, would not have his handcuffs taken off, only met with him for about ten minutes total, and did not tell him until well into the meeting that he was the PR. *See First Supplement to Petition for Writ of Habeas Corpus (Deghayes et all v. Bush), at 4-5 (filed April 1, 2005).* Such advice as Mr. Deghayes sought was not given. The PR did not, or would not, tell him whether there as any point attending the CSRT (i.e., whether anyone was being found not to be an Enemy Combatant), what kind of tribunal it would be, or how he might secure witnesses. *Id. at 5.* Neither could Mr. Deghayes get an answer as to how he could file a statement or secure witnesses when (as a Level 3 or 4 prisoner) he could not have a pen and paper.

114.    In another instance, Shaker Aamer had one meeting with a PR, and that was prior to his CSRT. His PR told him:

> "I'm not a lawyer. I'm more of a middle man. I'm not here to help you. I cannot give you any advice. I'm just here to take what you want to send to the [CSR] tribunal."

115.    According to Jamal Kiyemba when, prior to my being able to visit him, he asked for help understanding the habeas process, he found that "the advice is incomprehensible. The officers [PR/AMO] who are meant to explain the habeas corpus process to us do not know."

116.    Since meeting with my clients, I have instructed them to request to meet with the PR/AMO on a regular basis as they have to present a meaningful case to their ARB. I provided my clients with a list of suggested questions that they might ask about the ARB, as well as the habeas process. To my knowledge, to date, no PR/AMO has responded to the request of *any* of my clients for a meeting, let alone to provide this information.

### Problems Stemming from the Different Cultures and Languages of the Prisoners

117.    There are many problematic issues of translation in Guantanamo Bay. The ECN explanation is apparently one such issue. Some prisoners who are bi-lingual and have seen the ECN in both English and Arabic. They say that the ECN is hard to understand even in English, but even harder in Arabic.

118.    The prisoners are told that they "may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*." (emphasis in original). Recently, a very sophisticated graduate of Oxford University asked me what a "writ of habeas corpus" actually was, and what it meant to file a petition. If an educated person steeped in the culture of a country with the Anglo-

20

American habeas system does not understand the process, it is far from evident that someone without the benefit of an Oxford education or a person from a country with a wholly different legal system will do so.

119.    To tell a prisoner that a civilian judge will "look at the lawfulness of your detention" hardly informs the prisoner what he needs to know.  Indeed, my various clients insisted to me that they wanted to act as next friends to other prisoners, because they felt that a prisoner from a Middle East country who did not speak English would face great problems seeking legal assistance on his own.

### Problems Counsel Would Face in Getting More Information
### About a Prisoner Without Being Able to Meet with that Prisoner

120.    To the extent that Respondents insist that more information be supplied by the next friends about the prisoners who they would like to assist, this would cause a tremendous delay in securing legal assistance for the prisoners.

121.    The timing of Respondents' motion is perplexing to me.  Hitherto, Respondents' counsel have contacted me on more than one occasion to seek my assistance to flesh out information about prisoners, when they were having difficulty identifying the prisoner in a particular petition.  For example, in one e-mail, counsel for Respondents asked me as follows:

Clive,

When you speak to Messrs. Deghayes and Kiyemba this week, please ask them to provide more information about the detainees on whose behalf they purportedly acts as next friends.  ISN numbers would be best.  At this point, based on the information in the petitions, we have not been able to identify the following petitioner names with actual detainees at GTMO:

Mohammed al Nadour (Inram v. Bush) (Deghayes)
Mohammed Fahreo (Inram v. Bush) (Deghayes)
Mohamad Morotany (Sliti v. Bush) (Deghayes)
Mohmoud Al Soury (Sliti v. Bush) (Deghayes)
Ahmed Doe (Ahmed Doe v. Bush) (Deghayes)

Abdusabuy Doe (Kiyemba v. Bush)
Abdusamad Doe (Kiyemba v. Bush)
Abdunasir Doe (Kiyemba v. Bush)
Hammad Doe (Kiyemba v. Bush)
Hudhaifa Doe (Kiyemba v. Bush)
Jalaal Doe (Kiyemba v. Bush)
Khalid Doe (Kiyemba v. Bush)
Saabir Doe (Kiyemba v. Bush)
Saadiq Doe (Kiyemba v. Bush)

Thanks,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084

122.    While I was under no obligation to do this, I tried to cooperate with Respondents. Indeed, since Respondents seemed to be having the most trouble with the Turkestanis, I wrote up a memo to Mr. Warden identifying the prisoners and providing cell locations and other information, to help Respondents identify prisoners who, after all, have been in Respondents' custody for more than three years. I did the best I could on this, even though Respondents refused to reciprocate by providing me with a table of prisoners that could radically assist me in this task.

123.    It is perplexing that the only person on the list provided by Mr. Warden who is subject to this motion is Ahmad Doe. I should note that I do not have unclassified all of my notes yet, and have not been able to determine whether I got additional information about Mr. Doe that could help on this point. But for reasons best known to themselves, Respondents did not ask me to get additional information with respect to the other six petitions challenged in their motion.

124.    Respondents knew that I was in Guantanamo between August 4th and 14th, yet they filed their motion after I had returned, and I will not be going back down there until mid-October (assuming that they permit a visit then). It would be November at the earliest that I could therefore get additional information about these clients, delaying their legal rights even more.

125.    Since I cannot go sooner, I consent to counsel for the other prisoners speaking with my clients, where relevant, on a visit to Guantanamo Bay to secure this information before I am able to visit again.

### Checks Already in Place if Prisoners
### Decide They Do Not Want Lawyers

126.    There should be no concern that the prisoner is going to be provided with counsel when he does not want it. There is already a system in place should the prisoner decide he does not want a lawyer. The U.S. military requires that, by the second time that counsel visits, counsel secures an "Acknowledgement of Representation" form, signed by the prisoner.

127.    This form is already a considerable burden on the right to counsel, since many of the prisoners are very worried about signing anything.

## Background of Declarant

128.    For informational purposes, I will provide a limited resume of my experience in this area.

129.    I received my *Juris Doctor*, Columbia Law School, in 1984, and I was recognized as a Harlan Fiske Stone Merit Scholar all three years I was there. My previous degree was from the University of North Carolina at Chapel Hill, where I was a John Motley Morehead Scholar from 1978-81. I had completed my British education at Radley College, near Oxford where I received A levels in Physics, Chemistry, Mathematics, and Further Mathematics.

130.    Before turning to the Guantanamo Bay cases effectively full time, I was Director of the *Louisiana Crisis Assistance Center*, for almost eleven years from July 1993 to March 2004. The *LCAC* is a not-for-profit law foundation devoted to providing legal services to indigent persons facing the death penalty in the South. I had previously spent nine years as a staff attorney with the Southern Center for Human Rights in Atlanta, Georgia.

131.    Over the years, I have been counsel in many very serious criminal cases (mostly capital cases) at all levels of the process, from trial to the United States Supreme Court. I have tried more than two dozen capital cases to a jury, and been involved in many more cases that did not proceed to trial. I have been involved as counsel in dozens of capital appeals, and more capital cases in post-conviction and habeas review. I have been responsible for securing certiorari review in the United States Supreme Court in various cases, including *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 111 S. Ct. 313 (1990) (unanimous *per cuiam* reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 112 L. Ed. 2d 489 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 116 S. Ct. 1293 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate). In each case I asked another counsel to argue the case, so that I could focus on the capital trials that I was then responsible for.

132.    I was one of the counsel involved in the initial litigation of the case that eventually became *Rasul v. Bush* (June 28, 2004) (availability of judicial review for prisoners in Guantanamo Bay).

133.    Because of the importance of effective counsel in a meaningful judicial system, I have taken an very active role in systematic litigation on behalf of the right to counsel. This has included a class action on the right to counsel in capital post-

23

conviction in Mississippi, and a large amount of litigation on the need for adequate funding and caseload limits in Louisiana.

134.    I have taught many legal education programs on a variety of scientific subjects in Arizona, California, the District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Ohio, Tennessee, Texas, and Virginia.

135.    I have twice been invited to testify before the United States Congress, Sub-Committee on the Judiciary, regarding racial discrimination in capital cases.

136.    I was a member and staff counsel to the *Commission on Human Rights Abuses in Mississippi* (Jackson, MS, 1993).

137.    In 2000, I was honored by Her Majesty Queen Elizabeth II with the *Order of the British Empire* (OBE) for services to humanity. For work for indigent persons who could not afford counsel, I received an Honorary LLM Degree, from the University of Wolverhampton, England in 2001, and a *Lifetime Achievement Award*, from *The Lawyer Magazine* (UK April 2003), and *The Law Society* (U.K. Oct. 2003).

138.    I have been author or co-author of various manuals on the effective representation of indigent persons facing serious criminal or capital charges in Louisiana (1987, 1994 eds.), Mississippi (four editions, most recently in 1991) and Georgia (two editions).

139.    I have co-authored various law review articles, the most relevant perhaps being Paduano & Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43 Rutgers L. Rev. 281 (1991).

140.    I was a Soros Senior Fellow, courtesy of the Open Society Institute, for 2004-05, and have now been awarded a Rowntree Visionary grant for the next five years to do this charitable work. I had been working on the Guantanamo Bay issues part time even before this, but I resigned as director of the LCAC in August 2004 to devote all of my time to trying to help the prisoners in Guantanamo Bay, because I believe passionately that if we are going to preserve our standing as proponents of human rights, as Americans we must show that we mean what we say, and adhere to the rule of law in the most difficult cases, as well as the easiest. My main role in that position has been to work to ensure that prisoners in Guantanamo Bay were able to get counsel, and effective representation. I have assumed this role solely because the work so obviously needed to be done. I must stress at every turn, however, that my resources are wholly inadequate for the purpose.

141.    I am now based in the United Kingdom. I have dual U.S. and U.K. nationality.

### Conclusion

THE FOREGOING is executed under the penalties of perjury, constitutes a true and accurate account of what I know, and does not exhaust the sum of my knowledge.

Done this 12<sup>th</sup> day of September, 2005, in London, England.

_____
CLIVE A. STAFFORD SMITH

# **EXHIBIT 2**

# U.S. DEPARTMENT *of* STATE

Daily Press Briefing (Corrected)
**Richard Boucher, Spokesman**
Washington, DC
May 13, 2004

**INDEX:**

**ANNOUNCEMENT**
> Under Secretary Bolton's Announcement on Libya Ending Military Trade with States of
> Serious Weapons of Mass Destruction Proliferation Concern

**LIBYA**
> Ending Military Trade with Syria, Iran, and North Korea
> Diplomatic Relations between the United States and Libya
> Need to Eliminate Aspects of Chemical Weapons Programs

**MISCELLANEOUS**
> Red Cross Guantanamo Report

**CHINA**
> Negotiations on Status of Uighur Detainees at Guanatanamo

**KUWAIT**
> Talks with Kuwaiti Officials on Kuwaiti Detainees at Guantanamo

**CONSULAR**
> State Department's Contacts with Nicholas Berg and his Family
> Detention of Mr. Berg/ Assisting American Citizens to Leave Iraq

**IRAQ**
> UN Security Council Discussions on UN Resolution on Iraq
> Discussions with Group of Eight Ministers Tomorrow
> Transfer of Sovereignty/ Role of Ambassador Brahimi
> Security Arrangements for Iraq

**INDIA/PAKISTAN**
> India's Parliamentary Elections/Resignation of Prime Minister Vajpayee
> Dialogue between India and Pakistan/ Peace Process
> Religious Freedom in India and Pakistan

**EUROPEAN UNION**
> Expanding Visa Waiver Program/ Status of Belgium

**NORTH KOREA**
> Working Group Meeting in Beijing
> Discussion of North Korea at Group of Eight Meeting

**VENEZUELA**
> Military-to-Military Relations between United States and Venezuela
> Eviction of U.S. Military Mission from Base at Fuerte Tiuna

**HUMAN RIGHTS**
>           Upcoming Human Rights Report

**JORDAN**
>           Secretary Powell's Meetings in Jordan

**ISRAEL/PALESTINIANS**
>           Incursions in Gaza

**SYRIA**
>           Relations between the United States and Syria


**TRANSCRIPT:**


12:15 p.m. EDT

**MR. BOUCHER:** Good afternoon, ladies and gentlemen. I have a brief announcement, and that is that Under Secretary John Bolton is here with me to make a brief announcement.

**UNDER SECRETARY BOLTON:** Thank you, Richard. I have a very brief prepared statement on the subject of Libya, and then I'd be happy to address a couple questions on it.

Today, the Libyan Government issued the following statement. I am now quoting from the Libyan statement:

"As part of its efforts to strengthen peace and stability in the world, in the context of which Libya announced in December 2003 that it renounced programs, materials and equipment which might lead to the production of internationally banned weapons or delivery systems, as classified by the MTCR, Libya wishes to announce officially the application of this decision to its military dealings with other states.

"Libya will not deal in any military goods or services with states which Libya considers to be of serious weapons of mass destruction proliferation concern." Close quote on the Libyan statement.

Libya has also indicated that it will shortly announce its pledge to renounce trade in missiles and missile-related equipment and technology with countries that are not members of the missile technology control regime.

The United States welcomes this statement and regards it as an important step forward and an indicator of Libya's seriousness in abandoning weapons of mass destruction proliferation and rejoining the international community. We are particularly pleased that Libya has now committed to ending all military trade with states of serious weapons of mass destruction proliferation concern.

