# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BAHTIYAR MAHNUT )
Petitioner, )
v. ) Civil Action No. 05-1704 (JR)
GEORGE W. BUSH, *et al.*, )
Respondents. )

**DECLARATION OF JOSEPH S. IMBURGIA**

Pursuant to 28 U.S.C. § 1746, I, Major Joseph S. Imburgia, Judge Advocate General's Corps, United States Air Force, hereby state that to the best of my knowledge, information and belief, the following is true, accurate and correct:

1. I am the Assistant Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2. I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Bahtiyar Mahnut that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or are redacted. An OARDEC staff member has redacted information that would personally identify other detainees and certain U.S. Government personnel and foreign nationals in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 20 Sep 05

Joseph S. Imburgia
Joseph S. Imburgia
MAJ, JAGC, USAF



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 832

~~FOR OFFICIAL USE ONLY~~

29 JAN 2005

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 277**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #277 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

~~FOR OFFICIAL USE ONLY~~

19 Jan 05

MEMORANDUM

From: Assistant Legal Advisor
To: Director, Combatant Status Review Tribunal
Via: Legal Advisor

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN #277

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl: (1) Appointing Order for Tribunal #12 of 29 Sep 2004
(2) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I find that:

a. The detainee was properly notified of the Tribunal process and elected to participate by attending the CSRT, providing a sworn statement, and by responding to questions posed by his personal representative and the CSRT. *See* Enclosure (3) to Encl. (2).

b. The Tribunal was properly convened and constituted by enclosure (1).

c. The Tribunal substantially complied with all provisions of references (a) and (b).

d. Note that some information in Exhibits R-4 through R-6 was redacted. The FBI properly certified in exhibit R-2 that the redacted information would not support a determination that the detainee is not an enemy combatant.

e. The detainee did not request that any documentary evidence be produced. However, the detainee did request that 17 witnesses-detainees, all of [redacted] heritage (captured with detainee), be produced to testify on detainee's behalf. The CSRT determined that "all of the witnesses would probably testify similarly, if not identically," and therefore advised the detainee that he could chose two from the 17 to testify on his behalf. The detainee chose ISN [redacted] and ISN [redacted] to testify on his behalf, and the CSRT approved the request. Each of these two witnesses-detainees testified at the CSRT. The CSRT's determination to allow these two witnesses to testify was proper.

However, there is no documentation in Encl. (2) which indicates the basis of the Tribunal's determination that the requests for the 15 remaining witnesses would be

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 277

"similar[], if not identical," as noted in the Unclassified Summary Basis of Decision. *See* Enclosure (1) to Encl. (2).

Notwithstanding, references (a) and (b) clearly provide that the Tribunal has the discretion to determine what evidence it deems relevant, that it is "not bound by the rules of evidence such as would apply in a court of law," and that it "may consider any information it deems relevant and helpful to a resolution of the issues before it." As a corollary, the converse must be true that the Tribunal may refuse to consider any evidence it does not deem "relevant and helpful" to their determination.

Here, a review of the Record reveals that, although there is no documentation in Encl. (2) of the detainee's request for any of the witnesses, the Tribunal was presented with a proffer of the witnesses' testimony at some point during the proceedings which enabled it to reach its determination that these 17 witnesses' testimony would be "similar, if not identical," because the CSRT references "data" in reaching its determination. *See* Enclosure (1) to Encl. (2). Thus, it appears from a clear review of the record that, even if the remaining requested witnesses had been called, the CSRT would have reached the same determination, that the detainee was an enemy combatant, because the preponderance of evidence supports the determination reached by the CSRT. Therefore, the Tribunal's denial of detainee's request for these 15 additional witnesses did not appear to prejudice the detainee.

f. The Tribunal's decision that detainee #277 is properly classified as an enemy combatant was unanimous. However, the Tribunal "urges favorable consideration for release of the Detainee," and "urges that he not be forcibly returned to the People's Republic of China."

g. The detainee's Personal Representative was given the opportunity to review the record of proceedings, and submitted post-tribunal comments to the Tribunal which objected to the Tribunal's denial of detainee's request to produce all 17 witnesses, and which objected to the Tribunal's refusal to allow one of the witnesses to make an unsolicited statement to the Tribunal after the CSRT and personal representative had questioned the detainee. The personal representative specifically alleged that the CSRT's rulings were a denial of the detainee's due process rights.

In reviewing the objections, the CSRT first noted that the Tribunal would have been burdened with "repetitive, cumulative testimony" if it had permitted each of the 17 witnesses to testify. As discussed above, the CSRT's determination complied with references (a) and (b), and was therefore, proper, and did not appear to prejudice the detainee.

Similarly, the CSRT properly refused to allow an unsolicited statement of one of the witness-detainees. As the CSRT noted in its review of this objection, the Tribunal President "has never permitted witnesses to make spontaneous statement that are not in

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 277

response to questions" posed by the CSRT or the personal representative. However, the Tribunal noted that the personal representative "could have easily elicited the additional information from the witness by asking more questions" of the witness, "but elected not to do so." Therefore, the ruling was proper, and did not prejudice the detainee.

2. The proceedings and decision of the Tribunal are legally sufficient and no corrective action is required.

3. I recommend that the decision of the Tribunal be approved and the case be considered final.

KAREN M. GIBBS
CDR, JAGC, USNR



# Department of Defense
## Director, Combatant Status Review Tribunals

29 Sep 04

From: Director, Combatant Status Review Tribunals

Subj: APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref: (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

MEMBERS:

[redacted] Colonel, U.S. Marine Corps Reserve; President

[redacted] Lieutenant Colonel, JAGC, U.S. Army; Member (JAG)

[redacted] Lieutenant Colonel, U.S. Air Force; Member

[signature]

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

23 December 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM: OARDEC FORWARD Commander ICO ISN 277

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN [redacted].

