IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMAL KIYEMBA, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-CV-01509 (RMU) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| *et al.*, ) | |
| ) | |
| Respondents. ) | |

**RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO HOLD
RESPONDENTS IN CONTEMPT OF PROTECTIVE ORDER**

The motion (see dkt. no. 18) filed on behalf of petitioner "Saadiq Doe" to hold

respondents in contempt of the protective order for not scheduling counsel's requested visit with

petitioner is yet another in a series of harassing motions by petitioner, unjustly accusing the

government of intentional misconduct related to its initial inability to identify petitioner in this

case. Respondents have already responded to (1) petitioner's motion for leave to file a surreply

(dkt. no. 17) to respondents' reply in support of their motion for order to show cause why this

case should not be dismissed for lack of proper "next friend" standing and (2) petitioners'

motion for reconsideration of the Court's September 13, 2005 Order (dkt. no. 14), demonstrating

that the government did not establish the identity of "Saadiq Doe" until only recently, based on

information recently supplied by petitioners' counsel. Once the government established the

identity of petitioner and ascertained, from the recently supplied information, that petitioner had

directly requested and authorized representation and suit by petitioners' counsel, the parties

essentially agreed that the petition in this case be amended to convert it from a "next friend"

petition to a direct petition, at least insofar as it is brought on behalf of "Saadiq Doe," and a visit by counsel with petitioner "Saadiq Doe" at Guantanamo Bay is being scheduled pending such conversion. The impending amendment and conversion of the petition will resolve respondents' challenge to the defective standing of the so-called "next friend" in this case with respect to the claims on behalf of "Saadiq Doe" (though not the other putative petitioners in the case), such that a lawsuit exists properly on "Saadiq Doe"'s behalf and counsel visits with him can go forward.

Because the identification of petitioner and the impending amendment of the petition with respect to his claims have permitted respondents to undertake scheduling a counsel visit with him, the motion to hold respondents in contempt can be denied on that ground alone. In any event, the motion should be denied because respondents were never in contempt of the protective order in this case. The Protective Order does not "clear[ly] and unambiguous[ly]," see Armstrong v. Executive Office of the President, 1 F.3d 1274, 1289 (D.C. Cir. 1993), require respondents to permit a visit by counsel with any particular petitioner in this case. While the Revised Procedures for Counsel Access to Detainees annexed to the Protective Order operate under the assumption of counsel visits occurring in that they set certain terms, conditions and limitations applicable to any such visits, they do not order respondents to provide a visit on demand of counsel in the first place. Finally, even if petitioner had been identified prior to respondents' scheduling of a visit for counsel with petitioner, another provision of the Protective Order confirms that respondents would have acted appropriately in refusing to schedule a visit with a petitioner on whose behalf the case was brought where, as here, the standing of the so-called "next friend" in the case is being challenged as defective, making the case jurisdictionally

- 2 -

improper.  Accordingly, there is no basis for contempt in this matter, and petitioner's motion should be denied.

## BACKGROUND

### I.    The Identification of Petitioner "Saadiq Doe"

The petition in this case was filed on August 1, 2005, with Jamal Kiyemba, a Guantanamo detainee, acting as alleged "next friend" for nine other Guantanamo detainees. Each of the putative petitioners, other than the alleged next friend, were described by first name only and as Chinese citizens of Uighur ethnicity.   Petition ¶ 3.  The government then undertook, as in all Guantanamo detainee habeas cases, the process of attempting to match the provided names and nationality information with individuals detained at Guantanamo.

Identifying "Doe" petitioners as actual detainees at Guantanamo is far from straightforward, however.  Most of the detainees have foreign language names that have to be transliterated, and many have multiple, even numerous, aliases.  Fragments of purported identifying information that may be presented by counsel may not be unique in nature (*e.g.*, physical appearance or common first name); may be transitory (*e.g.*, camp location in the past); or may be contradictory of other information provided, *i.e.*, they may point to multiple, different individuals.  The government makes best efforts to identify putative petitioners, but is not in a position to divine the identity of a "Doe" petitioner counsel purports to represent when incomplete or conflicting information is provided.

