# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

ABU BAKKER QASSIM and A'DEL ABDUL HAKIM,

      Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

      Respondents/Defendants.

Case No. 05 cv 0497 (JR)

## SEPTEMBER 19, 2005 DECLARATION OF SABIN WILLETT

Pursuant to 28 U.S.C. § 1746, I, Sabin Willett declare the following to be true.

1.      I attended the public session of the September 8, 2005 oral argument held in the United States Court of Appeals for the District of Columbia Circuit, in nos. 05-5062, et al., and 05-5064, et al.

2.      Attached as Exhibit 1 to this declaration is a transcript of that public session obtained, via other habeas counsel, from the official reporter. I believe the transcript to be substantially accurate.

I declare under penalty of perjury that the foregoing is true.

dated:   **9/19/05**

                             Sabin Willett

# EXHIBIT 1

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

```
------------------------
LAKDAR BOURMEDIENE, DETAINEE,
CAMP DELTA, ET AL.,

          Appellants,
                                        No. 05-5062, et al.
     v.

GEORGE W. BUSH, PRESIDENT OF
THE UNITED STATES, ET AL.,

          Appellee.
------------------------
------------------------
KHALED A. F. AL ODAH, NEXT
FRIEND OF FAWZI KHALID ABDULLAH
FAHAD AL ODAH, ET AL.,

          Appellants,                   No. 05-5064, et al.

     v.

UNITED STATES OF AMERICA,

          Appellee.
------------------------
```

Thursday, September 8, 2005

Washington, D.C.

The above-entitled matter came on for oral argument pursuant to notice.

BEFORE:

CIRCUIT JUDGES SENTELLE, RANDOLPH AND ROGERS

DLB                                                                                          2

      APPEARANCES:

            <u>ON BEHALF OF THE APPELLANTS</u>:

            THOMAS B. WILNER, ESQ.
            STEPHEN H. OLESKEY, ESQ.

            <u>ON BEHALF OF THE APPELLEE</u>:

            GREGORY G. KATSAS, DEPUTY ASSISTANT ATTORNEY GENERAL

DLB                                                                                          3

# C O N T E N T S

ORAL ARGUMENT OF:                                                              PAGE

    Thomas B. Wilner, Esq.
    On Behalf of the Appellants                                           4

    Gregory B. Katsas,
    Deputy Assistant Attorney General
    On Behalf of the Appellee                                            27

REBUTTAL OF:

    Thomas B. Wilner, Esq.                                                50
    On Behalf of the Appellants

    Stephen H. Oleskey, Esq.                                              57
    On Behalf of the Appellants

    Gregory B. Katsas,                                                   84
    Deputy Assistant Attorney General
    On Behalf of the Appellee

    Stephen H. Oleskey, Esq.                                             107
    On Behalf of the Appellants

DLB                                                                              4

1                      P R O C E E D I N G S

2              THE CLERK:  Case number 05-5062, et al.  Lakdar

3     Boumediene, Detainee, Camp Delta, et al., Appellants v. George

4     W. Bush, President of the United States, et al.  Case number

5     05-5064, et al.  Khaled A. F. Al Odah, Next Friend of Fawzi

6     Khalid Abdullah Fahad Al Odah, et al., Appellants v. United

7     States of America, et al.  Mr. Wilner and Mr. Oleskey with

8     Appellant Detainees,  Mr. (indiscernible).

9              THE COURT:  Counsel?

10             MR. WILNER:  Good morning, Your Honor.  May it

11    please the Court, my name is Tom Wilner and I'm with the law

12    firm of Sherman and Sterling.  I represent the Petitioners in

13    the Al Odah case.  Today I'm arguing on behalf of all of the

14    Appellees from Judge Green's appeal.

15             Your Honors, despite all the briefs and all the

16    words we've thrown at you, I think that the issue before you

17    right now is really a very simple one and I'd just like to

18    take a few moments to lay out what I think are some undisputed

19    things about the case.

20             As we all know, over 14 months ago, the Supreme

21    Court ruled in this case.  It held explicitly that the habeas

22    statute applies to these Petitioners.  That they are entitled

23    to consideration of their claims on the merits and are

24    remanded to the District Court to do so.  Based on that

25    decision, I think there is no dispute, we all agree, that the

1    District Court has the jurisdiction to consider the merits of

2    their claims.  Now what are their claims?

3           The government asserts that it has the authority to

4    hold them because they are enemy combatants.  But the

5    Petitioners claim that they are not enemy combatants no matter

6    how broadly that term might be defined.  And that in the words

7    of the Supreme Court "they are wholly innocent of any

8    wrongdoing."  That is a factual claim on the merits and it

9    cannot be decided on the basis of a motion to dismiss.

10          The government has put in its returns to the

11   Petitions in the form of the CSR key material, setting forth

12   its factual justifications for the detentions.  But those

13   returns cannot simply be accepted as true.  Under the plain

14   terms of the habeas statute, the Petitioners have the right to

15   rebut or traverse those returns and present evidence of their

16   own.

17          THE COURT:  Did they do that?

18          MR. WILNER:  Pardon?

19          THE COURT:  Did they do that?

20          MR. WILNER:  No sir, we have not been allowed that

21   opportunity.  We have not had an opportunity to traverse the

22   returns.  We have not had that opportunity.  So in those

23   circumstances a motion to dismiss is simply improper.  I think

24   the issue now before you is as simple as that.  Indeed what

25   the government is doing is trying to invert.  It's asking you

DLB                                                                          6

1    to invert the standards of a motion to dismiss and accept its

2    allegations as true rather than those in the petitions.

3    That's exactly --

4         THE COURT:  Let me ask you, Counsel.  I thought that

5    the procedural posture of all of these cases was they had been

6    joined together before Judge Green and some before Judge Leon

7    to settle some of the mutual issues.  And basically these are

8    questions of law.  So Judge Green has made some decisions and,

9    at least in part, denied the government's motion to dismiss.

10   And but for -- or Section 1292 order, the cases would be back

11   before the original District Court Judge and at that point you

12   would be able, would you not, to produce or offer evidence to

13   rebut the government's returns?

14        MR. WILNER:  Yes, yes, Your Honor.

15        THE COURT:  So procedurally we're just not there

16   yet.

17        MR. WILNER:  You know that's exactly what I'm

18   saying, Your Honor.  What happened in this case is the

19   government put in its return and then filed -- and said we

20   move to dismiss, as a matter of law.  You haven't stated a

21   claim.  And I'm saying the claim is a basic factual claim,

22   cognizable and evident and habeas.  We say we are not enemy

23   combatants, they say we are, and we have not had the

24   opportunity to traverse the return yet.

25        Their argument, as you know, their main argument was

DLB                                                                          7

1    a legal argument.  They said well it doesn't matter if you

2    traverse a return or not because you don't have any rights in

3    the constitution that are cognizable and habeas.  That's wrong

4    and I can say that, but I think it's terribly important to

5    note that what's an issue here is a factual issue.  That's a

6    factual issue and we have not had the point.

7            Now let me say about their claim that we have no

8    rights under the constitution.

9            THE COURT:  Mr. Wilmer, let me back you up.  In the

10   main cases, the 12 detainees and Al Odah.

11           MR. WILNER:  Yes, sir.

12           THE COURT:  You represent them, right?

13           MR. WILNER:  Yes, sir.

14           THE COURT:  They had three claims for relief.  The

15   first was what?

16           MR. WILNER:  Our claims for relief at that time were

17   to meet with the prisoners, to have them meet with the

18   families, and to have an impartial tribunal to determine their

19   status.

20           THE COURT:  And then you had an Alien Tort Act

21   claim, right?  And then an APA claim.

22           MR. WILNER:  Yes, sir.

23           THE COURT:  There are three claims.

24           MR. WILNER:  That's right.  Yes, sir.

25           THE COURT:  For relief.

1            MR. WILNER:  And may I just say the first claim was

2   based, of course, on 2241, as well -- so we stated a cause of

3   action under --

4            THE COURT:  It wasn't, in fact, as I recall, there

5   was no claim for release.  It was just the terms and

6   conditions of the confinement.

7            MR. WILNER:  The first claim was for terms and

8   conditions but the right to an impartial tribunal to determine

9   their status.

10            THE COURT:  Under the due process clause.

11            MR. WILNER:  But also a cause of action under 2241.

12   We stated a cause of action under -- we asserted.

13            THE COURT:  What, if anything, in those three claims

14   that -- you have -- we have before us the original complaints.

15   They have not been amended?

16            MR. WILNER:  Yes, we did amend, Your Honor.  We

17   amended after -- we amended to really assert a habeas claim.

18            THE COURT:  When?

19            THE COURT:  But the amended complaint, as I recall,

20   reads as Judge Randolph is stating it.  Does it not?

21            THE COURT:  I believe it does.

22            MR. WILNER: Okay, you know, excuse me, Your Honor.

23   Yes, we moved for leave to amend and the Court though has not

24   acted on it.  The government moved to dismiss.

25            THE COURT:  Okay.  What's before us now are the

1  original complaints with three claims.  Of those three claims,

2  none of them turn on whether your client is or is not

3  affiliated with al Qaeda.

4          MR. WILNER:  Excuse me, Your Honor, I think they

5  did.  We asserted in the complaint, in the factual complaint,

6  that we were innocent, that we were innocent of any wrongdoing

7  as the Supreme Court noted.  That we were captured by mistake,

8  turned over by bounty hunters, and were innocent, were

9  unconnected.  And one of our claims was for an impartial

10  tribunal to determine that, either a Court or an impartial

11  tribunal at that time.  So our claim was of innocence and to

12  have a factual determination.  Now we didn't say release us at

13  that time, but we asserted that under the habeas statute as

14  well.  We absolutely did.  The question was whether the Court

15  has jurisdiction.  And as Your Honor held at that time, as the

16  Court held at that time, it felt that the Court didn't have

17  jurisdiction.

18          THE COURT:  Courts don't feel.

19          MR. WILNER:  I'm sorry?

20          THE COURT:  Courts don't feel.

21          MR. WILNER:  I'm sorry?

22          THE COURT:  You said the Court "felt" that it didn't

23  have jurisdiction.  I said Courts don't feel.

24          MR. WILNER:  Oh, I'm sorry.  Well, I meant the Court

25  held at that time that it didn't have jurisdiction.  The

1    Supreme Court has said there is jurisdiction.  There is

2    clearly jurisdiction in the District Court now.

3            THE COURT:  But that's all the Supreme Court held.

4    It did not say Eisentrager is overruled as to the merits of

5    any claim.

6            MR. WILNER: Well --

7            THE COURT:  Eisentrager cuts against coverage of

8    these prisoners by any part of the constitutional allocation

9    for the Bill of Rights, does it not?

10           MR. WILNER:  Your Honor, well, let me answer that

11   two ways.

12           THE COURT:  All right.

13           MR. WILNER:  I believe when a Court decides that

14   jurisdiction exists, it doesn't -- the issue of cause of

15   action is a separate issue.  Clearly, as the Court pointed out

16   in the Hamdan case, it had -- the Court did not decide the

17   issue whether there was a cause of action under the Geneva

18   Conventions.

19           THE COURT: Or anywhere else.

20           MR. WILNER:  Well, now, I want to disagree with that

21   a little bit.

22           THE COURT:  All right.

23           MR. WILNER:  I think that the Court -- of course,

24   Bell v. Hood does not prevent a Court from deciding both

25   jurisdiction and whether there is a substantive cause of

1    action.  I think in this case the Supreme Court did decide

2    both that there was jurisdiction and that there was a

3    substantive cause of action for violation of U.S. laws.

4            THE COURT:  That's Footnote 15?

5            MR. WILNER:  So I do, but I -- I'm sorry?

6            THE COURT:  Are you talking about Footnote 15?

7            MR. WILNER:  More than Footnote 15, Your Honor.

8            THE COURT:  Tell me what more than Footnote 15.

9            MR. WILNER:  Well, more than Footnote 15.  And if I

10   may, after I do this, I'd like to get back to why I don't

11   think that matters because I think it's terribly important and

12   I think I might even be able to show people.  But, Your Honor,

13   the Court held that it really rejected the government's claim

14   that Guantanamo was extra territorial.  It did that

15   explicitly.  It said that --

16           THE COURT:  Explicitly?

17           MR. WILNER:  Yes, yes.  It said that the claim --

18   that the presumption against extra territoriality applies to

19   Guantanamo does not hold here.  Whatever weight that might

20   have elsewhere, it doesn't have weight to a territory such as

21   Guantanamo, which is within the territorial jurisdiction of

22   the United States.  So I think that's --

23           THE COURT:  That's not a very direct quote is it,

24   Counselor?

25           MR. WILNER:  Not a direct quote from the opinion,

1  but I do have it here.  I mean I can see it.  But they did say

2  --

3          THE COURT:  If it's not from the opinion, it's not a

4  direct quote in the sense of what I'm asking you.

5          MR. WILNER:  It's not a direct quote.  But, Your

6  Honor, they did reject the government's claim of extra

7  territoriality with respect to Guantanamo.

8          THE COURT:  But the Court kept saying the only issue

9  before us is this narrow question of jurisdiction.  Isn't that

10  correct?

11          MR. WILNER:  No, I don't think they did just say

12  that.

13          THE COURT:  The Court did explicitly say that,

14  didn't they?

15          THE COURT:  At the beginning, the middle, and the

16  end.

17          THE COURT:  Yeah.

18          MR. WILNER:  The Court said that the question before

19  it is whether these people have a right to judicial review of

20  the legality of the detention imposed upon them.  And it

21  answered that question in the affirmative.  Later on in the

22  opinion, it said "jurisdiction to determine the merits of

23  their claim."  Jurisdiction to hear the merits of their claim.

24  Can I just back up?  If I agree that all the Court decided was

25  jurisdiction, and I think it did go further with respect to

DLB                                                                              13

1   legal rights, and I'll deal with that later, there is no doubt

2   that the Court has the jurisdiction to hear the merits of the

3   claim.  The point I'm making is the essential claim here is a

4   factual claim.  It's a claim that they are not enemy

5   combatants.  That's a factual claim that cannot be settled on

6   a motion to dismiss.  We've got to have a right to submit our

7   traverse to the returns.  We've never had a right.

8        Now can I just try to demonstrate that for a second?

9   Let me give an example.  Let's say that the government goes

10  out and it has an order to detail all redheaded men.  Somebody

11  could bring an action against that, a challenging under

12  habeas, and probably, unless there is a great reason for it,

13  that classification would not withstand constitutional

14  scrutiny.

15       Let me change the hypo a little bit.  Let's say that

16  Congress passed a statute saying I can pick up the -- it's

17  right to pick redheaded men and that a constitutional

18  amendment is adopted making that constitutional.  Clearly,

19  somebody couldn't come in and challenge that on constitutional

20  grounds, but let's say somebody came in and said you've got

21  the wrong guy.  I'm not a redheaded man.  That would be a

22  claim cognizable and habeas as it was in the Bowman case where

23  the claim was purely factual.

24       Everybody agreed that a person could be held for

25  treason.  The question before Justice Marshall, Chief Justice

DLB                                                                              14

1    Marshall in the Court, was, is there sufficient evidence of

2    that?  Do the facts square with the legal authority?

3         Let me change the hypo just a little bit more.

4    Let's say that we go to war with Japan and the government

5    asserts the power to pick up all Japanese -- people of

6    Japanese descent in the United States, and goes on and does it

7    and somebody brings a habeas claim about that.  Now they could

8    challenge that on constitutional grounds and the Court might

9    or might not find that that's constitutional.

10        THE COURT:  Let me change the hypothetical.  Suppose

11   that an individual is arrested on the streets of Washington,

12   D.C., brought before a magistrate, a preliminary hearing is

13   held, probable cause is determined, and the individual files a

14   habeas corpus petition saying you've got the wrong man.

15   What's happens then?

16        MR. WILNER:  I think that there would be

17   jurisdiction to hear that.  You might in that case, you defer

18   to the power of process in that case, which is a Court

19   process.  But that's a claim -- excuse me, Your Honor.

20        THE COURT:  Well then -- okay.  Which raises the

21   question, accepting everything you say, should the Court not

22   defer to the process of the tribunal that made a

23   determination?

24        MR. WILNER:  The CSRT -- yeah.

25        THE COURT:  And your answer to that is no.

1              MR. WILNER:  My answer -- that is no for separate

2     reasons, but --

3              THE COURT:  But what are the reasons?

4              MR. WILNER:  The reasons are a myriad.  First of

5     all, let me say, you only get to that question if you accept

6     they have a right to review.  Once they have a right to

7     review, the question is whether you defer to the tribunal.

