IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMAL KIYEMBA, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents. | Case No. 1:05-cv-01509-RMU <br><br><br> MEMORANDUM IN SUPPORT OF MOTION TO HOLD RESPONDENTS IN CONTEMPT OF PROTECTIVE ORDER |

Pursuant to the All Writs Act, 28 U.S.C. § 1651(a),[1] and this Court's Amended Protective Order entered September 13, 2005 (the "Protective Order"), Petitioner Saddiq Doe (hereinafter "Petitioner" or "Saddiq") by his undersigned counsel submits this Memorandum in Support of Motion to Hold Respondents in Contempt of Protective Order (the "Motion").

INTRODUCTION

After long years, a man whom the Government has cleared of any wrongdoing remains jailed at Guantánamo Bay. The Government knows precisely who he is and where he is. It knows that his name is Saddiq. It knows that he is not an "enemy combatant" because it made that determination itself more than six months ago. It knows that he desperately wants a lawyer, and it knows that he has repeatedly asked for a lawyer. It knows that he has asked to meet with this firm. Yet, as shown below, the Government has refused to grant our pointed and repeated

---

[1] Section 1651(a) empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

requests to speak to or meet him, and his requests to meet us. This refusal is a violation of the Protective Order. Having exhausted efforts to resolve this out of court, Petitioner asks that the Court find the Government in contempt, and allow him access to his counsel.

**FACTS**

**I.    The Petitioner**

1.    "Saddiq Doe," one of the petitioners in this case, is a Saudi citizen of Uighur heritage. October 6, 2005 Declaration of Sabin Willett ("Oct. Decl."), Ex. A (letter from "Sadeeq Ahmad Turkestani."[2]).

2.    Petitioner is unlawfully imprisoned at Guantánamo Bay, Cuba, where he is assigned Internment Security Number ("ISN") 491 and where, as of August 29, 2005, he was housed in Camp Iguana, a small prison camp that is part of the detention facilities at Guantánamo. September 8, 2005, Declaration of Sabin Willett ("Sept. Decl.").[3]

3.    Uighurs are an ethnically-Turkic Muslim group from the Xinjiang region of China. There are relatively few Uighurs or persons of Uighur heritage imprisoned at Guantánamo Bay. *Devastating Blows, Religious Repression of Uighurs in Xinjiang*, 17 HUMAN RIGHTS WATCH 2, § II, at 22-23 (2005) (stating that the United States is currently incarcerating approximately twenty-two Uighurs at Guantánamo) (attached at Pet'rs' Mot. For Order to Show Cause, Ex. 1) (hereinafter "Mot. to Show Cause"). According to public statements by military and Department of State personnel, the Uighurs are well-known to the Government, which claims to have been seeking to arrange for their resettlement for many years. *See, e.g.*, Interview

---

[2]    *See* ¶¶4-5, *infra*, regarding the orthography of translations of Uighur names.

[3]    The September Declaration was filed under seal in the Secure Facility on or about September 8, 2005. We have been advised that a copy was delivered to the Court. The Government has not unclassified the Declaration, although counsel believes it contains nothing that could fairly be construed as classified. As discussed below, Respondents and Respondents' Counsel have, at all times since September 9, 2005, been aware of the detailed facts contained in the September Declaration regarding Petitioner.

2

with Gordon England, Secretary of the Navy, in Washington, D.C., at 3 (Mar. 29, 2005) ("I think it has been reported we have Uighurs from China that we have not returned to China, even though, you know, some of those have been deemed, even before [the CSRT] hearings, to be non-enemy combatants because of concerns and issues about returning them to their country.") (Mot. to Show Cause, Ex. 3); Interview with Colin Powell, Secretary of State, in Washington, D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantanamo. The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at.") (Mot. to Show Cause, Ex. 5).

4. Uighur prisoners within Guantánamo generally refer to one another by first name, and sometimes know each other's ISN. They do not customarily use last names. Uighurs refer to their homeland, a region controlled by China, as "East Turkestan," or "Turkestan," and often refer to themselves as "Turkestanis." Sometimes Uighurs are known by combination of first name and reference to heritage, as in "Adel the Turkestani."

