## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

JAMAL KIYEMBA, as Next Friend of
ABDUSABUR DOE, *et al.*,

      Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

      Respondents/Defendants.

Case No. 1:05-cv-01509-RMU

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PETITIONER SADDIQ DOE, AKA SADDIQ AHMAD TURKESTANI FOR IMMEDIATE PRODUCTION OF THE BODY AND GRANT OF WRIT, OR, IN THE ALTERNATIVE, GRANT OF INTERIM RELEASE

### I. INTRODUCTION

This case changed dramatically on October 11, 2005, when the Government admitted for

the first time that petitioner Saddiq Doe (aka Saddiq Ahmad Turkestani) is not an enemy

combatant.[1] Petitioner submits this memorandum in support of his motion for immediate

production of the Body and Grant of Writ, or in the Alternative, Grant of Interim Release (the

"Motion"). In brief, relief is warranted because the Government's admission amounts to a

concession that (i) the Government has no lawful basis to imprison Petitioner, and (ii)

Petitioner's case is not in any way governed by the pending *Al Odah* appeals. In such a case the

mandate of Congress and the Supreme Court is plain. This Court *must* immediately order his

---

[1] Respondents' Opposition to (1) Petitioners' Motion for Leave to File Surreply to Respondents' Reply in Support of Motion for Order to Show Cause Why Case Should Not Be Dismissed for Lack of Proper "Next Friend" Standing and (2) Petitioners' Motion for Reconsideration of September 13, 2005 Order, at 11 (hereinafter "Respondents' Opposition").

release.[2]

## II. FACTS

*Petitioner's Non-Combatant Status.* This petition was filed on August 1, 2005. The Government has done everything possible since that date to hide the fact that Petitioner is not an enemy combatant: it has moved to stay, moved for an order to show cause why the case should not be dismissed, and until recently blocked counsel from access to Petitioner.[3] On October 11, 2005, the Government admitted that Petitioner is not an enemy combatant. *See* n. 1, *supra*, Brief at 11.

Because we have not yet been afforded access to Petitioner, it is unknown precisely how long he has suffered wrongful imprisonment. However, it is a matter of public record that the last non-combatant determinations were made on March 26, 2005. That means Petitioner has been wrongfully imprisoned for at least six and one-half months after a determination was completed that there is no basis to hold him.

## III. PERTINENT PROCEDURAL HISTORY

*The Appeals.* In June, 2004, ruling in a Guantanamo habeas corpus case, the Supreme Court of the United States mandated that the district courts hold hearings to determine the merits of the claims. *Rasul v. Bush*, 124 S. Ct. 2686 (2004). In January, 2005, District Judges Leon (*Boumediene v. Bush*, No. 04-CV-1166 (RJL)) and Green (*In re Guantanamo Detainee Cases*, No. 02-CV-0299 (JHG)) issued conflicting decisions. Judge Leon granted, and Judge Green

---

[2]     In light of the Government's belated admission, this case is now situated precisely as was *Qassim v. Bush*, No. 05-0497 (Robertson, J.). Accordingly, we rely on two declarations filed in that case, the August 10, 2005 Declaration of Sabin Willett (hereinafter "August 10, 2005 Willett Decl.") and the September 19, 2005 Declaration of Sabin Willett (hereinafter "September 19, 2005 Willett Decl."), and Judge Robertson's August 19, 2005 order.

[3]     Petitioner had to go to the extreme of a motion for contempt before the Government would authorize a base visit. A base visit is now scheduled for November 14. The motion is not moot because the Government has refused, in continued contempt of the protective order, to grant access to the remaining petitioners in this case.

denied government motions to dismiss in cases brought by alleged "enemy combatants." The cases were appealed and consolidated before the Circuit Court of Appeals in *Al Odah v. Bush*. The appeals involve only alleged "enemy combatants," and test only the executive's assertion that it may forever imprison, without review by any court, persons whom it contends are "enemy combatants." The appeals do not involve any case in which the Government itself concedes that the Petitioner is not an enemy combatant.

