IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMAL KIYEMBA, *et al.*,<br><br>        Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br>        Respondents/Defendants. | Civil Action No. 05-CV-01509 (RMU) |

**PETITIONER SADDIQ AHMAD TURKISTANI'S MOTION FOR AN ORDER
AMENDING ACCESS PROCEDURES PERTAINING TO NON-ENEMY COMBATANTS**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1
II. BACKGROUND .....................................................................................................2
III. PROPOSED REVISED ACCESS PROCEDURES FOR NON-ENEMY COMBATANTS ........................................................................................................3
    A. The Protective Order ...................................................................................3
    B. Respondents Have Failed To Meet And Confer Regarding The Proposed Amendment ................................................................................4
    C. The Proposed Revised Access Procedures ..................................................5
        1. Classified information ......................................................................5
        2. Security clearance .............................................................................6
        3. Correspondence procedures ..............................................................7
        4. Counsel visits ....................................................................................8
            a. Logistics ................................................................................8
            b. Materials brought into attorney-client meetings by counsel ..........9
        5. Telephone access ...............................................................................9
        6. JTF-Guantanamo Security Procedures ...........................................10
IV. CONCLUSION ......................................................................................................11

i

I.  **INTRODUCTION**

Petitioner Saddiq Ahmad Turkistani is not an "enemy combatant." He had not committed any crime and, indeed, he is not accused of any wrongdoing. As the Court is aware, the United States government nevertheless continues to treat him like a criminal and imprison him at the United States Naval Base in Guantanamo Bay, Cuba. It does so for its own convenience.

This Court should not condone the government's error of treating this innocent man as if he was an "enemy combatant." As discussed at greater length below, this Court has adopted a Protective Order that was specifically designed to govern sensitive information and attorney-client access procedures in cases involving "enemy combatants." Serious practical problems have arisen under the Protective Order, and the procedures for attorney-client communications have proven unworkable. But in the case of a non-enemy combatant such as Mr. Turkistani, it is not just the practical problems of the Protective Order that should be addressed. The basic assumption of the Protective Order—that detainees are dangerous men—has no place here. That erroneous assumption, and the many restrictions to Mr. Turkistani's freedom, access to counsel, and access to the world outside Guantanamo that flow from it, should be excised from this case.

Petitioner Turkistani therefore proposes Revised Procedures For Counsel Access To Non-Enemy Combatant Detainees At The U.S. Naval Base In Guantanamo Bay, Cuba (the "Revised Access Procedures") that will govern his access to counsel, family, and information.[1] This Court has broad discretion to enter an appropriate protective order in cases pending before it. *See generally* Fed. R. Civ. P. 26(c). The particular, and near-unique circumstances of Mr. Turkistani's case warrant modifying the previously entered Protective Order as it applies to him.[2]

---

[1]  The proposed Revised Access Procedures are attached as Exhibit A to the Manning Declaration.

[2]  The other eight Petitioners in this action do not at this time seek modification of the Protective Order as it applies to them.

Mr. Turkistani therefore respectfully requests that the Court adopt these Revised Access Procedures.

## II.    BACKGROUND

The United States has imprisoned Mr. Turkistani for nearly four years. The only purported authority or justification the government has ever had for holding anyone at Guantanamo is that he is an "enemy combatant." The government concedes, however, that Mr. Turkistani is not an "enemy combatant." The government therefore has no authority whatsoever to continue to imprison him.

Mr. Turkistani is a Saudi Arabian national of Uighur descent. The government has apparently determined that he cannot be repatriated to his home country, and has not been unable to identify any other country willing to accept him. And the government chooses not to give him refuge in this country.

Instead, the government chooses to continue to jail Mr. Turkistani at Guantanamo. Although the government has incrementally improved the conditions of his confinement by transferring him to a relatively less restrictive camp, the fact is that he is an innocent man are still held in one of the most oppressive, isolated and restrictive prisons in the world. He deserves nothing less than complete freedom immediately.

