# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JAMAL KIYEMBA, as Next Friend of ABDUSABUR DOE, *et al*., | |
| Petitioners, | Case No. 1:05-cv-01509 (RMU) |
| v. | |
| GEORGE W. BUSH, *et al*., | **DECLARATION OF JASON S. PINNEY IN SUPPORT OF PETITIONERS' EMERGENCY MOTION FOR AN ORDER (1) DIRECTING RESPONDENTS TO COMPLY WITH THE PROTECTIVE ORDER AND TO PERMIT AND FACILITATE ATTORNEY MEETINGS WITH PETITIONERS AND (2) IMPOSING A SANCTION UPON RESPONDENTS** |
| Respondents. | |

I, Jason S. Pinney, declare as follows:

1.      I have personal knowledge of the facts stated herein and, if called upon, could and would testify competently to them.  I make this declaration in support of Petitioners' Emergency Motion for an Order (1) Directing Respondents To Comply with the Protective Order and To Permit and Facilitate Attorney Meetings with Petitioners and (2) Imposing A Sanction Upon Respondents ("Emergency Motion").

2.      I am an associate with Bingham McCutchen LLP, counsel of record for the petitioners in the above-captioned matter, Abdul Nassir (a.k.a. Abdulnasir, Abdul Annaser), Abdul Sabour (a.k.a. AbduSabur), Hammad Doe, and Khalid Doe.

3.      Attached hereto as Exhibit 1 are true and correct copies of e-mail correspondence between myself and Andrew Warden (May & June 2006).

4.      Attached hereto as Exhibit 2 is a true and correct copy of the March 14, 2006, Memorandum Opinion in *Adem v. Bush*, Civ. No. 05-723 (RWR)(AK).

5.      Attached hereto as Exhibit 3 is a true and correct copy of the May 11, 2006, Memorandum Order in *Sadar Doe v. Bush*, Civ. No. 05-CV-1704 (JR)(LFO)(AK).

6.      Attached hereto as Exhibit 4 is a true and correct copy of correspondence between Susan Baker Manning and Terry Henry (Aug. 2005).

7.      Attached hereto as Exhibit 5 are true and accurate copies of news articles referenced in the Emergency Motion (June 2006).

8.      Attached hereto as Exhibit 6 are true and accurate copies of e-mail correspondence between Sabin Willett, Terry Henry and Andrew Warden (June 12, 2006).

9.      Attached hereto as Exhibit 7 is a true and accurate copy of the Declaration of Gitanjali S. Gutierrez (June 14, 2006).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on June 14, 2006, in Boston, Massachusetts.


/s/ Jason S. Pinney
Jason S. Pinney

# EXHIBIT 1

**Pinney, Jason S.**

| | |
|---|---|
| **From:** | Pinney, Jason S. |
| **Sent:** | Tuesday, May 30, 2006 8:51 AM |
| **To:** | Andrew. Warden@usdoj. gov (E-mail) |
| **Cc:** | Willett, P. Sabin; McGaraghan, Neil; Pinney, Jason S. |
| **Subject:** | Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH)) |

Andrew,

Pursuant to our recent telephone discussion, we would like to request a base visit during the week of July 10-15, 2006. Attached below is a Habeas Visit Coordination Sheet outlining the details of our request. Please let us know whether the proposed dates work so that we may finalize travel arrangements.

In addition, we have attached a letter of representation request from our client Jalal Jalalidin's (ISN 285) sister Shahida Kudiazova. We will be forwarding a hardcopy of the request via Federal Express today. Please confirm whether the Government will continue to challenge Mr. Jalalidin's next friend status.

Finally, in light of recent opinions from Judge Kay and others, please let us know whether the Government will continue to refuse any of our requests to meet with clients in the *Kiyemba* case.

We look forward to hearing from you.

Jason S. Pinney
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
tel: 617.951.8684
fax: 617.428.6491
www.bingham.com

*The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.*

*You should recognize that responses provided by means of this email are akin to ordinary telephone or face-to-face conversations and do not reflect the level of factual or legal inquiry or analysis which would be applied in the case of a formal legal opinion. A formal opinion could reach a different result. We would, of course, be happy to prepare such a definitive statement or formal opinion if you would like us to.*


Pinney, Jason
S..vcf


Habeas Visit
Coordination Shee..


Jalal Jalalidin

**Habeas Visit Coordination Sheet**

**Case: Kiyemba v. Bush (District Court No. 05-1509 RMU)**
**Mamet v. Bush (District Court No. 05-1602 ESH)**

**Date: July 9-16, 2006**

**Attorney/Interpreter Information:**

| Name/Role* | Home City/State | SSN | Security Clearance | Planned Arrival Day | Planned Departure Day |
|---|---|---|---|---|---|
| P. Sabin Willett/A | Boston, MA | 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 | Secret | Sunday, 7/9/06. 5:00 PM | Thursday, 7/13/06, 8:00 AM |
| Neil McGaraghan/A | Boston, MA | 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 | Secret | Wednesday, 7/12/06, 6:15 PM | Sunday, 7/16/06, 9:00 AM |
| Jason Pinney/A | Boston, MA | 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 | Secret | Sunday, 7/9/06, 5:00 PM | Friday, 7/14/06, 8:30 AM |
| Rushan Abbas/I | Fresno, CA | 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 | Secret | Monday, 7/10/06, 6:45 PM | Sunday, 7/16/06, 9:00 AM |
| Felice Bezri/I | Boston, MA | | Secret | Sunday, 7/9/06, 5:00 PM | Tuesday, 7/11/06, 8:00 AM |

* For Attorney indicate with "/A"; for Interpreter indicate with "/I"

LITDOCS/641365.1

**Visit Schedule\*:**

| Date | Morning (time) Detainee/Counsel | Afternoon (time) Detainee/Counsel |
|---|---|---|
| Monday, July 10, 2006 | Saddiq Ahmed Turkestani (ISN 491) (meeting in Camp Iguana requested)<br><br>P. Sabin Willett/A<br>Jason Pinney/A<br>Felice Bezri/I | Saddiq Ahmed Turkestani (ISN 491) (meeting in Camp Iguana requested)<br><br>P. Sabin Willett/A<br>Jason Pinney/A<br>Felice Bezri/I |
| Tuesday, July 11, 2006 | Hammad (ISN not disclosed/ Uighur/believed to be in Camp I)<br><br>P. Sabin Willett/A<br>Jason Pinney/A<br>Rushan Abbas/I | Edham Mamet (102)<br><br>P. Sabin Willett/A<br>Jason Pinney/A<br>Rushan Abbas/I |
| Wednesday, July 12, 2006 | Abdul Nasser (aka Abdulnasir, Abdul Anasser) (ISN not disclosed/Uighur/ believed to be in Camp I)<br><br>P. Sabin Willett/A<br>Jason Pinney/A<br>Rushan Abbas/I | Jalal Jalalidin (ISN 285)<br><br>P. Sabin Willett/A<br>Jason Pinney/A<br>Rushan Abbas/I |
| Thursday, July 13, 2006 | Abdul Sabour (aka Abdusaber) (ISN not disclosed/Uighur/believed to be in Camp I)<br><br>Neil McGaraghan /A<br>Jason Pinney/A<br>Rushan Abbas/I | Khalid (ISN not disclosed/Uighur/believed to be in Camp I)<br><br>Neil McGaraghan /A<br>Jason Pinney/A<br>Rushan Abbas/I |

LITDOCS/641365.1

| | | |
|---|---|---|
| Friday,<br>July 14, 2006 | Abdusemet (ISN 295)<br><br>Neil McGaraghan /A<br>Rushan Abbas/I | Huzaifa Parhat (ISN 282)<br><br>Neil McGaraghan /A<br>Rushan Abbas/I |
| Saturday,<br>July 14, 2006 | Sabir (ISN 282)<br><br>Neil McGaraghan /A<br>Rushan Abbas/I | Edham Mamet (102)<br><br>Neil McGaraghan /A<br>Rushan Abbas/I |

\* JTF reserves the right to adjust visit schedule to meet operational needs

Dear Mr Saibin wellet
I am willing to invite
you to be the lawyer
of MY brother. jalalidin.
who has been detainging
in Guantanamo Bay.

His identification nomber
is 285. Sester jalalidin

MY name is Shahida Kudiazova.

Signature.



202-349-1491

SETTLEMENT AND INTEGRATION
SERVICES ORGANIZATION
LIUNA STATION, 360 JAMES ST. N.
LOWER CONCOURSE
HAMILTON, ONTARIO L8L 1H5

**Pinney, Jason S.**

| | |
|---|---|
| **From:** | Pinney, Jason S. |
| **Sent:** | Tuesday, June 06, 2006 4:04 PM |
| **To:** | 'Andrew. Warden@usdoj. gov (E-mail)' |
| **Cc:** | Willett, P. Sabin; McGaraghan, Neil; Pinney, Jason S. |
| **Subject:** | RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH)) |

Andrew,

Please advise as to whether the Government (1) can accommodate our proposed visit, (2) will continue to challenge our representation of Mr. Jalalidin and (3) will be refusing to grant us meetings with any of our clients during our next base visit.

Thank you.

Jason

-----Original Message-----

| | |
|---|---|
| **From:** | Pinney, Jason S. |
| **Sent:** | Tuesday, May 30, 2006 8:51 AM |
| **To:** | Andrew. Warden@usdoj. gov (E-mail) |
| **Cc:** | Willett, P. Sabin; McGaraghan, Neil; Pinney, Jason S. |
| **Subject:** | Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH)) |

Andrew,

Pursuant to our recent telephone discussion, we would like to request a base visit during the week of July 10-15, 2006. Attached below is a Habeas Visit Coordination Sheet outlining the details of our request.  Please let us know whether the proposed dates work so that we may finalize travel arrangements.

In addition, we have attached a letter of representation request from our client Jalal Jalalidin's (ISN 285) sister Shahida Kudiazova.  We will be forwarding a hardcopy of the request via Federal Express today.  Please confirm whether the Government will continue to challenge Mr. Jalalidin's next friend status.

Finally, in light of recent opinions from Judge Kay and others, please let us know whether the Government will continue to refuse any of our requests to meet with clients in the *Kiyemba* case.

We look forward to hearing from you.

Jason S. Pinney
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
tel:  617.951.8684
fax:  617.428.6491
www.bingham.com

*The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above.  Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient.  If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal.  Thank you.*

*You should recognize that responses provided by means of this email are akin to ordinary telephone or face-to-face conversations and do not reflect the level of factual or legal inquiry or analysis which would be applied in the case of a formal legal opinion.  A formal opinion could reach a different result.  We would, of course, be happy to prepare such a definitive statement or formal opinion if you would like us to.*

<< File: Pinney, Jason S..vcf >>  << File: Habeas Visit Coordination Sheet (July 2006).DOC >>  << File: Jalal Jalalidin >>

**Pinney, Jason S.**

| | |
|---|---|
| **From:** | Andrew.Warden@usdoj.gov |
| **Sent:** | Wednesday, June 07, 2006 9:20 AM |
| **To:** | Pinney, Jason S. |
| **Cc:** | McGaraghan, Neil; Willett, P. Sabin |
| **Subject:** | RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH)) |

Jason,

1) We have forwarded your visit request to Guantanamo for coordination and approval. I'll let you know as soon as the arrangements are finalized and approved. Regarding Mr. Abbas, has the Court Security Office verified that his security clearance is current and valid? The CSOs will need to verify the status of Mr. Abbas' clearance before he is approved to visit Guantanamo.

2) In light of the authorization from petitioner Jalaal's sister, we have no objection to counsel access with petitioner Jalaal at this time. Additionally, given the new authorization, we believe the petition on behalf of Jalaal should be amended to reflect that his sister is now the proper next-friend.

3) With respect to the remaining petitioners in the Kiyemba case who have outstanding next-friend standing issues (Abdunasir, Abdusabur, Hammad, Khalid), we cannot agree to schedule counsel visits with the petitioners at this time. As we've explained previously, petitioners have not directly authorized the filing of the petition, nor has the putative "next friend" detainee, Jamal Kiyemba, established appropriate next friend standing under Whitmore v. Arkansas, 495 U.S. 149 (1990).

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470


-----Original Message-----
From: jason.pinney@bingham.com [mailto:jason.pinney@bingham.com]
Sent: Tuesday, June 06, 2006 4:04 PM
To: Warden, Andrew (CIV)
Cc: sabin.willett@bingham.com; neil.mcgaraghan@bingham.com;
jason.pinney@bingham.com
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet
v. Bush (District Court No. 05-1602 (ESH))

Andrew,

Please advise as to whether the Government (1) can accommodate our proposed visit, (2) will continue to challenge our representation of Mr. Jalalidin and (3) will be refusing to grant us meetings with any of our clients during our next base visit.

Thank you.

Jason

> -----Original Message-----
> From:      Pinney, Jason S.
> Sent:      Tuesday, May 30, 2006 8:51 AM
> To: Andrew.Warden@usdoj. gov (E-mail)
> Cc: Willett, P. Sabin; McGaraghan, Neil; Pinney, Jason S.
> Subject:  Kiyemba v. Bush (District Court No. 05-1509 (RMU));
Mamet v. Bush (District Court No. 05-1602 (ESH))
>
> Andrew,
>
> Pursuant to our recent telephone discussion, we would like to request
a base visit during the week of July 10-15, 2006.  Attached below is a
Habeas Visit Coordination Sheet outlining the details of our request.
Please let us know whether the proposed dates work so that we may
finalize travel arrangements.
>
> In addition, we have attached a letter of representation request from
our client Jalal Jalalidin's (ISN 285) sister Shahida Kudiazova.  We
will be forwarding a hardcopy of the request via Federal Express today.
Please confirm whether the Government will continue to challenge Mr.
Jalalidin's next friend status.
>
> Finally, in light of recent opinions from Judge Kay and others, please
let us know whether the Government will continue to refuse any of our
requests to meet with clients in the Kiyemba case.
>
> We look forward to hearing from you.
>
> Jason S. Pinney
> Bingham McCutchen LLP
> 150 Federal Street
> Boston, MA 02110
> tel:  617.951.8684
> fax:  617.428.6491
> www.bingham.com
>
> The information in this transmittal (including attachments, if any) is
privileged and confidential and is intended only for the recipient(s)
listed above.  Any review, use, disclosure, distribution or copying of
this transmittal is prohibited except by or on behalf of the intended
recipient.  If you have received this transmittal in error, please
notify me immediately by reply email and destroy all copies of the
transmittal.  Thank you.
>
> You should recognize that responses provided by means of this email
are akin to ordinary telephone or face-to-face conversations and do not
reflect the level of factual or legal inquiry or analysis which would be
applied in the case of a formal legal opinion.  A formal opinion could
reach a different result.  We would, of course, be happy to prepare such
a definitive statement or formal opinion if you would like us to.
>
>  << File: Pinney, Jason S..vcf >>  << File: Habeas Visit Coordination
> Sheet (July 2006).DOC >>  << File: Jalal Jalalidin >>


========================================================================
====
Bingham McCutchen LLP Circular 230 Notice:   To ensure compliance with
IRS requirements, we inform you that any U.S. federal tax advice
contained in this communication is not intended or written to be used,
and cannot be used by any taxpayer, for the purpose of avoiding any
federal tax penalties.  Any legal advice expressed in this message is

being delivered to you solely for your use in connection with the
matters addressed herein and may not be relied upon by any other person
or entity or used for any other purpose without our prior written
consent.
=======================================================================
====

## Pinney, Jason S.

| | |
|---|---|
| **From:** | Pinney, Jason S. |
| **Sent:** | Tuesday, June 13, 2006 1:47 PM |
| **To:** | 'Andrew.Warden@usdoj.gov' |
| **Cc:** | Willett, P. Sabin; McGaraghan, Neil |
| **Subject:** | RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH)) |

Andrew,

Thanks for your prompt reply.  We understand that you will not be challenging our ability to meet with any of these petitioners during our next scheduled visit.  To be clear, however, please advise as to the Government's willingness to amend the Petition and let Sabir, Abdusamet, and Huzaifa proceed on their own behalf.

Best Regards.

Jason

-----Original Message-----
From: Andrew.Warden@usdoj.gov [mailto:Andrew.Warden@usdoj.gov]
Sent: Tuesday, June 13, 2006 12:35 PM
To: Pinney, Jason S.
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet
v. Bush (District Court No. 05-1602 (ESH))

Jason,

1) Abdusament:  In light of our receipt of the original Uighur authorization letter signed by Abdusament, we have no objection to you meeting with him during this visit.

2) Sabir:  We have no objection to you meeting with Sabir during this visit given your representation that Sabir expressed his consent to be represented by you during your meeting with him in January.  However, the only written evidence of Sabir's consent to representation is the Nov. 7, 2005 letter that purports to be written by him in English. Prior to second visit with him in April we asked you to provide us with an authorization of representation signed directly by Sabir.  See Revised Procedures for Counsel Access § III.C.2.  We have not received the signed authorization.  Please let me know where we stand on that issue.

3) Huzaifa:  In light of the explanation we received from LTC Vitale during your April visit regarding the preparation and authentication of the letter that purports to be from Hudhaifa (dated November 7, 2005), we have no objection to you meeting with Huzaifa during this visit.  However, because this visit will be your second with him, please provide us with an authorization of representation signed by Huzaifa following your visit.  See Revised Procedures for Counsel Access § III.C.2.

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470

-----Original Message-----
From: jason.pinney@bingham.com [mailto:jason.pinney@bingham.com]

Sent: Tuesday, June 13, 2006 10:04 AM
To: Warden, Andrew (CIV)
Cc: neil.mcgaraghan@bingham.com; sabin.willett@bingham.com
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH))

Andrew,

In regards to your paragraph no. 3 directly below, please confirm that the Government will not continue to challenge our representation of Sabir, Abdusamet, and Huzaifa and we will amend the Petition to reflect that these three men are proceeding on their own behalf (as we've done for Saddiq).  In addition, as suggested in your paragraph no. 2 directly below, we will amend the Petition to reflect that Jalal is proceeding through his sister.

Please advise of the Government's position on Sabir, Abdusamet, and Huzaifa immediately as we will soon be seeking relief before Judge Kay
on these matters.  I will follow up with a phone call later today.

Thank you.

Jason

-----Original Message-----
From: Andrew.Warden@usdoj.gov [mailto:Andrew.Warden@usdoj.gov]
Sent: Wednesday, June 07, 2006 9:20 AM
To: Pinney, Jason S.
Cc: McGaraghan, Neil; Willett, P. Sabin
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH))

Jason,

1) We have forwarded your visit request to Guantanamo for coordination and approval.  I'll let you know as soon as the arrangements are finalized and approved.  Regarding Mr. Abbas, has the Court Security Office verified that his security clearance is current and valid? The CSOs will need to verify the status of Mr. Abbas' clearance before he is approved to visit Guantanamo.

2) In light of the authorization from petitioner Jalaal's sister, we have no objection to counsel access with petitioner Jalaal at this time.
Additionally, given the new authorization, we believe the petition on behalf of Jalaal should be amended to reflect that his sister is now the proper next-friend.

3) With respect to the remaining petitioners in the Kiyemba case who have outstanding next-friend standing issues (Abdunasir, Abdusabur, Hammad, Khalid), we cannot agree to schedule counsel visits with the petitioners at this time.  As we've explained previously, petitioners have not directly authorized the filing of the petition, nor has the putative "next friend" detainee, Jamal Kiyemba, established appropriate next friend standing under Whitmore v. Arkansas, 495 U.S. 149 (1990).

