UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **JAMAL KIYEMBA**, as Next Friend of **ABDUSABUR DOE**, *et al.*, | ) ) ) ) | |
| Petitioners | ) ) | |
| v. | ) ) | Civil Action No. 05-1509 (RMU)(AK) |
| **GEORGE W. BUSH**, *et al.*, | ) ) | |
| Respondents. | ) ) ) | |

**MEMORANDUM ORDER**

Pending before the Court is Petitioners' Emergency Motion for an Order Directing Respondents to Comply with Protective Order and To Permit and Facilitate Attorney Meetings with Petitioners and Imposing Sanctions on Respondents (Mot.) [54] and Respondents' Opposition (Opp'n) [57].[1] Petitioners claim that Respondents have refused to permit counsel access to Petitioners as required by the Protective Order and several previous court orders granting counsel access under virtually identical circumstances. Respondents insist that counsel provide written evidence of their authorization to represent the Petitioner before counsel will be

---

[1] On November 2, 2005, in recognition of "the need to promote orderly and efficient case management of all *habeas* petitions . . . relating to the rights of [Guantanamo] detainees," Judge Kessler, acting as Chair of the Calendar and Case Management Committee referred all motions "pertaining to interpretation or construction of any protective order" entered in any of the Guantanamo *habeas* cases to the undersigned for resolution pursuant to LCvR 72.2(a). A party may seek reconsideration of a ruling by a magistrate judge within 10 days after being served with the magistrate judge's order. LCvR 72.2(b). Rulings issued by a magistrate judge pursuant to LCvR 72.2 are reviewed by the district court judge, in this case Judge Urbina, on a "clearly erroneous" or "contrary to law" standard. LCvR 72.2(c).

allowed to meet with their clients.  Upon consideration of the parties' filings to the Court, Petitioners' Motion is hereby GRANTED.

## **Background**

Of the nine Petitioners in this case, only five have yet been permitted to meet with a lawyer. (Mot. at 1 n.1.)  Respondents have refused to allow the remaining four Petitioners, Abdul Nassir (a.k.a. Abdulnasir, Abdul Annaer), Abdul Sabour (a.k.a. AbduSabur), Hammad Doe, and Khalid Doe (hereinafter "Petitioners") to meet with a lawyer.  Petitioners now seek an order finally granting them access to counsel, now more than a year after they initially sought to exercise their right to challenge their detention in federal court with the assistance of counsel.

Petitioners in this case are Chinese Uighur detainees[2] presently held by the United States Government at the Guantanamo Bay Naval Station.  (Pet'rs' Opp'n to Mot. for Order to Show Cause Why Case Should Not be Dismissed for Lack of Proper "Next Friend" Standing at 2-3, Sept. 12, 2005, Dkt. No. 7.)  They have been detained without charge and held virtually incommunicado for more than four years.  (*See id.* at 2-5.)  In fact, it seems likely that Petitioners have already been determined to be innocent, a fact that may not be known until counsel is permitted to visit.[3]

---

[2]Uighurs are a Turkic Muslim ethnic minority that has been, and continues to be, brutally oppressed by the Chinese government. *See* U.S. Dep't of State, Country Reports on Human Rights Practices, China - 2005 (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61605.htm

[3]Most Uighur detainees have been determined to be "No Longer Enemy Combatants," a somewhat euphemistic term, given that these same detainees were never determined to be enemy combatants in the first instance.  (Pet'rs' Opp'n to Mot. for Order to Show Cause Why Case Should Not be Dismissed for Lack of Proper "Next Friend" Standing at 2-3, Sept. 12, 2005, Dkt. No. 7.)  Indeed, in *Qassim v. Bush*, 05-497 (JR), counsel for other Uighur detainees did not learn

In June, 2004, the Supreme Court ruled that the District Court had jurisdiction to consider aliens' "*habeas corpus* challenges to the legality of their [executive] detention at the Guantanamo Bay Naval Base." *Rasul v. Bush*, 542 U.S. 466, 484 (2004). In compliance with *Rasul*, the Government began in late 2004 to notify detainees of their right to challenge the legality of their detention in federal court. (Sweigart Decl. ¶¶ 2-5.)[4] The "DoD notification"[5] instructs detainees that they may challenge their detention "through a process called *a petition for a writ of habeas corpus*,"[6] and explains that they may **either** file a petition themselves **or** they "may ask a friend or family member or a lawyer to file such a petition with the court."[7] (*Id.*, Exs. A-C.)

