**TAB 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, *et al.* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 02-CV-0828 (CKK) |
| UNITED STATES OF AMERICA, *et al.,* | ) ) ) | |
| Defendants. | ) ) ) | |

**RESPONSE TO COMPLAINT**
**IN ACCORDANCE WITH COURT'S ORDER OF JULY 25, 2004**

**INTRODUCTION**

On July 25, 2004, the Court ordered respondents to submit to the Court by noon on July

30, 2004, a filing setting forth proposed procedures with respect to access to counsel that the

government will apply to Guantanamo Bay detainees and to petitioners in the case, including any

proposed monitoring of petitioners' conversations with counsel, and a response to petitioners'

"underlying petitions for writs of habeas corpus, specifically addressing, among other things, the

legal merits of the Government's entitlement to monitor any of Petitioners' conversations with

counsel." Procedures that the government intends to apply with respect to access by habeas

counsel to detainees at Guantanamo Bay generally are described in Exhibit A, "Procedures For

Counsel Access To Detainees At The US Naval Base in Guantanamo Bay, Cuba." See Exh. B

(Declaration of Martin J. Lucenti, Sr.), ¶ 8. Given the circumstances of this case, involving

individuals detained by United States authorities as enemy combatants in connection with

hostilities involving al Qaeda, the Taliban, and their supporters, at an important and sensitive United States naval base outside the territorial sovereignty of the United States, the procedures concerning access by counsel include, inter alia, a requirement that counsel obtain a security clearance; that information exchanged between counsel and a detainee undergo a classification review; and that, where appropriate, communications between counsel and detainee be monitored, i.e., not just subjected to classification review.  The procedures also contain restrictions on disclosure of classified information and on the use of other information outside the preparation for or conduct of the habeas litigation.  At the same time, these necessary precautions do not compromise attorney-detainee communications: any review of information or monitoring of communications is to be performed by persons unconnected with litigation or other proceedings concerning the detainee, and those persons are forbidden to disclose information to government personnel involved in litigation or proceedings involving the detainee.

With respect to the petitioners in this case, as explained in the Declaration of the Acting Commander, Joint Task Force Guantanamo Bay, Cuba, Exh. B, a determination has been made in accordance with the access procedures that three petitioner-detainees in this case should be subject to all aspects of those procedures, including monitoring of communications and classification review.  The remainder of the petitioner-detainees in this case will not be subject to real-time monitoring of communications.

As explained below, petitioners are not entitled to relief, whether in the form of access to counsel under conditions other than those established for Guantanamo Bay detainees, or otherwise.  Petitioners have no right to relief, including the right of access to counsel, under the Constitution because petitioners, as aliens outside the sovereign territory of the United States,

lack any cognizable Constitutional rights. Furthermore, no applicable right of access to counsel can be found in other sources, including international treaties. In any event, the procedures for counsel access to Guantanamo Bay detainees are entirely reasonable steps that provide detainees legitimate access to counsel while protecting national security interests, and thus, are fully justified. Petitioners are not entitled to relief.

## BACKGROUND AND PROCEDURES
## FOR COUNSEL ACCESS

On September 11, 2001, the al Qaeda terrorist network launched a vicious, coordinated attack on the United States, killing approximately 3,000 persons. In response, the President, as Commander-in-Chief and with Congressional authorization for the use of force, took steps to protect the Nation and prevent additional threats. Among these steps, the President dispatched the armed forces of the United States to Afghanistan to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported and protected that network. In the course of that campaign — which remains ongoing — the United States and its allies have captured or taken control of a large number of individuals, many of whom are foreign nationals. Pending in this Court are approximately 14 cases brought on behalf of close to 60 aliens who are held at the United States Naval Base at Guantanamo Bay, Cuba. The cases commonly challenge the legality and conditions of the detention of the aliens on whose behalf the cases are brought. On June 28, 2004, the Supreme Court issued a decision in three of the cases originally dismissed by the Court. See Rasul v. Bush, ___ U.S. ___, 124 S. Ct. 2686 (2004). The Court held for the first time that federal district courts had jurisdiction to consider a petition for a writ of habeas corpus under the habeas statute, 28 U.S.C. § 2241, brought by aliens apprehended abroad and

held at Guantanamo Bay, even though Guantanamo Bay was not within the ultimate sovereignty

of the United States.  See id. at 2693-98.  The Court expressly declined to address "whether and

what further proceedings" would be appropriate after remand of the case.  See id. at 2699.

In order to facilitate the litigation of habeas cases on behalf of Guantanamo Bay

detainees, the government intends to permit counsel for habeas petitioners access to the detainees

at issue in these cases.  So far at least 14 such habeas cases have been filed in this District before

eight different judges.  Thus, numerous counsel will potentially seek access to Guantanamo Bay

detainees.  Given the significant numbers of detainees and counsel involved, and because such

petitioners are being detained by United States authorities as enemy combatants in connection

with hostilities involving al Qaeda, the Taliban, and their supporters, and are being held at an

important and sensitive United States naval base outside the territorial sovereignty of the United

States, special procedures have been established for counsel access.  The procedures facilitate

attorney-detainee communications for purposes of the habeas litigation, while protecting against

disclosure of classified or other information that could result in damage to the national security,

and permitting appropriate authorities to act upon threats to national security.

The counsel access procedures for Guantanamo Bay detainees include the following

elements and conditions.[1]  First, counsel must hold or obtain a Secret-level United States security

clearance.  Exh. A, § III.A.  The Department of Justice Security & Emergency Planning Staff

office is overseeing the process of obtaining clearances, as appropriate, for habeas counsel who

---

[1] Additional administrative procedures are also in place to assure that counsel purporting
to represent a detainee and desiring access to the detainee is actually authorized to represent the
detainee, and to assist with the logistics of any visit by counsel to Guantanamo Bay.  Exh. A,
§ III.C., D.

need them.  Such requests for a clearance are currently being processed on an expedited basis,

with an expected processing time of 2-3 weeks.  Some counsel for petitioners in this case have

already received an interim secret clearance and been briefed on security procedures.

Second, the procedures create a system of classification review of information exchanged

between counsel and a detainee in order to ensure the proper handling, storage, and transportation

of classified information.  Exh. A, §§ VI, VII.

Third, the procedures contemplate, for some detainees, monitoring of communications

between counsel and a detainee (in addition to classification review) under circumstances

carefully designed to avoid unnecessary compromise of attorney-detainee communications.  Such

monitoring will be undertaken only "following an individualized assessment of the national

security implications of unmonitored communications between a detainee and his counsel."  Exh.

A, § IV.C.  Further, that individualized assessment must result in a conclusion that monitoring is

reasonably necessary to protect against the disclosure of information that reasonably
could be expected to result in immediate and substantial harm to the national security,
including communications regarding:

1.  The facilitation of terrorist operations or future terrorist acts;

2.  Military plans, weapons systems, or operations;

3.  Foreign government information;

4.  Foreign relations or foreign activities of the United States, including confidential
    sources;

5.  Intelligence activities (including special activities), intelligence sources or methods,
    or cryptology;

6.  Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans
    or protection services relating to national security, which includes defense against
    transnational terrorism;

    7.  Matters that are classified above the clearance level of the counsel.

Exh. A., § IV.D.  Such monitoring permits the identification and, if appropriate, dissemination to

appropriate law enforcement and intelligence authorities of information reasonably reflecting a

threat to national security, thus permitting any such threat to be averted. [2]  Exh. A, § X.

    Under the applicable procedures, the classification review and any monitoring are to be

undertaken in such a way as to avoid unnecessary compromise of attorney-detainee

communications.  Monitoring and classification review will be conducted only by a Department

of Defense "privilege team," i.e., DoD personnel who are and will continue to be walled off from

participation in any court or military proceedings concerning the detainee.  Exh. A, §§ II.D, IV.F.

Indeed, the privilege team is forbidden to disclose any information reviewed to government

personnel involved in court or military proceedings involving the detainee.  Id.  Monitored

information may only be disclosed if it reflects a likely threat to national security or of immediate

violence, and, then, only to the Commander, JTF-Guantanamo, who may convey the information

to appropriate law enforcement and intelligence officials.  Exh. A, § X.

    Fourth, the procedures prevent the disclosure of classified information to the detainee and

otherwise compel the appropriate treatment of classified information by counsel.  Exh. A, § VII.

Further, given the extraordinary circumstances presented by these Guantanamo Bay detainee

cases, the procedures limit counsel's dissemination of any communications with the detainee to

purposes of preparing for or conducting the litigation.  Exh. A, § XI.

