IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| Hicks (Rasul) v. Bush | ) | Case No.  02-CV-0299 (CKK) |
| Al Odah v. United States | ) | Case No.  02-CV-0828 (CKK) |
| Kurnaz v. Bush | ) | Case No.  04-CV-1135 (ESH) |
| O.K. v. Bush | ) | Case No.  04-CV-1136 (JDB) |
| El-Banna v. Bush | ) | Case No.  04-CV-1144 (RWR) |
| Anam v. Bush | ) | Case No.  04-CV-1194 (HHK) |
| Abdah v. Bush | ) | Case No.  04-CV-1254 (HHK) |
| Hamdan v. Bush | ) | Case No.  04-CV-1519 (JR) |
| Paracha v. Bush | ) | Case No.  04-CV-2022 (PLF) |
| Al-Marri v. Bush | ) | Case No.  04-CV-2035 (GK) |
| Zemiri v. Bush | ) | Case No.  04-CV-2046 (CKK) |
| Deghayes v. Bush | ) | Case No.  04-CV-2215 (RMC) |
| Abdullah v. Bush | ) | Case No.  05-CV-0023 (RWR) |
| Al-Mohammed v. Bush | ) | Case No.  05-CV-0247 (HHK) |
| El-Mashad v. Bush | ) | Case No.  05-CV-0270 (JR) (Consolidated with 05-CV-833) |
| Al-Adahi v. Bush | ) | Case No.  05-CV-0280 (GK) |
| Al-Joudi v. Bush | ) | Case No.  05-CV-0301 (GK) |
| Al-Wazan v. Bush | ) | Case No.  05-CV-0329 (PLF) |
| Al-Anazi v. Bush | ) | Case No.  05-CV-0345 (JDB) |
| Alhami v. Bush | ) | Case No.  05-CV-0359 (GK) |

| | | |
|---|---|---|
| Batarfi v. Bush | ) | Case No. 05-CV-0409 (EGS) |
| Sliti v. Bush | ) | Case No. 05-CV-0429 (RJL) |
| Kabir v. Bush | ) | Case No. 05-CV-0431 (RJL) |
| Al-Shihry v. Bush | ) | Case No. 05-CV-0490 (PLF) |
| Aziz v. Bush | ) | Case No. 05-CV-0492 (JR) |
| Al-Oshan v. Bush | ) | Case No. 05-CV-0520 (RMU) |
| Al-Sharekh v. Bush | ) | Case No. 05-CV-0583 (RJL) |
| Errachidi v. Bush | ) | Case No. 05-CV-0640 (EGS) |
| Adem v. Bush | ) | Case No. 05-CV-0723 (RWR) |
| Imran v. Bush | ) | Case No. 05-CV-0764 (CKK) |
| Al Habashi v. Bush | ) | Case No. 05-CV-0765 (EGS) |
| Al Hamamy v. Bush | ) | Case No. 05-CV-0766 (RJL) |
| Khiali-Gul v. Bush | ) | Case No. 05-CV-0877 (JR) |
| Muhibullah v. Bush | ) | Case No. 05-CV-0884 (RMC) |
| Chaman v. Bush | ) | Case No. 05-CV-0887 (RWR) |
| Gul v. Bush | ) | Case No. 05-CV-0888 (CKK) |
| Basardh v. Bush | ) | Case No. 05-CV-0889 (ESH) |
| Sohail v. Bush | ) | Case No. 05-CV-0993 (RMU) |
| Tohirjanovich v. Bush | ) | Case No. 05-CV-0994 (JDB) |
| Mangut v. Bush | ) | Case No. 05-CV-1008 (JDB) |
| Hamad v. Bush | ) | Case No. 05-CV-1009 (JDB) |
| Al-Hela v. Bush | ) | Case No. 05-CV-1048 (RMU) |
| Mousovi v. Bush | ) | Case No. 05-CV-1124 (RMC) |

| | | |
|---|---|---|
| Zalita v. Bush | ) | Case No.  05-CV-1220 (RMU) |
| Ahmed v. Bush | ) | Case No.  05-CV-1234 (EGS) |
| Aminullah v. Bush | ) | Case No.  05-CV-1237 (ESH) |
| Ghalib v. Bush | ) | Case No.  05-CV-1238 (CKK) |
| Bukhari v. Bush | ) | Case No.  05-CV-1241 (RMC) |
| Al Ginco v. Bush | ) | Case No.  05-CV-1310 (RJL) |
| Saib v. Bush | ) | Case No.  05-CV-1353 (RMC) |
| Hatim v. Bush | ) | Case No.  05-CV-1429 (RMU) |
| Al-Subaiy v. Bush | ) | Case No.  05-CV-1453 (RMU) |
| Sadkhan v. Bush | ) | Case No.  05-CV-1487 (RMC) |
| Faizullah v. Bush | ) | Case No.  05-CV-1489 (RMU) |
| Faraj v. Bush | ) | Case No.  05-CV-1490 (PLF) |
| Al Wirghi v. Bush | ) | Case No.  05-CV-1497 (RCL) |
| Kiyemba v. Bush | ) | Case No.  05-CV-1509 (RMU) |
| Idris v. Bush | ) | Case No.  05-CV-1555 (JR) (Consolidated with 05-CV-1725) |
| Attash v. Bush | ) | Case No.  05-CV-1592 (RCL) |
| Rabbani v. Bush | ) | Case No.  05-CV-1607 (RMU) |
| Al-Badah v. Bush | ) | Case No.  05-CV-1641 (CKK) |
| Almerfedi v. Bush | ) | Case No.  05-CV-1645 (PLF) |
| Zaid v. Bush | ) | Case No.  05-CV-1646 (JDB) |
| Al-Bahooth v. Bush | ) | Case No.  05-CV-1666 (ESH) |
| Ali Ahmed v. Bush | ) | Case No. 05-CV-1678 (GK) |

