IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY DETAINEE LITIGATION | Misc. No. 08-442 (TFH) |
| JAMAL KIYEMBA, AS NEXT FRIEND OF ABDUSABUR DOE, et al.,<br><br>　　Petitioners,<br><br>　　v.<br><br>GEORGE W. BUSH, et al.,<br><br>　　Respondents. | Civil Action No. 05-1509 (RMU) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
HUZAIFA PARHAT'S MOTION FOR IMMEDIATE RELEASE ON PAROLE
INTO THE CONTINENTAL UNITED STATES PENDING FINAL JUDGMENT
ON HIS *HABEAS* PETITION**

Huzaifa Parhat, a civilian unlawfully imprisoned at Guantánamo Bay, has moved for judgment on his *habeas corpus* petition ordering release into the continental United States. Parhat also has moved for immediate release on parole into the continental United States pending entry of final judgment ("Parole Motion"). He submits this memorandum of points and authorities in support of his Parole Motion.

**PROCEDURAL HISTORY**

The factual and procedural history of Parhat's case are set out in his motion for judgment and memorandum of points and authorities in support thereof. On June 20, 2008, the Court of Appeals for the D.C. Circuit held that the government's record did not justify Parhat's detention as an enemy combatant. *Parhat v. Gates*, No. 06-1397, 2008 WL 2576977, *1 (D.C. Cir. June 20, 2008). The Court ordered the government to release or transfer Parhat, or to expeditiously hold a new Combatant Status Review Tribunal ("CSRT") consistent with its opinion. *Id.* at *14.

The Court of Appeals noted that this Court, as a *habeas* court, has the power to order release, and that Parhat could seek that remedy immediately, *regardless of whether the government sought another CSRT. Id.* at *18.

Parhat has moved for final judgment ordering his release into the continental United States. He expects that the government will vigorously resist that motion. Because Parhat continues to be held in Guantánamo under no legal authority whatsoever, he has also moved for interim relief: namely, parole into the continental United States pending a ruling on the merits of his motion for judgment.

## ARGUMENT

A.   **This Court Has The Power To Order Parhat's Release On Parole.**

This Court has inherent power as a *habeas* court to order "parole—that is, release on conditions—pending its final decision on the merits of Parhat's motion for judgment. *Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969). In *Baker*, the D.C. Circuit stated that "[w]hen an action pending in a United States court seek release from what is claimed to be illegal detention, the court's jurisdiction to order release as a final disposition of the action includes an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits." 420 F.3d at 1343. The power is an incident to—a lesser-included subset of—*habeas* jurisdiction itself, not simply an analog to a bail statute. *See Johnston v. Marsh*, 227 F. 2d 528 (3d Cir. 1955) (court has power to order bail in *habeas* even in absence of bail statute).

This power is fully available to the Court in cases involving aliens. *See Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Truong Thanh Tam v. INS*, 14 F. Supp. 2d 1184, 1190-92 (E.D. Cal. 1998) (ordering release of an unremovable alien pending resolution of the merits of a *habeas* petition challenging indefinite detention where the detainee had a high probability of success on the merits and could not be deported to home country). In *Mapp*, for example, the Second Circuit held that there was *inherent* power to admit an alien to bail—power derivative not from any bail statute but from the power to grant final relief in a *habeas* case. 241 F.3d at 226. That power may be used where it may implicate a requirement that the government move

the prisoner. *United States v. Mauro*, 436 U.S. 340, 357 (1978) (power to issue writs of *habeas corpus* includes authority to issue such a writ when it is necessary to bring a prisoner into court to testify or for trial or to remove a prisoner in order to prosecute him in the jurisdiction where the offense was committed); *Chick Yow v. United States*, 208 U.S. 8, 13 (1908) (ordering writ of *habeas corpus* for a petitioner denied entry in a case in which citizenship was disputed; prisoner ordered brought before judge for trial); *Whitfield v. Hanges*, 222 F. 745, 756 (8th Cir. 1915) (concluding that "the [*habeas*] court has ample power to admit the alien to bail or to take his own recognizance").

