UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| USAMA HASSAN ABU KABIR, *et al* <br><br> Petitioners <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 05-CV-1704 (JR) <br> ) <br> ) <br> ) <br> ) <br> ) |

### DECLARATION OF BRUCE E. VARGO

I, Bruce E. Vargo, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am a Colonel in the United States Army with over 23 years of active duty service. I currently serve as the Commander of the Joint Detention Group (JDG) for the Joint Task Force – Guantanamo Bay Naval Base ("JTF-GTMO"). I am responsible for all aspects of detention operations for Camp Delta. I have served in this position since 30 June 2007. The information provided in this declaration is based on my personal knowledge or information obtained in the course of my official duties.

2. It is my responsibility, among others, to see that the detention mission at Guantanamo is performed in a humane manner that protects the safety and security of the detainees and the military personnel at JTF-GTMO. I am familiar with all of the areas of detention within JTF-GTMO, including the conditions and operational policies and procedures for each detention area.

3. Every detainee at JTF-GTMO is housed in an area that provides adequate shelter and ventilation. Every detainee at JTF-GTMO has full time access to potable drinking water, a toilet, and a sleeping area. Detainees receive three nutritionally sound meals prepared in compliance with their religious, cultural, and where applicable, medical dietary requirements. Detainees in

2

each detention area within JTF-GTMO receive regular opportunities for recreation and regular opportunities to maintain adequate personal hygiene. There are no solitary confinement detention areas at JTF-GTMO. In all detention areas, detainees have regular contact with other detainees, guards, medical corpsmen who are present on the blocks and are available to conduct med pass four times daily and sick call once a week, and other personnel involved in the delivery of other services to detainees. As explained below, detainees are able to communicate with other detainees either face-to-face or by spoken word from their cells throughout the day.

4. There are multiple facilities of varying levels of security at JTF-GTMO in which detainees can be housed. Detainees are housed in accordance with their compliance with camp rules. Detainees who are highly compliant are typically housed in Camp 4. Detainees who are not classified as highly compliant are typically housed in the other facilities.

5. Camp 4 is a medium security, communal living detention facility, in which detainees reside in open bays, with approximately five detainees per bay. They are able to recreate in groups for up to 20 hours per day, including three hours per day in the large recreation area. Detainees are able to play games such as soccer, basketball and volleyball in the large recreation area. Detainees in Camp 4 receive items such as athletic footwear, additional uniforms, and access to movies and recorded television programs, in addition to the basic and comfort items issued in all other camps. As in the other Camps, detainees in Camp 4 are constantly monitored by guard staff and regularly visited by medical personnel, the International Committee of the Red Cross (ICRC), and are moved in and out of their cell blocks for various reasons, including daily recreation, medical appointments, intelligence interviews, and legal visits.

3

6. Camp 4 also constitutes JTF-GTMO's most dangerous environment because of the detainees' ability to plan and act as a group. In 2005, a detainee plot was uncovered to commandeer a food service truck and use the vehicle to injure or kill guard staff. On 18 May 2006, guard staff members, upon entering a housing block, were attacked by the detainees inside. A guard was beaten with a baton and other instruments were used to assault and threaten other guards. Eventually, less than lethal weapons were employed by the guard staff in order to regain control of the housing block and rescue the guard staff. Immediately after the guard staff was rescued, detainees in several other cell blocks began rioting and physically damaging their housing blocks. By the time the incident was finally over, several hundred thousand dollars worth of damage had been inflicted, requiring repairs that, to date, are not fully completed. Because of this potential for group violence, detainees placed in Camp 4 are constantly assessed for their compliance levels, propensity for indiscipline, and population suitability.

7. Unlike Camp 4, other camps in the JDG area of responsibility, specifically Camps 5 and 6, are comparable to, and modeled after single cell detention maximum security facilities in the United States. No detainees are held in isolation. Detainees are permitted to speak to one another from their cells and participate in uninterrupted group prayer (led by a block detainee imam of their choosing) five times per day. All detainees housed in these camps have multiple opportunities for daily interaction with other detainees and camp personnel. The cells have solid walls, but detainees can talk with other detainees in adjoining cells and with detainees housed near them, as well as with guards, medical staff, library and mail delivery personnel. Even when fully secured with feed tray slots closed, cells in Camps 5 and 6 allow for easy communication between adjacent cells, and other cells within a group or tier of cells (referred to as "blocks" in

4

Camp 5 and "pods" in Camp 6). With a raised voice, an individual detainee located in a cell on one end of a block or pod can readily and effectively communicate with a detainee on the opposite end of the block or pod. This free communication is not discouraged. In fact, for the duration of the five separate thirty-minute prayer calls during each day, feed tray slots are opened to facilitate just such communication between detainees in order to coordinate prayer call. Additionally, detainees in these camps receive a minimum of two hours of outdoor recreation per day in single detainee recreation areas. Detainees who are not in a disciplinary status are permitted to recreate with another detainee in the same recreation yard and with other detainees who are in adjacent recreation areas. All recreation areas are formed with standard chain link fencing which facilitates easy communication between them. Detainees are also allowed two books and one magazine to be in their possession at any given time. Detainees in these camps are also permitted to send and receive regular mail, ICRC mail, and legal (privileged) mail (if they are represented by counsel). Detainees in these camps are viewed every three minutes by guard staff, regularly visited by medical personnel, routinely visited by the ICRC, and transferred in and out of their cells for various reasons, including daily recreation, medical appointments, intelligence interviews, and legal visits. All camps are lit by a combination of natural and artificial light.