That's the end of the prepared statement. I'd be happy to answer a couple of questions.

**QUESTION:** Do your lists -- does your list and theirs match up? And who are these states --

**UNDER SECRETARY BOLTON:** Yeah.

**QUESTION:** -- as you understand Libya to mean?

**UNDER SECRETARY BOLTON:** Yes, we have discussed this question expressly with the Libyans and do have an understanding of what it covers. And that's why this is a particularly important announcement because the Government of Libya has assured the United States and the United Kingdom that its renunciation of all military trade with states of serious WMD proliferation concern includes North Korea, Syria and Iran.

We welcome Libya's announcement that it has decided to give up military trade with North Korea, Syria and Iran. All three of those countries are indeed states are very great proliferation concern, especially North Korea, which uses its exports of military technology to finance other dangerous activities. Libya's

renunciation of military relationships with such proliferators is an important step forward.

Teri.

QUESTION: How much business do you believe Libya was doing with these three countries? How big a provider was it, or an importer, either way?

UNDER SECRETARY BOLTON: Well, North Korea had been the provider of Libya's Scud Missile arsenal, which included five Scud C's, which have been removed from Libya pursuant to the Libyan December declaration, and several hundred Scud B's, a lower range ballistic missile which Libya has agreed to, as part of its general commitment not to have missiles that go beyond the MTCR parameters, 500 kilograms, over 300 kilometers, to bring those missiles within those constraints or to eliminate them.

QUESTION: Is that the --

QUESTION: Yeah, I was just wondering what -- why you're making this announcement on behalf of the Libyans?

UNDER SECRETARY BOLTON: I didn't make the announcement on behalf of the Libyans. I quoted the Libyan announcement and responded to it.

QUESTION: Which was, what, transmitted to your people in Tripoli?

UNDER SECRETARY BOLTON: It was made in Tripoli earlier this morning.

QUESTION: Publicly?

UNDER SECRETARY BOLTON: Publicly.

QUESTION: By?

UNDER SECRETARY BOLTON: The Libyan Government.

QUESTION: Yeah, yeah. But in what way? Was it communicated directly to you guys?

UNDER SECRETARY BOLTON: As you say, I don't speak for the Libyan Government. I don't have this transmitted --

QUESTION: No, I'm just --

UNDER SECRETARY BOLTON: My understanding is it was announced publicly.

Yes, sir.

QUESTION: But this came -- but this statement that you got here came from your interests -- whatever, your liaison office that you -- that you have in Tripoli?

UNDER SECRETARY BOLTON: You know, where did the electrons come from? I don't know.

Yes, sir.

QUESTION: Mr. Bolton, Libya -- Pakistan was the source for the Libya and the relations in the technology and missile and nuclear and all. Do you think that Libya will continue to deal with Pakistan?

UNDER SECRETARY BOLTON: The question of Libya's dealings with the other countries that I've indicated is that we have discussed with the Libyans the three countries that I've named. The announcement they will make on missiles will restrict it further to MTCR member countries.

And that's what we have to say about it.

Yes, sir.

**QUESTION:** Is the Libyan decision preceding now an imminent restoration of diplomatic relations between the United States and Libya?

**UNDER SECRETARY BOLTON:** Well, the course ahead has been determined by prior negotiations. I'm limiting my comments today to the subject of this further elaboration of the Libyan commitment to foreswear weapons of mass destruction.

Yes, sir.

**QUESTION:** Can you give us an update on exactly where the Libyans are now in terms of having given up existing WMD programs? Do they have anything left? If so, what?

**UNDER SECRETARY BOLTON:** Yeah. There are still some aspects of the chemical weapons program that need to be eliminated. Obviously, the agent itself is a highly dangerous substance and has to be eliminated under conditions of appropriate health and safety regard, and we're still working on that. The issue of the Scud B's remains, although the -- and the question of what we call phase three, or the longer term implementation issues. But we're working ahead on that. We're satisfied with the progress we've made. This announcement today is a further step in that direction.

**QUESTION:** What's the chemical agent that you alluded to there?

**UNDER SECRETARY BOLTON:** Various kinds of chemical weapons agents.

Yes, sir.

**QUESTION:** Right here?

**UNDER SECRETARY BOLTON:** Second row.

**QUESTION:** Okay.

**UNDER SECRETARY BOLTON:** Second row.

**QUESTION:** Oh, Nicholas.

**QUESTION:** Can you tell us, John, how much of that was actually negotiated in detail with the United States or Britain, or how much is -- is it simply an unilateral decision, good gesture, or what?

**UNDER SECRETARY BOLTON:** We discussed this with the Libyans. That's why we have an understanding on what countries are covered. And this was something that's a further indication of the nature of the relations and the cooperative aspect of the work that they've been doing to eliminate their weapons of mass destruction.

Yeah.

**QUESTION:** How much business do you think that this will choke off from Syria, Iran and North Korea? I mean, were these -- was Libya a major purchaser?

**UNDER SECRETARY BOLTON:** Well, I think, particularly, with respect to North Korea, the sales of the Scud B's and the Scud C's over a period of time was a pretty substantial money earner for the North Koreans. And, as we know, North Korea has been the world's greatest proliferators of ballistic missile technology. They have used the hard currency earnings from that proliferation to finance their nuclear weapons program.

So this is a symbol by Libya of a decision not to have any further purchases from North Korea of any

Case 1:05-cv-01509-UNA    Document 7    Filed 09/12/2005    Page 45 of 101

military goods or services, particularly on the missile front. It is consistent with what we have urged other states in the region to cut off their purchaser relationships with North Korea, as part of our overall effort to squeeze North Korean WMD sales to reduce the amount of money they have for their nuclear weapons program.

QUESTION: John, can I follow up? But in terms of -- so, in terms of the effect, are you hoping this will have more of a symbolic effect with other countries of the region? Or do you think that this will significantly curtail North Korea's -- or any of these other states proliferation programs?

UNDER SECRETARY BOLTON: I think that the -- it has an immediate impact by definition because Libya will not engage in any purchases. And I think as an example, a continuing example of Libya's openness and transparency in giving up weapons of mass destruction, we hope this will be a productive example for others in the region and around the world.

Yes, ma'am.

QUESTION: Can I just ask --

QUESTION: (Inaudible.)

QUESTION: Can I just ask the practical effect with Iran and Syria? Were there continuing, or were there military sales?

UNDER SECRETARY BOLTON: Well, not to get into the specifics, the point is, Iran and Syria are very serious proliferant states, states we consider, in the case of Iran, of sufficient concern. We've been trying for some time to get the matter referred to the UN Security Council.

So when a state like Libya, which was pursuing weapons of mass destruction and advance delivery systems, not only gives up the pursuit of those assets, but says it's not going to have military dealings with other states that are pursuing weapons of mass destruction. I think that's a very important step forward.

And, I guess, Richard, did you want --

MR. BOUCHER: Last one, on this side.

QUESTION: Will this, the renunciation, sir, will it automatically translate into delisting Libya from the State Sponsors of Terror?

UNDER SECRETARY BOLTON: No, that's really a very separate question.

QUESTION: How will that come up? How will that be --

UNDER SECRETARY BOLTON: That's being handled in a separate track. I'm just addressing the WMD issues.

QUESTION: Thank you.

UNDER SECRETARY BOLTON: Okay. Thank you very much.

MR. BOUCHER: Thank you very much on that topic. Thank you, Under Secretary Bolton, in particular, for coming down to do that.

The wires kind of asked for a five-minute break. So that was about two minutes ago. So if we can, we'll have three minutes of quiet, and then we'll go on to the other things. Okay?

(Break.)

MR. BOUCHER: Okay, just to close off that discussion, there's one hanging question here: How did we know the Libyans had done this? We got -- we were informed by our people on the ground in Libya within

Case 1:05-cv-01509-UNA    Document 7    Filed 09/12/2005    Page 46 of 101

the last hour or so that the Libyans had, indeed, made the announcement. I don't know for you exactly how they made the announcement or what arrangements you have to pick up announcements, but our people on the ground said the Libyans had, indeed, made the statement that we quoted.

Now, with that, I am glad to take your questions on other topics.

Tammy.

QUESTION: Can I ask you about -- there's apparently a new Red Cross report on Guantanamo that a senior Pentagon official traveling with Rumsfeld is quoted as saying was delivered to the State Department this week. Do you have any knowledge of this report, any -- can you characterize it at all? Have there been any meetings with ICRC officials about it?

MR. BOUCHER: On the subject of Guantanamo, we, obviously, have had regular meetings with the ICRC about it. They have met with military authorities. They have met with people at the Pentagon. Mr. Kellenberger, during his visits to Washington, has talked about Guantanamo with the Pentagon, the NSC and us as well.

They do have a new report on Guantanamo. I think I've seen them confirm that they have presented one to us. As usual practice, I'm not in a position to go into any details on it, but they relay some of the concerns they have and some of the issues that they wanted to raise and discuss with us. And, indeed, we will certainly discuss those with them, and I'm sure the appropriate command authorities will discuss them as well.

QUESTION: Did it go first to Guantanamo, as the usual practices, or --

MR. BOUCHER: I don't quite know yet exactly. I know we have a copy, but whether we got the first one or not, I don't know for sure. But, certainly, it's available now inside the U.S. Government and we'll make sure that other responsible agencies have it and that those that are in a position to take the recommendations and decide what to do, that they are able to consider everything carefully and do what they can.

QUESTION: But now released at -- when did you get it?

MR. BOUCHER: Last couple days. I don't know exactly when.

Yeah, okay. Teri.

QUESTION: Change of subject?

QUESTION: Can I ask on Guantanamo?

QUESTION: Sure.

MR. BOUCHER: Sure.

QUESTION: There was a report this morning that the United States and China are negotiating over the status of a number of Uighur detainees at Guantanamo. I was wondering if you could say anything. Is this process underway?

MR. BOUCHER: As you know, we have a process underway of looking at people who are detained in Guantanamo, looking to identify those who may no longer be a significant threat or may not be wanted on criminal charges, and, indeed, reviewing those cases regularly now to ascertain which individuals might be eligible for release or transfer to other governments.

In the case of the Uighurs who are there, we have identified some who might be eligible for release. We are currently considering how that process can work. If it's decided that they can, obviously, the situations of individual, individuals need to be taken into account, including their wishes and their ability to go to different places.

We have talked to the Chinese and other governments about this situation at this point, but I don't have

anything definitive for you yet on the release or where they might go.

QUESTION: In other words, they might not go back to China?

MR. BOUCHER: We've been in touch with China and other governments about it. They won't necessarily -- well, everything has to be taken into account in the individual cases.

QUESTION: Can I follow up on that?

QUESTION: You've talked to China and other governments about the Uighurs?

MR. BOUCHER: About the Uighurs, yeah.

QUESTION: On the general issue of Guantanamo, the Secretary -- and what you were just saying -- the Secretary has said publicly that he's been trying to work with the U.S. Government in terms of identifying these people, getting them, you know, either transported or released to other governments.

Is this moving -- is the pace fast enough, to his liking?

MR. BOUCHER: The -- I think we all wanted to make sure, the Secretary wanted to make sure, and all, really, the principals who have met and worked this out wanted to make sure there's a process of review, there was a process of release and transfer. Indeed, we've managed to do that in many cases already. I think the number is 146, if I'm correct. It may be higher. I forgot to check. But the number of people who have been released from Guantanamo, it's a continuing process.

We have discussions going on with a number of governments right now, and there is a continuing process of identifying prisoners who may be, as I said, no longer a threat, if they were released or that could be transferred, subject to further monitoring by other governments. So that's an ongoing process. Obviously, we want it to be as comprehensive and thorough as possible, but I think that's what all the agencies are working together on.

QUESTION: Picking you up on your last remark, could it be that some of these people were never a threat, and they were detained while you checked suspicions and allegations, and they were, obviously, not only have gotten over being threatening but were never threatened?

MR. BOUCHER: I don't want to make broad observations like that. Each of these cases is different. There are, you know -- there have been many people in custody already released. The number of people that, one way or the other, were found on the battlefield are in a difficult situation; there were dangerous situations for us in Afghanistan.

It was very, very large, thousands and thousands of those people have been released, some of them are in detention. The ones at Guantanamo are the ones where there was the highest degree of suspicion about what they might have been up to. But whether every individual case, in the end, checked out or not, leave for the people who are operating the facility to answer, if they can.

Yeah. Okay. Sir.

QUESTION:  Have you had any talks with Kuwaiti officials on the Kuwaiti detainees at Guantanamo, like this week, or tomorrow, or upcoming?

MR. BOUCHER: I don't know of any particular discussions with the Kuwaiti officials. I'd have to check and see. We are in touch with a number of governments. I just don't know if we've -- where we stand on Kuwaiti.

Yeah. Teri.

QUESTION: Same subject.

MR. BOUCHER: Yeah.

QUESTION: Could you go over whatever timeline you have with the State Department's contacts with

Case 1:05-cv-01509-UNA      Document 7      Filed 09/12/2005      Page 48 of 101

Nicholas Berg while he was in Iraq?

**MR. BOUCHER:** Let me say, once again, we extend our deepest sympathies and condolences to Mr. Berg's family, and we condemn, in the strongest terms, this despicable act of murder and terrorism. Mr. Berg's remains have been returned to the United States, arrived this morning.