FOR [signature]
CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

## (U) Combatant Status Review Tribunal Decision Report Cover Sheet

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: #12

(U) ISN#: 277

Ref: (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
(b) (U) CSRT Implementation Directive of 29 July 2004 (U)
(c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl: (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/FOUO)
(2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
(3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
(4) (U) Copies of Documentary Evidence Presented (S/NF)
(5) (U) Personal Representative's Record Review (U/FOUO)

1. (U) This Tribunal was initially convened on 23 October 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 27 October 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #277 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is affiliated with forces associated with al Qaida and the Taliban, which are engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).

Colonel, U.S. Marine Corps
Tribunal President

DERV FM: Multiple Sources
DECLASS: X1

SECRET//NOFORN//X1

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

**(Enclosure (1) to Combatant Status Review Tribunal Decision Report)**

TRIBUNAL PANEL: #12
ISN #: 277

**1. Introduction**

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he is affiliated with forces apparently associated with al Qaida and the Taliban that are engaged in hostilities against the United States and its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

**2. Synopsis of Proceedings**

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee was in a [redacted] training camp in Tora Bora from June 2001 to November 2001 (where he was trained on the Kalashnikov rifle and on tactics) and left after the United States air campaign began against the Taliban. He is alleged to be a member of the East Turkistan Islamic Movement (ETIM), which is assessed to be an extremist movement, linked to Al Qaida. The Detainee was arrested with Arabs at a Pakistani mosque. The Detainee chose to participate in the Tribunal process. He initially requested seventeen witnesses then modified his request to two witnesses after the Personal Representative's discussion with the Tribunal President. He requested no unclassified or classified documents be produced, and made a sworn verbal statement. The Tribunal President found the two requested witnesses reasonably available. The Detainee, in his verbal statement, admitted training at a [redacted] training camp in Afghanistan but denied being a member of either Al Qaida or ETIM.

The Tribunal President's evidentiary and witness rulings are explained below.

**3. Evidence Considered by the Tribunal**

The Tribunal considered the following evidence in reaching its conclusions:

a. Exhibits: D-a, and R-1 through R-19.

b. Testimony of the following persons: [redacted] and [redacted] (fellow detainees of the Detainee; their internment serial numbers are included at Enclosure (2)).

c. Sworn statement of the Detainee.

**4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses**

The Detainee requested the following witnesses be produced for the hearing:

| Witness | President's Decision | Testified? |
|---|---|---|
| [redacted] | Reasonably Available | Yes* |
| [redacted] | Reasonably Available | Yes* |

* The Personal Representative, on behalf of the Detainee, originally requested all 17 witnesses of [redacted] heritage currently detained at Camp Delta be made available to testify. After determining from the data that all the witnesses would probably testify similarly, if not identically, the Tribunal President responded that he would allow two witnesses of the 17 originally requested, and the Detainee could choose whichever two he believed would best help his case. The Detainee chose the above-mentioned witnesses to testify and they did so.

The Detainee requested no additional evidence be produced.

**5. Discussion of Unclassified Evidence**

The Tribunal considered the following unclassified evidence in making its determinations:

a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

b. The Recorder also introduced, as Exhibit R-3, an excerpt of the Terrorist Organization Reference Guide from the U.S. Department of Homeland Security, January 2004. Although this was helpful in providing information concerning the Eastern Turkish Islamic Movement (ETIM), especially concerning the alleged tie between ETIM members and a plot to attack the U.S. Embassy in Kyrgyzstan and other U.S. interests abroad, the Tribunal found it to be only moderately persuasive because it did not indicate that this specific Detainee had any knowledge or responsibility for any anti-U.S. acts.

c. Essentially the only other unclassified evidence the Tribunal had to consider was the Detainee's sworn testimony and the sworn testimony of two witnesses that the Detainee requested to testify on his behalf. A summarized transcript of the Detainee's and witnesses sworn testimony is attached as CSRT Decision Report Enclosure (3). In sum, the Detainee testified that he did train at the [redacted] camp in Afghanistan but he did not belong to the ETIM or Al Qaida and he was not aware of any assistance that the Al Qaida might be giving to ETIM or any other Uighur group. The witnesses both testified that they had seen the Detainee in the [redacted] training camp in Afghanistan and trained with him there.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

**6. Consultations with the CSRT Legal Advisor**

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

**7. Conclusions of the Tribunal**

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

c. The Detainee is properly classified as an enemy combatant because he is affiliated with forces apparently associated with al Qaida and the Taliban, which are engaged in hostilities against the United States or its coalition partners.

d. The Tribunal President reviewed the Personal Representative's comments at Enclosure (5) to the CSRT Decision Report. Noting that the Personal Representative disputed his ruling to allow two witnesses instead of the 17 requested witnesses, the Tribunal President reaffirmed his ruling that permitting the Detainee to bring two witnesses on his behalf was a proper balance between allowing the Detainee to introduce favorable evidence on his behalf and not burdening the Tribunal with repetitive, cumulative testimony about the Detainee. Next, the Tribunal President disputes having denied the Detainee adequate due process in his hearing. The Detainee and Personal Representative could have, and apparently did, ask as many questions of the witness as they desired. It is true that the Tribunal President denied the witness's request to make a spontaneous statement because it was not in response to a question from any of the

participants (see page 15, Enclosure (3)). The Tribunal President has never permitted witnesses to make spontaneous statements that are not in response to questions and so the decision to act similarly here was consistent with past rulings on this topic. Furthermore, the Detainee or the Personal Representative could easily have elicited the additional information from the witness by asking more questions of him, but they, for whatever reason, evidently chose not to do so. The witness had sufficient opportunity to testify and the Detainee had adequate opportunity to present his case before the Tribunal.