On August 17, 2005, petitioners' counsel filed a motion for an order to show cause (dkt. no. 2), and on August 18, 2005, the government filed its own Motion for Order to Show Cause Why Case Should Not Be Dismissed for Lack of Proper "Next Friend" Standing Or, In the

Alternative, to Stay Proceedings Pending Related Appeals and for Continued Coordination, and

Memorandum in Opposition to Petitioners' Motion for Order to Show Cause (dkt. nos. 3, 4),

demonstrating that no showing had been made in the case establishing that the alleged "next

friend" Kiyemba satisfied the requirements for next friend standing set forth in Whitmore v.

Arkansas, 495 U.S. 149, 163-64 (1990), namely: (1) the inability of the detainees for whom

habeas relief is sought to challenge or arrange for the challenge of the legality of their detention

themselves; and (2) a significant relationship between the purported "next friend" and each

detainee to show that the "next friend" is truly dedicated to each detainee's best interests.

Petitioners' counsel filed an opposition to the motion on September 12, 2005 (dkt. no. 7), and on

September 13, 2005, the Court issued an Order entering the protective order applicable to other

Guantanamo detainee cases, denying petitioners' motion for an order to show cause, and staying

the case (dkt. no. 8). On September 22, 2005, respondents filed their reply in support of their

motion regarding "next friend" standing (dkt. no. 10).

     Meanwhile, between late August and mid-September, 2005, petitioners' counsel provided

further information regarding the identity of at least one of the putative petitioners through e-

mails to respondents' counsel or through court filings. First, petitioners' counsel claimed that

petitioner "Saadiq Doe" was not a Chinese citizen, but, in fact, a Saudi national or former

resident, of Uighur heritage, who might be known as "Saddiq Al Bukhari" and classified by a

Combatant Status Review as "no longer an enemy combatant" ("NLEC"). See Declaration of

Terry M. Henry ("Henry Decl.") Exs. A, B (Aug. 31, 2005 e-mail from Susan Manning; Sept. 1,

2005 e-mail from Sabin Willett). Counsel also informed respondents that they believed that the

internment serial number ("ISN") of "Saadiq Doe" at Guantanamo was ISN 491 and that he had

been in a certain camp at Guantanamo some two months before.  See Sept. 8, 2005 Declaration

of Sabin Willett ¶¶ 11-12.

       The piecemeal information regarding the identity of "Saadiq Doe" provided by

petitioners' counsel from the inception of the case up to that time, however, was internally

inconsistent, *i.e.*, it did not point to one particular individual detainee.  For example, one detainee

existed who used the name "al Bukhari" and was a Saudi national of Central Asian heritage –

but that detainee was classified as an "enemy combatant," not as an NLEC.  There was also a

detainee with ISN 491 who claimed to be a Saudi of Uighur heritage who had a first name

similar to "Saadiq" –  but that detainee, to the knowledge of the Department of Defense

("DoD"), did not use the name "al Bukhari."  On top of this, moreover, that particular detainee

had already been identified for months by DoD as likely the petitioner "Adel Turkestani" in

another Guantanamo case brought by other counsel and pending before Judge Leon, Sliti v.

Bush, No. 05-CV-0429 (RJL).  The detainee was the only one using the surname "Turkestani"

who was of Chinese or Uighur origin, consistent with the description of the petitioner in Sliti,

though the first name "Adel" was not associated with that detainee in DoD's records.  See Henry

Decl. ¶ 7.  Accordingly, in the mid-September time frame, it was unclear and indeterminate

which of the two detainees was the "Saadiq Doe" referenced in the petition, especially in light of

the fact that a petition appeared to be already pending in Sliti on behalf of the detainee with ISN

491.  Thus, on September 22, 2005, when respondents filed their reply brief in support of their

motion regarding "next friend" standing (dkt. no. 10), they accurately stated that the petitioners

in the case who had been identified were held as enemy combatants.  See Henry Decl. ¶ 8.