8              THE COURT:  Yeah.  I'm assuming that.

9              MR. WILNER:  Okay.  Well, the reasons for that start

10    out, first of all, this is a tribunal which wasn't authorized

11    by law.  It's not a Commission like what this Court confronted

12    in the Hamdi decision or what existed before in Curran or

13    Yamashita.  There was no statutory authority for the CSRT.  As

14    a matter of fact, the order announcing it was put in place by

15    the Deputy Secretary of Defense, not even the President, as --

16             THE COURT:  But let's assume we reject that on the

17    basis of the plurality opinion in Hamdi, and you can argue

18    back and forth, but assume it was required by the Hamdi

19    opinion, okay?  So what --

20             MR. WILNER:  I'm sorry.  I assumed that this

21    Commission was required by Hamdi.

22             THE COURT:  No, it's not required.  It's not

23    required.  At least put into effect in light of the Supreme

24    Court's opinion in Hamdi.  But then what is the basis for not

25    deferring to their judgement?

1          MR. WILNER:  Well, and I don't want to argue with

2     your hypothetical, but I think my first argument would be that

3     Hamdi authorized, you know, the possibility of these only if

4     they were appropriately authorized.  And so the first time I

5     see it, that doesn't meet the condition of Hamdi.  Is that the

6     words for you --

7          THE COURT:  Appropriately authorized or

8     appropriately structured - constituted.

9          MR. WILNER:  And properly constituted.  And properly

10    constituted.  We say it is not appropriately authorized.  It

11    was put in effect in this way.  Indeed it said it had no legal

12    effect.  But going beyond that, Your Honor, I'd say that

13    you've got to recognize the CSRT panel's Combatant Status

14    Review Tribunals for what they were.  They were a last minute,

15    after-the-fact attempt by the government to really displace

16    the Court's jurisdiction --

17         THE COURT:  What law are you relying on?  Let me

18    just cut to the chase here.  Doesn't your argument evolve down

19    into a due process argument?  That these tribunals, you can't

20    defer to these tribunals because these tribunals are in

21    violation of the Fifth Amendment due process clause.  And that

22    requires -- I'll just finish it and let you respond.  And that

23    requires us to get back to Judge Sentelle's question, to apply

24    the Fifth Amendment to an area that, you may disagree with us,

25    there is nothing in the complaints, that is not the sovereign

1    territory of the United States.  And the Supreme Court has

2    told us we can't do that in (indiscernible).

3              MR. WILNER:  Your Honor, I think that your

4    hypothetical actually accepts a wrong premise.  Let me just

5    try.  And the examples I gave, for instance, if -- let me

6    start the example again.  If we picked up Japanese and there

7    was constitutionality, and I'm not doing -- and a person came

8    in and he said, "I'm not of Japanese descent.  My name isn't

9    Hara, it's O'Hara and I'm Irish and you've just made a mistake

10   here."  He would have a right to go in and challenge that.

11   The question would be is there sufficient basis, in law there

12   might be, but is there sufficient basis in fact?  That's a

13   factual question.

14             Now before you ever get to questions of another

15   process, once you are at that point, the habeas statute kicks

16   in and the habeas statute has very specific procedures of what

17   happens when you're there.  It says somebody files a petition,

18   the government files a return.  That's what they've done now.

19   They filed a return.  Their CSRT procedure is in the form of a

20   return.

21             Let me -- the CSRT procedures should be treated the

22   way the government has treated them - as a return.  They are

23   nothing more.  They don't displace the procedures of the

24   habeas statute.

25             THE COURT:  With respect to the 12 individuals I

1    mentioned, when were the returns filed?

2            MR. WILNER:  The returns were filed in I think

3    October or November.  October/November.  What the government -

4    -

5            THE COURT:  October/November of last year?

6            MR. WILNER:  Yes.

7            THE COURT:  Last year.  And when did the District

8    Court rule in this case?

9            MR. WILNER:  The District Court in the Green case

10   ruled at the end of January.  So we had no opportunity.

11           THE COURT:  You had a couple of months.

12           MR. WILNER:  We weren't allowed.  No, she ruled.  I

13   mean they had filed their motion to dismiss.  We opposed the

14   motion to dismiss.

15           THE COURT:  But there was time in there where you

16   could have responded to the returns.  You could have traversed

17   the returns.  You said you had no opportunity, but the

18   District Court didn't order you not to file a traverse.

19           MR. WILNER:  Yeah, well, actually, Your Honor, at

20   that time, we moved for leave to do so.  We moved for leave to

21   take limited discovery as well and they were not acted on.

22   All opposed by the government, who said we had absolutely no

23   rights.  But I think it's an important thing.

24           THE COURT:  You moved to file -- a traverse is a

25   sworn statement by the Petitioners, is it not?

DLB                                                                            19

1          MR. WILNER:  Your Honor, you've got to remember

2    there was an issue -- I'm sorry.  I don't mean to put it that

3    way.  We had moved to go visit our people down in Guantanamo.

4    We were not granted that right until, what, the end of October

5    of last year?  We couldn't get down there because of logistics

6    until -- I couldn't get down there until the end of January.

7    So that's the first time to meet them.

8          THE COURT:  Is that because of the press of other

9    business or --

10         MR. WILNER:  No.  No.  It was not because of the

11   press of other business.  We were fighting and are still

12   fighting to get down there as often as we can and it's

13   normally opposed by the government.

14         The fact is, Your Honor, there is a factual question

15   here.  Since day one these people have said you've got the

16   wrong guys.  We want a fair hearing to determine that.  That's

17   all that's been ordered now and we haven't had that

18   opportunity.  There is no basis to dismiss a case on the basis

19   of their return, which we have not had the opportunity to

20   rebut.  You know, we have done everything we can to rebut it.

21   There's a factual issue now before the Court and it can't be

22   disposed of on a motion to dismiss.  And procedures of the

23   habeas statute, as Justice O'Connor pointed out in the Hamdi

24   opinion, have an outline of what's required under 22 --

25         THE COURT:  But Hamdi is not governing here, right?

1    This is not a Hamdi case, this is a Rasul case, right?

2              MR. WILNER:  This is the Rasul case.  Yeah.  This is

3    the Rasul case.  Your Honor, if you are implying -- yes.

4              THE COURT:  In Hamdi it was a U.S. citizen, who

5    certainly had the protections of -- or at least allegedly U.S.

6    citizen, certainly had the protections of the Fifth Amendment

7    and the other constitutional provisions, right?

8              MR. WILNER:  That's right, Your Honor.

9              THE COURT:  Taking you back to your colloquy with

10   Judge Rogers and with me as to the breadth of Rasul's

11   decision, the first sentence in that case is "these two cases

12   present the narrow but important question whether the United

13   States lacked, its Courts, lacked jurisdiction to consider the

14   challenges to the legality of the detentions of foreign

15   nationals captured abroad and connected with hostility and

16   incarcerated at Guantanamo Bay Naval Base, Cuba."  So the sole

17   question was jurisdiction, was it not in that case?  Nothing

18   about the merits of the claim, right?

19             MR. WILNER:  In defined that way, Your Honor, I

20   think that's right.  I think implicit in the Court's decision

21   -- can I just say something about that.  The government argues

22   that habeas is a subsidiary procedural right that follows from

23   substantive constitutional rights.  That's the basis of their

24   argument.  I disagree with that.  We disagree with that.  We

25   think the right to habeas review is an independent right

DLB                                                                        21

1    created by statute that does not depend on showing a

2    constitutional violation.  I believe that's true.  But if the

3    government is correct, that habeas is a subsidiary procedural

4    right that only follows from constitutional rights, then it

5    proves too much because then the Petitioners must have

6    constitutional rights because the Court decided they had

7    habeas rights.  So if they are in fact tied together, the

8    Court --

9            THE COURT:  The Court might have well have been

10   saying you have habeas writs in order to inquire into whether

11   or not your constitutional rights have been violated.  Or you

12   have constitutional rights that have been violated.

13           MR. WILNER:  Your Honor, I have two answers to that.

14   First of all, I think the language of the opinion is

15   inconsistent with that.

16           THE COURT:  I just read you the most summarized

17   language of that opinion, Counsel.

18           MR. WILNER:  Your Honor, with all respect, I think

19   there is other language and opinion though about the

20   constitutional rights.

21           THE COURT:  I thought you didn't even argue what --

22   did you argue in the Supreme Court, Mr. Wilner?

23           MR. WILNER:  No, I did not.

24           THE COURT:  No.  Good.  The brief that was filed in

25   the Supreme Court, did that say we're not -- all we're

1    contending is jurisdiction, we're not going to deal with what

2    substantive rights are involved?

3            MR. WILNER:  No, Your Honor.  It said that the issue

4    is jurisdiction.  To the extent that you believe jurisdiction

5    depends on the existence of substantive rights, then we

6    believe we have them.  And we made exactly the arguments that

7    the Court really adopts.  They said that Guantanamo --

8            THE COURT:  Well, you didn't.  I mean the Ahrens v.

9    Clark and the Braden case was in an amicus curiae.  It was

10   never argued before us.

11           MR. WILNER:  No, actually it was argued.  But you're

12   right because it was argued in the District Court and it

13   didn't go anywhere.

14           THE COURT:  Could I just back up to Judge Randolph's

15   earlier question because I want to be clear on this.  You say

16   we should treat the CSRT proceedings as a return by the

17   government to your petition.  In Hamdan, as well as in Hamdi,

18   and in Curran and Yamashita, in all of those cases the

19   prisoner had been charged with violation of the laws of war -

20   murder, whatever.  Except for Petitioner David Hicks, as I

21   read the record, no one has been charged.  So we're at that

22   initial stage of determining status.

23           MR. WILNER:  Yes.

24           THE COURT:  Now, following up on Judge Randolph's

25   point, and I need to be clear what your position is, if the

1  CSRT procedures included all of the protections that you say

2  they should, then -- and the CSRT's had ruled that your

3  clients were in fact enemy -- or had failed to rebut the

4  determination that they were enemy combatants, would you still

5  be arguing that on habeas there is a factual issue to be

6  determined by the Habeas Court?

7          MR. WILNER:  Your Honor, honestly, that's a more

8  difficult question.  I don't know whether we would.  In that

9  case, as the Court pointed out in Hamdan, we might be

10  restricted to challenging the decision afterwards.  In Hamdan,

11  the Court accepted that he could file a habeas case stating

12  claims afterwards.  But the difficulty here is, a) the CRT's

13  had none of those procedural rights.

14          THE COURT:  Yeah, but what I'm trying to understand

15  in your argument, and I didn't pick this up in your brief

16  candidly, is treating the CSRT's as returns because your

17  review is they don't comport with Fifth Amendment due process.

18  And I thought that was the thrust of Judge Randolph's question

19  and the point that Judge Green certified to us is whether or

20  not your clients have any Fifth Amendment due process rights.

21  Because that's the nature of your attack on the process that

22  has occurred.  And if I'm wrong about that, I need to be clear

23  about that.

24          MR. WILNER:  Your Honor, we do say that we have

25  rights under the Constitution and the Fifth Amendment,

1   fundamental rights under the Constitution.  I believe the

2   Court recognized that when it said that Guantanamo is not like

3   the Landsberg Prison.  It's much more like Micronesia in

4   Ralpho v. Bell.  But it says it's not like the Landsberg

5   Prison.  It's on the other side of the line.  It's within the

6   scope of U.S. law.

7           But we have another argument, which I think is the

8   correct argument here, that our right to relief does not

9   depend on showing a violation of the Constitution, that the

10  fundamental right of habeas corpus in Section 2241(c)1 of the

11  statute does not depend on it, has never depended on it.  What

12  it shows -- that's a statutory right, an independent statutory

13  right, that doesn't come from the Constitution.  Chief Justice

14  Marshall made that clear in --

15          THE COURT:  Where does it come from then?

16          MR. WILNER:  It comes from statute, Your Honor.  It

17  comes from statute.  The statute, Section 14 of the First

18  Judiciary Act in 1789 passed what is now 2241 in the habeas,

19  2241(c)1 of the Habeas Act, which gives the right to habeas to

20  anyone in custody under or by color of the authority of the

21  United States.  That basically codified the common law writ of

22  habeas.  And that -- it's an independent -- Chief Justice

23  Marshall made it clear.

24          THE COURT:  Are we sitting as a -- is it your

25  position we're sitting as a Common Law Court now?  That it

1    frees -- here's the question, did it freeze habeas corpus as

2    of 1789?

3             MR. WILNER:  Your Honor, as the Supreme Court said

4    in Sanseer (phonetic sp.), that habeas under that provision

5    exists at least as it did in 1789 at the time of the

6    suspension cause.  They said that in Sanseer.  So it exists at

7    least in that.  You're sitting as a Common Law Court.  You're

8    sitting as a Court enforcing a U.S. statute, which as the

9    Supreme Court has said really the meaning of the writ of

10   habeas corpus must be determined based on the common law.

11            With respect to the CSR --

12            THE COURT:  So, in other words, just want to be

13   clear.  These are not -- Judge Green didn't say anything about

14   this, right?

15            MR. WILNER:  No, he did not.

16            THE COURT:  Okay.  But you've made the argument,

17   whether it's in your complaints or not, you made the argument

18   to her.

19            MR. WILNER:  Yes, sir.  And to the Supreme Court

20   too.

21            THE COURT:  Right.  And so what you're saying is, at

22   a minimum, the District Court should have inquired into the

23   legality of the detention.

24            MR. WILNER:  Yes.  And the legality --

25            THE COURT:  And the legality of the detention

DLB                                                                                         26

1    depended upon whether these individuals were property detained

2    pursuant to the authorization to use military force.

3              MR. WILNER:  To all three -- (indiscernible).  I'm

4    sorry.  I missed the last --

5              THE COURT:  Detained, pursuant to the authorization

6    to use military force.

7              MR. WILNER:  That's one issue, but I think, Your

8    Honor --

9              THE COURT:  What are the other issues?

10             MR. WILNER:  Well, the lawful authority, the

11   government can't just detain anyone.  And it's asserted

12   authority to detain people who are enemy combatants.  There is

13   a legal question, and Mr. Oleskey will address it, how far the

14   authorization to use military force goes in doing that.  But

15   I'm saying aside -- putting the legal questions to the side,

16   there is another question here, a factual question, do you

17   have the wrong guy?  You know, even if you --

18             THE COURT:  I know, but you have to measure the --

19   whether it's the right guy or the wrong guy depends upon what

20   the authority is to detain.  And so if these are all al Qaeda

21   operatives, they've got the right guys, right?

22             MR. WILNER:  Yes.  But, Your Honor --

23             THE COURT:  According to the authorization to use

24   military force.

25             MR. WILNER:  Your Honor, there are two components to

1      the standard for habeas.  Legal authority.  Is this guy

2      properly held for treason?  Is he an enemy combatant?  And

3      that's one thing.  But putting those questions aside, what we

4      say, and have said from the beginning, no matter how broadly

5      you define that term, we don't fall within it.  We're like

6      O'Hara, not Hara.  That we're not there and we've never had

7      that fair hearing.  And it's not a question of measuring it

8      against the due process standard, it's a question of what

9      Courts do in habeas.  You know, we put in our petition, they

10     put in a return.  And by the way, the CSRT has retreated as a

11     return by the government.  That's what they are.  That's how

12     they treated them.  They put in the return, we get a chance to

13     traverse those.

14            Your Honor, I want to go -- can I reserve the rest

15     for rebuttal please?

16            THE COURT:  Yeah, sure.

17            MR. WILNER:  Thank you.

18            THE COURT:  Okay.  Thank you, Counsel.  Whatever

19     time is left you get back for rebuttal.  And we'll have

20     rebuttal on the principle issues before we close the courtroom

21     for class today.  On each issue, one at a time, before that I

22     should say.  Mr. Katsas?

23            MR. KATSAS:  Good morning.  May it please the

24     Court.

25            THE COURT:  Good morning, Counsel.

1          MR. KATSAS:  I would like to begin with the question

2     whether the aliens detained at Guantanamo Bay have any Fifth

3     Amendment rights.  The answer to that question, prior to the

4     Supreme Court's Rasul decision, would have been crystal clear,

5     both under one line of precedent, stretching back at least 60

6     years, standing for the proposition that the Constitution has

7     no extra territorial application outside of the sovereign

8     territory of the United States.  And under a separate line of

9     cases, exemplified by Spelar and Vermilya-Brown, standing for

10    the proposition that military bases like the one at issue at

11    Guantanamo Bay are, in fact, outside the sovereign territory

12    of the United States.