5. Among the Uighur population at Guantánamo, names generally are written in Arabic letters. Transliterating Arabic characters to English often results in variant spellings. Thus, the same name may be rendered, "Saadiq," "Saddiq," "Sadiq," or "Sadeeq" by a translator, and to an English-speaking ear it may sound like "Sidick" (as it did to undersigned counsel on occasion).

## II. The Government's Determination that Petitioner is Not an Enemy Combatant

6. Petitioner has advised that the Government conducted a combatant status review tribunal ("CSRT") as to the facts and circumstances surrounding Petitioner's capture and determined that he is not an enemy combatant. Oct. Decl., Ex. A. According to public information, all of the CSRTs were completed by March 2005. U.S. DEP'T OF STATE, STATUS OF ALL GUANTANAMO DETAINEES REVIEWED; 38 TO BE RELEASED at 1 ("Navy Secretary Gordon England reported in a March 29 Pentagon briefing that combatant status reviews have been completed for all of the 558 detainees captured as suspected al-Qaida terrorists and Taliban fighters against U.S. forces in Afghanistan."), *at* http://usinfo.state.gov/is/Archive/2005/Mar/31-996167.html. The Petitioner was advised of his enemy combatant determination earlier this year. Oct. Decl., Ex. A.

7. Heretofore, as Judge Robertson has ruled in a related case, "enemy combatant" status has been the only legal basis proffered for detention, and the only one approved by the Supreme Court. *Qassim v. Bush*, Civ. No. 05-0497 (JR) (hereinafter "*Qassim*") Memo. Order (Aug. 19, 2005) ("The status of 'enemy combatant' has been, until now, the only handhold for the government's claim of executive authority to hold detainees at Guantanamo. It is the only rationale approved by the Supreme Court, *see Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2639-40 (2004).") (Pet'rs' Opp'n to Mot. for Order to Show Cause, Ex. 4).

8. At all times since March 2005, Respondents have known or should have known that Petitioner is not an enemy combatant.

9. As shown below, Respondents and Respondents' Counsel have unreasonably denied Petitioner access to counsel.

4

### III. Petitioner's Repeated Efforts to Obtain Counsel

10. Petitioner has long sought counsel to help procure his release. Because he has been held *incommunicado*, however, communicating this desire has been difficult.

11. During his incarceration, Petitioner came to know Jamal Kiyemba. Long before March 2005, Petitioner told Mr. Kiyemba that he desired assistance in obtaining counsel. On March 10, 2005, Mr. Kiyemba executed a "next-friend" authorization noting Petitioner's "specific desire for a lawyer and for a legal challenge" to his illegal imprisonment. *See* Sept. Decl. Mr. Kiyemba referred to the Petitioner as "Saadiq" from Turkestan, a Uighur. At that time, Saddiq was a resident in Camp 4.

12. On July 13 and 14, 2005, undersigned counsel met with Abu Bakker Qassim and Adel Abdul Hakim in Camp Echo. Messrs. Qassim and Hakim advised counsel of the existence of Saddiq, who was then living with them in Camp 4, and further advised that he desired to have counsel. Oct. Decl. ¶ 11.

13. On August 1, 2005, Petitioner and eight other detainees, acting by and through their next friend Mr. Kiyemba, filed the petition in this case.

14. On August 29, 2005, counsel met personally with Mr. Qassim and Mr. Hakim in Camp Iguana. The men advised that earlier in August they had been moved to Camp Iguana, a new camp, with six other men, including Saddiq, all of whom had been determined not to be enemy combatants. *Only non-enemy combatants ("NEC")[4] are housed at Camp Iguana. See* Sept. Decl.

---

[4] Despite earlier references to the contrary, the Government has recently begun referring to NECs as "NLECs" or "No Longer Enemy Combatants."

5

15. In a meeting on August 29, 2005, Mr. Qassim advised counsel that "Sidick Ahmet,"[5] a Saudi-born Uighur and NEC who lived with him in Camp Iguana, desired counsel. Oct. Decl., Ex. B (unclassified notes of client meeting between Sabin Willett and Abu Bakker Qassim (Aug. 29, 2005)). Abu Bakker gave undersigned counsel several documents written in Arabic characters. Pursuant to the Protective Order, at the end of the meeting counsel numbered and dated his notes and these documents, and handed the package to the Navy chief petty officer assigned as escort. A letter from Saddiq was among the documents.