## IV. ARGUMENT

### A.    The Legal Significance Of The Non-Combatant Admission.

Heretofore the Government's only claim of right to imprison a person at JTF Guantanamo Bay has been that the prisoner is an "enemy combatant." In brief, the government's theory proceeds as follows:

*The AUMF.*  On September 18, 2001, the Congress authorized President Bush to use force against the "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." *See* Joint Resolution 23, Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Jan. 18, 2001) (hereinafter "AUMF").

*The Executive Order.*  Respondents contend that the President acted under the authority of the AUMF when, on November 13, 2001, he issued an Executive Order (hereinafter "Executive Order") authorizing Secretary of Defense indefinitely to detain anyone President Bush has "reason to believe":

     i.    is or was a member of the organization known as al Qaeda;

    ii.    has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threatened to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

      iii.    has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

*See* Executive Order, 66 Fed. Reg. 57,833 § 2 (Nov. 13, 2001).

     *The Wolfowitz Order.* On July 7, 2004 (years after most of the prisoners were captured and transported to Guantanamo), Deputy Defense Secretary of Defense Paul Wolfowitz issued an order -- claiming the authority of the AUMF and the Executive Order -- in which he defined "enemy combatants," and established "Combatant Status Review Tribunals" ("CSRTs") to review whether prisoners at Guantanamo were properly held as "enemy combatants."[4] *See* Paul Wolfowitz, Deputy Secretary of Defense, Memorandum for the Secretary of the Navy, Order Establishing Combatant Status Review Tribunal ("Wolfowitz Order).[5] The Wolfowitz Order defined "Enemy Combatant" as:

> [A]n individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces. Each detainee subject to this Order has been determined to be an enemy combatant through multiple levels of review by officers of the Department of Defense.

*Id.* The CSRT procedures, in turn, set out a procedure for determining whether a prisoner was "properly classified" as an "enemy combatant." Where a prisoner was not, he was to be remanded to the Secretary of State for repatriation or release. *See* Gordon England, Secretary of the Navy, Memorandum for Distribution for Implementation of Combat Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Naval Base, Cuba (July 29, 2004).

---

[4]      We think the definition and the CSRT process were both unlawful, but the dispute is academic in this case.

[5]      A few days earlier, the Supreme Court issued its decision in *Rasul v. Bush*, 124 S. Ct. 2686, 2699 (2004).

**B.    The Pending Appeals Do Not Affect Those Found *Not* To Be "Enemy Combatants."**

Respondents argue that the appeals address the same issues that are present in this case. *See* Respondents' Opposition. *That is simply not true*. In every case on appeal, the Government contends that the prisoner is an "enemy combatant," as defined by Deputy Secretary Wolfowitz. None of the appeals involves a claim of power to detain someone whom the Government itself, through its CSRT process, determined not to be an "enemy combatant." *See* Judge Robertson's August 19, 2005 Order at 5 in *Qassim v. Bush*, No. 05-0497 ("Neither of the twinned cases now pending before the Court of Appeals presents, or appears to have contemplated, the case of a detainee who has been through the [Combat Status Review Tribunal] process and declared no longer an enemy combatant . . . these petitioners are correct, as a formal, legal matter, in their insistence that the issue presented by this case is not before the Court of Appeals.") (hereinafter "*Qassim* Order"). Because the appeals do not consider the status of "non-enemy combatants," those appeals simply will not elucidate any power indefinitely to imprison "non-enemy-combatants." Additionally, the *Al-Odah* oral argument showed that the root question at issue was whether a prisoner was an "enemy combatant" or whether, as Judge Sentelle put it, he was "just a shepherd." September 19, 2005 Willett Decl., Ex. 1 at 36-37, 41-42, 45-46.