Mr. Turkistani has already asked this Court for that freedom. And he has alternatively moved for interim release, subject to appropriate conditions to be set by the Court, pending final resolution of their Petition for Writs of Habeas Corpus. *See* Docket No. 29. The Revised Access Procedures are not, of course, a substitute for Petitioner's core legal entitlement to be released. As documented at length in Petitioner's previous filings, there is no lawful basis to imprison him, and we confess to some concern that relaxed access procedures might obscure the profound wrong of prolonged, unlawful incarceration. In *Zadvydas v. Davis* the Supreme concluded that indefinite detention of undeportable aliens "would raise serious constitutional concerns" and created a presumption prohibiting such detention for more than six months. 533 U.S. 678, 682 (2001). Counsel is informed and believes that it has been at least that long since Mr. Turkistani

was formally cleared. Petitioner requests in the first instance that this motion be rendered moot by a grant of his pending request for parole.

Until the Court grants Petitioner's pending motion, however, or the government chooses to release him, he remains in jail. While nothing can erase the harm of being unjustly imprisoned, Petitioner must *at minimum* be given full access his counsel, families, and friends. But beyond that, he should be given as much freedom as possible given his continued (unjust) incarceration. He is an innocent man. Anything less is unconscionable.

### III.   PROPOSED REVISED ACCESS PROCEDURES FOR NON-ENEMY COMBATANTS

#### A.   The Protective Order

On November 8, 2004, in *In re Guantanamo Detainees Cases*, Senior Judge Joyce Hens Green entered an Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba (hereinafter collectively "the Protective Order"). Manning Decl. Ex. B.[3] The Protective Order was designed to safeguard the government's legitimate security concerns, while establishing effective procedures for attorney-client communication and access in the Guantanamo *habeas* cases. *See* Protective Order at 1-2. On November 10, 2004, Judge Green also entered an Order Addressing Designation Procedures for "Protected Information," and on December 13, 2004 issued an Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order.

Although Judge Green's three Orders have been entered here, *see* Docket No. 8, this case is critically different from other pending Guantanamo *habeas* cases because the government here

---

[3]   Judge Green's Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba (hereinafter "the Access Procedures") are Exhibit A to the Amended Protective Order.

admits that Mr. Turkistani is not an enemy combatant.[4] The Protective Order and Access Procedures assume that every detainee in Guantanamo is an alleged "enemy combatant" and treat detainees accordingly. *See, e.g.,* Access Procedures at § II(C) ("Detainee: An individual detained by DoD *as an alleged enemy combatant* at the U.S. Naval Base in Guantanamo Bay Cuba.") (emphasis added).[5] Here, that assumption is wrong.

The proposed Revised Access Procedures attempt to balance Petitioner's obvious and substantial interest in maximizing his liberty, and in improving his communication with counsel, friends and family even during continued detention at Guantanamo, with what Petitioner's counsel understands to be the government's ongoing security concerns.

### B. Respondents Have Failed To Meet And Confer Regarding The Proposed Amendment

On October 19, 2005, Petitioner's counsel provided the Revised Access Procedures to Respondents, asked that Respondents stipulate to their adoption by the Court, and informed Respondents that Petitioner intended to submit the proposal to the Court by the end of the week. Manning Decl., Ex. D. Respondents refused to provide a timely substantive response, and instead indicated that they would consider the proposal and respond the following week. *Id.*, Ex. E. In the hope of reaching a mutually agreeable resolution of the issue, Petitioner agreed not to file as planed and waited for Respondents' substantive response. *Id.*, Ex. F. As of the date of

---

[4] The government also concedes that both Uighur petitioners in *Qassim v. Bush*, Case No. 05-0497 (JR) are not enemy combatants. The *Qassim* petitioners are represented by the same counsel as Mr. Turkistani, and they have simultaneously moved the *Qassim* court for adoption of the Revised Access Procedures. Petitioners are further informed and believe that the three Uighur petitioners in *Mamet v. Bush*, Case No. 05-01886 (EGS), are non-enemy combatants, but the government has refused to confirm or deny this. To date, the *Mamet* court has not entered a protective order.