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470

```
-----Original Message-----
From: jason.pinney@bingham.com [mailto:jason.pinney@bingham.com]
Sent: Tuesday, June 06, 2006 4:04 PM
To: Warden, Andrew (CIV)
Cc: sabin.willett@bingham.com; neil.mcgaraghan@bingham.com; jason.pinney@bingham.com
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District
Court No. 05-1602 (ESH))
```

Andrew,

Please advise as to whether the Government (1) can accommodate our proposed visit, (2)
will continue to challenge our representation of Mr.
Jalalidin and (3) will be refusing to grant us meetings with any of our clients during our
next base visit.

Thank you.

Jason

```
>  -----Original Message-----
> From:      Pinney, Jason S.
> Sent:      Tuesday, May 30, 2006 8:51 AM
> To: Andrew. Warden@usdoj. gov (E-mail)
> Cc: Willett, P. Sabin; McGaraghan, Neil; Pinney, Jason S.
> Subject:  Kiyemba v. Bush (District Court No. 05-1509 (RMU));
Mamet v. Bush (District Court No. 05-1602 (ESH))
>
> Andrew,
>
> Pursuant to our recent telephone discussion, we would like to request
a base visit during the week of July 10-15, 2006.  Attached below is a Habeas Visit
Coordination Sheet outlining the details of our request.
Please let us know whether the proposed dates work so that we may finalize travel
arrangements.
>
> In addition, we have attached a letter of representation request from
our client Jalal Jalalidin's (ISN 285) sister Shahida Kudiazova.  We will be forwarding a
hardcopy of the request via Federal Express today.
Please confirm whether the Government will continue to challenge Mr.
Jalalidin's next friend status.
>
> Finally, in light of recent opinions from Judge Kay and others, please
let us know whether the Government will continue to refuse any of our requests to meet
with clients in the Kiyemba case.
>
> We look forward to hearing from you.
>
> Jason S. Pinney
> Bingham McCutchen LLP
> 150 Federal Street
> Boston, MA 02110
> tel:   617.951.8684
> fax:   617.428.6491
> www.bingham.com
>
> The information in this transmittal (including attachments, if any) is
privileged and confidential and is intended only for the recipient(s) listed above.  Any
review, use, disclosure, distribution or copying of this transmittal is prohibited except
by or on behalf of the intended recipient.  If you have received this transmittal in
error, please notify me immediately by reply email and destroy all copies of the
transmittal.  Thank you.
>
> You should recognize that responses provided by means of this email
are akin to ordinary telephone or face-to-face conversations and do not reflect the level
of factual or legal inquiry or analysis which would be applied in the case of a formal
legal opinion.  A formal opinion could reach a different result.  We would, of course, be
```

happy to prepare such a definitive statement or formal opinion if you would like us to.
>
>  << File: Pinney, Jason S..vcf >>  << File: Habeas Visit Coordination
> Sheet (July 2006).DOC >>  << File: Jalal Jalalidin >>

===================================================================
====
Bingham McCutchen LLP Circular 230 Notice:    To ensure compliance with
IRS requirements, we inform you that any U.S. federal tax advice contained in this
communication is not intended or written to be used, and cannot be used by any taxpayer,
for the purpose of avoiding any federal tax penalties.  Any legal advice expressed in this
message is being delivered to you solely for your use in connection with the matters
addressed herein and may not be relied upon by any other person or entity or used for any
other purpose without our prior written consent.
===================================================================
====

**Pinney, Jason S.**

| | |
|---|---|
| **From:** | Andrew.Warden@usdoj.gov |
| **Sent:** | Tuesday, June 13, 2006 4:19 PM |
| **To:** | Pinney, Jason S. |
| **Cc:** | Willett, P. Sabin; McGaraghan, Neil |
| **Subject:** | RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH)) |

Jason,

At this time we take no position on your motion to amend the petitions for Sabir, Abdusamet, and Huzaifa.  We reserve the right to oppose the motion once we evaluate the evidence that petitioners have directly authorized the petitions.

Andrew

-----Original Message-----
From: jason.pinney@bingham.com [mailto:jason.pinney@bingham.com]
Sent: Tuesday, June 13, 2006 1:47 PM
To: Warden, Andrew (CIV)
Cc: sabin.willett@bingham.com; neil.mcgaraghan@bingham.com
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH))

Andrew,

Thanks for your prompt reply.  We understand that you will not be challenging our ability to meet with any of these petitioners during our next scheduled visit.  To be clear, however, please advise as to the Government's willingness to amend the Petition and let Sabir, Abdusamet, and Huzaifa proceed on their own behalf.

Best Regards.

Jason

-----Original Message-----
From: Andrew.Warden@usdoj.gov [mailto:Andrew.Warden@usdoj.gov]
Sent: Tuesday, June 13, 2006 12:35 PM
To: Pinney, Jason S.
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District Court No. 05-1602 (ESH))

Jason,

1) Abdusament:  In light of our receipt of the original Uighur authorization letter signed by Abdusament, we have no objection to you meeting with him during this visit.

2) Sabir:  We have no objection to you meeting with Sabir during this visit given your representation that Sabir expressed his consent to be represented by you during your meeting with him in January.  However, the only written evidence of Sabir's consent to representation is the Nov. 7, 2005 letter that purports to be written by him in English.  Prior to second visit with him in April we asked you to provide us with an authorization of representation signed directly by Sabir.  See Revised Procedures for Counsel Access § III.C.2.  We have not received the signed authorization.  Please let me know where we stand on that issue.

3) Huzaifa:  In light of the explanation we received from LTC Vitale during your April visit regarding the preparation and authentication of the letter that purports to be from Hudhaifa (dated November 7, 2005), we have no objection to you meeting with Huzaifa during this visit.  However, because this visit will be your second with him, please provide us with an authorization of representation signed by Huzaifa following your visit.  See Revised Procedures for Counsel Access § III.C.2.

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470

-----Original Message-----
From: jason.pinney@bingham.com [mailto:jason.pinney@bingham.com]
Sent: Tuesday, June 13, 2006 10:04 AM
To: Warden, Andrew (CIV)
Cc: neil.mcgaraghan@bingham.com; sabin.willett@bingham.com
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District
Court No. 05-1602 (ESH))

Andrew,

In regards to your paragraph no. 3 directly below, please confirm that the Government will
not continue to challenge our representation of Sabir, Abdusamet, and Huzaifa and we will
amend the Petition to reflect that these three men are proceeding on their own behalf (as
we've done for Saddiq).  In addition, as suggested in your paragraph no. 2 directly below,
we will amend the Petition to reflect that Jalal is proceeding through his sister.

Please advise of the Government's position on Sabir, Abdusamet, and Huzaifa immediately as
we will soon be seeking relief before Judge Kay
on these matters.  I will follow up with a phone call later today.

Thank you.

Jason

-----Original Message-----
From: Andrew.Warden@usdoj.gov [mailto:Andrew.Warden@usdoj.gov]
Sent: Wednesday, June 07, 2006 9:20 AM
To: Pinney, Jason S.
Cc: McGaraghan, Neil; Willett, P. Sabin
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District
Court No. 05-1602 (ESH))

Jason,

1) We have forwarded your visit request to Guantanamo for coordination and approval.  I'll
let you know as soon as the arrangements are finalized and approved.  Regarding Mr. Abbas,
has the Court Security Office verified that his security clearance is current and valid?
The CSOs will need to verify the status of Mr. Abbas' clearance before he is approved to
visit Guantanamo.

2) In light of the authorization from petitioner Jalaal's sister, we have no objection to
counsel access with petitioner Jalaal at this time.
Additionally, given the new authorization, we believe the petition on behalf of Jalaal
should be amended to reflect that his sister is now the proper next-friend.

3) With respect to the remaining petitioners in the Kiyemba case who have outstanding
next-friend standing issues (Abdunasir, Abdusabur, Hammad, Khalid), we cannot agree to
schedule counsel visits with the petitioners at this time.  As we've explained previously,
petitioners have not directly authorized the filing of the petition, nor has the putative
"next friend" detainee, Jamal Kiyemba, established appropriate next friend standing under
Whitmore v. Arkansas, 495 U.S. 149 (1990).

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470


-----Original Message-----
From: jason.pinney@bingham.com [mailto:jason.pinney@bingham.com]
Sent: Tuesday, June 06, 2006 4:04 PM
To: Warden, Andrew (CIV)
Cc: sabin.willett@bingham.com; neil.mcgaraghan@bingham.com; jason.pinney@bingham.com
Subject: RE: Kiyemba v. Bush (District Court No. 05-1509 (RMU)); Mamet v. Bush (District
Court No. 05-1602 (ESH))

Andrew,

Please advise as to whether the Government (1) can accommodate our proposed visit, (2)
will continue to challenge our representation of Mr.
Jalalidin and (3) will be refusing to grant us meetings with any of our clients during our
next base visit.

Thank you.

Jason

> -----Original Message-----
> From:    Pinney, Jason S.
> Sent:    Tuesday, May 30, 2006 8:51 AM
> To: Andrew. Warden@usdoj. gov (E-mail)
> Cc: Willett, P. Sabin; McGaraghan, Neil; Pinney, Jason S.
> Subject:  Kiyemba v. Bush (District Court No. 05-1509 (RMU));
Mamet v. Bush (District Court No. 05-1602 (ESH))
>
> Andrew,
>
> Pursuant to our recent telephone discussion, we would like to request
a base visit during the week of July 10-15, 2006.  Attached below is a Habeas Visit
Coordination Sheet outlining the details of our request.
Please let us know whether the proposed dates work so that we may finalize travel
arrangements.
>
> In addition, we have attached a letter of representation request from
our client Jalal Jalalidin's (ISN 285) sister Shahida Kudiazova.  We will be forwarding a
hardcopy of the request via Federal Express today.
Please confirm whether the Government will continue to challenge Mr.
Jalalidin's next friend status.
>
> Finally, in light of recent opinions from Judge Kay and others, please
let us know whether the Government will continue to refuse any of our requests to meet
with clients in the Kiyemba case.
>
> We look forward to hearing from you.
>
> Jason S. Pinney
> Bingham McCutchen LLP
> 150 Federal Street

> Boston, MA 02110
> tel:   617.951.8684
> fax:   617.428.6491
> www.bingham.com
>
> The information in this transmittal (including attachments, if any) is
privileged and confidential and is intended only for the recipient(s) listed above.  Any
review, use, disclosure, distribution or copying of this transmittal is prohibited except
by or on behalf of the intended recipient.  If you have received this transmittal in
error, please notify me immediately by reply email and destroy all copies of the
transmittal.  Thank you.
>
> You should recognize that responses provided by means of this email
are akin to ordinary telephone or face-to-face conversations and do not reflect the level
of factual or legal inquiry or analysis which would be applied in the case of a formal
legal opinion.  A formal opinion could reach a different result.  We would, of course, be
happy to prepare such a definitive statement or formal opinion if you would like us to.
>
>  << File: Pinney, Jason S..vcf >>  << File: Habeas Visit Coordination
> Sheet (July 2006).DOC >>  << File: Jalal Jalalidin >>


=====================================================================
====
Bingham McCutchen LLP Circular 230 Notice:   To ensure compliance with
IRS requirements, we inform you that any U.S. federal tax advice contained in this
communication is not intended or written to be used, and cannot be used by any taxpayer,
for the purpose of avoiding any federal tax penalties.  Any legal advice expressed in this
message is being delivered to you solely for your use in connection with the matters
addressed herein and may not be relied upon by any other person or entity or used for any
other purpose without our prior written consent.
=====================================================================
====

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

SALIM MUHOOD ADEM,                )
                                  )
            Petitioner,           )
                                  )
      v.                          )      Civil Action No. 05-CV-00723 (RWR)(AK)
                                  )
GEORGE W. BUSH, *et al*           )
                                  )
            Respondents.          )
_____)

**MEMORANDUM OPINION**

Pending before the Court is Petitioner Adem's Motion to Hold Respondents in Contempt

of the Protective Order [23] ("Pet'r Contempt Mot."), the Respondents' Opposition [26]

("Resp'ts Contempt Opp'n")[1] and Petitioner's Reply [28] ("Pet'r Contempt Reply"), as well as

Petitioner's Motion to Expedite Petitioner Access to Counsel [31] ("Pet'r Mot. to Exp."),[2] a

Supplement to the Motion to Expedite [32] ("Pet'r Supp."),[3] Respondents' Opposition to the

_____

[1]Respondents' Opposition to Petitioner's Motion for Contempt was also filed as a separate Motion for an Order to Show Cause Why the Case Should not Be Dismissed for Lack of Proper Next Friend Standing [27] ("Resp'ts' Show Cause Mot."). The Petitioner filed a Response [28] on Jan. 3, 2006, which was also filed as his Reply in Support of the Motion for Contempt. Respondents filed a Reply [30] ("Resp'ts' Show Cause Reply") on Jan. 13, 2006. The Motion for an Order to Show Cause is not technically pending before this Court. However, because Respondents' opposition and motion are identical, the Court's opinion inevitably addresses some of the issues raised by Respondents' Motion for an Order to Show Cause and the responsive pleadings.

[2]The Motion to Expedite Petitioner Access to Counsel and the Supplement seek substantially the same relief as Petitioner's original Motion to Hold Respondents in Contempt, namely, an order directing that Petitioner be allowed to meet with his counsel.

[3]On November 2, 2005, in recognition of "the need to promote orderly and efficient case management of all *habeas* petitions . . . relating to the rights of [Guantanamo] detainees," Judge

Motion to Expedite and the Supplement [33]/[34] ("Resp'ts Opp'n to Mot. to Exp."), and

Petitioner's Reply in Support of his Motion to Expedite [35] ("Pet'r Exp. Reply").

In his motions, Petitioner claims that Respondents have refused and continue to refuse

counsel access to Petitioner as required by the Protective Order.  The Government insists that

counsel provide written evidence of their authorization to represent the Petitioner before counsel

will be allowed to meet with him.   Upon consideration of the filings submitted by the parties,

and following a conference with counsel for Petitioner and Respondents, the Court finds that a

plain reading of the Protective Order dictates that Petitioner's counsel be allowed to meet with

their client in order to obtain the very authorization of representation that Respondents insist be

provided prior to any visits.  Respondents are ordered to comply with the Protective Order and

allow counsel to visit with Adem.

### Factual and Procedural Background

At their core, the issues presented to this Court are about the right of detainees at

Guantanamo to have access to counsel if they so choose.  At some point in late 2004, well over a

year ago, Petitioner Salim Muhood Adem asked for a lawyer to help him challenge his

potentially indefinite detention without charge by the United States at the Naval Base in

Guantanamo Bay, Cuba.  Al-Rawi Decl. ¶ 5, attached as Exhibit A to Clingman Decl., attached

---

Kessler, acting as Chair of the Calendar and Case Management Committee referred all motions
"pertaining to interpretation or construction of any protective order" entered in any of the
Guantanamo *habeas* cases to the undersigned for resolution pursuant to LCvR 72.2(a).  A party
may seek reconsideration of a ruling by a magistrate judge within 10 days after being served with
the magistrate judge's order.  LCvR 72.2(b). Rulings issued by a magistrate judge pursuant to
LCvR 72.2 are reviewed by the district court judge, in this case Judge Roberts, on a "clearly
erroneous" or "contrary to law" standard. LCvR 72.2(c).

as Exhibit 1 to Pet'r Mot. to Exp.    Adem, who does not speak English, communicated his

request for counsel to a fellow detainee, Mr. Bisher Al-Rawi, while they were housed together in

Camp Delta. Al-Rawi Decl. ¶ 5. Adem knew that Al-Rawi, who speaks both English and

Arabic, was represented by counsel and "he specifically requested that [Al Rawi] try to get him

an attorney." *Id.* Al-Rawi passed Adem's request for counsel to his own lawyer, Brent Mickum,

Esq. *Id.* ¶¶ 2-3. Mr. Mickum, in turn, found Adem a lawyer through the Center for

Constitutional Rights, whose lawyers are "of counsel" in the majority of Guantanamo *habeas*

cases.

Murray Fogler, Esq. volunteered to represent Adem free of charge and filed a *habeas*

petition on his behalf in April of 2005. On Nov. 10, 2005, having obtained their security

clearances, counsel for Adem requested permission to meet with their client. Fogler Decl. ¶ 6,

Dkt. No. 25. Respondents, however, refused to permit counsel to meet with Adem absent

written evidence either in the form of a "next friend" petition or directly from Adem authorizing

counsel to represent him. *Id.* ¶¶ 7-9.

On December 9, 2005, Petitioner filed the instant Motion to Hold Respondents in

Contempt for refusing to permit counsel to meet with Adem in violation of the Protective Order.

Respondents filed their Opposition on December 22, 2006. On December 29, 2005, this Court

met with counsel for Petitioner and Respondents. Petitioner's counsel agreed that they would

seek additional information from Al-Rawi regarding the circumstances of his relationship with

Adem. The undersigned deferred ruling on Petitioner's motions pending receipt of the additional

3

information, which counsel submitted in early February.[4]

Adem has now had a lawyer for nearly a year. However, it is unclear if Adem even knows that his lawyer exists because Respondents refuse to acknowledge counsel's authority to represent him. Counsel for Adem seek to meet with their client in order to confirm that he does, in fact, want representation. *See* Pet'r Contempt Mot. at 2. Respondents insist that before counsel will be allowed to meet with their client, the Protective Order requires that they provide evidence of their authority to represent him.[5] *See* Resp'ts Contempt Opp'n at 5. Alternatively, Respondents argue that Adem may convert his direct petition to a "next friend" petition. *Id.* at 11. However, as the pleadings in this and other Guantanamo *habeas* cases demonstrate, Respondents do not consider Al-Rawi to be a proper "next friend." *Id.* at 11-20. According to Respondents,

_____

[4] *See* Clingman Decl. ¶ 4, attached as Exhibit 1 to Pet'r Mot. to Exp.1; Al-Rawi Decl. ¶¶ 2-8, attached as Ex. A to Clingman Decl.; Gutierrez (Al-Rawi) Decl. ¶¶ 6-29, attached as Exhibit B to Pet'r Supp. to Mot. to Exp.

[5] In response to Petitioner's objection that such evidence is hard to come by without ever seeing their client, Respondents suggested that counsel mail their client a letter. Notwithstanding their objection that the Protective Order does not limit counsel to obtaining authorization of representation through the mail, counsel for Adem attempted to mail their client a letter, only to find themselves in another catch-22. Because Respondents do not acknowledge counsel's authority to represent their client, Respondents refused to allow counsel to utilize the procedures put in place for "legal mail" under the Protective Order. Pet'r Mot. to Exp. at 3-4.
The Amended Protective Order and Revised Access Procedures, (collectively "the Protective Order"), govern detainees' access to the outside world. The Protective Order was initially entered by Judge Joyce Hens Green in *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004). The Revised Access Procedures are attached as Exhibit A to the Amended Protective Order. The Protective Order provides for two different mail systems: one for legal mail and one for non-legal mail. *See* Protective Order, Ex. A § IV. "Legal mail" includes any "letters written between counsel and a detainee that are related to the counsel's representation of the detainee." *Id.*, Ex. A § II.E. Detainees may also send non-legal mail, including letters to family, but non-legal mail is subject to review and censorship by military personnel at Guantanamo and takes much longer to process than legal mail. *Id.*, Ex. A § IV.

4

only a family member or a close personal friend has standing to assert the interests of Adem

through the "next friend" device. Otherwise, argue Respondents, how can the Court be assured

that Adem really does want to challenge his detention? *Id.* at 18-19.

For reasons explained in this memorandum opinion, Respondents' arguments are

misplaced. The Protective Order manifestly does not require evidence of authority to represent a

detainee as a ***prerequisite*** to counsel meeting with a detainee. Rather, the Protective Order

plainly provides that counsel who purportedly represent a particular detainee must provide

evidence of their authority to represent that detainee within ***10 days*** of counsel's ***second visit***

with the detainee. *See* Protective Order, Ex. A § III.C.2  Because Adem, through counsel, has

filed a direct petition, the Court's Order rests on this holding alone.