---

that their clients had been determined not to be enemy combatants until after counsel went to Guantanamo and met with their clients, even though Respondents had known of the detainees' innocence for several months. (*See id.* at 8.)

[4]*Attached as* Exhibit B to Resp'ts' Mot. for an Order to Show Cause Why Case Should not be Dismissed for Lack of Proper "Next Friend" Standing, August 31, 2005, Dkt. No. 3.

[5]The Department of Defense (DoD) issued three different types of notifications to detainees, depending on whether the detainee had been determined 1) an enemy combatant whose status may be reviewed by the Administrative Review Board (ARB), 2) an enemy combatant not eligible for ARB consideration because he is triable by Military Commission, or 3) a non-enemy combatant. (Sweigart Decl. ¶¶ 3-5, Exs. A-C.) Although each notification contains slightly different information, all three contain the same two paragraphs informing detainees of their right to seek review of the legality of their detention.

[6]The notification fails to provide any explanation of what a petition for *habeas corpus* is or how a detainee would go about getting one. (Sweigart Decl., Exs. A-C.) Some detainees were apparently so confused about what to do with the notice that they "simply mailed the entire [blank] sheet itself back to the court because they did not know what else to do to get legal assistance." (Gutierrez (Kabir) Decl. ¶ 12, *filed in Razakah v. Bush*, 05-2370 (D.D.C. Feb. 3, 2006) (Dkt. No. 8)).

[7] The notification instructs detainees to write to the District Court in order to challenge their detention, but provides little in the way of explanation about what detainees should write:

> If you do not have a lawyer or a family member or friend who could file this petition for you, you may file your own petition. According to prior court rulings, petitions should be

At some point in early 2005, Petitioners, who do not speak English, asked a fellow detainee, Jamal Kiyemba to help them find a lawyer to challenge their potentially indefinite detention without charge. (*See* Letter from Jamal Kiyemba ("Kiyemba Letter"), Mot., Ex. 4; Declaration of Gitanjali Gutierrez, Mot., Ex. 7.) Petitioners sought help from Kiyemba, a British resident, because he speaks fluent English and other detainees knew that he trusted his lawyer. (*See* Gutierrez Decl. ¶¶ 4, 6-9, 20.) Petitioners sought Kiyemba's help in initiating a challenge to the legality of their detention and in finding counsel, until such time as they could meet with their own counsel directly. (Kiyemba Letter at 1 (explaining that detainees' "specific desire for a lawyer and for a legal challenge to the illegality of their detention" was "independent of their reliance upon [Kiyemba] as 'next friend'"); Gutierrez Decl. ¶¶ 6-11; 16-17, 20.)

Kiyemba forwarded Petitioners' names to his own attorney and signed a statement attesting to their request for representation to challenge their detention. (Kiyemba Letter at 1.) Kiyemba's attorney then forwarded Petitioners' names to the Center for Constitutional Rights, a national public interest organization that has coordinated *pro bono* representation for the majority of Guantanamo detainees. Attorneys with Bingham McCutchen volunteered to represent Petitioners on a *pro bono* basis and filed a *habeas* petition on their behalf on July 29, 2005. On September 13, 2005, the trial court granted Respondents' motion for a stay pending appeal. *See* Order of Sept. 13, 2005, Dkt. No. 8. At the same time, the court also entered an order prohibiting Respondents from removing Petitioners from Guantanamo and from the jurisdiction of the court

---

sent to:
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001.

Sweigart Decl., Exs. A-C.

4

without providing 30 days notice and entering the Protective Order.[8] *Id.*

Following entry of the Protective Order, counsel for Petitioners obtained the necessary security clearances and submitted the Notification of Representation, including counsel's name, "licensing information, business and email addresses and phone numbers, as well as the name of the detainee being represented," all of which are required as prerequisites to any in-person meeting with a detainee-client. *See* Protective Order, Ex. A, § III. Counsel then sought to meet with Petitioners in person, only to be denied by Respondents on the grounds that counsel had provided insufficient evidence of their authority to represent the detainees. Petitioners now seek an order compelling Respondents to permit them access to their clients, in part so they may obtain the very authorization of representation that Respondents insist be provided prior to any visits.