---

    [2] The procedures also enable the termination of face-to-face communications where it
appears that monitoring is being intentionally frustrated by the detainee or counsel or where the
communication is being used to further terrorist or other criminal operations or other threats to
national security.  Exh. A., § V.B.

Finally, given the large number of cases, at least 14, involving numerous counsel, brought on behalf of Guantanamo Bay detainees before at least eight judges of the Court, the procedures applicable to counsel access require an acknowledgment and agreement of counsel that he or she will comply with the procedures for access to detainees at Guantanamo Bay.  Exh. A., §§ III.B., XII.  The acknowledgment states explicitly, however, that it is not an acknowledgment that counsel considers the access procedures legally permissible and makes clear that a challenge to the procedures is not foreclosed through signing the acknowledgment.  Exh. A., § III.B.  Rather, the acknowledgment serves as a necessary record that counsel are aware of and will abide by the procedures.

These procedures are justified by the extraordinary nature of these cases involving Guantanamo Bay detainees, including that the detainees may possess sensitive information, for example, information regarding the Guantanamo base or concerning agents, units, or methods involved in the detainee's capture.  Further, detainees may be in possession of classified information of the same or some other nature, including information that could jeopardize the safety of U.S. and other forces.  See Exh. B, ¶¶ 9-13.  In addition, those involved in terrorist and supporting groups are familiar with and utilize sophisticated techniques for communicating information to individuals or groups that can be used in planning or otherwise supporting terrorist activities.  These methods would include using coded communications transmitted through unwitting intermediaries.  See id. ¶¶ 5, 7, 10, 14, 18.

With respect to the specific petitioners in this case, pursuant to the procedures for access, a determination has been made that three of the petitioners will be subject to both monitoring of communications and classification review.  See Exh. B; Exh. A, §§ V-VII.  For the reasons

-7-

reflected in the Declaration of the Acting Commander, such monitoring is necessary to protect against the disclosure of information that reasonably could be expected to result in immediate and substantial harm to national security interests.  Exh. B, ¶ 17.  These three individuals all have established ties to or influential positions in various terrorist networks or groups hostile to U.S. interests, including al Qaeda and the Taliban, as well as operational knowledge of terrorists operations.  The detainees have the demonstrated capacity and commitment to direct or encourage harm to U.S. personnel and interests, are trained in sophisticated methods of communications with such groups despite detention, and have even attempted to use the mail system at Guantanamo Bay for such purposes.  See id. ¶¶ 17-20.  Further, their knowledge of potential gaps in U.S. intelligence, as well as knowledge of counter-interrogation techniques, creates a likelihood that, if their communications are not monitored, information would be disclosed creating a risk of immediate and substantial harm to United States national security interests.  See id.

## ARGUMENT

The Court has described petitioners' complaint, for all essential purposes, as a petition for a writ of habeas corpus complaining of the conditions of petitioners' confinement, including, predominantly, lack of access to counsel.  This claim for access must be evaluated in the unique context of this case.  This case does not involve criminal detention, nor are petitioners United States citizens, nor are they confined within an area of United States sovereignty.  To the contrary, petitioners are aliens held at Guantanamo Bay, Cuba.  Further, petitioners were taken into custody as enemy combatants in connection with hostilities involving al Qaeda, the Taliban, and their supporters, and are being detained while hostilities remain ongoing for the purposes of

preventing them from re-entering those hostilities, as well as potentially obtaining information that may serve to further national security interests.

Accordingly, as explained below, petitioners cannot appeal to the Constitution or other potential sources of a right to access to counsel.  To the extent petitioners seek relief based on a right to counsel, unqualified or otherwise, petitioners' application must be dismissed.  The same is true with regard to all other forms of relief sought by petitioners.  In any event, however, the access to counsel being provided by the government is merely to facilitate the litigation of petitioners' habeas claims, and that access is reasonably subject to the conditions imposed, which permit essential attorney-detainee communications while protecting national security interests. The fact that conditions on access to counsel have been imposed or upheld even in contexts involving a constitutional right to counsel or access suggests that the procedures established for counsel's access to aliens detained at Guantanamo Bay easily pass muster.

I.     **PETITIONERS HAVE NO RIGHT TO COUNSEL UNDER THE CONSTITUTION OR OTHER SOURCES OF LAW**

    A.     **Petitioners, As Aliens Outside The Sovereign Territory Of The United States, Lack Any Cognizable Constitutional Rights.**

Any assertion by petitioners of a Fifth Amendment due process right or any constitutional right to counsel is baseless.  As aliens detained by the military outside the sovereign territory of the United States and lacking a sufficient connection to this country, petitioners have no cognizable constitutional rights.

"It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders."  Zadvydas v. Davis, 533 U.S. 678, 693 (2001).  In particular, the Supreme Court has concluded that neither the Fourth nor

Fifth Amendments obtain with respect to aliens outside the United States territory.  See United States v. Verdugo-Urquidez, 494 U.S. 259, 266 (1990) (rejecting proposition that the Fourth Amendment "was intended to restrain the actions of the Federal Government against aliens outside of the United States territory"); Johnson v. Eisentrager, 339 U.S. 763, 783-85 (1950) (rejecting claim that aliens outside the territory of the United States are entitled to Fifth Amendment rights).  The D.C. Circuit, for its part, has repeatedly noted that a "'foreign entity without property or presence in this country has *no constitutional rights*, under the due process clause or otherwise.'"  32 County Sovereignty Comm. v. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002) (quoting People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999)) (emphasis added); see also Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."); Harbury v. Deutch, 1999 WL 33456919, *6-7 (D.D.C. 1999), rev'd in part on other grounds, 233 F.3d 596, 603 (D.C. Cir. 2000), rev'd in part on other grounds sub nom., Christopher v. Harbury, 536 U.S. 403 (2002) (rejecting extraterritorial application of Fifth Amendment); Pauling v. McElroy, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) ("The non-resident aliens here plainly cannot appeal to the protection of the Constitution or laws of the United States.").

The bar on extraterritorial assertion of constitutional rights by aliens undoubtedly applies here.  As the Supreme Court's decision in Eisentrager makes clear, in a holding unaffected by the Supreme Court's subsequent decision in this case, in determining whether an alien is present in the United States for purposes of evaluating the availability of constitutional protection, what matters is not whether the alien is located within territory over which the United States exercises

control, but whether the alien is within territory over which the United States exercises

*sovereignty*.    In <u>Eisentrager</u>, the Supreme Court denied a petition for a writ of habeas corpus

brought by a group of German civilians who had been captured in China by United States forces

during World War II, convicted by a military commission of violating the laws of war and

imprisoned in Germany under the control of the United States Army.  The Court rejected the

petitioners' attempt to invoke a "constitutional right" to bring a habeas petition, reasoning that

the "prisoners at no relevant time were within any territory over which the United States is

*sovereign*, and the scenes of their offense, their capture, their trial, and their punishment were all

beyond the territorial jurisdiction of any court of the United States."  339 U.S. at 778 (emphasis

added).  The Court went on to overturn the determination by the Court of Appeals that the

prisoners possessed Fifth Amendment liberty interests, highlighting concerns about

"extraterritorial application of organic law."  <u>Id.</u> at 781-785.   Thus, while the petitioners in

<u>Eisentrager</u> were imprisoned under the control of the United States government, the absence of

United States sovereignty precluded the attachment of constitutional rights.  As the Supreme

Court later explained, the Court in <u>Eisentrager</u> "rejected the claim that aliens are entitled to Fifth

Amendment rights outside the *sovereign* territory of the United States."  <u>Verdugo-Urquidez</u>, 494

U.S. at 269 (emphasis added).  These aspects of <u>Eisentrager</u> were in no way undermined by

<u>Braden v. 30th Jud. Conf. of Ky.</u>, 410 U.S. 484 (1973).