| | | |
|---|---|---|
| Kabir (Sadar Doe) v. Bush | ) | Case No.  05-CV-1704 (JR) |
| Al-Rubaish v. Bush | ) | Case No.  05-CV-1714 (RWR) |
| Al-Qahtani v. Bush | ) | Case No.  05-CV-1971 (RMC) |
| Alkhemisi v. Bush | ) | Case No.  05-CV-1983 (RMU) |
| Al-Shabany v. Bush | ) | Case No.  05-CV-2029 (JDB) |
| Al-Mudafari v. Bush | ) | Case No.  05-CV-2185 (JR) |
| Al-Mithali v. Bush | ) | Case No.  05-CV-2186 (ESH) |
| Alhag v. Bush | ) | Case No.  05-CV-2199 (HHK) |
| Al Subaie v. Bush | ) | Case No.  05-CV-2216 (RCL) |
| Ghazy v. Bush | ) | Case No.  05-CV-2223 (RJL) |
| Al-Shimrani v. Bush | ) | Case No.  05-CV-2249 (RMC) |
| Zadran v. Bush | ) | Case No.  05-CV-2367 (RWR) |
| Alsaaei v. Bush | ) | Case No.  05-CV-2369 (RWR) |
| Al Darby v. Bush | ) | Case No.  05-CV-2371 (RCL) |
| Al-Ghizzawi v. Bush | ) | Case No.  05-CV-2378 (JDB) |
| Awad v. Bush | ) | Case No.  05-CV-2379 (JR) |
| Al-Baidany v. Bush | ) | Case No.  05-CV-2380 (CKK) |
| Said v. Bush | ) | Case No.  05-CV-2384 (RWR) |
| Al Halmandy v. Bush | ) | Case No. 05-CV-2385 (RMU) |
| Al Salami v. Bush | ) | Case No.  05-CV-2452 (PLF) |
| Al Shareef v. Bush | ) | Case No.  05-CV-2458 (RWR) |
| Al-Harbi v. Bush | ) | Case No.  05-CV-2479 (HHK) |

**RESPONDENTS' REPLY MEMORANDUM IN SUPPORT OF JULY 7, 2006 MOTION
FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS
AND OPPOSITION TO PETITIONERS' REQUESTS FOR
RELIEF ASSOCIATED WITH IMPOUNDMENT OF DETAINEE MATERIALS**

Respondents hereby submit in the above-captioned cases this reply in support of their

July 7, 2006 Motion for Procedures Related to Review of Certain Detainee Materials and

Request for Expedited Briefing ("July 7 Motion") and in opposition to petitioners' requests for

various forms of relief associated with the impoundment of materials at issue in the July 7

Motion, including requests for sanctions, return of the impounded materials, transfer of the

materials to the Court, additional information, and discovery.  Because petitioners' filings in

opposition to the July 7 Motion are substantially similar, respondents submit this consolidated

reply.  The substantially similar nature of the filings in this matter also warrant that the Court

decide the July 7 Motion in a coordinated, and expedited, fashion among the cases.[1]

As explained below, the impoundment of detainee materials by the Naval Criminal

Investigative Service ("NCIS") was a reasonable and legally appropriate investigatory response

to a serious security situation arising within a wartime detention facility, reflected in apparently

coordinated detainee action with respect to suicides, attacks on personnel, and misuse of

materials reserved for privileged legal communications.  Furthermore, the use of a Filter Team,

as requested by respondents, to sort clearly unprivileged documents in the detainee materials

from attorney-client communications, is warranted and appropriate so as to permit the NCIS

---

[1] Several petitioners' counsel question whether their petitioners have attorney-client materials that have been impounded since counsel have not communicated with the petitioners. Respondents are willing to withdraw their July 7, 2006 Motion with respect to petitioners for whom counsel do not believe potentially privileged attorney-client communications would be contained in the impounded materials.  However, any examination of the impounded documents is currently awaiting the Court's consideration of the July 7 Motion.  *See infra* at 4-5.

investigation to proceed while protecting privileged attorney-client communications from inappropriate disclosure.[2]

## ARGUMENT

**I.    THE SEIZURE OF THE IMPOUNDED DETAINEE MATERIALS WAS LEGAL AND APPROPRIATE.**

Petitioners claim that the impoundment of detainee materials by the NCIS as part of its investigation into the circumstances of the recent suicides of three Guantanamo detainees, as well as any broader plot or planning for other such attempts in the past or future, was illegal and nothing more than part of what petitioners believe to be a multi-year conspiracy by respondents to thwart detainees' access to the courts and their relationships with attorneys acting on their behalf.  Petitioners legal assertions, however, improperly conflate the current, temporary impoundment of the detainee materials (as well as respondents' request for Court authorization of procedures for sorting and review of the materials intended to protect the attorney-client privilege) with actual abrogation of the attorney-client privilege.  Furthermore, counsel's histrionic tirade challenging the motives they allege are behind the impoundment of the materials, aside from being offensive and insulting, is based on assertions that are false or misleading, and it amounts to an irrational and improper attempt to second-guess virtually every aspect of the wartime detentions at Guantanamo.

---

[2] The July 7 Motion was made without prejudice to respondents' position that the Court lacks jurisdiction in light of the Detainee Treatment Act of 2005, *see* July 7 Motion at 2 n.3, and respondents do not concede the jurisdictional issue.  The effect of the Supreme Court's recent decision in *Hamdan* on the jurisdictional issue will be addressed in the pending Guantanamo detainee *habeas* appeals in the Court of Appeals through supplemental briefing to be completed by August 15, 2006.

**A.      Abrogation of the Attorney-Client Privilege Has Not Occurred.**

Much of the rhetoric in the various oppositions filed by petitioners to respondents' July 7, 2006 Motion appears to be grounded in the assumption that attorney-client communications in the universe of detainee materials that have been impounded have been permanently taken from the detainees and have been and will be reviewed in an unauthorized fashion.  This is incorrect.

As explained in respondents' July 7 Motion, on June 10, 2006, three detainees at Guantanamo committed suicide.  Just a few weeks prior to that, at least two other detainees had also attempted suicide or self-harm using illicitly hoarded medicine.  On the same day as those prior attempts, detainees in Camp 4 communal living bays were able to launch a coordinated ambush attack on guards there.  The three successful suicides occurred in separate cells in the same cellblock on the same day and in essentially the same manner.  Handwritten, apparent suicide notes were found on the deceased detainees, and a handwritten note was found in one of the deceased detainee's cell that, when translated, proved to be related to the suicides and written by someone other than the detainee who died in the cell in which the note was found.  *See* July 7 Motion, Exhibit B (Kisthardt Decl.) ¶ 3.  That note was written on notepaper that was stamped on the back as privileged attorney-client material.  *Id.*  Furthermore, notes were found in a living detainee's cell that, once translated, appeared to have been written by at least two of the deceased detainees on stationery that had been stamped as confidential attorney-client materials, *id.*, even though the deceased detainees had not been contacted by attorneys.