Parole does not constitute an admission into the United States for immigration purposes, *see Kaplan v. Tod*, 267 U.S. 228, 230 (1925), and Parhat does not, by this motion, seek an order changing his immigration status. Rather, interim release on conditions accords with recent Supreme Court guidance in an analogous circumstance—where deportable aliens have no legal right to admission into the United States, but are stranded because no foreign government has agreed to accept them. In *Clark v. Martinez*, 543 U.S. 371 (2005), the Supreme Court approved release into the population of aliens who were physically present but had never been admitted (for immigration purposes) to the United States. The case involved Cubans who arrived in the United States as part of the Mariel boatlift. Under the law then effective, such refugees were not lawful aliens, and they were not "admitted," but rather were "paroled" (in the immigration sense of the word) into the United States.[1] (Refugees could later adjust their status to that of lawful permanent resident unless they fell within statutory exclusions.) The *Martinez* petitioners committed (and served sentences for) serious crimes in the United States, and were therefore excluded from admission. The men were ordered deported, but because Cuba would not accept them, they were detained pursuant to statute. They brought *habeas corpus* petitions. The Supreme Court ordered that they must be released, even though, as the government argues is true

---

[1] The Attorney General has discretion to "parole" into the territory of the United States an alien who has never been admitted. 8 C.F.R. § 212.5(a) (2004).

of Parhat, they had no legal entitlement to presence in the continental United States. 543 U.S. at 386; *see also Zadvydas v. Davis*, 533 U.S. 678, 699-700 (2001) (adjudicated criminal aliens entitled to release).

Under *Martinez* and *Zadvydas*, detained deportable aliens "must presumptively be released into American society after six months." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 347-48 (2005) (recognizing the rule). This rule has been followed in numerous cases. *See, e.g., Morales-Fernandez v. INS*, 418 F.3d 1116 (10th Cir. 2005) (ordering release of inadmissible Cuban alien held beyond six-month presumptive detention period); *Baez v. Bureau of Immigration & Customs Enforcement*, 150 Fed. Appx. 311, 2005 WL 2436835 (5th Cir. 2005) (same); *Perez-Aquillar v. Ashcroft*, 130 Fed. Appx. 432, , 2005 WL 1074339 (11th Cir. 2005) (ordering parole and release into the United States of inadmissible Cuban national who had repeatedly violated U.S. laws).

**B.     Parhat Is Highly Likely To Prevail On The Merits.**

> **1.     Parhat has prevailed, and there is no showing the government can overcome its previous loss, in the Court of Appeals.**

The Court of Appeals has concluded that Parhat is not an enemy combatant, and that is the *status quo* today. Further, as the Circuit explained, "*Boumediene* [*v. Bush*, 553 U.S.__, 128 S. Ct. 2229 (2008)] made it quite clear" that Parhat is entitled to seek *habeas corpus* relief "immediately, without waiting to learn whether the government will convene another CSRT," and that, in such *habeas* proceeding, "he will be able to make use of the determinations we have made today regarding the decision of his CSRT, and he will be able to raise issues that we did not reach." 2008 WL 2576977 at *15 (citing *Boumediene* slip op. at 49, 66). "Most important," the Court emphasized, "in that proceeding there is no question but that the court will have the power to order him released." *Id.* (citing *Boumediene* slip op. at 50, 58). A central tenet of the Supreme Court's decision in *Boumediene* is that the delay in considering the Guantánamo detainees' *habeas* petitions challenging their detention has already been far too long, and that "[t]he detainees in these cases are entitled to a prompt *habeas corpus* hearing." 128 S. Ct. at 2275.

That *status quo* is unlikely to change. In *Parhat v. Gates*, the government had complete control of the record. That record included none of the myriad exculpatory materials that Parhat had gathered from public sources. Parhat was not able to make his own case or respond to the government's case, the government's record enjoyed a statutory presumption of accuracy, and still the record was so empty that the government could not prevail. 2008 WL 2576977 at *14-*15.[2] The government has not shown that it can overcome the non-combatant determination. It cannot, for the simple reason that Huzaifa Parhat has never himself been, nor affiliated himself with this Nation's enemies.

### 2. Parhat is entitled to the remedy of immediate release.

Like the detainees in *Martinez*, Parhat is detained for the practical reason that no safe country has been found to take him. As discussed in Parhat's memorandum of points and authorities in support of his motion for judgment, the government has conceded that it cannot return him to China, and it is evident that all efforts to persuade allies to accept him as a refugee have failed. Accordingly, Parhat falls within the rule of *Martinez*, and must be released here.