8. Both the camp in which a detainee is housed and the privileges which are afforded the detainee are determined largely by the detainee and his activities while in detention. As with any detention or correctional institution, custody and control measures at JTF-GTMO are in place to maintain good order and discipline and protect the welfare of JTF-GTMO personnel and detainees alike. Before a detainee is moved into Camp 4, he is formally vetted through a process

5

that carefully considers his past behavior in detention and his potential ability to assimilate into the current population of Camp 4 (e.g., whether the detainee's disposition is compatible with the current population of the camp). Only after the detainee is successfully vetted is a move into Camp 4 ordered. Once in Camp 4, a detainee is subject to immediate removal for acts of indiscipline and can be removed for a failure to assimilate into the current population. All detainees in Camp 4 are advised of this policy upon entry into Camp 4.

9. On 2 July 2008, some detainees were moved from Camp 6 to Camp 4, using the vetting process described above. As with all detainees placed in Camp 4, these detainees will continue to be assessed for their compliance levels, propensity for indiscipline, and population suitability. As noted above, once in Camp 4, the JDG exercises a near zero tolerance policy for infractions and detainees who fail to comply with camp rules are removed to other camps. A detainee housed in Camp 4, therefore, controls, through his behavior, whether he remains in the camp or is moved to one of the more restrictive camps.

10. Although other Uighers were moved to Camp 4 on 2 July 2008, the petitioners in this case, Bahtiyar Mahnut (ISN 277) and Arkin Mahmud (ISN 103), were not moved into Camp 4 at that time. Instead, these two detainees remain housed in Camp 6 due to their history of misconduct.

    a. Since March 2003, ISN 103 has committed 92 disciplinary infractions, consisting of 32 failures to comply with the guard force, 9 citations for possession of contraband, 6 citations for damage to government property, 1 offense requiring a forced cell extraction, 1 attempted assault on the guard force, 13 assaults on the guard force, 6 citations for participating in mass disturbances, 17 threats to the guard force, 6 citations for provoking words and gestures, and 1 citation for exposure of his sexual organs. In 2008 alone, ISN 103 has committed 15 infractions

6

consisting of 4 failures to comply with the guard force in April, 2 in March, and 1 in February; 1 citation for possession of contraband in May and one in February; 2 assaults on guard staff in May; 1 attempted assault in April, 1 threat to the guard force in May; and 2 instances of provoking words in April.

    b.  Since March 2003, ISN 277 has committed 44 disciplinary infractions, consisting of 17 failures to comply, 7 citations for possession of contraband, 1 attempted assault on the guard force, 8 assaults on the guard force, 4 citations for provoking words and gestures, 2 citations for damage to government property, 2 offenses requiring forced cell extraction, 2 citations for participating in a mass disturbance, and 1 threat to the guard force.  In 2008 alone, ISN 277 has committed 6 infractions consisting of 2 failures to comply with the guard force in March, 1 citation for possession of contraband in May, 2 assaults on guard staff in March, and 1 attempted assault in February.

11. Consistent with JTF-GTMO practice, the behavior of ISN 103 and ISN 277 will continue to be assessed and their eligibility for placement in Camp 4 will be reevaluated on a regular basis.

12. It is noteworthy that in March 2007, several members of the detained Uighur population were transferred from Camp 6 to Camp 1, where they were eligible to receive a greater range of privileges. The transferred detainees were then notified that their behavior and compliance with camp rules could possibly lead to a further transfer to Camp 4.  From March until June of 2007, several Uighur detainees in Camp 1, including ISNs 103 and 277, committed a myriad of infractions that subsequently led to their transfer to Camp 6.  For example, in March 2007, detainee ISN 103 was cited for improper use of bodily fluids during a mass disturbance and detainee ISN 277 was cited for participating in the same mass disturbance.

7

13. All Uighur detainees in Camp 6 reside on the same pod. Since March 2008, the Uighur detainees in Camp 6 have enjoyed extended and more flexible recreation times, as have other detainees in Camp 6. They, and other qualified detainees, are also permitted to engage in dual recreation, which allows for two detainees in a single recreation yard, vice the less compliant detainee standard of only one detainee per recreation yard. These qualified detainees are also allowed extended shower and dining times

14. I have been informed that counsel for ISNs 103 and 277 have filed a motion demanding these two detainees be transferred to Camp 4. As noted above, placement in Camp 4 is based on an assessment of detainee compliance with camp regulations and Camp 4 population suitability. These criteria prevent transfer to Camp 4 of detainees who are instigators, habitual offenders of camp regulations, violent detainees, suicide risks, detainees with psychological issues, and those who are, or are suspected to be, disruptive to their fellow detainees. As described above, a review of ISN 103's record indicates 92 disciplinary infractions, with 15 in 2008 alone, including assault and threats of assault to the guard force in May. A review of ISN 277's record indicates 44 disciplinary infractions, with 6 infractions in 2008 alone, including possession of contraband in May, two assaults on guard staff in March, and an attempted assault in February. Based upon a totality of their conduct and proximity to camp disturbances, the behavior of ISNs 103 and 277 is inconsistent with a transfer to Camp 4.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 10, 2008.