Our consular officers have been in touch with his family and spoke to them. I think it was on May 10th, when the remains that had been found earlier were identified as being Mr. Berg's body. We had contact with Mr. Berg in Baghdad with our U.S. consular officer who is out there. He had registered with a U.S. consular officer. He was in Iraq privately, not attached to any military operation or contractor.

We last spoke to him in Iraq on April 10th, 2004. At that time, our consular officer extended an offer to assist him in departing Iraq by plane to Jordan. He told us that he had planned to travel overland to Kuwait, and apparently had made arrangements to do that. We heard from his family a few days later and talked to his family about this when they talked to us on April 13th. Since then, since he went missing, then we were in regular touch with his family.

**QUESTION:** So he went -- April 10th was the last time you talked to him; April 13th was when you consider him missing, first, finally knew?

**MR. BOUCHER:** When his family -- I think his family contacted us and said we -- they hadn't heard from him --

**QUESTION:** Why was --

**MR. BOUCHER:** -- and what did we know?

**QUESTION:** Was the State Department encouraging him to get out when they -- is that why you offered to help him get to Jordan, you were encouraging him to leave?

**MR. BOUCHER:** I don't know if we were encouraging him, as much as that he was planning on leaving; but, certainly, we were trying to facilitate his departure which -- at that time.

**QUESTION:** When he was detained by the Iraqis, was there any -- I don't know if consular rules are in order yet. But do you have to be notified and get consular visits with him? Is that in effect yet in Iraq?

**MR. BOUCHER:** I don't think it necessarily legally applies in this case. I don't think it's a Geneva Convention situation, in this matter.

**QUESTION:** Why wouldn't it apply? If he was in prison there, wouldn't you -- there is not rule that you need to be notified?

**MR. BOUCHER:** It has to do with status of governments in diplomatic representation. I don't think it comes up in quite the same manner as it does in other situations. Certainly, the detention was known to U.S. authorities. The FBI visited him up there.

**QUESTION:** And the consular official never did, that wasn't even considered?

**MR. BOUCHER:** I don't know at what point our consular officers learned that he had been in detention. But as far as consular notification is required to tell the U.S. Government when a foreign government arrests American nationals. In this case, U.S. authorities knew he had been detained, and indeed visited him, the FBI did.

**QUESTION:** What is the response to the family saying that the government, the U.S. Government didn't do enough?

**MR. BOUCHER:** I really am not -- don't think I'm in a position to speak on behalf of all agencies. But I'd say that we tried to help Mr. Berg when he came to us.

**QUESTION:** Richard, without the consular, Geneva Conventions, or anything like that, did the State

Department know that this man was being detained? Because if you said that he had registered with the U.S. Consulate, wouldn't the State Department be able to clear some of the circumstances up while he was in detention?

**MR. BOUCHER:** I think I said three minutes ago, I don't know at what point we learned he was in detention. Sorry.

**QUESTION:** Did American officials, which was the next point --

**MR. BOUCHER:** Excuse me?

**QUESTION:** -- at any point -- well, I'll explain. There is an account out by people who knew him and who have said they thought he was singled out because he carried an Israeli stamp in his passport. Passports don't carry Israeli stamps, do they?

**MR. BOUCHER:** I don't know what the Israeli practice is on entry; that many countries stamp your passport when you go in. Certainly, we would have seen his passport when he registered. But, frankly, in normal registration process, we don't look through somebody's passport to find out where they've been. We look at the front page to find out who they are, make sure they're Americans and register them.

Sir.

**QUESTION:** This is -- I guess kind of goes to the whole issue of jurisdiction and custody. But if the gentleman was in Iraqi police custody, as the government -- as the U.S. has said, but the U.S. is the governing power of Iraq right now and the U.S. was interrogating him and the U.S. deemed that there was enough information that he wasn't a threat and thought that he could be released, then how does that make it that he was in Iraqi custody?

**MR. BOUCHER:** As I said yesterday, those questions, I think, need to be answered by the people involved in the coalition and the FBI who were out in Baghdad. So I really am not in a position to answer all those questions from here.

**QUESTION:** On a general issue, can you check and see what the procedure is for American citizens that are in Iraq right now that might be picked up and what the rules are for them and --

**MR. BOUCHER:** I think, again, that's a question of rules and authorities in Iraq by the people in Iraq, and you can have your people ask the question there.

Okay, Charlie.

**QUESTION:** Can I follow up on that?

**MR. BOUCHER:** Yeah.

**QUESTION:** Even though you didn't provide an answer to understand, but my question is slightly different. On the offer to Mr. Berg of help, if you don't know maybe you could find out, has that offer been extended to others in Iraq in the -- you know, since there's been a consular officer there, since the CPA has been stood up? Is this something that happens on a regular basis or an irregular basis?

**MR. BOUCHER:** Just based on my understanding of consular officers and what they're doing there, what they're doing elsewhere, sure. Anytime somebody comes to us and said, you know, I'm looking for a way to leave, we try to help them out. And I assume that was the circumstance in this case.

**QUESTION:** Well --

**QUESTION:** I'm not worried about this case. I'm just asking generally. Is Mr. Berg one of a dozen, 50, 100, or one of two or three.

**MR. BOUCHER:** I don't know how many people the consular officers have seen, but if somebody comes to our consular officer and says, you know, I want to leave, I don't know how to make the arrangements, we'll

help them to the extent we can.

**QUESTION:** Did you go over this already? Did he approach the consular officer to try and leave, or was he approached by them? Was that already answered?

**MR. BOUCHER:** As I said, my understanding is that we extended an offer to assist him in departing Iraq by plane to Jordan. I don't know specifically if he came and said help me out or how --

**QUESTION:** Well, it would appear he did not.

**MR. BOUCHER:** -- how it arose in the conversation --

**QUESTION:** Is it standard practice to go to people and tell them, "Hey, we can get you out of the country"?

**MR. BOUCHER:** Why do you say it appears that he did not?

**QUESTION:** Because he stayed.

**MR. BOUCHER:** This was April 10th, as I said ten minutes ago. This was April 10th. That was right around the time he disappeared.

**QUESTION:** I mean, there's three days between there and when he did disappear, right?

**MR. BOUCHER:** Yeah, right around the time he disappeared.

**QUESTION:** I think you may have handled this, but please explain to us how do private American citizens that are not working for a major corporation or something go to Iraq, whatever reason, business or pleasure or curiosity or whatever? What is the procedure? Do they go, they get a visa? What is the -- how is it done?

**MR. BOUCHER:** I don't know.

**QUESTION:** You can get a visa from somewhere?

**MR. BOUCHER:** First of all, you can ask an Iraqi embassy. They have representation overseas now. You can call the office here. I'm sure they'll be able to tell you what they issue for travel to Iraq.

Second of all, as far as how you make arrangements to get a truck or a bus or a plane or whatever to get into Iraq, I'm afraid I'm not a travel agent. I don't know.

**QUESTION:** Regarding the CPA, didn't they establish some sort of a protocol on how you go about this?

**MR. BOUCHER:** Again, if you want to know what the CPA might do with travelers to Iraq, you can ask the CPA. I'm sorry, I'm just not -- I'm standing here 10,000 miles away in Washington. I'm not able to answer questions about how to travel around Iraq.

**QUESTION:** Well, on --

**QUESTION:** Can I follow up on a different issue?

**MR. BOUCHER:** Yeah.

**QUESTION:** The murderers of Daniel Pearl were caught through some sort of, you know, a tool on the internet and so on. Is there something that is similar that is going on now, because it could be traced, you know, who these people are?

**MR. BOUCHER:** I don't know how the investigation is proceeding, but there is an --

**QUESTION:** Because they must have used some sort of a website, you know, probably registered with an

American company or something.

**MR. BOUCHER:** I appreciate that. I am sure the investigators are using every possible means to track these people down, and we will continue to do so until they are caught and punished.

**QUESTION:** There are some news reports suggesting that, in fact, he was murdered before and then he was decapitated on the video. Are you aware of these news reports and why he was wearing this orange U.S. prison suit?

**MR. BOUCHER:** I don't know.

**QUESTION:** You don't know any details?

**MR. BOUCHER:** I'm not in a position to know. I'm sorry. We're just -- again, we're not involved in the events on the ground. The investigation may be trying to ascertain exactly the circumstances, but I'm not in a position to share any details anyway, even if we had them.

**QUESTION:** Could I shift slightly to -- still Iraq but --

**QUESTION:** Well, can we stay -- I just have one more. On the -- I know you say that the people on the ground are dealing with this, but you do have U.S. consular officers on the ground. So what is the job of the U.S. consular officer there and what is the coordination with the CPA?

**MR. BOUCHER:** The consular officer there works closely with the CPA and works -- is there to take care of American citizens, to provide American citizen services to people who are there, whether they are contractors or military people or anybody else who loses their passport, wants to get a message home, mom hasn't heard from them for days, wants us to pass a message saying please call home, or people who are in more difficult circumstances who might be looking for a way to leave or otherwise fall into trouble in Iraq. We're there to help out Americans who are in Iraq of all kinds.

**QUESTION:** Is there anything new to report on progress toward a resolution or resolutions for pre-transition -- or even post-transition, for that matter?

**MR. BOUCHER:** I think the simple answer is that the discussions continue, that we have had a series of discussions at the United Nations. I think there have been two so-called "informal/informal" meetings, including one yesterday. We've had --

**QUESTION:** Informal/informal meetings?

**MR. BOUCHER:** Yeah, that's what they call them up in New York.

**QUESTION:** Is that like a non-TCOG TCOG?

**MR. BOUCHER:** Yeah, something like that, only less formal than that. Anyway, just when a group of people from the UN Security Council get together and kind of talk in general terms about something without it being a formal meeting or a statement of positions, they're just trying to figure something out, they call it an informal/informal.

So that's what they did yesterday again, discussing what the elements might be of a UN resolution on Iraq. As you -- as I have reported to previously, the Secretary has had a number of discussions about this in his bilateral meetings over the last couple weeks and he looks forward to discussions tomorrow with the Group of Eight foreign ministers and then discussions over the weekend with some of our Arab friends and partners who he'll be meeting.

The consultations that are going on in Iraq by Mr. Brahimi regarding the formation of an interim government will also be important to consider as we look at drafting a new UN resolution. So that's -- we're going to have to gage our progress on how fast we move in relation to how fast that process moves. We don't want to get ahead of that process of forming the interim government in Iraq; on the other hand, we are having these discussions so that we have an understanding about what we can do to support that process, to endorse the process, to deal with some of the issues that arise in giving the interim government authority to,

Case 1:05-cv-01509-UNA     Document 7     Filed 09/12/2005     Page 52 of 101

for example, control the Development Fund for Iraq and other details of things that have been previously handled in UN resolutions.

**QUESTION:** And just -- I'm not looking for a percentage or anything like that here, but for tomorrow in the G-8 meeting, considering that so many -- half, right? -- are on the Security Council --

**MR. BOUCHER:** Yeah, and two others who, as we know, have troops in Iraq. So there are many directly concerned.

**QUESTION:** Right. So can you kind of compare -- I mean, is this going to be the major or a major topic of conversation, or is it going to be -- in terms of that region, or will it be more the Greater Middle East Initiative?

**MR. BOUCHER:** The principal focus of this meeting of Group of Eight ministers is to talk about the Group of Eight summit that will come up in Sea Island. So they're going to deal --

**QUESTION:** Not the Greater Middle East Initiative?

**MR. BOUCHER:** They're going to deal most directly with all the issues that will come up at Sea Island. That goes beyond the Middle East. But in terms of the Middle East, I'm sure there will be significant discussion of what's called the Greater Middle East Initiative, how we support reform process underway in the Arab world. There will be probably considerable discussion of the Middle East peace process and how that's proceeding and what all of us can do to support that.

So this was -- this discussion of a UN resolution, I'd say, is an opportunity because half the G-8 are Security Council members and others are directly interested, so it's another topic being taken up with this group in a separate -- almost a separate meeting, and then get down to the plenaries and the business of the G-8. But the principal focus of the discussions tomorrow will be G-8 business.

**QUESTION:** Wait, wait. There's a separate meeting just on --

**MR. BOUCHER:** There will be a meeting on this and then a meeting on G-8 topics too. Same people.

**QUESTION:** Sorry. Meeting on Iraq resolution or meeting on all three: Greater Middle East, Middle East peace process and Iraq resolution?

**MR. BOUCHER:** There are a series of meetings during the day, including discussions over lunch, so they have parsed out the agenda. There will be a separate discussion of Iraq resolution and Iraq issues and then there will be getting down to specific business of the G-8.

**QUESTION:** Could I ask you if the U.S. is coming into any difficulties with France and Russia on a proposed UN resolution --

**MR. BOUCHER:** As you all know, there is countries that have a lot of different views about how we go forward on Iraq and what we can do in the UN resolution. We ourselves have opened up those discussions. We, the United States, and other members of the Council, have said we want to hear all the views. We want to hear the views of council members. We want to hear the views of coalition partners. We want to hear the views of people in the region.

And the Secretary himself has been consulting very widely and will continue to do so to get all the various ideas together about how we could proceed with this resolution to support the work that the UN is doing in Iraq, to support the Iraqi interim government and the overall transition process underway there.