**8. Dissenting Tribunal Member's report**

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

Colonel, U.S. Marine Corps
Tribunal President

**Summarized Sworn Detainee Statement**

***The Personal Representative made the following statement on behalf of the Detainee.***

Before addressing points on the Unclassified Summary, I want to state for the record that historically the Chinese have executed Uighurs who have been deported and returned to China. I do not want repatriation and am seeking political asylum because I fear execution upon return to China.

Part of the enemy combatant definition is whether someone fought against the United States or the coalition forces, and exhibit D-b is a list of coalition partners and China is not on that list.

- **3 Detainee is a member of Al Qaeda.**

  I never heard of Al Qaeda until arriving in Cuba and I have no ties to Al Qaeda.

- **3.1 Detainee was in a [redacted] training camp in Tora Bora from June 2001 to November 2001, and left the camp after the United States air campaign began.**

  The bombing did start while I was in the camp and we did flee for our lives. I do not know who was running or funding the camp, but the people who trained me were Uighur and I was not aware of any ties to the Taliban or Al Qaeda.

  My battle is against the Chinese, not the United States or the coalition partners. The other Uighurs and I prefer to settle in Europe, Canada or the United States. To our knowledge there was no fighting with the Chinese in Afghanistan, and it was therefore a safe place to train so we could one day fight the Chinese.

  The person running the camp was named [redacted] and he was a [redacted]

- **3.2 Detainee was trained on the Kalashnikov rifle and tactics.**

  I trained on the AK-47 and physical fitness activities.

- **3.3 Detainee is a member of the Eastern Turkistan Islamic Movement (ETIM).**

  I suspect that this is an organization that fights the Chinese but I don't know any organization by that exact name.

- **3.4 The Eastern Turkistan Islamic Movement is an Islamic extremist movement linked to Al Qaeda.**

  I had never heard of Al Qaeda, and therefore am not aware of any links between any Uighur freedom organizations and Al Qaeda. The Uighurs simply want freedom from China as our ultimate goal, just like the United States people have fought for freedom throughout their history.

- **3.5 Detainee was arrested with Arabs as a Pakistan mosque.**

  It's true I was arrested in a mosque and I got to the mosque by following Arabs who were also fleeing for their lives. I don't know much about the Arabs because I wasn't able to communicate with them; they spoke a different language.

We spoke of the Terrorist Organization Reference Guide, and this says there was a link between the Eastern Turkish (sic) Islamic Movement and Al Qaeda, and specifically the document thought there were links between the extremist movement and attacks on U.S. Embassies overseas. I reiterate that I'm not familiar with the Eastern Turkistan Movement and I have no knowledge by any Uighur group against embassies of the United States. What I know of the Uighur groups, the only goal is to get freedom from China and they are pro-U.S.

We discussed the relationship of the camp and it was a 3-hour drive from Jalalabad on a dirt road.

***The Detainee made the following sworn statement.***

The United States accused me of being a member of Al Qaeda, but in my life in Afghanistan, I had never heard of Al Qaeda, and when I came here, they started interrogating me and asked me if I knew about Al Qaeda. That's how I heard of Al Qaeda.

If you ask me questions one by one, I will answer everything.

**Tribunal Members' Questions to Detainee**

Q: Are you originally from the Uighur province of China?

A: Yes.

Q: So, you are considered a Chinese citizen?

A: Yes.

Q: If you were allowed to choose to live anywhere you wanted, where would you choose to live?

A: My best option, my choice would be to go back to live in my country if it was free, but until my country is free I'd like to live in some kind of democratic country, somewhere in Europe, it doesn't matter. Any country.

Q: How long were you in Afghanistan?

A: I went to Afghanistan approximately on June 20, 2001. One night, we were doing construction work, building a house and after we went to sleep, the bombs started. We then fled and ran for our lives.

Q: Was this in the camp with the other [REDACTED] fighters?

A: Yes, it's the place all the [REDACTED] stayed.

Q: How many other [REDACTED]?

A: Approximately 30-35 people.

Q: You said it was lead by a [REDACTED]

A: Yes.

Q: How did you know how to go there from your home country?

A: My goal wasn't to go to Afghanistan. When I was in my country, the Chinese government tortured our people. We suffered much and I can't take it. I don't want to see it anymore, that's why I want to go somewhere I can live a free life. That's why I left my country.

When I left my country, I went to Kazakhstan, then to Pakistan. When I reached Pakistan, I had $700 U.S. dollars and when I talked to other people in Pakistan, I was told I couldn't make it through the country with $700 and I wanted to go. I was told there was a place I could go.

I was in Pakistan and tried to do business, but it didn't work out because Pakistan is a poor country and very bad for business. If you had $700 U.S. dollars in my home country, you'd be a rich person, but I couldn't do any business there. People gave me advice and said there was a group of people in Afghanistan, and I could go there because their group's goal was just to fight against the Chinese government and if I went I didn't have to pay for food or anything, so I went to Afghanistan.

They told me to go and stay, and as soon as they get more money, they'll get me and take me to whatever country I wanted to go to, like Canada or America.