Subsequently, on September 28, 2005, petitioners' counsel *for the first time* informed respondents' counsel that "Saadiq Doe" used the names, "Saddiq Ahmad, Turkestani" or "Saddiq Ahmad al Turkestani," based on an English translation of a letter counsel purportedly had received from the detainee directly requesting and authorizing representation and suit by an unnamed addressee lawyer.  See Henry Decl. Ex. C (Sept. 28, 2005 e-mail from Sabin Willett). With respect to the identification of "Saadiq Doe," this information was of transformative significance in that it superceded the earlier information that the detainee's last name was "al Bukhari," removed the element of internal inconsistency, and enabled the government to conclude with reasonable certainty that "Saadiq Doe" was, in fact, the detainee with ISN 491, the only detainee using the surname "Turkestani," who also fulfilled most of the other identifying criteria supplied by petitioners' counsel.  See id. Ex. C (Sept. 29, 2005 e-mail to Sabin Willett), Ex. D (Sept. 30, 2005 e-mail to Sabin Willett).  With respect to the concomitant issue of whether the petitioner, now identified, had in fact authorized representation and suit by counsel, questions existed as to the origins, circumstances, and scope of the letter counsel purportedly had received from the detainee directly requesting and authorizing representation and suit by the unnamed addressee, see id. Ex. D (Sept. 30, 2005 e-mail to Sabin Willett), but then, on October 5, 2005, petitioner's counsel explained the circumstances surrounding his receipt of the letter, indicating its likely appropriateness and authenticity, see id. Ex. E (Oct. 7, 2005 e-mail to Sabin Willett).[1]

_____

[1] Petitioner's counsel originally claimed that the letter had "[e]vidently" been written "many months" earlier and that he first came into possession of it at the Secure Facility, implying that it had been mailed to him by the detainee for receipt there.  See Henry Decl. Ex. C (Sept. 28, 2005 e-mail from Sabin Willett).  This explanation raised more questions than it answered: the protective order had been entered in the case just two weeks earlier (dkt. no. 8;

Based upon this recently supplied information, including the purported direct request from "Saadiq Doe" to petitioners' counsel for representation, respondents proposed to petitioners' counsel that the petition in this case be amended to convert it from a "next friend" petition to a direct petition, at least insofar as it is brought on behalf of "Saadiq Doe."  See id. Ex. E (Oct. 7, 2005 e-mail to Sabin Willett).  This action would eliminate the issue of the defective "next friend" standing with respect to the claims on behalf of "Saadiq Doe," such that a lawsuit exists properly on "Saadiq Doe"'s behalf and counsel visits with him could go forward.[2]

Earlier that same day, October 7, 2005, petitioner's counsel filed with the Court Security Officer the motion to hold respondents in contempt of the protective order for refusing to schedule counsel a visit with "Saadiq Doe" prior to that time.  The motion sought an order holding respondents in contempt; ordering a visit with "Saadiq Doe"; ordering the government to pay counsel's fees and expenses on the motion; and ordering respondents to "immediately and

---

Sept. 13, 2005), prior to which the avenues in the Counsel Access Procedures for transmission of privileged attorney-client correspondence by petitioner to the Secure Facility were not available, making it extremely unlikely that a letter written many months earlier could have been sent, transmitted, and received in the manner described.  Moreover, as noted above, the letter did not contain petitioner's counsel's name but was addressed generally "Dear respected lawyer," raising questions whether it might have been intended for some other counsel, e.g., counsel representing Adel Turkestani in Sliti v. Bush, who was presumed to be the same individual as petitioner in this case.  On October 5, 2005, counsel explained that the letter had not in fact been written "many months ago" and had not been mailed to him by the detainee; rather, it was apparently written on or about the day of counsel's visits to other clients at Guantanamo on August 29, 2005, and handed personally to counsel in circumstances that tend to suggest that, even if addressed generically, it was intended for him.  See id. Ex. E (Oct. 5, 2005 e-mail from Sabin Willett; Oct. 7, 2005 e-mail to Sabin Willett).

[2] Once the petition is amended, however, the defective "next friend" standing of petitioner Kiyemba will remain an outstanding issue with respect to petitioners other than "Saadiq Doe," as discussed in respondents' motion for an order to show cause (dkt. no. 3).

publicly disclose the names and ISNs of (i) all Guantanamo detainees who have ever requested counsel and (ii) all Guantanamo detainees who are not enemy combatants."

On October 10, 2005, petitioners' counsel agreed to pursue the course suggested by respondents' counsel of amending the petition with respect to "Saadiq Doe," and respondents' counsel began scheduling a visit for counsel with "Saadiq Doe" at Guantanamo Bay for mid-November, conditioned upon the proposed amendment of the petition.[3]  See Henry Decl. ¶ 9 & & Ex. E. (Oct. 10, 2005 e-mail from Sabin Willett).[4]

## II.    The Protective Order

In its September 13, 2005 Order (dkt. no. 8), the Court, as it has routinely done in all of the Guantanamo detainee habeas cases pending before it, entered in this case, "by way of reference," the protective orders that been entered in other Guantanamo detainee cases pending before other Judges of the Court.  See Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba in In re Guantanamo Detainee Cases, 344 F. Supp. 2d 174 (D.D.C. Nov. 8, 2004) ("Protective Order"); Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order in In re Guantanamo Detainee Cases, No. 02-CV-0299, et al. (D.D.C.