13          The detainees' claim here boils down to the

14    proposition that the Supreme Court's Rasul decision changed

15    the Fifth Amendment, changed the geographic scope of the Fifth

16    Amendment, at least to the extent of extending it to

17    Guantanamo Bay.  We think that reading of Rasul is simply not

18    supportable.

19          Judge Sentelle, as you mentioned --

20          THE COURT:  What's the basis for that rule?

21          MR. KATSAS:  The basis for?

22          THE COURT:  For the restriction to the sovereign

23    territory as opposed to any territory of the United States?

24          MR. KATSAS:  I think in Verdugo, the Supreme Court,

25    making clear that where the executive is acting outside the

1    sovereign territory of the United States --

2            THE COURT:  I would suggest to you that the basis

3    for the rule, I don't disagree with -- obviously, the Supreme

4    Court said that in Verdugo, but the basis for the rule is if

5    another country has sovereignty over the particular area, then

6    to apply our procedures is to require another sovereign to

7    adopt them.  And you can't do that.  It would be impossible.

8    But that doesn't -- and that certainly in Verdugo that applies

9    to Mexico.  He was arrested in Mexico.  But it doesn't apply

10    to Guantanamo.

11            MR. KATSAS:  I think it's more than that.

12            THE COURT:  Then what more is there?

13            MR. KATSAS:  It is the proposition, the general

14    proposition in Verdugo, that for better or worse, we live in a

15    dangerous world of nation states and the executive needs to be

16    able to act vigorously in his foreign policy functions without

17    the kind of restraints that one would expect with respect to

18    American citizens in this country.  The Supreme Court in

19    Eisentrager made a similar point, more emphatically, on the

20    specific question of conducting wars.

21            THE COURT:  I don't disagree with your reading of

22    Eisentrager.  I don't know that the detainees do either, or

23    your reading of Verdugo.  I'm just asking you what the basis

24    for this is.  And you say it's because we live in a dangerous

25    world.  That's it?

1            MR. KATSAS:  Well, I mean the Supreme -- one has to

2       draw a line somewhere between what's inside and outside, and

3       for constitutional purposes the Court has always drawn that

4       line at sovereignty.  The question is whether Rasul changed

5       that line with respect to the Fifth Amendment.  And we think

6       the answer to that question has to be no because, as Judge

7       Sentelle pointed out, the very first sentence in the Rasul

8       opinion defining narrow but important question presented is

9       one of habeas jurisdiction.

10           That definition and the question presented was no

11      accident.  The detainees in Rasul petitioned for certiorari on

12      both the habeas jurisdiction question and the Fifth Amendment

13      merits question.  The Supreme Court specifically denied cert

14      on the Fifth Amendment merits question, redefined the question

15      presented to be limited, as stated in the first sentence of

16      the opinion, went on to reason both with respect to

17      Eisentrager and with respect to Guantanamo in very habeas

18      specific terms, stated its holding in habeas specific terms,

19      and then at the end of the opinion repeatedly and emphatically

20      said that the merits of the case, including the Fifth

21      Amendment claims are not before us.  So I don't think there is

22      any defensible reading of Rasul that would go against what the

23      Supreme Court said at the beginning, in the middle, and at the

24      end.

25           Now the detainees cite two features of Rasul.  One

1   is Footnote 15, which, in context, we think stands only for

2   the proposition that the allegations are jurisdictionally

3   sufficient for purposes of Bell v. Hood.  The second snippet

4   from Rasul that they cite to is the proposition that the

5   characterization of the Guantanamo is outside the territorial

6   jurisdiction of the United States.  As you pointed out, Judge

7   Sentelle, it's hardly a square holding.  But after using the

8   phrase "territorial jurisdiction," jurisdiction, of course,

9   being a somewhat ambiguous term, the Court went on to equate

10  territorial jurisdiction with complete jurisdiction and

11  control, which is the term in the governing lease and which in

12  the governing lease is contrasted to the concept of

13  sovereignty.  The Court then --

14          THE COURT:  What does Cuba really have left in the

15  way of sovereignty over Guantanamo?

16          MR. KATSAS:  It has any number of things.  The

17  United States' rights in Guantanamo are to operate a naval

18  station, a naval and coaling station.  The United States is

19  specifically prohibited from engaging in commercial activities

20  under the lease.  We have to pay for the right to be there and

21  give Cuba --

22          THE COURT:  Cuba doesn't cash the check, does it?

23          MR. KATSAS:  I'm sorry?

24          THE COURT:  Cuba doesn't cash the check.

25          MR. KATSAS:  Well, that's their choice.  But the

DLB                                                                                                    32

1    bundle of rights that we have under that sort of arrangement

2    is far different from what we have let's say over insular

3    territories.  And let me spell out a few.  We couldn't

4    sublease Guantanamo.  We couldn't sell Guantanamo.  If there

5    were mineral resources under Guantanamo, we couldn't extract

6    them.  We couldn't move civilian government agencies down to

7    Guantanamo.  We couldn't have a sort of modern homestead act

8    to encourage civilians to settle in Guantanamo.

9            And take Puerto Rico by contrast, Judge Sentelle.

10   What we debate with respect to Puerto Rico are issues like

11   should the United States grant Puerto Rico either statehood or

12   independence?  I mean that's unthinkable with respect to

13   Guantanamo, precisely because the bundle of rights that we

14   acquired is limited to running the naval station and is very

15   much like the bundle of rights in Spelar and Vermilya-Brown,

16   both of which equated those treaties to the Guantanamo treaty

17   and in which the Supreme Court said we defer to the executive

18   branch view that leases of that nature do not affect the

19   transfer of sovereignty.

20           The second set of issues presented in -- if you

21   agree with us on our reading of Rasul, it follows that the

22   detainees have no Fifth Amendment rights.  And if that's true,

23   to the extent there are Fifth Amendment claims in the case,

24   whether they are habeas proper claims for release or

25   alternatively whether they are conditions of confinement

1    claims, obviously if the Fifth Amendment doesn't apply to

2    these aliens at Guantanamo Bay there is no Fifth Amendment

3    issue in the case and there is nothing about which to have a

4    hearing.

5            If you --

6            THE COURT:  Well, I don't -- why does that follow?

7            THE COURT:  Yeah.

8            MR. KATSAS:  I'm sorry?

9            THE COURT:  Why does that follow?

10            MR. KATSAS:  What question would be material on

11    those assumptions to any Fifth Amendment --

12            THE COURT:  Whether they are being held pursuant to

13    lawful authority.

14            MR. KATSAS:  Well --

15            THE COURT:  That's not a due process question.

16            MR. KATSAS:  I think it is a due process question if

17    --

18            THE COURT:  Well, let me give you a hypothetical.

19    In 1790, the year after the first Judiciary Act was passed,

20    someone is detained by federal officers for jumping off a

21    bridge.

22            MR. KATSAS:  Right.

23            THE COURT:  Okay?  And it turns out there is no law

24    against jumping off a bridge.

25            MR. KATSAS:  Right.

1          THE COURT:  All right.  And he brings a habeas

2    corpus action.  And the federal officers justifies detention

3    on the basis, well, it's a common law crime and there is a

4    factual issue there.

5          MR. KATSAS:  Yeah, I think that would be a valid

6    habeas claim.

7          THE COURT:  Then let's jump ahead to modern day.

8          MR. KATSAS:  Okay.

9          THE COURT:  And the claim here is there is no lawful

10   authority to detain us because we're not affiliated with al

11   Qaeda.  Isn't that a factual question?

12         MR. KATSAS:  The question whether or not -- there is

13   a question, there is a legal question about lawful authority,

14   which we'll discuss later I think.  The factual question

15   whether or not these detainees are affiliated with al Qaeda is

16   precisely the question resolved against the detainees in the

17   CSRT procedures.

18         THE COURT:  I understand that, but still they claim

19   -- this is the same series of questions I asked Mr. Wilner.

20   They claim that there is no deference due to that Military

21   Tribunal, right?

22         MR. KATSAS:  They claim that, but the controlling

23   opinion in the Hamdi case, Justice O'Connor's plurality, said

24   that even with respect to United States citizens, detained as

25   enemy combatants in this country, the extent of the process

1    due give them the enormously sensitive government interest at

2    stake and the executive power to make war and so on.  The

3    extent of process due would be consistent with -- would likely

4    be consistent with a Military Tribunal.

5            THE COURT:  Well, I think that's a different

6    question because you're talking about what due process rights

7    of an individual who is an American citizen named as an enemy

8    combatant.  I'm asking a different question.  What I'm asking

9    you is where do you get any authority for the proposition that

10   in a habeas action challenging the lawfulness of the detention

11   that we have to defer to a Military Tribunal.  I don't want to

12   make this too long-winded, but the habeas statute says the

13   only thing that we have to defer to are decisions by --

14   factfinding by Courts.  That's what the habeas statute says,

15   correct?

16           MR. KATSAS:  That's what it says, but --

17           THE COURT:  And there is nothing in the habeas

18   statute that requires us to defer to a Military Tribunal.

19           MR. KATSAS:  If --

20           THE COURT:  So where does it come --

21           MR. KATSAS:  I don't know what the point --

22           THE COURT:  Where does it come from that you think

23   that if they claim we're not lawfully detained because we were

24   arrested or detained in violation of the authorization to use

25   military force and this Combat Review Tribunal says no, you

1    are not, you are al Qaeda, a Court has to defer to the

2    military.  Where does that come from?

3            MR. KATSAS:  There are two separate questions.  If

4    the question whether the CSRT orders were properly -- were a

5    proper exercise of authority under the military orders and

6    then ultimately under the authorization for use of military

7    force.

8            THE COURT:  Let's assume they were.

9            MR. KATSAS:  That --

10           THE COURT:  That's essentially a legal question.

11           MR. KATSAS:  That's a legal question.

12           THE COURT:  (Indiscernible).

13           MR. KATSAS:  And I'm happy to discuss that.  If we

14    are right about that question and if Justice O'Connor is right

15    that the extent of due process can be satisfied in a Military

16    Tribunal, it seems to me, analytically, the detainees are in a

17    position, in a like position as if they were collaterally

18    attacking a judgment --

19           THE COURT:  Well, suppose they simply picked up a

20    shepherd and said we think you look like you might be al Qaeda

21    and dragged him over to Guantanamo.  Wouldn't it not be a

22    factual question as to whether they had made a seizure that

23    was outside their lawful authority under the orders and under

24    the authorization?

25           MR. KATSAS:  But the question whether or not that

1    individual is a shepherd was precisely the question put to the

2    CSRT and if -- my point is --

3         THE COURT:  Suppose the CSRT then says, well, there

4    is no real evidence whether he's just a shepherd or whether

5    he's al Qaeda, but we think he looks like an al Qaeda too.  We

6    have to defer to that finding?

7         THE COURT:  And let me just footnote, the actual

8    question before the CSRT was whether the detainee could offer

9    evidence to rebut the determination that they were al Qaeda or

10    Taliban related.  Which is a little different, isn't it?  In

11    other words, what Justice O'Connor was talking about was Army

12    Regulation 190, which is implementing Geneva III.  That's

13    different, and of course only four justices went along with

14    that, and two question that, at least as to a citizen.  So I

15    mean there is no binding authority on that issue, is there?

16         MR. KATSAS:  If you measure -- we take Hamdi as the

17    controlling opinion for purposes of this discussion because

18    you have the four Justice plurality and Justice Thomas, who

19    would have gone farther.

20         If you take the analytical framework of Hamdi,

21    Justice O'Connor, applying Mathews v. Eldridge balancing to

22    determine the extent of due process rights of American

23    citizens, who obviously have them, said that, of course,

24    military exigency will profoundly shape the extent of process

25    due.  And she said it would be permissible to consider

DLB                                                                                    38

1   hearsay, it would be permissible to have a presumption in

2   favor --

3            THE COURT:  No, I understand that, Counsel.  But all

4   I'm saying is that there is no holding there that says what

5   procedures appear in the CSRT's are consistent with what

6   Justice O'Connor was talking about and I inference --

7            MR. KATSAS:  That's not a holding in Hamdi about the

8   CSRT's because they weren't then in existence.

9            THE COURT:  No, no, no.  But I mean Petitioners, in

10  their brief, have repeatedly pointed out the distinctions

11  between the procedures before the CSRT's and the procedures

12  under Army Regulation 198.

13           MR. KATSAS:  Well, Justice O'Connor cited Army

14  Regulation 190-8 as a set of procedures that would likely be

15  constitutionally sufficient to support even the detention of

16  an American citizen as an enemy combatant.  Now --

17           THE COURT:  So let me -- go back to Judge Randolph's

18  question, so I understand what your answer is.  You're saying

19  that a Habeas Court, if it determines, these are my words, not

20  yours, but I want to see if you agree because this is what I

21  understand your argument to be, that if the Habeas Court finds

22  that the CSRT's were authorized --

23           MR. KATSAS:  Right.

24           THE COURT:  -- and if the procedures before the CSRT

25  are, and you have to finish my sentence here, then the Habeas

1    Court's job is over.  And I thought Judge Randolph's question

2    was trying to fill in the blank there.  And the blank might be

3    under the reasoning of Justice O'Connor that the Habeas Court

4    can conclude that the procedures in the CSRT, or order, are

5    sufficient to protect against all reasonable detention of

6    wrongful people.

7            MR. KATSAS:  Okay.

8            THE COURT:  And if there is a shepherd in there, it

9    may be true that the shepherd gets caught up in the process,

10   but because we're in war, this is miliary, there are lots of

11   different judgments involved that Courts are incompetent to

12   deal with, we never get to the individual shepherd case.

13           MR. KATSAS:  No.  Not exactly.  What we do, Judge

14   Rogers, is ask the question which tribunal, as between a

15   Habeas Court and a Military Tribunal gets to make the

16   determination of shepherd or al Qaeda in the first instance

17   and then --

18           THE COURT:  So it's -- the breadth of the first

19   instance may be the question.  Is that a decision to which we

20   defer.  If so, what standard of review?  Or is it a rebuttable

21   presumption?  If so, what standard of review?

22           MR. KATSAS:  I think if I -- legal challenges --

23           THE COURT:  Factual challenge.

24           MR. KATSAS: I think if you assume, for purposes of

25   this question, that the procedures, the CSRT procedures, are

1    legally sufficient to satisfy any due process requirements --

2             THE COURT:  I understand that the right of habeas

3    exists independent of, and prior to, the due process clause.

4             MR. KATSAS: Of course, Judge Sentelle, but the right

5    of habeas is a cause of action to challenge the detention.  It

6    doesn't tell you about --

7             THE COURT:  And it exists if there is an unlawful

8    detention.  And as Judge Randolph posited, in the time between

9    the ratification of the Constitution and the adoption of the

10   Bill of Rights there could have been an unlawful detention.

11            MR. KATSAS:  Sure.  But if the military process is

12   both duly authorized and constitutionally sufficient under the

13   standards suggested --

14            THE COURT:  I find this argument really very

15   difficult to grasp.  On the one hand you began by saying the

16   Fifth Amendment due process clause doesn't apply to

17   Guantanamo.

18            MR. KATSAS:  Right.  This is our fallback.

19            THE COURT:  Okay.  Point one.  Point two --

20            MR. KATSAS:  If we win that, this conversation

21   becomes immaterial.

22            THE COURT:  Well, that is where I sort of get off

23   the boat.  Suppose the Fifth Amendment doesn't apply?  But

24   there is still the question whether these individuals were

25   detained under lawful authority of the United States.

1      Regardless of what the process is.  Why isn't that still a

2      question?  If somebody was held by the military that it was

3      clear they had no connection with 9/11, no connection with al

4      Qaeda, no connection with the Taliban, why aren't they

5      entitled to due process?  Or not due process, but habeas

6      corpus?

7              MR. KATSAS:  Because if the process is sufficient

8      and the claim by that person --

9              THE COURT:  But you see the premise of your answer

10     is the process by, if they got process, but the process

11     comports with due process, therefore the Court defers.  But

12     that -- so then we have to examine.  That requires us, does it

13     not, Mr. Katsas, to examine, exactly like Judge Green did,

14     examine whether the combatant tribunals comport with due

15     process.  Which is what you say doesn't apply.

16             MR. KATSAS:  Judge Randolph, assuming due process

17     rights apply to Guantanamo, there is a separate question that

18     --

19             THE COURT:  I'm not assuming that.  I'm assuming

20     they don't apply.  And so what I'm asking you what's left and

21     you say nothing.  And my response, the question I still need

22     an answer to, is what about a claim that we're detained

23     without lawful authority.  It's not a due process claim.  It's

24     a straight habeas corpus 1789 claim.