16. On or shortly before August 29, 2005, Petitioner wrote the letter attached as Exhibit A to the October Declaration. He noted that he had been told that he was not an enemy combatant and that he "want[ed] to meet [] personally." *Id.* In the translated version of the letter, Petitioner's name is written, "Sadeeq Ahmad Turkestani." *Id.* "Turkestani" is likely a reference to his heritage—that is, although "Sadeeq" was born in Saudi Arabia, he is of Uighur, or Turkestani heritage, and therefore was known as "Sadeeq the Turkestani."[6]

17. Also in the meeting on August 29, 2005, Abu Bakker listed the names of the eight prisoners at Camp Iguana. *See* Oct. Decl., Ex. B. The names of the prisoners at Camp Iguana, as given, were:

    (a) Adel;
    (b) Abu Bakker;
    (c) Ahmet Adil (aka Ahmad);
    (d) Ehter (aka "Ahkdar");

---

[5] The transliteration "Sidick Ahmet" appears to be the same as "Sadeeq Ahmad." The distinctions between the consonant sounds for English "D" and "T" do not transliterate consistently from Uighur or Arabic.

[6] Counsel in early filings inaccurately advised the Court that this letter had been written by Saddiq at an earlier time. The letter was made available and translated within the secure facility in late September, and after receiving its unclassified translation, counsel believed that it had been mailed. However, examination of the Arabic original on October 5, 2005, showed that it had been initialed by undersigned counsel on August 29, 2005. This indicates that the letter was one of several documents in Arabic characters handed to undersigned counsel, by Mr. Qassim or Mr. Hakim on that date (and in turn given by counsel to the Navy escort). Messrs. Hakim and Qassim share living quarters with Saddiq, or, at any rate, did on that date. Accordingly, it appears that the letter was written by Saddiq on or before August 29, 2005.

  (e) Ayoub Haji Mamet;

  *(all Uighurs)*

  (f) Fethi Boucetta; and

  *(Algerian)*

  (g) Zakerijan.

  *(Russian)*

The eighth prisoner was the Petitioner. No other Camp Iguana prisoner was a Saudi or had a name that began with "S" or sounded like "Saddiq."

  18. On August 29, 2005, counsel advised Adel and Abu Bakker that we had filed a case on behalf of Saddiq and others and were making efforts to arrange to meet Saddiq soon. Oct. Decl. ¶ 12.

**IV. The Protective Order**

  19. On September 13, 2005, this Court entered the Protective Order.

  20. The Protective Order was put in place to "establish the procedures that *must be followed* by…all…counsel involved in these cases." Protective Order at ¶ 2 (emphasis added). When these procedures break down, the Court is vested with the authority to enforce or modify the terms of the Order. *See id.* at ¶ 3.

  21. The Protective Order provides, among other things, that the Government must afford petitioners' counsel reasonable access to their clients at Guantánamo Bay. Specifically, Exhibit A, Section III.D.1, of the Protective Order states that "[r]easonable efforts *will be made* to accommodate counsel's request for a meeting" (emphasis added).

LITDOCS/617245.2

### V. The Government's Obstruction of Saddiq's Efforts to Consult Counsel

22. On return from the base, counsel learned of the "next-friend" motion. Counsel did not have his notes (they were still in DoD custody) and accordingly, on September 1, 2005, counsel sent an electronic message to Mr. Henry requesting an immediate phone call with Saddiq. Oct. Decl., Ex. C. In his message, counsel wrote, "we request an immediate phone call with any of our other clients who may have been determined not to be an enemy combatant. Please note that among our clients is a Uighur who may be a Saudi resident named Saddiq. He may also be known as Saddiq al Buhkari. He is one of the petitioners in the Kiyemba petition." *Id.*

23. On September 8, 2005, (counsel's first opportunity to see his notes) counsel filed under seal the September Declaration. The Government has thus far declined to unseal the Declaration, although we believe it contains no classified information. In the September Declaration, counsel identified Saddiq by nationality and location and states that, like all men in Camp Iguana, Saddiq has been determined by the Government not to be an enemy combatant.

24. The September Declaration was in the possession of and constructively or actually known to each of Respondents' Counsel by September 9, 2005.