**C.    The Government Has No "Wind-Up" Power To Detain.**

In *Qassim*, Judge Robertson addressed another non-combatant case. He noted that the "status of 'enemy combatant' has been, until now, the only handhold for the government's claim of executive authority to hold detainees at Guantanamo." Qassim Order, citing *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2639-40 (2004). There, as here, he noted, the government asserted "the Executive's necessary power to wind up wartime intentions in an orderly fashion." *Id.* Judge Robertson ruled that that "[t]here is no basis for this claimed authority except the

Executive's assertion of it." *See id.*

Judge Robertson was correct. The Government cites no authority for its claimed power indefinitely to imprison non-combatants as a "wind up" to its claimed war powers. The law of war is to the contrary. "Prisoners of War shall be released and repatriated *without delay* after the cessation of active hostilities." Article 118 of the Geneva Convention (III) relative to the treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316 (1955) (emphasis added); *see also Hamdi*, 124 S. Ct. at 2641. Of course, unlike the United States of today, the United States of World War II and the Korean conflict observed international law. Prisoner-of-war camps of the day adhered to the requirements, respectively, of the Hague Convention of 1929 and the Geneva Convention of 1949. No one in those facilities was coercively interrogated, held incognito, or deprived of contact with his family. Moreover, there is no record to show that the so-called "wind-up" of the detention there was, as it is here, indefinite. *See also Rasul*, 124 S. Ct. at 2700 (recognizing that indefinite detention "suggests a weaker case of military necessity and much greater alignment with the traditional function of habeas corpus") (Kennedy, J., concurring); *INS v. St. Cyr,* 533 U.S. 289, 302-03 (2001); *Brown v. Allen*, 344 U.S. 443, 532 (1953) (Jackson, J., concurring), *overruled on other grounds, Williams v. Taylor*, 529 U.S. 362, 410-11 (2000); *Ex Parte Burford*, 7 U.S. at 453.

This is, of course, not a case in which an avowed "enemy combatant" remains in a camp after the armistice. It is a case where a man who never was an "enemy combatant" was imprisoned in secret, and remains imprisoned today, despite the fact that the Government itself has determined that there is no basis for detention. The Government characterizes petitioner as an "NLEC," i.e., "no longer enemy combatant," but the definition of "enemy combatant" makes that a semantic shuffle. Anyone who "*was* part of or supporting Taliban or al Qaeda

forces, or associated forces that are engaged in hostilities against the United States or its coalition partners," *is* an "enemy combatant." *(emphasis added)* That is, if a person did *in the past* support those groups, then he is today an "enemy combatant" today. A decision that he is not, today, an "enemy combatant," necessarily is a decision that he did not, in the past, support such groups and engage in such acts. "NLEC" is a misnomer: the petitioner never was an "enemy combatant."

Even as to "enemy combatants," the Executive's historic practice as to "wind-up" detention is contrary to what the Government suggests.

     *1.*     *The Gulf War.* The Government quotes selectively from the Final Report to Congress on the Conduct of the Gulf War (hereinafter "Congressional Report"). In fact, the Congressional Report states that "[e]xpeditious repatriation of EPWs [enemy prisoners of war] became a high Coalition priority when offensive operations were suspended." Congressional Report at 605. Offensive operations ceased at 0800 on 28 February, 1991. *Id.* at 338. Repatriation began on 6 March, 1991. *Id.* at 671. By May 2, 1991, the last EPW had been transferred out of U.S. custody. *Id.* at 672.[6]

     *2.*     *World War II.*

     *Italian Prisoners of War.* The situation of Italian prisoners of war during World War II is particularly instructive. During the war, more than 50,000 were transported to prisoner-of-war camps in the continental United States. *See* Prisoners in Paradise, www.italianpow.com/history.html. On September 29, 1943, the Badoglio government executed the instrument of Italian surrender with allied forces. 61 Stat. 2704. Northern Italy remained

---

[6]     Many EPWs objected to return to Iraq and so were delivered to the custody of Saudi Arabia. On 23 August, 1991, representatives of the International Committee of the Red Cross announced that repatriation efforts were complete. *Id.* at 672.

under control of the German army, and the Germans had purported to place Benito Mussolini at the head of newly-declared fascist "republic." Accordingly, in September 1943, the Italian peninsula remained in chaos and repatriation of Italians to Italy was impractical. The war against Germany would rage on for twenty months. What was to be done with the Italians in the interim?