[5] For the sake of clarity, the Revised Procedures define who is a non-enemy combatant. Revised Procedures § II(E) ("Non-enemy combatant detainee ('NEC detainee'): a person whom the United States government, whether through the CSRT process or otherwise, has determined is not an 'enemy combatant' but who is nevertheless detained by DoD at the U.S. Naval Base in Guantanamo Bay, Cuba. 'NEC' is synonymous with 'no longer enemy combatant' or 'NLEC.'").

this Motion, it has been two weeks since Respondents asked for additional time, but they have never in fact responded. *Id.* ¶ 7. Petitioner is therefore forced to seek relief from this Court.

### C.    The Proposed Revised Access Procedures

The proposed Revised Access Procedures are based on Judge Green's Access Procedures. Without engaging here in a line-by-line review of the changes,[6] the following are the significant substantive differences between the procedures that govern access to enemy combatants, and the proposed revised procedures for non-enemy combatants:

### 1.    Classified information

Under the Access Procedures, information counsel obtains from an enemy combatant detainee is presumed to be classified information, and must be treated as such unless and until it is declassified by the Privilege Review Team. *See* Access Procedures § IX(B). Classified information, and documents such as attorney interview notes, must be treated in accordance with government strictures on the use, transport and handling of classified material. *Id.* For example, attorney notes containing presumptively classified information are taken from counsel after client meetings, and sent to the secure facility in Crystal City, Virginia. Until the information is declassified, it can only be reviewed at the secure facility with the blinds closed. It cannot be discussed with team members who do not hold a security clearance, and it may not be discussed over the telephone at all. Counsel cannot address the presumptively classified information in a filing unless he or she prepares the pleading at the secure facility, while working on government approved computers. Any pleadings including the presumptively classified information must be filed under seal, rather than on the public record, and must be handled by the Court and its staff as classified information unless and until the government declassifies it.

---

[6]    For the convenience of the Court, Exhibit C to the Manning Declaration is a redline comparison of Judge Green's Access Procedures for enemy combatants with the Revised Access Procedures.

This burdensome process is wholly unnecessary. Even assuming for the sake of argument, that the presumption that information learned from detainees is classified is proper in the case of enemy combatant prisoners, it is wholly inappropriate and unreasonable for non-enemy combatants. These men are eligible for release, and the government has assured this Court that it is trying to find a third country that will grant them asylum. If—and, unfortunately, it appears to be a big if—the government ever finds a country to take them, these men will be free. There will be *no* restrictions on what they can or cannot tell the outside world.

Under the proposed Revised Access Procedures, information provided by a non-enemy combatant to counsel would be presumed classified only if it relates to "(i) nonpublic information concerning the security of JTF-Guantanamo facilities; or (ii) nonpublic information concerning detainees who counsel knows or reasonably believes to be classified currently as "enemy combatants" by DoD." Revised Access Procedures at § VII(A). If the information provided by a non-enemy combatant detainee pertains to either of those two subjects, counsel is required to treat the information as classified and the information will be handled under the same strict procedures laid out in the Access Procedures. *Id.* at §§ VII(C)-(I); VI (governing attorney notes and other materials brought out of attorney-client meetings); IX (governing dissemination of information learned from detainee). Otherwise, the information is not deemed classified and may be treated accordingly.

2.  **Security clearance**

Under the Access Procedures, only persons with a Secret level or higher security clearance, "or its equivalent (as determined by appropriate DoD intelligence personnel)" may have access to an enemy combatant detainee. Access Procedures § III(A)(1). Non-US citizens are not eligible for the required Secret level or higher security clearance. The Revised Access Procedures maintain this requirement, but specifically provide that otherwise-eligible individuals will not be denied access to non-enemy combatant detainees—in other words, will not be denied an "equivalent" clearance—*solely* because they are not U.S. citizens. Revised Access Procedures § III(A)(3). This is particularly important given the very small number of U.S.

citizens who speak the Uighur language, and the difficulties counsel have experienced in identifying U.S. citizen translators.