However, as is explained in greater detail below, even if counsel had filed Adem's

*habeas* petition through Al-Rawi as "next friend," the Protective Order would still grant counsel

two visits with Adem directly (plus 10 days) before any challenge to Al-Rawi's standing as next

friend would be ripe. Had Adem's *habeas* petition been filed through Al-Rawi as 'next friend,'

upon receiving evidence of counsel's authority to represent Adem directly, the Court would

simply convert the "next friend" petition into a direct petition. If, on the other hand, evidence of

counsel's authority to represent Adem is not forthcoming within ten days of counsel's second

visit with Adem, then, and only then, would a motion to dismiss for lack of proper "next friend"

standing be appropriate.

## Analysis

I.    *History of the Protective Order and the Use of "Next Friends" in Guantanamo Habeas Cases*

It appears to the Court that the dispute between Adem and Respondents is the result of unnecessary confusion over the use of the terms "friend" and "next friend." This confusion is unfortunate, but perhaps understandable given the history of the Guantanamo *habeas* cases. On June 28, 2004, the Supreme Court ruled that the District Court had jurisdiction to consider aliens' "*habeas corpus* challenges to the legality of their [executive] detention at the Guantanamo Bay Naval Base." *Rasul v. Bush*, 542 U.S. 466, 484 (2004).

> Petitioners contend that they are being held in federal custody in violation of the laws of the United States. No party questions the District Court's jurisdiction over petitions' custodians. Section 2241, by its terms, requires nothing more.

*Id.* at 483-84

Prior to *Rasul*, the Government claimed authority to hold detainees at Guantanamo completely incommunicado and without access to counsel. *Id.* at 471-72. Until *Rasul*, therefore, the detainees at Guantanamo had neither access to the attorneys claiming to represent them nor the ability to personally seek relief from the courts reviewing their claims. Thus, *Rasul* and the related *habeas* cases were necessarily filed through other individuals, primarily relatives, acting as "next friends" as that term is traditionally used in the law. *Id.* at 471. A "next friend," as traditionally understood, functions as a guardian *ad litem*, standing in the shoes of the real party in interest throughout the entire litigation when the real party in interest is unable to represent himself or herself.[6]

---

[6]"Next friend" standing is a procedural mechanism by which a lawsuit is prosecuted or defended by someone other than the real party in interest. The practice of a "next friend"

6

Once *Rasul* rejected the proposition of Guantanamo Bay as a legal black hole, the "next friend" device, at least as the term is traditionally understood in its legal context, became unnecessary to sustain a *habeas* petition because detainees could eventually access counsel directly. On July 19, 2004, the Court of Appeals for the D.C. Circuit remanded *Rasul* and the related cases back to the District Court for further proceedings in light of the Supreme Court's opinion. On remand, the Government began drafting proposed procedures that would govern detainees' access to counsel. *See Rasul v. Bush*, No. 02-299 (D.D.C. July 26, 2004) (Dkt. No. 51) (order instructing parties to file a joint status report and briefing schedule regarding proposed procedures for counsel access to detainees); *Al Odah v. United States*, No. 02-828 (D.D.C. July 23, 2004) (Dkt. No. 38) (order setting briefing schedule on issue of "all proposed procedures with respect to counsel access that the Government intends to apply to the Guantanamo Bay detainees").

On Oct. 20, 2004, Judge Kollar-Kotelly ruled on the merits of the Government's proposed procedures. *Al Odah v. United States*, 346 F. Supp. 2d 1, 5-14 (D.D.C. 2004). *Al*

---

standing in the shoes of the real party in interest is an "ancient and fully accepted" practice, *U.S. ex rel Bryant v. Houston*, 273 F. 915, 916 (2d Cir. 1921), deriving from early English statutes, *see Whitmore v. Arkansas*, 495 U.S. 149, 162 (1990) (tracing development of "next friend" doctrine in *habeas* proceedings to English Habeas Corpus Act of 1679). Traditionally, a "next friend" stands in the shoes of the real party in interest when he or she cannot maintain the suit due to inaccessability, *see Whitmore*, 495 U.S. at 162-63, incapacity, *see Abbott v. Hancock*, 31 S.E. 268, 269 (N.C. 1898) ("next friend" permitted to prosecute tort action on behalf of an "insane" person); *Garnett v. Garnett*, 114 Mass. 379 (1874) ("next friend" permitted to bring divorce action on behalf of "insane" person), or infancy, *Blumenthal v. Craig*, 81 F. 320, 321-22 (3d Cir. 1897). "A 'next friend' does not himself become a party to the *habeas corpus* [or other] action. . . but simply pursues the cause on behalf of the detained [or incapacitated] person, who remains the real party in interest." *Whitmore*, 495 U.S. at 163. In that sense, "[a] 'next friend' resembles . . . a guardian ad litem" who prosecutes or defends the case from start to finish on behalf of another. *Morgan v. Potter*, 157 U.S. 195, 198 (1895).

*Odah* set the parameters for the final Amended Protective Order and Revised Access Procedures

subsequently approved by Judge Joyce Hens Green in *In re Guantanamo Cases*, 344 F. Supp. 2d

174 (D.D.C. 2004).[7]  In *Al Odah*, petitioners had challenged the government's proposed

procedures for counsel access, which contained significant restrictions on attorney-client

communications, including real-time monitoring of counsel meetings with detainees. *Al Odah*,

346 F. Supp. 2d at 3-4.  The Government took the position that detainees' access to counsel

existed purely at the pleasure of the Government, with restrictions to be imposed as it saw fit. *Id.*

at 3.  *Al Odah* flatly rejected the Government's position, *id.* at 5-8, and with it certain of the

Government's proposed procedures, *id.* at 9-14.  *Al Odah* held that the Guantanamo detainees are

entitled to be represented by counsel and that this Court has the authority to "craft the procedures

necessary" to enforce that right.  *Id.* at 7. On that basis, *Al Odah* rejected the Government's

proposal that it be allowed to monitor counsels' meetings with their clients and conduct a

classification review of counsels' notes and mail between counsel and detainees. *Id.* at 9-12.

Instead, Judge Kollar-Kotelly proposed a compromise framework under which counsel

would have completely unmonitored access to their clients, but which would permit the

government to conduct a classification review of attorney notes and detainee legal mail only if

---

[7]The judges of this District Court transferred the Guantanamo Bay *habeas* cases to Judge
Green for coordination and management, including rulings on all common procedural issues, on
Sept. 14, 2004, after briefing on the Government's proposed procedures for counsel access in *Al
Odah* had been completed and a hearing held before Judge Kollar-Kotelly.  *Al Odah*, 346 F.
Supp. 2d at 5 n.5.

the attorney who received the information wished to disclose the information to anyone else, including other counsel. *Id.* at 13-14. This framework subsequently became the basis for the Protective Order that now governs counsel access to detainees held at Guantanamo. *See* Resp'ts' Response on Proposed Procedures for Counsel Access, *Al Odah*, 02-828 (D.D.C. Nov. 4, 2004) (Dkt. No. 135) (acceding to "'closed universe' approach proposed by Judge Kollar-Kotelly").

Following *Rasul* and *Al Odah*, the Government began, on a rolling basis, to notify detainees that they had "the right to challenge the legality of their detention by filing *habeas corpus* petitions in federal court." (Second) Sweigart Decl. ¶¶ 2-5, attached as Exhibit A to Resp'ts' Contempt Opp'n. The "notification"[8] consists of approximately two paragraphs instructing detainees that they may challenge their detention "through a process called *a petition for a writ of habeas corpus*."[9] (Second) Sweigart Decl., Exs. A-C.

The notification tells detainees they may ***either*** file a "petition" themselves ***or*** they "may ask a friend or family member or a lawyer to file such a petition with the

_____

[8]The Department of Defense (DoD) issued three different types of notifications to detainees, depending on whether the detainee had been determined 1) an enemy combatant whose status may be reviewed by the Administrative Review Board (ARB), 2) an enemy combatant not eligible for ARB consideration because he is triable by Military Commission, or 3) a non-enemy combatant. (Second) Sweigart Decl. ¶¶ 3-5, Exs. A-C. Although each notification contains slightly different information, all three contain the same two paragraphs informing detainees of their right to seek review of the legality of their detention.

[9]The notification fails to provide any explanation of what a petition for *habeas corpus* is or how a detainee would go about getting one. (Second) Sweigart Decl., Exs. A-C. Some detainees were apparently so confused about what to do with the notice that they "simply mailed the entire [blank] sheet itself back to the court because they did not know what else to do to get legal assistance." Gutierrez (Kabir) Decl. ¶ 12, *Razakah v. Bush*, 05-2370 (D.D.C. Feb. 3, 2006) (Dkt. No. 8).

court."[10]  *Id.*  Once a *habeas* petition is docketed and the Protective Order entered, counsel may

meet with their detainee client.  *See* Protective Order, Ex. A § III.C.  Within ten days of their

second meeting, counsel must provide DoD with "evidence of his or her authority to represent

the detainee."  *Id.* § III.C.2.  Thus, after *Rasul* and the creation of the Protective Order, the legal

fiction of a "next friend" became largely irrelevant except as a mechanism for identifying those

detainees who seek to challenge their detention in the first instance.[11]  In those *habeas* cases

initiated since the creation and entry of the Protective Order, the detainees who initiated a *habeas*

petition on behalf of a fellow detainee generally do not seek to serve as a "next friend" in the

traditional sense, but are simply passing on another detainee's request for help, a fact that can be

confirmed once counsel meets directly with the detainee.[12]

    Unfortunately, post-*Rasul* and entry of the Protective Order, counsel for both

Respondents and Petitioners continued to use the term "next friend," even though the term's

_____

[10] The notification instructs detainees to write to the District Court in order to challenge
their detention, but provides little in the way of explanation about what detainees should write:

> If you do not have a lawyer or a family member or friend who could file this petition for
> you, you may file your own petition.  According to prior court rulings, petitions should be
> sent to:
>> United States District Court for the District of Columbia
>> 333 Constitution Ave., NW
>> Washington, DC 20001.

(Second) Sweigart Decl., Exs. A-C.

[11] A "next friend" might still be necessary if, however, a detainee is incapacitated or
otherwise unable to personally verify his intent to challenge his detention.

[12] *See* Gutierrez (Kabir) Decl. ¶¶ 19-20; Gutierrez (Al-Rawi) Decl. ¶¶ 14-22; Al-Rawi
Decl. ¶¶ 2-9.

traditional legal context no longer applied. This led the District Court in several instances to understandably assume that the so called "next friends" were in fact seeking to stand in the shoes of named detainees in the traditional sense, throughout the course of the *habeas* litigation.

In *Hamily v. Bush*, Judge Bates *sua sponte* issued an order to show cause why the case should not be dismissed for lack of "next friend" standing. *Hamily*, No. 05-763 (D.D.C. Oct. 3, 2005) (Dkt. No. 16) (Order to Show Cause). In *Hamily*, the detainee had filed a *habeas* petition through a fellow detainee, Shaker Aamer, as 'next friend' on April 15, 2005. Judge Bates issued the order to show cause because there was insufficient information in the record to determine whether Aamer could maintain "next friend" standing. *Id.* at 2. In fact, when the 'show cause' order was issued, counsel had already met directly with Hamily and obtained authorization of representation. However, counsel had failed to notify the Court of that fact. Smith Decl. ¶¶ 3-14, *Hamily v. Bush*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 20). Upon learning that Hamily had personally requested counsel to challenge his detention, Judge Bates converted the case into a direct petition and substituted Hamily as the sole petitioner. *Hamily*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 19).

From the time the Protective Order was first entered until approximately mid-summer 2005, the Government raised no objection to the practice of detainees initiating a *habeas* petition through a fellow detainee who was a friend because once the detainee confirmed his request for counsel, the question of 'next friend' standing was moot.[13] *See* Resp'ts' Response at 1-2, *Ahmed v. Bush*, No. 05-665 (June 23, 2005) (Dkt. No. 14) (taking no position on issue of "next friend"

_____

[13]The issue of 'next friend' standing appears to have been raised for the first time *sua sponte* in *Ahmed v. Bush*, No. 05-665 (May 24, 2005) (Dkt. No. 12) .

standing other than to argue that the fellow detainee should only be permitted to serve as a "next

friend" until such time as counsel could meet with Ahmed directly); *see also* Tarver Decl. ¶¶ 2-6,

attached as Ex. 2 to Pet'r Mot. to Exp. (noting that counsel was permitted to meet directly with

detainees who had filed *habeas* petitions through fellow detainees); *Sliti v. Bush*, No. 05-429

(D.D.C. 2005) (*habeas* petitions of seventeen detainees brought by three fellow detainees as

'next friends' without challenge).

     After *Hamily* and *Ahmed*, however, Respondents began challenging the standing of

fellow detainees to serve as "next friends."    At the same time, Respondents also refused to allow

counsel to meet with the detainee who was the real party in interest, thereby placing counsel in a

Sisyphean quagmire by preventing counsel from obtaining the authorization necessary to convert

the case to a direct petition.  As a result, the cases in which Respondents are challenging the

standing of fellow detainees to initiate a petition as a "next friend" have been at a standstill since

approximately October of 2005.[14]

_____

    [14]In Oct. of 2005, a number of pending motions challenging "next friend" standing in
Guantanamo *habeas* cases were transferred to Judge Oberdorfer pursuant to LCvR 40.6.  *See
Ahmed Doe v. Bush*, No. 05-1458 (Oct. 13, 2005) (Dkt. No. 8); *Nabil v. Bush*, No. 05-1504 (Oct.
25, 2005) (Dkt. No. 8); *Al Hawary v. Bush*, No. 05-1505 (Oct. 25, 2005) (Dkt. No. 10); *Shafiiq v.
Bush*, No. 05-1506 (Oct. 25, 2005) (Dkt. No. 10); *Idris v. Bush*, 05-1555 (Oct. 21, 2005) (Dkt.
No. 6); *Al Razak v. Bush*, 05-1601 (Minute Order dated Nov. 14, 2005); *Kabir v. Bush*, 05-1704
(Nov. 1, 2005) (Dkt. No. 18); *Qasim v. Bush*, 05-1779 (Oct. 31, 2005) (Dkt. No. 4); *Zakirjan v.
Bush*, 05-2053 (Oct. 21, 2005) (Dkt. No. 17); *Muhammed v. Bush*, 05-2087 (Nov. 11, 2005)
(Dkt. No. 11). In response to Petitioners' allegations that Respondents were preventing counsel
from obtaining direct authorizations from their detainee-clients, Judge Oberdorfer ordered
Petitioners and Respondents to confer with this Court to determine "how counsel for Petitioners
may obtain access to the detainees who allegedly seek to be represented by next friends to
determine if the detainees will authorize counsel to represent them directly."  *See* Order of
Oberdorfer, J., dated Nov. 4, 2005.
    Pursuant to Judge Oberdorfer's Order, this Court held a conference with counsel for the
Petitioners and Respondents in those cases in which a 'next friend' challenge had been raised.
The Court instructed Petitioners' counsel to meet with as many of the "next friends" as possible

II.   *Existing Procedures for Providing Detainees with Meaningful Access to Counsel and the Court*

The DoD "notifications" instruct detainees that they may either file a petition themselves

or they "may ask a friend or family member or a lawyer to file such a petition with the court."

(Second) Sweigart Decl., Exs. A-C.  The District Court received approximately 56 *"pro se*

petitions"[15] in response to the DoD notifications.[16]  Respondents point to these *pro se* petitions as

---

to seek additional information about the circumstances of their relationships with the detainees who are the real parties in interest.  Gitanjali Gutierrez, who is of counsel in many of the Guantanamo *habeas* cases, met with Mr. Al-Rawi, Mr. Kiyemba and Mr. Kabir.  These meetings shed some light on the ways detainees may have understood their legal rights and the process for challenging their detention in federal court. *See* Gutierrez (Al-Rawi Decl.); Gutierrez (Kabir) Decl.   Respondents have since transferred Jamal Kiyemba to the custody of the government of Uganda. *See* Respondents' Notice of Transfer, *Deghayes v. Bush*, 04-2215 (Feb. 9, 2006) (Dkt. No. 39).  Kiyemba, who speaks English, had relayed the requests of three other detainees for a lawyer to his lawyer. *See Nabil v. Bush*, No. 05-1504; *Shafiq v. Bush*, No. 05-1506; *Muhammed v. Bush*, No. 05-2087.
     Adem's petition is presently filed as a direct petition, and was therefore not one of the cases referred to Judge Oberdorfer.  Rather, the motions currently before the Court were referred directly to the undersigned by Judge Roberts.  However, because Respondents argue that Adem's petition should have been filed as a 'next friend,' many of the issues are identical.

[15]The term *"pro se* petition" is something of a euphemism in this context.  Because the notifications provided no explanation about the meaning of *"habeas corpus"* or what steps a detainee should take to challenge his detention, the responses received by the District Court varied widely.  The Court received lengthy letters of several pages as well as letters that consisted of little more than a few sentences asking for an explanation for their detention. The Court treated these inquiries as *pro se* petitions.

[16]*See* Resp'ts' Contempt Opp'n at 13 n. 9 (listing *Khiali-Gul v. Bush*, No. 05-877; *Rahmattulah v. Bush*, No. 05-878; *Mohammad v. Bush*, No. 05-879; *Nasrat v. Bush*, No. 05-880; *Slahi v. Bush*, No. 05-881; *Rahman v. Bush*, No. 05-882; *Bostan v. Bush*, No. 05-883; *Muhibullah v. Bush*, No. 05-884; *Mohammad v. Bush*, No. 05-885; *Wahab v. Bush*, No. 05-886; *Chaman v. Bush*, No. 05-887; *Gul v. Bush*, No. 05-888; *Basardh v. Bush*, No. 05-889; *Khan v. Bush*, No. 05-890; *Nasrullah v. Bush*, No. 05-891; *Shaaban v. Bush*, No. 05-892; *Sohail v. Bush*, No. 05-993; *Tohirjanovich v. Bush*, No. 05-994; *Slahi v. Bush*, No. 05-995; *Mohammad v. Bush*, No. 05-996; *Khudaidad v. Bush*, No. 05-997; *Al Karim v. Bush*, No. 05-998; *Al-Khalaqi v. Bush*, No. 05-999; *Sarajuddin v. Bush*, No. 05-1000; *Kahn v. Bush*, No. 05-1001; *Mohammed v. Bush*,

evidence that detainees are able to challenge their detention without seeking the assistance of a

fellow detainee, arguing in effect that Adem must not want to challenge his detention because he

did not submit a *pro se* petition directly to the Court. Resp'ts' Contempt Opp'n at 13-15.   The

evidence suggests, however, that DoD's attempts to notify detainees of their right to challenge

their detention have been marginally effective at best.

      First, it appears that there was significant confusion among detainees about what the DoD

notifications were and what the detainees should do with them.  *See* Gutierrez (Al-Rawi) Decl. ¶¶

6-12.  As noted previously, the DoD notice informed detainees that they could "ask a civilian

judge to look at the lawfulness of your detention through a process called a *petition for a writ of

habeas corpus*" without providing any further explanation. *See* (Second) Sweigart Decl., Exs. A-

C.  According to Al-Rawi, "[n]o U.S. personnel are available at the base to answer any

detainee's questions about how to obtain a lawyer or what a *habeas* petition is." Gutierrez (Al-

Rawi) Decl. ¶ 12; *see also* Gutierrez (Kabir) Decl. ¶ 18 (noting that the Military Police "were

prohibited from helping the detainees with any legal or other questions about the notification").