## Analysis

I.    *Interpretation of the Protective Order*

The question presented to the Court is a narrow one, namely, whether a detainee's right to meet with his counsel is conditioned on counsel providing direct, written "evidence of his or her authority to represent the detainee" before a visit, or whether counsel may provide such evidence after meeting with the detainee. This question has been discussed at length in previous opinions,

---

[8]In recognition of the security concerns attendant to the Guantanamo *habeas* cases, the Protective Order sets procedures that counsel must follow in order to meet and communicate with their clients. The Protective Order was initially approved and entered by Judge Joyce Hens Green in *In re Guantanamo Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004), following intense negotiation and litigation over its terms. *See Adem v. Bush*, 425 F. Supp. 2d 7, 10-14 (D.D.C. 2006) (reviewing history of negotiation and entry of Protective Order), *recons. denied*, No. 05-723, slip op., 2006 WL 1193853 (D.D.C. April 28, 2006). It has since been entered in the vast majority of Guantanamo *habeas* cases pending before the District Court.

which held that the Protective Order, by its plain terms, "manifestly does not require evidence of authority to represent a detainee as a ***prerequisite*** to counsel meeting with a detainee." *See Adem*, 425 F. Supp. 2d at 20-23, *recons. denied*, No. 05-723, slip op., 2006 WL 1193853, at *3-6 (D.D.C. April 28, 2006) (affirming magistrate judge's opinion and rejecting government's argument that evidence of authority to represent a detainee referred to a "two-step sequential showing"); *see also Kabir v. Bush*, No. 05-1704 (D.D.C. May 11, 2006) (Dkt. No. 33) (order granting motion to compel access to counsel); *Said v. Bush*, No. 05-2384 (D.D.C. May 23, 2006) (Dkt. No. 23) (same), *recons. denied*, Minute Order of May 26, 2006.

The instant case is no different. In fact, the question presented to the Court is identical to the question presented in *Adem*. The only difference between *Adem* and the instant case is that *Adem* was filed as a direct petition and the instant case was filed as a 'next friend' petition. The Protective Order, however, does not distinguish between cases filed by a 'next friend' and cases filed directly. *See Adem*, 425 F. Supp. 2d at 22-23 (rejecting government's argument that the Protective Order requires additional authorization solely for *habeas* petitions initiated through a 'next friend').

Respondents persist in arguing that the Protective Order implicitly distinguishes between direct petitions and 'next friend' petitions. (Opp'n at 10-11.) According to Respondents, the Court may ignore the plain language of the Protective Order because in those cases filed through a next friend, "the access procedures further require a second type of authorization directly from the detainee." (*Id.*) Upon receiving this "second, subsequent type of authorization," the Court would then convert the 'next friend' petition into a direct petition.

This Court already rejected Respondents' implied "two-layer" theory of interpretation in

*Adem*, which was upheld by Judge Roberts. The Court will not repeat the entirety of that extensive discussion here. Briefly, Respondents' interpretation would require the Court to ignore the plain meaning of the text of the Protective Order and to flaunt the most basic rules of construction. *See Adem*, 425 F. Supp. 2d at 22-23, *recons.. denied*, 2006 WL 1193853, at *4-6 (affirming magistrate judge's opinion and rejecting government's argument that evidence of authority to represent a detainee referred to a "two-step sequential showing"). The Court cannot infer a separate two-step requirement applicable solely to 'next friend' petitions out of thin air. *See id.* at 20- 23 (interpreting protective order); *see also Armstrong v. Executive Office of the President*, 830 F. Supp. 19, 22 (D.D.C. 1993) ("[g]iving plain meaning to [the] language" of the protective order).