Here, it is clear that the Guantanamo Bay Naval Base is outside the sovereign territory of

the United States.  As the Supreme Court observed in this very case, under the 1903 Lease

Agreement executed between the United States and Cuba, "'the United States recognizes the

continuance of the *ultimate sovereignty of the Republic of Cuba* over the [leased areas],' while

'the Republic of Cuba consents that . . . the United States shall exercise complete jurisdiction and control over and within said areas.'" Rasul, 124 S. Ct. at 2690-91 (emphasis added). Indeed, the Supreme Court posited a distinction between "plenary and exclusive jurisdiction" and "'ultimate sovereignty" at Guantanamo Bay even as it framed the specific question for its review. Id. at 2693; cf. United States v. Spelar, 338 U.S. 217, 221-22 (1949) (lease between for military air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases concerned"); Vermilya-Brown Co. v. Connell, 335 U.S. 377, 380-81 (1948) (U.S. naval base in Bermuda, controlled by United States under lease with Great Britain, was outside United States sovereignty).[3]

Given the absence of U.S. sovereignty over Guantanamo Bay and petitioners' status as aliens, it is plain that petitioners lack cognizable constitutional rights with respect to their detention. Indeed, in a similar case, the Eleventh Circuit concluded that alien migrants located at the Guantanamo Bay Naval Base have "no First Amendment or Fifth Amendment rights which they can assert." See Cuban American Bar Ass'n, Inc. v. Christopher, 43 F.3d 1412, 1428-29 (11th Cir. 1995). As a predicate to its decision, the court specifically rejected the contention that "'control and jurisdiction' is equivalent to sovereignty" for the purpose of assessing the applicability of constitutional provisions to aliens. Id. at 1424-25. Like the court in Cuban American Bar Ass'n, this Court should dismiss any contention that the Constitution provides actionable rights to aliens located at a U.S. military facility within the sovereign territory of

_____

[3] In its Memorandum Opinion dismissing the petition in this case, this Court concluded that the military base at Guantanamo Bay is outside the sovereign territory of the United States. See Rasul v. Bush, 215 F. Supp. 2d 55, 72 (D.D.C. 2002). This conclusion was not rebutted by the D.C. Circuit or the Supreme Court.

another nation.  See also Haitian Refugee Center, Inc. v. Baker, 953 F.2d 1498, 1513 (11th Cir.

1992) (Haitians interdicted by U.S. Coast Guard on the high seas "have no recognized

substantive rights under the laws or Constitution of the United States.").

 Even if this Court were to disagree with the Eleventh Circuit and conclude that

Guantanamo Bay was the equivalent of U.S. sovereign territory for purposes of assessing the

applicability of constitutional provisions, the Supreme Court's decision in United States v.

Verdugo-Urquidez would still bar the assertion of constitutional rights by petitioners here.  In

Verdugo-Urquidez, the Court considered whether the Fourth Amendment applied to the search

and seizure by United States agents of property in Mexico owned by a non-resident alien who

had been arrested and transported to the United States prior to the search.  The Court noted that

certain previous cases "establish only that aliens receive constitutional protections when they

have come within the territory of the United States *and developed substantial connections with

this country*."  Verdugo-Urquidez, 494 U.S. at 271 (1990) (emphasis added); see also Jifry, 370

F.3d at 1182; People's Mojahedin Org., 182 F.3d at 22.  The Court thus rejected respondent's

arguments based on this line of authority, reasoning that presence in the United States that is

"lawful but involuntary [] is not the sort to indicate any substantial connection with our country."

494 U.S. at 271.  Respondent, "an alien who ha[d] had no previous significant voluntary

connection with the United States" and was being held in the United States against his will, was

not entitled to the protection of the Fourth Amendment.  Id.  Even more clearly here, petitioners –

who do not allege to have any "significant voluntary connection with the United States" and

-13-

whose detention in Guantanamo Bay by the military is instead "involuntary" – do not have a

sufficient connection with the United States to give rise to constitutional protection.[4]

It bears noting that nothing in the Supreme Court's opinion in <u>Rasul</u> undermines the

foregoing analysis or the conclusion that invariably flows from <u>Eisentrager</u> and its progeny– that

aliens, such as petitioners, who are outside the sovereign territory of the United States and lack a

sufficient connection to the United States may not assert rights under the Constitution.  To begin

with, the Court in <u>Rasul</u> repeatedly emphasized that its decision that petitioners have a right to

seek a writ of habeas corpus was based on an interpretation of the habeas statute, 28 U.S.C.

§ 2241, not on a reading of the Constitution.  The question framed by the Court in <u>Rasul</u> was

"whether the habeas *statute* confers a right to judicial review" for aliens detained in Guantanamo

Bay.  124 S. Ct. at 2693 (emphasis added).  The Court, in turn, "h[e]ld that § 2241 confers on the

District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their

detention at the Guantanamo Bay Naval Base."  <u>Id.</u> at 2698.  The Court repeatedly distinguished

the decision in <u>Eisentrager</u>, emphasizing that the Court in <u>Eisentrager</u> was concerned with the

"question of the prisoners' *constitutional* entitlement to habeas corpus" and "had far less to say

---

[4] In <u>People's Mojahedin Organization</u>, the D.C. Circuit stated, "'[A]liens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country.'" 182 F.3d at 22 (quoting <u>Verdugo-Urquidez</u>, 494 U.S. at 271 (alterations in <u>People's Mojahedin Organization</u>); <u>see</u> <u>also</u> <u>Jifry</u>, 370 F.3d at 1182 (aliens may be accorded some constitutional protections where they "have come within the territory of the United States and established 'substantial connections' with this country . . . .").  However, in <u>National Council of Resistance of Iran v. Dep't of State</u>, 251 F.3d 192, 201-02 (2001), a separate panel of the D.C. Circuit queried, but did not decide, whether a "substantial" connection to the United States is necessary.  Even that court, however, appeared to assume that some connection was required.  <u>See</u> <u>id.</u> at 202.  Regardless, petitioners' lack of *any* "voluntary connection with the United States" makes constitutional protection unavailable.  <u>See</u> <u>Verdugo-Urquidez</u>, 494 U.S. at 271.

on the question of petitioners' *statutory* entitlement to habeas review." Id. at 2693-94 (emphases in original); see also id. at 2694 (Eisentrager opinion "devoted . . . little attention to question[s] of statutory jurisdiction"); id. at 2694 n.8 (the Court in Eisentrager "clearly understood the Court of Appeals' decision to rest on constitutional and not statutory grounds"). Rasul thus left intact Eisentrager's constitutional holding that non-resident aliens in U.S. custody overseas do not have a constitutional right to the writ of habeas corpus. See Eisentrager, 339 U.S. at 778.[5]

More importantly, the Court in Rasul made no effort at all to revisit Eisentrager's specific rejection of an extraterritorial application of the Fifth Amendment in that case. See id. at 785. Indeed, nothing in Rasul detracts from Eisentrager's powerful admonition against extension of the Amendments in the Bill of Rights to aliens detained by the military outside the United States:

> If the Fifth Amendment confers its rights on all the world except Americans engaged in defending it, the same must be true of the companion civil-rights Amendments, for none of them is limited by its express terms, territorially or as to persons. Such a construction would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'were-wolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments.

> Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has ever hinted at it. The practice of every modern government is opposed to it.

---

[5] The Court's conclusion that Eisentrager does not "*categorically exclude*[] aliens detained in military custody outside the United States from the 'privilege of litigation' in U.S. Courts," see Rasul, 124 S. Ct. at 2698 (emphasis added), of course, only means that Congress may provide jurisdiction for these persons by statute, not that they have a constitutional entitlement to bring suit in the absence of congressional action.

-15-

339 U.S. at 784-785 (internal citation omitted).[6]

This Court should heed the Supreme Court's warning, follow clear and still binding circuit precedent, and resist any assertion that constitutional rights may be raised by non-resident aliens detained by the military outside the sovereign United States. Petitioners' request for relief under the Due Process Clause of the Fifth Amendment, and any argument for a constitutional right to counsel,[7] should be rejected.[8]

---

[6] The cryptic dicta in a footnote in Rasul that the petitioners' have alleged that they are in "'custody in violation of the Constitution or laws or treaties of the United States,' 28 U.S.C. § 2241(c)(3)," 124 S. Ct. at 2698 n.15, cannot reasonably be read to overrule the Supreme Court's repeated holdings that aliens outside sovereign United States territory and with insufficient connection to the United States lack constitutional rights. E.g., Verdugo-Urquidez, 494 U.S. at 266; Zadvydas, 533 U.S. at 693. The Court's holding is clear that it decides only the statutory jurisdiction of a court to hear a claim like the petitioners'. At most, the footnote establishes that, once aliens have been determined neither to "have engaged . . . in combat nor in acts of terrorism against the United States," 124 S. Ct. at 2698 n.15, they may have certain rights under the treaties of the United States. Because, as we have explained below, those treaties are not self-executing and were intended by Congress to be enforced by the political branches rather than by the Courts, they would not be the proper basis for a judicial remedy. Any constitutional claims brought by an alien abroad necessarily fail, as the D.C. Circuit, has previously recognized. See People's Mojahedin Org. of Iran, 182 F.3d at 22; see also Cuban American Bar Ass'n, Inc., 43 F.3d at 1428. As the Supreme Court has repeatedly recognized, it is improper for the courts of appeals to engage in anticipatory overruling of the Court's precedents. See, e.g., State Oil Co. v. Khan, 522 U.S. 3, 20 (1997).