In light of this evidence that the deceased detainees had secreted suicide notes between themselves and at least one other living detainee, the NCIS – which conducts its investigations independently and with which commands with matters under investigation are obligated to

cooperate – expanded the scope of its investigation to the cells of other enemy combatant detainees at Guantanamo.  Approximately 1,100 pounds of materials were collected by NCIS on or about June 14, 2006, with materials collected from each detainees' cell being separately bagged.  *Id.* ¶¶ 4-5.  NCIS personnel then began sorting materials from eleven bags and uncovered therein a note providing instructions concerning the tying of knots, along with a potentially classified e-mail from a camp officer containing information regarding cell locations of detainees and other details regarding camp operational matters.  *Id.* ¶ 5.  The latter discovery led to the examination of other materials from the same detainee to determine whether there were other potentially classified U.S. Government documents in that detainee's possession, including in three legal mail envelopes.  *See id.*  An NCIS investigator scanned the contents of the three envelopes, but did not read the documents therein.  *See id.*

The sorting made clear that review and translation of the collected detainee materials would be burdensome given the volume of materials and the apparent multitude of foreign languages involved, and it revealed the likelihood that attorney-client communications would be encountered.  *See id.*  In addition, as noted in the declaration of the supervisory NCIS investigator in charge of the investigation, the only review of the 1,100 pounds of seized materials was this initial sorting of the contents of the eleven bags.  *See id.*  Further, attorney-client communications were not read; the contents of three legal mail envelopes were scanned in the search for other possibly classified U.S. documents and certain markings on the documents were observed, but the documents in the envelopes were not read.  *Id.*  After the initial sorting, further review of the materials was suspended until appropriate procedures and staffing could be developed to account for the scope of the undertaking and the possibility that the review team would encounter

potentially privileged attorney-client communications.  *Id.*  The bags of materials are currently kept in in sealed boxes in a locked and alarmed storage facility consistent with NCIS practices for maintenance of evidence obtained in criminal investigations, *i.e.*, under the control of the NCIS to the exclusion of others, including Guantanamo authorities.  No further review of the contents of the bags of materials is occurring pending the Court's consideration of respondents' July 7 Motion.[3]

Furthermore, the June 14, 2006 impoundment of detainee materials did not affect delivery of legal mail to detainees after the impoundment, and scheduled visits by counsel to Guantanamo are continuing.

Accordingly, no "abrogation" of attorney-client communications has occurred; attorney-client materials have not been read.  In addition, the impoundment by NCIS of attorney-client materials within the impounded materials is temporary, pending authorization of procedures that would permit the effective separation of unprivileged matter from privileged, attorney-client communications.  Furthermore, otherwise appropriate ongoing legal communications between petitioners and their counsel are not being impeded: legal mail is being delivered pursuant to the applicable Protective Order and counsel visits with petitioners are being scheduled and are ongoing.  The attorney-client privilege, therefore, has not been "abrogated" by the impoundment of detainee materials.

---

[3] As explained in recent conferences with Magistrate Judge Kay on this matter, after the impoundment, NCIS personnel conducted an inventory of the bags, each of which is marked with the Interment Serial Number ("ISN") of the detainee from whom the materials were impounded, to determine detainees for whom bags of materials exist.  The inventory, however, was not of the contents of the bags and did not involve review of materials within the bags.

**B.      Impoundment of the Detainee Materials and the Request for Court Authorized Procedures for Sorting and Review of the Materials Is Fully Justified**.

Despite petitioners' rhetoric and attempts to obfuscate the matter, most petitioners' counsel admit, as they must, that it has long been recognized, even in the context of the detention of U.S. individuals possessing constitutional rights, that officials must be permitted to take all reasonable steps to mitigate and address potential threats to the security of detention facilities and the safety of personnel and detainees in those facilities, including with respect to searches of detainee quarters and materials.  For example, in *Bell v. Wolfish*, 441 U.S. 520, 555-57 (1979), the Supreme Court upheld against a due process challenge a number of security-related practices, including searches of the cells and persons of those held in pretrial detention facilities.  And in *Hudson v. Reno*, 468 U.S. 517 (1984), and *Block v. Rutherford*, 468 U.S. 576 (1984), the Court upheld against constitutional challenge, including Fourth Amendment challenge, even random searches of detainee cells outside of the detainees' presence.  *See also Turner v. Safley*, 482 U.S. 78 (1987) (prison practice impinging on prisoner's constitutional right is nonetheless valid if reasonably related to legitimate penological interests); *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (applying *Turner* standard to challenge to withholding of inmate legal papers).  As the Supreme Court noted in *Block* with respect to the propriety of searches of detainee cells:

> We . . . cautioned [in *Wolfish*]: Prison administrators [are to be] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

468 U.S. at 585 (citing *Wolfish*, 441 U.S. at 547).  *See also* 468 U.S. at 591 ("[W]e could not have been clearer in our holding in *Wolfish* that this is a matter lodged in the sound discretion of

- 6 -

institutional officials."). Moreover, the Court stated that "officials are not obligated to adopt the least restrictive means to meet their legitimate objectives."[4] *Id.* at 591 n.11.

Such deference would be even more appropriate in the context presented in the Guantanamo *habeas* cases here, that is, with respect to actions taken in response to specific security issues raised at a military detention facility during a time of war, including where, as here, the security issues bear the hallmarks of coordinated planning by enemy combatant detainees against their captors. *See* July 7 Motion at 14. Indeed, as previously explained, Guantanamo was faced with three concurrent suicides in the same cellblock on the same day, in essentially the same manner, and evidence exists that the deceased detainees had secreted suicide notes between themselves and at least one other living detainee and had (mis)used materials for support of the suicides that were on their face reserved for privileged legal communications. The seizure of detainee materials was, at the very least, a reasonable investigatory response to a serious security issue. Further, just a sampling of the detainee documents impounded uncovered a note providing instructions concerning the tying of knots, along with a potentially classified e-mail from a camp officer that was somehow obtained by a detainee. Accordingly, the

---

[4] Accordingly, even if petitioners – aliens detained outside of U.S. territory – were permitted to avail themselves of the Fourth Amendment in this context, which they are not, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990) (Fourth Amendment does not "restrain the actions of the Federal Government against aliens outside of the United States territory"), petitioners' invocation of the Fourth Amendment, *see, e.g.*, Zemiri (No. 05-CV-2046-CKK) Opp. at 5-6, or its standards, *see, e.g.*, Abdah (No. 04-1254-HHK) Opp. at 15 & *infra* at 14, in an attempt to impugn the impoundment of detainee materials is misplaced. *See Hudson*, 468 U.S. at 526 (Fourth Amendment "does not apply within the confines of the prison cell). The case, *Lonegan .v Hasty*, 2006 WL 1707258 (E.D.N.Y. Jun. 22, 2006), which did not involve security-related searches of detainee cells but surreptitious recording of attorney-client conversations contrary to regulation and unrelated to security concerns, *id.* at *4, *15, is not to the contrary.

impoundment of the detainee materials, and the request for ultimate review of the materials, for the purpose of comprehending the scope of and mechanisms for detainee planning of suicide attempts at Guantanamo, both in the past and possibly in the future, with the goal of disrupting those mechanisms, is appropriate under any realistic standard. It is most definitely appropriate under the deferential standard established by the Supreme Court in the U.S. prison context and would be especially so under what should be an even more deferential standard given the unique context here involving the detention of individuals held by the military as enemy combatants.[5]

Despite the facts, petitioners assert that impoundment of the materials and respondents' request to the Court regarding review of the materials is merely a pretext for interference with attorney-client relations. Petitioners' efforts to undercut the bases for the impoundment and the judgment of NCIS in the matter are neither factually nor legally legitimate and should be rejected.