Under the *Martinez* rule, courts must order release of an inadmissible alien even where substantial issues are raised concerning the alien's mental stability, risk to the community, or the protection of national security. *See, e.g., Tran v. Mukasey*, 515 F.3d 478, 486 (5th Cir. 2008) ("While this Court is sympathetic to the Government's concern for public safety, we are without power to authorize [petitioner's] continued detention."); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1083-84 (9th Cir. 2006) (granting Sri Lankan national's motion for immediate release from his five-year detention where agency's conclusions that continued detention was in the public interest or that his release posed risk to national security were based on implausible evidence and ignored evidence of detention's deleterious effect on petitioner's health); *Hernandez-Carrera v. Carlson*, 546 F. Supp. 2d 1185, 1190-91 (D. Kan. 2008) (ordering release of Cuban aliens

---

[2] The opinion was sealed and on June 30, 2008, a redacted version of the opinion was publicly released.

detained beyond the six-month presumptive detention period, even though it was alleged that they had a harm-threatening mental illness and were likely to engage in violent behavior if released, such that public safety could not reasonably be guaranteed; explaining that "[i]f further detention of aliens with mental illness or threat of violence is required to protect public safety, rather than the supervised release which is currently authorized, Congress has not yet acted to provide such additional protection").

*A fortiori*, Parhat is entitled to release, because none of those concerns applies here. As demonstrated in Parhat's memorandum of points and authorities in support of his motion for judgment, he has never even been charged with wrongdoing, and has never engaged in nor contemplated hostilities against the United States or its allies. He has been cleared for release for years. He was not deemed by the military in 2003 or 2004 to constitute any threat to U.S. interests, and was transported involuntarily to Guantánamo by bounty hunters and the United States military. His temporary release would constitute no threat.

Parhat's situation recalls that of Italian prisoners of war during World War II. On September 29, 1943, the Badoglio government executed the instrument of Italian surrender with allied forces. *See* Instrument of Surrender of Italy, Sept. 29, 1943, 61 Stat. 2742, 3 Bevans 775. But in September 1943, the Italian peninsula remained in chaos and repatriation of Italians to Italy was impractical. Thus Italian prisoners of war were granted substantial liberty. More than 45,000 Italian prisoners of war joined "Italian Service Units," located throughout the continental United States. *See* Camilla Calamandrei, *Italian POWs Held in America During WW II: Historical Narrative and Scholarly Analysis* (2000), *available at* www.italianpow.com/history.html. These former enemy combatants were given increased freedom of movement among the civilian population: they held jobs and earned money. *Id.* In San Francisco, California, and Ogden, Utah, for example, Italian-American families could take Italian Service Unit members out of POW camps for picnics and outings. *Id.* Fraternization was common: after the war, a significant number of American women traveled to Italy to marry former Italian prisoners of war. *Id.*

After the Italian armistice, prisoners of war formerly held at Camp McKay in South Boston were transported to a housing facility on Peddocks Island in Boston Harbor, which was "not a stockade," according to the commander. *See generally* July 21, 2008 Declaration of Sabin Willett ("July 21, 2008 Willett Decl.") Ex. 1 (*Moved From So. Boston to Harbor Island; Two Sides of the Row*, Boston Globe, July 30, 1944). The Italians were permitted to work for pay. They received liberty to go among the civilian population of the city. *Id.* The War Department stated that "these service units of Italian prisoners of war are being used in *all major ports of embarkation the country*." *Id.* (emphasis supplied). A brigadier general sent a commendatory telegram to local Italian-Americans in the Boston area who had provided social support for the Italian POWs. The army sent out for ice cream and cookies. *Id.* The Boston Globe reported that young women at Carson's Beach [were] "passing notes through the fence." *Id.*; *see also* July 21, 2008 Willett Decl. Ex. 2 (*Former Italian Prisoners Enjoy Boston Hospitality*, Boston Globe June 5, 1944) (documenting how Italian POWs attended Mass in Boston's North End, picnics, and concerts along the Esplanade).

3. **An immediate, practical remedy is available.**

An immediate vehicle for release is available. A community of Uighur Americans is resident in the District of Columbia and its environs, and is deeply sympathetic to Mr. Parhat's plight. *See generally* Declarations of Alim Seytoff and Rebiya Kadeer, submitted herewith. This expatriate community has deep loyalty to the United States. Its leader, Ms. Kadeer, has met with and been honored by President Bush for her tireless efforts in behalf of human rights. The community has broad experience helping Uighur refugees, some of them victims of long Chinese imprisonment, negotiate the linguistic and practical challenges of resettlement in the United States. Ms. Kadeer herself, current president of the Uyghur American Association and the World Uyghur Congress, arrived in this country in 2005 after a long and harsh imprisonment in the People's Republic of China. Kadeer Decl. ¶¶ 5, 8.

In addition, U.S. law itself provides a means of maintenance for persons, like Parhat, in the situation of petitioners like those in *Martinez*; for example, through regulations providing for

the issuance of temporary work authorizations for aliens released under an order of supervision. *See* 8 C.F.R. § 241.13(h)(3); 8 C.F.R. § 241.5(c); 8 C.F.R. § 274a.12(c)(18).