So we're hearing ideas from the Russians, from the French, from many nations. Some of these nations have started to talk in public about some of the things that they have thrown out on the table. We ourselves, I think, have put forward a list of half of dozen things that we would expect to do in the resolution. So we'll gather all of this together in the drafting process, and I'm sure work in the usual fashion at the United Nations to come up with a resolution that everybody thinks is the appropriate one.

I would say, and this is based on our discussions with other ministers, that there is considerable

Case 1:05-cv-01509-UNA     Document 7     Filed 09/12/2005     Page 53 of 101

convergence on the elements of a resolution, considerable understanding of what a resolution needs to do, and then we're sort of in the stage now of talking about a whole variety of details that need to be included as well.

**QUESTION:** Is there convergence on the principle that Iraqis should take full control of their government?

**MR. BOUCHER:** There is definitely convergence on the principle that the transfer of sovereignty needs to occur, that Iraqis need to be in charge of their country and running their country with this interim government and that we all support the process that Ambassador Brahimi has underway in Iraq, as well as the preparations that the UN is making to support elections down the road.

Nicholas.

**QUESTION:** Richard, Secretary Rumsfeld said today in Iraq that he thought a resolution, or resolutions, will help one, two, up to three handful of countries to join the United States in Iraq. Do you share his optimism? And, if so, well, what are the reasons you have to have that optimism?

**MR. BOUCHER:** One, two or three handfuls?

**QUESTION:** He said one or two, and then, actually, the second time, he said up to three handfuls of countries, yes.

**MR. BOUCHER:** I think we have made clear that we do think there are countries who would be interested in participating in Iraq with a sovereign Iraqi government and a new UN resolution. I don't think we've -- I've seen a count over here, at this point, of how many might be willing to do that.

But over our discussions with many governments, over the course of months, really, about participation in Iraq, we know that there are many governments that said maybe when there is a UN resolution and an Iraqi government, we'll think about it more, or again, and we are in contact with other governments to see who might be interested at this stage. But I don't think I have any new count for you.

**QUESTION:** He also seemed to indicate in a sentence he began, but didn't finish, that if there is a second resolution, it might deal with the continuing presence of the multinational force. Is that something that you see --

**MR. BOUCHER:** I'm not usually in the habit of finishing Secretary Rumsfeld's sentences.

**QUESTION:** I know. Right.

**MR. BOUCHER:** But that is one of the elements we've already identified previously as being something that we would expect the resolution to deal with, the continuation and status of the multinational force.

**QUESTION:** He said it in the context of that part would -- may have to be in a separate resolution, not in the main one.

**MR. BOUCHER:** As I said, these elements are being discussed. I don't have drafts or specific decisions on paragraphs or what goes in where.

Okay.

**QUESTION:** Can we go to the elections in India, please?

**QUESTION:** Yes, please.

**QUESTION:** Can I get one more --

**QUESTION:** Can I ask one more on Iraq, please?

**MR. BOUCHER:** Two more on Iraq. Okay.

Case 1:05-cv-01509-UNA    Document 7    Filed 09/12/2005    Page 54 of 101

**QUESTION:** Some on the Iraq Governing Council are saying Brahimi's role is advisory, they don't really have to accept what he recommends. Would you care to respond to that notion?

**MR. BOUCHER:** I think we have all in the international community and, indeed, throughout Iraqi society, said that we appreciate the work that Ambassador Brahimi is doing. He's leading a consultative process of Iraqis. He's consulting very widely in Iraqi society, hearing a lot of different views from different people in Iraqi society.

The overall process in Iraq is governed by the Transitional Law that the Governing Council passed, and will be further supplemented by the annex to that law and other things the Governing Council will do. So their role in the current situation is quite clear that they have certain authority as well as coalition authority to make these things happen. We have all welcomed the role that Ambassador Brahimi has played and we look for the results of his consultations.

**QUESTION:** India, please?

**QUESTION:** There is a new poll in *The Washington Post* that says 80 percent of Iraqis are against the CPA and American forces there and they're mistrustful of the transitional government. Do you think that this will complicate your effort to transfer the government to Iraqis by June 30th, possibly the anti-American sentiment?

**MR. BOUCHER:** I think -- I don't think one should go by one answer to one -- one report of one answer of one question of polls. I think there have been extensive polling done in Iraq that describe Iraqi attitudes. Certainly, Iraqis want their sovereignty back, they want to run their own country, they want to run their own government.

But they also, generally, from the data that I've seen, want us to stay there to make sure they can do that successfully and securely. That's the process that is, indeed, underway. That's the process that I think most Iraqis support. That is the process that has received widespread support in Ambassador Brahimi's consultations is for Iraqi to be able to stand up and take charge of their country and take charge of their government. That's what we want, that's what the UN wants, and that's what Iraqis want.

**QUESTION:** (Inaudible) come closer to June 30th (inaudible).

**MR. BOUCHER:** Yeah, but what does it say, in essence? It says that they want to run their own country. Well, that's what we want, too. We're all moving in that direction.

**QUESTION:** Richard, the most popular Prime Minister of India was ousted by the voters yesterday and he resigned today, and the Congress Party's opposition leader, Sonia Gandhi, may be the next Prime Minister in the next few hours. So you think any policy will change with the United States and also as far as the peace process with Pakistan is concerned?

**MR. BOUCHER:** I am not able to predict Indian policy. I will you, for the United States part, that we congratulate the Congress Party on their success in the election. As in any well established democracy, Prime Minister Vajpayee and his cabinet have accepted the decision of the electorate. Once again, we are shown how strong and how deep are the roots of Indian democracy in this matter.

We have a very strong bilateral relationship with India and we look forward to working with the new government when it's formed.

**QUESTION:** The Pakistan Government said it hoped that the incoming government would proceed with what they call a peace process. Is that a sentiment the U.S. shares?

**MR. BOUCHER:** We --

**QUESTION:** Because the outgoing government was making overtures to Pakistan.

**MR. BOUCHER:** Yeah, we have -- first of all, we have always supported a resolution of differences between India and Pakistan through dialogue. We have made, as you know, extensive efforts to try to assist them in the lowering of tension. We think that does reflect the desire of people in both countries for peace, so we will continue to assist that process and encourage that process.

I would note that during the Secretary's visits to India, I think every time he has met with Mrs. Gandhi and members of the Congress Party leadership, and he has frequently discussed this process going on with Pakistan with them and made clear how much we encourage it and support it.

**QUESTION:** Richard, one follow-up. Was U.S. expecting in any way defeat for Vajpayee because it's so close relations with -- between Vajpayee and this Administration? Also, at the same time, the U.S. has been dealing with the Congress Party for the last almost 45 to 50 years. You think this will make any difference now after the (inaudible)?

**MR. BOUCHER:** I think I answered that question first off. We've had excellent relations with India and we look forward to continuing those relations.

**QUESTION:** And U.S. is ready to welcome Prime Minister Sonia Gandhi if she --

**MR. BOUCHER:** When they have a government, we look forward to working with that government. It's just not quite time to say that yet.

Okay, sir.

**QUESTION:** I want to change the subject, if I could. Yesterday, in meetings with Deputy Secretary Armitage, these two officials from the EU asked for the United States to expand the Visa Waiver Program to include all EU members. I presume that means that they want Greece, which wasn't in the program before but was in the EU before May 1st, as well as nine out of the ten because Slovenia, one of the new ones, is already in the Visa Waiver Program, that they want all of those countries, citizens of those countries, to be able to come in the U.S. without visas.

What was the response, and how likely is that to -- how likely is that?

**MR. BOUCHER:** The United States will look at these countries on a country-by-country basis, but they -- really, participation in the Visa Waiver Program is a matter of statute, it's a matter of law. The criteria for a company* to be nominated for Visa Waiver Program participation are that the country have a nonimmigrant visa applicant refusal rate of less than 3 percent, a

_____
*Speaker misspoke, meant to say…The criteria for a country…

machine-readable passport program in place, that they demonstrate adequate safeguards against fraudulent use of passports, and be sufficiently stable to ensure that conditions which could affect the program-qualifying criteria are not likely to change in the future.

Once nominated, the country must demonstrate that it has effective border controls in place for all territory under its control and that the country's law enforcement must demonstrate significant cooperation with U.S. counterparts, as well as international entities such as Interpol.

So those are the criteria that are applied that must be applied by law and that would be applied to any EU members. We are certainly willing to look at this in terms of any given government, but actually qualifying for the program requires meeting those statutory requirements.

A href="http://www.state.gov/r/pa/prs/ps/2004/32463.htm#visa">**QUESTION:** Well, in fact, isn't -- aren't you more likely, at least at the moment, to drop at least one EU country from the Visa Waiver Program, Belgium, which is kind of on a double secret probation?

**MR. BOUCHER:** I'm not going to make any prediction. We, as you know, regularly review countries that are in the Visa Waiver Program to ensure that all the criteria are continuing to be met. And we have had discussions with the Belgian Government, along with other governments about that, but I wouldn't make any prediction on that, at this moment.

**QUESTION:** Can you just make -- is it not correct that Belgium has been warned that it may be dropped --

**MR. BOUCHER:** I'll check on what I can say about the exact status from Belgium. We've had discussions about the criteria, and making sure that all the various safeguards are in place, and if we're satisfied they will continue.

**QUESTION:** Are you under the impression right now that any -- either Greece or any of the nine of the 10 newcomers that are not in the program now, if any of them come close to meeting these criteria?

**MR. BOUCHER:** I don't think we --

**QUESTION:** Or has it never been --

**MR. BOUCHER:** We don't necessarily publish refusal rates on governments, but we always do look at the countries that are coming close or are becoming eligible. So I'm sure we'll be willing to look at it for countries that may be coming close on that. But, at this point, it's a country-by-country determination. And, as I said, we're happy to look at it for countries that join the -- are joining the EU, but they're going to have to meet the requirements if we are able to accept them under the law.

Teri.

**QUESTION:** Change the subject. Could you update us on the North Korea talks and let us know if, in fact, there was a one-on-one North Korea-U.S. meeting?

**MR. BOUCHER:** No separate meetings. They had a plenary session yesterday. They've had continued working groups talks today. Each party has presented its views on how to resolve the problem presented by North Korea's pursuit of nuclear weapons, and they are scheduled to meet again tomorrow.

**QUESTION:** Any progress, or everybody just made statements?

**MR. BOUCHER:** I don't think I would report anything particular on progress, or lack thereof, at this stage in the talks. So I'd let the working group continue their work, and we'll see where we get to and report at the end.

**QUESTION:** (Inaudible) includes no sort of brief encounters together sitting in the room while --

**MR. BOUCHER:** There are no additional meetings, meeting. It was all at six.

**QUESTION:** Can I change subject? Venezuela has -- provincial government has apparently asked the United States military missions to leave liaison offices that it has at various military bases around that country, and apparently this was conveyed on Friday by the Venezuelan Defense Minister. Have you protested against this? And have the people actually left? Are they going to come back? Or are they going to end up at the U.S. Embassy? And how do you regard it?

**MR. BOUCHER:** The United States has had longstanding cooperation with the -- longstanding military-to-military relations with the Government of Venezuela. And that has included having liaison personnel at various -- I think, four different Venezuelan military installations including the headquarters, but is being discussed here, Fuerte Tiuna.

We did receive notification from the Venezuelans last Friday that they would like us not to maintain offices at that installation, or those, I guess, all Venezuelan military bases, by May 30th. I think we find the notice disappointing. We felt that the military-to-military relations between the United States and Venezuela have been important to both of us, over a long period of time.

We have been -- worked cooperatively with the Venezuelans on military matters. We supplied equipment and continued to supply spare parts to the Venezuelans. So I think we're disappointed that they made this decision, but it is their decision to make. It's their property, their bases, their offices. And so we do think the overall goal of maintaining liaison with the Venezuelan Government. Venezuelan military remains important to us.

So I think our intention, at this point, is to put those people into our embassy and have them work out of there.

**QUESTION:** Does the Venezuelan military have any similar liaison officers at U.S. military facilities? And do you plan to ask them to vacate?

**MR. BOUCHER:** I, frankly, don't know if they have people or offices at CENTCOM, for example. I just don't know.

**QUESTION:** Do you know if they have any -- and you probably don't know this. But if you -- you know --

**MR. BOUCHER:** I'm sorry. SOUTHCOM, for example.

**QUESTION:** Yeah. Do you have any other -- do you have any plans to sort of -- retaliate is maybe not the right word, but take reciprocal measures because of this?

**MR. BOUCHER:** I think it's important to remember that, first of all, the relationships are important to us. And, second of all, we do recognize this is a decision that the Venezuelans can make about who they offer office space to at their headquarters. So we may be disappointed in the decision, but we intend to try to continue the work from our embassies.

**QUESTION:** So the spare parts will continue whether -- that has been (inaudible)?

**MR. BOUCHER:** I don't know if there is anything in particular pending at this point, or whether it might be more difficult to do at a slight distance. But, in principle, we'll try to maintain liaison-type relationships that we have had.

**QUESTION:** Change of subject. Richard, yesterday, the Commission on International Religious Freedom came out with a report and they have recommended India and Pakistan, both, to be countries of concern, if Secretary is likely to enforce the assumption that they have recommended to the Secretary?

**MR. BOUCHER:** I'm not going to speculate, at this point, on what we might come out with in the -- in the designations that we do every year. The committee is separate, and they make a variety of recommendations to us.