Q: Did you go by yourself? With a group of other people? With your family?

A: There were two people when I left my home country. We went to Pakistan and Afghanistan together.

Q: So, the other [redacted] that were at the camp, you met them there?

A: Yes.

Q: You said you didn't know the name of this group by its exact name, the Eastern Turkistan Islamic Movement. Do you belong to a group with a similar name?

A: Our fight is for freedom and our independence, but we don't talk about the Islamic Movement. I don't know where the Islamic Movement came from. The freedom fights and the independent fights have not been called [during] the last decade, they've been called for the past few centuries.

Q: Are all the people in the group Muslim?

A: Yes.

Q: Are people who are not Muslim accepted into the group?

A: The U.S. is the most powerful country in the world and China is the second most powerful; it is growing very fast. We are fighting against the government and we need help from any nation that will help us. We need their help to fight.

Q: How many [redacted] are there today that are involved in this?

A: I saw about 35 people with my own eyes at that place [the camp].

Q: Probably more than that have the same goals you do?

A: There are lots of Uighurs. They left the country because of the Chinese government. All of the Uighurs have the same goal of taking back our own country.

Q: Do you know how many Uighurs are still in your home country?

A: From what I read in books, there are up to 30 million Uighurs and if you don't count those abroad, there are probably 26 or 28 million people at home.

**Tribunal Members Questions to Personal Representative**

Q: You mentioned the name [redacted] Can you explain his significance again, please?

A: He was the [redacted] who was running the camp.

**Tribunal Members Questions to Detainee**

Q: When you were at the camp, did you see any people training there besides you and your fellow [redacted]

A: When I came to the camp, I only saw [redacted] people.

Q: Was there ever a time when the Taliban soldiers asked you and your group to help them in their fight?

A: No.

Q: Before the United States attacked the camp, had anyone else, like the Northern Alliance, attacked your camp before that?

A: No. In the camp there was no fighting, there was just peace and quiet.

Q: So, as soon as that attack happened, that is when you and your group tried to escape to Pakistan?

A: When the bombing started, one of our people was dead. We said they came here to try to fight, if we stay here we're going to lose all of our people. We were scared and ran to the mountain and looked for the road to go somewhere else. We couldn't find the road, so we stayed there a little while.

Q: Did you have a passport, money and weapons with you for protection when you were making your journey?

A: The first day I came to the camp, [redacted] told me that I had to give him my passport and whenever I wanted to leave I could ask for it back. He then took my passport from me.

Our clothing and baggage was inside the house at the time. We left everything in the house when we left.

Q: You didn't have time to go back and get anything?

A: We couldn't take our clothing with us.

Q: So, it's not as though he [redacted] wouldn't let you have it back, it's that you didn't go back to get it because you were afraid you might get killed?

A: When they dropped the bombs, the place caught on fire and everybody was running in different directions. Nobody asked what are you doing, let's go, everyone was just running scared. If you stay there, you will get burnt.

Q: So, no passport and no money, did you at least take weapons for protection?

A: No, I didn't have a weapon.

Q: So, you went from Tora Bora all the way to the Pakistan border and you were able to enter Pakistan?

A: We stayed behind the mountain for a while because we couldn't find a road. One day we saw some Arabs and asked them, they said "Pakistan" so we followed them.

There is a funny story; at that time, even the local monkeys chased us to get out. We really wanted to get out of that place. If you want to hear it, I would like to tell.

Q: It says here that you were arrested in a mosque in Pakistan, and I'm wondering how you made it in without a passport.

A: There were no immigration people or border people. We just passed through the mountains. They had nothing there.

Q: So, they captured you and put you in a jail in Pakistan for a while?

A: We entered the village, and we were fed. Then in the middle of the night, around midnight we were told to get up. We got up and we went to the mosque. During this time, I didn't realize I was being captured. When they took me to the prison and put shackles on my hand, I realized I had been captured.

Q: So, they left you in the jail for a while and then turned you over to Americans?

A: Yes.

Q: How many of the other [redacted] were with you when you were captured?

A: There were 18.

Q: All of you were in the same place at the same time?

A: All 18 of us left camp together, but we were not in the same cell in the Pakistan prison.

Q: But in the mosque, yes?

A: Yes.

Q: I don't suppose any representatives from your home country tried to help you?

A: The Chinese Delegation came to this island.

Q: They didn't come to Pakistan?

A: No, not to Pakistan.

Q: But you said they came to this island and talked with you?

A: Yes. When we were captured in Pakistan, we didn't tell them we were from China. If we told them we were from China, Pakistani tradition will send us back to China. We were scared of that, so we told them we were Afghani.

Q: Of the 30-35 [redacted] in the camp, are any of them veterans of fighting in Afghanistan?

A: There are no veterans from the training camp; all of them are my age.

Q: But they were there before you were there?

A: When I got to the camp, there were 20-25 people there ahead of me.

Q: Do you have any idea how long they were there?

A: I didn't ask how long they'd been there.

Q: So, you were together about 3 or 4 months before the bombing started?

A: Yes. The time I spent with them started approximately in July, about 3 months.

Q: You were all [redacted] there, and you must have talked about what you wanted to do and how you wanted to free your country. There was no discussion about what was happening in Afghanistan, the Taliban and the Northern Alliance?

A: At that time in the camp, we didn't know about the fights going on between the Taliban and the Northern Alliance, but I heard about the fighting from outside.

Q: Outside from where?

A: In my home country.

Q: Before you got there?

A: Yes.

Q: You mentioned that you turned in your passport. Was a passport needed to go from China to Pakistan?