---

[3] Petitioner's counsel also requested a visit with another purported petitioner in this case, but that visit has not been scheduled pending resolution of the propriety of this petition with respect to purported petitioners other than "Saadiq Doe" given the defective "next friend" standing of petitioner Kiyemba, as explained in respondents' motion for an order to show cause (dkt. no. 3).  See Henry Decl. Ex. E. (Oct. 10, 2005 e-mail from Sabin Willett); see also infra at 15-18.

[4] Respondents believe that there continues to be a potential issue about whether petitioner "Saadiq Doe"/Turkestani in this case is the same individual as petitioner Turkestani in Sliti, and whether, if so, his claims should be dismissed in this case without prejudice to his pursuing them in the earlier-filed case.  However, respondents have agreed to permit a visit without prejudice to their seeking relief in the future in this regard if the two petitioners are in fact one and the same.

Dec. 13, 2004); Order Addressing Designation Procedures for "Protected Information" in In re

Guantanamo Detainee Cases, No. 02-CV-0299, et al. (D.D.C. Nov. 10, 2004).

      As the Protective Order recites, it was originally entered by Judge Green "upon

Respondents' Motion for Protective Order to prevent the unauthorized disclosure or

dissemination of classified national security information and other protected information that

may be reviewed by, made available to, or are otherwise in the possession of, the petitioners

and/or petitioners' counsel in these coordinated cases."  344 F. Supp. 2d at 175.  The first two

paragraphs of the Protective Order set forth its premises, function, and scope:

> 1.    The Court finds that these cases involve classified national security
> information or documents, the storage, handling and control of which require
> special security precautions, and access to which requires a security clearance and
> a "need to know."  These cases may also involve other protected information or
> documents, the storage, handling and control of which may require special
> precautions in order to protect the security of United States government personnel
> and facilities, and other significant government interests.
>
> 2.    The purpose of this Protective Order is to establish the procedures that
> must be followed by all petitioners' counsel, their respective petitioner(s), all
> counsel involved in these cases, translators for the parties, and all other
> individuals who receive access to classified national security information or
> documents, or other protected information or documents, in connection with these
> cases, including the privilege team as defined in Exhibit A.

Protective Order ¶¶ 1, 2, 344 F. Supp. 2d at 175-76.

      To serve this overarching function of "preventing[ing] the unauthorized disclosure or

dissemination of classified national security information and other protected information," the

Protective Order further provides that "Petitioners' counsel are bound by the terms and

conditions set forth in the 'Revised Procedures for Counsel Access to Detainees At the U.S.

Naval Base in Guantanamo Bay, Cuba,' and the procedures for handling mail and documents

brought into and out of counsel meetings, attached hereto as Exhibit A."  Protective Order ¶ 6,

344 F. Supp. 2d at 176 (emphasis added).  Moreover, "[t]his Protective Order specifically incorporates by reference all terms and conditions established in the procedures contained in Exhibit A *to the extent they place limitations on petitioners' counsel in their access to and interaction with petitioners or handling of information*."  Id. (emphasis added).

The Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba, annexed to the Protective Order as Exhibit A, in turn, set certain terms, conditions, and limitations for habeas counsel's access to properly represented detainees and sets out procedures and requirements for the handling of information obtained from and delivered to detainees.  For example, it requires that visiting counsel obtain a security clearance.  See 344 F. Supp. 2d at 184 (Ex. A) § III.A.  Further, it provides that "[p]rior to being permitted access to the detainee," counsel must "provide evidence of his or her authority to represent the detainee."  See id. at 185 § III.C.1.  In a number of the Guantanamo detainee cases, this evidence has typically taken the form of affidavits and authorizations of "next friends" who have filed petitions on behalf of detainees.  Because the detainee "remains the real party in interest," see Whitmore v. Arkansas, 495 U.S. 149, 163 (1990), the access procedures further require a second, subsequent type of authorization, directly from the detainee, once counsel in a proper next friend case is provided access to the detainee.  See 344 F. Supp. 2d at 185 (Ex. A) § III.C.2. (counsel must "provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with a detainee.").  With respect to the "Logistics of Counsel Visits," the access procedures in the Protective Order provide:

> Counsel shall submit to the Department of Justice (DoJ) any request to meet with a detainee.  This request shall specify date(s) of availability for the meeting, the

desired duration of the meeting and the language that will be utilized during the meeting with the detainee. Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting. Once the request has been approved, DoJ will contact counsel with the date and duration of the meeting.