25             MR. KATSAS:  And then the question -- there would be

1    a legal question whether the orders rendered -- whether the

2    CSRT tribunal has lawful authority to make the enemy combatant

3    determination.  My point on the shepherd, my point is simply

4    if we have that authority under the AUMF --

5         THE COURT:  You have what authority?  That authority

6    doesn't tell me a thing.

7         MR. KATSAS:  The authority to detain, to determine

8    who is an enemy combatant and then to detain that person.

9         THE COURT:  With or without evidence?

10         MR. KATSAS:  I'm sorry?

11         THE COURT:  With or without evidence?  I mean if you

12    had no evidence he was an enemy combatant, you could still

13    detain him lawfully?

14         MR. KATSAS:  If we set up a process in which that --

15         THE COURT:  So you are back to process and you are

16    still not dealing with Judge Randolph's period of time when I

17    think 11 states, I don't think we had 13 yet, but when there

18    was a Constitution but not yet a Bill of Rights, there was no

19    due process clause, but there was a habeas protection.

20         MR. KATSAS:  There is a habeas --

21         THE COURT:  The habeas must go beyond due process

22    when you are talking about unlawful detention.

23         MR. KATSAS:  It could give you the -- yeah, it could

24    give you the right to challenge, to raise the question,

25    whether this system is lawfully authorized under --

1          THE COURT:  I'm not talking about a system.  We're

2     talking about the individual's detention.

3          MR. KATSAS:  And my point is that if there is a

4     permissible -- if there is a military process that is

5     authorized in the sense of legal authority and if the

6     procedures comport with whatever due process minimums exist,

7     then the question of evidence and factual innocense is

8     properly adjudicated by that tribunal just as in an ordinary

9     2254 case if there is a duly authorized state court to

10    adjudicate a question of guilt or not.  That's the tribunal in

11    which --

12         THE COURT:  Yeah, but that's because the habeas

13    statute requires deference to the factfinding of the State

14    Court.  But there is nothing in here, in the statute anyway,

15    that requires deference to a Military Tribunal.

16         What is the situation in Immigration cases when

17    someone is held to be deported and the Immigration authorities

18    make a determination they're deportable and they bring a

19    habeas action?  Do the Federal Courts defer to the

20    determination of the Immigration authorities?  Are there cases

21    on that?

22         MR. KATSAS:  I don't know the answer to that.

23         THE COURT:  There are also some statutes that

24    address some of those.

25         MR. KATSAS:  I'm sorry?

1          THE COURT:  There are also some statutes Congress

2     has passed that have addressed precisely the question Judge

3     Randolph poses.

4          MR. KATSAS:  Oh, and if there were --

5          THE COURT:  And we don't have that here.

6          MR. KATSAS:  If a detainee has -- seeks to enforce a

7     right under a statute, habeas challenging custody, habeas

8     would give the detainee a cause of action.

9          THE COURT:  Yeah, I know, yeah.  But there's nothing

10     that says absence such a statute, is there?  That Habeas Court

11     defers to the Immigration Agency determination?

12          MR. KATSAS:  Well, let's -- I don't know the answer

13     to Immigration, but let's focus on enemy combatant

14     determinations, which the Supreme Court said are the

15     fundamental incident of waging war.  Justice O'Connor suggests

16     that Military Tribunals are a permissible forum in which to

17     make enemy combatant determinations.  It makes no sense to

18     both say that and then to say that on habeas review a

19     Petitioner can come in and simply say I am innocent, I am not

20     an enemy combatant, and then re-litigate de novo the precise

21     question that on -- by hypothesis.

22          THE COURT:  There is a difference between re-

23     litigating de novo and reviewing the decision of another

24     tribunal.  I mean we do that all the time.  We review

25     decisions of other tribunals with various standards of review.

1          MR. KATSAS:  Right.

2          THE COURT:  I don't know that anybody is saying it

3     has to be a de novo review.  It could be for substantial

4     evidence.

5          MR. KATSAS:  I mean Judge Green seemed to

6     contemplate some sort of factfinding, some sort of de novo

7     factfinding.  Judge Sentelle, I agree with you.  If there were

8     a sufficiency type review, if any such review were appropriate

9     in this context, I think it surely would have to be enormously

10    deferential.  In a garden --

11         THE COURT:  You can't agree with me.  I asked a

12    question.  You can't agree or disagree with the question.

13         THE COURT:  Judge Green didn't reach any of what we

14    are talking about.

15         THE COURT:  Yeah.

16         THE COURT:  Judge Green was making her decision on

17    the basis that the due process clause applies to Guantanamo,

18    right?

19         MR. KATSAS:  Right.  The due process clause applies

20    and then --

21         THE COURT:  And I think the premise of the questions

22    that you are hearing from us is let's assume it doesn't.  What

23    is left?  And that is an issue that Judge Green never

24    addressed.

25         MR. KATSAS:  The Court would be left, or the various

1    other claims, I mean the ATS claim that they've asserted --

2              THE COURT:  Was a common law habeas claim.  That's

3    what's left.  That's one thing that's left anyway.

4              THE COURT:  That's the hard claim that's left.

5              MR. KATSAS:  I mean there is a --

6              THE COURT:  I don't know -- by the way, I don't know

7    why it has to be a common law habeas.  I mean the argument it

8    seems to me is they are being held in violation of the law of

9    the United States.  And that law, you agree that the -- do you

10   agree that the authorization to use military force is a law of

11   the United States?

12             MR. KATSAS:  Oh, absolutely.

13             THE COURT:  Yeah.  And it has extra territorial

14   effect, does it not?

15             MR. KATSAS:  Sure.

16             THE COURT:  It applies in Guantanamo, it applies in

17   Afghanistan, it applies in France, Belgium, Bosnia, right?

18             MR. KATSAS:  Sure.

19             THE COURT:  Okay.  So there is no problem with extra

20   territoriality or anything else.  The question is whether that

21   law authorized the detention of these individuals, and that's

22   a factual question, and it's also a legal question.

23             MR. KATSAS:  It's a legal --

24             THE COURT:  Well, it's both.  I mean you have to

25   determine the scope of the law and whether these individuals

1    fit within it.

2              MR. KATSAS:  The question whether the authorization

3    for use of military force authorizes the military regime set

4    up in the military orders by the Deputy Secretary and the

5    Secretary of the Navy is a legal question.  We think the

6    answer to that question surely has to be yes, because the AUMF

7    authorizes necessary and appropriate military force and the

8    Supreme Court in Hamdi said that detaining enemy combatants is

9    necessary and appropriate precisely because it is a

10   fundamental aspect of waging war.  That's your authorization

11   point.  Then there is the distinct point about what procedures

12   are constitutionally compelled in order to figure out who is

13   an enemy combatant.

14             THE COURT:  Let me test this a little bit, Mr.

15   Katsas, so I can understand your position.  Suppose that an

16   individual is, in fact, detained in Afghanistan, brought to

17   Guantanamo, and like all the individuals before these

18   tribunals were set up, has given -- there is no tribunal.  And

19   that individual hasn't been before a tribunal.  That

20   individual brings a habeas corpus action.  What does the Court

21   do with that?

22             MR. KATSAS:  The Court could -- the Court would have

23   a question whether an alien --

24             THE COURT:  And the action is based on I'm not

25   within the authorization to use military force.

1          MR. KATSAS:  Right.  And it's an alien held abroad.

2          THE COURT:  Held in Guantanamo.

3          MR. KATSAS:  Yeah.  I think the answer to that

4    question would be no habeas review, because the AUMF is not

5    judicially enforceable by aliens and --

6          THE COURT:  Well, if that's the answer to that

7    question, then the fact that these tribunals operated is

8    irrelevant to your position.

9          MR. KATSAS:  That's -- sure.  But we have many

10   alterative layers here.  In Hamdan, you reserved an analogous

11   question whether a detainee could make a separation of powers

12   argument that the President acted Ultra Vires.

13         THE COURT:  Okay, but we have your answer, and the

14   answer you gave is that, forget about the tribunals, that the

15   habeas corpus couldn't do anything.  For the individual

16   detained, no process, he's in Guantanamo, brings a habeas

17   action, the Habeas Court couldn't do anything.  That's your --

18   that's what you just said.  What I don't get is why not?

19         MR. KATSAS:  Because that alien still needs a source

20   of rights to claim either that the detention was unauthorized

21   or that the detention was in violation of a constitutional

22   provision.  And then you would have the question whether --

23         THE COURT:  And the alien holds up the habeas

24   statute and says, "Here's my source of rights.  You can't hold

25   me without lawful authority, period.  And you don't have

1    lawful authority.  That's my right."

2              MR. KATSAS:  Lawful authority.  But that's different

3    from what I understand our opponent's notion of the common law

4    to be, which is that a judge has a sort of free floating

5    discretion to make a determination whether or not there is

6    sufficient cause, independent of the question, whether there

7    is any source of positive law, any constitutional right being

8    violated.  But --

9              THE COURT:  But if there is a positive law source,

10   you still have to bring this prisoner within it, don't you?  I

11   mean it brings us back to the shepherd.  You can't just come

12   in and say we have the right to arrest the detained enemy

13   aliens, enemy combatants.  This guy was out in the field.  He

14   looks like an enemy combatant.  Is that enough for you to hold

15   him against the habeas?

16             MR. KATSAS:  What we can say is that the shepherd

17   has no constitutional rights.  As an alien abroad, can't

18   challenge authorization.  Alternatively --

19             THE COURT:  Can challenge in Guantanamo.

20             MR. KATSAS:  If he could challenge authorization,

21   this detention is authorized, he is afforded constitutionally

22   sufficient procedures and if he has a claim of factual

23   innocence, he makes it to the CSRT, subject at most to very

24   deferential review under something like a sum evidence --

25             THE COURT:  You got us then too at a review?  Are

1    you conceding a possibility of a review?  You just said at

2    most a very deferential review.  Is that --

3            MR. KATSAS:  We think there is none.  There is no

4    review of sufficiency fact-based type questions.  My time is

5    running low, but I'll tell you quickly.

6            THE COURT:  Your position is that the authorization

7    to use military force empowers the unreviewable discretion of

8    the military to detain anybody.

9            MR. KATSAS:  We're saying it's not judicially

10   enforceable by aliens.  But if we're wrong about that, we are

11   also saying that this system of enemy combatant detentions

12   fall squarely within an authorization that --

13           THE COURT:  Unless my colleagues have further

14   questions, your red light is on.  We will hear rebuttal.

15           MR. KATSAS:  Thank you.

16           THE COURT:  How much time is left for rebuttal?  You

17   have four minutes for rebuttal, Counselor.

18           MR. WILNER:  Thank you, Your Honor.  Let me just

19   make two quick points.  The government argument, and the

20   government just said, that these aliens at Guantanamo have no

21   rights.  Well, they clearly have the right to the writ of

22   habeas corpus, which has been called the most fundamental

23   right developed under the common law - the right to review the

24   legality of their detention.  I agree with Judge Randolph, the

25   question is whether they are held in accordance with U.S.

1   legal authority, and that is both a legal question, the scope

2   of the definition of enemy combatant, and also a factual

3   definition, however you define it, do they fall within it, and

4   they say no.

5           I think the government makes another fundamental

6   error.

7           THE COURT:  Common Law Courts in England, if the

8   King detains somebody and puts them in the tower, and somebody

9   brought a petition for a writ of habeas corpus, what would the

10  Courts in England do about that?

11          MR. WILNER:  Exactly what started out -- the whole

12  idea of habeas -- of course, we start out, the government or

13  the King or our government doesn't just have the right to

14  detain people.  They've got to point to some authority to do

15  it.

16          THE COURT:  Okay.  The King says that I'm holding

17  this individual for treason.  That's my return.

18          MR. WILNER:  And then the King -- the whole point of

19  habeas, it's a procedure which requires the custodian to come

20  forward and give a legal and factual justification for holding

21  these people.

22          THE COURT:  Suppose there is a factual.  The reason

23  treason, he said he engaged in seditious liable, all right?

24  And that's all.  And gave a few details.  Now do the Common

25  Law Courts of England then hold a evidentiary hearing to

1      determine whether that was true or not true?

2             MR. WILNER:  Yes.  And Chief Justice Marshall in

3      Bowman goes through this.  There is a difference.  If somebody

4      is being held for trial, the question would be is there really

5      probable cause to commit this person to the charge of treason,

6      trial on treason.  And what Chief Justice Marshall did in

7      there, he said, look, first we look what does treason mean?

8      And then he said, well, what is the evidence that you're

9      presenting as a reason for committing this person?  I mean he

10     said is there sufficient evidence to commit him on treason?

11     And they examined that evidence in detail, found it was

12     totally insufficient, and discharged him.  So that's a

13     question -- but I think this point is really important that

14     you're making.

15            The government's misconception is that somehow that

16     what we have brought is a collateral attack on another

17     proceeding, on a prior proceeding.  Well, that's not what we

18     brought.  We didn't bring a collateral attack on a prior

19     proceeding authorized by law.  It's not like challenging a

20     State Court.  This is a basic challenge to executive

21     detention.  And in that case, and you've got to remember that

22     the CSRT's, the tribunals they're talking about, weren't put

23     in place until long after our case was filed.  Indeed, not

24     until --

25            THE COURT:  Well, but that's not fair.  When your

DLB                                                                    53

1    case was filed, you didn't make any of the arguments that

2    you're making now.

3                MR. WILNER:  Well, Your Honor, excuse me, I really

4    think we did.  Oh, I've just got 56 senticans (phonetic sp.)

5    today.  I really think we did.  We said we have a right under

6    the habeas statute.  That's not what's in our jurisdictional

7    base.  A right to a determination.  But you know --

8                THE COURT:  There was no common law habeas claim.

9                MR. WILNER:  Yes, Your Honor -- well, we certainly

10   made it very squarely in the Supreme Court saying exactly the

11   hypothetical you did.  If this happened -- if we brought a

12   case before the Bill of Rights was enacted we would have that

13   right.  But my point is that they put this procedure in, not

14   only long after we filed the case, but long -- but after the

15   Supreme Court ordered it back to the District Court to --

16               THE COURT:  I don't understand what's wrong with

17   that, if this is habeas.

18               MR. WILNER:  Your Honor, what's wrong with it I

19   think is what they were trying to do.  Once this was remanded

20   at the District Court, the procedures of the habeas statute,

21   enacted by Congress, apply, and they require a traverse --

22               THE COURT:  That argument seems to be assuming that

23   once they have detained somebody wrongfully, they have to let

24   him go if it's found to be wrongful.  That they can't --

25               MR. WILNER:  No.

DLB                                                                           54

1          THE COURT:  -- cure the wrong that they've committed

2     and continue to hold him.

3          MR. WILNER:  No, no, but at that point, you're

4     before a Court.  You can't just take the jurisdiction away

5     from you, Your Honor, when Congress has given it to you.

6     That's a Congressional enactment.  The executive can't put

7     through some --

8          THE COURT:  Congress gave the right to habeas --

9     gave the jurisdiction to hear habeas.  But assuming that there

10    is something wrong and it can't ever be cured is quite

11    different than saying that jurisdiction can't be taken away.

12         MR. WILNER:  But, Your Honor --

13         THE COURT:  What were they supposed to do when the

14    Court said the detention is unlawful?  Continue to hold people

15    unlawfully?

16         MR. WILNER:  No, Your Honor, absolutely not.  But

17    what they did then is put in -- the statute triggers

18    procedures at that point and the executive has no authority

19    and there is no precedent for taking it away from them.  2243,

20    2246, 2248 have procedure.

21         THE COURT:  By the way, do you know how much help it

22    would have been if one of you all had included in your

23    supplement, your statutory appendix, the statutes that deal

24    with habeas?

25         MR. WILNER:  I think we put in the habeas statute.

1    Yes, we did, Your Honor.

2          THE COURT:  I mean the fact of the matter is we're

3    somewhat --

4          THE COURT:  (Indiscernible).

5          MR. WILNER:  I'm sorry?  I --

6          THE COURT:  We're somewhat at sea here because the

7    Rasul case does not connect -- it's difficult to fit the

8    situation here with the statute, the habeas corpus statute, as

9    it is written now.  The habeas statute, as written now, does

10   not seem to contemplate the sort of situation we have.  And

11   that's why I asked you whether you think we're sitting as a

12   Common Law Court as well, whether -- because you are relying

13   on the common law of habeas corpus, whether that's frozen in

14   time in 1789 or whether that too has to be accommodated, as a

15   Common Law Court would do to a particular situation that's

16   facing us now.