25. On September 16, 2005, counsel sent to the Government another electronic message regarding Saddiq. Counsel wrote, "Terry, I heard that we may be on for telephone calls for Sept 23 [with other clients in Camp Iguana]. Is that correct? *Will this include Saddiq?*" Oct. Decl., Ex. D (emphasis added).

26. Mr. Henry responded:

> As to a call with the alleged petitioner you refer to as Saddiq, DoD has been unable to identify this alleged petitioner based on the information you have provided. In any event, as noted in our motion for an order to show cause, the Kiyemba suit is not a proper

8

> suit on behalf of the purported petitioners therein. And as to your earlier request for call with any of your alleged petitioners who are NLECs, as noted in our motion to show cause, the alleged petitioners whom DoD has been able to identify as of this date, all are enemy combatants (ECs).

Oct. Decl., Ex. E. As of this date, the Court had entered the Protective Order.

    27.    On September 17, 2005, counsel replied:

> Are you saying that there is no Saddiq in Camp Iguana? We understand him to be a Uighur speaker whose parents had relocated to Saudi Arabia, who is being held in Camp Iguana, and who has been advised that he is "NLEC."

*Id.*

    28.    Mr. Henry did not respond. On September 23, 2005, counsel sent the following message to Mr. Henry:

> Dear Terry:
>
> Please consider this electronic message a formal request for immediate telephonic contact with our client Saddiq Doe, one of the Petitioners in Kiyemba v. Bush, a case pending before Judge Urbina.
>
> Saddiq is of Uighur parentage, but was born and raised in Saudi Arabia. He has been determined by CSRT not to be an enemy combatant and currently is jailed at Camp Iguana, Guantanamo Bay, where he is one of only nine[7] detainees held there. It will be a simple matter for you to confirm his identity. He has repeatedly requested, through other detainees, access to us, as his attorneys.
>
> I have information as to what I believe to be his ISN which I can share with you on your request. We propose to have a secret-cleared Arabic interpreter on the call with Saddiq. The Arabic interpreter would be in my office with me for the call. He and I would confirm his identity to you both before the call and at the outset of the call with the JAG officer in the camp.
>
> I am advised that our client has asked for leave to contact his family in Saudi Arabia, and has a phone number for his family.

---

[7] On September 23, 2005, we had been advised that an additional non-combatant, an Egyptian, had been moved to Camp Iguana. Oct. Decl. ¶ 11.

> We request that you immediately provide us with that phone number.
>
> We expect to make a motion for this and other relief before Judge Urbina next week, unless you advise that it can be arranged consensually.
>
> Thank you for your attention to this matter.
>
> Very truly yours,
>
> Sabin Willett

Oct. Decl., Ex. F.

29. On September 23, 2005, counsel, who represents other men held at Camp Iguana, was permitted to speak with them by telephone. The Government denied counsel's request to speak by telephone, during the same call, with Saddiq. Oct. Decl. ¶ 11.

30. By September 27, 2005, a copy of Saddiq's letter was translated and the translation was unclassified.

31. On September 27, 2005, Mr. Henry responded to our September 23, 2005, written request to speak to Saddiq, saying "[o]bviously, we would need to get the identification issues, as well as the outstanding questions about next-friend standing, straightened out before we could entertain any request for a telephone call. Please advise what ISN you believe 'Saddiq' has and what is the basis for that belief." Oct. Decl., Ex. G.

32. Counsel responded on September 28, 2005, by sending a copy of the translation of Saddiq's letter just received (Oct. Decl., Ex. A), along with the following message:

> With respect to Saddiq Doe, I have several reactions. First, **our information is that his ISN is 491**. "Saddiq" is of course a transliteration of Arabic characters, and in English the name might be spelled in different ways, including as "Sadeeq," as the translator of the attachment did, and "Sidick." But we are struggling to understand the contention that you are unable to identify him, for several reasons. First and foremost, he is at Camp Iguana, and only NLECs (as you call them) are at Camp Iguana,