More than 45,000 Italian prisoners of war joined "Italian Service Units," located throughout the continental United States. *See* Prisoners in Paradise, www.italianpow.com/history.html. These former enemy combatants were given increased freedom of movement among the civilian population: they held jobs and earned money. *Id.* Particularly in U.S. regions that had large Italian-American communities, liberty became the norm during the period between September 1943 and the end of the war. In San Francisco, California, and Ogden, Utah, for example, Italian-American families could take Italian Service Unit members out of POW camps for picnics and outings. *Id.* Fraternization was common: after the war, a significant number of American women traveled to Italy to marry former Italian prisoners of war. *Id.*

After the Italian armistice, prisoners of war formerly held at Camp McKay in South Boston were transported to a housing facility on Peddocks Island in Boston Harbor, which was "not a stockade," according to the commander. *See generally*, August 10, 2005 Willett Decl. Ex. F (*Moved From So. Boston to Harbor Island; Two Sides of the Row*, Boston Globe, July 30, 1944). The Italians were permitted to work for pay. They received liberty to go among the civilian population of the city. *Id.* They would ride a ferry from Peddocks Island, where they were housed, to work at the Boston Port of Embarkation, where they were paid for work. *Id.* This was not unique to Boston: the War Department stated that "these service units of Italian

prisoners of war are being used in *all major ports of embarkation the country.*" *Id.* (emphasis added).

The commander reported that "they will be given some liberty on their days off in the way of passes out of the camp." *Id.* A brigadier general sent a commendatory telegram to local Italian-Americans in the Boston area who had provided social support for the Italian POWs. Even before the transfer to Peddocks, security was lax. The army sent out for ice cream and cookies. *Id.* The Globe reported that young women at Carson's Beach [were] "passing notes through the fence." *Id.*

On June 4, 1944, a group of Italian POWs was taken to St. Leonard's Church in Boston's North End, and thence to the Hatch Shell (an outdoor concert facility along the Esplanade most famous for its Fourth-of-July concerts). *See generally*, August 10, 2005 Willett Decl. Ex. G (*Former Italian Prisoners Enjoy Boston Hospitality*, Boston Globe June 5, 1944). The Globe reported:

> Following the church services, the men were conveyed by troop carriers down Prince St. in the North End. Crowds cheered them as they passed through Boston's closest facsimile to their beloved homeland. At the Hatch Memorial Shell on the Charles River Esplanada, they halted and sang a native song entitled, "A Bouquet of Flowers."

*Id.* The men posed for pictures; they played bocci; they "feast[ed] on native dishes." *Id.*

*Fort McLellan and the Texas POW Camps.* During World War II, a prisoner of war camp was maintained at Fort McLellan, Alabama. www.McLellan.army.mil/info.asp. POWs were permitted to work for pay in local farms. *Id.* Texas was home to as many as 33 prisoner-of-war camps. See generally, Robert J. Tissing, *Utilization of Prisoners of War in the United States During World War II; Texas, A Case Study (Master's Thesis)*, www.rootsweb.com/ds.rober2/TissingIII.htm (Baylor University 1973). German POWs worked in agricultural jobs for pay. *Id.* They cooked their own meals, maintained gardens, engaged in organized sports, painted murals, built clocks, at some camps formed POW orchestras, had

access to mimeograph machines, distributed their own POW mail. With earnings from day labor they bought food, ice cream, and fresh flowers. *Id.*

The Hearne Camp in Texas contained prisoners until December 20, 1945, only four months after V-J Day. *Id.* It appears that *all* former Italian combatants were repatriated to Italy by January, 1946, fewer than six months following V-J Day. *See* www.italianpow.com/history.html. The POW camp at Fort McLellan closed in April, 1946, some nine months after the end of the war. www.McLellan.army.mil/info.asp.[7]

The separation from family and loved ones here, by contrast, is Draconian and interminable. There is no effective contact with the outside world at all. Indeed, although a petition was filed last August, this Petitioner has been denied contact even with his counsel for months.