This change is in keeping with practices to date in the *Qassim* case. With the government's approval, a non-U.S. citizen, Nury Turkel, has traveled to the base and acted as a translator during an August 29, 2005 meeting in Camp Iguana between counsel and the *Qassim* Petitioners. Mr. Turkel has also served as an interpreter during attorney-client telephone calls between the *Qassim* Petitioners and their counsel.

### 3. Correspondence procedures

The Revised Access Procedures allow counsel to send traditional attorney-client communications (as also authorized by the Access Procedures), as well as other written materials (*e.g.*, books, magazines, photographs, etc.) and electronic materials (*e.g.*, CDs and DVDs) to non-enemy combatant detainees. Revised Access Procedures § IV(A)(1). *See also id.* at § II(D) & (H) (defining "electronic material" and "written material"). Contraband is absolutely forbidden.[7]

The government has gone to great lengths to isolate prisoners at Guantanamo from the outside world. Beyond physically isolating them on an island, the government has tried mightily to prevent Guantanamo prisoners from learning anything about the outside world, or indeed the outside world from learning anything about them. If there was ever a legitimate governmental interest in cutting enemy combatant prisoners off from communication with the outside world, there cannot possibly be any reason to limit non-enemy combatant prisoners' access to information. Counsel should be able to send Petitioner letters, books, magazines, newspapers, movies, music and any other sort of media. None of this will imperil the security of JTF-Guantanamo facilities or personnel.

---

[7] *See* § III(f) below for a discussion the term "contraband," which was not defined in the previous Access Procedures, and which is defined in the proposed Revised Access Procedures.

Because correspondence to and from Guantanamo detainees has been plagued by delay,[8] the Revised Access Procedures require records to be kept of detainee mail, and create reasonable timetables for mail delivery. Revised Access Procedures §§ IV(A)(3)-(4); IV(B)(3)-(4); IV(C)(2); IV(D). Counsel may also send correspondence to non-enemy combatant detainees by facsimile, for delivery within two days. *Id.* § IV(A)(3).

### 4. Counsel visits

#### a. Logistics

Petitioner and other non-enemy combatant detainees are presently incarcerated in Camp Iguana. With the government's agreement, counsel visited the *Qassim* Petitioners there on August 29, 2005, and anticipate visiting Mr. Turkistani there on November 14, 2005. It is current DoD policy that all attorney-client visits between counsel and enemy combatant prisoners take place in Camp Echo, a solitary confinement facility. It is also DoD policy that prisoners be shackled to the floor during attorney-client visits. Detainees are sometimes moved to Camp Echo well in advance of attorney-client meetings and left there until long after the meeting has ended, effectively punishing them for meeting with counsel.

The Revised Access Procedures provide that counsel visits with non-enemy combatants will take place where the detainee is housed. Revised Access Procedures §§ III(D)(2) & X(F). This is in keeping with recent practices, and avoids the further injustice of detaining innocent men in solitary confinement. By ensuring that non-enemy combatants no longer have to pay the price of solitary confinement in order to speak with counsel, it also avoids burdening the

---

[8] To take just one example, Petitioners in the *Qassim* case wrote to counsel on June 13, 2005, informing counsel that they had been exonerated by the CSRT. When counsel first met with the *Qassim* Petitioners at the base a month later, on June 13 and 14, they learned of this correspondence and of Petitioners' innocence for the first time. On July 25, Counsel asked about the delay of this attorney-client communication, and was told by counsel for Respondents that "DoJ has no control over the timing of the postal system or the United States Postal Service." Finally, on September 21—exactly 100 days after it was sent—this letter was finally delivered to counsel.

attorney-client relationship.

The Revised Access Procedures also require the government to cover the actual travel and accommodation costs for one attorney and one translator for each counsel visit. Revised Access Procedures § III(D)(5). Given the government's choice to imprison innocent men in a part of Cuba over which the United States has sole domain, and counsel's *pro bono* representation of them, this is more than reasonable.