Petitioner asserts that detainees who tried to ask their "personal representative" for an

---

No. 05-1002; *Mangut v. Bush*, No. 05-1008; *Hamad v. Bush*, No. 05-1009; *Khan v. Bush*, No.
05-1010; *Zuhoor v. Bush*, No. 05-1011; *Ali Shah v. Bush*, No. 05-1012; *Salaam v. Bush*, No. 05-
1013; *Mammar v. Bush*, No. 05-1233; *Ahmed v. Bush*, No. 05-1234; *Baqi v. Bush*, No. 05-1235;
*Abdulzaher v. Bush*, No. 05-1236; *Aminullah v. Bush*, No. 05-1237; *Ghalib v. Bush*, No. 05-
1238; *Al Khaiy v. Bush*, No. 05-1239; *Altaiy v. Bush*, No. 05-1240; *Bukhari v. Bush*, No. 05-
1241; *Pirzai v. Bush*, No. 05-1242; *Peerzai v. Bush*, No. 05-1243; *Alsawam v. Bush*, No. 05-
1244; *Mohammadi v. Bush*, No. 05-1246; *Al Ginco v. Bush*, No. 05-1310; *Ullah v. Bush*, No. 05-
1311; *Al Bihani v. Bush*, No. 05-1312; *Sadkhan v. Bush*, No. 05-1487; *Faizullah v. Bush*, No. 05-
1489; *Faraj v. Bush*, No. 05-1490; *Khan v. Bush*, No. 05-1491; *Ahmad v. Bush*, No. 05-1492;
*Amon v. Bush*, No. 05-1493; *Idris v. Bush*, No. 05-1555; *Jamolivich v. Bush*, No. 05-2112).

explanation of a *habeas* petition "received no response."[17] *See* Gutierrez (Al-Rawi) Decl. ¶ 12.

As one detainee complained in his letter directly to the Court:

> Here we are, sending you the so-called petition, Writ of habeas corpus. And I don't know any details about it. I have asked the camp administration for a lawyer about four to six months ago and there was no attention given to the matter. Please, send a lawyer with either a verbal or written message [in response] to this letter so that I can be understand that [sic] the petition is and what this court is all about.

*Al Bihani v. Bush*, 05-1312 (June 30, 2005) (Dkt. No. 1).

Language issues appear to have compounded the confusion. The DoD notice was translated into Arabic and several other languages, but, according to one detainee who speaks both Arabic and English, the Arabic version was much more difficult to understand. Gutierrez (Kabir) Decl. ¶ 18. This same detainee did not understand what a *habeas corpus* petition was until he spoke to his own lawyer. *Id.* Additionally, those detainees who are illiterate in their own language had "to ask another detainee to read the notification to him, if he was in a camp where this was even possible." *Id.*

According to Al-Rawi, after receiving the DoD notice, a group of Afghani detainees decided to try to write to the Court because they thought they had nothing to lose. *Id.* ¶ 8. However, Al-Rawi believed that the only reason the Afghani detainees were able to send letters to the Court is because one of the Afghani detainees spoke some English and because these particular detainees were held in a group setting. *Id.* ¶ 9. According to Al-Rawi, the Afghani detainees discussed the DoD notice and wrote their letters to the Court as a group. *Id.* However, this kind of collective action "cannot happen in other blocks because the prisoners cannot easily

---

[17]The Court assumes that the "personal representative" referred to in the Declaration is the same personal representative assigned to assist the detainee in the Combatant Status Review Tribunal.

speak as a group to discuss their options for challenging their detention."[18] *Id.*

Petitioner alleges, however that most detainees did not trust that "writing a simple letter would do anything" Gutierrez (Al-Rawi) Decl. ¶¶ 6-7.  According to Al-Rawi, "the authorities at Guantanamo have deceived the prisoners so consistently and so often" the detainees simply do not trust anything they are told by their captors. *Id.* ¶ 6.  Rather, "most detainees only trusted contacting other detainees who had actual *habeas* lawyers as a means of securing legal representation." *Id.*, ¶ 14.  According to Al-Rawi, "[t]his was because the other prisoners had had time to get to know their lawyers, and learn whether they could be trusted." *Id.* Al-Rawi

---

[18]The circumstances under which the District Court received the 56 *pro se* petitions lends credence to Al-Rawi's allegations.  All but one of the *pro se* petitions were submitted by detainees between mid-February and late May.  At least 34 were submitted by detainees during the month of March, (some are undated), although it appears to have taken anywhere from two to four months before they were delivered to the Court.  *See Khiali-Gul v. Bush*, No. 05-877; *Rahmattulah v. Bush*, No. 05-878; *Mohammad v. Bush*, No. 05-879; *Nasrat v. Bush*, No. 05-880; *Slahi v. Bush*, No. 05-881; *Rahman v. Bush*, No. 05-882; *Bostan v. Bush*, No. 05-883; *Muhibullah v. Bush*, No. 05-884; *Mohammad v. Bush*, No. 05-885; *Wahab v. Bush*, No. 05-886; *Chaman v. Bush*, No. 05-887; *Basardh v. Bush*, No. 05-889; *Khan v. Bush*, No. 05-890; *Nasrullah v. Bush*, No. 05-891; *Shaaban v. Bush*, No. 05-892; *Sohail v. Bush*, No. 05-993; *Tohirjanovich v. Bush*, No. 05-994; *Mohammad v. Bush*, No. 05-996; *Khudaidad v. Bush*, No. 05-997; *Al Karim v. Bush*, No. 05-998; *Al-Khalaqi v. Bush*, No. 05-999; *Sarajuddin v. Bush*, No. 05-1000; *Kahn v. Bush*, No. 05-1001; *Mohammed v. Bush*, No. 05-1002; *Mangut v. Bush*, No. 05-1008; *Hamad v. Bush*, No. 05-1009; *Khan v. Bush*, No. 05-1010; *Zuhoor v. Bush*, No. 05-1011; *Ali Shah v. Bush*, No. 05-1012; *Salaam v. Bush*, No. 05-1013; *Ghalib v. Bush*, No. 05-1238; *Peerzai v. Bush*, No. 05-1243; *Alsawam v. Bush*, No. 05-1244; *Mohammadi v. Bush*, No. 05-1246.
     Of these 34 petitions, nearly half were written over a period of four days (March 1 to March 4), appear to be written by Afghani detainees and are strikingly similar in style and content.  *See Khiali-Gul v. Bush*, No. 05-877; *Rahmattulah v. Bush*, No. 05-0878; *Mohammad v. Bush*, No. 05-879; *Nasrat v. Bush*, No. 05-880; *Rahman v. Bush*, No. 05-882; *Bostan v. Bush*, No. 05-883; *Muhibullah v. Bush*, No. 05-884; *Mohammad v. Bush*, No. 05-885; *Wahab v. Bush*, No. 05-886; *Chaman v. Bush*, No. 05-887; *Basardh v. Bush*, No. 05-889; *Khan v. Bush*, No. 05-890; *Nasrullah v. Bush*, No. 05-891; *Sohail v. Bush*, No. 05-993; *Ghalib v. Bush*, No. 05-1238. Significantly, one of these fifteen petitions was written in English by an Afghani detainee. *Sohail v. Bush*, No. 05-993.

16

also stated that he knew, based on conversations with Adem directly, that Adem does not trust

his military captors and would therefore view anything from the military with suspicion. *See* Al-

Rawi Decl. ¶ 8.

Additionally, the DoD notices told detainees to write to a "court," whereas the detainees

"were seeking an 'attorney' to help them."[19] Gutierrez (Kabir) Decl. ¶ 9.  Detainees have no way

of knowing what kind of institution the United States District Court for the District of Columbia

is and whether it is associated with the military. *Id.* ¶ 8.  According to Al-Rawi, the view of most

detainees that it was useless to try to write the Court has been confirmed by the fact that, as of

yet, no detainee who sent a letter to the Court has been able to meet with a lawyer.[20]  Gutierrez

---

[19]In September 2005, DoD began to notify some detainees that they could obtain a lawyer
by sending a form to the American Bar Association (ABA).  (Second) Sweigart Decl. ¶ 7.  The
ABA notice uses so much legal and technical language that the Court doubts it would mean
much of anything to an individual not already familiar with the United States legal system. *Id.*,
Ex. E.  More importantly, however, it is unclear whether any detainees have received the notice,
other than the 56 detainees who already sent *pro se* petitions to the District Court. *Id.* ¶ 7.
Respondents assert that they have delivered the notice "to all *pro se* petitioners who are not
already represented by counsel." *Id.*  Since the District Court appointed Federal Public
Defenders to serve as counsel to the unrepresented *pro se* petitioners within a month of DoD
mailing the ABA notice, it is unclear what relevance the notice has for those detainees.
Additionally, Respondents state that they "will continue to deliver" the ABA notice to all "other
detainees who request the assistance of counsel." *Id.*  Respondents do not claim that the ABA
notice has yet been sent to any detainee other than those detainees who have already
communicated with the Court.  Perhaps this is merely an oversight, but Respondents also fail to
explain how delivery of the ABA notice is triggered.  Does a request to another detainee count?
If so, how does DoD learn about the request?  What about a statement to a guard or the detainee's
"personal representative"?  Is the detainee obliged to make some sort of formal request for
counsel in writing?  Given Respondents' insistence on the niceties of form, these are hardly
empty questions.

[20]The Court received the majority of the 56 *pro se* petitions in May of 2005.  In October
of 2005, the Court appointed Federal Public Defender Offices to represent the *pro se* detainees.
Although the District Court mailed an acknowledgment to each detainee who had personally
submitted some sort of request for assistance, it appears that the notices, written in English, may
never have been translated. Gutierrez (Al-Rawi) Decl. ¶ 10.  As a result, those detainees who

(Al-Rawi) Decl. ¶¶ 10-11.

Al-Rawi, who speaks English, and who is himself represented by counsel, offered to help other detainees file a *habeas* petition because the DoD notice "specifically said that he could." *Id.* ¶¶ 16-20. Al-Rawi claims that he knows Adem personally because they lived together for some period of time in Camp Delta. Al-Rawi Decl. ¶ 5. Adem specifically asked Al-Rawi to help him get a lawyer.[21] *Id.* ¶¶ 3-6. Several other detainees did the same. *See* Gutierrez (Al-Rawi) Decl. ¶¶ 14-21. Al-Rawi sent a letter to Mr. Mickum, his own lawyer, listing the names of the detainees who had come to him asking for help in getting a lawyer. Resp'ts' Show Cause Reply, Ex. A ¶ 10. Al-Rawi listed Adem's name, his ISDN number and his home country (Sudan). *Id.* He also noted that Adem had attempted to write directly to Mr. Mickum, but the letter apparently never arrived.

According to Al-Rawi, when he "gave his attorney authorizations from other detainees, he was conveying 'their words, their wishes.'" Gutierrez (Al-Rawi) Decl. ¶ 18. Adem and other detainees sought help from Al-Rawi because he had a lawyer whom he trusted and also because he spoke English and could help translate detainees' requests for a lawyer. *Id.* ¶¶ 18-19.

---

received a letter from the Court may have no idea that the Court is presently reviewing the legality of their detention. After waiting several months for security clearances, several appointed counsel are scheduled to meet with clients for the first time in early March 2006. It is the Court's understanding, however, that as of mid-February, nearly a year after the *pro se* petitions were written by the detainees, not a single detainee represented by appointed Federal Public Defender counsel had met or spoken with his lawyer.

[21]Al-Rawi also filed as a 'next friend' in *Idris v. Bush*, No. 05-1555, consolidated with *Edries v. Bush*, No. 05-1725. Respondents initially challenged Al-Rawi's standing to act as a 'next friend' in that case as well, but the case was converted to a direct petition after determining that the petitioner had written a letter directly to the Court. Idris' letter to the Court took six months to arrive.

18

According to Al-Rawi, the detainees who sought his help "held out some hope that their

translated requests would reach a lawyer who could help them if Al-Rawi gave the request

directly to his lawyer, rather than sending the letter in an abyss by mailing it through the military

mail system."[22] *Id.* ¶ 19.   The detainees whose requests Al-Rawi forwarded to his counsel

"continue to ask him if he has heard back from his lawyer." *Id.* ¶ 21.   They "want to know what

is happening with their request for a lawyer" and "are starting to believe that it is the habeas

lawyers' fault for not meeting them." *Id.*

    Careful review of the pleadings and the Amended Protective Order and Revised

Procedures for Counsel Access convinces this Court that Respondents' arguments are without

---

[22]Respondents and Petitioner make widely divergent claims about the reliability of the
non-legal mail system in Guantanamo.  Respondents attest that detainees have "the opportunity
to send and receive mail" and that "[d]etainees cannot lose mail privileges for any reason,
including as part of disciplinary action or interrogation." (Second) Sweigart Decl., Ex. D.
According to Respondents, the non-legal mail system works smoothly and non-legal mail is
generally processed within 14 days on average. *Id.*  Petitioner, on the other hand, notes that
"there is anecdotal evidence that it takes months for regular correspondence to reach a detainee."
Pet'r Mot. to Exp. at 3-4.

    It appears from evidence in other *habeas* cases that Petitioner's concerns may not be
entirely misplaced.  Although most of the *pro se* petitions received by the Court took
approximately two months to be delivered, several *pro se* petitions did not arrive until 3 to 6
months after detainees sent them. *See Idris v. Bush*, No. 05-1555 (Aug. 2, 2005) (written on Feb.
12; received on Aug. 2); *Mammar v. Bush*, 05-1233 (June 22, 2005) (written on Jan. 30; received
on June 22); *Aminullah v. Bush*, 05-1237 (June 22, 2005) (written on Feb. 22; received on June
22); *Ghalib v. Bush*, 05-1238 (June 22, 2005) (written on March 3; received on June 22);
*Mohammadi v. Bush*, No. 05-1246 (June 22, 2005) (written on March 23; received on June 22);
*Peerzai v. Bush*, No. 05-1243 (June 22, 2005) (same); *Alsawam v. Bush*, No. 05-1244 (June 22,
2005) (written on March 14; received on June 22).   *See also* Pet'rs Mot. for an Order Amending
Protective Order for Non-Enemy Combatants at 7 n.7, *Qassim v. Bush*, 05-497 (Dkt. No.42)
(detainee's letter to his lawyer informing him that CSRT had exonerated him arrived exactly 100
days after it was mailed from Guantanamo); Gutierrez (Kabir) Decl. ¶ 13 (detainee "has not
received one letter from his attorney in six months, even though his attorney has written to him
several times"); Smith Decl. ¶ 80, attached as Exhibit 2 to Pet'r Response to Order to Show
Cause, *Nabil v. Bush*, 05-1504 (Nov. 18, 2005) (Dkt. No. 17) (noting routine delay of six months
for detainee-client letters to arrive).

merit. Adem, who has been detained *incommunicado* without charge by the United States, who

does not speak English, who has no access to family or friends, has indicated to a fellow detainee

who is represented by counsel that he wishes to challenge his potentially indefinite detention

without charge. *Rasul* and *Al Odah* give him the right to have counsel. The Protective Order

provides the mechanisms by which detainees may access the counsel to which they are entitled.

Petitioner Adem's counsel have fully complied with the procedures necessary to meet with

Adem. Nothing more is necessary.

III.    *Counsel Access to Detainees Under the Protective Order*

      The "Amended Protective Order and Procedures for Counsel Access at the United States

Naval Based in Guantanamo Bay, Cuba" ("Protective Order") and the "Revised Procedures for

Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba

("Revised Access Procedures"), attached to the Protective Order as Exhibit A, govern the

procedures by which counsel for Guantanamo detainees may meet and communicate with their

clients. The Protective Order and Revised Access Procedures were initially entered by Judge

Joyce Hens Green in November 2004 in *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174

(D.D.C. 2004), and have since been entered in the vast majority of Guantanamo *habeas* cases

currently pending in the District Court. The Protective Order and Revised Access Procedures

were entered in Adem's case on June 3, 2006. *See* Dkt. No. 12.  On June 6, 2005, Judge Roberts

stayed Adem's case pending resolution of the appeals in *In re Guantanamo Detainee Cases*, 355

F. Supp. 2d 443 (D.D.C. 2005), but provided that Petitioner could seek relief as necessary under

the Protective Order. *See* Dkt. No. 13.  The Protective Order and Revised Access Procedures

remain in effect in Adem's case.

As an initial matter, the Court respectfully declines Respondents' invitation to defer

ruling on Adem's motion pending resolution of the jurisdictional and retroactivity questions

raised by the Detainee Treatment Act of 2005 (the "DTA").[23]   The issues raised by Adem's

motion seeking access to counsel pursuant to the Amended Protective Order do not implicate any

of the jurisdictional questions currently pending in the D.C. Circuit and the Supreme Court.

Respondents concede, as they must, that the Protective Order remains in effect in Adem's

case and in each of the Guantanamo *habeas* cases in which it was entered.  Counsel for other

detainees continue to visit their clients according to its terms. Indeed, under no circumstances

would DoD permit counsel to visit detainees in Guantanamo Bay without counsel's signed

agreement to abide by the Protective Order.  When an attorney wishes to share information

learned from a detainee with other co-counsel, members of the DoD Privilege Review Team

continue to conduct classification reviews of detainee mail and attorneys' notes as required by

the Protective Order.  The acknowledgments signed by *habeas* counsel agreeing to abide by the

terms of the Protective Order remain in effect, *see* Protective Order, Ex. C, "Acknowledgment,"

and counsel remains subject to this District Court's contempt power, *see Armstrong v. Executive

Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993).  Were the situation reversed, and

were counsel for a detainee alleged to have violated the Protective Order, the Court has no doubt

that Respondents would seek relief immediately.

---

[23]On December 30, 3005, President Bush signed into law the Detainee Treatment Act of
2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680 (the "DTA"). Respondents argue that the DTA
divests the District Court of jurisdiction over the Guantanamo *habeas* petitions, including those
already filed prior to the DTA's passage.

21

"[A] protective order, like any ongoing injunction, is always subject to the inherent power

of the district court." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993); *see also*

*Armstrong*, 1 F.3d at 1289 (recognizing courts' "inherent power to enforce compliance with their

lawful orders"); *Broderick v. Donaldson*, __ F.3d __, 2006 WL 305505 at *6 (D.C. Cir. Feb. 10,

2006) (same); *cf. Gambale v. Deutsche Bank, AG*, 377 F.3d 133, 140-41 (2d Cir. 2004)

(recognizing court's jurisdiction to modify protective orders that remain in effect, even after

dismissal of the underlying litigation); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d

1424, 1427 (10th Cir. 1990) (same), *cert. denied, American Special Risk Ins. Co. v. Rohm &*

*Haas Co.*, 498 U.S. 1073 (1991).   It would be untenable for the District Court to be put in a

position where it is powerless to enforce its own protective order, presently in effect and over

which it has continuing control.[24]

The question of when, and under what circumstances the existing Protective Order

permits Adem to meet with his lawyer has no bearing on the question of which Court has

jurisdiction to review the merits of Petitioner's challenge to his detention.[25]   It has been over a

year since Adem first tried to get a lawyer to help him challenge his detention.   It is simply

_____

[24]Respondents appear to concede this point, as they do not argue that this Court lacks
jurisdiction to resolve disputes involving construction of the Protective Order.  Rather,
Respondents suggest that it would be more "appropriate" to stay Petitioner's motion pending a
further guidance by the D.C. Circuit or the Supreme Court regarding the effect of the DTA.
Resp'ts' Reply at 1 n.1.; Resp'ts' Opp'n to Mot. to Exp. at 2.

[25]Presumably, counsel for Adem would also represent him in any proceedings before the
D.C. Circuit.  Thus, the need to resolve questions regarding the logistics of counsel access will
remain an issue, even if the D.C. Circuit and the Supreme Court determine that the DTA applies
to those *habeas* cases currently pending in the District Court.  Moreover, it will undoubtedly take
months for the courts to grapple with the jurisdiction and retroactivity questions presented by the
DTA.  Forcing Adem to wait until all such proceedings and appeals are concluded before
permitting him to speak with his lawyer renders his right to counsel meaningless.

unacceptable to wait any longer.