Respondents' argument is also belied by the fact that a "proper next friend petition" under *Whitmore v. Arkansas*, 495 U.S. 149, 161-66 (1990) would not need to be converted into a direct petition in order to be litigated. Respondents' theory is tantamount to arguing that unless Petitioners' counsel provides a second, subsequent authorization, directly from the detainee, neither this court, nor any other court, may entertain even those 'next friend' petitions that clearly meet the *Whitmore* standing doctrine. To the contrary, however, a "proper" next friend petition is sufficient by itself to prosecute a case without any additional evidence of authority directly from the real party in interest.

Indeed, as this Court explained in *Adem*, following the Supreme Court's decision in *Rasul* and the negotiation and entry of the Protective Order, the legal fiction of a 'next friend' became largely irrelevant except as a mechanism for identifying those detainees who seek to challenge their detention in the first instance. *See Adem*, 425 F. Supp. 2d at 10-14 (reviewing history of use

of 'next friend' device in Guantanamo *habeas* cases).  In those *habeas* cases filed since the creation and entry of the Protective Order, the detainees who initiate a *habeas* petition on behalf of a fellow detainee generally do not seek to serve procedurally as a 'next friend' in the traditional sense, but are simply passing on another detainee's request for help, a fact that can be confirmed once counsel meets directly with the detainee.  *See id.*, at 12-14; *see also Hamily v. Bush*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 19) (Order of Bates, J. dismissing Shaker Aamer as next friend and substituting Adel Hamily as sole petitioner); *Zakirjan v. Bush*, No. 05-2053 (Dec. 12, 2005) (Dkt. No. 24) (Order of Oberdorfer, J. dismissing as moot government's "Motion to Show Cause Why Case Should Not Be Dismissed for Lack of Proper 'Next Friend' Standing" because detainee who was real party in interest authorized counsel to represent him directly); *Muhammed v. Bush*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17) (same); *Idris v. Bush*, No. 05-1555 (Nov. 1, 2005) (Dkt. No. 8) (same).

As was the case in *Adem*, the alleged 'next friends' in this case are not seeking to serve as next friends in the traditional legal context, but are merely conveying another detainee's request for help in challenging his detention as a friend in the social context .[9]  *See Adem*, 425 F. Supp. 2d at 13.  Notwithstanding Petitioners' use of a 'next friend' to initiate the petition, Petitioners have provided prima facie evidence that they ***personally*** authorized the challenge to the legality of their detention and sought the assistance of counsel by communicating those requests through a fellow detainee.  Jamal Kiyemba submitted a signed statement listing the names of the

---

[9]This is not to say that Respondents' challenge to Petitioners' next friend standing will necessarily be moot.  Petitioners' challenge to their detention may ultimately need to proceed through a 'next friend' if, for example, they are incapacitated or otherwise unable to personally verify their intent to challenge their detention within 10 days of a second visit.

detainees who had come to him seeking help, and asserting that, "[i]ndependent of their reliance upon [him] as 'Next Friend,'" each of the named detainees had a "specific desire for a lawyer and for a legal challenge to the illegality of their detention by the United States of America." (Kiyemba Letter at 2.) Kiyemba lists the names of 27 detainees, their nationalities, the camps in which they are held, and for most, the languages they speak. In the margin by the name of one detainee, Kiyemba noted that he was "very ill." (*Id.*)

Respondents argue that the Court should deny Petitioners' request for a meeting with their lawyers because the purported 'next friends' have not supplied sufficient information for the Court to find that the Petitioners in fact made such a request. (Opp'n at 14.) Respondents' argument boils down to an assertion that the 'next friends' might be lying.[10] However,

---

[10] Notably, one of the detainees listed by Kiyemba as requesting counsel is Dr. Abu Muhammed, a/k/a Fethi Boucetta, a non-enemy combatant (NEC). Respondents previously challenged Kiyemba's standing to serve as Boucetta's 'next friend' and similarly prohibited Boucetta from meeting with his counsel. (*See* Motion for Order to Show Cause, *Muhammed v. Bush*, 05-2087, Nov. 18, 2005, Dkt. No. 8.) Respondents made the exact same arguments in Boucetta's case as they now make in opposition to allowing Petitioners access to their counsel. Considering the circumstances under which Respondents' challenge to Kiyemba's next friend standing was resolved, the implication that Petitioners' requests are not sincere rings somewhat hollow.