[7] To the extent that petitioners' lawyers may be invoking their own rights in demanding access to petitioners, such a claim fails. For example, petitioners' counsel cannot invoke a First Amendment right to associate for the purpose of engaging in litigation as a form of political expression because the detainees lack an underlying substantive legal claim to advance in litigation. See Haitian Refugee Center, 953 F.2d at 1513 (counsel had no First Amendment right to associate for purpose of litigation where clients had no recognized substantive rights); see also First Defense Legal Aid v. City of Chicago, 319 F.3d 967, 970-71 (7th Cir. 2003) (holding that an attorney does not have a derivative First Amendment right to access a client-witness in police custody because "[w]itnesses have no right to counsel under either the fifth or the sixth amendment[,]" as the "constitutional right to counsel attaches only with formal charges"). The "right to judicial review" that the Supreme Court identified in reviewing 28 U.S.C. § 2241, see Rasul, 124 S. Ct. 2693, 2698, is, of course, a procedural right, not a substantive one. Moreover, even if counsel for petitioners had a limited right to associate with the detainees, it remains the

**B.      Even If Petitioners Could Legitimately Appeal To The Constitution, Petitioners Have No Right To Counsel Under The Fifth And Sixth Amendments.**

Even assuming that the Constitution did apply to petitioners, which it does not, the two

constitutional bases for the right to counsel—the Fifth and Sixth Amendments—do not provide a

right to counsel in the context of this case.  The plain text of the Sixth Amendment provides that

the "accused" in a "criminal proceeding" shall "have the assistance of counsel for his defense."

U.S. Const. amend VI.  Therefore, the Sixth Amendment is not triggered until the government

commences a criminal proceeding against the accused.  See Texas v. Cobb, 532 U.S. 162, 167-68

(2001) (stating that the Sixth Amendment "does not attach until a prosecution is commenced,

that is, at or after the initiation of adversary judicial criminal proceedings--whether by way of

formal charge, preliminary hearing, indictment, information, or arraignment") (quoting McNeil v.

Wisconsin, 501 U.S. 171, 175 (1991)) (internal quotations and citations omitted).

Here, the Sixth Amendment does not apply to petitionerss because the government has

not instituted criminal proceedings against them.  Petitioners are being detained solely because of

their status as enemy combatants, not for any other criminal or punitive purpose.  This detention,

like the detention of all enemy combatants during wartime, serves two important purposes

directly related to the conduct of war.  First, it prevents "captured individuals from returning to

the field of battle and taking up arms once again."  Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2640

---

case that "[t]he Constitution does not require the Government to assist the holder of a
constitutional right in exercise of that right."  Haitian Refugee Center, 953 F.2d at 1513.  See
also infra Part II.

[8] For the same reasons, petitioners cannot assert any constitutional claim to be informed
any charges against them, have access to a court or other impartial tribunal, or meet (in person or
via teleconference) with their families or medical personnel.  See also infra Part II.

(2004) (plurality).  Second, detention enables the military to gather vital intelligence from enemy combatants in advancement of the prosecution of the war.  Because the right to counsel embodied by the Sixth Amendment is inapplicable to the detention of enemy combatants, the procedures imposed upon counsel's access to petitioners cannot violate the Sixth Amendment.

Petitioners also lack a right to counsel under the Self-Incrimination Clause of the Fifth Amendment.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized that, in order to protect a suspect's Fifth Amendment right not to incriminate himself, a suspect must be warned prior to custodial interrogation that he has the right to remain silent and the right to have an attorney present.  The Court has since explained, however, that the Fifth Amendment's Self-Incrimination Clause is "a fundamental trial right of criminal defendants."  Verdugo-Urquidez, 494 U.S. at 264.  Accordingly, "a constitutional violation occurs only at trial."  Id.; see Chavez v. Martinez, 538 U.S. 760, 767 (2003) ("Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs.") (internal citation omitted).  Because petitioners are not being subjected to a criminal trial, the right to counsel associated with the Fifth Amendment's Self-Incrimination Clause does not apply to this case.

Moreover, in the enemy combatant setting, the Due Process Clause of the Fifth Amendment does not provide petitioners with a right to counsel, much less a right to unmonitored access to counsel.  Indeed, a generalized due process right for enemy combatants to have unlimited and unqualified access to counsel cannot be squared with settled historical

-18-

practice, under which no comparable right has yet been found.[9]  Furthermore, at a minimum, any

interest by petitioners in an unqualified right of access to counsel would have to be balanced

against the government's own interests, including the President's plenary authority as

Commander-in-Chief and the important national security interests implicated by allowing enemy

combatants unsupervised access to counsel.  As the Supreme Court recently explained in Hamdi

v. Rumsfeld, 124 S. Ct. 2633, 2646 (2004), the "ordinary mechanism that we use for balancing

such serious competing interests, and for determining the procedures that are necessary to ensure

that a citizen is not 'deprived of life, liberty, or property, without due process of law,' U.S.

Const., Amend. 5, is the test that we articulated in Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct

893, 47 L.Ed.2d 18 (1976)."

Thus, even in the case of citizens held within the sovereign territory of the United States,

Mathews provides that the process due in any given instance is determined by balancing "the

private interest that will be affected by the official action" against the "Government's interest,

including the function involved" and the burdens the Government would face in providing

greater process.  Matthews, 424 U.S. at 335.  To the extent any constitutional protection applies

---

[9] As the Supreme Court explained in Ex Parte Quirin, 317 U.S. 1, 27-28 (1942), "[f]rom
the very beginning of its history this Court has recognized and applied the law of war as
including that part of the law of nations which prescribes, for the conduct of war, the status,
rights and duties of enemy nations as well as of enemy individuals."  That is consistent with the
analysis that the Court applies in determining the scope of the Due Process Clause in other
contexts. Cf. Herrera v. Collins, 506 U.S. 390, 407-408 (1993) (examining "[h]istorical practice"
in assessing the scope of the "Fourteenth Amendments's guarantee of due process"); Medina v.
California, 505 U.S. 437, 445-46 (1992) (relying on "[h]istorical practice" and "historical
treatment" when analyzing scope of due process rights).  Because the unqualified right of access
that petitioners seek has no foundation in any tradition or practice, the Fifth Amendment does not
confer such a right.

to alien-detainees at Guantanamo Bay, it would surely be less than that afforded a citizen-detainee in the United States  Cf. Verdugo-Urquidez, 494 U.S. at 275-78 (Kennedy, J., concurring) (explaining that the constitutional standards that normally apply to United States citizens do not necessarily with the same force to "noncitizens who are beyond our territory").  "The Mathews calculus then contemplates a judicious balancing of these concerns, through an analysis of 'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"  Hamdi, 124 S. Ct. at 2646 (quoting Matthews, 424 U.S. at 335).

        With respect to the private interest affected by the government's official action, even if the Constitution applied to petitioners, which it manifestly does not, they would have a liberty interest in being free from unlawful physical detention.  See Foucha v. Louisiana, 504 U.S. 71, 80 (1993) ("Freedom from bodily restraint has always been at the core of the liberty interest protected by the Due Process Clause from arbitrary government action.").  In considering the degree of process due a "citizen-detainee seeking to challenge his classification as an enemy combatant[,]" the Court explained in Hamdi  that a citizen-detainee "must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's assertions before a neutral decisionmaker."  Hamdi, 124 S. Ct. at 2648.  The Court, however, explained that "exigencies of the circumstances may demand that, aside from these core elements, enemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict."  Id. at 2649; see also id. at 2650 (stating that "the full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting").  Here, as more fully explained

infra section II, the national security burdens that the government would face by providing

greater process to petitioners in the form of unlimited and unmonitored access to counsel would

be substantial.  Accordingly, the due process clause of the Fifth Amendment, even if applicable,

would not endow petitioners with an unqualified right to counsel.