---

[5] One set of counsel goes so far as to claim that even the impoundment of nonlegal materials is illegal, based on their view that general conditions of confinement at Guantanamo as reported on the Internet (which respondents do not concede as accurately reported), including the impoundment, violate the Third Geneva Convention. *See* Chaman (No. 05-CV-887-RWR) Opp. at 23-36. Counsel claim, *inter alia*, that the Supreme Court in *Hamdan* held that the Geneva Conventions were judicially enforceable. *Hamdan*, however, held no such thing; rather, it concluded that the petitioner in that case could invoke Common Article 3 of the Geneva Conventions, not because the Conventions provided petitioner with enforceable rights, but because Article 3 was incorporated into a provision of the Uniform Code of Military Justice governing the military commission at issue in the case. *See Hamdan*, 126 S. Ct. 2749, 2794 (2006) (assuming that Conventions scheme "would, absent some other provision of law, preclude . . . [petitioner's] invocation of the Convention's provisions as an independent source of law binding the Government's actions and furnishing petitioner with any enforceable right"). *See also Hamdan*, 415 F.3d 33, 40 (D.C. Cir. 2005) ("[T]he 1949 Geneva Convention does not confer upon [a detainee] a right to enforce its provisions in court."). Counsel's Geneva Conventions-based attack on the seizure of nonlegal materials, therefore, must be rejected.

Petitioners, for example, improperly twist respondents' role in the hard-fought litigation in these cases, over unique and often unprecedented issues arising in a wartime detention setting, into nothing more than a campaign to deny detainees access to counsel. *See*, *e.g.*, Abdah Opp. at 11-12. Petitioners also claim, based upon newspaper articles recounting petitioners' own allegations, that respondents have intentionally attempted to interfere with and disrupt detainee relationships with attorneys through alleged statements of interrogators and retribution visited upon detainees meeting with lawyers. Of course, counsel misleadingly fail even to mention that respondents have submitted sworn declarations in this litigation refuting those very allegations.[6]

While petitioners' filings reflect a penchant for ignoring or dismissing as lies any fact or matter inconsistent with a preconceived "torture narrative" concerning Guantanamo, contrary to the picture petitioners' counsel attempt to paint, respondents have gone to great lengths to accommodate attorney-detainee communications since August 2004, shortly after the Supreme Court's decision in *Rasul*. Respondents have supported visits by over 150 *habeas* lawyers and their translators to Guantanamo for meetings with detainees, and many of these have made multiple visits to the base. Visiting counsel groups frequently consist of multiple lawyers and translators who stay at Guantanamo for several days to conduct interviews with multiple detainees. To date, over 250 detainees have personally met with *habeas* counsel at Guantanamo,

---

[6] *See*, *e.g.*, *Al Odah* (No. 02-CV-0828-CKK), Respondents' May 9, 2005 Opp. to Mot. for Writ of Injunction, Exhibits 1 & 2 (dkt. no. 236) (declarations of then-Chief of Staff and then-Director of Joint Intelligence Group of JTF-Guantanamo, explaining that interrogators and other personnel are not permitted to interfere with the relationship between any detainee and his lawyer and that such personnel are prohibited from impersonating a lawyer, making disparaging comments about the lawyer, or retaliating against a detainee for having met with a lawyer or being involved in habeas corpus litigation; explaining also that detainees are not granted or denied privileges, disciplined, or otherwise discriminated against on account of their involvement with *habeas* litigation or counsel).

many having met with counsel multiple times. Typically, multiple attorney-detainee meetings occur weekly, often presenting difficult and resource-intensive logistical demands on Guantanamo authorities. Guantanamo authorities have accommodated numerous, sometimes disruptive scheduling change requests by counsel with respect to such meetings. Authorities also have spent many hours urging uncooperative detainees to meet with awaiting counsel[7] and attempting to accommodate reasonable requests of counsel relating to various aspects of their meetings. Furthermore, Guantanamo has delivered countless pieces of legal mail between counsel and detainees permitted under the Protective Order. While instances of disagreements with counsel have arisen, for example, regarding materials that may be brought into a counsel meeting with a detainee,[8] or over materials provided by counsel to detainees and subsequently discovered by guards (though not through a search of legal mail),[9] petitioners' claim of a concerted conspiracy to improperly interfere with access to counsel is unfounded, and it does not

---

[7] *See, e.g.*, *Al Adahi* (No. 05-CV-280-GK), Respondents' Opp. to Mot. to Compel Access to Petitioner (dkt. no. 80), Ex. A (Decl. of Dale T. Vitale) (describing Guantanamo authorities' efforts to convince detainee to meet with awaiting counsel, including delivering notes from counsel and enlisting assistance of Islamic Cultural Advisor).

[8] *See* Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba (annexed to Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. Nov. 8, 2004)), § V ("Access Procedures").

[9] *See, e.g.*, *Al-Joudi* (No. 05-CV-0301-GK), Respondents' Mar. 2, 2006 Response to Mot. for Order to Show Cause Requiring Rescheduling of Attorney-client Meetings (dkt. no. 59).

undercut the basis for the NCIS impoundment of detainee materials and request for review procedures here.[10]

Petitioners' counsel's harangue also fails to account for the important fact that the impoundment at issue was undertaken by NCIS. Petitioners' counsel attempts to expand the scope of their conspiracy theory to include a criminal investigative service that acts independently in the execution of its investigatory judgments, *see* July 7 Motion at 4-5, makes their attacks particularly unsound and illegitimate.[11]

---

[10] Petitioners also attempt to impugn the basis for the impoundment of materials based on the timing of respondents' July 7 Motion. Counsel assert that the government "devious[ly]" had no intention of disclosing the seizure or seeking Court relief in the matter until a motion for return of impounded materials, filed in *Abdullah* (No. 05-CV-0023-RWR) on July 5, 2006, "forced it hand." *See, e.g.*, Abdah Opp. at 5-6. As counsel are aware, however, and as some acknowledge, *see, e.g.*, Al-Marri (No. 04-CV-2035-GK) Opp., Ex. B; Sliti (No. 05-CV-0429-RJL), Ex. A, respondents' counsel informed *habeas* counsel of the impoundment, and respondents' intention to file a motion regarding the matter, on June 30, 2006, before the filing of the motion in *Abdullah*. Moreover, counsel visits to Guantanamo were ongoing immediately following the impoundment of the detainee materials, so no attempt to "hide" the seizure would have even been possible. Rather, respondents filed their motion once the circumstances of the impoundment and the appropriate relief to be sought from the Court were ascertained. Further, with respect to issues of timing, respondents in their motion and otherwise, have attempted at every turn to obtain an expedited resolution of this matter to permit this aspect of the NCIS investigation to move forward and enable the return of privilege attorney-client communications in the detainee materials to detainees. Petitioners' counsel, however, have resisted expedited and coordinated handling of the matter.