The Court can order such conditions of release as are reasonable. For example, the Court may wish to order regular reporting to the U.S. Marshals' Service, the Department of Homeland Security, or to other governmental officials, while Parhat's *habeas* case is pending. The Court may wish also to enter appropriate restrictions on travel. The Uighur American community can provide valuable assistance in assuring that Parhat can understand and comply with whatever conditions of release may be imposed by the Court. All such arrangements can be addressed at Parhat's parole hearing.

The situation of Italian prisoners of war during World War II is particularly instructive. On September 29, 1943, the Badoglio government executed the instrument of Italian surrender with allied forces. *See* Instrument of Surrender of Italy, Sept. 29, 1943, 61 Stat. 2742, 3 Bevans 775. Northern Italy remained under control of the German army, and the Germans had purported to place Benito Mussolini at the head of newly declared fascist "republic." Accordingly, in September 1943, the Italian peninsula remained in chaos and repatriation of Italians to Italy was impractical. The war against Germany would rage on for twenty months.

Nevertheless, Italian prisoners of war were granted substantial liberty. More than 45,000 Italian prisoners of war joined "Italian Service Units," located throughout the continental United States. *See* Camilla Calamandrei, *Italian POWs Held in America During WW II: Historical Narrative and Scholarly Analysis* (2000), *available at* www.italianpow.com/history.html. These former enemy combatants were given increased freedom of movement among the civilian population: they held jobs and earned money. *Id.* In San Francisco, California, and Ogden, Utah, for example, Italian-American families could take Italian Service Unit members out of POW camps for picnics and outings. *Id.* Fraternization was common: after the war, a significant number of American women traveled to Italy to marry former Italian prisoners of war. *Id.*

After the Italian armistice, prisoners of war formerly held at Camp McKay in South Boston were transported to a housing facility on Peddocks Island in Boston Harbor, which was

"not a stockade," according to the commander. *See generally* July 21, 2008 Declaration of Sabin Willett ("July 21, 2008 Willett Decl.") Ex. 1 (*Moved From So. Boston to Harbor Island; Two Sides of the Row*, Boston Globe, July 30, 1944). The Italians were permitted to work for pay. They received liberty to go among the civilian population of the city. *Id.* They would ride a ferry from Peddocks Island, where they were housed, to work at the Boston Port of Embarkation, where they were paid for work. *Id.* This was not unique to Boston: the War Department stated that "these service units of Italian prisoners of war are being used in *all major ports of embarkation the country*." *Id.* (emphasis supplied).

The commander reported that "they will be given some liberty on their days off in the way of passes out of the camp." July 21, 2008 Willett Decl. Ex. 1. A brigadier general sent a commendatory telegram to local Italian-Americans in the Boston area who had provided social support for the Italian POWs. Even before the transfer to Peddocks, security was lax. The army sent out for ice cream and cookies. *Id.* The Boston Globe reported that young women at Carson's Beach [were] "passing notes through the fence." *Id.*

On June 4, 1944, a group of Italian POWs was taken to St. Leonard's Church in Boston's North End,[3] and thence to the Hatch Shell (an outdoor concert facility along the Esplanade most famous for its Fourth-of-July concerts). *See generally* July 21, 2008 Willett Decl. Ex. 2 (*Former Italian Prisoners Enjoy Boston Hospitality*, Boston Globe June 5, 1944). The Boston Globe reported:

> Following the church services, the men were conveyed by troop carriers down Prince St. in the North End. Crowds cheered them as they passed through Boston's closest facsimile to their beloved homeland. At the Hatch Memorial Shell on the Charles River Esplanade, they halted and sang a native song entitled, "A Bouquet of Flowers."

*Id.* The men posed for pictures; they played bocci; they "feast[ed] on native dishes." *Id.*

---

[3] Then as now, the North End of Boston was home to large numbers of Italian-Americans. It appears that the spirit of welcome among Uighur expatriates in the District of Columbia and its environs would be no less heartfelt.

## CONCLUSION

For the foregoing reasons, Huzaifa Parhat respectfully requests that his Parole Motion be granted.

Respectfully submitted,

DATED: July 23, 2008

Susan Baker Manning
susan.manning@bingham.com
Catherine R. Murphy
catherine.murphy@bingham.com
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006
Telephone:   (202) 373-6000
Facsimile:    (202) 373-6001

Sabin Willett
sabin.willett@bingham.com
Neil McGaraghan
neil.mcgaraghan@bingham.com
Rheba Rutkowski
rheba.rutkowski@bingham.com
Jason S. Pinney
jason.pinney@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
Telephone:   (617) 951-8000
Facsimile:    (617) 951-8736

*Counsel for Huzaifa Parhat*