**QUESTION:** How do the State Department or Secretary feel about religious freedoms in India and Pakistan?

**MR. BOUCHER:** I don't have anything new to say today. We'll say what's new at the appropriate time.

**QUESTION:** Richard, do you know when the --

**MR. BOUCHER:** I don't remember exactly, frankly. It takes a while.

Yeah.

**QUESTION:** Do you know when the Human Rights Report, the Report on Human Rights --

**MR. BOUCHER:** I think we'll do it early next week. We'll get a notice out as soon as we're ready.

**QUESTION:** (Inaudible) more on G-8 meeting?

**MR. BOUCHER:** Yeah.

**QUESTION:** Japan wants to include the abduction issue and a chairman's statement to be issued after the meeting, will North Korean issues come up tomorrow?

**MR. BOUCHER:** I would expect, since many of these governments are concerned about North Korea, that we will discuss North Korea. The Secretary will have a separate meeting with Foreign Minister Kawaguchi tomorrow morning. So that's a chance for the two of us, who are most directly concerned with North Korea, to talk about it as well.

So I'm sure there will be discussion tomorrow of North Korea, including our concern that we share with the Japanese about the abductee issue. But, as far as predicting what we'll say at the end of the discussions, let's wait until the discussions are held.

Yeah.

**QUESTION:** Speaking of the Secretary's meetings, do you have anything more on who he is going to be seeing in Jordan? And can you confirm from this end what the Palestinians are saying, that he will meet with Abu Alaa on Saturday or tomorrow?

**MR. BOUCHER:** I'm not sure all the arrangements are made yet for meetings with the Palestinians. So I don't think at this point I can confirm any specific meetings.

**QUESTION:** Any? Not -- forget about the Palestinian. Anyone else?

**MR. BOUCHER:** He will have other meetings with other people, but I don't think I can confirm any specific meetings at this point.

Yeah.

**QUESTION:** You don't even want to go out on a limb and say that he's going to see King Abdullah?

**MR. BOUCHER:** I'm sure he will see King Abdullah. But under what circumstances, I don't know yet.

**QUESTION:** Well, we know that Abu Alaa is on his way to Amman. But my question to you: Why is the letter not being made available, the President's letter to Abu Alaa, to the Palestinian Prime Minister? Do you have any information on the letter?

**MR. BOUCHER:** I don't have anything -- information on that letter that the President said he was going to send. It would be up to the White House to discuss it. If you want to ask over there, I'm sure they can talk to you about it.

**QUESTION:** One more?

**MR. BOUCHER:** One more. Actually, we've got two more.

**QUESTION:** Under Secretary Grossman, on the Hill, today, this morning, said that if the new Iraqi government, whatever its shape, asks the U.S. military to leave, the military, U.S. military would leave. Is that the U.S. Government's position? Or do you not believe that you have authority in existing UN resolutions to stay longer?

**MR. BOUCHER:** I'd have to look back at the exact question. I think the authorities, the sovereignty of the Iraqi government, is clear. And that would be the logical answer and I'm sure Ambassador Grossman spoke for the United States Government on the point. Whether he was asked about it at the interim stage or the further post-election stage, I don't know. Didn't see the question myself.

But, in any case, I think it's not an issue that we expect to arise. Both we and the Iraqis that we're talking to, that others are talking to, expect that we will be able to work out security arrangements for Iraq that involve the continuation of the multinational force, the taking of increasing security responsibilities by the Iraqis and eventually the departure of the multinational force when the Iraqis are able to assume those full responsibilities.

We recognize on our part as well as the Iraqi part that it's necessary to have arrangements, to have appropriate military arrangements with the interim government and with the elected government, and we're very confident that that will be worked out.

We do have one more. Nadia.

**QUESTION:** I just wanted to ask you if you've been in contact with the Israelis regarding the purpose of the incursions in Gaza and the high death of 30 Palestinians and 11 Israelis, and Arafat calling for the international communities to condemn that attack.

**MR. BOUCHER:** I don't know what contacts we've had with the Israelis. I'm sure our Embassy is in touch with them and the Consul General's Office is in touch with the Palestinian side as well. We, obviously, are

Case 1:05-cv-01509-UNA   Document 7   Filed 09/12/2005   Page 59 of 101

following the situation out there, have been very concerned about some of the violence, some of the deaths that have occurred, specifically the attacks on the IDF and the whole question of remains --

**QUESTION:** (Inaudible.)

**MR. BOUCHER:** Excuse me. Over the last two days, we've talked about that. We are always concerned when this kind of violence occurs, always concerned about the deaths of Palestinians as well. So it's been a flare-up of violence and our people out there are following it closely.

We've got one more?

**QUESTION:** Yes, please. President Bashar Assad of Syria, he, after commenting on the Syria Accountability Act, he said he doesn't see the relations between the United States and Syria as at a deadlock and he welcomed the continuation of the dialogue between the two countries. That took place after the strong criticism yesterday from Amr Moussa of the Arab League and the Gulf states, you know, for the act.

Do you see -- do you agree with the assessment of President Assad's, you know, kind of optimistic, you know, futuristic look?

**MR. BOUCHER:** I think I'd stand by what we have said over the last few days, that we're certainly willing to continue our dialogue with the Syrian Government about these issues. But more important than that, we need to see action by the Syrian Government that accepts the need to change its relationships with terrorists, to change its behavior with regard to Iraq and the various other things that we have raised.

**QUESTION:** Thank you.

(The briefing was concluded at 1:25 p.m.)

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, *et al.*,    :
                                :
          Petitioners,          :
                                :
    v.                          :    Civil Action No. 05-0497 (JR)
                                :
GEORGE W. BUSH, *et al.*,       :
                                :
          Respondents.          :

MEMORANDUM ORDER

Abu Bakker Qassim and A'del Abdu Al-Hakim are Muslim Uighurs, natives of China's western semi-autonomous Xinjiang province. They were captured by Pakistani security forces in late 2001 or early 2002, delivered into U.S. custody, and held in Afghanistan for approximately six months. In June 2002 they were transferred to the naval base at Guantanamo Bay, Cuba, where they were detained as "enemy combatants," and where they remain to this day, even though, nearly five months ago, a Combatant Status Review Tribunal (CSRT) determined that "they should no longer be classified as enemy combatants." Resp't Mem. in Opp'n to Mot. to Vacate Stay Order at 4, n.5.

Qassim and Al-Hakim petitioned for a writ of habeas corpus on March 10, 2005. The government (which knew about the CSRT determination but advised nobody) moved for a stay of proceedings pending the Court of Appeals' decision in the consolidated appeals of Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), and In re Guantanamo Detainee Cases, 355 F. Supp.

2d. 443 (D.D.C. 2005). Petitioners (whose counsel were ignorant
of the CSRT determination) moved for a preliminary injunction.
On April 13, 2005, I (also ignorant of the CSRT determination)
denied the motion for preliminary injunction and granted a stay
of all proceedings concerning these petitioners, including "their
release, repatriation, or rendition."[1]

In the midst of this motions practice, counsel for
petitioners twice sought information from the government about
proceedings before the CSRT, see Manning Decl., Exs. G-H.  The
government did not respond.[2]  It was only in mid-July, when
petitioners' counsel traveled to Guantanamo Bay to meet their
clients for the first time, that counsel were informed by their
clients that the CSRT had found them not to be enemy combatants.
After this information was confirmed by a JAG officer stationed
at Guantanamo Bay, Willett Decl. ¶ 15, counsel filed an emergency
motion to vacate the stay order and for their clients' immediate
release.  The government opposed, and a hearing was held on
August 1, 2005.

---

[1] Both sides have appealed that stay order, but the parties agree
that the pendency of their appeals does not oust this Court of
jurisdiction to decide the matters presented by petitioners' instant
motions.

[2] At a hearing held on August 1, 2005, the government acknowledged
receiving informal discovery requests for the 120 detainee cases it
has, and stated that it generally did not respond to such requests
"simply because we're not in a position to do it, especially when
these cases should be stayed because the legal issues involved are
before the Court of Appeals." August 1, 2005 Tr. at 16.

The status of "enemy combatant" has been, until now, the only handhold for the government's claim of executive authority to hold detainees at Guantanamo.  It is the only rationale approved by the Supreme Court, see Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2639-40 (2004).  Now that these petitioners are "no longer enemy combatants" (NLECs[3]), the government has had to articulate a new reason for continuing to hold them.  That reason, asserted at the August 1 hearing and again in the government's post-hearing memorandum, is "the Executive's necessary power to wind up wartime detentions in an orderly fashion."  Resp't Supplemental Mem. at 12.  There is no basis for this claimed authority except the Executive's assertion of it.

It is not necessary to decide whether such a "wind up" power really exists, however, because the parties agree that Qassim and Al-Hakim should be and will be released.  Their disagreement is about when they will be released, what is to become of them pending their release, and what power, if any, this Court has to control events.  It is undisputed that the government cannot return these petitioners to China, because they

---

[3] Petitioners suggest that the designation "no longer enemy combatant" has Orwellian overtones, but the "no longer" language appears to be fairly rooted in the Supreme Court's holding that a detainee "seeking to challenge his classification as an enemy combatant" must be given "notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions . . . ." Hamdi, 124 S.Ct. at 2648.

- 3 -

would be persecuted there,[4] but, the government says,
notwithstanding sensitive, ongoing diplomatic efforts to place
them, it has no place to send them at the moment.  If that is the
case, petitioners say, and if they cannot be released to civilian
quarters on the Guantanamo Bay base (a proposition that I have
already rejected in open court), then the government should be
ordered to "produce at the hearing [here in Washington, D.C.] the
bod[ies] of the person[s] detained" pursuant to the plain
language of 28 U.S.C. § 2243.  The government opposes that
suggestion, arguing (I) that the stay should remain in effect
because the scope of the habeas writ as it applies to Guantanamo
detainees is an open question that is still pending, undecided,
before the Court of Appeals, and (ii) that in any case the habeas
statute is trumped by the exclusive power of the Executive to say
who can and who cannot enter the United States.

     All the Supreme Court did, in Rasul v. Bush, 124 S.Ct.
2686 (2004), was confirm the jurisdiction of the federal courts
"to determine the legality of the Executive's potentially
indefinite detention of individuals who claim to be wholly

------------------------------------

     [4] "The [Chinese] Government used the international war on terror
as a pretext for cracking down harshly on suspected Uighur separatists
expressing peaceful political dissent and on independent Muslim
religious leaders." United States Department of State, Country Reports
on Human Rights Practices 2004: China, available at
http://www.state.gov/g/drl/rls/hrrpt/2004/41640.htm.  The State
Department reports executions, torture, and other mistreatment of
suspected separatist Uighurs by the Chinese government.

innocent of wrongdoing." Id. at 2699.  It did not decide what
relief might be available to Guantanamo detainees by way of
habeas corpus, nor, obviously, did it decide what relief might be
available to detainees who have been declared "no longer enemy
combatants."  Neither of the twinned cases now pending before the
Court of Appeals presents, or appears to have contemplated, the
case of a detainee who has been through the CSRT process and
declared no longer an enemy combatant.  Judge Joyce Green's
ruling in Guantanamo Detainee Cases was that Guantanamo detainees
have enforceable constitutional rights, 355 F. Supp. 2d at 457 --
a proposition that is unnecessary to either side's position in
the present case.  Judge Leon's ruling in Khalid, that there is
no cognizable legal theory on which a writ of habeas corpus could
actually issue in such a case, 355 F. Supp. 2d at 321, did not
involve and did not consider the case of an "NLEC" detainee.
Thus these petitioners are correct, as a formal, legal matter, in
their insistence that the issue presented by this case is not
before the Court of Appeals.  As a practical matter, however, it
is a safe prediction[5] that any order requiring the immediate
release of these petitioners would be appealed, that the Court of
Appeals would enter a stay, as it did in Guantanamo Detainee
Cases, and that whatever processes are now underway for

_____

   [5] "The prophecies of what the courts will do in fact, and nothing
more pretentious, are what I mean by the law." Holmes, The Path of the
Law.

alleviating the conditions of petitioners' detention and arranging for their relocation to another country would be put on hold pending the appeal.

Turning to the question of whether this court or any court has the power to command the production of the body of a habeas petitioner when obedience to that command would bring an alien into the United States: The authorities cited by the government are for the most part inapposite; this case does not involve judicial review of an executive branch decision to exclude aliens. The government may have reason to suspect that petitioners' "primary interest in being brought to the United States is to derive various immigration-related benefits," Resp't Supplemental Mem. at 16, but petitioners' motives are not material to the question at hand. The government correctly points out that the language of the habeas statute that contemplates the physical production of a petitioner is rarely used, but this is a rare case. And the government's argument that the Real ID Act controls the interpretation of the habeas statute, because it was enacted later, strikes me as specious.

It is unnecessary, however -- at least for now -- to decide whether this Court has the power to require the production of the petitioners. The idea of such an order emerged during the August 1 hearing as one way of dealing with petitioners' complaints that they were denied telephone communication with

- 6 -

their families, that they could meet their lawyers only when chained to tables or walls in detention cells, and that the scarcity of Uighur interpreters and the red tape associated with clearing interpreters to work with counsel made regular attorney-client communication impossible. The government's supplemental memorandum makes substantial concessions on those points.

Petitioners have asked for a "hearing on the conditions of interim relief." Giving it that label would suggest a ruling on the question of whether the Court has the power to grant "relief" to these petitioners. Nevertheless, as it appears that both sides seek a just and honorable solution to the practical problem before us, a hearing will be set for the purpose of considering and perhaps reaching agreement on the conditions in which the petitioners are live, and the privileges they will have, pending their relocation to another country.