A: Yes, a passport is required to go from China to Pakistan.

Q: You mentioned that you didn't speak the Afghani language, correct?

A: Yes.

Q: Is that true of the Arabic language also?

A: True.

Q: So, on the way to Pakistan when you ran into the Arabs, how did you communicate?

A: I said "Pakistan, Pakistan," they said "Pakistan" and we just followed. That was the communication.

Q: I'd like to know the story about the monkeys.

A: We escaped when the bombing started. We saw a little hole, like a bunker in the mountainside and saw two monkeys run out. We cleaned it out and lied down. When it got dark, a lot of stones were falling from the top of the mountain. We were scared, thinking there was another bomb. We were scared to get up, but we looked around and the monkeys were throwing stones from the mountain at the people lying down because we were sleeping in their home.

**Tribunal President's Questions to Detainee**

Q: You said you traveled to Afghanistan in June or July of 2001?

A: Yes.

Q: And your purpose was to attend training at this camp in Afghanistan. Is that correct?

A: It was not my intention to go to a war zone. I heard there was a war going on when I was in my home country. If there is a war going I don't want to go to the war zone.

I went to that place [training camp] because I had a financial problem. I needed the money, so I was forced to go there to survive.

Q: In your home country you had a financial problem?

A: When I got to Pakistan, I had financial problems. The people in Pakistan told me there was a freedom fighters group in Afghanistan and if I went there, they'd feed my stomach, I'd be okay and then as soon as the financial stuff is fixed, they'd pick me up.

Q: I understand. At this training camp in Afghanistan, were there others besides your [redacted] brothers?

A: No, only [redacted].

Q: No Arabs or Afghanis?

A: No.

Q: Did you have weapons training on the AK-47 at the training camp?

A: Yes.

Q: Have you ever had weapons training before attending this camp in Afghanistan, either in Pakistan, or Kashmir or your home country?

A: The Kalashnikov, I've seen pictures, but never had the training.

Q: Thank you for your testimony.

A: Also, thank all of you.

Q: Is there any information you would like to make known to us before we call the witness?

A: Yes, I have one more thing to tell. The U.S. said we have ties with the Taliban, so I have to talk about this issue.

Al Qaeda's name we heard in here. Al Qaeda is an enemy of the whole world and the United States. The whole world is against the Al Qaeda organization. The Turkistanis need help from people stronger than the Chinese, like the U.S.

[REDACTED] is a smart person and he knows that if we had ties with Al Qaeda, that would mean all the Uighur people would lose help from the whole world and lose our goals.

To get our independence, we need the whole world's help, from a country like the U.S. If Al Qaeda is an enemy of the United States, it's the whole world's enemy. If we want freedom, how could we have ties with the whole world's and America's enemy? If we have those ties, we will lose everything.

We never heard of Al Qaeda. We did not have ties with Al Qaeda in the past and we will not have ties with Al Qaeda in the future.

We understand that Al Qaeda was established by Arab people, and we understand also that those Arab people have their own country and can live however they want in their own country. We are Uighurs and have lost our country on the west side of China. I don't know what their goals are, they can live independently and freely in their country and I don't understand why they're fighting with the whole world and the Americans. I have no knowledge about why they're fighting.

I believe our leaders are smart enough to figure out that if we had ties with Al Qaeda we would be left out of world support. I personally don't believe our leaders will do that.

The second thing, if Uighurs go to Kazakhstan, Kyrgyzstan or Pakistan, and are captured, they will send us back to China. Pakistan sent back 10 or 12 people and they were killed. Kyrgyzstan sent back 2 people to China and they were killed. We had no chance to stay in those countries. Afghanistan is the only place Uighurs can stay safely. Uighurs need a permanent location to get our country back and to fight against them.

The only help the Uighurs got from the Taliban was that they allowed us to stay in their territory and didn't send us back to China. They just supported us by letting us stay in their home country and to get trained to fight the Chinese government.

If anyone has any more questions, I can answer them.

**Tribunal Members Questions to Detainee**

Q: If you were to be set free, you would go back to your homeland, which is China, unless you were to get asylum somewhere?

A: I was going to ask that. My Personal Representative told me that if I am innocent I'll go back to my home country. If I'm guilty and come back an enemy, I will stay. I was going to ask you about this. If I go back to China they will kill me, but if I wanted to stay here do I have to make myself guilty?

Tribunal President: It is my understanding that if we determine you are not properly classified as an enemy combatant, you will be released to your home country.

Detainee: China is not my country. My original country is Turkistan. How can I go back to China if China is not my home country? If I have to go back to my home country, I will wait until my country is free. Then I will go back to my home country, I will not go back to China.

Tribunal President: You will have an opportunity to address that at a later time if that turns out to be the case.

Detainee: The main goal of all Uighurs is not to go back to China. We're seeking political asylum.

Tribunal President: That's beyond our authority. All we have been assigned to do is to determine your classification, whether you are or are not an enemy combatant.

Detainee: We would really like to hear from you guys any news about our families. All the Detainees living here get letters or some sort of communication with their families, but we don't get any communications from our families back home. We don't receive mail or anything. We're living really miserable lives. We would like to hear about our kids and if things have gotten better.

Tribunal President: We have no issues with that. That is not within our realm of authority or responsibility. We are here only to determine if you are an enemy combatant. There are processes in place in this facility that will address that issue.

Detainee: I just remembered one thing, I'd like to tell you if you have time. The Personal Representative told me that 2 Uighurs from Kyrgyzstan were sent back to China because they planned to attack the U.S. Embassy in Kyrgyzstan. I'd like to talk about that.