Id. § III.D.1. The access procedures also address other aspects of visit logistics including number of counsel participating in visits and procedures related to certain clearances needed to visit a foreign military base such as Guantanamo. See id. § III.D.2.-4.

## ARGUMENT

## I.    THE CIVIL CONTEMPT POWER.

Courts have inherent power to enforce compliance with their lawful orders through civil contempt. Armstrong v. Executive Office of the President, 1 F.3d 1274, 1289 (D.C. Cir. 1993). For more than a century, however, the law has been well settled that civil contempt "is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." California Paving Co. v. Molitor, 113 U.S. 609, 618 (1885). "In light of the [contempt] remedy's extraordinary nature, courts rightly impose it with caution." Joshi v. Professional Health Services, Inc., 817 F.2d 877, 879 n.2 (D.C. Cir. 1987). As the Supreme Court has held, "the very amplitude of the power is a warning to use it with discretion, and a command never to exert it where it is not necessary or proper." Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 451 (1911). Indeed, in order to prevent abuses of the contempt power and to protect those on whom the potent authority may be visited, Congress has long regulated the exercise of the contempt power by statute. See 18 U.S.C. § 401 (providing that a court of the United States shall have the power to punish only certain acts as contempt, including "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command"); In re

<u>McConnell</u>, 370 U.S. 230, 233-34 (1962); <u>Nye v. United States</u>, 313 U.S. 33, 44-48 (1941); <u>In re Brown</u>, 454 F.2d 999, 1002 (D.C. Cir. 1971).

Accordingly, civil "contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous . . . and the violation must be proved by 'clear and convincing' evidence." <u>Armstrong</u>, 1 F.3d at 1289 (citations omitted); <u>see</u> <u>SEC v. Showalter</u>, 227 F. Supp. 2d 110, 120-21 (D.D.C. 2002) (Urbina, J.).  As the Supreme Court has explained:

> The judicial contempt power is a potent weapon.  When it is founded upon a decree too vague to be understood, it can be a deadly one.  Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

<u>International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n</u>, 389 U.S. 64, 76 (1967) (discussing FED. R. CIV. P. 65(d) regarding injunctions).

Civil contempt is a remedial device used to achieve compliance with an order of the court that is being violated, <u>see</u> <u>Showalter</u>, 227 F. Supp. 2d at 120-21, and contempt sanctions can be avoided by prompt compliance with the order, <u>see</u> <u>Petties v. District of Columbia</u>, 888 F. Supp. 165, 169 (D.D.C. 1995) (Friedman, J.).  Defenses to civil contempt can include impossibility of compliance with the order.  <u>See</u>, <u>e.g.</u>, <u>SEC v. Ormont Drug & Chem. Co.</u>, 739 F.2d 654, 656-57 (D.C. Cir. 1984).  Further, the Supreme Court has suggested that civil contempt proceedings may be inappropriate in cases involving out-of-court disobedience to complex injunctions.  <u>See</u> <u>Int'l Union, United Mine Workers v. Bagwell</u>, 512 U.S. 821, 833-34 (1994).[5]

---

[5] In addition, courts have held that civil contempt fines are not available against the United States and its officials under the doctrine of sovereign immunity.  <u>See</u> <u>United States v. Horn</u>, 29 F.3d 754, 763, 765 n.13, 767 (1st Cir. 1994) (citing cases); <u>U.S. v. Waksberg</u>, 881 F. Supp. 36, 39–41 (D.D.C. 1995) (June Green, J.), <u>vacated and remanded on other grounds</u>,112 F.3d 1225 (D.C. Cir. 1997).  <u>But see</u> <u>Am. Rivers v. U.S. Army Corps of Eng'rs</u>, 274 F. Supp. 2d 62, 69 (D.D.C. 2003) (Kessler, J.) (rejecting assertion of sovereign immunity with respect to

## II.    THERE IS NO BASIS FOR CONTEMPT.

Respondents are not now and have not been in contempt of the Protective Order or its accompanying counsel access procedures in this case.