17         MR. WILNER:  Your Honor, habeas, 95 percent of the

18   habeas cases are under 2254 or 2255, dealing with prior

19   convictions.  This is an unusual case.  Thankfully it is

20   unusual because we haven't had many executive detentions in

21   the last 200 years.  But really what the Court did in Hamdi --

22         THE COURT:  Well, how many people were detained in

23   World War II?  Millions.

24         MR. WILNER:  There weren't -- the only habeas cases

25   I'm aware of are those that were after -- following a military

1    commission.  You know, Your Honor, most of the people there

2    were in uniforms.  There was no question about them.

3         THE COURT:  But you said there were no executive

4    detentions.  There were millions of people.

5         MR. WILNER:  But they were -- Your Honor, well, one

6    thing is this is a case, this is why I say it's not a

7    collateral attack.  When we first came to this Court, the

8    government had never followed its procedures.  There were no

9    hearings.  The Article V hearings or something -- and that's

10   one -- you know, they've got to follow their hearings.  This

11   whole case probably came up because they didn't follow their

12   procedures.

13        You know, if they had followed their procedures, the

14   case would probably have never been filed and most of these

15   people would have never been at Guantanamo.  What they did is

16   they waited until after the Supreme Court remanded it to the

17   District Court and then suddenly put a procedure in place.  By

18   that time, the statutory procedures at 2243, 2246, and 2248

19   are in place, and they couldn't displace Congressional

20   mandates of what should occur.  Thank you very much, Your

21   Honor.

22        THE COURT:  Your light is on and it's now time for I

23   guess Mr. Oleskey to further enlighten the Court.

24        MR. OLESKEY:  May we have a moment to shift, Your

25   Honor?

DLB                                                                                      57

1          THE COURT:  We are going to take a brief recess

2     before we proceed further.

3               (Recess.)

4          THE COURT:  It's beginning to be a long day.  We

5     don't promise there won't be another recess before we get

6     done.  Go ahead, Counselor.

7          MR. OLESKEY:  Good afternoon, Your Honor.  Stephen

8     Oleskey for the Boumediene Petitioners.  And also associated

9     with the argument of the El-Banna Petitions, who are the

10    English residents who were seized in Africa in cases 5107,

11    5108.  I want to make it clear that I adopt, as we did in our

12    brief, the arguments made by Mr. Wilner on C-1.

13         THE COURT:  Did you make any of those arguments

14    before Judge Leon?

15         MR. OLESKEY:  We made -- I'm sorry, Your Honor, were

16    you through?

17         THE COURT:  Judge Leon, did you make any of those

18    arguments?

19         MR. OLESKEY:  We argued C-1, but our predominant

20    argument was on C-3, Your Honor.

21         THE COURT:  You argued that there is a common law

22    right to that -- that applies here?

23         MR. OLESKEY:  Yes.

24         THE COURT:  I looked for that, but I didn't see it.

25         MR. OLESKEY:  We had a long footnote before Judge

1    Leon and we raised that argument in a footnote with you

2    because we knew that the Al Odah Petitioners were briefing,

3    argument that case, as they have.  I want to make it clear

4    that our Petition, with cites 2241, and --

5              THE COURT:  Judge Leon didn't mention that argument.

6              MR. OLESKEY:  Judge Leon didn't mention many of the

7    arguments, which he termed, in general, frivolous without

8    merit and the like.  That was one of the difficulties that we

9    had with Judge Leon, Your Honor.

10             THE COURT:  As our former colleague, Edner Mitner

11   (phonetic sp.) would say THE COURT:

12             MR. WILNER: anything stuck in the margin is deemed

13   to be of marginal importance.  You understand that, Counselor.

14             MR. OLESKEY:  Thank you, Your Honor.  I'm not going

15   to address the C3R at length because it's been addressed in

16   your questions with Mr. Wilner and is discussed at length in

17   our brief.  I simply want to say that we can't lead Rasul in

18   light of this Court's decision in Al Odah without coming to

19   conclusion that the Footnote 15, while brooding about in part,

20   6 of Rasul, which says the matter is remanded to the District

21   Court for consideration of merits, that that means something

22   and that the government has never given any explanation really

23   that's cullible (phonetic sp.) as to what it means.  And that

24   the footnote, which takes you back to the Verdugo case, the

25   insular cases, is really all about a parallel between

1    Guantanamo as being a place where the U.S. exercises its laws

2    to the fullest.  Much like that was found, we did in the

3    Philippines.  Much like was found, we did sufficient in the

4    Marshal Islands for purposes of this Court's decision in

5    Ralpho.  So that what has been referred to as the fundamental

6    rights, which liberty is pre-eminent, get extended in those

7    limited circumstances.  That's the core of the argument.  I

8    understand that the Court has it and you are either going to

9    agree with our position, the brief, that the Supreme Court

10   resolved it, and that the government should not be re-

11   litigating that case here, or you won't.  But I know you'll

12   understand.

13           THE COURT:  The government resolved what precisely,

14   Counselor?  You just said the government -- that Rasul

15   resolved it.  What is the it that Rasul resolved?

16           MR. OLESKEY:  We believe Rasul resolved the question

17   whether the Guantanamo detainees have constitutional rights to

18   raise permanent or indefinite deprivation of their liberty in

19   Guantanamo in the habeas proceeding.  That's what that --

20           THE COURT:  Because of Footnote 15?

21           THE COURT:  Yeah, to raise it, but does that mean

22   that they have constitutional rights?

23           MR. OLESKEY:  Well, this Court said, as I read your

24   Al Odah decision, that the rights are secondary to

25   jurisdiction.  If there is no right, there is no jurisdiction.

1    The Supreme Court then said there's jurisdiction.  I can't

2    read --

3              THE COURT:  Forget we said anything.  Just look at

4    Rasul and tell me how the Supreme Court resolved that

5    question.

6              MR. OLESKEY:  They resolved it in the footnote,

7    which I described and which is discussed at length in our

8    brief and in the instruction in Part 6 at the very end, to

9    return the matter in the first instance to the District Court

10   for consideration of the merits.

11             THE COURT:  Well, Mr. Katsas raises a good point.

12   What about the question presented refrained by the Supreme

13   Court?  How can you say that in light of the Supreme Court's

14   rejection of a question presented that would have raised the

15   very issue you are arguing?

16             MR. OLESKEY:  I think the Supreme Court went out of

17   its way and Footnote 15 and Part 6 to make the point that they

18   were reversing Al Odah because the war rights that could be

19   asserted by these men in Guantanamo.  And that the reference

20   to Justice Kennedy's concurrence in Verdugo and to the line of

21   cases there to include the Balzac case and the Dorr case, both

22   of which this Court had cited in Al Odah, can only mean that

23   the Court was analogizing Cuba, that little piece of Cuba that

24   we completely control, to the situation that existed in the

25   insular cases in the territories.

1          THE COURT:  And did not have Rasul.  Would you have

2     any claim to the possession of constitutional rights by the

3     detainees in Guantanamo?

4          MR. OLESKEY:  Well, we do have Rasul, of course.

5          THE COURT:  Yeah, but that's why I asked you the

6     question if we didn't have it.

7          MR. OLESKEY:  Well, I know.  That was the argument

8     as I understand it two years ago in this Court and then --

9          THE COURT:  I understand that two years ago, Supreme

10    Court reversed in Rasul and stated the question in the habeas

11    jurisdictional terms.  I'm asking you a hypothetical question

12    if they had not take that case at all, if we had not had the

13    Barra case at all, if we had only Eisentrager to look at,

14    would you have a claim to constitutional rights?

15         MR. OLESKEY:  Yes.

16         THE COURT:  You would?  Tell me about that.

17         MR. OLESKEY:  Because Guantanamo is not Landsberg

18    Prison in Germany.  There had been a military process there

19    under military commissions.  That had all happened and the

20    United States was a power that shared rights to occupy Germany

21    and rights over that prison at that time and these men were

22    essentially convicted of an offense against the laws of war,

23    namely continuing resistance after the surrender of Germany.

24         THE COURT:  Did not Eisentrager hold though that the

25    prisoners could not even assert those rights in an American

1    Court?  Because a good deal of the rationale has to do with

2    the military having to come back to defend, not to the kind of

3    factual based merits argument you're making now.

4              MR. OLESKEY:  Well, they did look at the merits

5    there.  Look at the merits in Curran and both of those cases I

6    think have to be seen in light of what was happening in World

7    War II.

8              THE COURT:  What I'm asking you is we can't grant

9    your petition, or we can't rule in your favor here, can we,

10   unless we hold that Rasul overruled Eisentrager?

11             MR. OLESKEY:  Yes, you can.

12             THE COURT:  We can?

13             MR. OLESKEY:  You can find that Rasul and

14   Eisentrager are harmonious for the reasons that I've just

15   stated.

16             THE COURT:  Because Guantanamo is sovereign

17   territory of the United States?

18             MR. OLESKEY:  Sufficient for purposes of habeas,

19   yes.

20             THE COURT:  If we had only Justice Kennedy's

21   concurrence, you might have a good argument there, but they

22   don't even need his concurrence.  We have to look to the

23   majority, not to the concurrence.  And where in the majority

24   do we find the position that you are arguing here?

25             MR. OLESKEY:  The majority is the entity that put

1    Footnote 15 in.

2              THE COURT:  Footnote 15 is your best argument, isn't

3    it?

4              MR. OLESKEY:  Yes.  And then directly --

5              THE COURT:  Virtually your only argument.

6              MR. OLESKEY:  Well, and then directively, the case

7    back for consideration.

8              THE COURT:  But the problem with that is a steel

9    company problem.  The Supreme Court was looking at

10   jurisdiction.  They are not at merits.  That's all they looked

11   at as far as the clarity of the sentence at the beginning of

12   the opinion, the narrow issue that we decide today is, and

13   then as I read it to your co-counselor.

14             MR. OLESKEY:  Let me pass on to --

15             THE COURT:  You know, Justice Douglas, in a case

16   called Tidewater Oil Company, said in a descent footnotes

17   don't count.  He said that in a footnote, by the way, which is

18   --

19             MR. OLESKEY:  Point taken, Your Honor.  Just

20   wrapping up that colloquy, Your Honor, we think that that

21   footnote confirms the vitality and validity of the insular

22   cases.

23             THE COURT:  I'm not sure, you went awhile ago to

24   Part 6 of the opinion, I'm not sure why you think it supports

25   your position here.  Part 6 is very short and seems to again

1    being declaring a rather narrow question of review, doesn't

2    it?

3           MR. OLESKEY:  The last sentence, which I take to be

4    the summing up in the instruction that the Court is giving the

5    Lower Courts, I'm sorry, I have it here somewhere.  I believe

6    says in substance, therefore the matter is remanded to the

7    District Court for further consideration in light of the

8    merits.

9           THE COURT:  What about the first sentence and the

10   second sentence of 6?  And there is only about three or four

11   sentences.  "Whether and what further proceedings may become

12   necessary after Respondents make their response.  The merits

13   the Petitioners claim are matters we need not address now.

14   What is presently at stake is only," I'm italicizing only,

15   "whether the Federal Courts have jurisdiction in terms of the

16   legality of the executive potentially indefinite detention of

17   individuals who claim to be totally innocent of wrongdoing."

18   Whether the Courts have jurisdiction.  That's, again, as Judge

19   Rogers says, the beginning, the middle, and the end is

20   narrowing it just to that one question.

21          MR. OLESKEY:  I agree that you've correctly quoted

22   the language before -- the language I quote.  That language,

23   the last sentence seems to be the direction to the Lower

24   Courts, not to this Court, but to the District Courts in the

25   first instance.  I can't make anything of merits other than to

DLB                                                                                          65

1    a consideration of what rights are asserted in other

2    jurisdiction been found and that's what we are here discussing

3    today.

4              THE COURT:  It certainly doesn't assume that there

5    are any merits (indiscernible).

6              MR. OLESKEY:  Only let me talk about my clients,

7    Your Honor, in that respect.  Because, as the Court is aware

8    from our brief, these are not men who were detained or

9    captured, although the government often uses that verb, on the

10   battlefield in Afghanistan.  These are not people who were

11   seized anywhere.  They are people who were, in fact, arrested

12   by the Bosnians in October of 2001 because we said to the

13   Bosnians that we had information that they were plotting to

14   blow up the U.S. Embassy.  They then were held for 90 days.

15   Their homes were fully searched.  Their computers were seized

16   and searched.  They were interrogated under a system, the

17   Bosnian Supreme Court, which we validated in the date and

18   accords in 1995.

19             After that, the -- and during that period there was

20   an opportunity to come forward, the United States or anybody,

21   with evidence that would support those claims.  No evidence

22   was forthcoming.  The Bosnian process concluded that there was

23   insufficient evidence to hold them on those charges.  The

24   Bosnian Supreme Court ordered them released on January 17,

25   2002.  And as they were walking out of the central jail in

1   Sarajevo, having been announced on television that they were

2   going to be released, they were turned over to Bosnian

3   security forces, who turned them over to the United States

4   military, were resident there not because of any battle in

5   Bosnia but because of the peacekeeping activities that we

6   undertook with Western Europe in Bosnia after that terrible

7   war, and they were found and gagged to Guantanamo.

8           At that time, there was also an order from the

9   Bosnian Human Rights Chamber, which is a Court set up by

10  Dayton to have the supreme authority to speak on human rights

11  matters in Bosnia, which forbade that transfer.  When they got

12  to Guantanamo, they held for two and a half years without

13  being charged.  They were never charged.  They were told in

14  October of 2004 that the claims that the CSRT advanced, that

15  you have before you on the record, and there are various of

16  those claims, but that was the first time that they were ever

17  informed in any formal sense of why it was that they were

18  taken to Guantanamo in early 2002.

19          Now at the time that they were taken to Guantanamo

20  there was no definition that we can find of what it is that

21  the United States says makes a enemy combatant subject to

22  being detained under the authorization for use of military

23  force.  The definition that the Supreme Court was given by the

24  government, and it relied on Hamdi, which the Supreme Court

25  found consistent with the laws of war, was sufficient to

1  authorize detention of people seized on the battlefield in

2  Afghanistan subject to subsequent process to determine whether

3  they were properly held had to do with whether or not you were

4  baring arms on the battlefield in Afghanistan against United

5  States forces.

6      So that's the definition insofar as there is one of

7  who was allowed to be detained in Guantanamo at the time, at

8  least at the time of the Supreme Court argument.  And that's

9  the -- but that's not the definition that was applied to my

10 clients in Guantanamo in these CSRT tribunals.  What was

11 applied to them was a definition that the Deputy Defense

12 Secretary created by an order on July 7, 2004, which

13 significantly broadened both the language of the AUMF and also

14 broadened the language of the statute.

15     As Mr. Wilner has commented, what Justice O'Connor

16 said in the Hamdi case was that perhaps a properly authorized

17 tribunal could make a determination that the Courts would

18 review and give some deference to.  The detainees in

19 Guantanamo were all reviewed by their various tribunals under

20 this definition created by the Deputy Defense Secretary on

21 July 7, 2004.  What the basis is on which they were held,

22 between the time they were charged so to speak under that

23 definition in October 2004 and the time they were first taken

24 to Guantanamo in the case of my clients in 2002, is not

25 apparent for the record.  But the first definition that's the

1     formal one that appears in the record, as I understand it, is

2     a definition given to the Supreme Court in late 2003 or early

3     2004.

4             THE COURT:  You know how the governments return for

5     each one of the individuals you represent.

6             MR. OLESKEY:  Yes, Your Honor.

7             THE COURT:  If the information in the government's

8     return, without disclosing what that was, is accurate, did the

9     United States have a basis for detaining your client?

10            MR. OLESKEY:  No.

11            THE COURT:  And the reason for that is --

12            MR. OLESKEY:  Well, I've got to discuss part of that

13    in the close session, but part of it is that, I can certainly

14    say now, these are not people who were --

15            THE COURT:  Involved in 9/11?  Is that --

16            MR. OLESKEY:  -- involved in 9/11.

17            THE COURT:  So even if they were al Qaeda operatives

18    planning to blow up U.S. embassies outside of Afghanistan, you

19    would say the United States had no authority to detain them?

20            MR. OLESKEY:  If they are al Qaeda operatives, I

21    think, as the Supreme Court read the AUMF, you could probably

22    detain them because they are members of an organization that's

23    generally understood to have been the motivating force behind

24    9/11.

25            THE COURT:  What if they are affiliated with that

1     organization?