10

> and indeed there are very few of these -- only eight or nine, of which two are Adel and Abu Bakker, leaving at most six or seven. As we have said before, he is a Saudi of Uighur ancestry. Is it really the government's position that it can identify no Saudi NLEC of Uighur heritage who is one of six or seven men at Iguana and whose name, transliterated to English characters, is "Saddiq" or something like "Saddiq?" Our information is that, at least as of August 29, there was no other person in Iguana with a similar name, and no other Saudi at Iguana.
>
> As an NLEC, Saddiq would have been through a CSRT. Is it the government's position that there is no CSRT **with an NLEC determination** for a Saudi whose first name is Saddiq or something like Saddiq?
>
> We believe that Saddiq earnestly desires that our firm represent him because (i) of the Kiyemba next-friend authorization, (ii) because our clients Adel and Abu Bakker have twice advised us that Saddiq desires this, and in both cases advised that Saddiq lives with them, and (iii) because we have just received from the secure facility a letter from Saddiq. Evidently it was written many months ago. We have just had it translated and I attach to this email a copy of the translation (which is unclassified, and from which I have redacted a telephone number given to us for Saddiq's family). It makes abundantly clear that Saddiq exists and desires that we personally meet and represent him. It also states that Saddiq is known as Saddiq Ahmad, Turkestani, or perhaps Saddiq Ahmad [al] Turkestani (i.e. Saddiq the Turkestani), as would be customary in Saudi culture.
>
> We renew our urgent request for an immediate telephone call to Saddiq at Camp Iguana. I can assure you that as with any client, if we learn that the client would prefer that we not represent him, we will take appropriate steps.

Oct. Decl., Ex. G (emphasis in original).

33.     The Government responded on September 29, 2005 with a series of obfuscations. It failed to address the questions of Saddiq's ISN, location, and name, and then suggested, without basis, that our client's real name is "Adil Turkestani." This provoked an intemperate response from undersigned counsel. Oct. Decl., Ex. H. Intemperance aside, however, counsel's

11

response *once again* set out in painstaking detail the clear basis for knowing exactly who Saddiq is, exactly where he is, that he is the Petitioner and that he desires counsel.

34.     On September 30, 2005, counsel advised the Respondents that if they did not immediately permit us to communicate with our client, we would move for this relief. Oct. Decl., Ex. I.

**VI.     The Government's Misrepresentations to this Court**

35.     On August 31, 2005, the Government filed in this case its Motion for Order to Show Cause Why Case Should Not be Dismissed for Lack of Proper "Next Friend" Standing. It informed the court that "of the petitioners whom Respondents have been able to arguably identify as of this date, all are held as enemy combatants." *Id.* at 19 n.18.

36.     On September 9, 2005, the Government was served with the September Declaration of Sabin Willett. That Declaration made clear that Petitioner Saddiq Doe in this case (i) was the Saddiq whom the Government itself had found no later than March 2005, not to be an enemy combatant, and (ii) was housed at Camp Iguana. The Government reasonably should have been able to identify Petitioner from this point forward *at the very latest*. Furthermore, subsequent e-mails quoted above confirmed that Petitioner was a Uighur speaker, an NEC and a Saudi citizen.

37.     Nevertheless, the Government filed a Reply in Support of its Motion for Order to Show Cause ("Reply") on September 22, 2005, again declaring, "of the petitioners whom respondents have been able to arguably identify as of this date, all are held as enemy combatants." Reply at 12 n.15. The evidence of the September Declaration and the communications from counsel shows that this representation was false when made.

12

38. This is not an isolated incident. In *Qassim*, the Government suggested that petitioners were enemy combatants when it knew that suggestion was false. *See Qassim*, Tr. of Mot. Hr'g before the Honorable James Robertson at 20 (Aug. 1, 2005) ("[M]aybe I can understand that you blow off e-mails and don't answer e-mails, but why did you not tell petitioners' counsel what the situation was? And why did you file a piece of paper in this court three days after the CSRT proceeding [had been finalized] implying that they were [enemy] combatants?") (Pet'rs' Mot. For Order to Show Cause, Ex. 1).