**D.    This Court Is Required By Act Of Congress To Grant Immediate Relief.**

Congress' mandate in a habeas case is plain. "Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained." 28 U.S.C. § 2243. That obligation cannot be avoided through stays. A writ, or order to show cause, "shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed." *Id.* In such a case, it is worth remembering that the the Government's position ignores the mandate of the

---

[7]    The Government's citation to the Delessert chapter (Respondents' Opposition at 12, n. 9) is quite misleading. The essay in question addresses the problem faced by Allied Forces in the post-war period, and United Nations peacekeepers after the Korean conflict, as to whether Article 118 required the repatriation of POWs *against their will*. It does not deal with the conditions under which such POWs would live during the interim period, except to say that "[t]he detaining powers, pressed by needs of reconstruction, transformed the status of hundreds of prisoners into one of 'civilian workers.'" Christiane Shields Delessert, Repatriation of Prisoners of War to the Soviet Union During World War II: A Question of Human Rights, in World in Transition: Challenges to Human Rights, Development and World Order 80 (Henry H. Han ed., 1979). That our Government should cite this article as authority is chilling: the prime example cited by Delessert for continued detention is that of the Soviet Union under Stalin. *Id.* at 80-81.

Supreme Court in *Rasul*. There the Supreme Court: (i) observed that "Petitioners' allegations . . . unquestionably describe custody in violation of the Constitution or laws or treaties of the United States," 124 S. Ct. at 2698 n.15[8], (ii) held that 28 U.S.C. § 2241 confers on this Court jurisdiction to "*hear* petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base," *id.* (emphasis added), (iii) directed that the Government "make [its] response *to the merits* of petitioners' claims," *id.* at 2689 (emphasis added), and, most importantly, (iv) "remand[ed] for the *district court to consider in the first instance the merits* of the Petitioners' Claims." *Id.* (emphasis added). Accordingly, the Court must direct that the Government produce the body in this Court, and this Court, in turn, must order the Petitioner's release.

The Government argues that Petitioners rely on "constitutional rights" now being tested in the Court of Appeals. This is not true. We rest on the Government's threshold obligation to point to some lawful basis for imprisonment. This obligation arises under the common law of *habeas corpus* that long predated our Constitution and exists independently of it. "*Habeas corpus* is," as the Supreme Court explained, "a writ antecedent to statute,…throwing its root deep into the genius of our common law." 124 S. Ct. at 2692 (*quoting Williams v. Kaiser*, 323 U.S. 471, 484 n.2 (1945)). This ancient writ is the right to require that the executive "show cause" for imprisonment. *See* 28 U.S.C. § 2243. Authorities have long acknowledged that the centerpiece of the common-law writ is its first-instance requirement that the Executive justify detention by pointing to law or adjudication. *See* 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND at 132-133 (1765) (in order to make imprisonment lawful, there must be a written warrant that "express[es] the causes of the commitment, in order to be examined into (if

---

[8]    The same allegations are made by Petitioner here.