### b.   Materials brought into attorney-client meetings by counsel

Consistent with the Revised Access Procedures for attorney-client mail, the new visitation procedures clarify that counsel may bring legal mail, written material, and electronic material (in addition to writing utensils and paper) into a client meeting. Revised Access Procedures § V(A). Other materials may be brought in only with the prior approval of the JTF-Guantanamo Commander. *Id.*

### 5.   Telephone access

With the government's agreement, counsel spoke with Mr. Turkistani for the first time by telephone on November 1, 2005. Counsel have also twice spoken with Petitioners in the *Qassim* case telephone, and one of the *Qassim* Petitioners has also spoken to his sister by telephone on two occasions. The Revised Access Procedures specifically provide for telephonic access to non-enemy combatant detainees, while also avoiding some of the wholly unnecessary—and, indeed, punitive—treatment non-enemy combatant prisoners have experienced in order to have a simple telephone call. Specifically, the Revised Access Procedures require that "DoD shall maintain one or more telephones within Camp Iguana for use by NEC detainees," and that the men have unlimited access to the telephones. Revised Procedures § VIII(A). Attorney-client communications are not to be monitored, *id.* § VIII(B), and telephone calls with friends and family "may be monitored solely for the purpose of preventing release of classified information concerning (1) the security of JTF Guantanamo facilities or (2) persons not classified as NEC detainees who are detained there." *Id.* § VIII(C).

By making telephones available to non-enemy combatant detainees in the camp where

they are held, the Revised Access Procedures avoid the problem of transferring the men to the Camp Echo solitary confinement facility for a simple phone-call. DoD has transferred non-enemy combatants to Camp Echo for counsel and family calls, and—egregiously—has even expanded on its wholly inappropriate policy of chaining prisoners to the floor of the cell during attorney-client visits (ostensibly for security reasons) by chaining the men to the floor during telephone calls *when they are alone in the room.* This is unconscionable, and cannot be allowed to continue. The Revised Access Procedures ensure that it does not.

### 6. JTF-Guantanamo Security Procedures

The Revised Access Procedures amend the section entitled "JTF-Guantanamo Security Procedures" in ways that do not impact the security of JTF-Guantanamo facilities or personnel.

First, the Revised Access Procedures clarify the ban on "contraband" by specifically defining it as "weapons, chemicals, money, stamps, drugs, cigarettes, or physical articles reasonably susceptible to use for purposes of escape or inflicting injury on persons." Revised Access Procedures §§ II(A) (definition) & X(B) (prohibiting contraband). This is an important clarification and improvement over the previous Access Procedures, which prohibited "contraband," but did not clearly define it. *See* Access Procedures at § X(B) (prohibiting contraband and giving certain examples of contraband). The change is warranted. Certainly the government cannot justify denying these innocent men items that do not affect their safety and security, or the safety and security of others.

Second, the Revised Access Procedures clarify that the Commander's authorization for photography or recording (which is not permitted without authorization) "shall not be unreasonably withheld." Revised Access Procedures § X(C). Moreover, "[a]n NEC detainee's informed consent to be photographed or recorded shall be presumptive evidence of the reasonableness of such request." *Id.* This will be an invaluable form of communication with friends and family, and can only help the efforts to obtain asylum for Petitioner in a safe third country. Petitioner can and should be able to choose whether to be photographed or recorded.

## IV.  CONCLUSION

For all of these reasons, Petitioner respectfully request that the Court enter an order adopting the proposed Revised Procedures For Counsel Access To Non-Enemy Combatant Detainees At The U.S. Naval Base In Guantanamo Bay, Cuba.


Dated: November 2, 2005                   Respectfully submitted,

SADDIQ AHMAD TURKISTANI

By their attorneys


P. Sabin Willett
Neil G. McGaraghan
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
Telephone:  (617) 951-8000
Facsimile:   (617) 951-8925

Susan Baker Manning
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC  20036
Telephone:  (202) 778-6150
Facsimile:   (202) 778-6155

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Telephone:  (212) 614-6439