The Protective Order and the Revised Access Procedures govern in-person meetings with detainees, procedures for sending and receiving legal mail, handling of classified information and any other access and communications issues involving Guantanamo detainees who are seeking *habeas* relief in this District Court. The requirements for in-person access to detainees by their counsel are laid out in Section III of the Revised Procedures. Protective Order, Ex. A § III.

Under Section III of the Protective Order, *habeas* counsel must verify that they represent the detainee in question.[26] *Id.*, Ex. A § III.C. The Protective Order divides the verification process into two steps: 1) notification of representation[27] and 2) evidence of authority to represent the detainee. *Id.* Respondents argue that counsel must comply with both steps of the verification process before being allowed to visit with their client. Resp'ts Contempt Opp'n at 5. According to Respondents, the Protective Order "provides that '[p]rior to being permitted access to the detainee,' counsel must 'provide evidence of his or her authority to represent the detainee.'" Resp'ts Contempt Opp'n at 5.

Respondents quote the Protective Order in such a way that the phrase "prior to being permitted access to the detainee" appears linked to the phrase "evidence of authority to represent the detainee." *Id.* In fact, the phrase "prior to being permitted access to the detainee" only

_____

[26]In addition to providing DoD with verification of representation, Counsel must also hold a valid security clearance at the Secret level or higher, *see* Protective Order, Ex. A § III.A, and must sign an affirmation acknowledging that they agree to "fully comply with the[] procedures" in the Protective Order, *id.* § III.B.1

[27]The Notification of Representation must include "counsel's licensing information, business and email addresses and phone numbers, as well as the name of the detainee being represented." *Id.*, Ex. A § III.C.1.

23

modifies the "notification of representation" requirement.  Protective Order, Ex. A § III.C.1.  By

selectively combining two sentences into one, Respondents transform the meaning of the

Protective Order.

Paragraph (1) of Section III.C of the Revised Procedures lists two requirements for

verification: "notification of representation" and "evidence of [counsel's] authority to represent

the detainee."    However, while paragraph (1) makes the "notification of representation" a

prerequisite to counsel's access to a detainee, it imposes no time frame for the evidence of

authority to represent the detainee.

> Prior to being permitted access to the detainee, counsel must provide DoD with a
> *Notification of Representation.*  This Notification must include the counsel's licensing
> information, business and email addresses and phone number, as well as the name of the
> detainee being represented by the counsel.  Additionally, counsel shall provide evidence
> of his or her authority to represent the detainee.

*Id.*, Ex. A, § C.1

If paragraph C.1 contained the only reference to any time frame for submitting "evidence

of authority," Respondents' interpretation might well be correct.  The reference to "evidence of

authority" in C.1 simply states "additionally," but provides no time by when counsel must

provide the evidence to DoD.  Standing alone, it might be reasonable to assume that the phrase

"[p]rior to being permitted access to the detainee" was intended to apply to the "evidence of

authority" requirement as well as the "notification of representation" requirement.  The problem

with Respondents' argument, however, is that the very next paragraph establishes a different

deadline for providing the very "evidence of authority" referred to in paragraph C.1.

Paragraph C.1 ends with a sentence that imposes a requirement on counsel to submit

evidence of their authority to represent the detainee to DoD.  Paragraph C.2 begins by

24

establishing the deadline for counsel to fulfil this requirement:

> Counsel shall provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with the detainee.

*Id.*, Ex. A § C.2.   By its plain terms, therefore, the Protective Order and Revised Procedures allow counsel a maximum of two visits with a detainee, plus ten days, before counsel must submit evidence of his or her authority to represent the detainee. *See Armstrong v. Executive Office of the President*, 830 F. Supp. 19, 22 (D.D.C. 1993) (construing protective order's "plain language").   To accept Respondents' interpretation of Paragraph C.1 would render Paragraph C.2 completely redundant.

The Court's reading is supported by the most basic cannons of construction.  It is a settled principle of contract[28] and statutory interpretation, for example, that when a word or phrase is used generally, and then later defined more narrowly, the narrow, more specific definition applies. *See, e.g.,* 5 Corbin on Contracts § 24.23 (Margaret N. Kniffin & Joseph M. Perilla eds., 1998); *Ki See Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (noting "'commonplace [rule] of statutory construction' [] that the 'specific governs the general'").

Moreover, the Protective Order explains the basis for imposing separate time frames for submission of the "notification of representation" and the "evidence of authority."  The Protective Order grants counsel at least two visits with the detainee before counsel must submit evidence of their authority to represent the detainee in view of the logistical difficulties of meeting with Guantanamo detainees, most of whom do not speak English, and may have reason

---

[28]*Cf. Geller v. Branic Intern. Realty Corp.*, 212 F.3d 734, 737 (2d Cir. 2000) (applying contract law principles to interpretation of protective order).

to distrust American visitors.  Protective Order, Ex. A § C.2 ("The Court recognizes that counsel

may not be in a position to present such evidence after the initial meeting with a detainee); *see*

*also* Tarver Decl. ¶¶ 2-13 (alleging that detainees were reluctant to sign "any piece of paper"

due to abuse and deception by the military).

Respondents attempt to avoid the plain language of Paragraph C.2 by arguing that

Paragraphs C.1 and C.2 refer to two different types of evidence of authority to represent a

detainee. Resp'ts Contempt Opp'n at 5.  According to Respondents, the Protective Order

envisions a "two-layer requirement regarding counsel's authority to bring and then maintain the

lawsuit." *Id.* at 5 n.2.  According to Respondents, the phrase "evidence of authority to represent

the detainee" referred to in Paragraph C.1 means either evidence from the "next friend," if the

case has been initiated by a "next friend,"or, in the case of a direct petition, the *pro se* petition

and evidence of appointment of counsel.  *Id.* at 5.  Respondents argue that the phrase "evidence

of authority to represent the detainee" referred to in Paragraph C.2, by contrast, is a "second,

subsequent type of authorization, directly from the detainee" that is only required when a *habeas*

petition is initiated by a "next friend."[29] *Id.*

In order to credit Respondents' "two-layer" theory, the Court would have to believe that

the Protective Order uses the exact same phrase in immediately successive paragraphs to refer to

_____

[29] Facing the obvious problem that the Protective Order provides for only one system of
verification, not a two-step process for "next friend" petitions and a one-step process for direct
petitions, Respondents invite the Court to infer a "two-layer[ed] requirement" solely for 'next
friend' petitions because "the Guantanamo habeas cases pending at the time the access
procedures were negotiated and established were uniformly 'next friend' cases." Resp'ts
Contempt Opp'n at 5 n.2.  This argument is hard to take seriously, since, at the same time the
Protective Order was being negotiated, DoD was in the process of notifying all the detainees of
their right to file a *habeas* petition directly with the Court.  (Second) Sweigart Decl. ¶¶ 3-5.

two distinctly different requirements despite the lack of any language indicating that such was its

intent. The Court simply cannot fathom that such a carefully crafted Protective Order,

painstakingly negotiated by both Petitioners and Respondents and approved by the Court to

balance national security concerns with detainees' right to counsel as articulated in *Rasul v. Bush*

and *Al Odah v. United States*, would have been so careless in its use of language. *Cf. C.I.R. v.

Lundy*, 516 U.S. 235, 250 (1996) ("interrelationship and close proximity of these provisions of

the statute 'presents a classic case for application of the normal rule of statutory construction that

identical words used in different parts of the same act are intended to have the same meaning'")

(*quoting Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)).

Respondents' argument is also belied by the fact that a proper "next friend" petition under

*Whitmore v. Arkansas*, 495 U.S. 149, 161-66 (1990) would not need to be converted into a direct

petition in order to be prosecuted in District Court. Thus, a "proper next friend petition" is,

standing alone, sufficient evidence of authority to represent the detainee under Paragraph C.2.

No additional evidence from the detainee himself would be necessary.

The phrase "evidence of authority to represent the detainee," on its face and by its plain

terms, refers to a single requirement. The Protective Order contains no reference to multiple

"layers" or "a second [and] subsequent type of authorization" by the detainee who is the "real

party in interest." Resp'ts Contempt Opp'n at 5. If the Protective Order meant to require two

entirely separate sets of "evidence of authority" from two different individuals - first the next

friend and second the detainee himself - it would have said so. The Court cannot infer a "two-

layer requirement" out of thin air.

Thus, this Court finds that the Protective Order entitles counsel to two visits plus ten days before they must submit evidence of their authority to represent the detainee in question. The only information that counsel must submit to DoD before being permitted to meet with a detainee is the "Notification of Representation." Counsel for Adem have submitted the "Notification of Representation. No further evidence is required at this stage.

IV.    *Petitioner's Right to Counsel*

Respondents insist that absent written authorization directly from the Petitioner, counsel must proceed through a "proper next friend" petition before they may be granted access to their client. Resp'ts' Contempt Opp'n at 11. Whether Petitioner's *habeas* petition has been properly filed is an issue for Judge Roberts, and is not before this Court. Adem's petition for *habeas* relief has proceeded as a direct petition since April of 2005. Until otherwise notified by the Trial Court, the undersigned will continue to treat it as a direct petition.

However, even if Adem's petition had been filed through Al-Rawi as a "next friend," the Protective Order would still require that counsel be permitted to meet with Adem in order to confirm his desire for representation.   First, as explained above, the Protective Order does not distinguish between direct and "next friend" petitions in its provisions for counsel access. The two-step process by which counsel provide evidence of their authority to represent a detainee applies to all counsel, including counsel for detainees who initially filed through a "next friend." All *habeas* counsel must "provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of second visit with the detainee." Protective Order, Ex. A § III.C.2.

28

Second, as Respondents themselves concede, "[i]f counsel are able to secure direct

authorization from Adem, then the next friend standing issue will become moot."[30] Resp'ts

Opp'n to Mot. to Exp. at 6. Once counsel meet with the detainee directly, and obtain

authorization of representation, the case is converted into a direct petition.[31] The Government

uses the term "next friend" but in reality, Al-Rawi is simply a "friend" who, at the explicit

invitation of the Department of Defense, communicated Adem's direct request for counsel to

help him challenge his detention to his lawyer. Once Adem confirms his desire for counsel to his

own lawyers, Al-Rawi will play no further role in the case. Alternatively, if Adem is unwilling

or unable to authorize counsel to represent him, then Respondents' "next friend" challenge will

be ripe.[32]

Respondents, however, insist that the only acceptable way to confirm Adem's desire for

counsel directly is to require Adem to sign a form and send it through the "non-legal mail"

channels at Guantanamo. Thus, the issue, at this point in the case is not whether Al- Rawi's

------------------------------

[30]The Court expresses no opinion on the question of whether Al-Rawi has a significant enough relationship with Adem to maintain 'next friend' standing.

[31]*See Hamily v. Bush*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 19) (Order of J. Bates dismissing Shaker Aamer as next friend and substituting Adel Hamily as sole petitioner); *Zakirjan v. Bush*, No. 05-2053 (Dec. 12, 2005) (Dkt. No. 24) (Order of Oberdorfer, J. dismissing as moot government's "Motion to Show Cause Why Case Should Not Be Dismissed for Lack of Proper 'Next Friend' Standing" because detainee who was real party in interest authorized counsel to represent him directly); *Muhammed v. Bush*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17) (same); *Idris v. Bush*, No. 05-1555 (Nov. 1, 2005) (Dkt. No. 8) (same).

[32]At this point, nothing is known about Adem's physical or mental condition. If he has been participating in a hunger strike, or if he is mentally unstable as a result of long periods in isolation or other conditions, he may not be in a position to authorize counsel to represent him. *See, e.g.,* Eric Schmidt and Tim Golden, *Force Feeding at Guantanamo Now Acknowledged*, NY Times, Feb. 22, 2006, at A6.

relationship with Adem would be sufficiently close to maintain traditional "next friend" standing.

Rather, the issue is whether the District Court's authority to "craft [the] procedures necessary" to

allow Adem to "present the facts surrounding [his] confinement to the Court," is somehow

inherently limited to relying on the mail. *See Al Odah*, 346 F. Supp. 2d at 7. The Court can

think of no principled reason why this should be so.

Respondents seem to be arguing that if Adem really wanted to challenge his detention, he

would have written directly to the Court. First, Respondents cannot be heard to insist on a

written *pro se* petition as the sole procedural mechanism by which a detainee may communicate

his request for counsel or seek to challenge his potentially indefinite detention without charge,

when DoD has already informed Adem in writing that he may challenge his detention *either* by

writing directly to the Court *or* by asking a "friend" or a "lawyer" to file a petition for him, and

when Respondents have previously permitted detainees to meet directly with counsel to confirm

their oral request.[33]

Second, the evidence submitted by Adem casts doubt on Respondents' claim that "DoD

has taken affirmative steps to facilitate legal representation for detainees who have indicated a

desire to challenge the legality of their detention," at least in any meaningful way.[34] *See* Resp'ts

_____

[33]Respondents urge the Court to ignore the inconsistencies in its approach to counsel
access under the Protective Order, but are unable to articulate any principled basis for the
disparity. *See* Resp'ts Opp'n to Mot. to Exp. at 5 n.4. Respondents essentially argue that
because their "treatment of defective 'next friend' cases" has been consistent recently, the Court
should ignore the fact that Respondents' previously allowed counsel to meet with directly with
the detainees who were the real parties in interest. *Id.*

[34]In two cases in which Respondents raised a 'next friend' challenge, counsel was able to
meet with the detainees in person and confirm their desire for representation purely by accident.
*See Zakirjan v. Bush*, No. 05-2053; *Muhammed v. Bush*, 05-2087. Zakirjan, who is being held

Contempt Opp'n at 13-14.    Serious questions exist regarding the extent to which detainees

received and understood the DoD notice.  The Court doubts that most Americans would

understand the meaning of the phrase "petition for a writ of *habeas corpus*."  To expect Adem,

who does not speak English and who "almost certainly lack[s] a working knowledge of the

American legal system" to intuit the meaning of an ancient, Latin, legal term of art is simply

---

as a non-enemy combatant (NEC), filed a *habeas* petition through another NEC detainee, Abu
Qassim. Susan Baker Manning, who is counsel for Qassim and other clients, was in Guantanamo
meeting with her clients on November 14 and November 16.  *See* Decl. of Susan Baker Manning
¶ 5, *Zakirjan*, No. 05-2053, Dkt. No. 20.  During a break between meetings with her clients,
Zakirjan approached Ms. Manning to ask for help obtaining a lawyer.  *Id.* ¶ 6. Although
Respondents had refused to allow any attorney to meet directly with Zakirjan, the guards allowed
the conversations to take place. *Id.*

   Zakirjan informed Ms. Manning that he had been "trying to obtain a lawyer for a very
long time."  *Id.* ¶ 9.  "He ha[d] been sending his name, ISN number and request for counsel with
other inmates who were taken to Camp Echo to meet with their lawyers, including Mr. Qassim."
*Id.*  During the same visit, Ms. Manning was also approached by Fethi Boucetta (a/k/a Dr. Abu
Muhammed), who also asked her for help finding a lawyer. *See* Decl. of Susan Baker Manning,
*attached as* Exhibit A to Pet.'s Mem. in Opp'n to Mot. for an Order to Show Cause, *Muhammed
v. Bush*, No. 05-2087 (Dec. 2, 2005) (Dkt. No. 14).  Upon learning that Zakirjan and Boucetta
had personally requested counsel, Judge Oberdorfer dismissed the 'next friends' and converted
the cases into direct petitions. *See Zakirjan*, No. 05-2053 (Dec. 12, 2005) (Dkt. No. 24);
*Muhammed*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17).

   Ms. Baker Manning was able to speak directly with these two particular detainees
because they both speak passable English and because they are NECs being held in Camp Iguana,
a fortuity virtually guaranteed not to repeat itself.  In August of 2005, Respondents began
housing non-enemy combatants detainees in a separate detention facility called "Camp Iguana."
Brigadier General Jay W. Hood Decl. ¶ 5, attached as Ex. 1 to Resp'ts Mem., *Qassim v. Bush*,
05-497 (Aug. 8, 2005) (Dkt. No. 27).  Camp Iguana is a "communal living facility." *Id.*  NEC
detainees housed in Camp Iguana have significantly greater freedom of movement than detainees
held as enemy combatants.  They have a common bunk room, a recreation room and a recreation
yard.  *Id.* ¶¶ 5-6. There is a fence around the facility and guards posted, but detainees in Camp
Iguana are otherwise free to move about the grounds within the confines of the Camp. *Id.*
Because of their location in Camp Iguana, Zakirjan and Foucetta were able to walk up to Ms.
Baker Manning and personally ask her for help getting a lawyer, something detainees in other
parts of Guantanamo could never do.  With the exception of NEC detainees, who are allowed to
meet with their lawyers in Camp Iguana, counsel meetings with detainees in Guantanamo take
place in Camp Echo, a solitary confinement facility.

absurd. *See Al Odah*, 346 F. Supp. 2d at 8 (explaining detainees' need for the assistance of counsel in presenting their claims to the District Court).

For those who did understand it, questions remain about detainees' ability to send and receive non-legal mail and their willingness to trust information provided by the military. Gutierrez (Al-Rawi) Decl. ¶¶ 6-15. In fact, Petitioner has submitted evidence indicating that Adem wrote directly to Al-Rawi's lawyer asking to be represented, but that the letter never arrived. Considering that the 56 *pro se* detainees who did write to the Court have already waited a year without seeing a lawyer, this Court can hardly fault Adem for being skeptical.

Adem did what Respondents invited him to do in the first instance; he asked "a friend" that he trusted to help him challenge his detention. (Second) Sweigart Decl., Exs. A-C. Al-Rawi did as he was asked and counsel filed a petition on Adem's behalf. Yet, Respondents insist that, absent Adem's signature on a form, Al-Rawi's lack of "proper next friend standing" precludes this Court from further inquiring into the truth of Adem's request. It is inconceivable that the Court's authority to investigate Adem's request would be so constrained. Adem is "entitled to present the facts surrounding [his] confinement to the Court. It is equally clear that the Court is authorized to craft the procedures necessary to make this possible, in order that the Court might fully consider Petitioners' challenge to their detention." *Al Odah*, 346 F. Supp. 2d at 7.

It appears that attempts to inform detainees of their rights in writing have been, at best, fraught with diffculty. Furthermore, the Protective Order clearly provides that counsel for Adem may meet with him twice before they are obliged to provide evidence of authority to represent

him. Considering the lack of any possible prejudice to the Government from allowing Adem to

confirm his desire for representation in person rather than in writing, and weighing the

importance of Adem's right to counsel, which he has been attempting to exercise for over a year,

Respondents are ordered to comply with the Protective Order and allow Adem's counsel to meet

with him in person as soon as possible.

The Petitioner's request that the Government be sanctioned by contempt is denied as not

warranted. *See Armstrong*, 1 F.3d at 1289.


Dated: March 14th, 2006                         _____/s/_____
                                                ALAN KAY
                                                UNITED STATES MAGISTRATE JUDGE

33

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **SADAR DOE**, *et al.*, | ) | |
| | ) | |
| **Petitioners** | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-1704 (JR)(LFO)(AK) |
| | ) | |
| **GEORGE W. BUSH**, *et al.*, | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM ORDER

Pending before the Court is Petitioners' Motion for an Order Compelling Counsel Access

(Mot.) and Memorandum in Support (Mem.) [31] and Respondents' Opposition (Opp'n) [32].[1]

Petitioners claim that Respondents have refused and continue to refuse counsel access to

Petitioners as required by the Protective Order. The Government insists that counsel provide

written evidence of their authorization to represent the Petitioner before counsel will be allowed

to meet with their clients. Upon consideration of the parties' filings to the Court, and following

a conference with parties, Petitioners' Motion is hereby GRANTED.