Respondents' challenge to Kiyemba's next friend standing was rendered moot when Boucetta was able to communicate with counsel in person and confirm his desire for representation purely by accident. Susan Baker Manning, who is counsel for other non-enemy combatant detainees, was in Guantanamo meeting with her clients. (*See* Decl. of Susan Baker Manning, *attached as* Ex. A to Pet.'s Mem. in Opp'n to Mot. for an Order to Show Cause, *Muhammed v. Bush*, No. 05-2087, Dec. 2, 2005, Dkt. No. 14). During a break between meetings with her clients, Boucetta approached Ms. Baker Manning and asked her for help finding a lawyer. (*See id.*, ¶¶ 3-9.) Upon learning that Boucetta had personally requested counsel, Judge Oberdorfer dismissed Kiyemba as 'next friend' and converted the case into a direct petition. *See Muhammed*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17).

Ms. Baker Manning was able to speak directly with Boucetta because he speaks passable English and because he is an NEC being held in Camp Iguana, a fortuity virtually guaranteed not to repeat itself. In August of 2005, Respondents began housing non-enemy combatants detainees in a separate detention facility called "Camp Iguana." (*See* Brigadier General Jay W. Hood Decl.

Respondents have provided no evidence to contradict the signed, witnessed statements that Petitioners want to challenge their detention and that they asked Kiyemba to help them get a lawyer. *See Adem*, 2006 WL 1193853, at *3 (D.D.C. April 28, 2006) (rejecting government's argument that petition should be dismissed for lack of next friend standing where government provided no evidence to contradict prima facie evidence that detainee desired to challenge his detention).

Respondents insist that, absent Petitioners' signatures on a form, the alleged lack of proper next friend standing precludes this Court from further inquiring into the truth of Petitioners' request to challenge their detention.[11] It is inconceivable that the Court's authority to investigate Petitioners' request would be so constrained. Petitioners are "entitled to present the facts surrounding their confinement to the Court. It is equally clear that the Court is authorized to craft the procedures necessary to make this possible, in order that the Court might fully consider Petitioners' challenge to their detention." *Al Odah v. United States*, 346 F. Supp. 2d 1,

---

¶ 5, attached as Ex. 1 to Resp'ts' Mem., *Qassim v. Bush*, 05-497, Aug. 8, 2005, Dkt. No. 27.) Camp Iguana is a "communal living facility." (*Id.*) NEC detainees housed in Camp Iguana have significantly greater freedom of movement than detainees held as enemy combatants. They have a common bunk room, a recreation room and a recreation yard. (*Id.* ¶¶ 5-6.) There is a fence around the facility and guards posted, but detainees in Camp Iguana are otherwise free to move about the grounds within the confines of the Camp. (*Id.*) At the time, counsel meetings with NEC detainees took place in Camp Iguana, which meant that Boucetta was able to walk up to Ms. Baker Manning and personally ask her for help getting a lawyer, something detainees in other parts of Guantanamo could never do. All counsel meetings, including NEC counsel meetings, now take place in Camp Echo, a solitary confinement facility.

[11]Respondents assert that by allowing detainees to meet with their counsel in-person, the Court ignores Respondents' efforts to provide "reasonable mechanisms, . . . for detainees to contact the Court or counsel directly" in compliance with *Rasul v. Bush*, 542 U.S. 466, 484 (2004). (Opp'n at 14.) To the contrary, the Court is well aware of these efforts. Unfortunately, the steps taken by Respondents to notify detainees of their right to contact counsel and the court have been largely ineffective. *See Adem*, 425 F. Supp. 2d at 14-18 & nn.18-22.

7 (D.D.C. 2004). As Judge Roberts explained, not only does the plain language of the Protective Order not require a showing of direct evidence of authorization to represent a detainee as a prerequisite to an in-person meeting, but "[r]equiring a Guantanamo detainee to identify a specific lawyer from among all the volunteer lawyers -- most of whom are unknown to the detainee before a meeting -- is a meaningless exercise. It would be unconscionable to tether a detainee's access to counsel to such an unworkable prerequisite." *Adem*, 2006 WL 1193853, at *7 (D.D.C. April 28, 2006); *see also Nasrullah v. Bush*, 05-891 (D.D.C. June 12, 2006) (Dkt. No. 18) (RBW) (granting petitioner's motion for entry of the protective order and rejecting government's argument that the Detainee Treatment Act divested District Court of its authority to appoint counsel to represent Guantanamo Bay detainees).