### C.    Petitioners Have No Right To Counsel Under International Treaties Or The Law of War.

Not only does petitioners' claim for a right of access to counsel fail to find refuge in the

Constitution, petitioners cannot rely on international treaties or the law of war as a basis for such

a right.  Although treaties are the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, they

provide no basis for private lawsuits unless they are implemented by appropriate legislation or

are intended to be self-executing.  See Whitney v. Robinson, 124 U.S. 190, 194 (1888) ("When

the stipulations [of a treaty] are not self-executing, they can only be enforced pursuant to

legislation to carry them into effect.").  In this case, petitioners cannot identify any self-executing

or congressionally-implemented treaty that provides them with a right to counsel to challenge

their detention.

For example, under the Third Geneva Convention (GPW), even lawful enemy combatants

who are entitled to prisoner of war privileges—which does not include the detainees in the

current conflict—are not entitled to counsel to challenge their detention.  Instead, Article 105 of

the GPW provides that a prisoner of war should be provided with counsel to defend against

formal *charges* brought against him in a prosecution.  This provision underscores that prisoners

of war who have not been charged with specific war crimes are not entitled to counsel to

challenge the fact of their wartime detention.  See Geneva Convention Relative to the Treatment

of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3317, 75 U.N.T.S. 135 (GPW), Article 105.

Similarly, the Fourth Geneva Convention, which addresses the treatment of non-combatant

civilians during times of war, provides a right of counsel only when accused persons "are

prosecuted by the Occupying Power." See Geneva Convention Relative to the Protection of

Civilian Persons in Time of War, art. 71-72, Feb. 2, 1956, 6 U.S.T. 3516, 75 U.N.T.S. 287.  In

any event, the Third and Fourth Geneva Conventions are not self-executing and Congress has not

implemented their terms pursuant to authorizing legislation.  See Tel-Oren v. Libyan Arab

Republic, 726 F.2d 774, 808-09 (D.C. Cir. 1984) (Bork, J., concurring); see also Eisentrager, 339

U.S. at 789 n.14.

Furthermore, the International Covenant on Civil and Political Rights (ICCPR), which the

United States ratified in 1992, does not provide petitioners with a right to counsel.  Like the

Third and Fourth Geneva Conventions, the ICCPR provides a right of counsel only in "the

determination of any criminal charge."  Art. 14, 999 U.N.T.S. 171, 6 I.L.M. 368 (1992). More

importantly, however, Congress ratified the ICCPR with numerous reservations and with the

express declaration that the ICCPR is not self-executing.  See International Covenant on Civil

and Political Rights, 102d Cong., 138 Cong. Rec. S4781, S4784 (April 2, 1992).  Accordingly,

the ICCPR does not create a right to counsel enforceable in United States courts.  See Alva***,

124 S. Ct. 2739, 2767 (2004) (ICCPR does not "create obligations enforceable in the federal

courts"); Flores v. Southern Peru Copper Corp., 343 F.3d 140, 163-64 & n.35 (2d Cir. 2003);

Macharia v. United States, 238 F. Supp. 2d 13, 29 (D.D.C. 2003), aff'd 334 F.3d 61 (D.C. Cir.

2004).

Finally, to the extent petitioners seek to find a right to counsel in either the American

Convention on Human Rights (ACHR), 1144 U.N.T.S. 123, 9 I.L.M. 673 (1969), or the

American Declaration on the Rights and Duties of Man (ADRDM), O.A.S. Off. Rec. OEA/Ser.

LV/I.4 Rev. (1965), these provisions are simply multinational resolutions that have not been

ratified by Congress; thus they do not have the force or effect of law.  See Flores, 343 F.3d at

162-64 (stating that "the United States has declined to ratify the American Convention [on

Human Rights] for more than three decades"); Garza v. Lappin, 253 F.3d 918, 925 (7th Cir.

2001) (stating that the American Declaration on the Rights and Duties of Man "is an aspirational

document" that "did not create any enforceable obligations on the part of any" member nations).

In sum, to the extent petitioners claim a right of unqualified access to counsel or seek

relief based on such a right, the petition must be rejected as no such right can be found in the

Constitution or any treaties.

## II.    THE GOVERNMENT IS PROVIDING PETITIONERS ACCESS TO COUNSEL AND THE PROCEDURES GOVERNING SUCH ACCESS ARE REASONABLE AND APPROPRIATE

Notwithstanding the absence of any right to counsel on the part of the aliens held at

Guantanamo Bay, the government is permitting access, subject to conditions, to facilitate the

litigation of habeas cases brought on behalf of Guantanamo Bay detainees.[10]  Given that no right

---

[10] Any suggestion that petitioners have an unqualified right to counsel based upon the
habeas corpus statute, 28 U.S.C. § 2241, or the All Writs Act, 28 U.S.C. § 1651, is also
misplaced.  The district court's reasoning in Padilla ex. rel. Newman v. Bush, 233 F. Supp. 2d
564 (S.D.N.Y. 2002), aff'd in part, rev'd in part sub nom., Padilla v. Rumsfeld, 352 F.3d 695 (2d
Cir. 2003), rev'd 124 S. Ct. 2711 (2004), is not to the contrary.  Padilla addressed, inter alia,
whether an American citizen apprehended in the United States and designated an enemy
combatant has the right to meet with counsel to challenge the factual basis for his designation as
an enemy combatant.  After dismissing a constitutional basis for the right to counsel, 233 F.

-23-

to counsel exists, the conditions governing counsel's access should be considered reasonable <u>per se</u>.  In any event, the procedures governing counsel access are more than reasonable and permit petitioners to obtain assistance of counsel in this habeas proceeding, while still maintaining essential national security protections.

Though a case involving enemy combatants held at Guantanamo Bay is unique, the notion of placing conditions on counsel's access to potential clients in national security contexts is not.  In fact, even in the context of criminal trials involving accused terrorists with a Sixth Amendment right to counsel, courts have established or upheld various special measures

---

Supp. 2d. at 600-01, the district court concluded that the "provisions and characteristics of the habeas corpus statute . . .  and the court's power under the All Writs Act, 28 U.S.C. § 1651(a) (2000), to issue writs in aid of its jurisdiction, provide a statutory basis for [permitting Padilla to consult with counsel.]"  The court located that entitlement principally in 28 U.S.C. § 2243, which provides for the petitioner to allege and deny facts, and 28 U.S.C. § 2246, which allows for the taking of evidence.  Reading these provisions to grant a statutory right to present facts, the district court reasoned that vindication of these rights required affording Padilla some access to counsel.  <u>Id.</u> at 604.

Importantly, however, the district court recognized the government's significant national security interests and rejected any assertion that access to counsel must be unlimited or unqualified.  Indeed, the district court even suggested that "there is no reason that military personnel cannot monitor Padilla's contacts with counsel, so long as those who participate in the monitoring are insulated from any activity in connection with this petition, or in connection with a future criminal prosecution of Padilla, if there should ever be one."  <u>Id.</u>

Moreover, even assuming that a statutory basis for the right to counsel could be fashioned from the All Writs Act, the text of this statute plainly limits the court's discretionary authority only to writs that are "necessary or appropriate."  <u>See</u> 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").  Given the national security interests that could be compromised by providing enemy combatants with unrestricted access to counsel and the aspects of the access to counsel being provided in this case that permit petitioners to obtain assistance of counsel, it would be neither "necessary or appropriate" to fashion a remedy that has the potential to compromise these interests.

constraining defendants and/or their counsel.  See United States v. Bin Laden, 58 F. Supp. 2d

113, 121 (S.D.N.Y. 1999) (upholding requirements that counsel for defendants undergo DOJ-

initiated security clearance procedure to obtain access to classified information, noting

inadequacy of remedying unauthorized disclosure or security breach when "reasonable measures

could have prevented the disclosure altogether"); Padilla, 233 F. Supp. 2d at 604 (approving

monitoring of communications between attorneys and U.S. citizen enemy combatant); see also 28

C.F.R. § 501.3(d) (providing for monitoring of communications between prison inmates and their

counsel).  Also, in United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000) (per curiam), the

court upheld restrictions on communications by a criminal defendant accused of terrorism-related

crimes where the restrictions were "reasonably related" to the government's interest in

preventing defendant from facilitating activities of co-conspirators.  The court upheld the

restrictions over defendant's argument that restrictions interfered with his due process right to

prepare his defense.  Id.