[11] In a particularly galling and unjustified stunt, some counsel go so far as to claim that the seizure and impoundment of detainee materials actually occurred weeks before the date indicated in the sworn declaration from the NCIS submitted with respondents' July 7 Motion and that "[t]he government is overlaying its investigation into the deaths onto their earlier seizure of legal mail in an attempt to justify retroactively its unlawful behavior." *See* Al-Anazi (No. 05-CV-0345-JDB) Opp. at 6; *see also* Abdah Supplemental Opp. at 1. This outrageous claim is based on the most anemic and incompetent evidence, *i.e.*, an allegation made by an unidentified client of counsel. *See* Al-Anazi Opp., Ex. A (Raut Decl.); Abdah Supplemental Opp., Exhibit (Raut Decl.). Counsel provide only snippets of information from a letter from the detainee, completely devoid of context, such that it is impossible to tell what the detainee is talking about, whether some incident involving the return of materials to the detainee's storage bin (as

Petitioners' counsel also attack the basis for the impoundment of the detainee materials based on improper attempts to second-guess the security factors that led to the impoundment. The scope of petitioners' counsel's willingness to second-guess the bases for the NCIS impoundment of detainee materials is stunning. Counsel are willing not only to offer their opinion that the detainee suicides were not related, coordinated acts,[12] even in the face of obvious circumstantial evidence to the contrary, *see supra* at 3-4, but, based on their own conspiracy viewpoint, they question whether the deaths were suicides at all.[13] Petitioners' counsel also disagree that the use by the suicide victims of attorney-client stationery may reflect an attempt to shield or disguise materials from detection, *see, e.g.*, Abdah Opp. at 18, despite the fact that the deceased detainees had not had contact with attorneys and the materials were positioned so as not to be discovered until after the suicide and upon the search of the detainees' effects. *See* Kisthardt Decl. ¶¶ 3-4. Petitioners' counsel further question the need for investigation of

------------------------------------------------

detainees are only permitted to retain in their cells a certain number of documents at one time depending on the detainee's disciplinary level, with remaining materials kept in the detainee's bin, *see* July 7 Motion at 6 n.6), or some misunderstanding with guards over access to materials in the detainee's bin. While it is at least theoretically possible the detainee's allegations refer to Guantanamo's inability to return certain materials to detainees in the aftermath of the May 18, 2006 melee in Camp 4, *see* July 7 Motion at 6 n.6, it is impossible to tell from the tidbits of the detainee's allegations provided by counsel. In addition, the allegations are not internally consistent: one of the snippets provided by counsel states that the detainee is being denied pen and paper by Guantanamo, Raut Decl. ¶ 5, yet obviously the detainee was able to write counsel a letter. Such "evidence" is certainly insufficient to support counsel's offensive claims of deception and lying by respondents, which are refuted by the declaration submitted with respondents' July 7 Motion.

[12] *See, e.g.*, Abdah Opp. at 6-10 (suicides merely acts of despair).

[13] *See, e.g.*, Abdah Opp. at 2 (while conceding that "there is no basis for alleging . . . that the prisoner deaths were not suicides," questioning whether they were); *id.* at 10 ("the deaths – if suicides – were not acts of belligerence").

detainee materials based on counsel's view of the overall compliant and docile nature of the enemy combatant detainees, *see*, *e.g.*, Alhami (No. 05-CV-0359-GK) Opp. at 9,[14] even in the face the recent coordinated ambush of guards by detainees in Camp 4, a communal living facility reserved for the most compliant Guantanamo detainees.  Counsel even have the temerity to assert that the investigation of how detainees came into possession of the potentially classified JTF-Guantanamo e-mail should be hamstrung to prevent NCIS from potentially discovering other such materials in the possession of detainees or information in the detainee materials that might shed light on how the e-mail was obtained.  *See*, *e.g.*, Abdah Opp. at 19; Al-Anazi Opp. at 10.  According to counsel, the NCIS should be limited merely to asking the detainee or investigating JTF-Guantanamo officials, without the benefit of a review of detainee materials.  *See id.* at 10.

Petitioners' counsel further speculate that detainees would not participate in suicide plots, *see*, *e.g.*, Kurnaz (No. 04-CV 1135-ESH) Opp. at 7; Al Odah Opp. at 6-7; or, in an interesting twist upon that theory, that since counsel would not promote or participate in any such plots, there is no need to investigate or review the detainees' materials, *see*, *e.g.*, Al Odah Opp. at 4; Almerfedi (No. 05-CV-1645-PLF) Opp. at 11 n.3.  Also, based upon the assumption that "prisoners at Guantanamo, like prisoners everywhere, are able to share information among themselves by word of mouth accurately and efficiently," counsel go so far as to assert that "the prisoners would be most unlikely to leave a written record of their communications."  *See*, *e.g.*, Abdah Opp. at 19; Chaman Opp. at 19-20.  This despite the discovery of multiple writings and other documents described *supra*.

---

[14] The so-called "study" relied upon by counsel for their conclusions regarding the docile nature of the detainees was recently authored by two of the petitioners' counsel in *Alhami*.

Of course, the law, even in the context of detentions of U.S. individuals possessing constitutional rights as opposed to the alien enemy combatants here, does not permit petitioners' counter-factual opinions and conjectures to carry the day. Rather, a response to a security issue within a detention facility is entrusted to the reasonable judgments and discretion of responsible officials. *See supra* at 6-8. The impoundment of the detainee materials here was a reasonable and appropriate investigatory response to a security situation arising within a wartime detention facility. It was undertaken for purposes of comprehending the existence of and mechanisms for detainee planning of suicide attempts at Guantanamo, both in the past and possibly in the future, with the goal of disrupting those mechanisms and potentially saving lives and otherwise maintaining ongoing security and order within the facility. *See* Kisthardt Decl.; July 7 Motion, Exhibit A, (Harris Decl.) ¶ 4. The impoundment, therefore, was appropriate.

**C.    No Individualized, Detainee-Specific Showings of Probable Cause Are Needed to Justify Impoundment and Review of the Detainee Materials.**

Petitioners argue that the relief respondents request, *i.e.*, the authorization of a Filter Team for sorting and review of the impounded detainee materials in a fashion that protects privileged attorney-client communications from disclosure, requires a showing of probable cause by the government with respect to each detainee for whom material is to be reviewed. *See*, *e.g.*, Abdah at 15. Petitioners reason that just as an individualized showing is necessary to warrant application of the crime-fraud exception so as to deny the protection of the attorney-client privilege to an otherwise protected attorney-client communication, "[s]imilarly, when the government seizes materials from a location that likely contains privileged papers, the seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials." *Id.* This argument, however, conflates the impoundment

- 14 -

of the detainee materials and respondents' request for Court authorization of a Filter Team for sorting and review of the materials in a fashion intended to protect the attorney-client privilege, with actual abrogation of the privilege. As discussed *supra*, the Fourth Amendment's probable cause standard and warrant requirement applicable to searches of the property and persons of U.S. citizens has no application to searches and seizures in a prison context, either generally or with respect to specific detainees.[15] Rather, legitimate security interests and concerns fully justify the NCIS impoundment in this wartime detention facility context. As to an "appropriate means of screening out privileged materials," that is exactly the relief respondents are seeking.