- 7 -

It is accordingly:

ORDERED that a hearing is set for **August 25, 2005, at 2:00 p.m.** And it is

FURTHER ORDERED that the government be prepared at the time of that hearing to make appropriate disclosures to the Court in camera augmenting the declaration of Pierre-Richard Prosper concerning the process and status of efforts to relocate the petitioners.

                              JAMES ROBERTSON
                    United States District Judge

# **EXHIBIT 4**

BINGHAM McCUTCHEN

Susan Baker Manning
Direct Phone: (202) 778-6172
Direct Fax:    (202) 778-6155
susan.manning@bingham.com
Our File No.:  0999997-0000928706

August 15, 2005

**Via U.S. Mail**

Andrew I. Warden,. Esq.
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530

Re:  *Kiyemba v. Bush, et al.* (No. 1:05cv01509 (RMU))

Dear Andrew:

Pursuant to the Revised Procedure for Counsel Access to Detainees at the U.S. Naval
Base in Guantanamo Bay, Cuba § III(C), please find enclosed evidence of Bingham
McCutchen's authority to represent Petitioners Abdusabur Doe, Abdusamad Doe,
Abdunasir Doe, Hammad Doe, Hudhaifa Doe, Jalaal Doe, Khalid Doe, Saabir Doe and
Saadiq Doe, and to represent Jamal Kiyemba, next friend of the aforementioned
Petitioners.

Sincerely,

Susan Baker Manning

Enclosure

Bingham McCutchen LLP
Suite 800
1120 20th Street, NW
Washington, DC
20036-3406

202.778.6150
202.778.6155 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

## AUTHORIZATION & NOTIFICATION

I, JAMAL KIYEMBA (#701), UNDERSTAND THE LEGAL TERM "NEXT FRIEND" AND FIRMLY BELIEVE THAT THE FOLLOWING PEOPLE, WHO I HAVE COME TO KNOW DURING MY CAPTIVITY SINCE (AS ATTACHED) MARCH 2002, WANT ME TO ACT AS THEIR "NEXT FRIEND", AND AUTHORIZE CLIVE STAFFORD SMITH TO SEEK ANY LEGAL REDRESS ON THEIR BEHALF THAT IS POSSIBLE, AND I SO AUTHORIZE HIM. I ALSO SUBMIT THIS DOCUMENT AS EVIDENCE, INDEPENDENT OF THEIR RELIANCE UPON ME AS "NEXT FRIEND" OF THEIR SPECIAL DESIRE FOR A LAWYER AND FOR A LEGAL CHALLENGE TO THE ILLEGALITY OF THEIR DETENTION BY THE UNITED STATES OF AMERICA.

THIS AUTHORIZATION & NOTIFICATION APPLIES TO ALL PERSONS LISTED ON THE ATTACHED LISTS, AS INITIALED BY ME.

MARCH 10TH, 2005.

Kiyemba

**FOUO**

| | | | |
|---|---|---|---|
| 1 | ALI | UZBEKISTAN | CAMP I |
| 2 | ABDULLAH | UZBEKISTAN | CAMP I |
| 3 | KHALID | TURKISTAN | CAMP 4 (UIGUIR) |
| 4 | ABOUSARAH | " | " " |
| 5 | ABOUSAMAD | " | " " |
| 6 | HAMMAD | " | " " |
| 7 | ABDU NASIR | " | " " |
| 8 | JALAAL | " | " " |
| 9 | BILAL | SYRIAN | CAMP I (ARABIC) |
| 10 | FAISAL | SAUDI | CAMP I |
| 11 | BANDAR AL JAMBIR | " | " " |
| 12 | AHMAD | TURKISTAN | CAMP 4 (UIGUIR) |
| 13 | SAADIQ | " | " |
| 14 | WALIID | SUDAN | CAMP I |
| 15 | HAMMAD | " | CAMP 4 |
| 16 | MAHMOOD | SUDAN | CAMP I |
| 17 | SAIFULLAH | TUNISIAN | CAMP II ITALIAN? ARABIC |
| 18 | YUSUF ALSSIHRI | SAUDI | CAMP III |
| 19 | YUSUF ALRISH | SAUDI | CAMP I |
| 20 | ABDALLAH | TUNISIAN | CAMP II ITALIAN? |
| 21 | ADIL | TUNISIAN | CAMP IV ITALIAN? |
| 22 | ABU RAWDAH | SYRIAN | CAMP I |
| 23 | SAABIR | TURKISTAN | CAMP IV (UIGUIR |
| 24 | SALIH | TURKISH | CAMP IV |
| 25 | ABU MUHAMMAD | ALGERIAN | CAMP IV (ENG/MASI) |
| 26 | VERY ILL SALMAN ALBAHRI | SAUDI | CAMP I |
| 27 | JAABIR ALQAHTANI | | CAMP II |

**UNCLASSIFIED**

J.K.

RIDWAAN ALMAGERI          MOROCCAN
FAHD ALTHARAZI            SAUDI
FAHD ABU HAFSA            YEMENI          CAMP IV   Arabic
HUDHAIFA                  TURKWANI        CAMP I    Urguis
2 ABDURAHMAN (C+41)       YEMENI          CAMP I    Arabic
3 SHAFIIQ                 ALGERIAN        CAMP I    Arabic
1 NABIL                   ALGERIAN        CAMP I    French & Arabic

FOUO

**Manning, Susan Baker**

| | |
|---|---|
| **From:** | Terry.Henry@usdoj.gov |
| **Sent:** | Thursday, September 01, 2005 3:14 PM |
| **To:** | Manning, Susan Baker |
| **Cc:** | Andrew.Warden@usdoj.gov |
| **Subject:** | RE: Kiyemba v. Bush (No. 1:05cv01509) |

Susan,

I believe the motion we filed yesterday in the Kiyemba case essentially reflects our position with respect to your requests at this time.

Regards,

Terry M. Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel. 202.514.4107

-----Original Message-----
From: susan.manning@bingham.com [mailto:susan.manning@bingham.com]
Sent: Wednesday, August 31, 2005 11:58 AM
To: Henry, Terry (CIV)
Cc: Warden, Andrew (CIV)
Subject: RE: Kiyemba v. Bush (No. 1:05cv01509)

Dear Terry --
We still have not heard from the government regarding the critical issues raised below.
We have asked the government to advise whether it has determined that any of our clients
are not enemy combatants, or otherwise not a security threat to the United States.  We
have also asked the government to advise whether it has any plan or expectation of
releasing our clients.  As you know, Judge Robertson has viewed most unfavorably the
government's failure to provide us with that same information in the Qassim case.  I trust
that Judge Robertson's statements to date are enough to make it clear to the government
that our request for this critical information is appropriate.  Please provide the
requested information.

As to our client Saddiq, we have obtained additional unclassified information about him.
We believe that he may be an ethnic Uighur who is a citizen of Saudi Arabia.  His full
name may be Saddiq Al Bukhari.  We also believe that the government has determined that he
is not an enemy combatant, or "no longer an enemy combatant" in DoD parlance.  If that
information is correct, I can only assume that he has either been repatriated or moved to
Camp Iguana.  Please advise.

regards,
Susan


Susan Baker Manning, Esq.
Bingham McCutchen LLP
1120 20th Street NW, Suite 800
Washington DC 20036
202.778.6172 (t)
202.778.6155 (f)
susan.manning@bingham.com


> -----Original Message-----
> From:    Manning, Susan Baker
> Sent:    Monday, August 22, 2005 11:54 AM
> To: 'terry.henry@usdoj.gov'
> Cc: 'andrew.warden@usdoj.gov'

> Subject:  RE: Kiyemba v. Bush (No. 1:05cv01509)
>
> Terry --
> With the additional information below requested by the government as to each Kiyemba v.
Bush petitioner, has the govt. been able to determine (1) whether each petitioner is a
Uighur?; (2) whether the Government made a determination that the detainee is not an enemy
combatant, or otherwise does not represent a security threat to the United States?; and
(3) whether the Government has any plan or expectation as to the detainee's release?
>
> As you'll recall, Sabin Willett asked you these same questions in correspondence dated
August 4, 2005, and we provided the information below to assist in your investigation.
Given the publicly available information that more than half of the Uighurs in Guantanamo
have been cleared by the government, we are of course particularly interested to know
whether petitioners have been determined not to be enemy combatants.  I look forward to
hearing from you on these important matters.
>
> regards,
> Susan
>
>
> Susan Baker Manning, Esq.
> Bingham McCutchen LLP
> 1120 20th Street NW, Suite 800
> Washington DC 20036
> 202.778.6172 (t)
> 202.778.6155 (f)
> susan.manning@bingham.com
>
>
>
>      -----Original Message-----
>      From:      Manning, Susan Baker
>      Sent: Tuesday, August 16, 2005 5:02 PM
>      To:   'terry.henry@usdoj.gov'
>      Cc:   'andrew.warden@usdoj.gov'
>      Subject:   Kiyemba v. Bush (No. 1:05cv01509)
>
>      Terry --
>      I write in response to the issues you raised with Sabin Willett regarding the
Kiyemba petitioners.  I have forwarded you the next friend authorization under separate
cover.  As to the Petitioners, we trust that the government will be able to identify each
of them as they are all Uighurs, and we understand that there are only approximately 22
Uighurs in Guantanamo.
>
>      Nevertheless, to assist the government, please find below some add'l information
regarding each of the Petitioners.  Naturally, I have not been able to confirm any of this
information with my clients yet, but this is my best understanding.
>

| > Name (and possible AKAs) | ISN | Camp |
|---|---|---|
| > Abdul Nasser (aka Abdulnasir, Abdul Anasser) | | I |
| > Abdul Sabour (aka Abdusaber) | | I |
| > Abdul Somad (aka Abdul Samad) | 295 | I |
| > Hammad | I | |
| > Hudhafia (aka Hoozaifa) | | IV |
| > Jalal Jalaldin (aka Jalal Eddine)> | 285 | I |
| > Khalid | | I |
| > Sabir | 289(?) | IV |
| > Saddiq | ? | |

>
> regards,
> Susan
>
>
> Susan Baker Manning, Esq.
> Bingham McCutchen LLP
> 1120 20th Street NW, Suite 800
> Washington DC 20036

2

```
> 202.778.6172 (t)
> 202.778.6155 (f)
> susan.manning@bingham.com
>
>
```

# **EXHIBIT 5**

## DECLARATION BY ATTORNEY BARBARA OLSHANSKY

I, Barbara Olshansky, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am a member in good standing of the bar of this Court and have practiced law for 18 years. I am also an attorney in good standing in the State of New York.

2. For the last three years, I have been actively involved in the steps that my office, the Center for Constitutional Rights (CCR), has taken to (1) advance the rights of the Guantánamo detainees through litigation establishing their right to file petitions for writs of *habeas corpus* in federal court; (2) work with other non-profit organizations to reach out to the family members of the Guantánamo detainees for the purpose of filing next-friend petitions for writs of *habeas corpus*; and (3) recruit and train private attorneys to represent individual Guantánamo detainees on a *pro bono* basis.

3. CCR has engaged in extensive litigation, advocacy and public education on behalf of the individuals detained at Guantánamo Bay, including the following:

> A. *Request to Inter-American Commission on Human Rights for Precautionary Measures on Behalf of the Guantánamo Detainees*. In February of 2002, CCR requested that the Inter-American Commission on Human Rights (IACHR) of the Organization of American States issue precautionary measures to protect the detainees at Guantánamo Bay. On March 12, 2002, the IACHR requested that the U.S. Government take the urgent measures necessary to have the legal status of the detainees determined by a competent tribunal. The U.S. Government has failed to comply and continues to fail to comply with the IACHR's request. *See* Decision on Request for Precautionary Measures (Detainees at Guantánamo Bay, Cuba), Inter-Am. C.H.R. (Mar. 12, 2002), *reprinted in* 41 I.L.M. 532, 533 (2002).

> B. *Habib v. Bush & Rasul v. Bush*. In February and May of 2002 CCR filed *habeas corpus* petitions challenging the U.S. government's practice of holding foreign nationals in indefinite detention at Guantánamo

without access to the courts or the right to know the charges against them. CCR filed the petitions on behalf of two Australian citizens, David Hicks and Mamdouh Habib, and two men from the United Kingdom, Shafiq Rasul and Asif Iqbal. The petitions challenged respondents' indefinite detention of petitioners without due process of law, in violation of the U.S. Constitution and other federal laws, the Geneva Conventions, and international humanitarian and human rights law. CCR and its co-counsel litigated the case before the District Court, the D.C. Circuit Court of Appeals, and the United States Supreme Court. On June 28, 2004, the Supreme Court held that the detainees have the right of access to U.S. courts to challenge their detention under 28 U.S.C. § 2241. *Rasul v. Bush*, 124 S. Ct. 2686, 2698 (2004).

4.    Responding to the Supreme Court's historic decision upholding the rule of law at Guantánamo, CCR has spearheaded the effort to get each detainee his day in court. Since the Supreme Court decision, CCR and its partners have arranged for private law firms to represent detainees and file *habeas corpus* petitions on a pro bono basis in this Court. Through these efforts, more than 200 detainees currently have *habeas corpus* petitions pending in this Court.