Tribunal President: I have no knowledge of that.

Detainee: I'd like to tell you about it.

Tribunal President: Does this have relevance to your determination of enemy combatant status?

Detainee: It says that the Uighur people are involved in terrorist activity and that's why I wanted to talk about this. The Kyrgyzstan terrorist act recently happened and that's why I want to talk about this.

Tribunal President: And you said that the Personal Representative brought this to your attention?

Detainee: Yes.

Tribunal President: Through this…[consults with Tribunal Judge Advocate]

Personal Representative: …mentioned terrorist activity on that document [R-3], Sir.

Tribunal President: You may begin.

Detainee: The fights between the Uighurs and the Chinese have been happening for a long time. They didn't just happen yesterday. Two Uighur people have been captured in Kyrgyzstan and then were sent back to China.

If I am sent back to China, they will torture me really bad. They will use dogs; they will pull out my nails, and all kinds of bad torture. The Chinese government tried to block the Uighur people from getting help from the U.S. government. If [we are] sent back, the Chinese will make up a fake story to tell everybody. I hope the whole world and the United States don't believe the Chinese who are blaming all the problems on the Uighur people.

Tribunal President: We'll certainly take everything you tell us into consideration.

Personal Representative: Sir, for clarity, the statement he is talking about is page 48 of the Terrorist Guide, second paragraph, under activities.

Tribunal President: Yes, exhibit R-3.

***The Personal Representative called [redacted] as a witness for the Detainee.***

***The Tribunal President advised the Detainee that when the witness comes in, the Detainee will be allowed to question him first, then the Personal Representative, the Recorder and then the Tribunal Members.***

***The witness, [redacted] was sworn.***

**<u>Detainee's Questions to Witness [redacted]</u>**

Q: They want to know if we were in the camp, and left the camp together. I want you to testify for that.

A: I will testify for you.

Tribunal President: You may begin.

Witness: I don't know where to begin.

Tribunal President: Mahnut will ask you questions and then the others will ask you questions.

Tribunal President: Do you have any questions for the witness?

Detainee: You can ask questions. We can move on.

**Personal Representative's Questions to Witness**

Q: When did you meet Mahnut?

A: I don't know the exact time, but I met him when I was in Jalalabad.

Q: Were you in the training camp together?

A: Yes.

Q: Who were the people training in the camp?

A: It's not someone telling us what to do, it's volunteer. People train themselves.

Q: What kinds of people were at the camp? Anyone else besides

A: No.

Q: Do you know who ran the camp?

A:

Q: Where is the camp in relation to Jalalabad?

A: I don't know what kind of relationship they have in Jalalabad, but the village belongs to Jalalabad City.

Q: Did you ever encounter any Taliban or Al Qaeda at the camp?

A: No.

Q: Were you ever asked to join in fighting in Afghanistan?

A: If I don't see them, how would they ask me those kinds of questions?

Q: Were you and Mahnut captured together?

A: Yes.

**Tribunal Members Questions for Witness [redacted]**

Q: Can you tell us what the difference is between a [redacted] and a [redacted] please?

A: All the [redacted] are being called [redacted]

Q: Is there any difference between the two words?

A: There is no difference between [redacted] and [redacted] because we use our country name for [redacted]

Q: Which is [redacted]?

A: That's why we call ourselves that, we use our land name.

Q: So, the goal of the [redacted] people is to establish a free country called [redacted]?

A: Yes.

Q: We have heard the name of a group today called the Eastern Turkistan Islamic Movement. Can you tell us anything about this group?

A: Because you call this group the Eastern Turkistan Islamic Movement, we don't call it that. We didn't join that group. When we came to that place [training camp] no one called it the Islamic Movement. We don't call it by that name. Everything is volunteer and nobody asked us to join an organization. Our goals were just to go there to get trained.

**Tribunal President's Questions to Witness [redacted]**

Q: Did you train at any other training camp besides the one in Afghanistan?

A: No.

Q: Did you receive weapons training at the camp in Afghanistan?

A: I wasn't really trained on the weapon, I just learned a little bit about how to use it.

Q: What did you hope to accomplish by attending this training camp?

A: It's in the best interest of the [redacted] people for me to defend myself because I was living in [redacted]

Q: This Tribunal thanks you for your testimony and you are excused. Guards, please return the witness.

A: Can I talk?

Q: No. Only in reply to questions. If Mahnut has no more questions, we thank you for your testimony.

A: The questions you asked don't really apply to his [Detainee's] case.

Q: The questions we are asking, we feel apply in our determination of his [Detainee's] enemy combatant status. You are excused.

***The Personal Representative called [redacted] as a witness for the Detainee.***

Detainee: Can I talk until the witness comes in?

Tribunal President: If you would like, you are certainly free to talk.

Detainee: I want you to ask the witnesses anything you'd like that applies to my case. I don't want you to ask him about his own questions.

Tribunal President: You're welcome to request that, but if we feel that your association with that individual and what his activities have been with you, that has a determination in your status.

Detainee: It's okay as long as it helps my case.

Tribunal President: That's why you have the opportunity to ask the witness anything you'd like to help your case. In turn, since you have made him available, we will ask him anything we feel has relevance to your case.

Detainee: Okay.

***The Witness, [redacted] was sworn.***

<u>**Detainee's Questions to Witness [redacted]**</u>

Q: Did you stay with me in the [redacted] camp in Afghanistan?

A: Yes.

Q: Did you come to Pakistan from Afghanistan with me?

A: Yes.