As an initial matter, even if declining to schedule a visit with a petitioner could be considered a violation of the counsel access procedures – which it cannot for reasons explained infra – there has been no violation of the access procedures here: the scheduling of a counsel visit with "Saadiq Doe" began immediately following respondents' identification of petitioner based on the information supplied for the first time by petitioner's counsel on September 28, 2005, and petitioner's counsel's clarification of his authority to represent petitioner on October 5, 2005.

Moreover, regardless of the fact that a visit with petitioner is being scheduled, circumstances such as petitioner alleges could never be considered as amounting to contempt of the Protective Order and/or the access procedures annexed thereto.  First, as explained supra, the primary purpose of the access procedures – which are subsidiary to a Protective Order preventing unauthorized disclosure of classified or protected information, and which are incorporated into the Protective Order "to the extent they place limitations on petitioners' counsel in their access to and interaction with petitioners or handling of information" – is to set certain terms, conditions and limitations for habeas counsel's access to properly represented detainees.  The access procedures neither "clearly" nor "unambiguously," see Armstrong, 1 F.3d at 1289, require respondents to permit a visit by counsel with any particular petitioner in this case.  While the access procedures certainly operate with the assumption that counsel visits will

––––––––––––––––––

coercive, as opposed to compensatory, contempt fines).

occur in that they set the terms and procedures applicable to any such visits, they do not

themselves order respondents to provide such visits on demand of counsel in the first place.[6]

Indeed, petitioner must resort to *misquoting* the language of the access procedures in order to

concoct an argument regarding contempt.  Petitioner claims the access procedures say,

"Reasonable efforts will be made to accommodate counsel's request for a meeting."  See Motion

to Hold Respondents in Contempt at 7, 13.  In fact, however, as noted supra, the access

procedures provide, "Reasonable efforts will be made to accommodate the counsel's request

regarding the scheduling of a meeting," and that language is embedded in a paragraph dealing

solely with logistical arrangements as to the date and timing of counsel meetings with

represented petitioners.[7]  See 344 F. Supp. 2d at 185 (Ex. A) § III.D.1.  The access procedures do

---

[6] The relationship between counsel visits and the access procedures in this case would be analogous to other cases in which an omnibus protective order is entered at the outset of the case governing the use and handling of information that will be exchanged between parties in discovery.  The omnibus protective order may set the terms of how information obtained in discovery is to be treated, shared, or stored, for example, but a party's entitlement to any particular requested discovery is settled through court process (*e.g.*, a motion to compel) and not through the protective order.  Thus, an omnibus protective order operates with the assumption that discovery will occur, but typically does not by its own terms obligate the parties to produce any particular information on pain of contempt.

[7] The full provision provides:

D.     *Logistics of Counsel Visits*

   1.     Counsel shall submit to the Department of Justice (DoJ) any request to meet with a detainee.  This request shall specify date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the detainee.  Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting.  Once the request has been approved, DoJ will contact counsel with the date and duration of the meeting.

344 F. Supp. 2d at 185 (Ex. A) § III.D.1.

- 14 -

not order or direct a counsel visit, and petitioner cannot show by "clear and convincing evidence" the violation of a "clear and unambiguous" order in that regard. See Armstrong, 1 F.3d at 1289.

Second, even if petitioner had been identified prior to the scheduling of a visit by counsel, another provision of the access procedures confirm that respondents would have acted appropriately and consistent with the access procedures in deferring the scheduling of a visit with a petitioner on whose behalf the case was brought where the standing of the so-called "next friend" in the case is being challenged as defective, making the case jurisdictionally improper.[8] As explained supra, the access procedures require two types of authorizations of representation from counsel. Initially, "[p]rior to being permitted access to the detainee," counsel must "provide evidence of his or her authority to represent the detainee." See 344 F. Supp. 2d at 185 (Ex. A) § III.C.1. In a next friend case such as this one, such evidence would be an appropriate affidavit or authorization from a proper next friend, demonstrating that the requirements established by the Supreme Court for next friend standing are met.[9] Assuming such evidence is produced, and subject to other requirements of the Protective Order and access procedures, the

---

[8] Of course, to the extent the identity of a petitioner with whom a visit was requested is uncertain – as in the case of "Saadiq Doe" – respondents acted reasonably and appropriately in declining to schedule a visit.