2            MR. OLESKEY:  Well, it doesn't -- the statute

3     doesn't say that.  That gets in because in the order of July

4     7, 2004 the language was substantially broadened to delete any

5     reference or connection or nexus to 9/11, to include

6     individuals supporting the Taliban or al Qaeda, as opposed to

7     those members of the Taliban and al Qaeda, to refer to

8     individuals part of a supporting forces associated with the

9     Taliban and al Qaeda, as opposed to being part of the Taliban

10    and al Qaeda.  And then also add a reference to individuals

11    who committed a belligerent act, whatever that may have been.

12    So that definition that was given to the Supreme Court after

13    the arguments here was significantly broadened by the order of

14    July 7, 2004.

15           THE COURT:  Put aside the authorization for use of

16    military force.  Is it your proposition that if the United

17    States has information that an individual is about to blow up

18    an embassy in Bosnia that the United States has no authority

19    to detain that individual?

20           MR. OLESKEY:  My position is this, Your Honor, that

21    the AUMF does not give --

22           THE COURT:  I said put that aside.  The President of

23    the United States, through the CIA, has firm information.

24    We'll accept it as true for the purpose of this question.  But

25    an individual is about to blow up the embassy in Bosnia.  Is

DLB                                                                      70

1    it your position that the United States has no authority to

2    detain that individual?

3              MR. OLESKEY:  I have to say it depends.  And let me

4    explain.

5              THE COURT:  It depends?

6              MR. OLESKEY:  It depends.

7              THE COURT:  What's it depend on?

8              MR. OLESKEY:  It depends on whether the Bosnian

9    authorities are there and can deal with the attack.  If they

10   can't --

11             THE COURT:  Regardless whether they can, it's going

12   to be an attack on a U.S. embassy.

13             MR. OLESKEY:  But are they five miles outside town?

14   Are they driving a suicide truck into the embassy?

15             THE COURT:  Okay.  That's a --

16             MR. OLESKEY:  I don't think in that instance, to

17   take Bosnia, that U.S. troops, if they happen to be there, can

18   drive to some corner of Bosnia and capture those men, unless

19   they are about to do imminent harm or damage to U.S. property

20   or persons.  And in any event, if there --

21             THE COURT:  Why?  The imminent part of thing comes

22   from the clear and present danger test, which is a First

23   Amendment concept thing.  The First Amendment doesn't apply in

24   Bosnia.  So where does that imminence come from?

25             MR. OLESKEY:  Imminent, exigent; an immediate

1    circumstance is the point I'm making, Your Honor.

2            THE COURT:  Well, they are sitting in their rooms

3    and they're putting the bombs together and they're not going

4    to blow it up for three weeks.

5            MR. OLESKEY:  Then unless Article II gives the

6    Commander-in-Chief --

7            THE COURT:  Well, that's the question.

8            THE COURT:  That's where we're going to.  Yeah.

9            THE COURT:  That is the question.

10            MR. OLESKEY:  (Indiscernible) then the President

11    does -- the Chief Executive, the Commander-in-Chief does not

12    have that authority.  In Hamdi, they carefully tethered the

13    authority of the President to the laws of war.

14            THE COURT:  I want to make sure I understand your

15    answer to that question.  You are saying that if the President

16    has information through the CIA or anybody else, call it

17    unimpeachable evidence, that somebody is about to blow up a

18    United States embassy, Article II does not empower the

19    President to take action against those people?

20            MR. OLESKEY:  I don't believe the Constitution

21    empowers the President to fly in the military to some other

22    country under those circumstances, unless it's the only way to

23    prevent whatever is going to happen.

24            THE COURT:  Justice Jackson once said that the

25    Constitution is not a suicide pact.

1           MR. OLESKEY:  Yes, but he also said in the

2     Youngstown case that if you accept this expansive notion then

3     I think the discussion, Your Honor, about the President's

4     power being essentially unlimited in this area either has no

5     beginning or has no end.  And we're talking about limits on

6     the President's power found in the Constitution, found --

7           THE COURT:  The limits are that when information

8     comes to the Executive that imperils U.S. life and property

9     the Executive can take action.  That's a limit.

10          THE COURT:  And that's a fair paraphrase of Jackson

11    and Youngstown too, isn't it?

12          MR. OLESKEY:  Well, I think that's one paraphrase,

13    yes.  But it doesn't say --

14          THE COURT:  Category 1.

15          MR. OLESKEY:  It doesn't say, Your Honor, that the

16    President can then hold those men for 43 months in Guantanamo

17    or any number of months without either subjecting them to the

18    criminal process or turning them over to the --

19          THE COURT:  That's a different question.  Now you're

20    coming much closer to the facts of the case granted, but as

21    far as your answer to Judge Randolph, I still understand it to

22    be that you see no Article II power to defend the embassy.  Is

23    that correct?

24          MR. OLESKEY:  I agree -- if the premise is that

25    there is no way to prevent the imminent harm, I agree the

1    President can take action to seize.  But --

2            THE COURT:  I didn't understand that premise to be

3    in there.  The premise is there's going to be -- there is good

4    information there is going to be an attack on a U.S. embassy.

5    Don't give me any ifs, ands, or buts, just tell me, does the

6    President have the authority, and if you say it depends,

7    that's all right, you can say that, but I want to make sure I

8    understood it correctly.

9            MR. OLESKEY:  I do say that it depends.  But then,

10   more importantly, I say that even if it is necessary to

11   exercise that authority, the President --

12           THE COURT:  Does your argument today depend on being

13   correct in that position?

14           MR. OLESKEY:  No.

15           THE COURT:  Okay.

16           MR. OLESKEY:  This is, of course, the series of

17   questions that are asked in the argument -- motion dismissed

18   in front of Judge Green.  The hypotheticals are asked to

19   Government Counsel, including supposed little old lady in

20   Switzerland who wants to give money to an orphanage in

21   Afghanistan and she doesn't know it's an al Qaeda front, do

22   you have the authority under the AUMF or otherwise to seize

23   her and take her to Guantanamo?  My recollection of the answer

24   was yes, we do, Your Honor.

25               In any event, the definition that was applied in

DLB                                                                          74

1   Guantanamo in all of these hearings, including our clients,

2   was the definition authored on July 7, about ten days after

3   the decision of the Supreme Court.  It was not the decision

4   that the Supreme Court had.  It's a broad, very broadly,

5   expansive definition and it permits essentially targeting of

6   people like Swiss grandmothers or others around the world who

7   have no nexus to 9/11.

8         Of course, in the CSRT's there was nobody to attack

9   the application and use of that standard because there were no

10  Counsel; there were only these Personal Representatives, who

11  were lined military officers with no legal training, who had

12  no duty or loyalty to any of the prisoners they represented.

13  So nobody in our tribunals raised the issue of this expanded

14  and expansive definition.  Nobody asked where the authority

15  was of the Deputy Defense Secretary to issue this order.

16  Nobody noticed that the order doesn't cite any authority on

17  its face, it just says, "Order for Combat Status Review

18  Tribunals," and begins with a definition and ends with a

19  procedure, which was then implemented further by the order of

20  the Navy Secretary at the end of July.

21        THE COURT:  See, my question really went to the

22  issue raised is that order that you're referring to doesn't

23  necessarily have to depend upon an interpretation that the

24  authorization needs military force.

25        MR. OLESKEY:  Not if the President otherwise has

1    that authority.

2         THE COURT:  If the President has other authority

3    under the Constitution itself, right?

4         MR. OLESKEY:  Yes.

5         THE COURT:  And it's not so hypothetical.  I mean

6    the Combat Review, and this is unclassified, found that your

7    client, one of your clients, was planning an attack on an

8    American embassy and was in contact with al Qaeda, was a

9    Mujahideen member of a network and also a likely member of

10   another organization that was affiliated with al Qaeda.

11        Now given all that information, that's why I asked.

12   If that's true, you may contest the factual basis of it,

13   although your client had an opportunity to do in the tribunal.

14   If all that's true, I just don't understand what your argument

15   is that there's no authority in the Executive Branch to detain

16   this person.

17        MR. OLESKEY:  The authority would have to be found,

18   if it's outside the AUMF, under Article II.  The Supreme Court

19   tethered the authority to detain, in the limited and now the

20   Circuit answers there, to the AUMF, and particularly linked it

21   to the laws of war.  It said in substance that it would

22   sustain the grant of authority in the AUMF because, under laws

23   of war, there was an accepted principle at stake which is

24   preventing combatants captured in Afghanistan from returning

25   to the battlefield.  But my clients were not captured in

1    Afghanistan and they are not on any battlefield anymore than

2    anybody is in London and New York.

3            THE COURT:  Why doesn't the same principle apply

4    that you don't return individuals like this two in Bosnia to

5    blow up U.S. embassies?

6            MR. OLESKEY:  Because that's not a principle of the

7    law of war; that's a principle of detention under our criminal

8    laws.  Title 18 has a plethora of statutes to deal with

9    terrorist actions.  People have been indicted and convicted

10   under those.  Most recently, beginning with the first World

11   Trade Center bombing, the Al Khobar barracks bombing, the

12   U.S.S. Cole, and so on.  Our criminal process is robust.  So

13   there is no reason for plenary authority in the President,

14   which would be a quantum leap in anything any Court has ever

15   authorized the President to do to hold people indefinitely

16   without subjecting them to the criminal process.  This isn't a

17   military commission, mind you.  These are these very summary

18   processes that occurred in July of 2004.

19           THE COURT:  Your argument is the President does have

20   authority to detain the individual but then is required to

21   bring that individual into the United States to face the

22   indictment in a federal grand jury.

23           MR. OLESKEY:  Well, they could be held and indicted

24   and charged in the country where they are or both could occur,

25   as often happens.  I'm not saying that the law or rule doesn't

1    apply to any aspect of the war on terror.  Rather, it does not

2    apply to every aspect of the war on terror, so called, and

3    seizures of civilians in friendly nations who never set foot

4    on a battlefield --

5         THE COURT:  Why is it so called?

6         MR. OLESKEY:  Because Congress has never enacted the

7    statute from my understanding entitled war on terror

8    authorizations granted in connection with that and so forth.

9    It's a metaphor for the situation we're engaged, it's not a

10   formal statutory definition, as I understand it.  That's all I

11   meant.

12        Of course, the District Court did not examine into

13   this issue about whether or not the definition that was

14   applied in Guantanamo was a definition that was passed upon

15   and sanctioned by the Supreme Court in Hamdi.  It's simply

16   treated, in my case, what the tribunals had done in Guantanamo

17   as factually sufficient, even if they had rights under the

18   habeas statute.  And referred repeatedly as if it was a fact

19   that had been resolved in a habeas review rather than a fact

20   provided in a so called return in the habeas proceedings to my

21   client as terrorist enemy combatants and the like.

22        THE COURT:  Can you tell me, I asked Mr. Wilner this

23   question, and I want to be clear about your situation, the

24   government made returns with respect to each one of the

25   detainees that you're representing?

1          MR. OLESKEY:  Yes.

2          THE COURT:  Okay.  And when did those returns come

3    in?

4          MR. OLESKEY:  I believe those returns came in late

5    October/November, because I know the final decisions in my

6    case range I believe from October 20th to October 29th.  So my

7    best recollection would be sometime in November, Your Honor.

8          THE COURT:  That the returns came in?

9          MR. OLESKEY:  That the process was complete.

10         THE COURT:  Okay.  And when did Judge Leon rule?

11         MR. OLESKEY:   Judge Leon ruled on about January

12    17th, but the hearing was on December 2nd.  And it was after

13    that hearing before Judge Leon, the motion to dismiss --

14         THE COURT:  And I asked Mr. Wilner this, were you

15    planning to traverse, get sworn statements to rebut the

16    government's return?

17         MR. OLESKEY:  I was planning to do whatever the

18    District Court allowed me in a habeas statute to do to

19    traverse or rebut.

20         THE COURT:  Did you file an -- I don't know that you

21    need a motion to do that, but you certainly needed access to

22    the detainees.

23         MR. OLESKEY:  Yes.  Which I did --

24         THE COURT:  What efforts did you make to get access?

25         MR. OLESKEY:  We made efforts to have access from

1    the time we appealed the case, which was in July of 2004.  As

2    the Court may or may not know, there is an elaborate security

3    clearance process you have to go through in order to go and

4    talk to your clients.  And then when that's over, you have to

5    get in line because there are limited slots in Guantanamo that

6    the military has allocated for lawyers to go in a holding area

7    to interview their clients.  So pushing as hard as we could,

8    the first time we got there I think was in the third week of

9    December of 2004, which was two to three weeks after the case

10   had been submitted to Judge Leon.

11          THE COURT:  Did you take sworn statements from these

12   detainees?

13          MR. OLESKEY:  I didn't take sworn statements because

14   the case had been submitted to Judge Leon on the motion to

15   dismiss and there was no procedural ground or format at that

16   time to submit anything.  We had --

17          THE COURT:  There was.  I mean under 18 U.S.A. 2248.

18          MR. OLESKEY:  But Judge Leon treated this as if it

19   were a summary judgment.  We filed our petition.  These

20   motions to dismiss were filed.  Judge Leon had the CSRT

21   results, but it does not appear that he looked at the CSRT

22   results.  He just generally considered that they were

23   legitimate because they were the result of this process.

24          THE COURT:  He didn't rely on them anyway.

25          MR. OLESKEY:  Excuse me?

1          THE COURT:  He did not rely on the returns.

2          MR. OLESKEY:  No, not as I read his decision.  So,

3    procedurally, the first chance we had to get there was the end

4    of December and in my view of the process, we are in no

5    position to file anything with the record on the motion to

6    dismiss closed at that time.  What we have been allowed to do,

7    which is not at all the same as a traverse, we've been allowed

8    to file comments in these review boards that are going on,

9    which is another military process which assumes that your

10   client is an enemy combatant but perhaps for some reason the

11   military will decide they should go home.  That's not the same

12   as being allowed to appear in Federal Court and argue the

13   reasons why the process was deficient.

14         THE COURT:  You've had access to the classified

15   material.

16         MR. OLESKEY:  Yes.

17         THE COURT:  You are not permitted to share that with

18   the detainees?

19         MR. OLESKEY:  That's right.

20         THE COURT:  Okay.  And where does that come from?

21   That --

22         MR. OLESKEY:  I believe that's part of the order or

23   a series of orders issued by Judge Green at the government's

24   instigation.  The theory of the government being, if we told

25   the detainees classified information and they really are

1    people who deserve to be in Guantanamo, that's a breach of

2    security.  So it is a hindrance in the development of our case

3    ultimately, assuming that you do as Wolasky (phonetic sp.) and

4    reverse and send it back to the District Court to hold the

5    prudential incremental factfinding that Hamdi contemplates.

6    And then you won't be --

7           THE COURT:  That's actually unusual in cases

8    involving classified information, even at the criminal trials.

9           MR. OLESKEY:  I understand.

10          THE COURT:  Would hearsay be permitted under your

11   vision of that factual determination in the District Court?

12          MR. OLESKEY:  I didn't get that question, Your

13   Honor.

14          THE COURT:  Under your -- in what you contemplate,

15   you were talking about an evidentiary hearing I thought before

16   the District Courts about the validity of the information that

17   the government put in the return?  Would hearsay be permitted?

18          MR. OLESKEY:  It could be, depending on its

19   reliability.  I think that the Supreme Court contemplated in

20   Hamdi that all those issues would be worked out on a case-by-

21   case basis by the District Courts.

22          THE COURT:  That's in a tribunal.  That's not in a

23   Court.  The Supreme Court was talking about a separate

24   tribunal, not a judicial -- do the rules of evidence apply in

25   habeas corpus cases?

1          MR. OLESKEY:  I believe they do.

2          THE COURT:  Well, if they do, then hearsay wouldn't

3     be permitted.

4          MR. OLESKEY:  I understand.  But we had that gloss

5     and --

6          THE COURT:  And that means that military commanders

7     from around the globe would have to come to Washington to

8     testify?

9          MR. OLESKEY:  I don't know whether it would be

10    depositions or not.  I wish I was at the point where these

11    questions were real because I would like to be back in the

12    District Court making the arguments about the scope of my

13    authority to challenge his attention.