## DISCUSSION

"Civil…contempt is a sanction to enforce compliance with an order of the court." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). It has been said that court orders place upon litigants a "duty to obey." *Id.* Failure to abide by this duty is grounds for contempt. *See* 17 AM. JUR. 2D *Contempt* § 1 (2005) (defining contempt to include "disobedience to the orders of the judiciary"). It is well settled that contempt is the appropriate remedy for a contemnor's non-compliance even where that non-compliance is unintentional. *Food Lion, Inc. v. United Food and Commercial Workers Intern. Union*, 104 F.3d 1007, 1016 (D.C. Cir. 1997) ("[T]he law is clear in this circuit that 'the [contemnor's] failure to comply with the court decree need not be intentional.'") (*citing to National Labor Relations Bd. v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183 (D.C. Cir. 1981)).

This Court entered the Protective Order on September 13, 2005. Section III.D.1 of Exhibit A of the Order states that "[r]easonable efforts will be made to accommodate counsel's request for a meeting." This language places an affirmative duty on Respondents to undertake reasonable efforts to accommodate undersigned counsel's requests to communicate with

13

Petitioner.[8] They have this obligation regardless of the pendency of other motions, or other theories. Until and unless this Court's order is stayed or vacated by a supervising court, it must be honored.

As detailed above, the Government violated by the Protective Order. It failed repeatedly to undertake reasonable efforts to accommodate our request to meet or communicate with our client. The evidence shows this failure to be deliberate and calculated. The Government knows precisely who the petitioner is and where he is, and the suggestions of confusion can only be seen as deliberate and tactical. If the Court were to view the small confines of Camp Iguana, with its tiny population of inmates, the Court would see how indefensible the Government's claim of confusion is. The September Declaration leaves no doubt as to the identity of Saddiq.

Violating any court order is bad enough. Two points involved here show that the violation is an extreme departure from ethical behavior. First, the prisoner in this case is not an enemy combatant. That means that in this case, unlike all of the cases on appeal, *the Government has already conceded the absence of a lawful basis to imprison this man.*[9] Second, the Government is knowingly interfering with the attorney-client relationship. The central importance of this relationship has long been recognized in this Circuit. *See Lee v. United States*, 235 F.2d 219, 221 n.5 (D.C. Cir. 1956); *Linton v. Perini*, 656 F.2d 207, 212 (6th Cir. 1981). So important is it to the judicial process that courts have imposed sanctions on the government when it attempts to undermine it. *See Commonwealth v. Manning*, 373 Mass. 438 (1977) (dismissing indictment where government agents had engaged in deliberate attack on attorney-client relationship).

---

[8] Counsel has requested both face-to-face meetings and, as contemplated by the Protective Order and permitted by the Court in *Qassim* for other NECs, telephone contact.

[9] We have detailed the Government's misrepresentations to the Court, which would support sanctions under Fed. R. Civ. P. 11. Petitioner hopes this dispute can be resolved without resort to sanctions, but thus far the Government has not corrected its misrepresentations.

We have pursued the remedy of contempt as a last resort. Counsel repeatedly sought to resolve this issue short of this motion. Requests to speak with or visit the client were made on September 1, 16, 23, 27, 29 & 30, 2005, as well as October 1, 3, 4 & 5, 2005. Counsel provided Respondents with a wealth of information by which they could identify and contact Petitioner, including Petitioner's name, his ISN, his location, his ethnicity, his enemy combatant status, his citizenship, and his personal requests for counsel.

An absurdity colors this entire affray. The Government has all the information. It knows who its own prisoners are, where they are, what their internment numbers are. Its standard operating procedure is to put these questions to counsel, who have no such access, then feign confusion when counsel cannot penetrate the web of secrecy. This is a conscious and deliberate strategy and no court should countenance it. In many other habeas cases, this strategy of obfuscation and delay is working, because counsel are blocked from the clients and other sources of information.[10] Here, by luck and chance, we have penetrated the fog. Still they persist.

---

[10] For this reason, we have suggested that as relief the Court order not only access to our client, but public disclosure of names and ISNs of all non-enemy-combatants and of all persons at Guantanamo who have requested counsel.

## CONCLUSION

For the foregoing reasons, we request that the Court allow our motion for contempt.

Dated: October 6, 2005                    **SADDIQ DOE,**

                                          By his attorneys:

                                          Sabin Willett
                                          **BINGHAM McCUTCHEN LLP**
                                          150 Federal Street
                                          Boston, MA 02110-1726
                                          Telephone:  (617) 951-8000
                                          Facsimile:   (617) 951-8925