necessary) upon a *habeas corpus.* If there be no cause expressed, the gaoler is not bound to detain the prisoner....[I]t is unreasonable to send a prisoner, and not to signify withal the crimes alleged against him."). This rule has been acknowledged by our courts from the beginning of the Republic, and by English courts long before. In *Ex parte Bollman,* 8 U.S. (4 Cranch) 75 (1807), the Court's grant of habeas relief did not depend on any finding of a violation of the Constitution or statute or regulation. The Court ordered the prisoners discharged simply because the Government had not demonstrated sufficient factual and legal cause for the detentions. *Id.* at 125, 136-37. The same was true in *Ex parte Burford,* 7 U.S. (3 Cranch) 448 (1806), where the Court issued a writ of habeas corpus and discharged a federal prisoner who had been committed to the custody of federal marshals. The prisoner pointed to no federal statute or constitutional provision violated by his detention. His sole claim was that the Government had not justified detention by some cause in fact or law. The Supreme Court ordered him discharged. *Id.* at 453. Nor does any of the numerous cases cited with approval by the Supreme Court in *Rasul* suggest that the prisoner has an obligation to point to an independent constitutional, statutory or regulatory right. The obligation to show cause is the Executive's.[9] Since it has now conceded that it has none, the prisoner must be released.

## E.    This Court Has Power To Grant Interim Release Pending Final Resolution Of A *Habeas* Case

### 1.    This Court Has Power to Order Conditional Bail Or Release.

We expect the Government to argue that Petitioner is being held only because it has not yet been able to arrange for a third country to accept him as an asylee. Its failure in that regard is not a legal justification to continue imprisonment. However, even if the Court were inclined to permit the Government some leeway in attempting to arrange for the Petitioner's ultimate

---

[9]    *See* 28 U.S.C. § 2243.

resettlement abroad, the Court of Appeals in this circuit has recognized a power of interim release, pending final adjudication of the writ.

A district court having jurisdiction of a *habeas corpus* matter has the power to order interim release; that is, a temporary release from custody pending final adjudication of the writ. *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (*citing to Baker*, 420 F.2d at 1343); *Ostrer v. United States*, 584 F.2d 594, 596 at n.1 (2d Cir. 1978); *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968) (ordering the release of a habeas petitioner on bail pending exhaustion of state and federal remedies); *Whitfield v. Hanges*, 222 F. 745, 755-56 (8th Cir. 1915) (holding that an alien about to be deported without a fair hearing is entitled to relief by habeas corpus). In *Baker*, the Court of Appeals for the District of Columbia confirmed that a district court has "an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits." *Baker*, 420 F.2d at 1343. The D.C. Circuit specifically noted that "*[r]elease is available in a habeas corpus action*, which is a civil collateral attack." *Id.* (emphasis added).

The Second Circuit Court of Appeals's recent decision in *Mapp* cites to *Baker* and is in accord with it. *Mapp* involved a *habeas* petitioner who had been detained by the Immigration and Naturalization Service ("INS") pending deportation pursuant to a statute authorizing such detention. The petitioner sought a writ of *habeas corpus*, and asked the district court to release him from INS detention on bond, pending resolution of the writ. No provision of immigration law authorized this. The Second Circuit affirmed the proposition that "[a] district court has inherent power to enter an order affecting the custody of a *habeas* petitioner who is properly before it contesting the legality of his custody." *Mapp*, 241 F.3d at 226 (*quoting Ostrer*, 584 F.2d at 596 n.1). It specifically held that this principle applies not simply to *habeas corpus*

challenges to criminal convictions, but also to cases involving immigration, alien status, and deportation.

*Mapp* is very close to the present situation. Indeed, *Mapp* presented a much stronger case for the Government because the Attorney General there acted under specific statutory authority to detain aliens. *See id.* at 228-29. Yet the Second Circuit concluded that even in such cases the district court had the power to consider whether a petitioner should be released on bail or conditions pending final resolution of the petitions for *habeas corpus*. That is precisely the relief Petitioners seek.

Grants of such relief are, of course, to be exercised only in "special cases." *Id.* at 226. This is such a case. Here the Government has (i) imprisoned the Petitioner, (ii) indefinitely, (iii) absent statutory authority, (iv) after what amounts to an acquittal. Furthermore, the Government had kept this information a secret from the public, Petitioner's counsel, and this Court. Such extraordinary circumstances warrant the remedy.