---

[1]On November 2, 2005, in recognition of "the need to promote orderly and efficient case management of all *habeas* petitions . . . relating to the rights of [Guantanamo] detainees," Judge Kessler, acting as Chair of the Calendar and Case Management Committee referred all motions "pertaining to interpretation or construction of any protective order" entered in any of the Guantanamo *habeas* cases to the undersigned for resolution pursuant to LCvR 72.2(a). A party may seek reconsideration of a ruling by a magistrate judge within 10 days after being served with the magistrate judge's order. LCvR 72.2(b). Rulings issued by a magistrate judge pursuant to LCvR 72.2 are reviewed by the district court judge, in this case Judge Robertson, on a "clearly erroneous" or "contrary to law" standard. LCvR 72.2(c).

## Background

The Petitioners, Sadar Doe (a/k/a Bahtiyar Mahout) and Arkeen Doe (a/k/a Arkina

Amahmud), are brothers and Chinese Uighur[2] detainees presently held by the United States

Government at the Guantanamo Bay Naval Station. (*See* Pet'rs' Mem. at 1.) They have been

detained without charge and held virtually incommunicado for more than four years. In

December of 2004, the Combatant Status Review Tribunal (CSRT) determined that the

Petitioners were enemy combatants, but nevertheless recommended at least one if not both of

them for release from Guantanamo as soon as possible. (*See* Pet'rs' Mem. Showing Cause Why

Pet. for Writ of Habeas Corpus Should not be Dismissed for Lack of Next Friend Standing at 3,

Dkt. No. 23, Nov. 18, 2005.) Petitioners allege that the CSRT adjudged them to be enemy

combatants only to avoid their forced repatriation to China, where there is reason to fear they

would be indefinitely detained and tortured.[3] (*See* Pet'rs' Mem. in Support of Mot. to Compel

Access to Classified Factual Returns at 2, Dkt. No. 29, Feb. 8, 2006.)

In June, 2004, the Supreme Court ruled that the District Court had jurisdiction to consider

aliens' "*habeas corpus* challenges to the legality of their [executive] detention at the Guantanamo

---

[2]Uighurs are a Turkic Muslim ethnic minority that has been, and continues to be, brutally
oppressed by the Chinese government. *See* U.S. Dep't of State, Country Reports on Human
Rights Practices, China - 2005 (March 8, 2006), *available at*
http://www.state.gov/g/drl/rls/hrrpt/2005/61605.htm

[3]Most Uighur detainees have been determined to be "No Longer Enemy Combatants," a
somewhat euphemistic term, given that these same detainees were never determined to be enemy
combatants in the first instance. (*See* Pet'rs' Opp'n to Resp'ts' Mot. to Show Cause Why Case
Should Not be Dismissed for Lack of Proper "Next Friend" Standing at 2.) In *Qassim v. Bush*,
05-497 (JR), counsel for other Uighur detainees did not learn that their clients had been
determined not to be enemy combatants until after counsel went to Guantanamo and met with
their clients, even though Respondents had known of the detainees' innocence for several
months. *See id.* at 3 n.3.

Bay Naval Base." *Rasul v. Bush*, 542 U.S. 466, 484 (2004). In compliance with *Rasul*, the

Government began in late 2004 to notify detainees of their right to challenge the legality of their

detention in federal court. (Sweigart Decl. ¶¶ 2-5.)[4] The "DoD notification"[5] instructs detainees

that they may challenge their detention "through a process called *a petition for a writ of habeas*

*corpus*,"[6] and explains that they may *either* file a petition themselves *or* they "may ask a friend or

family member or a lawyer to file such a petition with the court."[7] *Id.*, Exs. A-C.

At some point in early 2005, Petitioners, who do not speak English, asked a fellow

---

[4]*Attached as* Exhibit B to Resp'ts' Mot. for an Order to Show Cause Why Case Should
not be Dismissed for Lack of "Next Friend" Standing (Dkt. No. 4).

[5]The Department of Defense (DoD) issued three different types of notifications to
detainees, depending on whether the detainee had been determined 1) an enemy combatant
whose status may be reviewed by the Administrative Review Board (ARB), 2) an enemy
combatant not eligible for ARB consideration because he is triable by Military Commission, or
3) a non-enemy combatant. (Second) Sweigart Decl. ¶¶ 3-5, Exs. A-C. Although each
notification contains slightly different information, all three contain the same two paragraphs
informing detainees of their right to seek review of the legality of their detention.

[6]The notification fails to provide any explanation of what a petition for *habeas corpus* is
or how a detainee would go about getting one. (Second) Sweigart Decl., Exs. A-C. Some
detainees were apparently so confused about what to do with the notice that they "simply mailed
the entire [blank] sheet itself back to the court because they did not know what else to do to get
legal assistance." Gutierrez (Kabir) Decl. ¶ 12, *Razakah v. Bush*, 05-2370 (D.D.C. Feb. 3, 2006)
(Dkt. No. 8).

[7] The notification instructs detainees to write to the District Court in order to challenge
their detention, but provides little in the way of explanation about what detainees should write:

If you do not have a lawyer or a family member or friend who could file this petition for
you, you may file your own petition. According to prior court rulings, petitions should be
sent to:
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001.
(Second) Sweigart Decl., Exs. A-C.

detainee, Usama Abu Kabir, to help them find a lawyer to challenge their potentially indefinite

detention without charge. (Pet'r Mem. at 1-2.)  Petitioners sought help from Kabir, a Jordanian

citizen, because he speaks fluent English and other detainees knew that he trusted his lawyer.

(*See* Gutierrez (Kabir) Decl. ¶¶ 4, 19-20.)[8]   Kabir agreed to help by sending his lawyer the names

of detainees who wanted to challenge their detention and who had asked for lawyers.  (Pet'rs'

Mem. Showing Cause Why Pet. for Writ of Habeas Corpus Should not be Dismissed for Lack of

Next Friend Standing at 6. Dkt. No. 23, Nov. 18, 2005.)

---

[8]In Oct. of 2005, a number of pending motions challenging "next friend" standing in
Guantanamo *habeas* cases were transferred to Judge Oberdorfer pursuant to LCvR 40.6.  *See
Ahmed Doe v. Bush*, No. 05-1458 (Oct. 13, 2005) (Dkt. No. 8); *Nabil v. Bush*, No. 05-1504 (Oct.
25, 2005) (Dkt. No. 8); *Al Hawary v. Bush*, No. 05-1505 (Oct. 25, 2005) (Dkt. No. 10); *Shafiiq v.
Bush*, No. 05-1506 (Oct. 25, 2005) (Dkt. No. 10); *Idris v. Bush*, 05-1555 (Oct. 21, 2005) (Dkt.
No. 6); *Al Razak v. Bush*, 05-1601 (Minute Order dated Nov. 14, 2005); *Kabir v. Bush*, 05-1704
(Nov. 1, 2005) (Dkt. No. 18); *Qasim v. Bush*, 05-1779 (Oct. 31, 2005) (Dkt. No. 4); *Zakirjan v.
Bush*, 05-2053 (Oct. 21, 2005) (Dkt. No. 17); *Muhammed v. Bush*, 05-2087 (Nov. 11, 2005)
(Dkt. No. 11).  In response to Petitioners' allegations that Respondents were preventing counsel
from obtaining direct authorizations from their detainee-clients, Judge Oberdorfer ordered
Petitioners and Respondents to confer with this Court to determine "how counsel for Petitioners
may obtain access to the detainees who allegedly seek to be represented by next friends to
determine if the detainees will authorize counsel to represent them directly."  *See* Order of
Oberdorfer, J., dated Nov. 4, 2005.
        Pursuant to Judge Oberdorfer's Order, this Court held a conference with counsel for the
Petitioners and Respondents in those cases in which a 'next friend' challenge had been raised.
The Court instructed Petitioners' counsel to meet with as many of the "next friends" as possible
to seek additional information about the circumstances of their relationships with the detainees
who are the real parties in interest.  Gitanjali Gutierrez, who is of counsel in many of the
Guantanamo *habeas* cases, met with Mr. Al-Rawi, Mr. Kiyemba and Mr. Kabir.  These meetings
shed some light on the ways detainees may have understood their legal rights and the process for
challenging their detention in federal court. *See* Gutierrez (Kabir) Decl., *filed in Razakah v. Bush*,
05-2370 (D.D.C. Feb. 3, 2006) (Dkt. No. 8); *see also* Gutierrez (Al-Rawi Decl.), *attached as*
Exhibit B to Pet'r Supp. to Mot. to Exp., *Adem v. Bush*, 05-723 (D.D.C. Feb. 7, 2006) (Dkt. No.
32).  Respondents have since transferred Jamal Kiyemba to the custody of the government of
Uganda.  *See* Respondents' Notice of Transfer, *Deghayes v. Bush*, 04-2215 (Feb. 9, 2006) (Dkt.
No. 39). Kiyemba, who speaks English, had relayed the requests of three other detainees for a
lawyer to his lawyer. *See Nabil v. Bush*, No. 05-1504; *Shafiq v. Bush*, No. 05-1506; *Muhammed
v. Bush*, No. 05-2087.

On May 1, 2005, Kabir provided his attorney with Petitioners' names and signed a statement attesting to their request for representation to challenge their detention. (Pet. for Writ of Habeas Corpus at 34.)  Because the DoD notification told detainees that they could file the petition themselves or ask a "friend" to file it for them, Kabir also agreed to file the petition and act on Petitioners' behalf until they could meet with their own lawyers and confirm their desire for representation. (*See* Gutierrez (Kabir) Decl. ¶¶ 19-30; *see also* Smith Decl. ¶¶ 81-127, *attached as* Ex. A to Pet'rs' Opp'n to Resp'ts' Mot. to Show Cause Why Case Should not be Dismissed for Lack of Propert "Next Friend" Standing, Dkt. No. 8, Sept. 12, 2005.)

Kabir's lawyer, Clive Stafford Smith, forwarded Petitioners' names to the Center for Constitutional Rights, a national public interest organization that has coordinated *pro bono* representation for the majority of Guantanamo detainees.  Elizabeth Gilson, an attorney who had volunteered with CCR, agreed to represent Petitioners on a *pro bono* basis and filed a *habeas* petition on their behalf on Aug. 25, 2005.

On October 11, 2005, Judge Robertson granted Petitioners' motion for entry of the Amended Protective Order & Revised Procedures for Counsel Access,[9]  Protected Information Order and Supplemental Filing Procedures (collectively "the Protective Order").  In recognition of the security concerns attendant to the Guantanamo *habeas* cases, the Protective Order sets procedures that counsel must follow in order to meet and communicate with their clients.  The Protective Order was initially approved and entered by Judge Joyce Hens Green in *In re Guantanamo Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004), following intense negotiation and

---

[9]The Revised Procedures for Counsel Access are attached as Exhibit A to the Amended Protective Order.

litigation over its terms. *See Adem v. Bush*, __ F. Supp. 2d __, 2006 WL 751309, at \*3-5

(D.D.C. March 21, 2006) (reviewing history of negotiation and entry of Protective Order),

*recons. denied*, No. 05-723, slip op. (D.D.C. April 28, 2006) (Dkt. No. 42). It has since been

entered in the vast majority of Guantanamo *habeas* cases pending before the District Court.

    Following entry of the Protective Order, counsel for Petitioners obtained the necessary

security clearances and submitted the Notification of Representation, including counsel's name,

"licensing information, business and email addresses and phone numbers, as well as the name of

the detainee being represented," all of which are required as prerequisites to any in-person

meeting with a detainee-client. *See* Protective Order, Ex. A, § III. Counsel then sought to meet

with Petitioners in person, only to be denied by Respondents on the grounds that counsel had

provided insufficient evidence of their authority to represent the detainees. Petitioners now seek

an order compelling Respondents to permit them access to their clients, in part so they may

obtain the very authorization of representation that Respondents insist be provided prior to any

visits.

### Analysis

*I.*    *Interpretation of the Protective Order*

    The question presented to the Court is a narrow one, namely, whether counsel must

provide "evidence of his or her authority to represent the detainee" prior to a counsel visit or

within 10 days of the second counsel visit. The disputed phrase appears in immediately

successive paragraphs in paragraphs (1) and (2) of Section III.C of the Protective Order.

Paragraph (1) imposes two requirements on Guantanamo *habeas* counsel related to verification

of their representation. Pursuant to paragraph (1), counsel must submit a "notification of

representation" and "evidence of [counsel's] authority to represent the detainee." *See* Protective

Order, Ex. A § III.C.1.   However, while paragraph (1) makes the "notification of representation"

a prerequisite to counsel's access to a detainee, it imposes no time frame for the evidence of

authority to represent the detainee.

> Prior to being permitted access to the detainee, counsel must provide DoD with a
> *Notification of Representation*.   This Notification must include the counsel's licensing
> information, business and email addresses and phone number, as well as the name of the
> detainee being represented by the counsel.   Additionally, counsel shall provide evidence
> of his or her authority to represent the detainee.

*Id.*, Ex. A, § C.1

Paragraph C.2, by contrast, establishes an explicit deadline for counsel to submit evidence

of their authority to represent the detainee:

> Counsel shall provide evidence of his or her authority to represent the detainee as soon as
> practicable and in any event no later than ten (10) days after the conclusion of a second
> visit with the detainee.

*Id.*, Ex. A § C.2.

In an attempt to avoid what can only be described as clear and explicit language,

Respondents argue that in those cases filed through a next-friend, the phrase "evidence of

[counsel's] authority to represent a detainee" actually refers to two separate showings of

evidence, "differ[ing] in quantum of proof, with the latter showing requiring 'additional, direct'

evidence," in writing from the detainee. *Adem v. Bush*, No. 05-723, slip op. at 8 (D.D.C. April

28, 2006) (rejecting government's interpretation).   Respondents essentially argue that because the

phrase "evidence of [counsel's] authority to represent a detainee" appears in two separate but

adjacent paragraphs, it must refer to two separate types of evidence.   However, Respondents'

interpretation would require the Court to ignore the plain meaning of the text and to flaunt the

most basic rules of construction. *See Adem*, __ F. Supp. 2d __, 2006 WL 751309, at *9-11;

*Adem*, No. 05-723, slip op. at 8-14 (D.D.C. April 28, 2006) (affirming magistrate judge's opinion

and rejecting government's argument that evidence of authority to represent a detainee referred to

a "two-step sequential showing").

Indeed, this precise question of the meaning of the phrase "evidence of [counsel's

authority to represent [a] detainee" was previously presented to the Court in *Adem v. Bush*, __ F.

Supp. 2d __, 2006 WL 751309, at *7-11 (D.D.C. March 21, 2006), *recons. denied*, No. 05-723,

slip op. (D.D.C. April 28, 2006).   In *Adem*, this Court rejected Respondents interpretation and

held that the plain language of the protective order dictated that counsel was entitled to two visits

with a detainee, plus 10 days, before they must provide the required evidence. *See id.* at *7-11

(interpreting protective order); *see also Armstrong v. Executive Office of the President*, 830 F.

Supp. 19, 22 (D.D.C. 1993) ("[g]iving plain meaning to [the] language" of the protective order).

The instant case is no different.   In fact, the question presented to the Court is identical to

the question presented in *Adem*.   The only difference between *Adem* and the instant case is that

*Adem* was filed as a direct petition and the instant case was filed as a 'next friend' petition.   The

Protective Order, however, does not distinguish between cases filed by a 'next friend' and cases

filed directly. *See Adem*, 2006 WL 751309, at *10-13 (rejecting government's argument that the

Protective Order requires additional authorization solely for *habeas* petitions initiated through a

'next friend').   The Court cannot infer a separate two-step requirement applicable solely to 'next

friend' petitions out of thin air.

Indeed, as this Court explained in *Adem*, following the Supreme Court's decision in *Rasul*

and the negotiation and entry of the Protective Order, the legal fiction of a "next friend" became

8

largely irrelevant except as a mechanism for identifying those detainees who seek to challenge

their detention in the first instance.[10] *See Adem*, 2006 WL 751309, at *3-5 (reviewing history of

use of 'next friend' device in Guantanamo *habeas* cases).    In those *habeas* cases filed since the

creation and entry of the Protective Order, the detainees who initiate a *habeas* petition on behalf

of a fellow detainee generally do not seek to serve procedurally as a "next friend" in the

traditional sense, but are simply passing on another detainee's request for help, a fact that can be

confirmed once counsel meets directly with the detainee. *See id.*, at *4-5; *see also Hamily v.

Bush*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 19) (Order of J. Bates dismissing Shaker Aamer as

next friend and substituting Adel Hamily as sole petitioner); *Zakirjan v. Bush*, No. 05-2053 (Dec.

12, 2005) (Dkt. No. 24) (Order of Oberdorfer, J. dismissing as moot government's "Motion to

Show Cause Why Case Should Not Be Dismissed for Lack of Proper 'Next Friend' Standing"

because detainee who was real party in interest authorized counsel to represent him directly);

*Muhammed v. Bush*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17) (same); *Idris v. Bush*, No. 05-

1555 (Nov. 1, 2005) (Dkt. No. 8) (same).

      Finally, the record in this case shows that Petitioners have, in fact, provided substantial

evidence that they genuinely wish to challenge their detention.    The unclassified portions of the

CSRT records show that Petitioner Arkeen clearly and emphatically stated that he wanted to

challenge his detention before "the US Court system or US judges."  (Pet'rs' Mem. Showing

Cause Why Petition for Writ of Habeas Corpus Should not be Dismissed for Lack of Next Friend

Standing at 7.)  Petitioner Arkeen testified:

---

      [10]A "next friend" might still be necessary if, however, a detainee is incapacitated or
otherwise unable to personally verify his intent to challenge his detention.

I have no more comments [other than the written responses], that is good enough evidence, which my Personal Representative already presented. What I wanted to do was go to Afghanistan to look for my brothers. I wanted the US Court system or US Judges to determine my case, they have to come up with, if I am innocent or not. If I am guilty they should come up with my punishment or what ever I deserve to serve time I will do that. Other wise [sic] do something faster to finish my case. I would like the results as soon as possible.

*Id.*

Respondents insist that, absent Petitioners' signatures on a form, Kabir's alleged lack of proper next friend standing precludes this Court from further inquiring into the truth of Petitioners' request to challenge their detention. It is inconceivable that the Court's authority to investigate Petitioners' request would be so constrained. Petitioners Arkeen and Sadar are "entitled to present the facts surrounding their confinement to the Court. It is equally clear that the Court is authorized to craft the procedures necessary to make this possible, in order that the Court might fully consider Petitioners' challenge to their detention." *Al Odah v. United States*, 346 F. Supp. 2d 1, 7 (D.D.C. 2004).

As Judge Roberts explained, not only does the plain language of the Protective Order not require a showing of direct evidence of authorization to represent a detainee as a prerequisite to an in-person meeting, but "[r]equiring a Guantanamo detainee to identify a specific lawyer from among all the volunteer lawyers -- most of whom are unknown to the detainee before a meeting -- is a meaningless exercise. It would be unconscionable to tether a detainee's access to counsel to such an unworkable prerequisite." *Adem*, No. 05-723, slip op. at 16 (D.D.C. April 28, 2006). Respondents concede that the Protective Order remains in effect, and the Court has inherent power to enforce its own lawful orders. *See Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006). Pursuant to the Protective Order, therefore, Petitioners are entitled to meet with their

10

lawyers.

II.    *Jurisdiction*

Respondents contend that the Detainee Treatment Act of 2005 (the "DTA") divests this

Court of jurisdiction to decide the instant motion.[11]    The retroactive effect of the DTA was

addressed in supplemental briefing in the Guantanamo *habeas* appeals pending before the D.C.

Circuit in *Kalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), *appeal docketed sub nom.*

*Boumediene v. Bush*, Nos. 05-5062, 05-5063 (D.C. Cir. March 10, 2005), and before the

Supreme Court in *Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005), *cert. granted*, 126 S. Ct.