Until revoked or modified, the Protective Order remains in effect, and the Court has inherent power to enforce its own lawful orders. *See Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006). Absent evidence that Petitioners' requests are not genuine, they are entitled to meet with their lawyers.

II.    *Jurisdiction*

Respondents also contend that the Detainee Treatment Act of 2005 (the "DTA") divests this Court of jurisdiction to decide the instant motion.[12]  The retroactive effect of the DTA is a question presently pending before the D.C. Circuit and the Supreme Court.[13]  Respondents note

---

[12]On December 30, 3005, President Bush signed into law the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680 (the "DTA"). Respondents argue that the DTA divests the District Court of jurisdiction over the Guantanamo *habeas* petitions, including those filed prior to the DTA's passage.

[13]Oral argument before the D.C. Circuit was held on March 22, 2006, and before the Supreme Court on March 28, 2006.

that "the sense of the Court was to await anticipated guidance from the D.C. Circuit regarding the effect of the Act before proceeding further in the Guantanamo habeas cases." (Opp'n at 9 n.6.) Allowing Petitioners to meet with their lawyers, however, is not the type of interim relief that even remotely risks infringing on the Circuit's possible exclusive jurisdiction. *Cf. Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 75, 78-79 (D.C. Cir. 1984). The question of when, and under what circumstances the existing Protective Order permits Petitioners to meet with their lawyers simply has no bearing on the question of which Court has jurisdiction to review the merits of Petitioner's challenge to his detention.[14] *See Adem*, 2006 WL 1193853, at *7-8; *see also Nasrullah v. Bush*, 05-891 (D.D.C. June 12, 2006) (RBW) (entering protective order for purposes of granting petitioners access to counsel); *Al Salami v. Bush*, 05-2452 (D.D.C. April 13, 2006) (PLF) (explaining that "[d]etainees' right to meet with counsel under the Protective Order is independent of the (still-unresolved) question of the Court's jurisdiction to rule on their *habeas* petitions"). Petitioners have a right to counsel under *Al Odah v. United States*, 346 F. Supp. 2d 1, 7 (D.D.C. 2004). That right extends to the assistance of counsel in litigating the very jurisdictional questions pending before the D.C. Circuit and the Supreme Court.

Furthermore, it is well-settled that until such time as jurisdiction is determined not to exist, the District Court has the authority to issues such orders as necessary to preserve its own jurisdiction and to maintain the status quo. *See United States v. United Mine Workers of*

---

[14]Presumably, counsel for Petitioners would also represent them in any proceedings before the D.C. Circuit. Thus, the need to resolve questions regarding the logistics of counsel access will remain an issue, even if the D.C. Circuit and the Supreme Court determine that the DTA applies to those *habeas* cases currently pending in the District Court.

*America*, 330 U.S. 258, 290-93 (1947). The status quo includes the integrity of the Protective Order, painstakingly negotiated by the parties and approved by the District Court, which remains binding and in effect in those cases in which it has been entered. "[A] protective order, like any ongoing injunction, is always subject to the inherent power of the district court." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993); *see also Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (recognizing courts' "inherent power to enforce compliance with their lawful orders"); *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (same); *cf. Gambale v. Deutsche Bank, AG*, 377 F.3d 133, 140-41 (2d Cir. 2004) (recognizing court's jurisdiction to modify protective orders that remain in effect, even after dismissal of the underlying litigation); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (same), *cert. denied, Am. Special Risk Ins. Co. v. Rohm & Haas Co.*, 498 U.S. 1073 (1991). It would be untenable for the District Court to be put in a position where it is powerless to enforce its own protective order, presently in effect and over which it has continuing control.

    Therefore, it is hereby, this __29th__ day of June, 2006

    ORDERED that Respondents shall comply with the Protective Order and allow counsel to meet with the Petitioners as soon as possible, and it is

    FURTHER ORDERED that Petitioners' Motion for sanctions and costs is denied.

    SO ORDERED.

_____/s/_____
ALAN KAY
UNITED STATES MAGISTRATE JUDGE