Courts considering the issue of restrictions on access to detained individuals in the

criminal justice system have essentially used a reasonableness standard, consistent with the

standard applied by the Supreme Court in reviewing claims of prisoners that restrictions placed

on their confinement violate the inmates' constitutional rights.  In Turner v. Safley, 482 U.S. 78

(1987), the Court held,  "[W]hen a prison regulation impinges on inmates' constitutional rights,

the regulation is valid if it is reasonably related to legitimate penological interests."[11]  Id. at 89.

---

[11] The Court described four factors "relevant in determining the reasonableness of the
regulation at issue":  (1) whether there is "a valid rational connection between the prison
regulation and the legitimate governmental interest put forward to justify it"; (2) whether the
prisoners have alternative means of exercising the right at issue; (3) "the impact accommodation

-25-

Furthermore, this reasonable relationship standard has been applied notwithstanding that a restriction constrains others besides the prisoner who may themselves assert a right of access to the inmate.  In Thornburgh v. Abbott, 490 U.S. 401 (1989), the Supreme Court applied the Turner reasonableness standard in upholding a prison regulation that limited incoming publications, notwithstanding the fact that the regulation also affected the "legitimate First Amendment interest," id. at 408, of the publishers who joined the suit as plaintiffs.  Id. at 409, 413, 419.  The Court rejected "any attempt to forge separate standards for cases implicating the rights of outsiders."[12]  Id. at 410 n.9.  The military in this unique context is entitled to substantially more deference than prison officials who are dealing with prisoners who enjoy Constitutional rights.

Given that a variety of restrictions have been upheld in these contexts where constitutional rights, including the right to counsel, were affected, the procedures established for access by counsel to Guantanamo Bay detainees, who cannot prevail based upon the Constitution, easily pass muster.

---

of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) "the absence of ready alternatives," i.e., alternatives that "fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests."  Id. at 89-91 (internal quotation marks omitted).

[12] Thus, the  reasonableness standard has been applied to reject an attorney's claim that restrictions on a prisoners' unmonitored telephone calls violated the attorney's Fifth Amendment due process right to communicate with a client for purposes of practicing law and accessing the courts.  See Massey v. Wheeler, 221 F.3d 1030, 1036 (7th Cir. 2000).  And it has also been applied to uphold restrictions on family visits, despite disruption of family relationships.  See Overton v. Bazzetta, 539 U.S. 126, 133-36 (2003), reversing Bazzetta v. McGinnis, 286 F.3d 311, 319 (6th Cir. 2002) (noting showing of disruption of family relationships).

As explained in more detail in the Declaration of the Acting Commander, Joint Task

Force, Guantanamo Bay, Cuba, permitting counsel to have unmonitored and unconstrained

access to a detained enemy combatant would threaten the government's compelling national

security interests in several ways.  Such access would enable detained enemy combatants to pass

sensitive information about military detention facilities, the security at such facilities, or other

military operations, including specific circumstances of capture to other terrorists through

unwitting intermediary attorneys—something that members (and presumably supporters) of

terrorist organizations are trained to do.  See Al Qaeda Training Manual, available at

www.usdoj.gov/ag/trainingmanual.htm.  Indeed, many of the detainees at Guantanamo Bay are in

possession of vital and highly classified information, the disclosure of which could result in

immediate and substantial harm to national security.  See Exh. B, ¶ 9.  Even if an attorney is not

used as an intermediary, unmonitored access could result in the attorney having information that

the government considered uniquely classified and dangerous, such as, for example, the identity

of a military captor, that could be improperly disclosed merely because the government did not

have an opportunity to inform the attorney that the information is classified.  See Snepp v. United

States, 444 U.S. 507, 509 n.3 ("The Government has a compelling interest in protecting both the

secrecy of information important to our national security and the appearance of confidentiality so

essential to the effective operation of our foreign intelligence service.")

Unmonitored access also creates a risk that attorneys may disclose—perhaps even

unknowingly—sensitive and classified information to detainees, who could then pass the

information on to other detainees as well as to terrorists outside of United States custody.  See

Exh. B, ¶ 10 ("Many of these detainees have received extensive training in how to pass coded messages in furtherance of their terrorist operations through unwitting counsel and others.").

To prevent the unregulated flow of sensitive information, the access procedures impose reasonable monitoring requirements on several categories of attorney-detainee communications that protect the government's national security interest without significantly compromising the attorney-detainee relationship.  See Exh. B, ¶¶ 8, 12.  As a threshold matter, any authorization for individualized monitoring is based on a list of factors.  Exh. A, § IV.D.  The procedures, therefore, avoid arbitrary application of the monitoring provisions and ensure that monitoring will only occur in those attorney-detainee communications where there is a potential for disclosure of sensitive information.[13]  See Exh. B, ¶ 12.  If monitoring is ordered, the access procedures restrict monitoring only to a "privilege team," a team of DoD attorneys, intelligence and law enforcement personnel, and translators "who have not taken part in, and, in the future, will not take part in, any court proceedings concerning the detainee."  Exh. A, § II.D.  This screening requirement ensures that no person who is privy to communications between detainees and their counsel will use that information in any judicial proceeding that could adversely affect the detainees' legal status.  Cf. Weatherford v. Bursey, 429 U.S. 545, 554-59 (1977) (holding that the constitutional right to counsel in a criminal case is violated only if intercepted

---

[13] Furthermore, these procedures are consistent with existing federal regulations regarding the monitoring of communications between prison inmates and their counsel.  See 28 C.F.R. § 501.3(d) ("In any case where the Attorney General specifically so orders, based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism, the Director, Bureau of Prisons, shall . . . provide appropriate procedures for the monitoring or review of communications between that inmate and attorneys . . . .").

communications are somehow used against the defendant).  For this reason, any argument by petitioners that they will be harmed by the monitoring or chilled in their ability to consult with their attorneys is unreasonable.  Furthermore, any alternative to such monitoring would essentially result in the government abdicating its serious responsibilities to safeguard classified information, as well as to act on incoming information concerning likely threats to national security, to a private attorney.  See Exh. B, ¶¶ 8, 12.

Finally, the requirement that counsel sign an acknowledgment that he or she will comply with the procedures for access to detainees at Guantanamo Bay is also reasonable.  Exh. A., §§ III.B., XII.  The acknowledgment serves as a record of counsel subject to the procedures and deflects any confusion as to the responsibilities of counsel or attempts by counsel to profess ignorance concerning a requirement, including with respect to responsibilities for handling of classified information.  At the same time, however, the acknowledgment does not force counsel to agree that the access procedures are legally permissible and makes clear that a challenge to the procedures is not foreclosed through signing the acknowledgment.  Given the large number of cases, at least 14, brought on behalf of almost 60 Guantanamo Bay detainees, pending before eight judges of the Court, the acknowledgment serves to provide some uniformity as to the conduct of counsel, instead of having various counsel treated differently based on different rulings from judges.

The access procedures are reasonable.

## CONCLUSION

For the foregoing reasons, petitioners have no constitutional or other right of access to counsel, and, in any event, counsel may have access to petitioners in accordance with reasonable procedures that accommodate attorney-detainee communications while protecting government interests.   The petition for a writ of habeas corpus based on any right of access or the lack of access, or any other basis,[14] must be rejected.

---

[14] Because the Court directed briefing primarily on the issue of access to counsel, respondents have not undertaken full briefing of all issues potentially raised in this case, and we reserve the right to submit such briefing, as appropriate, including on the issues of the proper respondent to a habeas action brought on behalf of a Guantanamo detainee and whether this Court is the proper forum to entertain a habeas action against that respondent.  Indeed, the access provided by the military will allow counsel to meet with the detainees, and counsel may then wish to convert their next-friend petition into a direct petition or otherwise amend their petition. Respondent would respond to any such amended petition at an appropriate juncture.  We address briefly here, however, petitioners' Alien Tort Statute (ATS), 28 U.S.C. § 1350, and Administrative Procedure Act (APA), 5 U.S.C. § 702, claims.  As the Court held in its previous opinion in this case, Rasul v. Bush, 215 F. Supp. 2d 55, 62-64 &  n.11 (D.D.C. 2002), a habeas action couched as a claim under the ATS cannot succeed.  The ATS does not provide a waiver of sovereign immunity.  See Koohi v. United States, 976 F.2d 1328, 1332 n. 4 (9th Cir. 1992); Industria Panificadora, S.A., et al., v. United States, 957 F.2d 886, 887 (D.C. Cir. 1992); Goldstar S.A. v. United States, 967 F.2d 965 (4th Cir. 1992); Biergu v. Ashcroft, 259 F .Supp. 2d 342, 354 (D. N.J. 2003) (stating that "all courts that have addressed the issue agree that the [ATS] does not itself waive the sovereign immunity of the United States") (citations omitted).  Therefore, the Court is without jurisdiction to hear ATS claims against the federal government or agents of the federal government.