Thus, at this point, the issue before the Court is much more simple and straightforward than whether an otherwise protected attorney-client communication may be disclosed as falling within an exception to the privilege. Rather, an impounded set of detainee materials exist that presumably includes detainee communications with persons other than counsel, other detainee papers, as well as, possibly, attorney-client communications, typically within legal mail envelopes.[16] As to the former category – documents that are not attorney-client communications – such documents and writings, without question, are subject to review by NCIS, as well as Guantanamo authorities, without Court authorization. Beyond the indisputably unprivileged materials, however, the universe of impounded documents would also contain legitimate

---

[15] Petitioners' citation of *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002), *see*, *e.g.*, Abdah Opp. at 15 n.38, is not to the contrary. That case involved a warrant issued for the search of a private law office.

[16] Knowledge of the contents of the bags of impounded materials is based on common sense, as well as the initial investigatory steps taken by NCIS, including its sampling of eleven bags of the impounded material. *See* Kisthardt Decl. ¶¶ 3-5. The remainder of the materials, including the materials in the legal mail envelopes in the sampled material, have not been reviewed. *See supra* at 4-5.

attorney-client communications, typically in legal mail envelopes.  Furthermore, given the

demonstrated existence of nonprivileged documents masquerading as privileged, *i.e.*, on

stationery stamped as attorney-client privileged, it is entirely possible that similar unprivileged

writings bearing some trapping of an attorney-client communication exist.  Other related

possibilities include nonprivileged materials intermingled, *i.e.*, stored, among legitimate attorney-

client communications within legal mail envelopes, or nonprivileged notes or messages hand-

written on otherwise legitimate attorney-client materials.[17]  As with the status of the notes

uncovered so far, the status of such materials and information as unprivileged would not

necessarily be readily discernable absent translation,[18] which would necessarily involve some

review of the material.

        Thus, in order to sort unprivileged materials from legitimately privileged attorney-client

communications, an inspection and possible translation of the materials to an extent necessary to

ascertain their nature, including of material in legal mail envelopes, is necessary.  And given the

possibility of encountering attorney-client communications that would be privileged, respondents

have proposed that the materials be reviewed and sorted by a Filter Team so that privileged

materials are not disclosed to NCIS investigators or Guantanamo authorities.  Thus, contrary to

petitioners' inflammatory accusations, respondents have been respectful in the extreme of the

--------

        [17] While petitioners argue that no legal mail envelope scanned in the NCIS sampling of
detainee materials was found to contain, in counsel's view, improper material, only three such
envelopes out of the universe of 1,100 pounds of material were scanned.  Given that the
detainees were misusing attorney-client stationery for unprivileged communications, however,
some review of the contents of legal mail envelopes is warranted.

        [18] As noted in the NCIS declaration, the impounded documents will include materials in a
number of different foreign languages.  *See* Kisthardt Decl. ¶ 5.

attorney-client privilege; the privilege has not been abrogated, nor will it be through respondents' proposed Filter Team review. *See also infra* § II.

Such an arrangement, *i.e.*, the sorting of unprivileged information from legitimate attorney-client communications, as with the impoundment of detainee materials, is not dependent upon a showing of probable cause. Rather, such sorting is a necessary aspect of any review of detainee materials. The issue is how to accomplish the review and sorting in a fashion that respects the privilege, and respondents' proposal does just that. At least some of petitioners' counsel seem to recognize implicitly that a sorting review is necessary when they request the return of only attorney-client materials to the detainees. *See, e.g.*, Abdah Opp., Prop. Order (calling for delivery of "legal papers" to counsel); Al Odah Opp. (objecting to seizure of "attorney-client materials"); *see also* Alhami Opp. at 8 (unprivileged documents may be examined by NCIS "without fear of legal backlash"). If such materials are to be returned at all, those materials, in all events, must be identified in and segregated from the universe of impounded materials.

Indeed, one of the cases primarily relied upon by petitioners' counsel makes clear that such sorting is necessary and does not require a showing of probable cause. In *Goff v. Nix*, 113 F.3d 887 (8th Cir. 1997), the court considered challenges to certain practices of a penitentiary limiting communications between inmates, practices that were alleged to deny inmates the right of access to the courts. The court applied the standard of *Turner v. Safely*, *see supra* at 6, to the penitentiary's practice of refusing to return an inmate's legal documents to him when his jailhouse lawyer was transferred to another facility.[19] While the court upheld an injunction

---

[19] The documents either had to remain with the jailhouse lawyer, who could not return them once he was transferred, or they were destroyed. 113 F.3d at 888-89.

against the complete deprivation of the inmate's legal papers represented by the practice, it

recognized the state's legitimate concern that contraband – which was considered in the case to

include not only physical contraband, but certain unauthorized communications between or about

inmates, *see* 113 F.3d at 891 & n.2 – not be disseminated through the return of putative legal

papers that had been in an inmate's possession for some period of time. *Id.* at 892. Accordingly,

the court upheld a requirement that prison officials be permitted to scan the documents to be

returned so that any contraband could be confiscated.[20] *See id.* Thus, despite the presence of

privileged material, the *Goff* court authorized a sorting review by prison officials themselves.

Here, of course, respondents have proposed sorting of the impounded materials not by

NCIS investigators or Guantanamo authorities, but by a Filter Team operating under Court-

ordered nondisclosure constraints as a safeguard for privileged communications among the

impounded materials. An individualized showing of probable cause is simply not required for

such Filter Team review. Only where the Filter Team were to encounter an attorney-client

communication that was excepted from the privilege, *e.g.*, under the crime-fraud exception,

would an individualized showing be required, *i.e.*, to demonstrate the applicability of the

exception. Respondents' Filter Team proposal contemplates this, however; the Filter Team is not

permitted to disclose attorney-client communications except upon obtaining the permission of

counsel or the Court. *See* July 7 Motion, Proposed Order. An individualized showing of

---

[20] Thus, the cases cited by some petitioners' counsel, *see*, *e.g.*, Al Anazi Opp. at 3, for the proposition that privileged, incoming legal mail can be inspected by prison officials for contraband, but not read, do not undermine respondents' request for Filter Team review in this context. Here, the issue is with respect to materials that have rested in the hands of detainees with the potential for detainees to use, abuse, or add to such materials or legal mail envelopes for purposes of creating unprivileged materials or facilitating unprivileged communications. Further, here, the review of the materials will be performed not by prison officials themselves, but by a Filter Team operating under Court-ordered nondisclosure constraints.