5.    Because the U.S. government has refused to provide CCR or any other organization or attorney access to the Guantánamo detainees in any manner that would facilitate providing them advice regarding their right to file a habeas petition and the availability of pro bono counsel to represent them, each of the petitions currently on file with this Court was made possible through one of two means: (i) requests by the family members or loved ones of those detained for legal assistance from CCR or from other human rights organizations or counsel with whom CCR is working; or (ii) requests made through certain detainees (who are represented by counsel) acting as next friends for other detainees who have expressed their desire to retain counsel and file habeas petitions.

3

6.      More specifically, CCR and its partner organizations received authorizations from next friends through outreach activities which included, among other things, taking part in human rights conferences around the world, contacting international human rights organizations, and searching for family members of known detainees.  In addition, advocates working with CCR made numerous outreach efforts to member countries of the European Parliament seeking their assistance in locating their citizens. Despite these efforts, CCR and its partners have not been able to identify next friends for the vast majority of Guantánamo detainees.

7.      CCR and its partners have used the information they have obtained to date to match detainees with private law firms willing to represent detainees on a *pro bono* basis and file *habeas corpus* petitions on the detainees' behalf.

8.      However, despite the work of CCR and its *pro bono* partners, the vast majority of detainees at Guantánamo – upon information and belief, approximately 300 – remain unrepresented for the simple reason that the United States Government has held them virtually incommunicado and in physical isolation.

9.      The Government's refusal to disclose the names of the Petitioners, to provide the Petitioners with meaningful notice of their rights, and to permit CCR or any similar organization to communicate with them regarding these rights has prevented the Petitioners from being able to access and obtain counsel to do what the Supreme Court said they have a right to do—file *habeas* petitions challenging the legality of their detention.

10.     In addition to its own efforts as described above, CCR has also tried to work with the United States Government to ensure that every detainee at Guantánamo is

able to take advantage of his right to file a *habeas corpus* petition, as affirmed by the U.S. Supreme Court in *Rasul v. Bush*.

11.    Despite a number of good faith efforts to negotiate with Respondents, CCR has been denied any opportunity to communicate with the detainees at Guantánamo to advise them of their rights, and assist them in retaining counsel.

12.    In a July 1, 2004 letter to Respondent Rumsfeld, CCR Legal Director Jeffrey Fogel requested immediate access to the unrepresented detainees. Mr. Fogel offered to organize a delegation of lawyers to travel to Guantánamo to inform them of their rights under *Rasul*, and to assist them in obtaining legal representation. A true and correct copy of that letter is attached to this Declaration as Exhibit A. Mr. Fogel did not receive any reply to his request.

13.    Mr. Fogel subsequently contacted Gordon England, Secretary of the Navy, by letter dated July 14, 2004. In this letter, Mr. Fogel stated that the detainees had still not been adequately informed of their rights under *Rasul*, and again offered to lead a delegation of lawyers to Guantánamo to provide detainees with information about their rights under *Rasul* and to aid them in seeking legal representation. A true and correct copy of the July 14, 2004 letter is attached to this Declaration as Exhibit B.

14.    Alberto J. Mora, General Counsel of the Navy, responded to CCR's July 14 letter by letter dated July 20, 2004. Mr. Mora stated that the "Department of Defense and the Department of the Navy are in the process of exploring, in concert with the Department of Justice, the manner in which additional information will be provided to the detainees regarding habeas corpus applications." Mr. Mora did not provide any concrete information regarding how these Departments would provide the detainees with

information about their rights, nor did he indicate any willingness to negotiate access to the unrepresented detainees by CCR or any other counsel.  A true and correct copy of July 20, 2004 letter is attached to this Declaration as Exhibit C.

15.    In another attempt to assist the Guantánamo detainees, CCR attorney Shayana Kadidal, sought to apply for security clearance in order to meet with unrepresented detainees.  The Solicitor General's Office informed Mr. Kadidal that it only handled security clearances for existing petitions and he would have to seek access to the unrepresented detainees through the Department of Defense General Counsel's Office, which stated it would handle the clearance "like any other request for a visit to Guantánamo."

16.    On September 16, 2004, Mr. Kadidal applied for clearance through the Department of Defense.  A true and correct copy of Mr. Kadidal's application is attached to this Declaration as Exhibit D.  Mr. Kadidal's application was denied by letter dated November 2, 2004.  Mr. Kadidal did not receive the November 2, 2004 letter until December 8, 2004.  The November 2, 2044 letter stated that:

> Under procedures set up by the Department of Defense, the only counsel currently provided access to the detainees are counsel who are employed or retained by or on behalf of a detainee for purposes of representing the detainee in habeas corpus or other litigation in federal court in the United States …

A true and correct copy of the November 2, 2004 letter is attached to this Declaration as Exhibit E.

17.    On December 17, 2004, CCR sent yet another letter to Secretary England requesting the names and identifying information of all unrepresented detainees at Guantánamo, so that CCR could contact the remaining detainees or their family

members, to advise them of their rights under *Rasul* and of the availability of volunteer lawyers to assist them in bringing *habeas* actions.   A true and correct copy of that letter is attached to this Declaration as Exhibit F.

18.    This request was also denied.  In a letter dated January 14, 2005, Principal Deputy Associate Attorney General Brian Boyle stated that the Department of Defense: "believe[s] that each of [CCR's] concerns is being effectively addressed by the habeas filing opportunities currently afforded detainees, or is of marginal bearing on the issue of detainee access to the habeas process."  A true and correct copy of that letter is attached to this Declaration as Exhibit G.

19.    The Government has also failed to adequately inform the unrepresented detainees of their rights.  Between July 12 and 14, 2004, each detainee apparently was given a notice (the "July Notification") stating:

> . . . United States courts have jurisdiction to consider petitions brought by enemy combatants held at this facility that challenge the legality of their detention.  **You will be notified in the near future what procedures are available should you seek to challenge your detention in U.S. courts.**
> (emphasis added)

20.    Notwithstanding this promise by the Government, for more than five months, the Government did nothing to adequately explain the "procedures ... available should [the detainees] seek to challenge [their] detention in U.S. courts."

21.    In mid-December 2004, the Department of Defense posted on its website a second notification (the "December Notification") which addresses the possibility of the detainees' seeking *habeas* relief.  But the December Notification, like the July Notification, did not provide detainees with practical information that would in any way enable them to secure counsel to file a petition in court.  In fact, the December

Notification merely informs detainees that they can file their *own habeas* corpus petitions.

22.     We believe that the Government's July and December Notifications are inadequate to enable the unrepresented detainees to make and implement meaningful decisions as to the filing of *habeas corpus* petitions.  It is especially significant in this regard that CCR and other *habeas* counsel have received information that corroborates the repeated reports by the press and official investigative bodies:  many of the detainees may be in poor physical and mental condition.  *See, e.g.*, United Nations Press Release, "United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees," Feb. 4, 2005.  The unrepresented detainees, moreover, are now beginning the fourth year of a detention that makes it nearly impossible for them to contact the outside world.

23.     The additional information dissemination plans outlined in Mr. Boyle's January 14, 2005 letter did not cure these deficiencies.  Mr. Boyle states that the Department of Defense plans to provide a "supplemental information sheet with the names and addresses of U.S. lawyers" to "detainees who inquire about the availability of a lawyer for purposes of filing a habeas petition."  *See* Exhibit G.  But the detainees cannot be expected to trust the military officers who serve as their custodians and interrogators to provide them with attorneys who will act as zealous advocates on their behalf.  As a consequence, it seems highly unlikely that the detainees will ask their captors for help, or trust their statements.  Moreover, the "supplemental information," should it materialize, does not aid those detainees who are physically or mentally unable to express an interest in advocating on their own behalf.

I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 9th day of September, 2005, New York, New York.

_Barbara J. Olshansky_
Barbara Olshansky (NY0057)

# ATTACHMENTS TO EXHIBIT 5

# centerforconstitutionalrights

666 broadway new york, ny 10012
t 212 614 6464 f 212 614 6499 www.ccr-ny.org

July 1, 2004

Hon. Donald H. Rumsfeld
Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Dear Secretary Rumsfeld:

As you know, the Center for Constitutional Rights represents two of the petitioners in the decision of the United States Supreme Court entitled Rasul v. Bush. In addition, we represent 51 other detainees being held by the United States at Guantánamo Bay.

I write to insist that we be permitted unfettered access to our clients as expeditiously as possible. There is no question of the right of each of them to file petitions for habeas corpus and to have access to counsel in order to do so.

In addition, it is incumbent on the United States government to provide a means of informing each of the persons held by it at Guantánamo of the fact of the decision and of their rights pursuant to the ruling of the Court. They must also have means to contact their families or others for the purpose of securing counsel. We are prepared to organize a delegation of attorneys for that purpose.

I look forward to your prompt response.

Very truly yours,

Jeffrey E. Fogel
Legal Director



# centerforconstitutionalrights

666 broadway new york, ny 10012
t 212 614 6464 f 212 614 6499 www.ccr-ny.org

July 14, 2004

Hon. Gordon R. England          BY FAX: 703-693-7330
Secretary of the Navy           and regular mail
1000 Navy Pentagon
Washington, D.C. 20350-1000

                              Re:  Guantanamo detainees

Dear Secretary England:

    The Center for Constitutional Rights has reviewed the
proposed notice which will be provided to each of the detainees
held by the United States at Guantanamo Bay.

    As the notice itself says, there is a need for additional
information on the issue of habeas corpus applications.
No explanation is given to these foreign nationals of what a
habeas corpus petition is, or what their rights are in light of
the Supreme Court decision in Rasul v. Bush.  Moreover, no
information is provided about how the detainees may secure
counsel (who are available) in order to file and prosecute such
an action.  There is an obvious conflict of interest where the
armed forces provides legal advice to the persons who are its
adversaries, and there are ethical problems with having non-
lawyers (the "Personal Representatives") provide legal advice.

    As a public interest law firm, CCR has offered to organize a
delegation of lawyers who would be willing to provide the kind of
information necessary for each of the detainees to understand
their rights, to make a meaningful choice of their legal options
and to assist in securing legal representation.  Meanwhile, I
enclose herewith a form of notice which would, at least, begin
the process necessary to comply with the Constitution of the
United States, international law as well as the decision of the
Supreme Court.

                         Very truly yours,

                         Jeffrey E. Fogel
                         Legal Director



## NOTICE OF RIGHT TO CHALLENGE DETENTION IN FEDERAL COURT

You now have the right to be represented by counsel in federal court on a writ of habeas corpus. This is a legal process where we are able to question whether you are being held illegally and, if you are being held illegally, ask that a court order your release. The *Center for Constitutional Rights* (CCR) is a charity that has been fighting for this right on behalf of the prisoners in Guantanamo Bay. CCR is strongly opposed to the denial of rights that has prevailed in Guantanamo Bay for the past two and a half years, and is willing to secure you a lawyer at no cost to yourself for such a process. If you wish, CCR will also contact your family and advise them that steps are being taken on your behalf.

If you would like to be represented by CCR, please fill in your name, nationality, and date of birth below, along with the languages you speak (so we can try to secure assistance for you in your own language):

Name: _____

Nationality: _____

Date of Birth: _____

Languages spoken: _____

If you wish us to contact your family, please provide a name, address, telephone number, e-mail or some other contact details so that we can do this (if you do not wish to do this, we understand that you may be concerned that the U.S. Government might use this against you):

Name of Relative: _____

Contact details: _____



**DEPARTMENT OF THE NAVY**
GENERAL COUNSEL OF THE NAVY
1000 NAVY PENTAGON
WASHINGTON, D.C. 20350-1000

JUL 20 2004

Mr. Jeffrey E. Fogel
Legal Director
Center for Constitutional Rights
666 Broadway
New York, NY   10012

Dear Mr. Fogel:

    Thank you for your letter of July 14, 2004, regarding the notice to be provided to detainees held at Guantanamo Bay, Cuba.  The Secretary of the Navy has asked me to review your letter and respond to you directly.

    The Department of Defense and the Department of the Navy are in the process of exploring, in concert with the Department of Justice, the manner in which additional information will be provided to the detainees regarding habeas corpus applications.  We will add your input to those we have already received.  We are working hard to satisfy the mandate of the recent Supreme Court decisions within the constraints of the unique security situation that exists at Guantanamo.

    Thank you for your interest in this matter.

Sincerely yours,

Alberto J. Mora

# centerforconstitutionalrights

666 broadway new york, ny 10012
t 212 614 6464 f 212 614 6499 www.ccr-ny.org

September 16, 2004

John J. Sullivan, Esq.
Deputy General Counsel
Department of Defense
Room 3C975
1600 Defense Pentagon
Washington DC 20301

Dear Mr. Sullivan:

I am writing to seek authorization to visit unrepresented detainees being held at Camp Delta in the Guantánamo Bay Naval Station and advise them on their right to file habeas corpus petitions in federal court challenging the legality of their detention, and assist them in obtaining other counsel in order to do so.

As I stated in our phone conversation earlier today, I am seeking to meet with unrepresented detainees, that is, those who have not retained counsel themselves and who do not have next friends who have already filed habeas petitions on their behalves. There are some individual detainees who I believe fall within this class whose names I can provide to you if it will expedite this process.