Q: Are you going to testify that we were captured in Pakistan in the same place?

A: Yes, I will. I was captured at the same time and at the same place with him [Detainee].

**Personal Representative's Questions to Witne**[redacted]

Q: When did you meet Mahnut?

A: End of July, 2001.

Q: How far is the camp from Jalalabad?

A: It ties with another village.

Q: How long would it take to drive there from Jalalabad?

A: Approximately 2-3 hours.

Q: Did you see any fighting while you were at the camp?

A: There was no fighting in the camp, there was bombing.

Q: Do you know who ran the camp?

A: [redacted]

Q: How many people were at the camp?

A: During that time, a little over 30 people.

Q: What kind of people were they?

A: All of them were [redacted]

Q: Were they ever asked to fight in Afghanistan?

A: There was no such conversation.

Q: Did you ever have any contact with the Taliban or Al Qaeda?

A: No.

Q: Is there any other information you feel would be relevant to this case?

A: No.

**Tribunal Members Questions to Witness, [redacted]**

Q: Outside of your time at the training camp together, did you or Mahnut have any other type of military training?

A: At the camp?

Q: Anywhere.

A: We just ran early in the morning, but we never had any training at any other place.

Q: Was this the first time you've had military training, as far as learning how to use weapons?

A: Yes, the first time.

Q: You said you don't think Al Qaeda gave any help to the [redacted] at the camp?

A: I don't know. What is Al Qaeda?

Q: You don't know what that means?

A: I've heard about it from other people, but I don't exactly know what kind of activities they do.

Q: Besides the [redacted] who would you consider the enemies of the [redacted] people?

A: Besides the [redacted] there are no [redacted] enemies.

Q: Why did you go to Afghanistan to train?

A: This doesn't apply to his [Detainee's] case. I will tell you about this when it is my turn.

Q: Did you have an opportunity to train in Pakistan?

A: No, I didn't have a chance and also I didn't even want to get training when I was in Pakistan.

**Tribunal President's Questions to Witness**

Q: Why do you think Mahnut went to this training camp in Afghanistan?

A: Because he heard about the in Afghanistan against the government, that's the one reason he might have gone to Afghanistan. For myself, I went for that reason.

Q: Do you know if Mahnut has had any association with the Taliban?

A: I don't know about it.

Q: Did you also get the training on the AK-47 at the same time as Mahnut?

A: I got the same training, but I trained later.

Q: Did you see Mahnut with a weapon during the training?

A: I don't remember.

Q: This Tribunal thanks you for your testimony and you are excused.

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Colonel, U.S. Marine Corps
Tribunal President

# DETAINEE ELECTION FORM

Date: 09 Oct 04

Start Time: 0840

End Time: 1030

ISN#: 277

Personal Representative: LTCOL [redacted]
(Name/Rank)

Translator Required? YES Language? UIGHUR

CSRT Procedure Read to Detainee or Written Copy Read by Detainee? YES

---

**Detainee Election:**

[X] Wants to Participate in Tribunal

[ ] Affirmatively Declines to Participate in Tribunal

[ ] Uncooperative or Unresponsive

**Personal Representative Comments:**

17 in camp witnesses. Polite and calm.

[redacted] b [redacted]

Personal Representative [redacted]

Exhibit D-a

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (29 September 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal -BAHTIYAR, Mahnut.

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba,* a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is a member of a force engaged in hostilities against the United States or its coalition partners.

Detainee is a member of an extremist organization linked to al Qaida.

1. Detainee was in a [redacted] training camp in Tora Bora from June 2001 to November 2001, and left the camp after the United States air campaign began.
2. Detainee was trained on the Kalishnikov rifle and tactics.
3. Detainee is a member of the Eastern Turkistan Islamic Movement (ETIM).
4. ETIM is an Islamic extremist movement linked to al Qaida.
5. Detainee was arrested with Arabs at a Pakistani mosque.

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

R-1

# Memorandum

To : Department of Defense
Office of Administrative Review
for Detained Enemy Combatants
Col. David Taylor, OIC, CSRT

Date 09/20/2004

From : FBI GTMO
Counterterrorism Division
Asst. Gen. Counsel [redacted]

Subject REQUEST FOR REDACTION OF
NATIONAL SECURITY INFORMATION
[redacted]

Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

The following documents relative to ISN 277 have been redacted by the FBI and provided to the OARDEC:

FD-302 dated 06/27/2002
FD-302 dated 11/11/2002
FD-302 dated 12/12/2002

---

[1]Redactions are blackened out on the OARDEC provided FBI document.

[2]See Executive Order 12958

R-2



U.S. Department of Homeland Security
U.S. Customs and Border Protection
Office of Border Patrol

NOTE: This report is based upon information obtained from various open sources. No classified information was used in the preparation of this report.

f Border Patrol
1624 SSG Sims Road,
AF,
, TX 79908
Address: Attn. BPSCC P.O. Box 6017
, Texas 79906
ent D. Thew
5) 724-3218

# Terrorist Organization Reference Guide

January 2004

Pg 1 of 3

R-3

## 46. Continuity Irish Republican Army (CIRA)

### Description

Terrorist splinter group formed in 1994 as the clandestine armed wing of Republican Sinn Fein (RSF), which split from Sinn Fein in 1986. "Continuity" refers to the group's belief that it is carrying on the original IRA goal of forcing the British out of Northern Ireland. Cooperates with the larger Real IRA.