[9] As explained in Whitmore v. Arkansas, 495 U.S. 149, 163-64 (1990), to have standing, a purported "next friend" must demonstrate: (1) the inability of the detainees for whom habeas relief is sought to challenge or arrange for the challenge of the legality of their detention themselves; and (2) a significant relationship between the purported "next friend" and each detainee to show that the "next friend" is truly dedicated to each detainee's best interests. See Respondents' Motion for Order to Show Cause Why Case Should Not Be Dismissed for Lack of Proper "Next Friend" Standing Or, In the Alternative, to Stay Proceedings Pending Related Appeals and for Continued Coordination, and Memorandum in Opposition to Petitioners' Motion for Order to Show Cause (dkt. nos. 3, 4).

access procedures further require a second type of authorization, directly from the detainee, once

counsel in a proper next friend case is provided access to the detainee.  See id. § III.C.2. (counsel

must "provide evidence of his or her authority to represent the detainee as soon as practicable

and in any event no later than ten (10) days after the conclusion of a second visit with a

detainee.").

      Where the standing of the so-called "next friend" in the case is being challenged as

defective and respondents defer scheduling of a counsel visit, the parties would be in dispute

over whether counsel had provided sufficient "evidence of his or her authority to represent the

detainee" through the petition or other submissions provided by the next friend whose standing

as a proper next friend is challenged.  Because the "evidence of his or her authority to represent

the detainee," must be provided "[p]rior to [counsel] being permitted access to the detainee,"

respondent would be acting consistent with the access procedures in deferring scheduling of a

counsel visit pending appropriate "evidence of . . . authority to represent the detainee."[10]  There

---

      [10] Not only would respondents be acting consistent with the access procedures, they otherwise would be acting appropriately.  As explained in Respondents' Motion for Order to Show Cause Why Case Should Not Be Dismissed for Lack of Proper "Next Friend" Standing Or, In the Alternative, to Stay Proceedings Pending Related Appeals and for Continued Coordination, and Memorandum in Opposition to Petitioners' Motion for Order to Show Cause (dkt. nos. 3, 4) at 10-12, if a detainee, such as Mr. Kiyemba in this case, were able to act as next friend for another detainee simply based on the mere fact that they are both detained at Guantanamo, detainees or prisoners could purport to bring mass habeas corpus petitions simply by being able to list the identities of those detained alongside them, a situation that is surely inconsistent with standing jurisprudence and that disregards both the available avenues for detainees to initiate habeas suits themselves and, potentially, a detainee's particular wishes.  Mr. Kiyemba's list of 30 detainees for whom he purports to act as next friend indicates he is pursuing such a course.  Id.  In addition, the phenomenon of detainees improperly purporting to act as next friends could result in counsel abusing the next friend device in order merely to solicit the Guantanamo detainee population for clients, while in the meantime seeking various forms of relief with respect to anyone a purported next friend detainee, such as Mr. Kiyemba, can remember having come in contact with.  Id.  For such reasons, it is appropriate that the issue of the next friend standing of Mr. Kiyemba with respect to various petitioners be resolved before

would be no "clear and convincing evidence" of the violation of a "clear and unambiguous"

order, and contempt would not be appropriate.  Even if petitioner disagreed with respect to the

insufficiency of the evidence regarding the standing of the next friend,[11] as petitioners apparently

do, contempt "is a severe remedy, and should not be resorted to where there is fair ground of

doubt as to the wrongfulness of the defendant's conduct," <u>California Paving Co. v. Molitor</u>, 113

U.S. 609, 618 (1885), and, at the very least, such "fair ground of doubt" would exist in such a

situation.  Indeed, it is difficult to see how respondents' position on the next-friend standing

issue could be seen as so meritless as to warrant contempt when Judges of this Court have raised

the issue *sua sponte* in other cases presenting similar circumstances.[12]

Indeed, petitioner's contempt motion stems from the refusal or inability of petitioner's

counsel to comprehend that the identity of petitioner "Saadiq Doe" was uncertain until recently

and to recognize any arguable basis for respondents' challenge to the standing of the purported

next friend in this case.  Petitioner's counsel is entitled to argue against respondents on these

_____

direct access to those petitioners be permitted through counsel visits.