14          Just in closing, we have briefed, and I'll discuss

15    in a moment in the closed session extensively, on the

16    insufficiency of the process at Guantanamo, not just on its

17    face because of the Wolfowitz or the Defense Department order

18    of July 7th, which goes well beyond anything that's in the

19    statute that was improved by the Supreme Court, not just

20    because the instructions of the tribunals were these men had

21    been repeatedly found to be enemy combatants under some

22    standard the record doesn't disclose.  And when the government

23    was asked in front of Judge Green are those prior

24    determinations written down anywhere, the answer came back not

25    that we're informed.  But these military officers in Cuba I'm

1    told, these are men who are properly seized and properly

2    detained and this has been determined through multiple levels

3    of review by others before you.  None of that, however, could

4    be substantiated.  Nonetheless, that's what they were told.

5              THE COURT:  After the Combat Status Review Tribunal,

6    do they have a right of appeal within the military system?

7              MR. OLESKEY:  No.  What happens is, according to the

8    order of July 7th and implementing order of the Navy Secretary

9    at the end of July, there is a review by the legal officer for

10   the tribunals and then a final review by the principle

11   director of the tribunals.

12             THE COURT:  What is the Administrative Review Board

13   I saw in some of these papers?

14             MR. OLESKEY:  That's a different entity that was

15   created after the CSRT's, also by the Defense Department, the

16   premise of which is even if you've been found to be an enemy

17   combatant you might now have insufficient intelligence value

18   or insufficient dangerousness posed to the United States but

19   you can nonetheless be released.

20             THE COURT:  It's an annual review.

21             MR. OLESKEY:  The annual review of which the first

22   is now underway.  But, again, there is no right for Counsel to

23   appear and advocate in those proceedings.  It's purely

24   administrative and purely military.  I believe my time has run

25   out.

DLB                                                                          84

1          MR. KATSAS:  Thank you.  Let me start with the

2   question of authorization and then try to circle back to the

3   question of who gets to do the factfinding and what standards

4   of review apply.

5          The enemy combatant detentions at issue here

6   encompass members or supporters of the Taliban and al Qaeda,

7   both as a matter of Article II and as a matter of the AUMF.  I

8   think that category of Defendants can be permissibly detained.

9   In the AUMF, Congress gave the President the authority to take

10  necessary and appropriate force against nations,

11  organizations, or person who committed the September 11

12  atrocities and against nation's organizations or persons who

13  harbored such people.

14         We think it's perfectly clear that al Qaeda is an

15  organization that committed the September 11 attacks and the

16  Taliban is a government that harbored al Qaeda, and therefore,

17  the President could take necessary and appropriate force

18  against al Qaeda or the Taliban.

19         The next step in the analysis is what constitutes

20  necessary and appropriate force.  The Hamdi case answers that

21  question to the extent the Court said that one fundamental

22  incident of waging war and committing Armed Forces is

23  detaining enemy combatants.  In this case, al Qaeda and the

24  Taliban.

25         And if all of that is true and the AUMF

1     authorization builds on the President's independent Article II

2     authority, we think the authorization question whose

3     reviewability I was debating with you on the last round, is

4     firmly established with respect to that class of people.  And

5     then if that's true the next question in the analysis becomes,

6     well, how do you determine who is or is not a Taliban or al

7     Qaeda affiliate?

8               And it seems to me that gets us back to the question

9     of procedures.  And with respect to the how do you determine

10    who is or who is not an enemy combatant question, there is a

11    lot of history bearing on that question.  There is Army

12    Regulation 190-8, which has been on the books for four or five

13    decades which contemplates a determination by a duly

14    constituted military tribunal.  That is the way enemy

15    combatant determinations have been done under 190-8.  I mean

16    it's the way they were done with respect to the 2 million

17    people detained during World War II.  And so both, because the

18    AUMF, with respect --

19               THE COURT:  190-8 requires that the tribunal be

20    composed of officers of a particular rank.

21               MR. KATSAS:  And one of --

22               THE COURT:  Colonel Major said it?

23               MR. KATSAS:  AUMF is three commissioned officer, I'm

24    sorry, 190-8 is three commissioned officers, one of whom must

25    be field grade.  The --

DLB                                                                        86

1          THE COURT:  And that's Major Colonel.

2          MR. KATSAS:  The tribunals constituted here are 06

3    and two field grade, so the tribunal -- this is one of many

4    respects, Judge Randolph, in which the CSRT process exceeds

5    the extent of process contemplated by 190-8.  The detainee is

6    given a substantially more senior tribunal.  The members of

7    that tribunal have expressed requirements of independence.

8          THE COURT:  106 and two other field grades.  Is that

9    correct?

10          MR. KATSAS:  106 and two field grades for the

11    CSRT's, as against three CO's, one of whom is field grade.  So

12    you have a substantially more senior tribunal which has sort

13    of recusal and independence requirements.

14          THE COURT:  And 06 would be a field grade.  It's the

15    highest field grade, if I recall correctly.  So it's an 06 an

16    two other field grades.

17          MR. KATSAS:  Yes, sir.  06 and two 04's would be the

18    lowest --

19          THE COURT:  Okay.  Or an 05 in there.

20          MR. KATSAS:  Right.  But the lowest level to the

21    extent that one protection built into the system is having

22    officers of rank and stature.  The tribunal afforded to these

23    detainees --

24          THE COURT:  I've got you now.  I was just trying to

25    make sure I substantially understood what you said.

1          MR. KATSAS:  Right.  So you have the --

2          THE COURT:  Which is not easy in this courtroom

3     sometimes.

4          MR. KATSAS:  You have a substantially -- a senior

5     tribunal with expressed independence requirements.  If you

6     look at the orders establishing the CSRT procedures, you also

7     have notice provided to a detainee and you have advanced

8     notice of all but the classified information.  That's the CSRT

9     proceeding.  In the 190-8 proceeding, there is no provision

10     for advanced notice of anything.  So in that respect, the

11     detainee is substantially better off.

12          With respect to participation rights in the tribunal

13     --

14          THE COURT:  I thought the timing and burden of proof

15     was different under 190-8.

16          MR. KATSAS:  No, Judge Rogers, in both -- 190-8

17     requires a preponderance standard.  It is silent on the

18     question who actually bears the burden.  The CSRT procedures

19     propose a preponderance standard subject to two tweaks on

20     that.  One is that the government evidence is presumed to be

21     correct, which goes to matters like authentication and so on.

22     But, two, just as importantly, the tribunal is charged with

23     determining the reliability of every piece of evidence.  So

24     you have a preponderance standard and a reliability

25     determination.

1          THE COURT:  This is not -- these tribunals are not

2    190-8 tribunals.

3          MR. KATSAS:  Not literally.  But they are CSRT --

4    they are tribunals --

5          THE COURT:  They can't be because 190-8 is designed

6    to determine whether someone is a prisoner of war within the

7    meaning of the Geneva Convention.

8          MR. KATSAS:  No, it actually goes beyond that.  It

9    contemplates that determination or other determinations of a

10   like nature and it has various categories of detainees,

11   various possible dispositions, including POW, but with various

12   other retained personnel and civilian internees and other

13   detainees.  But in any event --

14         THE COURT:  But that all follows the Geneva

15   Conventions.

16         MR. KATSAS:  Whether or not, I don't think they are

17   literally 190-8 tribunals, but crucial point for purposes of

18   this discussion is the procedures afforded to detainees in

19   order to make the necessary enemy combatant or not

20   determination vastly exceed the procedures contemplated by

21   190-8.  The tribunal, for reasons I've said, more notice in

22   terms of participation rights.  The detainee can introduce --

23   he can participate at the hearing, he can testify, he can call

24   witnesses, if reasonably available, he can introduce

25   documentary evidence, which is not available under 190-8, and

DLB                                                                          89

1    --

2            THE COURT:  That isn't the argument, that in fact as

3    190-8 has been applied for decades, the burden has been on the

4    government to come forth with evidence.  Then the burden

5    shifts and the ultimate burden remains on the government and

6    the finding has to be made by a preponderance.  And except for

7    the provision for a military representative everything else is

8    the same.

9            MR. KATSAS:  No, that's -- with respect, Judge

10   Rogers, that --

11           THE COURT:  I mean I know how your brief wants to

12   read it, but I'm just looking at the language of the

13   Regulation and the language of the CSRT's.

14           MR. KATSAS:  Right.  Put them side by side and make

15   the comparisons.  The tribunal has --

16           THE COURT:  But I think the critical point is who

17   has the burden of coming forward with the evidence.  And the

18   CSRT's were designed simply to allow the detainee to rebut a

19   predetermined decision.

20           MR. KATSAS:  No, that's actually not correct.

21           THE COURT:  That's what the CSRT order says.

22           MR. KATSAS:  The members of the panel, the members

23   of each panel were charged with making a fact-based

24   determination whether or not the detainee is an enemy

25   combatant.  You're right, there is a presumption that the

1    government's evidence is regular and accurate.  That is --

2    that piece of it was specifically cited with approval by the

3    Hamdi plurality.  But against that one --

4            THE COURT:  Remember the Hamdi, they are talking

5    about having Counsel, etc.

6            MR. KATSAS:  I'm sorry?

7            THE COURT:  In Hamdi, the Supreme Court is talking

8    about having Counsel, etc.

9            MR. KATSAS:  Having Counsel in --

10            THE COURT:  I know you say it's only in the habeas

11    proceedings.

12            MR. KATSAS:  In the habeas proceedings.  But, Judge

13    Rogers, the Supreme Court also contemplates a 190-8 proceeding

14    to make this determination in which the detainee would not

15    have Counsel.  Compare that to the CSRT procedures, which have

16    two very, very significant structural innovations protective

17    of the detainee, relative --

18            THE COURT:  I mean, Counsel, you cannot go -- you

19    have to deal with the language in the order.  It says

20    "notified of an opportunity to contest the designation as an

21    enemy combatant."  And then it says the CSRT is supposed to

22    determine "if they determine that the detainee shall no longer

23    be classified."  I mean it's an after-the-fact review is what

24    I'm getting at, as distinct from the Army Regulation 190-8.  I

25    mean I'm literally quoting the language.  In any event, we can

1    both quibble about the language.

2              MR. KATSAS:  But there is no concept of deference

3    built into the CSRT proceeding.  It is not a proceeding to be

4    appellate like in order to confirm a determination that some

5    other military authority has made.  It is a first instance

6    proceeding in every relevant respect.  There is introduction

7    of evidence.  There is detainee participation.  And if I could

8    just say in terms of comparing the overall set of rights in

9    the two kinds of proceedings there are, as I said, two major

10   structural innovations in the CSRT's.  One is that the

11   recorder in the CSRT's is affirmatively charged with searching

12   all of the relevant government files.  Not only for

13   information that might tend to prove that the detainee is an

14   enemy combatant, but also for all information that might tend

15   to disprove that proposition.

16             That's the first point.  There is none of that in

17   190-8.  Second point, in 190-8, the detainee is sort of left

18   by himself without a lawyer or anyone else.  In the CSRT

19   proceeding, the detainee is given a personal representative

20   who is charged with explaining the system and the detainees

21   rights, helping the detainee develop evidence, which in many

22   cases involves affidavits and so on submitted abroad and

23   commenting on the classified evidence that the detainee can't

24   see.  So whether --

25             THE COURT:  So does the Habeas Court have to

1    determine whether or not in fact the recorder made these

2    searches?

3              MR. KATSAS:  Made what?

4              THE COURT:  You said the CSRT procedures are unique

5    in that the recorder has to research all government records,

6    including for exculpatory evidence.  Does have Habeas Corpus

7    Court have to determine in each case whether the recorder did

8    this?

9              MR. KATSAS:  No, I don't think so, but, and I'll

10   explain that answer in a minute.  What I want to tie down,

11   what I hope to tie down, is the proposition that whether you

12   view the extensiveness of the military procedures here as

13   going to the extent of any due process rights as we have in

14   our brief or alternatively to some sort of common law habeas

15   concept that the Court has been suggesting.  Whether you view

16   it either way, those procedures, on their face, stack up very

17   favorably to the set of procedures --

18             THE COURT:  Counselor, I understand that maybe what

19   you want to talk about, but Judge -- former Judge, now Justice

20   Ginsberg used to say (indiscernible) the Court wants you to

21   talk about.  It's only three votes and you want to talk to

22   what those are and you have a question from Judge Rogers in

23   front of you that you promised us an explanation to and then

24   gone completely afield from it.  Could you go back to that

25   please?

1              MR. KATSAS:  The question is if you assume by

2     hypothesis, as I've been trying to demonstrate, that the

3     procedures are facially sufficient under whatever relative

4     standards are, can a detainee make a fact-based attack to

5     custody on --

6              THE COURT:  Can the Habeas Court review whether the

7     recorder made the search that the order requires?  That's what

8     the question was as I understood it.

9              MR. KATSAS:  And I think the answer to that question

10    has to be no under the Supreme Court's decision in Yamashita.

11             THE COURT:  That was after a trial, full trial, full

12    Counsel.

13             MR. KATSAS:  It was after a military tribunal.

14             THE COURT:  I know, but he had Counsel.  I mean it's

15    totally different.  The government had the burden of proof,

16    etc.  I mean it was a trial on criminal charges.

17             THE COURT:  Yeah.

18             MR. KATSAS:  Well, that's true, but here we have a

19    proceeding whose procedures exceed the ones that the Supreme

20    Court said would be good enough even to detain American

21    citizens as enemy combatants.

22             THE COURT:  I didn't see the Supreme Court say that

23    the Habeas Corpus Court was barred from determining whether or

24    not an individual habeas Petitioner actually received those

25    procedures.

1          MR. KATSAS:  In Yamashita, what you had was a

2    miliary tribunal --

3          THE COURT:  Counsel, I will concede that in both

4    Curran and Yamashita the Supreme Court said the Habeas Court

5    is not to determine guilt or innocence.  But that was guilt or

6    innocence on criminal charges.  It didn't say anything about

7    whether or not the Habeas Court had the scope of review

8    extended to did the prisoner receive the procedures that the

9    government said he was entitled to.  That's not a factual

10   question in the sense of am I a shepherd or am I an al Qaeda

11   supporter?

12         MR. KATSAS:  Two responses.  To the extent

13   Yamashita, as you point out, was a criminal prosecution, that

14   distinction cuts in our favor.  Generally, Yamashita was

15   criminally convicted and ultimately executed.  And if the

16   deference to the military in that context compels a principle

17   that Habeas Courts don't review for factual innocence or

18   conduct of the proceedings where a person's life is literally

19   at stake, how much more clearly would those principles not

20   compel --

21         THE COURT:  Well, the question is whether or not, if

22   you don't get all of the procedural rights that General

23   Yamashita had and you are facing the possibility of indefinite

24   detention, does the Habeas Court have a role in determining

25   whether the individual Petitioner received the protections

1      that the government says he or she is entitled to?

2              MR. KATSAS:  Yamashita said more than simply that

3      the Habeas Court doesn't review for guilt or innocence.  It

4      also said that the Habeas Court doesn't review the conduct of

5      the proceedings or particular evidentiary determinations and I

6      think my answer to your original question rests on the

7      instinct that what we have here, as in Yamashita, are facially

8      valid procedures and the detainee wants to make a contention

9      that in a particular case they weren't followed.  Yamashita

10     said you didn't follow your own rules of evidence.  Your

11     hypothetical is the recorder didn't follow his own obligations

12     under the procedures.

13             THE COURT:  No, that would be where the Yamashita is

14     arguing that the District Court abused his discretion, or

15     something like that, in applying the rules of evidence.

16     That's a different type of -- I mean if under those

17     regulations Yamashita had a right to Counsel and he didn't get

18     Counsel, did the Habeas Court look at that?  I didn't see the

19     Supreme Court saying the Habeas Court couldn't look at that.

20             MR. KATSAS:  I think in terms --

21             THE COURT:  Do you think so?

22             MR. KATSAS:  Assuming Fifth Amendment rights, if the

23     question is does the panoply of procedures provided satisfy

24     either a Fifth Amendment right or a common law habeas right or

25     whatever the legal standard is by which you are going to

1    measure, yes that claim, the Habeas Court could look at that.

2    Here, assuming Fifth Amendment rights, the Habeas Court can

3    look at the question, for instance, whether there is a right

4    of access to classified information by the detainee or whether

5    the detainee has a right not only to a personal representative

6    but also to a lawyer.  Those sorts of questions we think are

7    reviewable, assuming again Fifth Amendment rights.

8         My point about Yamashita is I think it is the very

9    different kind of claim, either I am innocent or you

10    misapplied your own rule of evidence is treated differently.

11        THE COURT:  So you answer yes both to Judge

12    Sentelle's question that you could lock up anybody without any

13    evidence and detain them and you could continue to detain them

14    whether they got the procedures that you say are on the books

15    or not.  Is that right?  Is that your position I mean?