### 2.    **Factors Governing Release.**

At any hearing on interim release, this Court should consider (i) whether the relief sought is appropriate to make the *habeas* remedy effective, and (ii) whether, upon release subject to conditions, the petitioner represents a substantial threat to the community, or of flight. *See id.* at 224, 226 & 230. We request such a hearing.

   *a.    Interim Release is Necessary to Make the Habeas Remedy Effective.*

First, release is necessary to make habeas effective, because without it the wrong habeas addresses -- indefinite, illegal imprisonment -- will continue. In the Supreme Court's 2004 Guantanamo decisions, *indefinite* detention was a matter of great concern. *See Rasul*, 124 S. Ct. at 2699 (discussing the "legality of the Executive's potentially indefinite detention of individuals

who claim to be wholly innocent of wrongdoing"); *id.* at 2701 ("[I]n light of . . . the indefinite

pretrial detention of the detainees, I would hold that federal court jurisdiction is permitted in

these cases") (Kennedy, J., concurring); *see also Zadvydas v. Davis*, 533 U.S. 678, 702 (2001)

(finding it error to deny *habeas* petitions challenging indefinite detention, even where detention

had been authorized by Congress).

More practically, the presence of Petitioner in this District would remove a significant

impediment to the ultimate resolution of his case. In most countries, the usual practice is to

accept a quota of such refugees referred by the United Nations High Commissioner for Refugees

("UNHCR"). A refugee decision involves a two-step process. First, the petitioner must qualify

as a victim of political persecution. Second, the UNHCR must satisfy itself that no "exclusion"

exists that would indicate that the petitioner is not a suitable candidate for asylum. Notably, and

not surprisingly, the UNHCR undertakes its own "due diligence" in a refugee case. On

information and belief, the restrictions on base access impede the smooth functioning of the

review process. We believe that this problem may have contributed to substantial delays at

Guantanamo. Were the Petitioner to be present in the District, however, UNHCR representatives

could more readily conduct their background checks directly, and the case could more readily

move forward towards a consensual transfer abroad. None of this would interfere with whatever

the State Department may be doing, and indeed it might assist that process.

    *b.*    *The Petitioner Does Not Present a Risk Justifying Continued Imprisonment.*

The Government has, to date, denied us any access to our client. But it has failed to

proffer any evidence suggesting that it could carry its burden to show that he would be a threat to

the community or himself, or that he would not obey orders of this Court. Any such assertions,

if made, would require a hearing with the Petitioner present and able to traverse the allegations.

## V. CONCLUSION

The Motion should be allowed.


Dated: October 19, 2005                    Respectfully submitted,

                                           COUNSEL FOR PETITIONERS:


                                           _Sabin Willett_
                                           Sabin Willett
                                           Neil G. McGaraghan
                                           Jason S. Pinney
                                           **BINGHAM MCCUTCHEN LLP**
                                           150 Federal Street
                                           Boston, MA  02110-1726
                                           Telephone:    (617) 951-8000
                                           Facsimile:    (617) 951-8925

                                           Susan Baker Manning
                                           **BINGHAM MCCUTCHEN LLP**
                                           1120 20th Street NW, Suite 800
                                           Washington, DC  20036
                                           Telephone:    (202) 778-6150
                                           Facsimile:    (202) 778-6155

                                           Farschad Farzan
                                           **BINGHAM MCCUTCHEN LLP**
                                           Three Embarcadero Center
                                           San Francisco, CA 94111
                                           Telephone:    (415) 393-2000
                                           Facsimile:    (415) 393-2286

                                           Barbara Olshansky
                                           Deputy Director
                                           **CENTER FOR CONSTITUTIONAL
                                           RIGHTS**
                                           666 Broadway, 7th Floor
                                           New York, NY 10012
                                           Telephone:    (212) 614-6439