622 (U.S. Nov. 7, 2005) (No. 05-184).[12]    Petitioners' motion for an order compelling access to

counsel pursuant to the Amended Protective Order, however, does not implicate any of the

jurisdictional questions currently pending in the D.C. Circuit and the Supreme Court.

Respondents concede, as they must, that the Protective Order remains in effect in

Petitioners' case and in each of the Guantanamo *habeas* cases in which it was entered.    Counsel

for other detainees continue to visit their clients according to its terms. Indeed, under no

circumstances would DoD permit counsel to visit detainees in Guantanamo Bay without

counsel's signed agreement to abide by the Protective Order.    When an attorney wishes to share

information learned from a detainee with other co-counsel, members of the DoD Privilege

Review Team continue to conduct classification reviews of detainee mail and attorneys' notes as

---

[11]On December 30, 3005, President Bush signed into law the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680 (the "DTA"). Respondents argue that the DTA divests the District Court of jurisdiction over the Guantanamo *habeas* petitions, including those already filed prior to the DTA's passage.

[12]Oral argument before the D.C. Circuit was held on March 22, 2006, and before the Supreme Court on March 28, 2006.

11

required by the Protective Order.  The acknowledgments signed by *habeas* counsel agreeing to

abide by the terms of the Protective Order remain in effect, *see* Protective Order, Ex. C,

"Acknowledgment," and counsel remains subject to this District Court's contempt power, *see*

*Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993).  Were the

situation reversed, and were counsel for a detainee alleged to have violated the Protective Order,

the Court has no doubt that Respondents would seek relief immediately.

"[A] protective order, like any ongoing injunction, is always subject to the inherent power

of the district court." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993); *see also*

*Armstrong*, 1 F.3d at 1289 (recognizing courts' "inherent power to enforce compliance with their

lawful orders"); *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (same); *cf.*

*Gambale v. Deutsche Bank, AG*, 377 F.3d 133, 140-41 (2d Cir. 2004) (recognizing court's

jurisdiction to modify protective orders that remain in effect, even after dismissal of the

underlying litigation); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th

Cir. 1990) (same), *cert. denied, American Special Risk Ins. Co. v. Rohm & Haas Co.*, 498 U.S.

1073 (1991).   It would be untenable for the District Court to be put in a position where it is

powerless to enforce its own protective order, presently in effect and over which it has continuing

control.

Moreover, it is well-settled law that "a federal court always has jurisdiction to determine

its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002).  Petitioners are entitled to

meet with their counsel in order to litigate that very question.  *See United States v. United Mine*

*Workers of America*, 330 U.S. 258, 290-93 (1947) (explaining that, until such time as jurisdiction

is determined not to exist, a court has the authority to issues such orders as necessary "to preserve

the existing conditions" of any pending action).[13] Thus, the question of when, and under what circumstances the existing Protective Order permits Petitioners to meet with their lawyers - a Protective Order that Respondents concede remains in effect and binding on the parties - has no bearing on the question of which Court has jurisdiction to review the merits of Petitioner's challenge to his detention.[14] *See Adem*, No. 05-723, slip op. at 16-17 (D.D.C. April 28, 2006).

It has been over a year since Petitioners first tried to get a lawyer to help them challenge their detention. It is unacceptable to wait any longer. Respondents are ordered to comply with the Protective Order and allow Petitioners' counsel to meet with them in person as soon as possible.

Dated: May _11[th]_, 2006                    _____/s/_____

ALAN KAY
UNITED STATES MAGISTRATE JUDGE

---

[13]For example, it is unknown whether Respondents are attempting to repatriate Petitioners under the same type of agreement recently reached with Albania. On May 6, just three days before their appeal was scheduled to be heard before the D.C. Circuit, Respondents released five ethnic Uigher detainees to Albania. *See* Pete Yost, *Chinese Detainees Released to Albania*, Washington Post, May 6, 2006, at A9. It seems the Government transferred the five men without notifying either them or their counsel of the impending transfer. *See id.*

[14]Presumably, counsel for Petitioners would also represent them in any proceedings before the D.C. Circuit. Thus, the need to resolve questions regarding the logistics of counsel access will remain an issue, even if the D.C. Circuit and the Supreme Court determine that the DTA applies to those *habeas* cases currently pending in the District Court.

# EXHIBIT 4

BINGHAM McCUTCHEN

Susan Baker Manning
Direct Phone: (202) 778-6172
Direct Fax:   (202) 778-6155
susan.manning@bingham.com
Our File No.:  0999997-0000928706

August 15, 2005

Bingham McCutchen LLP

Suite 800

1120 20th Street, NW

Washington, DC

20036-3406

202.778.6150

202.778.6155 fax

bingham.com

Boston

Hartford

London

Los Angeles

New York

Orange County

San Francisco

Silicon Valley

Tokyo

Walnut Creek

Washington

**Via U.S. Mail**

Andrew I. Warden,. Esq.
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530

**Re:  *Kiyemba v. Bush, et al.* (No. 1:05cv01509 (RMU))**

Dear Andrew:

Pursuant to the Revised Procedure for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba § III(C), please find enclosed evidence of Bingham McCutchen's authority to represent Petitioners Abdusabur Doe, Abdusamad Doe, Abdunasir Doe, Hammad Doe, Hudhaifa Doe, Jalaal Doe, Khalid Doe, Saabir Doe and Saadiq Doe, and to represent Jamal Kiyemba, next friend of the aforementioned Petitioners.

Sincerely,

Susan Baker Manning

Enclosure

## AUTHORIZATION & NOTIFICATION

I, JAMAL KIYEMBA (#701), UNDERSTAND THE LEGAL TERM "NEXT FRIEND" AND FIRMLY BELIEVE THAT THE FOLLOWING PEOPLE (AS ATTACHED), WHO I HAVE COME TO KNOW DURING MY CAPTIVITY SINCE MARCH 2002, WANT ME TO ACT AS THEIR "NEXT FRIEND" AND AUTHORIZE CLIVE STAFFORD SMITH TO SEEK ANY LEGAL REDRESS ON THEIR BEHALF THAT IS POSSIBLE, AND I SO AUTHORIZE HIM. I ALSO SUBMIT THIS DOCUMENT AS EVIDENCE, INDEPENDENT OF THEIR RELIANCE UPON ME AS "NEXT FRIEND" OF THEIR SPECIFIC DESIRE FOR A LAWYER AND FOR A LEGAL CHALLENGE TO THE ILLEGALITY OF THEIR DETENTION BY THE UNITED STATES OF AMERICA.

THIS AUTHORIZATION & NOTIFICATION APPLIES TO ALL PERSONS LISTED ON THE ATTACHED LISTS, AS INITIALED BY ME.

MARCH 10TH, 2005.

*Kiyemba*

**FOUO**

| | | | |
|---|---|---|---|
| 1 | ALI | UZBEKISTAN | CAMP I |
| 2 | ABDULLAH | UZBEKISTAN | CAMP I |
| 3 | KHALID | TURKISTAN | CAMP 4 (UIGUR) |
| 4 | ABDULSAME | " | " " |
| 5 | ABUSAMAD | " | " " |
| 6 | HAMMAD | " | " " |
| 7 | ABDUNASIR | " | " " |
| 8 | JALAAL | " | " " |
| 9 | BILAL | SYRIAN | CAMP I (ARABIC) |
| 10 | FAISAL | SAUDI | CAMP I |
| 11 | BANDAR ALJAABIR | " | " " |
| 12 | AHMAD | TURKISTAN | CAMP 4 (UIGUR) |
| 13 | SAADIQ | | " |
| 14 | WALIID | SUDAN | CAMP I |
| 15 | HAMMAD | " | CAMP 4 |
| 16 | MAHMOOD | SUDAN | CAMP I |
| 17 | SAMI ULLAH | TUNISIAN | CAMP II ITALIAN? ARABIC |
| 18 | YUSUF ASSHIHRI | SAUDI | CAMP II |
| 19 | YUSUF ARIBESH | SAUDI | CAMP I |
| 20 | ABDALLAH | TUNISIAN | CAMP II JORDAN? |
| 21 | ADIL | TUNISIAN | CAMP IV JORDAN? |
| 22 | ABU RAWDAH | SYRIAN | CAMP I |
| 23 | SAABIR | TURKISTAN | CAMP IV (UIGUR |
| 24 | SALIH | TURKISH | CAMP IV |
| 25 | ABU MUHAMMAD | ALGERIAN | CAMP IV (ENG ARABIC) |
| 26 | SALMAN ALBAHRI | SAUDI | CAMP I |
| 27 | JAABIR ALQAM | | CAMP II |

UNCLASSIFIED
J.K.

RIDWAAN ALMAGCERI         MOROCCAN

1 FAHD ALHARAAZI          SAUDI

1 FAHD ABU HAFSA          YEMENI           CAMP IV   Arabic

· HUDHAIFA                TURKWANI         CAMP I  Urguia

4 ABDURAHMAN (cm 41)      YEMENI           CAMP I  Arabic

3 SAFIIQ                  ALGERIAN         CAMP I   Arabic

1 NABIL                   ALGERIAN         CAMP I  French Arabic

**FOUO**

# EXHIBIT 5

## Document Retrieval Result



---

6/11/06 NYT 11

6/11/06 N.Y. Times 11
2006 WLNR 9971871

New York Times (NY)
Copyright (c) 2006 The New York Times. All rights reserved.

June 11, 2006

Section: 1

### THREE PRISONERS COMMIT SUICIDE AT GUANTANAMO

JAMES RISEN and TIM GOLDEN

WASHINGTON, June 10 Three detainees being held at the United States military prison at Guantanamo Bay, Cuba, committed suicide early on Saturday, the first deaths of detainees to be reported at the military prison since it opened in early 2002, United States military officials said.

The deaths come at a time of mounting international criticism of the Bush administration's handling of terrorism suspects at Guantanamo and other prisons around the world. President Bush, who was at Camp David on Saturday, expressed "serious concern" about the deaths, said Tony Snow, the White House spokesman.

The three detainees were not identified, but United States officials said two were from Saudi Arabia and the third was from Yemen. Military officials said that the three hanged themselves in their cells with nooses made of sheets and clothing and died before they could be revived by medical personnel.

Rear Adm. Harry B. Harris Jr., the commander of the detention camp at Guantanamo, told reporters in a news conference that the deaths were discovered early on Saturday when a guard noticed something out of the ordinary in a cell and found that a prisoner had hanged himself. Admiral Harris said guards and a medical team rushed in to try to save the inmate's life but were unsuccessful. Then, guards found two other detainees in nearby cells had hanged themselves as well; all were pronounced dead by a physician.

Military officials on Saturday suggested that the three suicides were a form of a coordinated protest.

"They are smart, they are creative, they are committed," Admiral Harris said. "They have no regard for life, neither ours nor their own. I believe this was not an act of desperation, but an act of asymmetrical warfare waged against us."

The Naval Criminal Investigative Service has opened an investigation into the deaths, and the State Department has notified the governments of Saudi Arabia and Yemen, according to a statement issued on Saturday by the United States Southern Command, the military organization that oversees Guantanamo.

All three men left suicide notes in Arabic, officials said. One of the detainees was a mid- or high-level Qaeda operative, another had been captured in Afghanistan and the third was a member of a splinter group, Admiral Harris said, in an account by The Associated Press. He said all three had participated in hunger strikes at the detention center.

He said the acts were tied to a "mystical" belief at Guantanamo that three detainees must die at the camp for all the detainees to be released. There have been 41 suicide attempts by 25 detainees since the facility opened, officials said.

Lawyers for the detainees, human rights groups and legal associations have increasingly questioned whether many of the prisoners can even rightfully be called terrorists. They note that only 10 of the roughly 465 men held at Guantanamo have been charged before military tribunals, and that recently released documents indicate that many have never been accused even in administrative proceedings of belonging to Al Qaeda or attacking the United States.

Advocates for the detainees said they believed the suicides resulted from the deep despair felt by inmates who are being held indefinitely.

"The total, intractable unwillingness of the Bush administration to provide any meaningful justice for these men is what is at the heart of these tragedies," said Bill Goodman, the legal director of the Center for Constitutional Rights, the New York advocacy group that oversees lawyers representing many of the detainees. "We all had the sense that these men were getting more and more hopeless. There's been a general sense of desperation that's been growing."

Joshua Colangelo-Bryan, a lawyer at Dorsey & Whitney in New York who represents one detainee who has repeatedly attempted suicide, said, "These men have been told they will be held at Guantanamo forever. They've been told that while they're held there they do not have a single right."

Foreign governments and international organizations have stepped up their criticism of detainee treatment at Guantanamo. Just last month, a United Nations treaty panel reviewing the United States' compliance with the international prohibition on torture argued that Guantanamo should be shut down. Last week, the Council of Europe issued a separate investigative report that said the United States had created a "reprehensible network" of dealing with terror suspects, highlighted by secret prisons believed to be in Eastern Europe and other nations around the world.

Responding to the growing furor over the issue in Europe, Mr. Bush said in an interview with German television in May that he would like to close the Guantanamo prison, but that his administration had to await the outcome of a Supreme Court ruling on whether the detainees should be tried by civilian courts or military commissions.

Meanwhile, the situation inside the detention center has grown more volatile in recent months, with reports that prisoners have engaged in hunger strikes, suicide attempts and violent attacks on guards.

Lawyers for the detainees have predicted for months that some would kill themselves. They have complained repeatedly about their access to the detainees, and have litigated in federal courts to try to get more information about the prisoners' medical and psychological health.

The lawyers have also strenuously protested the administration's efforts to have all litigation over the treatment of the detainees dismissed under the Detainee Treatment Act, a law signed by Mr. Bush on Dec. 30 that would strip the courts of jurisdiction to hear habeas corpus petitions from detainees.

Action on nearly all of those petitions has been suspended in recent months, pending a ruling by the Supreme Court this month on the case of a former driver for Osama bin Laden.

In public statements, Defense Department officials have often dismissed the detainees' suicide attempts as less than serious and as the actions of trained Qaeda terrorists to manipulate public opinion. The first hunger strikes by detainees at Guantanamo began soon after the camp opened in January 2002, and two of those prisoners were forcibly fed through tubes that year. Dozens of other suicide attempts followed.

Over one eight-day period in August 2003, 23 detainees tried to hang or strangle themselves, including 10 on a single day. But the Pentagon did not disclose the episode until January 2005, and lawyers for the detainees have complained about what they say has been a pattern in which the government has withheld information about suicide attempts or minimized their importance.

In late 2003, military officials at Guantanamo began to re-classify many of the suicide attempts as "manipulative, self-injurious behavior" that was intended to bring pressure for better conditions or for release. Officials at Guantanamo acknowledged that those designations were not necessarily made after any formal psychological evaluation.

But early last summer, as a new wave of protests broke out, officials at Guantanamo and at the Pentagon grew increasingly concerned, Defense Department officials said.

Doctors overseeing the treatment of detainees at Guantanamo sought new guidance from the Pentagon about the circumstances under which they could force-feed hunger strikers by tubes inserted through their noses and into their stomachs. While Defense Department officials took new measures to try to break a wave of hunger strikes that began last summer, they also undertook a review of procedures they would follow for the possible burial of detainees or the transfer of their remains in the event that any of them succeeded in committing suicide, military officials said.

Military officials began trying to discourage the detainees from killing themselves in part by having military and medical personnel cite passages in the Koran that condemn suicide. The detainees were systematically told that annual reviews of their status as "enemy combatants" had been completed, that they would remain at Guantanamo for at least another year, and that they should reconcile themselves to the situation, Defense Department officials said.

The military's review of the hunger-strike issue, which included senior Pentagon officials and officers of the United States Southern Command, which oversees Guantanamo, eventually led to a decision to begin strapping those detainees who refused to eat into metal "restraint chairs" while they were force-fed.

After the use of the chairs was disclosed by The New York Times in February, military officials insisted that they were acting only to save the lives of hunger-striking detainees who were precariously close to serious harm or death.

Interviews with military officials indicated that only a handful of the detainees who were then being force-fed had lost so much weight that they were classified by doctors there as "severely malnourished." The restraint chair was used on all of those who refused to eat, military officials said, regardless of their medical condition.

For months after the use of the restraint chairs became public, lawyers for the detainees and other critics of United States detention policy predicted that the tougher measures would push the prisoners to take more radical steps to end their lives.

What may have been the most serious such incident before Saturday's suicides came on May 18, when two detainees were found unconscious in their cells after ingesting a large quantity of anti-anxiety medication that various prisoners had apparently hoarded for the purpose. Another detainee said he had also tried to commit suicide but did not have enough medication; military officials said they did not believe his attempt had been serious.

Military officials said other detainees violently attacked guards in subsequent searches of their cells. A few of the detainees have since told their lawyers that the upheaval was provoked by guards who mistreated the prisoners' Korans as they tore through their cells.

Another brief hunger strike began barely two weeks later, the military authorities said, and eventually involved some 75 detainees. The chief spokesman for the military task force charged with guarding and interrogating the detainees, Cmdr. Robert Durand of the Navy, described that episode, like others before it, as an "attention getting" effort intended to increase public pressure for their release.

Chart: "A Troubled Detention Center"
Since January 2002 the military has reported 44 suicide attempts at Guantanamo, as well as dozens of incidents classified as "manipulative, self-injurious behavior." Three suicides yesterday were the first reported deaths.

Doctors begin force-feeding two detainees who had been fasting for nearly a month.
By April 2003 there were 24 suicide attempts by 17 detainees.
In an eight-day protest, 23 detainees try to hang or strangle themselves.
A total of 350 "self-harm" incidents were reported at Guantanamo in 2003, including 120 "hanging gestures."
A months-long hunger strike involves 131 detainees at its peak, but is virtually broken afer the military begins using restraint chairs for force-feeding.
Detainees attack guards after two prisoners attempt suicide using hoarded medications.

Graph tracks the number of detainees at Guantanamo since 2002.

(Sources by Department of Defense; interviews)(pg. 30)

---- INDEX REFERENCES ----

NEWS SUBJECT: (Legal (1LE33); International Terrorism (1IN37); United Nations (1UN54); Government (1GO80); Government Litigation (1GO18); World Organizations (1IN77); Judicial (1JU36); Prisons (1PR87))

REGION: (Americas (1AM92); Yemen (1YE36); Saudi Arabia (1SA38); North America (1NO39); Latin America (1LA15); Cuba (1CU43); Middle East (1MI23); Europe (1EU83); USA (1US73); Gulf States (1GU47); Eastern Europe (1EA48); New York (1NE72); Caribbean (1CA06); Arab States (1AR46))

Language: EN

OTHER INDEXING: (DEFENSE DEPARTMENT; DEPARTMENT OF DEFENSE; DETAINEE TREATMENT ACT; DORSEY WHITNEY; NAVAL CRIMINAL INVESTIGATIVE; NAVY; PENTAGON; STATE DEPARTMENT; SUPREME COURT; TROUBLED DETENTION CENTER; UNITED NATIONS; WHITE HOUSE) (Al Qaeda; Bill Goodman; Bush; Foreign; Harris; Harry B. Harris Jr.; Joshua Colangelo-Bryan; PRISONERS COMMIT SUICIDE; Qaeda; Robert Durand; Tony Snow)

EDITION: Late Edition - Final

Word Count: 2268
6/11/06 NYT 11
END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Copr. (c) 2006 Dialog, a Thomson business.

**News**Room

Print/Deliver

Help © 2006 West

Westlaw.                                                    **NewsRoom**

6/12/06 TIMESUK 27                                          Page 1


6/12/06 Times (U.K.) 27
2006 WLNR 9996793

Times (UK)
Copyright 2006 Times Newspapers Ltd

**June 12, 2006**

Section: Overseas news

US **dismisses** Guantanamo **suicides** as 'PR stunt';Factbox

Catherine Philp in Washington

A MILITARY investigation into the suicides of three inmates at Guantanamo Bay  was under way yesterday as American officials sought to counter international  condemnation over the deaths, dismissing them as a **"PR stunt"** aimed at  discrediting the US.