Even assuming, however, that the Court has jurisdiction to hear an ATS claim against the federal government under the sovereign immunity waiver provision of the APA, see Sanchez-Espinoza v. Reagan, 770 F.2d 202, 707 (D.C. Cir. 1985) (stating in dicta that the APA's waiver of sovereign immunity, 5 U.S.C. § 702, "is arguably available" for ATS claims against federal officials for "nonmonetary relief"), the APA's sovereign immunity waiver is limited to claims against an "agency or an officer or employee thereof."  The APA specifically excludes from its definition of an agency "military authority exercised in the field in the time of war or in occupied territory."  5 U.S.C. § 701(b)(1)(6).  Because petitioners admit that they were captured in areas where the United States was engaged in armed hostilities, see Amended Complaint ¶ 16, they cannot invoke the APA's waiver of sovereign immunity as basis for their ATS claims.

Dated:  July 30, 2004                     Respectfully submitted,


                                          PETER D. KEISLER
                                          Assistant Attorney General


                                          KENNETH L. WAINSTEIN
                                          Interim United States Attorney


                                          THOMAS R. LEE
                                          Deputy Assistant Attorney General


                                          DAVID B. SALMONS
                                          Assistant to the Solicitor General


                                          DOUGLAS N. LETTER
                                          Terrorism Litigation Counsel


                                          ROBERT D. OKUN
                                          D.C. Bar No. 457-078
                                          Chief, Special Proceedings Section
                                          555 Fourth Street, N.W.
                                          Room 10-435
                                          Washington, D.C. 20530
                                          (202) 514-7280

---

(Petitioners' APA claim (Third Claim) fails for this same reason.)

In addition, the Supreme Court's recent decision in <u>Sosa v. Alavarez-Machain</u> severely restricts the types of claims that can be brought under the ATS.  124 S. Ct. 2739, 2754 (2004) (holding that the jurisdictional grant of the ATS enables federal courts to hear "claims in a very limited category defined by the law of nations and recognized at common law").  Of particular relevance to this case, the Court held that the ICCPR as well as other aspirational declarations like the ADRDM and the ACHR, which do "not of their own force impose obligations as a matter of international law," cannot form the basis for ATS suits.  <u>Id.</u> at 2767 (holding that these agreements have "little utility under the standard set out in this opinion").  Consequently, petitioners cannot rely on these provisions to state a claim for violations of customary international law under the ATS.

-31-

  /s/ Terry M. Henry
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
ALAN S. MODLINGER
ANDREW I. WARDEN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 7144
Washington, DC  20530
Tel.:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents

# EXHIBIT A

<u>**PROCEDURES FOR COUNSEL ACCESS TO DETAINEES**</u>
<u>**AT THE US NAVAL BASE IN GUANTANAMO BAY, CUBA**</u>

## I.  Applicability

The following procedures shall govern access to all detainees in the control of the Department of Defense (DoD) at the US Naval Base in Guantanamo Bay, Cuba by counsel for purposes of habeas corpus or other litigation in federal court.

These procedures do not apply to counsel who are retained solely to assist in the defense of a detainee whom the President has determined to be subject to trial by military commission. Access by that counsel is covered by the Procedures for Monitoring Communications Between Detainees Subject to Trial by Military Commission and their Defense Counsel Pursuant to Military Commission Order No. 3.

## II.  Definitions

A.  <u>Communications</u>:  All forms of communication between counsel and a detainee, including oral, written, electronic, or by any other means.

B.  <u>Counsel</u>:  An attorney who is employed or retained by or on behalf of a detainee for purposes of representing the detainee in habeas corpus or other litigation in federal court in the United States and who is admitted, either generally or pro hac vice, in the jurisdiction where the habeas petition or other litigation is pending.  Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.  Neither the references herein to "counsel," nor any other part of these procedures reflect any determination about, or an acknowledgement of, an attorney-detainee relationship between counsel and the detainee.

C.  <u>Detainee</u>:  An individual detained by DoD as an enemy combatant at U.S. Naval Base, Guantanamo Bay, Cuba.

D.  <u>Privilege Team</u>:  A team comprised of one or more DoD attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any court, military commission or combatant status tribunal proceedings concerning the detainee.  If required, the privilege team may include interpreters/translators, provided that such personnel meet these same criteria.

1

**III. Requirements for Access to and Communication with Detainees**

A. Security Clearance:

    1.  Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

    2.  Counsel who possess a valid security clearance shall provide, in writing, the date of their background investigation, the date such clearance was granted, the level of the clearance, and the agency who granted the clearance.  Access will be granted only after DoD verification of the security clearance.

    3.  Counsel who does not currently possess a Secret clearance will be required to submit to a background investigation and to pay any actual costs associated with the processing of the same.

B. Acknowledgement of and Compliance with Access Procedures

    1.  Before being granted access to the detainee, counsel will receive a copy of these procedures.  To have access to the detainee, counsel must agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

    2.  This affirmation will not be considered an acknowledgement by counsel that the procedures are legally permissible.  Even if counsel elects to challenge these procedures, counsel may not knowingly disobey an obligation imposed by these procedures.

    3.  The DoD expects that counsel, counsel's staff, and anyone acting on the behalf of the attorney will fully abide by the requirements of this document.  The attorney is required to provide the DoD with signed affirmations from interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation, prior to those individuals being utilized by the attorney.

    4.  Should counsel fail to comply with the procedures set forth in this document, access to or communication with the detainee will not be permitted.

C. Verification of Representation

    1.  Prior to being permitted access to the detainee, counsel must provide DoD with a *Notification of Representation*.  This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as the name of the detainee being represented by the counsel.  Furthermore, the counsel must provide sufficient details regarding the circumstances of his/her retention to demonstrate the

counsel's authority or standing to bring a habeas or other federal court action on the detainee's behalf.

2. After meeting with the detainee, counsel must provide DoD with an *Acknowledgement of Representation*. This document must be signed by the detainee and must specifically state that the detainee is being represented in habeas or other federal litigation by counsel named in the Acknowledgement.

3. If the counsel withdraws from representation of the detainee or if the representation is otherwise terminated, counsel is required to inform DoD immediately of that change in circumstances.

4. Counsel must provide DoD with a signed representation stating that (a) to the best of counsel's knowledge after reasonable inquiry, the source of funds to pay counsel any fees or reimbursement of expenses are not funded directly or indirectly by persons or entities the counsel believes are connected to terrorism or the product of terrorist activities, including "Specially Designated Global Terrorists," identified pursuant to Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) or Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 23, 1995), and (b) counsel has complied with ABA Model Rule 1.8(f).

D. Logistics of Counsel Visits

1. Counsel shall submit to the Commander or Acting Commander, JTF-Guantanamo (hereinafter Commander), any request to meet with a detainee. This request shall specify date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the detainee. Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting. Once the request has been approved, DoD will contact counsel with the date and duration of the meeting.

2. Legal visits shall take place in a room designated by JTF-Guantanamo. No more than one attorney and one interpreter/translator shall visit with a detainee at one time, unless approved in advance by the Commander, JTF-Guantanamo.

3. Due to the mission and location of the US Naval Base at Guantanamo Bay, Cuba, certain logistical details will need to be coordinated by counsel prior to arrival. This includes arrangements for travel and lodging. Specific information regarding these issues will be provided by JTF-Guantanamo.

## IV. Decision to Monitor Counsel Visits And Communications

A. When appropriate, DoD will monitor communications between the detainee and counsel to protect U.S. national security interests without compromising attorney-detainee privileged communications. Communications solely between counsel and/or translators/interpreters will not be monitored.

B.  Only the Commander, JTF-GTMO may approve monitoring communications pursuant to these procedures.

C.  Monitoring shall only be approved following an individualized assessment of the national security implications of unmonitored communications between a detainee and his counsel or agents.