probable cause, however, is not required for the Court to permit the Filter Team review and

sorting of the impounded materials to occur.[21]

## II.   THE FILTER TEAM PROCEDURE PROPOSED BY RESPONDENTS IS APPROPRIATE AND SHOULD BE ORDERED BY THE COURT.

As discussed above, both the impoundment of detainee materials and the anticipated

review of such materials is fully justified and appropriate.  The Court also should authorize the

procedures for the review proposed by respondents, *i.e.*, the use of a Filter Team composed of

individuals essentially walled-off from the *habeas* litigation.  As discussed in the July 7 Motion,

the Filter Team will be composed of individuals meeting the qualifications of the Department of

Defense "Privilege Team" created by the Protective Order, that is, DoD "attorney[s], intelligence,

or law enforcement personnel [or translators] who have not taken part in, and, in the future, will

not take part in, any domestic or foreign court, military commission or combatant status tribunal

proceedings involving the detainee."  *See* Access Procedures § II.D.  At present, it is anticipated

that the Filter Team will be composed of Navy JAG attorneys assisted by DoD translators as

necessary, but, again, only those who have not taken part in and will not take part in litigation

and other proceedings pertaining to the detainees.  The Filter Team would review the detainee

materials, segregating attorney-client communications from other unprivileged detainee

_____

[21] Thus, petitioners' assertions that Court authorization was required prior to impoundment of the detainee materials is erroneous.  For these same reasons, the NCIS impoundment of materials and the proposed Filter Team review do not violate the Protective Order in this case, nor are they contrary to *Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004).  The attorney-client privilege has not been abrogated here; attorney-client materials have not been read.  Further, neither the Protective Order nor the *Al Odah* decision addresses the security-related situation such as that presented here, *i.e.*, where evidence exists of detainee misuse of attorney-client stationery for unprivileged communications, justifying the sorting of privileged communications from unprivileged ones so that a key aspect of the investigation into the security situation can proceed expeditiously.-

- 19 -

materials.  Unprivileged materials will be disclosed to NCIS investigators, and documents among

those determined not to be relevant to the investigation will be returned to JTF-Guantanamo for

return to the detainees or other appropriate action.  With respect to attorney-client

communications encountered in the Filter Team review, the Filter Team would be prohibited by

Court order from disclosure of those documents, absent the consent of counsel or the Court.  *See*

July 7 Motion, Proposed Order.  Given that the object of the Filter Team review is to sort

legitimate attorney-client communications from unprivileged documents that may ultimately be

relevant to the NCIS investigation, any legitimate attorney-client communications not bearing on

the investigation, especially those in English, can be identified quickly and set aside without

detailed further review and returned to detainees.[22]  Should the Filter Team encounter an

attorney-client communication that is excepted from privilege, however, the Filter Team could

not disclose the document to NCIS investigators or Guantanamo authorities, but rather would be

constrained[23] to seek the consent of the detainee's counsel or authorization from the Court for

such disclosure.[24]  Thus, the proposed review of the detainee materials should be straightforward

---

[22] Materials in foreign languages, especially those that are not typewritten or on law firm letterhead, however, will require some amount of review for translation so as to ascertain that they are attorney-client communications.

[23] As explained in the July 7 Motion, however, the proposed Filter Team procedure permit the Filter Team to disclose information discovered in attorney-client communications that pertains to future events that threaten national security or involve imminent violence, that is, in situations in which the current Access Procedures already contemplate and require disclosure of otherwise confidential information to JTF-Guantanamo.  *See* Access Procedures § VII. A., D.-F (DoD Privilege Team permitted to disclose such information discovered during classification review of legal communications); *id.* § IX.C (petitioners' counsel required to disclose such information learned from a detainee).

[24] Because of the prospect that the Filter Team may need to raise disclosure of specific attorney-client communications with the Court, it is necessary that the Court also authorize a Filter Litigation Team to represent the Filter Team in such matters, as discussed in the July 7

and efficient, with the Filter Team subject to appropriate safeguards imposed by the Court regarding qualifications and nondisclosure of attorney-client communications.

Petitioners' counsel argue that the proposed Filter Team review should be rejected in favor of review by the Court itself or a special master or even counsel. *See*, *e.g.*, Abdah Opp. at 20. Counsel's objections to the use of a Filter Team run to the possible perception of unfairness in the use of such a team and to the asserted possibility that the Filter Team would draw "false negative conclusions" about the applicability of privilege to particular documents. *See id.* at 21-22. These concerns do not warrant rejection of the use of the Filter Team in this matter, however. Here, the Filter Team would be operating under Court-ordered constraints regarding team members' qualifications and duties of nondisclosure, all but eliminating concerns of fairness. Indeed, similar constraints have been in place and operated successfully with respect to the DoD Privilege Team, created under the Court's Protective Order for classification review of otherwise privileged material, for almost two years without compromise of privileged material.[25] Further, petitioners' counsel's concern that disagreements over the applicability of privilege will not become apparent until documents are disclosed to NCIS investigators fails to account for the fact that under respondents' requested procedures, the Filter Team is not permitted to disclose any attorney-client communication without consent or Court authorization. Thus, counsel's argument that the Filter Team will be disclosing such communications based on its own privilege determinations is misplaced.

---

Motion. *See* July 7 Motion at 12, 22-23.

[25] One counsel's speculative concern that the Filter Team would be forced by respondents to run amok contrary to any Court order, *see* Al Anazi Opp. at 14-15, is baseless if for no other reason than it is *respondents*, through counsel, who have proposed the order that would govern the Filter Team.

Furthermore, of the cases cited by petitioners' counsel that criticized the use of "taint teams," none voiced a *per se* rejection of such mechanisms. Rather, some of the cases have involved after-the-fact expressions of preference for court review over taint team review,[26] and, in any event, rulings on the issue have involved a consideration of the various facts and circumstances of the situations involved, including the interests of the parties, the volume and ease of segregation of materials subject to review, and feasibility of court involvement.[27] Indeed, courts have recognized that the use of alternative review procedures in certain circumstances can result in unacceptable delays injurious to the government's interests. For instance, while the court in *Black v. United States*, 172 F.R.D. 511 (S.D. Fla. 1997) ultimately adopted a procedure for court review of the limited materials involved in the matter, it noted with respect to a special master review procedure adopted in *United States v. Abbell*, 939 F. Supp. 860 (S.D. Fla. 1996) (another case cited by petitioners), that one and one-half years after adoption of procedure, and two and one-half years after the initial seizure of documents, the review process still was not

___

[26] *See, e.g.*, *In re Search of the Scranton Hous. Auth.*, 2006 WL 1722565 (M.D. Pa. Jun. 22, 2006); *In re Search Warrant for Law Offices*, 153 F.R.D. 55 (S.D.N.Y. 1994); *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997).