I spoke earlier today with David Salmons, Esq. of the Solicitor General's Office, who has authorized the Department of Justice Court Security Office to process the security clearance applications of various habeas counsel for Guantánamo detainees. Mr. Salmons informed me that because no cases had yet been filed in federal court on behalf of the detainees I seek to visit, the Department of Justice could not process my security clearance application. He recommended that I speak to you.

When we spoke earlier today you did not indicate whether you expected me to include a copy of a security clearance application with this letter. I have taken the liberty of including a completed SF86 form, with certain additional waivers requested by the Department of Justice as part of its Guantánamo clearance process. The Department of Justice Court Security Office provides fingerprint cards to attorneys seeking clearance to visit clients in Guantánamo; if your office could arrange for delivery of appropriate fingerprint cards I will have a set of my prints made at our local police precinct immediately.

Please feel free to contact me with any questions you may have about this matter at (212) 614-6438. Thank you for your assistance, which I am sure will be appreciated by the detainees.

Yours sincerely,

Shayana Kadidal, Esq.



DEC-08-2004 15:22    ODGCLC                                    P.02



**DEPARTMENT OF DEFENSE**
**OFFICE OF GENERAL COUNSEL**
1600 DEFENSE PENTAGON
WASHINGTON, DC 20301-1600



NOV 0 2 2004

Shayana Kadidal
Center for Constitutional Rights
66 Broadway
New York, New York 10012

Dear Mr. Kadidal:

I am writing in response to your letter of September 16, 2004, requesting access to detainees at Guantanamo Bay.

Under procedures set up by the Department of Defense, the only counsel currently provided access to the detainees are counsel who are employed or retained by or on behalf of a detainee for purposes of representing the detainee in habeas corpus or other litigation in federal court in the United States and who are admitted, either generally or pro hac vice, in the jurisdiction where the habeas petition or other litigation is pending. As you do not meet those criteria, your request for access to the detainees cannot be granted.

If you have any questions about this policy, please contact Andrew Warden at the Department of Justice at (202) 616-5084

John J. Sullivan
Deputy General Counsel
(Legal Counsel)

TOTAL P.02

# centerforconstitutionalrights

666 broadway new york, ny 10012
212.614.6464 www.ccr-ny.org

December 17, 2004

Hon. Gordon R. England
Secretary of the Navy
1000 Navy Pentagon
Washington, DC  20350-1000

**VIA FACSIMILE:  (703) 693-7330**

Dear Secretary England,

As you know, the United States presently acknowledges detaining approximately 550 individuals at the Guantánamo Bay Naval Base, Cuba.  Approximately 63 of those individuals have filed habeas corpus petitions with the D.C. district court.  We intend to take any legal action necessary, including filing habeas petitions on behalf of the remaining detainees, in order to ensure that every detainee at Guantánamo has the opportunity to avail themselves of the decision in *Rasul*.

Accordingly, we are writing to request that you provide us with the names and other identifying information about each person held at Guantánamo whose identity has not yet been made known and who has not yet filed a petition for a writ of habeas corpus ("unidentified detainee" or "detainee").  This request encompasses every detainee being held at Guantánamo by any agency of the U.S. Government or any employee or agent, public or private, thereof, regardless of whether the individual is listed on the International Committee of the Red Cross internee rolls.  This information must be provided so that each detainee can be contacted and offered legal assistance.

We specifically request the following information for all such detainees:

(a) names, including all alternate spellings, aliases, or other appellations used by the U.S.



Government; (b) ethnicity and national origin; (c) country or countries of citizenship; (d) country of residence prior to interdiction; (e) next of kin and their contact information; (f) the names and countries for the detainees' consular contacts. The information that will enable us to reach a detainee's next of kin is required so that we will be able to contact those individuals in the event that any detainee is unable to make a decision by himself regarding whether or not to file a petition for a writ of habeas corpus.

The right to counsel has been recognized by the Supreme Court and is crucial to carrying out the Supreme Court's mandate that each detainee be permitted to challenge his detention. *See Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2652 (plurality opinion of O'Connor, J.) ("He [Hamdi] unquestionably has the right to access to counsel in connection with the proceedings on remand."); *id.* at 2660 (concurring opinion of Souter, J.); *Rasul v. Bush*, 524 U.S. __, 124 S. Ct. 2826, 2698 n.15 (2004) (plaintiffs' allegations of detention "without access to counsel and without being charged with any wrongdoing—unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'"); *see also Al Odah v. United States*, No. 02-828 (D.D.C. Oct. 20, 2004), slip op. at 8 (the "Supreme Court has found that Petitioners have the right to bring their claims before this Court, and this Court finds that Petitioners cannot be expected to exercise this right without the assistance of counsel.").

After the Supreme Court released its opinions in *Rasul* and *Hamdi*, Government officials publicly acknowledged the necessity of taking action to enable detainees to consult with counsel. For example, during a Department of Defense briefing on July 7, 2004, a senior Justice Department Official was asked whether currently unrepresented Guantanamo detainees would have access to counsel. The official replied that lawyers

would have access to the detainees but that the "precise details of that would have to be worked out in the future." Defense Department Background Briefing on the Combatant Status Review Tribunals, July 7, 2004, available at http://www.defenselink.mil/ transcripts/2004/tr20040707-0981.html.   Similarly, in a news briefing two days later, you promised that the Government would "facilitate" access to the unidentified detainees as "quickly as we can." Defense Department News Briefing on the Combatant Status Review Tribunals, July 9, 2004, available at http://www.defenselink.mil/transcripts/2004/ tr20040709-0986.html.

      Unfortunately, these promises have not been honored.  We recognize that the Department of Defense has recently made available the text of a Notification, a copy of which we have attached to this letter as Exhibit A, that it intends to distribute to all detainees after they have completed the Combatant Status Review Tribunal ("CSRT") process and received certifications.  Although the Notification mentions the right to file a habeas petition, it is insufficient for a number of reasons.  First, the Notification does not explain the mechanics of filing a habeas lawsuit.  There is no explanation of what a "petition" is or should allege.  Second, detainees, who are not familiar with U.S. law, certainly will not understand what a habeas lawsuit is (notwithstanding the description that appears in the Notification).  Third, the detainees have no reason to trust the person delivering the Notification -- a representative of the U.S. Government -- and as a result might doubt that the Notification means what it says.  This is particularly true given that these same individuals will have just been denied relief through the CSRT process. Fourth, the Notification's instruction that the detainees speak with their "assigned Assisting Military Officer" if they have any questions is particularly problematic and

objectionable, because the officer would lack a privileged relationship with the detainee and would be free to communicate any information that he or she learns from the detainee to his or her superiors. Fifth, the Notification does not provide any instruction on how the detainee could retain a lawyer, should he desire legal advice or assistance with this matter before the petition is filed. Sixth, the Notification makes no provision for assistance for those detainees who are illiterate or otherwise lack the capacity to advocate on their own behalf. Seventh, the Notification provides no assurance that these "petitions" or letters to family members will be mailed in a timely manner. Our understanding is that getting mail in and out of Guantánamo is a very difficult and time-consuming process. Moreover, even if the mail reaches the district court, there does not appear to be any process in existence to expedite the assignment of counsel for detainees seeking counsel to represent them. Finally, it appears that this Notification is being distributed to detainees only *after* their certification as "enemy combatants" through the CSRT process.

Nearly six months have elapsed since the Supreme Court issued its decisions in *Rasul* and *Hamdi*, yet the unidentified detainees at Guantánamo have been unable to pursue the right that the Supreme Court recognized in these cases -- the right to file a habeas petition with the assistance of counsel. There has been ample time for you to take action to effectuate the Supreme Court's holding in *Rasul*, as you and other U.S. officials promised in the first week of July 2004. Accordingly, if we do not receive by January 5, 2005 the detainees' names and the other identifying information that we have requested, we will take appropriate legal action on behalf of the detainees through the judicial process.

Sincerely,

Barbara Olshansky,
Deputy Legal Director
Center for Constitutional Rights


cc:
Terry Henry, United States Department of Justice
FAX: (202) 616-8470



**U.S. Department of Justice**

Office of the Associate Attorney General

_____

*Washington, D.C. 20530*

January 14, 2005

VIA FACSIMILE AND ELECTRONIC MAIL

Ms. Barbara Olshansky
Deputy Legal Director
Center for Constitutional Right
666 Broadway
New York, NY 10012

Dear Ms. Olshansky:

The Secretary of the Navy, Gordon England, has asked me to reply to your letter of
December 17, 2004, to him raising concerns regarding the ability of enemy combatants detained at
Guantanamo Naval Base to access habeas corpus opportunities in U.S. federal courts.

It has been longstanding Department of Defense ("DOD") policy, reinforced by requests
from a number of home countries, not to release detainee names into the public domain. We
believe each of your concerns is effectively being addressed by the habeas filing opportunities
currently afforded detainees, or is of relatively marginal bearing on the issue of detainee access to
the habeas process. Therefore, DOD declines to provide the Center for Constitutional Rights with
the detainees' names or other identifying information as requested in your letter.

Nevertheless, it may be of interest to you that DOD is currently preparing a supplemental
information sheet that would be provided to those detainees who inquire about the availability of a
lawyer for purposes of filing a habeas petition. DOD's intentions are to include in the information
sheet the names and addresses of U.S. lawyers who may be available to provide representation to
interested detainees, or who may be able to refer the request for representation to other attorneys.
(The disclosure of names and addresses will obviously be subject to the prior approval of the
lawyers in question.) The information sheet will include instructions for detainees interested in legal
representation concerning, for example, what information to include in a letter to counsel. DOD
has requested that we discuss the formulation of this information sheet with the lawyers who are
currently involved in representing Guantanamo detainees in habeas matters, among others.

- 2 -

If you and other lawyers involved in Guantanamo litigation are interested in pursuing such a discussion, please contact me at your earliest convenience.

Sincerely,

BRIAN D. BOYLE
Principal Deputy Associate Attorney General

cc:    (Via Electronic Mail)
       Lead Counsel of Record/Guantanamo Litigation

## Combatant Status Review Tribunal Notice to Detainees*

You are being held as an enemy combatant by the United States Armed Forces. An enemy combatant is an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. The definition includes any person who has committed a belligerent act or has directly supported such hostilities.

The U.S. Government will give you an opportunity to contest your status as an enemy combatant. Your case will go before a Combatant Status Review Tribunal, composed of military officers. This is not a criminal trial and the Tribunal will not punish you, but will determine whether you are properly held. The Tribunal will provide you with the following process:

1. You will be assigned a military officer to assist you with the presentation of your case to the Tribunal. This officer will be known as your Personal Representative. Your Personal Representative will review information that may be relevant to a determination of your status. Your Personal Representative will be able to discuss that information with you, except for classified information.

2. Before the Tribunal proceeding, you will be given a written statement of the unclassified factual basis for your classification as an enemy combatant.

3. You will be allowed to attend all Tribunal proceedings, except for proceedings involving deliberation and voting by the members, and testimony or other matters that would compromise U.S. national security if you attended. You will not be forced to attend, but if you choose not to attend, the Tribunal will be held in your absence. Your Personal Representative will attend in either case.

4. You will be provided with an interpreter during the Tribunal hearing if necessary.

5. You will be able to present evidence to the Tribunal, including the testimony of witnesses. If those witnesses you propose are not reasonably available, their written testimony may be sought. You may also present written statements and other documents. You may testify before the Tribunal but will not be compelled to testify or answer questions.

As a matter separate from these Tribunals, United States courts have jurisdiction to consider petitions brought by enemy combatants held at this facility that challenge the legality of their detention. You will be notified in the near future what procedures are available should you seek to challenge your detention in U.S. courts. Whether or not you decide to do so, the Combatant Status Review Tribunal will still review your status as an enemy combatant.

If you have any questions about this notice, your Personal Representative will be able to answer them.

**[*Text of Notice translated, and delivered to detainees 12-14 July 2004]**

**Enclosure (4)**

# NOTIFICATIONS

1. A Combatant Status Review Tribunal (CSRT) has determined that you are an enemy combatant. Because you are an enemy combatant, the United States may continue to detain you.

2. An Administrative Review Board (ARB) will now be held to determine whether you still pose a threat to the United States or its allies. The ARB will consider all relevant and reasonably available information. If the ARB decides you no longer pose a threat, you may be released from detention.

3. You may attend the ARB proceeding and present information about yourself to ARB members. If you believe you do not pose a threat to the United States or its allies, we recommend you immediately gather any information that you believe will prove that you are no longer a threat and why you should be released from detention.

4. The ARB will consider written statements from family members or other persons who can explain why you are no longer a threat. You may also present a written or oral statement at the ARB. Unlike the CSRT, witnesses are not allowed to testify during the ARB. An American officer (called an Assisting Military Officer) will help you prepare your case if you want him to. You do not have to attend the ARB, and you do not have to say anything if you do attend. The ARB will be conducted whether or not you choose to attend.

5. In addition, you have been notified that you may challenge your detention in a United States court. The following procedures are available if you want to challenge your detention in a U.S. court.

6. You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You may ask a friend or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member or friend who could file this petition for you, you may file your own petition. According to prior court rulings, petitions may be sent to:

United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

If you do not wish to file a petition, you do not have to do so. However, a court will only consider your case if you file a petition.

7. Please talk to your Assisting Military Officer if you have any questions about this notification. Your assigned Assisting Military Officer will meet with you later.

Detainee ISN: _____    Date: _____

Signature of Officer Serving Notice: _____

Printed Name of Officer Serving Notice: _____