### Activities

CIRA has been active in Belfast and the border areas of Northern Ireland where it has carried out bombings, assassinations, kidnappings, hijackings, extortions, and robberies. On occasion, it has provided advance warning to police of its attacks. Targets include British military, Northern Ireland security targets, and loyalist paramilitary groups. Unlike the Provisional IRA, CIRA is not observing a cease-fire. CIRA continued its bombing campaign in 2002 with an explosion at a Belfast police training college in April and a bombing in July at the estate of a Policing Board member; other CIRA bombing attempts in the center of Belfast were thwarted by police.

### Strength

Fewer than 50 hard-core activists. Eleven CIRA members have been convicted of criminal charges and others are awaiting trial. Police counterterrorist operations have reduced the group's strength, but CIRA has been able to reconstitute its membership through active recruiting efforts.

### Location/Area of Operation

Northern Ireland, Irish Republic. Does not have an established presence on the UK mainland.

### External Aid

Suspected of receiving funds and arms from sympathizers in the United States. May have acquired arms and materiel from the Balkans in cooperation with the Real IRA.

## 47. Eastern Turkistan Islamic Movement (ETIM)

### Description

The Eastern Turkistan Islamic Movement (ETIM), a small Islamic extremist group based in China's western Xinjiang Province, is one of the most militant of the ethnic Uighur separatist groups pursuing an independent "Eastern Turkistan," which would include Turkey, Kazakhstan, Kyrgyzstan, Pakistan, Afghanistan, and Xinjiang. ETIM and other



overlapping militant Uighur groups are linked to the international mujahidin movement - and to a limited degree al-Qaeda - beginning with the participation of ethnic Uighur mujahidin in the Soviet/Afghan war.

**Activities**

US and Chinese Government information suggests ETIM was responsible for terrorist acts inside and outside China. Most recently, in May 2002, two ETIM members were deported to China from Kyrgyzstan for plotting to attack the US Embassy in Kyrgyzstan as well as other US interests abroad.

**Strength**

Unknown. Only a small minority of ethnic Uighurs supports the Xinjiang independence movement or the formation of an East Turkistan.

**Location/Area of Operation**

Xinjiang Province and neighboring countries in the region.

**External Aid**

ETIM is suspected of having received training and financial assistance from al-Qaeda.

## 48. First of October Antifascist Resistance Group (GRAPO)

**a.k.a. Grupo de Resistencia Anti-Fascista Primero de Octubre**

**Description**

Formed in 1975 as the armed wing of the illegal Communist Party of Spain during the Franco era. Advocates the overthrow of the Spanish Government and its replacement with a Marxist-Leninist regime. GRAPO is vehemently anti-US, seeks the removal of all US military forces from Spanish territory, and has conducted and attempted several attacks against US targets since 1977. The group issued a communique following the 11 September attacks in the United States, expressing its satisfaction that "symbols of Primero de Octubre imperialist power" were decimated and affirming that "the war" has only just begun.

**Activities**

GRAPO did not mount a successful terrorist attack in 2002. GRAPO has killed more than 90 persons and injured more than 200. The group's operations traditionally have been designed to cause material damage and gain publicity rather than inflict casualties, but the terrorists have conducted lethal bombings and close-range

Pg. 3 of 3

MEMORANDUM FOR RECORD 24 Sep 04

FROM Office of Administrative Review of Detained Enemy Combatants (OARDEC)

Subject: List of Coalition Forces in Operation Enduring Freedom (OEF)

1. The following is a list of coalition forces in Afghanistan (numbers include OEF and ISAF)

Albania
Armenia
Australia
Azerbaijan
Belgium
Bulgaria
Canada
Czech Republic
Denmark
Djibouti
Egypt
Eritrea
Estonia
Ethiopia
Finland
France
Georgia
Germany
Greece
India
Italy
Japan
Jordan
Kazakhstan
Kenya
Kuwait
Kyrgyzstan
Latvia
Lithuania
Malaysia
Netherlands
New Zealand
Norway
Pakistan
Philippines
Poland
Portugal
Republic of Korea
Romania
Russia
Slovakia
Spain
Sweden
Tajikistan
Turkmenistan
Turkey
Ukraine
United Arab Emirates
United Kingdom
Uzbekistan

2. This list is derived from unclassified sources, including a Fact Sheet, dated June 14, 2002, issued by the Public Affairs Office of the United States Department of Defense.

EXHIBIT D-b

# Personal Representative Review of the Record of Proceedings

I acknowledge that on 20 November 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #277.

___ I have no comments.

X My comments are attached.

[redacted] LtCol, USAF

Name

20 NOV 04

Date

Signature

ISN #277
Enclosure (5)

Comments on Tribunal Results for ISN 277

The detainee requested 17 witnesses who were with him during the period of interest in Afghanistan. These relevant witnesses were limited to two, to be chosen by the detainee, with any more than that being deemed redundant. The convening order makes no mention of the exclusion of relevant evidence based on redundancy. The definition of relevant is:

> Relevant information is information having any tendency to make the existence of any fact that is of consequence to the determination to the Tribunal more probable or less probable than it would be without the information.

It is more probable that 17 witnesses are telling the truth than 2, thus the witnesses should have been allowed under the above definition. Further there is a reasonable expectation that relevant witnesses will have information beyond what is anticipated that will elucidate the case.

During the Tribunal at approximately 1520 hours, witness [redacted] was finished answering questions. The witness stated that he had additional information for the Tribunal and asked to make a statement. The president declined saying that the only information that the Tribunal needed to know had been asked as questions.

The above mentioned failure to view relevant testimony denied this detainee due process as outlined in the order of the convening authority.

20 NOV 04
Date

Lieutenant Colonel, USAFR
Personal Representative