[11] Of course, here, with respect to petitioner "Saadiq Doe," the issue of next friend
standing will be resolved by the impending amendment of the petition to convert it to a direct
petition, at least insofar as it is brought on behalf of "Saadiq Doe."  Thus, respondents are
scheduling counsel's requested visit with petitioner "Saadiq Doe," conditional upon the
amendment of the petition.  <u>See</u> <u>supra</u> at 8.

[12] <u>See</u>, *e.g.*, <u>Ahmed v. Bush</u>, No. 05-CV-0665 (RWR) (Order dated May 24, 2005) (dkt.
no. 12) ("The petition presumes, rather than demonstrates through facts, that Ahmed has been
denied access to the courts of the United States. . . . In light of the fact that several <u>pro</u> <u>se</u>
petitions have been filed recently by Guantanamo Bay detainees, Ahmed's lack of access to this
court cannot be presumed, but must be established."); <u>Hamlily v. Bush</u>, No. 05-CV-0763 (JDB)
(Order dated Oct. 3, 2005) (dkt. no. 16) ("[The petition] states only that [Hamlily] is 'being held
essentially communicado' and that 'his family members have not been able to contact U.S.
counsel to file a petition on his behalf.' . . . There is a serious question as to whether this alone is
sufficient to establish Hamlily's inability to prosecute this action on his own behalf.").

- 17 -

points, but counsel should not be entitled to harangue and harass respondents with threats of

contempt and sanctions,[13] a severe and extraordinary remedy to be imposed with the greatest of

caution, see Joshi, 817 F.2d at 879.  There is no basis or grounds for a finding of contempt in this

matter, and petitioner's motion should be denied.

## CONCLUSION

For the reasons stated, the Court should deny petitioners' motion to hold respondents in

contempt of protective order.

---

[13] That petitioner's counsel intends to harass is evident not only from the baseless argument for contempt, but also from other matters raised in the motion.  Although civil contempt is a remedial device used to achieve compliance with an order of the court that is being violated, see Showalter, 227 F. Supp. 2d at 120-21, petitioner loads his motion with a request for an order requiring respondents to disclose identifying information regarding all NLECs at Guantanamo and any detainee who has ever requested counsel, relief having nothing to do with the alleged violation of the counsel access procedures at issue in the motion.

Even more improperly harassing are counsel's meritless accusations of "departure from ethical behavior."  See Motion to Hold Respondents in Contempt at 14.  Respondents' conduct has not been unethical in any way.  First, as explained supra at 3-6, respondents never made misrepresentations regarding the identity of petitioner "Saadiq Doe."  Second, as soon as the identity of "Saadiq Doe" was settled and the issue of petitioner's authorization of representation was resolved, respondents began scheduling a visit by counsel with petitioner.  Third, petitioner wrongly accuses the government as having conceded the absence of any lawful basis to hold NLECs, such as petitioner "Saadiq Doe," see Motion to Hold Respondents in Contempt at 14, when respondents have previously articulated the straightforward basis for the Executive's authority on the issue.  The Executive's power to detain a suspected enemy combatant necessarily includes the authority to wind up that detention in an orderly fashion, i.e., pending relocation, after a detainee has been determined to no longer be an enemy combatant or after hostilities have ended, and such authority is supported by historical practice.  See Respondents' Opposition to (1) Petitioners' Motion for Leave to File Surreply to Respondents' Reply in Support of Motion for Order to Show Cause Why Case Should Not Be Dismissed for Lack of Proper "Next Friend" Standing and (2) Petitioners' Motion for Reconsideration of September 13, 2005 Order (dkt. no. 19) at 12 n.9.

Dated: October 18, 2005                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           KENNETH L. WAINSTEIN
                                           United States Attorney

                                           DOUGLAS N. LETTER
                                           Terrorism Litigation Counsel

                                           _____/s/ Terry M. Henry_____
                                           JOSEPH H. HUNT (D.C. Bar No. 431134)
                                           VINCENT M. GARVEY (D.C. Bar No. 127191)
                                           TERRY M. HENRY
                                           JAMES J. SCHWARTZ
                                           PREEYA M. NORONHA
                                           ROBERT J. KATERBERG
                                           NICHOLAS J. PATTERSON
                                           ANDREW I. WARDEN
                                           EDWARD H. WHITE
                                           Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.  Room 7144
                                           Washington, DC  20530
                                           Tel:  (202) 514-4107
                                           Fax:  (202) 616-8470

                                           Attorneys for Respondents