16        MR. KATSAS:  The extent of habeas review, we think,

17    is, as I've described with Yamashita, but, but I sense your --

18    I sense I haven't persuaded you with that.  But we do -- I

19    want to be clear here.  We do have a fallback position in

20    that, Judge Rogers, think of how many steps removed this

21    Yamashita point that we've been debating is from the regime

22    that Judge Green seemed to be envisioning.  I am urging the

23    proposition that there is no review of fact-based sufficiency

24    or application of rule of evidence type claims.

25        Okay, if you don't go that far, the next most

1    protective possibility, it seems to me, would be some sort of

2    deferential review by the Habeas Court of either the innocence

3    determination or the application of the procedure or whatever

4    it would be.  It would surely, both under traditional habeas

5    principles and I think out of respect to the crucial military

6    interests at stake, that review I think would have to be very

7    deferential.

8          I suggested a sum evidence standard.  If you focus

9    on review of factual innocence, the standard that comes to

10   mind for ordinary criminal cases is the sufficiency standard

11   of Jackson v. Virginia.  That --

12         THE COURT:  Oh, I was thinking the habeas context.

13   Sufficient cause to hold a prisoner.  I'm just -- these are

14   all questions, Counselor.  I'm just trying to see how far --

15         MR. KATSAS:  Sufficient -- right, but -- sufficient

16   cause, again, in a context whereby hypothesis we have a

17   sufficient set of procedures and you are testing their

18   application in a particular case, I'm suggesting to you if

19   there were review of fact questions, two points; number one,

20   it would be review, and number two, it would be deferential.

21   That is --

22         THE COURT:  See, just hypothetically, Counsel, I

23   thought what the concern of the District Court was you do --

24   the Habeas Court does have to look at the procedures.

25   Assuming that upon finding them to be sufficient to protect

1    against the likelihood of erroneous determinations, that then

2    what would follow, and we don't know yet because the District

3    Court hasn't ruled, might well be a very deferential approach

4    toward what the CSRT has determined.

5              MR. KATSAS:  We don't know exactly what would

6    follow, but we have some strong hints from the District

7    Court's opinion that what she had in mind when she invokes a

8    principle that the detainees' allegation of factual innocence

9    and so on are to be presumed true, subject to further

10   factfinding, what she seems to have in mind is something like

11   a de novo redetermination of the very questions, the very

12   fact-based questions, that were committed to the military

13   tribunal in the first instance.  And my point is that makes no

14   sense because there is no point in the commitment.  There is

15   no point in having a 190-8 on the books for 50 years.  There

16   is no point in Justice O'Connor saying, look, if you want to

17   set up a military system to make these adjudications, 190-8

18   looks like a pretty good option, even for citizens detained

19   here.

20             And the final point, the final point I'd like to

21   make, above and beyond the distinction between deferential

22   review on the one hand and de novo factfinding on the other,

23   is the sort of most intrusive aspect of Judge Green's world

24   view on this set of issues is the proposition that if, on your

25   hypothetical, the recorder is not doing his job or, to take an

DLB                                                                                          99

1    actual instance cited by Judge Green, if hypothetically an

2    evidentiary rule designed to keep out unreliable evidence were

3    misapplied in a particular case.  That, at most, gives you a

4    concern about that particular case.  It doesn't give the

5    Habeas Court license to embark on de novo or whatever

6    factfinding might be perceived.  Because, for instance, among

7    the 54 detainees, she cited one moot case in which she raised

8    a concern about the admission of particular piece of evidence.

9    So I think we also have that element of going too far.

10          For all of those reasons, we think whatever review

11   the Court conducts, you can review the general legal

12   questions.  Is there a right of access to classified

13   information?  We say no.  I want belabor it unless the Court

14   wants more detail.  Is there a right to have a lawyer.  We say

15   no.  Same general -- and then there are these series of case

16   specific type arguments about particular rules not being

17   followed, particular detainees claiming being innocent, things

18   of that nature.

19          THE COURT:  Does the government continue to take the

20   position it took in the Hamdan case, that if the only evidence

21   was evidence secured by torture that would not be a sufficient

22   ground on which to hold someone?  And secondly, if the only

23   evidence were the unwitting act?

24          MR. KATSAS:  The rule, this goes to the point I was

25   raising about the rule of evidence.  The CSRT's are bound to

1    apply the rule of evidence keyed to reliability.  We think

2    that rule, properly applied, would screen out evidence

3    procured by torture.

4         THE COURT:  Properly applied.

5         MR. KATSAS:  Yes.  Okay.  Then let's talk about what

6    that means.  If the District Court raises a concern about its

7    application in one case, that's a concern about the one case,

8    not the 53.  And then let's look at that case.  Well, first of

9    all, it's moot, so I don't know that there would be any

10   occasion for further inquiry.  But second, assuming you have

11   some degree of review, take a look at the case, what you find

12   in that particular case is multiple independent --

13        THE COURT:  No, no.  My hypothetical was if the only

14   evidence was evidence produced as a result of torture.

15        MR. KATSAS:  Right.

16        THE COURT:  I thought in the Hamdan case the

17   government had taken the position that that would not be a

18   sufficient ground on which to detain.

19        MR. KATSAS:  I don't know.

20        THE COURT:  Well, all right.  But I mean you,

21   yourself, just said that the CSRT's are to look at the

22   reliability of evidence.  And if that were properly applied,

23   then there would be no problem.

24        MR. KATSAS:  Right.

25        THE COURT:  But I get your -- I anticipate your next

1    step will be that it's for the staff, Attorney General, what

2    is his name or title?  The person who reviews the CSRT for

3    legal sufficiency.

4         MR. KATSAS:  There are two layers.  There is a

5    review for legal sufficiency and then there is a further

6    review by the director of the CSRT's.

7         THE COURT:  Yeah.  Your position would be that's the

8    only review that's available.  That it's not for the Habeas

9    Court.

10         MR. KATSAS:  My position is wherever you come down

11    on the spectrum of possibilities from that one on down, the

12    one possibility that cannot possibly be right is that a

13    concern about misapplication in one case creates a de novo

14    retrial not only in that case but also in every other with

15    respect to every other Petitioner.

16         THE COURT:  How about as to that case?

17         THE COURT:  Yeah.  How about as to that one case?

18         MR. KATSAS:  As to that one case, I think you -- our

19    --

20         THE COURT:  Think through this carefully.

21         MR. KATSAS:  Our broad -- our Yamashita position is

22    no review.  If you disagree, I think there would be some

23    degree of deferential review and if you apply that principle,

24    some evidence standard and abusive discretion standard,

25    however you articulate it, if you apply that principle to the

1    case identified by Judge Green, I think you would be very

2    comfortable in affirming the designation as to that detainee.

3            THE COURT:  I'm not quite sure how to apply

4    Yamashita to this case for the reasons (indiscernible).  The

5    Yamashita Court dealt with the -- it said we're not concerned

6    with the guilt or innocence, we're concerned with the lawful

7    power of the Commission to try the Petitioner for the events

8    charged in the present case.  Before us, we have no offense

9    charged.

10           MR. KATSAS:  No, but we have an enemy combatant

11   determination, which is the analog of the offense charged.

12   And indeed punishment --

13           THE COURT:  Well, it is for this extent.  Yamashita

14   knew exactly what his sentence, and granted it was a hanging

15   in that case, but in this case, once you've determined this

16   person is an enemy combatant, as far as we can tell, this

17   could be life imprisonment or it could be the day after

18   tomorrow.  It certainly won't bother Justice Kennedy in

19   (indiscernible).

20           MR. KATSAS:  In Hamdi itself, which was an enemy

21   combatant case, the Court reasoned back from Curran and

22   Yamashita, which were military commission trial for war crimes

23   cases, and the Court in Hamdi said, look, this case is

24   different because it's an EC determination, but they said of

25   course if the principles are good to justify a criminal trial

1    with someone's life at stake, the similar principles will

2    justify what the Court described as the mere detention, non-

3    punitive detention, for enemy combatant status.  So the

4    distinction between a criminal punishment, which was death in

5    that case, and an EC detention, I think, cuts in our favor,

6    not against us.

7            THE COURT:  But I thought Judge Sentelle's question

8    was pointing out the fact that in Hamdi, as well as in Hamdan,

9    charges had been placed by the government.  Here there are no

10   charges, except for Petitioner Hicks.

11           MR. KATSAS:  But there is the analog --

12           THE COURT:  So that the context --

13           MR. KATSAS:  The analog to the charge, the criminal

14   charge, in the EC context is --

15           THE COURT:  Combatant (indiscernible).

16           MR. KATSAS:  -- the accusation that we think you are

17   an enemy combatant for the following reason and this is why

18   we're detaining you and if you want to contest it you have

19   every right to do so in a hearing which affords procedures

20   well beyond those the Supreme Court said would be sufficient,

21   even as to American citizens.

22           THE COURT:  What is the difference, in your view,

23   between the Al Odah group of cases and the Boumediene group of

24   cases?  If any?

25           MR. KATSAS:  Not much.  The Fifth Amendment

DLB                                                                              104

1    questions are common to both.  The general legal questions are

2    common to both.  The Al Odah Petitioners have raised a couple

3    of additional arguments about procedural defects and the

4    Boumediene Petitioners have raised a couple of fact-based

5    arguments about their particular circumstances.  But I think

6    the broad legal principles about Rasul that I began some time

7    ago discussing with you and the general discussion I've been

8    having with Judge Rogers about how a Habeas Court -- the

9    extent of the procedures given at the military stage and how

10   the Habeas Court reacts to that.  I think for those purposes

11   the cases are the same.

12        THE COURT:  You think the Boumediene Petitioners

13   have sufficiently raised the, for lack of a better word, the

14   common law habeas corpus claim?

15        MR. KATSAS:  I don't know.  We haven't contested it.

16   If I could just say one more sentence.  There were no charges

17   in the sense of criminal charges against Mr. Hamdi either.

18        THE COURT:  Turned Hamdi loose.  I mean we're sort

19   of ignoring the elephant in the room on that one.  Once the

20   Supreme Court acted, they turned him loose.  Are you going to

21   turn these guys loose if we do something?

22        MR. KATSAS:  Not to my knowledge.

23        THE COURT:  Well, as Judge Green pointed out, they

24   wouldn't be released.  There are all other kinds of

25   constraints on him.  That's right in her opinion.  Even if the

1  writ were granted.

2        MR. KATSAS:  Well, not under her opinion.  But if

3  what is ultimately imposed is anything remotely like the

4  regime envisioned by the detainees, with something either at

5  the military or at the judicial process approaching a full

6  blown trial, that system will collapse of its own weight.  And

7  that is a profound intrusion on the President's statutory and

8  constitutional powers to use the Armed Forces in order to

9  protect the lives and safety of American citizens.

10        THE COURT:  I have one other question.  Just to

11  clear this up for me.  I think there is a line of Supreme

12  Court cases that says that you cannot use habeas corpus,

13  whether it's 2254 or 2255, to challenge the conditions of

14  confinement, right?

15        MR. KATSAS:  Right.

16        THE COURT:  In these cases, the complaints,

17  certainly in Al Odah, are challenging the conditions of the

18  confinement.  I can't see my family, I can't do this, I can't

19  do that, and so on and so forth.  Do you, or is it your

20  position that those claims are properly rejected because they

21  are not seeking proper habeas release?

22        MR. KATSAS:  Yes.  Habeas, the logic of those 2254

23  and 2255 cases is that habeas is a challenge to custody itself

24  rather than to conditions.  That line of reasoning applies

25  equally to the habeas actions here.

1          THE COURT:  Why doesn't that line also apply to the

2     condition of confinement that -- we're being held without

3     having had a proper hearing before a tribunal?

4          MR. KATSAS:  I think the hearing, as I understand

5     the claims on the other side, the hearing before the -- the

6     reason for having the hearing before the tribunal is to

7     challenge the fact of custody.  And I think that claim would

8     be cognizable on habeas.  I mean subject to these other legal

9     restrictions.  But the claims about hours of exercise and so

10    on are not cognizable for all of the reasons we've discussed

11    plus the one you just mentioned.

12         THE COURT:  Okay.

13         THE COURT:  What do you do if the President of this

14    Circuit that says a prisoner is entitled to the writ of habeas

15    corpus when, though lawfully in custody, is deprived some

16    right which he is lawfully entitled, even in his confinement,

17    the deprivation of which serves to make his imprisonment more

18    burdensome than the law allows or curtails his liberty to a

19    greater extent than the law permits, citing a Supreme Court

20    case.  This is Miller v. Overhauser.

21         MR. KATSAS:  I'm sorry.  I'm not familiar with --

22         THE COURT:  Well, somebody cited it.  I can't

23    remember which brief it's in.

24         MR. KATSAS:  I don't recall, but in any event, the

25    conditions of confinement claims --

1          THE COURT:  Well, the Second Circuit agrees with us.

2     So I mean this is our Circuit.

3          MR. KATSAS:  When we looked at this question, we

4     didn't find a D.C. Circuit case.

5          THE COURT:  All right.

6          MR. KATSAS:  But in any event, those claims have the

7     same -- are subject to the same independent legal constraints

8     that we've been discussing.  You've been very generous with

9     your time.  I thank you for your attention.

10          THE COURT:  Thank you, Counsel.  Any time left for

11     rebuttal?  I'll give you two minutes for rebuttal.

12          MR. OLESKEY:  Thank you, Your Honor.  This question

13     about deference in habeas has come up and I just wanted to

14     bring your attention the Zadvydas case, which is a Supreme

15     Court case I think all of us have cited, which is a pre-

16     detention removal case where the government appears to advance

17     substantially the position being advanced here.

18          THE COURT:  What's the citation on it?

19          MR. OLESKEY:  The citation is 533 U.S. 678.  And the

20     Supreme Court said that it was not correct that little or no

21     review should be conducted.  Whether a set of particular

22     circumstances amounts to detention within or beyond, the

23     question there was a reasonable period is something that can

24     be determined pursuant to statutory authority.  Basic federal

25     habeas statute grants the Federal Court's authority to answer

 1    that question.  We think that clearly is the case here where

 2    it's not a pre --

 3            THE COURT:  I'm not familiar with that case.  Could

 4    -- what are the facts of it?

 5            MR. OLESKEY:  The case involved whether the extent

 6    to which someone who was going to be -- who was unlawfully in

 7    the United States and had been found to be unlawfully in the

 8    United States.

 9            THE COURT:  Oh, that was what I was -- it's a

10    deportation case?

11            MR. OLESKEY:  Yes.

12            THE COURT:  Yeah.  Okay.

13            MR. OLESKEY:  And there is a final order of removal

14    and how long they could be held where I believe the problem

15    was there was no place to send them.

16            THE COURT:  I know that case.

17            MR. OLESKEY:  All right.  The other point I make

18    here is the irony to us of the consequence position that the

19    government is arguing here about military commissions, which

20    after all, as the Court pointed out, at least are tethered to

21    a law of war charges is that here our clients can be found to

22    be detained indefinitely, which Justice O'Connor said in Hamdi

23    could be a generation or so, without charges that are tethered

24    to the law of war, anything that is recognized, only found in

25    this order that the Deputy Defense Secretary issued in July of

1    2004.

2                As to the notion that the recorder is going to find

3    exonerative evidence and has a responsibility to do so, and

4    I'll point out in a moment exactly what happened with the only

5    exonerative evidence that any recorder brought to the

6    attention of anyone of the tribunals involving any of my

7    clients.

8                And lastly, notion that somehow this personal

9    representative plays a meaningful role I think is totally

10   disabused by the failure in the record to show that they

11   played any other than a passive role, which is not surprising

12   because they are required to go and tell detainees --

13               THE COURT:  Okay, Counsel, unless my colleagues have

14   questions, your red light is on.

15               MR. OLESKEY:  Thank you, Your Honor.

16               THE COURT:  We have agreed that you can have a

17   hearing on the classified material.

18               MR. OLESKEY:  Yes.

19               THE COURT:  I don't want more than the absolute

20   necessary number of people in this courtroom so that our

21   security personnel do not have to conduct a census in order to

22   find out whose in here properly.  We are going to break for

23   about five minutes or so.  We come back, I don't want to see

24   more than four people at that table and no more than two at

25   that table.  And then we want to hear only what we have to

DLB                                                                                                          110

1    hear.  Give us a recess.

2                 (Recess.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DLB                                                                                  111

## CERTIFICATE

I certify that the foregoing is a correct transcription of the electronic sound recording of the proceedings in the above-entitled matter.

_____    _____

      Debra Blum                                9/15/05

  DEPOSITION SERVICES, INC.