The suicides by hanging of the three men, two Saudis and one Yemeni, on  Saturday sparked renewed calls from foreign governments and human rights groups  for the military facility to be closed or moved.

About 465 foreign nationals are being held there without charge, some for  almost four years. Yesterday, however, Colleen Graffy, a senior State  Department official, **dismissed** the **suicides** as a "good PR move to draw  attention" and "a tactic to further the jihadi cause".

The camp commander described the men as dangerous extremists who would go to  any lengths to become martyrs. "They are smart, they are creative, they are  committed," Rear Admiral Harry Harris said. "This was not an act of  desperation, but an act of asymmetrical warfare waged against us."

"Asymmetrical warfare" is a military term to describe how a much weaker  opponent may adopt unorthodox tactics to defeat a conventionally stronger  enemy. Since September 11, 2001, the term has been adopted by neoconservatives  to describe what they see as an unfair fight between terrorists and an America  hobbled by international conventions.

The deaths have come as a huge embarrassment for the Bush Administration amid  mounting calls for the facility's closure and ahead of a potentially fateful  Supreme Court decision this month. Human rights groups denounced yesterday the  officials' remarks as callous. "These people are despairing because they are  being held lawlessly," Kenneth Roth, of Human Rights Watch, said. "There's no  end in sight. They are not being charged and convicted for any crime."

The deaths of the three men, who hanged themselves with nooses made of sheets  and clothes, are the first suicides at the facility.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                    NewsRoom

6/12/06 TIMESUK 27                                            Page 2


Dozens of other attempts, from hanging to overdosing, have been thwarted by  military medics.

Suicide attempts at Guantanamo began shortly after the facility opened in  January 2002. In late 2003 officials began to reclassify many suicide attempts  as "manipulative, self-injurious" behaviour intended to bring pressure on the  authorities, but acknowledged that those classifications were not made after  any formal evaluation.

All three men had participated in hunger strikes to protest against conditions.

Lawyers for inmates had previously predicted that the harsh measures would  push prisoners towards radical steps.

Officials said that shortly before the suicides, rumours had been circulating  around the block that the facility would be closed if three inmates were to  take their lives.

Leading article, page 17 MILITARY CAMP

* The camp opened in January 2002 after the US invaded Afghanistan

* 23 inmates have tried to kill themselves on 41 occasions, says the military

* 29 suicide attempts were by hanging

* There are currently 465 prisoners from 40 countries

* Ten have been charged but none has been tried

* Nearly 300 have been returned to their countries

* A report that the Koran had been desecrated provoked worldwide riots

* Several prisoners have been on a hunger strike on and off since last August

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Judicial (1JU36); Legal (1LE33))

REGION:  (Cuba (1CU43); Americas (1AM92); Caribbean (1CA06); Latin America (1LA15))

Language:  EN

OTHER INDEXING:  (BUSH ADMINISTRATION; GUANTANAMO; KORAN; STATE DEPARTMENT; SUPREME COURT) (Asymmetrical; Colleen Graffy; Factbox; Harry Harris; Kenneth Roth; Ten)

Word Count: 666
6/12/06 TIMESUK 27

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

NewsRoom

6/12/06 TIMESUK 27                                                      Page 3

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

6/12/06 CHAROBSVR 1A

NewsRoom

Page 1

6/12/06 Charlotte Observer (N.C.) 1A
2006 WLNR 9991675

Charlotte Observer (NC)
Copyright 2006 The Charlotte Observer

**June 12, 2006**

Section: Asection

Officer expects more suicide tries
Guantanamo Bay colonel says **homemade nooses** seized

MICHAEL GORDON, mgordon@charlotteobserver.com

The day after three Middle Eastern detainees took their lives under his watch, the commander of the military prison here said he expects other prisoner suicide attempts "any time now."

Speaking inside the heavily guarded camp, Col. Mike Bumgarner told the Observer that military authorities have seized some **homemade nooses** from cells since the suicides early Saturday.

"We have indications of more attempts any time now," said Bumgarner, a Kings Mountain native who has commanded the camp for the past year and a half. He said he expects the next attempt toward the end of the week, as inmates "wait to see how the world reacts."

Two Saudis and a Yemeni were found hanging in their cells just after midnight Saturday. They all used pieces of cloth from clothes or bedding to piece together ropes. They all left suicide notes in Arabic.

U.S. officials said one of the men had direct ties to al-Qaida, another fought for the Taliban and a third had been involved with a group that recruits for al-Qaida.

And Bumgarner said each man had a large wad of cloth in his mouth. He said he did not know if the material was for choking or to muffle their voices while they took their lives.

Bumgarner and his boss, Guantanamo Bay's commanding officer, Rear Adm. Harry Harris Jr., have described the incidents as "acts of warfare" aimed at manipulating world reaction against the prison.

"The war is won in the media, and it takes a little more each time," Bumgarner said Sunday. "The hunger strikes are dying out. They've used that silver bullet. They needed something else, something more dramatic."

The 4-year-old prison holds 465 detainees. The government describes them as enemy com-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                      NewsRoom

batants or suspected terrorists who pose grave security threats to the United States and its allies.

Yet several of those allies have joined the cacophony of critics who say the prison violates international law, tortures inmates and damages the U.S. reputation around the world.

A U.N. panel has called for its closure. The Supreme Court is expected to rule soon whether the Bush Administration can continue to keep the detainees out of the U.S. courts and instead try them before military tribunals. Attorneys for the detainees described the suicides as the act of desperate men losing hope of ever receiving freedom.

In a news conference inside the prison wire, Gen. John Craddock, head of the Army's Southern Command, said an investigation into the deaths and camp procedures is continuing. He said he hoped it would shed light into the rash of recent detainee suicide attempts and camp efforts to control them.

As part of that process, Bumgarner ordered guards to remove all sheets and blankets from cells starting at 5 a.m. Sunday. He said some detainees, particularly the high-security prisoners in Camp 5, had resisted and some still had their bedding by mid-afternoon. The bedding was to be returned at the end of the day so the men could sleep.

Some 25 detainees have committed 41 attempted suicides -- 13 by one man, Bumgarner said.

The recent efforts may be fueled by a so-called "vision of three." According to Bumgarner, several detainee leaders say they have dreamed that if three prisoners commit suicide, the rest will go free.

On May 18, three detainees gulped overdoses of medication they'd been hoarding. That led to a brief riot as prisoners with makeshift weapons battled guards in Camp 4, reserved for compliant detainees.

Bumgarner said the Yemeni, Ali Abdullah Ahmed, the first to be found Saturday morning, was a longtime hunger-striker. The two Saudis also took part in the strikes. One of them was among the first to undergo the camp's new and controversial force feeding of prisoners believed to be health risks. Harris said Saturday that none of the three was considered a suicide threat.

When he took over the prison, Bumgarner said he was told to bring conditions to the standards of the Geneva Convention without endangering security. That meant extra clothing, fans, underwear for detainees he said.

That also meant enough cloth for the three detainees to take their lives, he said.

"One of the things I've learned in this job is that everything affects security, particularly dealing with the people we have here."

Bumgarner gives up his command June 30. He said he is bitterly disappointed the camp's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                                    NewsRoom

6/12/06 CHAROBSVR 1A                                        Page 3


first successful suicides fell in the last days of his watch.

"I didn't think it would happen. I thought we'd be able to stop them," he said.

"And I really didn't they were committed to go all the way. I always thought they'd go up to the line and stop."

Except for the Yemeni, he said. "I always knew he wanted to be a martyr."

Observer Staffers

Staff writer Michael Gordon and staff photographer Todd Sumlin are in Guantanamo Bay on assignment for the Observer.

Identities Released

The U.S. Defense Department released the identities of three Guantanamo detainees who committed suicide.

Saudi Arabians Mani Shaman Turki al-Habardi Al-Utaybi and Yassar Talal Al-Zahrani -- identified earlier by Saudi officials -- and Ali Abdullah Ahmed, were the prisoners who hung themselves Ahmed's nationality was not provided, but U.S. military officials earlier said that two Saudis and one Yemeni had taken their lives:

** Ali Abdullah Ahmed of Yemen was identified by officials as a mid-to-high level al-Qaida operative who has been non-compliant and hostile to the guard force; was a long term hunger striker from late 2005 to this May.

** Mani Shaman Turki al-Habardi al-Utaybi of Saudi Arabia was a member of a militant missionary/recruitment group for al-Qaida and other jihadist terrorist groups and had been recommended for transfer to another country.

** Yassar Talal Al-Zahrani of Saudi Arabia was a front line fighter for the Taliban and traveled to Afghanistan to take up arms against anti-Taliban forces.

                    ---- INDEX REFERENCES ----

NEWS SUBJECT: (International Law (1IN60); Legal (1LE33); International Terrorism (1IN37))

REGION: (Cuba (1CU43); Middle East (1MI23); Gulf States (1GU47); Americas (1AM92); Yemen (1YE36); Saudi Arabia (1SA38); Caribbean (1CA06); Arab States (1AR46); Latin America (1LA15))

Language: EN

OTHER INDEXING: (Mike Bumgarner; Harry Harris Jr.; John Craddock; Ali Abdullah Ahmed; Michael Gordon; Todd Sumlin; Ali Abdullah Ahmed; Ali Abdullah Ahmed) (ARMY; GENEVA CONVENTION; HABARDI; HABARDI AL; SOUTHERN COMMAND; SUPREME COURT; TALIBAN; UN; US DEFENSE DE-


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.    **NewsRoom**

6/12/06 CHAROBSVR 1A    Page 4

PARTMENT; YEMENI)  (Abdullah Ahmed; Ahmed; Al-Zahrani; Ali; Ali Abdullah Ahmed; Bumgarner;
Bush; Harris; Harry Harris Jr.; John Craddock; Michael Gordon; Mike Bumgarner; Observer
Staffers; Qaida; Saudi Arabians; Speaking; Todd Sumlin; Utaybi)  (United States; Yemen;
Saudi Arabia; Saudi Arabia; Afghanistan; us; usa; na; us.nc; us.nc.charlt; af; afg; sa;
sau; ye; yem; as; asp; md; mde; nam)

KEYWORDS:  (NT/NEC);  (SU/news)

EDITION: 3rd

Word Count: 1158
6/12/06 CHAROBSVR 1A

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

**Pinney, Jason S.**

| | |
|---|---|
| **From:** | Willett, P. Sabin |
| **Sent:** | Monday, June 12, 2006 9:26 AM |
| **To:** | 'Terry.Henry@usdoj.gov'; Andrew.Warden@usdoj.gov |
| **Cc:** | McGaraghan, Neil; Pinney, Jason S. |
| **Subject:** | Saddiq Turkestani/Kiyemba petitioners |

Terry and Andrew, I have two requests, each of which is made more urgent by this weekend's appalling disclosures.

1.    I am increasingly concerned about your silence regarding our request to speak by telephone to Mr. Turkestani.  In a moment of despair he in the past participated in a hunger strike.  Please confirm a call soonest.

2.    It is simply bad faith for the government to continue to press its unilateral denial of access in "next friend" cases despite (i) the execution by Judge Urbina of a protective order that such unilateral activity violates, and (ii) the repeated rejections of the Government's position by Judge Kay and various judges of the district court in precisely identical circumstances.  This is transparently an exercise seeking to delay and deny counsel access.  Since we have clients who we fear may be in despair, we renew our request for your immediate written confirmation that we will be permitted to visit all of our clients during our July visit.  Your failure immediately to confirm this in writing will leave us no choice but to seek expedited relief from the court and an appropriate sanction.

Very truly yours,

Sabin

**Pinney, Jason S.**

| | |
|---|---|
| **From:** | Andrew.Warden@usdoj.gov |
| **Sent:** | Monday, June 12, 2006 7:56 PM |
| **To:** | Willett, P. Sabin; Terry.Henry@usdoj.gov |
| **Cc:** | McGaraghan, Neil; Pinney, Jason S. |
| **Subject:** | RE: Saddiq Turkestani/Kiyemba petitioners |

Sabin,

1) We are working on arranging a call between you and Mr. Turkestani. Once GTMO has the logistics in place and a date certain for the call, we'll let you know.

2) Our position regarding counsel access to the four petitioners in the Kiyemba case who have outstanding next-friend standing issues (Abdunasir, Abdusabur, Hammad, Khalid) remains the same.  See June 7, 2006 e-mail.

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8470

-----Original Message-----
From: sabin.willett@bingham.com [mailto:sabin.willett@bingham.com]
Sent: Monday, June 12, 2006 9:26 AM
To: Henry, Terry (CIV); Warden, Andrew (CIV)
Cc: neil.mcgaraghan@bingham.com; jason.pinney@bingham.com
Subject: Saddiq Turkestani/Kiyemba petitioners

Terry and Andrew, I have two requests, each of which is made more urgent by this weekend's appalling disclosures.

1.    I am increasingly concerned about your silence regarding our request to speak by telephone to Mr. Turkestani.  In a moment of despair he in the past participated in a hunger strike.  Please confirm a call soonest.

2.    It is simply bad faith for the government to continue to press its unilateral denial of access in "next friend" cases despite (i) the execution by Judge Urbina of a protective order that such unilateral activity violates, and (ii) the repeated rejections of the Government's position by Judge Kay and various judges of the district court in precisely identical circumstances.  This is transparently an exercise seeking to delay and deny counsel access.  Since we have clients who we fear may be in despair, we renew our request for your immediate written confirmation that we will be permitted to visit all of our clients during our July visit.  Your failure immediately to confirm this in writing will leave us no choice but to seek expedited relief from the court and an appropriate sanction.

Very truly yours,

Sabin

# EXHIBIT 7

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMAL KIYEMBA, as Next Friend of ABDUSABUR DOE, *et al.*,<br><br>    Petitioners,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>    Respondents. | Case No. 1:05-cv-01509 (RMU)<br><br><br>**DECLARATION OF GITANJALI S. GUTIERREZ** |

I, Gitanjali S. Gutierrez, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am an attorney with the Center for Constitutional Rights, co-counsel for Petitioners Abdul Nassir (a.k.a., Abdulnasir, Abdul Annaser), Abdul Sabour (a.k.a., AbduSabur), Hammad Doe, and Khalid Doe ("Petitioners") in the above-captioned action. I offer this Declaration in support of Petitioners' Petition for Writs of Habeas Corpus. This declaration supplements the prior declarations submitted by Petitioners.

2. I met with Petitioners' Next Friend, Mr. Jamal Kiyemba, a detainee at Guantánamo Bay Naval Station, Guantánamo Bay, Cuba ("Guantánamo") on December 13, 2005, to discuss his role as the next friend for several prisoners.

3. The Department of Defense (DOD) sent my attorney notes from Guantánamo to the secure work facility for habeas counsel in Washington, D.C. I submitted the notes for review by the Privilege Team on January 12, 2006, and received my unclassified notes from the Court Security Office on January 20, 2006.

4. Mr. Kiyemba is a British resident who speaks English. He has been detained in Guantánamo for almost four years. He also understands our legal system and the meaning of a "next friend."

5. I asked Mr. Kiyemba about the ability of the detainees to access the federal courts or counsel to challenge the legality of their detention and about the relationship between the prisoners.

### Inability to Access the Courts or Legal Counsel

6. According to Mr. Kiyemba, the military mail system is too slow for any detainee to rely upon it as a means of reliably contacting a lawyer.

7. He also explained that there is no guarantee that if a prisoner submits a letter asking for help from the court to the military guards at the camp that the letter will ever reach the court. The prisoners hardly receive any letters from the outside world – perhaps one heavily censored letter every six to nine months – which leads to the conclusion that they cannot trust or rely upon the military mail system to deliver the detainees' letters to the intended recipient.

8. Moreover, the detainees do not have the address for a lawyer in the United States and do not know where they can write to get a lawyer, other than through verbal or written requests given to the lawyers who are currently representing other prisoners. The detainees have no experience with United States lawyers and have no idea how to secure a lawyer other than communicating their request through a prisoner who has counsel.

9. The detainees, including the petitioners in this matter, wait for a friend to have a meeting with a lawyer. Then they ask their friend to request legal assistance for them from the lawyer who comes to visit.

10. Mr. Kiyemba only knows of two detainees who wrote the court to after receiving the Enemy Combatant Notification (ECN). Nothing in the ECN explained to the detainees that if they wrote the court, the court will assign a lawyer, or that the lawyer was free, or what the lawyer could do for them

11. The detainees did not know, and still do not know, if any lawyer will help them file a habeas petition, if a lawyer is available to answer their questions about this process, etc. Mr. Kiyemba was educated in England, yet he has a very limited grasp of what a "petition for habeas corpus" is. It was his opinion that most of the prisoners in Guantánamo would have no idea what the term meant.

12. As of December 5, 2005, the two detainees who tried to contact the court had not received lawyers to Mr. Kiymeba's knowledge. Neither of these detainees reads or speaks English. They eventually received some document in the mail from the court, but it is in English and the detainees do not know what it is or what it means. The document was never translated into Arabic so they still cannot read it.

13. For the rest of the detainees, this situation was further evidence that the instructions in the ECN for writing the court would not work as a means of obtaining access to the court or, more importantly, access to a lawyer.

14. According to Mr. Kiyemba, the ECN was also distributed with translations in some, but not all, of the languages spoken by the detainees. Mr. Kiyemba remembers, for example, a detainee from the Maldives who requested a copy in his native language.

The detainee never received it. Instead, he was given a copy of the ECN in Urdu, a language he was not fluent in. This makes it even less likely that the prisoners will understand their rights.

15. Military personnel told the detainees living with Mr. Kiyemba at the time they received their ECN that if the detainees had any questions about the information in the ECN, they could ask their "personal representative" during the CSRT process. This assumes that the detainee met with the personal representative and participated in the CSRT process, which many detainees did not. Also, a number of prisoners asked to see their personal representative about questions like this and received no reply.

16. The individuals whom Mr. Kiyemba has acted as a next friend, including Petitioners, all sought his assistance in finding them legal counsel because they did not know how else to obtain a lawyer. One thing that most prisoners did understand in the ECN was that they could ask "a friend" to file a petition for them. This is what Mr. Kiyemba was doing for these prisoners, and this is what they wanted him to do.

17. Because he speaks English and has a lawyer, he translated these verbal requests for counsel and forwarded them to his existing attorney.

### Close Relationship Between the Detainees

18. Mr. Kiyemba provided several reasons why a detainee next friend is necessary and appropriate. A significant number of detainees do not want their wife or family meeting with strangers, especially U.S. lawyers. Many prisoners are from countries where they fear that such contact could get their families into danger. The detainees would much rather ask a friend in Guantánamo to help them get an attorney.

19. After being imprisoned together and living with one another for twenty-four hours a day, seven days a week, the detainees are very close and familiar with one another.

20. Petitioners asked Mr. Kiyemba to convey their request for a lawyer to Mr. Kiyemba's attorney. Mr. Kiyemba understood the Petitioners to be trusting him to act in their best interest and to help them find a lawyer. He thought that acting as their next friend was the most effective way to secure a lawyer for them, but they made a direct request for an attorney.

21. According to Mr. Kiyemba, the military also moves the detainees into different cell blocks on a regular basis. This makes it often impossible for him to get additional details or to have a detainee sign a new written authorization for direct authorization if the detainee previously gave Mr. Kiyemba a verbal request for the assistance of a lawyer that Mr. Kiyemba translated and wrote down.

22. On February 9, 2006, Mr. Kiyemba was transferred to the custody of the Ugandan government, despite his long-term residency in the United Kingdom.

23. I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th day of June, 2006.

_____
Gitanjali S. Gutierrez