D.  Prior to ordering monitoring of the attorney-detainee communications, the approval authority must conclude that it is reasonably necessary to protect against the disclosure of information that reasonably could be expected to result in immediate and substantial harm to the national security, including communications regarding:

   1.  The facilitation of terrorist operations or future terrorist acts;

   2.  Military plans, weapons systems, or operations;

   3.  Foreign government information;

   4.  Foreign relations or foreign activities of the United States, including confidential sources;

   5.  Intelligence activities (including special activities), intelligence sources or methods, or cryptology;

   6.  Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans or protection services relating to national security, which includes defense against transnational terrorism;

   7.  Matters that are classified above the clearance level of the counsel.

E.  The Commander's written determination will remain valid, unless otherwise noted in the determination, for all subsequent communications between a given detainee and his counsel, unless and until it is rescinded by the Commander, JTF-Guantanamo or higher authority.

F.  To ensure that any attorney-detainee privileged communications are not compromised, monitoring will be conducted by a DoD privilege team.  Except as provided herein, the privilege team shall not disseminate information derived from monitored communications.


**V.  Monitoring of Counsel Visits And Communications**

A.  When authorized under these procedures, the privilege team will monitor oral communications in real time between counsel and the detainee during any meetings.

1. These communications will be recorded in their entirety by audio and/or video recording devices.

2. Video recordings may be retained by JTF-Guantanamo—notwithstanding the prohibition against non-privilege team members having access to records of monitored conversations—provided that the recordings do not include audio.

3. Audio recordings may be retained by JTF-Guantanamo only as provided for herein.

B.   The privilege team may terminate the meeting immediately if, at any time, the team determines that the detainee or counsel are:

1. Attempting to defeat or frustrate the monitoring of communications through the use of low-volume conversation, codes or discussions in a language other than previously agreed upon; or

2. Conveying information in furtherance of terrorist or other criminal operations or that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

C.  To the extent the detainee divulges information to counsel that the privilege team identifies as classified, the privilege team may immediately terminate the meeting if:

1. Any discussion of such classified information is outside counsel's pre-cleared classification level, or is not related to counsel's representation of the detainee.

2. Counsel discloses any classified information to the detainee (other than information that the counsel obtained from the detainee), or if counsel discloses to the detainee that the Government has classified any information at any particular classification level.

D.  The privilege team may monitor all written materials brought into or out of the meeting by counsel or counsel's staff, including notes, drawings or other writings created by counsel and/or the detainee during or prior to meetings to determine whether any such communications convey information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

E.  The privilege team may also monitor mail between the counsel and the detainee to determine whether any monitored communications convey information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

**VI.  Classification Review of Legal Mail**

A.  In order to ensure the proper handling of classified information, the privilege team may review mail between counsel and the detainee to determine its appropriate security classification.

B.  The cover sheet or envelope of any such mail shall include the annotation "Attorney-Detainee materials."

C.  After analysis and approval, if appropriate, the detainee's incoming legal mail will be sealed and forwarded to the appropriate JTF-Guantanamo staff section for delivery to the detainee, and the detainee's outgoing legal mail will be sealed and forwarded to the detainee's counsel.

D.  The privilege team will forward the detainee's legal mail after a review and analysis period not to exceed:

    a.  Five (5) business days for legal mail that is written in the English language;

    b.  Ten (10) business days for any legal mail that includes writing in any language other than English, to allow for translation;

    c.  Thirty (30) business days for any legal mail where the privilege team has reason to believe that a code was used, to allow for further analysis.

E.  Legal mail may be retained by JTF-Guantanamo only as provided for herein.

**VII.  Classification Review of Materials Brought Into or Out of the Meeting by Counsel**

A.  In order to ensure the proper handling of classified information, the privilege team may review all written materials brought into or out of the meeting by counsel or counsel's staff, including notes, drawings or other writings created by counsel and/or the detainee during or prior to meetings to determine their appropriate security classification.

B.  After review by the privilege team, counsel may provide the detainee with court papers or other legal or related documents pertaining to his case, provided they do not contain any classified information.

C.  Security personnel will directly receive and distribute all materials passed between counsel and the detainee during their meeting.

D.  Copies of any documents counsel desires to leave with the detainee following the meeting must be provided to the Commander, JTF-Guantanamo at least three business days in advance.  Counsel shall annotate on the cover sheet or forwarding envelope the words "Attorney-Detainee Documents."

E.  These materials may be retained by JTF-Guantanamo only as provided for herein.


## VIII. Telephonic Access to Detainee

A.  Requests for telephonic access to the detainee by counsel or other persons will not normally be approved.  Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo.

B.  Any telephonic access will be subject to appropriate security procedures, including contemporaneous monitoring and recording by the privilege team, under the same conditions as in-person counsel visits.


## IX.  Retention of Monitored Communication Materials

A.  The privilege team will retain custody of any monitored communications that conveys information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures.

B.  No copies of any other portions of monitored communications will be retained.


## X.  Disclosure of Monitored Communications

A.  No information derived from monitored communications will be disclosed outside the privilege team until after the privilege team has reviewed it for security and intelligence purposes.

B.  If the privilege team determines that monitored communications convey information that reasonably could be expected to result in immediate and substantial harm to the national security, as determined by the Commander, JTF-Guantanamo under these procedures,  it will promptly report that information to the Commander, JTF-Guantanamo.  If Commander, JTF-Guantanamo concurs in that assessment, he may disseminate the relevant portions of the monitored communications to law enforcement, military and intelligence officials as appropriate.

C.  If, at any time, the Commander, JTF-Guantanamo determines that monitored communications relate to imminent acts of violence, the contents of those communications may be disclosed immediately to law enforcement, military and intelligence officials.

D.  Monitored communications will not be disclosed to any Government personnel involved in court, military commission or enemy combatant status proceedings involving the detainee.

## XI.  Counsel's Handling and Dissemination of Information from the Detainee

a. Counsel may disseminate the <u>unclassified</u> contents of the detainee's communications for the purpose of preparing for or conducting litigation involving the detainee.

b. Counsel may not divulge <u>classified</u> information provided by the detainee or related to his case to anyone except United States government personnel with the requisite security clearance <u>and</u> need to know, using a secure means of communication.  As soon as possible after reviewing monitored communications or conducting classification review of materials, the DoD privilege team will advise counsel of the classification levels of any classified information disclosed during the communication.  All classified material must be handled, transported and stored in a secure manner in accordance with US government requirements for handling, transporting and storing such information.  Any information not subject to classification review by the privilege team, including oral communications with the detainee, must be treated as classified information unless otherwise determined by the privilege team.

## XII.  JTF-Guantanamo Security Procedures

a. Counsel and translators/interpreters shall comply with the following security procedures and force protection safeguards applicable to the US Naval Base in Guantanamo Bay, Cuba, JTF-Guantanamo and the personnel assigned to or visiting these locations, as well as any supplemental procedures implemented by JTF-Guantanamo personnel.

b. Contraband is not permitted in JTF-Guantanamo and all visitors are subject to search upon arrival and departure.  Examples of contraband include, but are not limited to, weapons, chemicals, drugs, and materials that may be used in an escape attempt. Contraband also includes money, stamps, cigarettes, writing instruments, etc.  No items of any kind may be provided to the detainee without the advance approval of the Commander, JTF-Guantanamo.

c. Photography or recording of any type is prohibited without the prior approval of the Commander, JTF-Guantanamo.  No electronic communication devices are permitted. All recording devices, cameras, pagers, cellular phones, PDAs, laptops and related equipment are prohibited in or near JTF-Guantanamo.  Should any of these devices be inadvertently taken into a prohibited area, the device must be surrendered to JTF-Guantanamo staff and purged of all information.

d. Upon arrival at JTF-Guantanamo, security personnel will perform a contraband inspection of counsel and translators/interpreters using metal detectors as well as a physical inspection of counsel's bags and briefcases and, if determined necessary, a physical inspection of his/her person.

e. Following the meeting, counsel and translators/interpreters will again be inspected using a metal detector and, if deemed necessary, by physical inspection of their persons. Counsel will then meet with the privilege team to discuss the classification levels of information disclosed during the meeting and to turn over any written materials created during the meeting for screening.

## Agreement to Comply with Access Procedures

The undersigned hereby acknowledges receipt of these procedures and agrees, by his/her signature, to comply fully with all such procedures. This agreement will not be considered an acknowledgement by the counsel that the procedures are legally permissible. This signed acknowledgement will be provided at least five business days prior to the first scheduled meeting or communication with the detainee. The Commander, JTF-Guantanamo will maintain the original of the signed acknowledgement and agreement.

Acknowledged and Agreed:


_____          _____
            Signature                                    Date


_____          _____
          Print Name                                  Position


Business Address:      _____

                       _____

                       _____


Business Phone:        _____

Business Fax:          _____

E-mail Address:        _____


Detainee:              _____