[27] *See, e.g.*, *United States v. Grant*, 2004 WL 1171258 at *3 (S.D.N.Y. May 25, 2004) (approving use of filter team and noting that "exceptional set of circumstances," not applicable in *Grant*, led to rejection of use of such a team in *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002); *see also* July 7 Motion at 21 n.12 (discussing special circumstances in *Stewart*).

Also, in *In re Grand Jury Subpoenas*, ___ F.3d ___, 2006 WL 1915386 (6th Cir. Jul. 13, 2006), the court decided against use of government taint team in review of documents subject to grand jury subpoena, where a third party claimed privilege over the documents in the hands of the subpoenaed party. In doing so, it marginalized interests in grand jury secrecy in light of fact that in routine circumstances the party claiming privilege would have received the grand jury subpoena and, thus, known what the grand jury was seeking. The court also relied heavily on the availability of alternate review procedures that would ensure timely review and assessment of the limited number of potentially privileged materials. *See id.* at *11-*12.

completed.  172 F.R.D. at 514 n.4.  The court observed, "A special master review procedure

utilized in *United States v. Abbell* . . . takes too long and costs too much.  It would effectively

deprive the Government of any access to the seized information."[28]  *Id.* at 516.

      Here, the facts and circumstances augur decidedly in favor of the Filter Team review

procedure requested in respondents' July 7 Motion.  First, the situation involved here is unique.

The review at issue is a key aspect of an investigation in response to specific security issues

raised at a military detention facility during a time of war, where the security issues bear the

hallmarks of coordinated planning by detainees against their captors.  The context is one in

which government interests are entitled to wide-ranging deference, *see supra* at 6-8, and the

purpose of the investigation, of which the review is part, is to fully uncover the complete

circumstances of the suicides, including the extent to which coordination among and assistance

from other detainees or others existed, as well as any other plans for additional detainee suicides

or other violence.  The strong public policy interests in potentially saving lives and in

maintaining security and order within a wartime detention facility warrants the prompt and

efficient separation of unprivileged materials from attorney-client communications that can be

accomplished through the requested Filter Team procedures.

      Second, the volume of materials to be reviewed in this matter is massive, some 1,100

pounds worth.  Furthermore, documents in those materials will be in a variety of languages,

---

    [28] One factor that apparently motivated the *Abbell* court to establish the procedure it did
was that "vast portions of the materials seized relate[d] . . . to clients of the law firm [subjected to
the search] who have no relationship to the matter under investigation or to the scope of any
probable cause which may have been demonstrated."  *See United States v. Skeddle*, 989 F. Supp.
890, 896 (N.D. Ohio 1997).  Similar factors motivated rejection of taint team review in *United
States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002), *see* July 7 Motion at 21 n.12, but are not
involved here where authorities are investigating matters related to the security of Guantanamo.

reflecting the various nationalities of the Guantanamo detainees; thus, significant translator resources will be required in the review to make determinations as to the nature of foreign language documents, so they can be sorted between attorney-client communications and unprivileged materials appropriately. In such circumstances, review by a Filter Team with government translator resources appears to be the only option for prompt review of the materials. Any more cumbersome or time-consuming procedure very well could engender protracted delays such as those experienced in *Abbell*, and such delays would be wholly unacceptable in this context.

Third, as discussed above, issues of fairness and integrity of the Filter Team are addressed through the Court-ordered constraints regarding the qualifications of team members and their duties of nondisclosure.

Fourth, concerns over "false negative conclusions" as to applicability of privilege are misplaced in view of the fact that the Filter Team will be parsing attorney-client communications from other materials and will not be disclosing attorney-client communications it determines to be unprivileged on its own, without counsel's consent or Court authorization. (In a related vein, to the extent counsel would seek a process in which any disclosure of any document by the Filter Team, even if not an attorney-client communication, must be preapproved, such a process would not be appropriate. Given the volume of documents, the scores of cases and attorneys involved, and the presumed need for complete translation of documents to facilitate an approval process, the sheer logistics of preapproval would effectively frustrate the entire review process and "deprive the Government of any access to the seized information." *Black*, 172 F.R.D. at 516.)[29]

--------

[29] The same would be true with respect to some petitioners' proposals that each detainee's documents, whether attorney-client communications or not, be provided to counsel for review

In sum, in contrast to the circumstances involved in many of the cases critical of the use of filter teams, the unique circumstances involved in this matter, and the contemplated Court-ordered safeguards in use of the Filter Team provided for in respondents' proposal – safeguards imposed in order to protect attorney-client privilege – all call for Court authorization of Filter Team review.[30]

## CONCLUSION

For the foregoing reasons and those stated in respondents' July 7 Motion, the July 7 Motion should be granted, and the requests of petitioners' counsel for various forms of relief associated with impoundment of detainee materials should be denied.

Dated: July 28, 2006                    Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

_____

and production of a privilege log.  *See* Sliti Opp. at 15; Chaman Opp. at 38.

[30] The unique circumstances involved in this matter also warrant rejection of the requests of various petitioners' counsel that pending resolution of the July 7 Motion, the impounded materials be transported from Guantanamo to the registry of the Court in Washington, D.C.  *See, e.g.*, Al-Odah Opp. at 16; Al-Salami (No. 05-CV-2452-PLF) Opp., Prop. Order.  Aside from the fact that the volume of materials is significant, presenting issues regarding transportation of the materials the more than 1,300 miles from Guantanamo to D.C. and regarding appropriate storage of the materials, there is simply no need for transfer of the materials to the Court.  Counsel's demands are grounded in an inappropriate distrust of the declaration submitted in support of respondents' July 7 Motion, which flatly states that all review of the materials has been suspended.  *See* Kisthardt Decl. ¶ 5.  And as has been explained in conferences with Magistrate Judge Kay, and is discussed *supra*, the materials are currently kept in in sealed boxes in a locked and alarmed storage facility consistent with NCIS practices for maintenance of evidence obtained in criminal investigations, *i.e.*, under the control of the NCIS to the exclusion of others, including Guantanamo authorities.  No further review of the contents of the bags of materials is occurring pending the Court's consideration of respondents' July 7 Motion.  Furthermore, transfer of the materials to the registry of the Court is inappropriate given that many, if not most, of the materials are likely not attorney-client communications and, thus, are not properly the subject of deposit into the Court's registry.  For these reasons, the Court should reject the requests for deposit of the impounded detainee materials with the Court.

DOUGLAS N. LETTER
Terrorism Litigation Counsel

     /s/ *Terry M. Henry*
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
MARC A. PEREZ
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel: (202) 514-4107
Fax: (202) 616-8470

Attorneys for Respondents